UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DIOMED, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANGIODYNAMICS, INC., | ) | CIVIL ACTION NO.: 04-10019-RGS |
| | ) | |
| Defendant. | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| ANGIODYNAMICS, INC., | ) | |
| | ) | |
| Counterclaim-Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| DIOMED, INC. AND ENDOLASER, LLC, | ) | |
| | ) | |
| Counterclaim-Defendants. | ) | OCTOBER 1, 2004 |

## MOTION FOR CONSTRUCTION OF CLAIMS 1, 9-11, 16-19, AND 21 OF U.S. PATENT NO. 6,398,777

Defendant AngioDynamics hereby moves the Court to construe Claims 1, 9-11, 16-19, and 21 of U.S. Patent No. 6,398,777 ("the '777 patent") in accordance with the memorandum of law filed herewith, as summarized by the Claim Chart attached as Exhibit 2 thereto.

The claims of the '777 patent, and in particular Claim 9, recite claims to a method for treating varicose veins with laser energy. The specification, prosecution history, and every embodiment of the invention define the method to require touching the tip of a fiber optic line against the interior wall of a vein and state repeatedly that the only way of assuring this contact and thus the performance of the invention, is by first draining the blood, then compressing the

walls of the vein against the rounded tip of the fiber optic line to "insure direct contact," then firing the laser through this point of contact, while maintaining the contact through continued compression. These statements expressly disavow any claim scope that does not include the stated limitations. The '777 patentees expressly reiterated and relied on all of these requirements and their necessary interdependence in the prosecution history in order to distinguish the '777 patent over a very crowded field of prior art that taught treating varicose veins with fiber optic lasers fired inside the vein.

Accordingly, for the reasons more fully set forth in the accompanying memorandum of law, defendants move this court to construe the identified claims as including each of these necessary limitations, and others more specifically set out in the accompanying memorandum, and to adopt defendants proposed claim interpretation summarized as the Claim Chart appended as Exhibit 2 to the memorandum.

Dated:  October 1, 2004

DEFENDANT
ANGIODYNAMICS, INC.
BY ITS ATTORNEYS


By _____
MARK D. GIARRATANA
ALEXANDRA B. STEVENS
SETH M. WILSON
McCarter & English, LLP
CityPlace I
185 Asylum Street
Hartford, CT  06103
(860) 275-6700
(860) 724-3397 (fax)
astevens@mccarter.com
        -and-
RODNEY S. DOWELL (BBO # 620916)
Berman & Dowell
210 Commercial Street
Boston, MA  02109
(617) 723-9911
(617) 723-6688 (fax)
rdowell@bermandowell.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of AngioDynamics, Inc.'s Motion for Construction of Claims 1, 9, 22, 16-19 and 21 of U.S. Patent No. 6,398,777 was served upon the attorney of record for the Plaintiff and Counterclaim-Defendants by regular mail on October 1, 2004.

Michael A. Albert, Esq.
Michael N. Rader, Esq.
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210-2206


_____
Seth M. Wilson

HARTFORD: 624168.01

97353-00062

# Exhibit 1.



US006398777B1

(12) **United States Patent**
Navarro et al.

(10) Patent No.: **US 6,398,777 B1**
(45) Date of Patent: **Jun. 4, 2002**

(54) **ENDOVASCULAR LASER DEVICE AND TREATMENT OF VARICOSE VEINS**

(76) Inventors: **Luis Navarro**, 164 E. 71st St., New York, NY (US) 10021; **Nestor Navarro**, Manuel Girona 74, Barcelona (ES), 08034; **Carlos Bone Salat**; **Joaquina Fructuoso Gomez**, both of Santa Lavinea, No. 7, Costa d'en Blanc Calvia, Mallorca (ES), 07018; **Robert J. Min**, 2000 Broadway #8C, New York, NY (US) 10023

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/374,280**

(22) Filed: **Aug. 13, 1999**

(51) Int. Cl.[7] ............................................ **A61B 18/18**

(52) U.S. Cl. .................................. 606/7; 606/13; 606/14; 606/15; 607/89; 128/898

(58) Field of Search .............................. 606/13–15, 7, 606/8; 607/788, 89, 92–94; 128/898

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,564,011 A | * | 1/1986 | Goldman ................... 128/303.1 |
| 4,587,972 A | | 5/1986 | Morantte, Jr. |
| 4,852,567 A | | 8/1989 | Sinofsky |
| 5,053,033 A | | 10/1991 | Clarke |

| | | | |
|---|---|---|---|
| 5,161,526 A | | 11/1992 | Hellwig et al. |
| 5,304,171 A | * | 4/1994 | Gregory et al. ............ 606/15 |
| 5,334,207 A | * | 8/1994 | Gay, Jr. ....................... 606/7 |
| 5,531,739 A | * | 7/1996 | Trelles ..................... 606/2.5 |
| 5,707,403 A | | 1/1998 | Grove et al. |
| 5,814,039 A | | 9/1998 | Prescott ....................... 606/7 |
| 5,840,008 A | | 11/1998 | Klein et al. ................. 600/3 |
| 5,855,563 A | | 1/1999 | Kaplan et al. ............. 604/49 |
| 5,984,915 A | * | 11/1999 | Leob et al. ................... 606/9 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| ES | P9701586 | 7/1997 |

* cited by examiner

*Primary Examiner*—Linda C. M. Dvorak
*Assistant Examiner*—Ahmed Farah
(74) *Attorney, Agent, or Firm*—Steinberg & Raskin, P.C.

(57) **ABSTRACT**

A method is disclosed for treating blood vessels using endovascular techniques to deliver laser energy. Percutaneous access into the vein lumen will be obtained using an angiocatheter through which a fiber optic line will be introduced. The vein will be emptied of blood using elevation of the limb, patient positioning, compression, or other means. Laser energy will be delivered into the vein lumen using wavelengths from about 532 nanometers to about 1064 nanometers. Sufficient power and duration will be used to damage the entire thickness of the vein wall, ultimately causing fibrosis of the treated blood vessel. Fibrosis of the treated blood vessel causes the blood vessel to decrease in diameter or collapse.

21 Claims, 9 Drawing Sheets





*FIG. 1*



*FIG. 2*



FIG. 3A



FIG. 3B



FIG. 4A



FIG. 4B



FIG. 5



FIG. 6



FIG. 7A

FIG. 7B

FIG. 7C



**FIG. 8**



**FIG. 9**



**FIG. 10**



FIG. 11

FIG. 12

FIG. 13

FIG. 14



*FIG. 15*



*FIG. 16*



*FIG. 17*



*FIG. 18*



*FIG. 19*



*FIG. 20*

US 6,398,777 B1

1

# ENDOVASCULAR LASER DEVICE AND TREATMENT OF VARICOSE VEINS

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a method for treating varicose veins. More particularly, the present invention relates to a method of utilizing laser energy delivered into the vessel lumen via endovascular techniques to treat varicose veins.

### 2. Description of the Prior Art

The use of lasers in the treatment of vascular disease has been gaining rapid interest. Lesions such as port wine stains, facial telangiectasias, and some lower extremity veins have been treated externally by lasers with some success. Most of these laser procedures irradiate the surface of the skin with laser energy that penetrates the skin, is absorbed by the blood, and coagulates and collapses the blood vessel.

Larger varicose veins are located deeper in the soft tissues. Such veins have not been successfully treated with laser techniques. It is believed that treating such larger veins with laser energy delivered from the surface would require higher powers that could lead to increased side effects including scarring and skin hyper- or hypopigmentation.

Current accepted treatments of varicose veins include sclerotherapy, ambulatory phlebectomy, and ligation and stripping of the greater saphenous vein in cases of saphenofemoral junction incompetence. Although there has been wide variation in reported results of sclerotherapy treatment of the greater saphenous vein when saphenofemoral junction reflux is present, most studies report recurrence rates of 30% to 70% after 5 years. The existing standard for the treatment of saphenofemoral junction reflux is limited ligation and stripping of the greater saphenous vein.

The obvious drawbacks of traditional surgical therapy include the increased risks and costs associated with more extensive anesthesia because general anesthesia is normally used during varicose vein surgery, instead of local anesthesia. In addition, there are possible complications of the surgery that include bleeding, infection, hypertrophic scars, ankle paresthesia, and a prolonged recovery period. Ambulatory phlebectomy for treatment of saphenopopliteal junction reflux or isolated perforator incompetence is less invasive than ligation and stripping and can be done with local anesthesia. However, complications incident to the surgical procedure may still occur.

The search for less invasive techniques to treat varicose veins with acceptable short and long term results has led to the development of additional treatment modalities. These modalities include ultrasound guided sclerotherapy (echo sclerotherapy), monopolar electrocautery, and a bipolar radio frequency based energy source delivered by a disposable catheter (VNUS).

Although, perhaps more invasive than surface laser irradiation, there are potential advantages to delivering laser energy from below the skin. Such advantages include a decrease in thermal damage to intervening tissue and minimization of the possible side effects to the skin itself.

In Spanish Patent No. 9701586 to Salat et al., electricity is used to treat varicose veins. The Salat et al. patent describes an endoluminal electrocoagulator for varicose vein operations. The microsurgical instrument contemplated by that invention is essentially based on the use of an electrocoagulating microhead joined to a conductor wire with adequate flexibility to be inserted percutaneously. The

2

use of electricity inevitably leads to coagulation of blood within the blood vessel rather than causing fibrosis of the blood vessel itself. However, it has now been found that fibrosis of the blood vessel is preferred because veins of a much larger diameter may therefore be treated safely and effectively.

In U.S. Pat. No. 4,564,011 to Goldman, laser energy is delivered from below the skin. The Goldman patent provides using laser energy delivered via a hollow needle insertable within a blood vessel to create a blood clot. The Goldman patent also provides using laser energy immediately adjacent to a damaged blood vessel for creating white scar tissue which tends to push against the vessel, thereby causing the vessel to shrink in size and at least partially disappear from view. This requires that each single point of damage be treated separately.

In U.S. Pat. No. 5,531,739 to Trelles, laser energy is delivered again from below the skin. The Trelles patent discloses a method in which laser energy is delivered via a fiber optic probe to a location underneath a blood vessel to be treated. The vessel is irradiated with a treatment beam having a fluence sufficient to coagulate and collapse the vessel at that location. Yet, again, this procedure must be repeated at multiple sites along the length of the blood vessel so that it will collapse along its length and no longer carry any blood.

In U.S. Pat. No. 5,053,033 to Clarke, laser energy is delivered endoluminally. The Clarke patent describes using laser energy in the range about 240 nanometers to about 280 nanometers delivered via an optical fiber or other waveguide incorporated, for example, into a percutaneous catheter. In operation, the ultraviolet laser energy kills smooth muscle cells at an angioplasty site, thereby reducing the risk of restenosis, while minimizing damage to surrounding tissue. However, this technique is used to keep a blood vessel open and, therefore, has little use in the treatment of varicose veins.

In U.S. Pat. No. 5,161,526 to Hellwing et al., laser energy in the wavelength range of 500 nanometers to 1100 nanometers is used. The Hellwing et al. patent describes using laser energy to aid in the treatment of hemophilia by biostimulating muscles and joints. However, this method delivers the laser energy from the surface of the skin. Thus, blood vessels in the treatment area remain unaffected.

In U.S. Pat. No. 5,707,403 to Grove et al., laser energy is used to affect blood vessels. In the Grove et al. patent, laser energy is delivered at the surface of the skin in the wavelength range 700 nanometers to 1100 nanometers. Blood vessels within the first 2 millimeters of the dermis can be treated with this method, otherwise the high fluence or energy can cause explosion of surface vessels and burning of the skin. Furthermore, the delivery of laser energy at the surface of the skin inevitably causes coagulation of blood within the blood vessel rather than causing fibrosis of the blood vessel itself.

Endovascular delivery of laser energy would decrease the amount of power necessary to treat the vein and virtually eliminate the potential for adverse side effects to the overlying skin and intervening tissues. In addition, fibrosis of the blood vessel is preferred because veins of a much larger diameter may therefore be treated safely and effectively.

Accordingly, a need exists for an endovascular laser treatment of varicose veins using laser energy in order to produce direct endothelial and vein wall damage with subsequent fibrosis.

## SUMMARY OF THE INVENTION

It is an object of the present invention to improve the method of the treatment of varicose veins.

US 6,398,777 B1

3

It is another object of the present invention to provide such a method that decreases varicose vein recurrence rates.

It is still another object of the present invention to provide such a method that causes direct endothelial and vein wall damage with subsequent fibrosis.

It is a further object of the present invention to provide such a method that introduces a fiber optic line into the vein lumen to deliver intraluminal laser energy with direct contact of the tip of the fiber optic line with the vein wall.

It is yet another object of the present invention to provide such a method that avoids blood clot formation and maximizes vein wall damage.

These and any other objects of the present invention are achieved by a method for treating varicose veins using a tipped laser energy carrier to deliver laser energy into the blood vessel lumen to produce direct endothelial and vein wall damage with subsequent fibrosis. By delivering laser energy intraluminally, the entire thickness of the vein wall is damaged. This results in fibrosis of the vein and a decrease in the diameter of the varicosity. Preferably, the vein wall will be damaged to the extent that the subsequent fibrosis causes the vein to collapse.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a lateral sectional view of a leg with varicose veins involving a greater saphenous vein;

FIG. 2 shows application of a compression bandage to the leg of FIG. 1;

FIG. 3A shows percutaneous placement of an angiocatheter into the greater saphenous vein of the leg of FIG. 1;

FIG. 3B shows an enlarged, detailed view of a portion of FIG. 3A;

FIG. 4A shows endovascular placement of a tipped laser energy carrier into the greater saphenous vein of the leg of FIG. 1;

FIG. 4B shows an enlarged, detailed view of a portion of FIG. 4A;

FIG. 5 shows a position of the tip of the laser energy carrier under ultrasound guidance in the leg of FIG. 1;

FIG. 6 shows removing of venous blood from the leg of FIG. 1 with elevation and manual compression at the saphenofemoral junction;

FIG. 7A shows manual finger compression over the tip of the fiber optic line during delivery of laser energy to the saphenofemoral junction of the greater saphenous vein of FIG. 1.

FIGS. 7B and 7C show manual finger compression over the tip of the fiber optic line while simultaneously delivering laser energy and withdrawing the fiber optic line from the greater saphenous vein of FIG. 1.

FIG. 8 shows an application of a compression bandage or stocking with foam pads along the course of the treated vein of the leg of FIG. 1;

FIG. 9 shows a prone sectional view of a leg with varicose veins involving a lesser saphenous vein;

FIG. 10 shows an application of a compression bandage to the leg of FIG. 9;

FIG. 11 shows percutaneous placement of an angiocatheter into the lesser saphenous vein of the leg of FIG. 9;

FIG. 12 shows positioning of the tip of a laser energy carrier under ultrasound guidance to the leg of FIG. 9;

FIG. 13 shows a manual finger compression of the lesser saphenous vein at the tip of the laser energy carrier during delivery of laser energy to the leg of FIG. 9;

4

FIG. 14 shows an application of a compression bandage or stocking with foam pads along the course of the treated vein in the leg of FIG. 9;

FIG. 15 shows a supine sectional view of a leg with varicose veins with isolated perforator incompetence;

FIG. 16 shows application of a compression bandage to the leg of FIG. 15.

FIG. 17 shows percutaneous placement of an angiocatheter into the varicose vein of the leg of FIG. 15;

FIG. 18 shows positioning of the tip of a laser energy carrier under ultrasound guidance to the leg of FIG. 15;

FIG. 19 shows a manual finger compression of the varicose vein of the leg of FIG. 15 at the tip of the laser energy carrier during delivery of laser energy; and

FIG. 20 shows an application of a compression bandage or stocking with foam pads along the course of the treated vein of the leg of FIG. 15.

DETAILED DESCRIPTION OF THE INVENTION

Referring to the drawings and, in particular, FIG. 1, there is shown a leg generally represented by reference numeral 10. Leg 10 has a varicose, greater saphenous vein 30. A varicosity in greater saphenous vein is typically due to incompetence of the saphenofemoral valve with reflux at a saphenofemoral junction 32. Additional perforators 34 connect greater saphenous vein 30 to the deep venous system of leg 10.

The following is representative of methods of the present invention.

The treatment area is anesthetized following preprocedure evaluation and informed consent. As shown in FIG. 2, a compression bandage 36 is applied starting from the distal end of the foot up to the planned entry site of an angiocatheter 38, shown in FIG. 3A. Compression bandage 36 facilitates emptying of the superficial venous system of leg 10.

As shown in FIGS. 3A and 3B, angiocatheter 38, or a device of similar function, is placed percutaneously into greater saphenous vein 30. To aid in the placement of angiocatheter 38, ultrasound imaging, or a similar functioning device, may be used.

As an alternative to the use of angiocatheter 38, an incision may be made above greater saphenous vein 30 at the planned entry site of a fiber optic line 40 so that the planned entry site may be visualized. Then, fiber optic line 40 can be inserted without the use of angiocatheter 38. However, use of angiocatheter 38 is preferred.

Referring to FIGS. 4A and 4B, in a preferred embodiment, fiber optic line 40 is introduced into the vein lumen via angiocatheter 38. Fiber optic line 40 has a tip 41 that is uncoated so as to allow emittance of laser energy. The remainder of fiber optic line 40 can be coated with various substances known to the art. The coated portion of fiber optic line 40 will not emit laser energy. In addition, the coating provides fiber optic line 40 with a combination of flexibility and rigidity to minimizing the risk of breakage during manipulation. The tip of fiber optic line 40 is preferably rounded in shape, although other shapes are contemplated. A rounded tip 41 is preferred because it enables the operator to more easily control the amount of vein to be treated and decreases the risk of perforation of the vein during positioning of tip 41. Tip 41 preferably has an outer diameter about 200 microns to about 600 microns in diameter.

As illustrated in FIG. 5, tip 41 of fiber optic line 40 is positioned a few centimeters distal to the saphenofemoral

US 6,398,777 B1

5

junction 32. Positioning of tip 41 is preferably accomplished by emitting laser energy in the visible spectrum through tip 41. This visible spectrum energy can be seen through the skin and may be emitted concurrently with laser energy in other wavelengths. Alternatively, a traditional ultrasound imager, shown generally as 42, may be used.

Then, the patient is placed in trendelenberg position or, as is shown in FIG. 6, leg 10 is elevated. In this position, saphenofemoral junction 32 is compressed, preferably by a hand 44 or ultrasound imager 42, to empty greater saphenous vein 30. An optional first compression bandage (not shown) may be applied to the upper portion of leg 10 to aid in keeping greater saphenous vein 30 empty of blood. After being emptied of blood, greater saphenous vein 30 is also compressed, preferably by hand 44 or by ultrasound imager 42, so that tip 41 of fiber optic line 40 makes direct contact with the vein wall. Then, laser energy about 500 nanometers to about 1100 nanometers in wavelength is delivered in bursts through fiber optic line 40 into the vein wall. Preferably, the laser energy is in the range from about 532 nanometers to about 1064 nanometers and the duration of each burst is about 0.2 seconds to about 10 seconds. Each burst delivers from about 5 to about 20 watts of energy into the vein wall. While laser energy is delivered in bursts through fiber optic line 40, the fiber optic line is incrementally withdrawn from greater saphenous vein 30. However, the compression of greater saphenous vein 30 around tip 41 is maintained as fiber optic line 40 is withdrawn. This method insures damage to the entire thickness of the vein wall of greater saphenous vein 30, ultimately resulting in fibrosis of the vein wall. Fibrosis of the vein wall leads to a decrease in the diameter of the vein. The amount of fibrosis in the vein wall is determined by the amount of laser energy delivered thereto. Preferably, the method will damage the vein wall to an extent that the subsequent fibrosis causes the vein to collapse. Alternatively, fibrosis of the vein wall will decrease the diameter of the vein such that normal uni-directional blood flow in greater saphenous vein 30 is restored.

FIGS. 7A, 7B, and 7C illustrate three selected points of laser energy delivery with manual compression. Preferably, laser energy is first delivered to saphenofemoral junction 32 as shown in FIG. 7A. Beginning the treatment method as saphenofemoral junction 32 ensures that the entire length of greater saphenous vein 30 is treated with laser energy. Then, as shown in FIGS. 7B and 7C, compression is maintained over the tip of fiber optic line 40 as it simultaneously delivers laser energy to and is withdrawn from greater saphenous vein 30. The power and burst duration can be modified according to initial clinical observations and obtained results at the discretion of the provider. The range of power is set forth above.

As shown is FIG. 8, after fiber optic line 40 and angio-catheter 38 are removed, one or more foam pads, identified as 46, are used to cover the puncture site and the course of the treated vein. A second compression bandage or stocking 48 may be applied over foam pads 46.

FIG. 9 shows a varicose, lesser saphenous vein 50. Such a varicosity is a typical consequence of the incompetence of saphenopopliteal valve 52 with reflux at the saphenopo-pliteal junction 52a. The procedure for treating lesser saphe-nous vein 50 is similar to the procedure used to treat greater saphenous vein 30. Thus, as stated above with reference to treatment of greater saphenous vein 30 and as now illus-trated in FIG. 10, compression bandage 36 is applied to leg 10. Then, percutaneous access into lesser saphenous vein 50 is obtained with angiocatheter 38, or a similar functioning

6

device, as shown in FIG. 11. Also as stated above with reference to treatment of greater saphenous vein 30 and as now illustrated in FIG. 12, fiber optic line 40 is placed into lesser saphenous vein 50 through angiocatheter 38. The fiber optic line 40 is positioned a few centimeters distal to saphenopopliteal junction 52. Again, visible spectrum energy emitted from tip 41, or ultrasound emitted from ultrasound imager 42, is preferably used to facilitate such precise placement. As illustrated in FIG. 13, leg 10 is then elevated and lesser saphenous vein 50 is drained of blood and compressed. The drainage of blood is important to insure direct contact of the vessel walls with tip 41 during delivery of laser energy. Again, the preferred laser energy is about 500 nanometers to about 1100 nanometers in wavelength, preferably about 532 nanometers to about 1064 nanometers, in bursts for about 0.2 seconds to about 10 seconds per burst for a total of about 5 watts to about 20 watts per burst. The above described procedure is followed, with compression of lesser saphenous vein 50 maintained around tip 41, while fiber optic line 40 is incrementally withdrawn.

FIG. 14 shows that foam pads 46 are applied at the puncture site and along the treated vein after fiber optic line 40 is completely withdrawn. A second compression bandage or stocking 48 may then be applied over foam pads 46.

Another example of a vein, identified generally as 54, having a varicosity that can be treated with the described endovascular laser method is illustrated in FIG. 15. The varicosity in vein 54 is due to an isolated perforator incompetence, which creates a point of refluM 56 even though the saphenofemoral junction 32 remains intact. The procedure for treating vein 54 is similar to the procedure for treating both greater and lesser saphenous veins 30 and 50. As now illustrated in FIG. 16, first compression bandage 36 is applied to leg 10, then percutaneous access into vein 54 is obtained with angiocatheter 38, or a device of similar function, as shown in FIG. 17. Referring to FIG. 18, fiber optic line 40 is then placed into vein 54 through angiocath-eter 38 and positioned a few centimeters distal to point of reflux 56 by using visible spectrum energy emitted from tip 41 or by using another instrument, such as ultrasound imager 42. As shown in FIG. 19, leg 10 is elevated. Then, vein 54 is emptied of blood and compressed to insure direct contact of the vessel walls with tip 41 during delivery of laser energy. Again, laser energy is delivered at about 500 nano-meters to about 1100 nanometers in wavelength, preferably about 532 nanometers to about 1064 nanometers, for bursts about 0.2 seconds to about 10 seconds per burst, for a total of about 5 watts to about 20 watts per burst. The above described procedure continues to be followed as the process of compression of vein 54 around tip 41 is repeated while fiber optic line 40 is withdrawn.

Again, FIG. 20 shows that foam pads 46 are applied at the puncture site and along the treated vein, and then a second compression bandage or stocking 48 may be applied over foam pads 46.

Varicose veins in other locations can be treated with similar endovascular laser techniques.

Although the description above contains specificities, these should not be construed as limiting the scope of the present invention, but as merely providing illustrations of some of the presently preferred embodiments of the present invention.

The present invention having thus been described with particular reference to the preferred forms thereof, it will be obvious that various changes and modifications may be

US 6,398,777 B1

7

made therein without departing from the spirit and scope of the present invention as defined in the appended claims.

What we claim is:

1. A blood vessel treatment device comprising:

means adapted for insertion into a blood vessel; and

means adapted for intraluminal contact with a wall of said blood vessel, for emitting laser energy to cause a decrease in the diameter of said blood vessel.

2. The blood vessel treatment device of claim 1, wherein said laser energy causes said blood vessel to collapse.

3. The blood vessel treatment device of claim 1, wherein said emitting means is about 200 microns to about 600 microns in diameter.

4. The blood vessel treatment device of claim 1, wherein said emitting means is a fiber optic line.

5. The blood vessel treatment device of claim 1, wherein said emitting means has a laser emitting section located at a tip of said emitting means.

6. The blood vessel treatment device of claim 5, wherein said tip of said emitting means is rounded.

7. The blood vessel treatment device of claim 1, wherein said laser energy is applied in the range about 500 nanometers to about 1100 nanometers.

8. The blood vessel treatment device of claim 1, wherein said laser energy is delivered in bursts.

9. A method of treating a blood vessel using laser energy, comprising the steps of:

inserting means for emitting laser energy into the blood vessel at a puncture site, wherein said emitting means has a laser emitting section;

placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment site; and

emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of said blood vessel.

10. The method of claim 9, further comprising emptying the blood vessel prior to emitting said laser energy.

11. The method of claim 9, wherein said emitting means is inserted into the blood vessel through the use of an angiocatheter.

8

12. The method of claim 9, wherein said emitting means is about 200 microns to about 600 microns in diameter.

13. The method of claim 9, wherein said emitting means is a fiber optic line.

14. The method of claim 9, wherein said laser emitting section of said emitting means is located at a tip of said emitting means.

15. The method of claim 14, wherein said tip of said emitting means is rounded.

16. The method of claim 14, wherein said tip of said emitting means is located at the treatment site through the use of a guidance means.

17. The method of claim 9, further comprising applying compression externally to the blood vessel prior to applying said laser energy, thereby ensuring contact of said tip of said emitting means with the blood vessel.

18. The method of claim 9, wherein said laser energy is applied in the range of about 500 nanometers to about 1100 nanometers.

19. The method of claim 9, wherein said laser energy is delivered in bursts.

20. The method of claim 9, further comprising:

removing said emitting means after applying said laser energy;

placing foam pads over said puncture site;

placing foam pads over the blood vessel; and

applying a compression means over said foam pads.

21. A method of treating a blood vessel using laser energy, comprising the steps of:

inserting means for emitting laser energy into the blood vessel at a puncture site, wherein said emitting means has a laser emitting section;

placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment site;

emptying the blood vessel; and

emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of said blood vessel.

*    *    *    *    *

# Exhibit 2.

| Claim 1 | Construction |
|---|---|
| A blood vessel treatment device comprising: | A device for treatment of an artery, capillary or vein comprising: |
| (a) means adapted for insertion into a blood vessel; and | A structure which performs the function of introducing the device into the space within an artery, capillary or vein.<br><br>Because the specification fails to identify a structure on the device which performs the claimed insertion function, the claim is indefinite and invalid under 35 U.S.C. § 112. |
| (b) means adapted for intraluminal contact with a wall of said blood vessel, for emitting laser energy to cause a decrease in the diameter of said blood vessel. | A single structure which performs the functions of both 1) achieving physical contact between itself and the interior surface of the artery, capillary or vein, and 2) emitting amplified monochromatic light or other electromagnetic radiation into the interior surface of the artery, capillary or vein.<br><br>Because the specification fails to clearly identify one structure that performs both of the claimed functions, the claim is indefinite and invalid under 35 U.S.C. § 112. |

1

| Claim 9 | Construction |
|---|---|
| A method of treating a blood vessel using laser energy, comprising the steps of | A method of treating an artery, capillary or vein using amplified monochromatic light or other electromagnetic radiation comprising the steps of |
| (a) inserting means for emitting laser energy into the blood vessel at a puncture site, wherein said emitting means has a laser emitting section; | introducing through a small hole into the space within the artery, capillary or vein a fiber optic line having an uncoated rounded tip or equivalent structure for emitting through the uncoated tip of the fiber optic line the amplified monochromatic light or other electromagnetic radiation; |
| (b) placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment site; and | deliberately and systematically putting the uncoated tip of the fiber optic line in physical contact with the interior surface of the artery, capillary or vein at a treatment site; this requires drainage of blood and compression of the vein; |
| (c) emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of the blood vessel. | emitting the amplified monochromatic light or other electromagnetic radiation into the interior surface of the artery, capillary or vein through the uncoated tip of the fiber optic line while maintaining the tip-interior surface physical contact to decrease the diameter of the artery, capillary or vein. |

| Claim 10 | Construction |
|---|---|
| The method of claim 9, further comprising | The method of claim 9, further comprising |
| (a) emptying the blood vessel prior to emitting said laser energy. | making the interior space of the artery, capillary or vein empty before emitting the amplified monochromatic light or other electromagnetic radiation into the interior surface of the artery, capillary or vein. |

2

| Claim 11 | Construction |
|---|---|
| The method of claim 9, | The method of claim 9, |
| (a) wherein said emitting means is inserted into the blood vessel through the use of an angiocatheter. | wherein the fiber optic line or equivalent structure is introduced into the space within the artery, capillary or vein through a tubular instrument used for introducing objects into the interior space of an artery, capillary or vein. |

| Claim 12 | Construction |
|---|---|
| The method of claim 9, | The method of claim 9, |
| (a) wherein said emitting means is about 200 microns to about 600 microns in diameter. | wherein the fiber optic line or equivalent structure is about 200 microns to about 600 microns in diameter. |

| Claim 13 | Construction |
|---|---|
| The method of claim 9, | The method of claim 9, |
| (a) wherein said emitting means is a fiber optic line. | wherein the structure for emitting the amplified monochromatic light or other electromagnetic radiation is the fiber optic line as described above (and not any equivalent structure). |

| Claim 14 | Construction |
|---|---|
| The method of claim 9, | The method of claim 9, |
| (a) wherein said laser emitting section of said emitting means is located at a tip of said emitting means. | wherein the uncoated portion of the fiber optic line or equivalent structure is located at an extremity of the fiber optic line. |

| Claim 16 | Construction |
|---|---|
| The method of claim 14, | The method of claim 14, |
| (a) wherein said tip of said emitting means is located at the treatment site through the use of a guidance means. | wherein the uncoated extremity of the fiber optic line or equivalent structure is directed to the treatment site through use of ultrasound imagery or visual observation of visible spectrum light emitted within the artery, capillary or vein. |

| Claim 17 | Construction |
|---|---|
| The method of claim 9, further comprising | The method of claim 9, further comprising |
| (a) applying compression externally to the blood vessel prior to applying said laser energy, thereby ensuring contact of said tip of said emitting means with the blood vessel. | applying pressure to the external surface of the artery, capillary or vein, before emitting the amplified monochromatic light or other electromagnetic radiation through the uncoated tip of the fiber optic line, to assure physical contact between the interior surface of the artery, capillary or vein and the uncoated tip of the fiber optic line or equivalent structure. |

| Claim 18 | Construction |
|---|---|
| The method of claim 9, | The method of claim 9, |
| (a) wherein said laser energy is applied in the range of about 500 nanometers to about 1100 nanometers. | wherein the amplified monochromatic light or other electromagnetic radiation enters the interior surface of the artery, capillary or vein in the range of about 500 nanometers to about 1100 nanometers. |

5

| Claim 19 | Construction |
|---|---|
| The method of claim 9, | The method of claim 9, |
| (a) wherein said laser energy is delivered in bursts. | wherein the amplified monochromatic light or other electromagnetic radiation is emitted in timed intervals. |

| Claim 21 | Construction |
|---|---|
| A method of treating a blood vessel using laser energy, comprising the steps of: | A method of treating an artery, capillary or vein using amplified monochromatic light or other electromagnetic radiation comprising the steps of: |
| (a) inserting means for emitting laser energy into the blood vessel at a puncture site, wherein said emitting means has a laser emitting section; | introducing through a small hole into the space within the artery, capillary or vein a fiber optic line having an uncoated rounded tip or equivalent structure for emitting through the uncoated tip of the fiber optic line the amplified monochromatic light or other electromagnetic radiation; |
| (b) placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment site; | deliberately and systematically putting the uncoated tip of the fiber optic line in physical contact with the interior surface of the artery, capillary or vein at a treatment site; this requires drainage of blood and compression of the vein; |
| (c) emptying the blood vessel; and | making the interior space of the artery, capillary or vein empty; |
| (d) emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of the blood vessel. | emitting the amplified monochromatic light or other electromagnetic radiation into the interior surface of the artery, capillary or vein through the uncoated tip of the fiber optic line while maintaining the tip-interior surface physical contact to decrease the diameter of the artery, capillary or vein. |

6

# Exhibit 3.

# United States Patent [19]

## Biegeleisen

[11] Patent Number: **5,022,399**

[45] Date of Patent: **Jun. 11, 1991**

[54] **VENOSCOPE**

[76] Inventor: **Ken P. Biegeleisen,** 91 Hudson Ave., Irvington, N.Y. 10533

[21] Appl. No.: **350,061**

[22] Filed: **May 10, 1989**

[51] Int. Cl.⁵ ................................................ A61B 8/06
[52] U.S. Cl. ........................... 128/662.06; 128/660.03
[58] Field of Search ...................... 128/660.03, 662.06, 128/24 A, 4; 604/262, 264, 266

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,142,412 | 3/1979 | McLeod et al. | 73/194 A |
| 4,231,373 | 11/1980 | Waxman et al. | 128/660 |
| 4,237,729 | 12/1980 | McLeod et al. | 73/861.25 |
| 4,331,132 | 5/1982 | Mukasa | 128/6 |
| 4,341,120 | 7/1982 | Anderson | 73/618 |
| 4,354,502 | 10/1982 | Colley et al. | 128/663 |
| 4,407,293 | 10/1983 | Suarez, Jr. et al. | 128/660 |
| 4,413,630 | 11/1983 | Anderson et al. | 128/661 |
| 4,424,813 | 1/1984 | Havlice et al. | 128/660 |
| 4,512,762 | 4/1985 | Spears | 604/21 |
| 4,517,985 | 5/1985 | Teslawski et al. | 128/660 |
| 4,524,623 | 6/1985 | Terwilliger | 73/633 |
| 4,538,613 | 9/1985 | Rosenberg | 128/395 |
| 4,576,177 | 3/1986 | Webster, Jr. | 128/660.03 |
| 4,582,067 | 4/1986 | Silverstein et al. | 128/663 |
| 4,587,972 | 5/1986 | Morantle, Jr. | 128/660.03 |
| 4,589,419 | 5/1986 | Laughlin et al. | 128/660.03 |
| 4,615,330 | 10/1986 | Nogasaki et al. | 128/662.06 X |
| 4,641,668 | 2/1987 | Namekawa | 128/663 |
| 4,641,912 | 2/1987 | Goldenberg | 350/96.10 |
| 4,665,925 | 5/1987 | Millar | 128/663 |
| 4,681,103 | 7/1987 | Boner et al. | 128/303 B |
| 4,718,422 | 1/1988 | Rosenberg | 128/632 |
| 4,732,156 | 3/1988 | Makamura | 128/660 |
| 4,733,669 | 3/1988 | Segal | 128/663 |
| 4,763,662 | 8/1988 | Yokoi | 128/660 |
| 4,770,185 | 9/1988 | Silverstein et al. | 128/661.08 |
| 4,771,788 | 9/1988 | Millar | 128/661.09 |
| 4,773,899 | 9/1988 | Spears | 604/20 |
| 4,779,624 | 10/1988 | Yokoi | 128/660.03 X |
| 4,781,681 | 11/1988 | Sharrow et al. | 604/96 |
| 4,784,133 | 11/1988 | Mackin | 128/303.1 |
| 4,794,931 | 1/1989 | Yock | 128/660.03 |
| 4,824,225 | 4/1989 | Nishioka | 350/432 |
| 4,841,977 | 6/1989 | Griffith et al. | 128/660.03 |
| 4,846,155 | 7/1989 | Kimura | 128/6 |
| 4,856,529 | 8/1989 | Segal | 128/662.04 X |
| 4,887,605 | 12/1989 | Angelsen et al. | 128/660.03 |

### OTHER PUBLICATIONS

C. R. Appleby, "New Ultrasound Method Offers a Look Inside Blood Vessels," *Healthweek*, Dec. 27, 1988.
J. Ballenot, "Intravascular Sonic Catheter Imaging Shows Big Potential," *Cardio News*, Jan. 1989, pp. 15–21.
Endosonics, "The Cathscanner I ™ System".
Surgiter®, Operator's Manual for Surgiflex ™ Ureteroscopes Models SU–7 and SU9 (1988).
M. Young, "Pleasanton Firm's Unique Ultrasound Catheter Nears Market," *The Alameda Times-Star*, Mar. 28, 1989.

*Primary Examiner*—Francis Jaworski
*Attorney, Agent, or Firm*—Pennie & Edwards

[57] **ABSTRACT**

A method and apparatus for the non-surgical treatment of venous disorders and varicose veins wherein a flexible catheter is inserted into a varicose vein of a patient to be treated, guiding the catheter to the initial branch of the vein while viewing and monitoring blood flow therein to assure proper position and directing a treatment through the catheter to treat the varicose vein. The catheter of the invention includes first and second passages for directing a fluid and treatment to the distal end of the catheter, first and second fiber bundles to illuminate and view the vein, at least one piezoelectric crystal located on the distal end of the catheter for monitoring areas adjacent thereto and a guide wire for guiding the distal end of the catheter through the veins of the patient.

**40 Claims, 4 Drawing Sheets**





FIG. 1

FIG. 2A

FIG. 2B

FIG. 2C



FIG. 3C



FIG. 3B



FIG. 3A

## FIG. 4A



110

112

## FIG. 4B



114

## FIG. 5



118

120

122

116



FIG. 6

5,022,399

1

# VENOSCOPE

## TECHNICAL FIELD

The invention relates to a modified angioscope having special features which render it ideally suited for the non-surgical treatment of venous disorders and varicose veins in particular. Thus, the inventive device is called a "venous angioscope" or simply, a "venoscope."

## BACKGROUND ART

Venous disorders, especially varicose veins, are extremely common, afflicting tens of millions of Americans. The treatment of varicose veins has always been controversial, because no perfect treatment exists.

There is substantial data indicating that the differences between the veins of varicose people and "normal" (i.e., non-varicose) people are not limited to the diseased veins, but bear as well on the apparently normal ones. In other words, whatever forces are responsible for the conversion of a normal vein to a varicose vein are present and acting upon the apparently normal veins adjacent to the varicose veins on the same leg. It is now universally accepted that no existing treatment will prevent veins which are normal now from becoming varicose in the future.

Above and beyond the fact that the varicose predisposition cannot be permanently cured, the recognizably abnormal varicose veins currently present, toward which all therapeutic modalities are directed, are not easily removed: In certain respects, removal of a varicose vein is like removal of a malignant tumor. Any part of the venous network which is contributing to the varicosity, and which is left behind by the surgeon, can and will give rise to a total treatment failure.

The key word here is "network"—the venous system is a continuous network of connected vessels, and in many instances the distinctions drawn between different veins in anatomy texts are arbitrary. For example, the main deep vein of the leg is called the "popliteal" vein below the knee, and the "femoral" vein above the knee. But there's no discontinuity between these veins—they are the same long tube, half of which having one name, and the other half having another name. Similarly, many veins change names at junctions with other similar sized vessels. But there is no reason why a disease afflicting a named vein will stop at a point where the name of the vein changes.

In FIG. 1, vein 100 is shown as branching into veins 102 and 104. If vein 100 was a varicose vein, and surgical removal of vein 100 were deemed to be the treatment of choice, then the treatment would work if and only if veins 102 and 104 were normal.

Unfortunately, the real situation is that vein 100 might be a visible, palpable vein on the surface of the leg, and veins 102 and 104 might be buried deep in the calf or thigh muscles, or somewhere in the pelvis. If either of veins 102 or 104 is a contributing factor to the varicose condition of vein 100, then failure to remove 102 and 104 along with 100 at the time of surgery will lead to rapid recurrence of varicosity. Suppose, for example, that vein 102 is abnormal. FIG. 2 illustrates how failure to remove vein 102 will lead to recurrent varicosity.

Note that there are numerous small, seemingly insignificant and unnamed veins in the network of vessels connecting and surrounding 100, 102, and 104. (FIG. 2A) After vein 100 is removed, the pressure formerly

2

exerted on it by vein 102 now bears on the small unnamed vessels of the network. (FIG. 2B) In as short a time as 3–6 months, one or more formerly small vessels in the network will have undergone varicose degeneration, and the patient will return to the surgeon looking as if the operation had never been done. (FIG. 2C)

FIG. 3 illustrates a slightly different way in which incomplete surgery can lead to recurrence. The best-known and most frequently treated of all veins subject to varicosity is the greater saphenous vein 106. The segment of the venous system bearing this name begins at the medial (inside) ankle, just in front of the medial malleolus (inside ankle bone), and extends along the inside of the leg all the way to the groin, where it joins the femoral vein 108, at a point called the saphenofemoral junction. There are a few small vessels, referred to as tributaries, entering the saphenous vein 106 just below this junction. The actual number of such tributaries is variable, generally numbering between 3 and 8. (FIG. 3A) If the surgeon cuts the saphenous vein 106 below these tributaries, (FIG. 3B) one or more of them will dilate and the patient returns in 1–12 months with a new varicose vein that looks just like the old one that was removed. (FIG. 3C).

Since 1851, varicose veins have been treated by injection therapy. This treatment is now called "sclerotherapy". The medicines injected are called "sclerosing solutions", or simply "sclerosants". All the early attempts had unacceptably high failure rates, largely because of the lack of attention to the sort of anatomical features outlined above. In the case of the greater saphenous vein, for example, a varicose vein might protrude through the skin at two or three places as shown in FIG. 4A. The vein, however, actually runs all the way up from the ankle to the groin as shown in FIG. 4B.

The old-time injectionist or sclerotherapist would inject a sclerosing treatment solution at each of the blue bumps 110 and 112 (FIG. 4A), totally ignoring the top of the vein where all those tributaries 114 are: (FIG. 4B) For reasons illustrated in FIGS. 2 and 3, this treatment usually failed within a year or two. The sclerotherapist's answer to this problem, in the early days, was to insist on annual check-ups, at which time the recurrent varicosities would be re-treated. There would be no end to the annual checkups.

The surgical approach to varicosity is the stripping operation, invented by Charles Mayo at the clinic bearing his name at around 1900. The original stripping operation proved, on long term followup, to have roughly a 50% failure rate. It was 30–40 years before surgeons figured out what was wrong. The main problem was the tributaries. Mayo did not realize the importance of cutting the saphenous vein 116 precisely at its junction with the femoral vein 118, at a point above the highest of the tributaries. FIG. 5 illustrates the proper 120 (operation is successful) and improper 122 (operation fails) locations for this cut.

The major achievement of the post-Mayo vein stripping researchers was the realization of the importance of the absolutely flush saphenofemoral ligation and division, with simultaneous ligation of all the tributaries.

In spite of this increased meticulousness of varicose vein surgery, the existing procedures still fail to bring about even short-term remission from varicosity in 10–20% of cases. Efforts to improve on these figures with a variety of more aggressive and mutilating operations, developed and tested between 1940 and 1960,

5,022,399

3

were uniformly unsuccessful, and today, nearly a century after the invention of the Mayo stripping, it remains in only slightly modified form the treatment of choice for severe saphenous varicosity.

The reasons for the high failure rate with surgery (the failure rate with injection sclerotherapy being even higher) are complex and multifactorial. The known reasons are listed now:

1. The deep veins may be diseased. In the presence of severe deep venous disease, rapid recurrence of surface varicosity cannot be prevented.

2. Varicosity may be associated with multiple small arteriovenous malformations. Surgical interruption of hundreds of tiny arteriovenous communications is generally not feasible.

3. The saphenous vein may be double, triple, or even quadruple. When a duplicate saphenous vein is present, it is usually quite small, and is likely to be missed during surgery. But after the primary saphenous is removed, the duplicate will rapidly enlarge.

4. In spite of the best efforts of the surgeon, a tributary of the saphenous vein might be missed.

5. A varicose vein which appears, at first glance, to start at the groin, may actually start in the pelvis. As explained above, failure to treat the pelvic component inevitably leads to recurrence.

6. A varicose vein which appears to be a result of disease of the short saphenous vein, a vein which extends from the back of the knee (popliteal space) to the ankle, may actually originate deep in the muscles of the calf, or may enter the muscles of the thigh and terminate somewhere far removed from the popliteal space. If these anomalous veins are not taken into account, recurrence is inevitable.

The present invention is designed to overcome the shortcomings of available treatments, especially with respect to the problems listed above. The first two items on the above list cannot be overcome by any forseeable technological advance, but the last four are well known and frequent causes of treatment failure; causes which can be avoided if the treatment takes advantage of the special characteristics of the invention.

## SUMMARY OF THE INVENTION

The present invention is a modified angioscope or "venoscope" which is particularly well suited for the non-surgical treatment of venous disorders. The venoscope comprises a flexible catheter having a proximal end and a distal end, means for directing a fluid from a fluid source to the distal end of the catheter, fiberoptic means for viewing areas adjacent the distal end of the catheter, means for guiding the distal end of the catheter through the veins of a patient and means for ultrasonically monitoring areas adjacent to the distal end of the catheter. The directing means, viewing means, guiding means and monitoring means are all located within the body of the catheter.

It should be noted at the outset that the main strength of the venoscope is the incorporation of fiberoptic viewing means and ultrasonic monitoring means into a single instrument. Vascular catheters embodying either one or the other of these means are well known in the prior art and have been exploited mainly for coronary blood flow and peripheral arterial studies. In the venous system, however, it is not sufficient to merely see the inner wall of the vessel, nor is it sufficient to merely measure the velocity of blood flow. In the venous system, the direction of blood flow is of critical importance.

In arteries, blood always flows away from the heart. In veins, however, the direction of blood flow may be either toward or away from the heart. In both the diagnosis and treatment of venous disorders, the determination of the direction of blood flow is essential. Ultrasound provides a means of determining both the velocity and direction of blood flow.

At the same time, the placement of a catheter at the correct anatomical site in the venous system, for diagnosis and treatment, is immensely facilitated by the direct vision afforded by fiberoptics. Because virtually all vascular work performed via catheters has been limited to the arterial system, the importance of combining fiberoptic viewing means and ultrasound monitoring means into a single instrument has not been appreciated by those otherwise skilled in this art. But for applications limited to venous work, a specialty known as Phlebology which is rarely practiced in the United States and which is not comprehensively taught in any U.S. medical school, the need for both fiberoptic and ultrasonic means in a single instrument is fully appreciated.

The ultrasonic monitoring means may be a pulsed wave or continuous wave doppler device. Preferably, the monitoring means is one or more piezoelectric crystals. A single crystal may be split or several individual crystals may be employed. The crystals may be either fixed to provide flow data, or moved to scan an area and create a two-dimensional image. If multiple crystals are used, they may be either internally or externally focused. Internal focusing and beam steering can be accomplished either statically or dynamically.

The venoscope is provided with a fluid directing means to inject treatment solutions into the veins which are preferably channels extending longitudinally through the catheter. Several of these channels, of almost any cross section, may be used depending upon the nature of the venous disorder and the type of treatment required. In the preferred embodiment, there are two such channels. The first channel may be used for injecting a cleansing fluid, such as saline, to flush the blood from the vein while the second may be used for injecting a treatment solution, such as an adhesive or a sclerosant, or for passage of a conducting wire for therapeutic electro-cauterization.

Optical fiber bundles provide means for viewing the areas adjacent to the distal end of the catheter. In a preferred embodiment, there are only two optical fiber bundles. A first optical fiber bundle is attached to any suitable light source and is therefore used to illuminate the distal end of the catheter. The second optical fiber bundle may be connected to an eyepiece at the proximal end of the catheter to facilitate the viewing process. Alternatively, the second bundle may be connected to a video coupler to permit the attachment of a video camera. The image produced by the video camera is then projected onto any suitable video monitor.

The guiding means may be provided by a guide wire or wires capable of changing the direction of the catheter tip so that the operator can safely guide the catheter through the veins of the patient. The guide wires may be passed through additional channels in the catheter or attached in any other convenient way.

An alternate embodiment of the invention relates to a venoscope as described above which further comprises a laser and means to direct a laser beam to ablate an

5,022,399

5

obstruction found in the vein, or to therapeutically cauterize the inner lining of the vein (the intima).

## BRIEF DESCRIPTION OF THE DRAWINGS

The nature, advantages and various other additional features of the invention will appear more fully upon consideration of the illustrative embodiments now to be described in detail in connection with the accompanying drawing figures, wherein:

FIGS. 1, 2A, 2B, 2C, 3A, 3B, 3C, 4A, 4B and 5 are illustrations of different veins to show what happens when some of these veins are removed; and

FIG. 6 is a perspective view of a venoscope according to the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

As noted above, the invention will be referred to as a venoscope. In essence, it is a catheter through which we enter the vascular system with our eyes and ears. Thus, both visual and auditory access to the vein and to the position of the catheter therein is provided to assist in the determination of the appropriate location for treatment of the varicosity.

Visual access is provided by two fiberoptic bundles running longitudinally through the length of the catheter. A fiber optic bundle preferably comprising many optical fibers made of high optical grade glass or quartz is used. These two optical fiber bundles are generally located in an adjacent parallel relationship within the body of the catheter. One optical bundle is used with an output source such as a Halogen or Xenon lamp to deliver visible light to illuminate the interior of the vein adjacent to the distal end of the catheter. A second optical bundle can be used either with an eyepiece or with a video camera for viewing the image received from the illuminated region. When used with a video camera, the apparatus is further equipped with a suitable video monitor and a video coupler which connects the optical fiber with the camera.

Auditory access, as well as blood flow velocity and directional monitoring capability, is provided by one or more piezoelectric crystals. These crystals are well known in the prior art devices known as doppler flowmeters and ultrasound imaging devices. More recently, catheters developed for arterial blood flow studies have included one or more piezoelectric crystals, located in the distal tips, which operate in these respective modes. These devices are generally referred to as doppler catheters or ultrasonic imaging catheters.

The crystals used in the present invention are extremely small, ranging in size from only a fraction of a millimeter in diameter, and are connected to the outside world by 2–4 wires depending on the number of crystal used and the functions which they perform. When crystals are excited electrically, they vibrate and generate sound in the ultrasonic range. Returning ultrasonic echoes, conversely, cause the crystal to vibrate and generate electricity. The geometry of the crystal determines its operating frequency. Currently, the range of operating frequencies is 1–20 megahertz (MHz). The higher frequencies provide better resolution but poorer tissue penetration. When the crystals are in invasive catheters, however, tissue penetration is not necessary and the higher frequencies are preferred. Crystals operating at 30 MHz and higher are being developed at the present time and will be highly desirable in the venoscope when they become available.

6

The ultrasonic monitoring means may be a pulsed wave or continuous wave doppler device. The pivotal technology in this device is the transducer which converts electrical energy to ultrasound, and also converts the returning ultrasound reflections back to electricity. The transducer is preferably one or more piezoelectric crystals. These crystals may operate in the continuous mode, that is, they may be dedicated exclusively to the sending or receiving mode. In the continuous mode, the device requires either multiple crystals, or a single crystal which is split into sending and receiving halves. Alternatively, a single crystal may be employed which operates in a pulsed mode. In this mode, the single crystal sends out pulses of ultrasound in the sending mode and then switches to the receiving mode to listen for returning echos.

In its simplest form, the venoscope has a single piezoelectric crystal located in its distal tip which operates in the pulse (discontinuous) mode. In this mode, the crystal alternately sends and receives ultrasound mode. The portion of the ultrasound reflected by moving blood will be frequency-shifted in proportion to the velocity of blood flow. In a preferred embodiment, multiple crystals are employed to form a continuous mode doppler. In the continuous mode, the device adds information about phase shifts in the reflected beam, relative to the phases of the pulses initially sent out. These phase shifts provide directional information. Thus, in this embodiment of the venoscope, the direct visual data provided by fiberoptics is supplemented by ultrasonic data which reveal the velocity and direction of blood flow. All these data combined provide a setting for therapeutic intervention which is unparalleled in accuracy, safety, and control. Even the direct visualization of the outsides of the vessels which is afforded by extensive surgical exposure cannot provide the degree of control available with the venoscope.

In an alternate embodiment, one or more piezoelectric crystals could be mechanically moved so that they could scan or "interrogate" a larger area. By adding timing data to the information to be processed, specifically, the time necessary for each ultrasound pulse to reach a target and be reflected back to the transducer, a 2-dimensional image of the area adjacent to the catheter tip could be created. This mode of operation is known by those skilled in the art as the "B-mode". At the present time, the preferred method of obtaining a B-mode scan with a single crystal involves rotating and/or translating a single crystal which is affixed to the end of a wire in one channel of the venoscope. One suitable B-mode system is described in U.S. Pat. No. 4,794,931 to Yock which is incorporated herein by reference.

In another embodiment, multiple crystals are mounted in the catheter tip, forming a geometric array. The array may be either externally or internally focused. External focusing requires a lens or mirror, in a manner analogous to the focusing of light rays. Internal focusing, on the other hand, may be either static or dynamic. Static focusing involves shaping the transducer so that unfocused elements (i.e., piezoelectric crystals) will form a focused beam by superposition of unfocused waves. In a preferred embodiment, the ultrasound beam would be dynamically focused and steered. Dynamic focusing, which occurs without any movement of transducer elements, is accomplished by timing the firing of the individual elements in such a way that multiple ultrasound beams reach a defined focal area as if they had been directed there by a physical lens. Such

5,022,399

7

an arrangement is referred to as a phased array of transducer elements.

Some examples of suitable phase array ultrasound imaging systems are those found in catheters produced by Endosonics Corporation of Rancho Cordova, California and Diasonics Incorporated of South San Francisco, Calif. One particularly preferred system is the Endosonics Cathscanner I ™ System.

A recent refinement in image processing, often referred to as color doppler, involves representating blood flow as a color which is superimposed on the gray scale B-mode image of the blood vessel. Such a device, for example, could be programmed so that vessels carrying blood toward the transducer would appear red on the monitoring screen. Similarly, vessels carrying blood away from the transducer would appear blue. The intensity of the color would vary according to the velocity of blood flow. Existing dedicated color doppler devices, none of which embody fiberoptic capability, also give quantitative digital blood flow data. This data supplements the qualitative visual images which appear on the monitoring screens. One preferred embodiment of the venoscope involves the incorporation of an array of piezoelectric crystals providing color doppler to supplement the fiberoptic image.

Current color dopplers, such as those produced by Quantum Medical System of Issaquah, Wash. and that described in U.S. Pat. No. 4,641,668, incorporate suitable transducers which are relatively large. A reasonable representation of blood flow, however, is obtained by the crystal tipped catheter of the current invention when used in combination with its fiberoptic capabilities. It is anticipated that future technology will reduce this transducer to a compatible size.

It should be specifically noted that all the abovementioned modes of ultrasound operation are already in commercial use at the present time. The combination of these ultrasound operations with fiberoptic direct visualization, however, is not known. In all the preferred embodiments of the venoscope, the piezoelectric elements, which are exceedingly small, and tiny wires connecting them to data processing equipment external to the catheter. Some doppler amplification systems suitable for use in this invention are disclosed in U.S. Pat. Nos. 4,733,669 and 4,771,788 which patents are incorporated herein by reference. The nature of the data processing equipment will depend entirely on the number of piezoelectric crystals in the venoscope, and their operating modes.

The venoscope further comprises at least two injection channels and at least one guide wire channel. Preferably there are two injection channels, one for saline to flush blood from the vein so its interior can be visualized through the optical fibers and one for the injection of a treatment solution, or, alternatively, for passage of an electrical conducting wire for therapeutic cauterization. This treatment solution may be the conventional sclerosants which are used to block the veins. As these veins dissolve, the characteristic blue lines gradually fade away. Instead of these solutions, however, it is possible to inject a vascular adhesive which will displace blood from the vein and seal it from further entry of blood, thus removing the appearance of the blue lines from the patient.

A guide wire is passed through the third channel which may be a central lumen for sliding reception of the guide wire or an elongated open side channel for engaging the guide wire. The guide wire preferably has

8

a diameter of between about 0.02 to 0.03 inches and is capable of changing the direction of the catheter tip so that the operator can safely guide the catheter through the vein or the particular branches which are encountered. Such guide wires are well known in the art and generally comprise a flexible, elongated wire member which is longitudinally inelastic. An example of one such device which may be used in this invention is described in U.S. Pat. No. 4,771,788, the disclosure of which is incorporated herein by reference thereto.

Some prior art fiberoptic devices employ a unique segmented wall structure which facilitates their deformability for the purposes of steering. The deformation is generally accomplished by the operator manipulating a trigger or some other control mechanism, located at the user end of the device. The segmented wall structure increases the outer diameter of a device, but nevertheless, this configuration provides a highly desirable option for venoscopes intended for evaluation and treatment of very large abnormal veins.

Another embodiment of the invention relates to a venoscope further comprising a high energy beam generating device, such as a laser to ablate obstructions found in the vein, or to therapeutically cauterize the venous intima. The laser, which may be of the gas ion, solid state or pulsar type, may be used in unison with the light source along one existing channel or in a separate channel extending through the catheter body dedicated to the laser.

The combination of fiberoptics and doppler in a single device provides advantages particularly well suited for venous work. The catheter described here would have its greatest strength when the treatment solution is a vascular adhesive instead of a sclerosant. The vascular adhesive most widely used has been Bucrylate (2-isobutylcyanoacrylate, formerly distributed by Ethicon). Bucrylate, although not yet F.D.A. approved in the U.S., has proven to be extremely effective in experimental settings, as well as in more ordinary settings in other countries, and appears to have no adverse side-effects. Bucrylate, and other medical grade cyanoacrylates, have been given to countless millions of people over the last few decades without incident.

Bucrylate can be used to permanently seal and shut any abnormal blood vessel. It is potentially a complete replacement for surgical ligation. Its main potential problem is also its main strength, that being its extraordinary ability to close blood vessels. For if injected into the wrong vessel, such as an artery, that one will surely and permanently close down. Therefore, a delivery system for such adhesives through the venoscope described herein would be ideal for delivering Bucrylate, or some other "super sclerosant", to precisely the right area of the right blood vessel. This would prevent accidents due to the injection of sclerosants "blindly" from the surface into the wrong vessel or location.

As an alternative to the cyanoacrylates, a substance known in the medical field as "mussel glue" can be used. This substance is a natural polypeptide that has excellent adhesive properties when wet. As such, it is ideally suited for placement in a vein, which of course is wetted by the blood therein as well as the saline solution which is injected so that the operator can view the vein.

With either adhesive, care must be exercised to assure that the injection passage does not become blocked with cured adhesive. One way to prevent such blockage is to clean the passage after each injection with an appropriate cleaning solution such as water, alcohol, etc. to

5,022,399

9                                          10

remove any remaining adhesive from the device. Thereafter, the fluid passages could be disinfected by injecting a solution of glutaraldehyde or idophor as is known in the art for cleaning meterscopes and the like.

Instead of cleaning this fluid passage, the device can be designed to utilize a removable insert made of an engineering thermoplastic, such as a polyacetal or polycarbonate, which could be disposed of after the treatment.

It is also possible to make the fluid passage portion of the device to be removable (or detachable) and thus disposable after one use. Finally, the entire device can be designed to be disposable so that it is only used once. thus avoiding any cleaning or replacement operation after use.

Referring now to FIG. 6, venoscope 10 comprises a flexible catheter 12 having a proximal end 14 and a distal end 16. Catheter 12 further comprises first and second passages 18 and 20 for directing first and second fluids to distal end 16 of catheter 12; first and second optical fiber bundles 22 and 24; at least one piezoelectric crystal 26 located at distal end 16 of catheter 12 for monitoring areas adjacent thereto; and guide wire 28 for guiding distal end 16 through the veins of the patient.

Passages 18 and 20 are preferably bore of any suitable cross-section which extend longitudinally through the body of catheter 12. In the preferred embodiment first passage 18 directs saline from a source located near the proximal end 14 to distal end 16 of catheter 12 while second passage 20 directs an adhesive from a source to distal end 16.

Viewing means comprises a first optical fiber bundle 22 for illuminating the region of the vein adjacent to distal end 16 and second optical fiber bundle 24 for viewing the illuminated area. Optical bundles 22 and 24 are placed in a side-by-side arrangement within the body of catheter 12. Preferably, each fiber is made from a high optical grade material such as pure silica and has a diameter of about 0.02 in. or less.

Accordingly, first optical bundle 22 is connected at its proximal end to a light source, such as a Halogen or Xenon lamp (not shown), which directs light towards distal end 16. Second optical fiber bundle 24 receives the image of the illuminated area in the region of distal end 16. This image is transmitted by optical fiber bundle 24 to an eyepiece or via a video coupler to a video monitor for viewing by the physician as venoscope 10 is being positioned within the patient.

Piezoelectric crystal 26 may be any of a number of suitable materials, such as aluminum or silicon oxide, but is preferably a lead-zirconate-titanate material. Crystal 26 is electrically connected to a voltage source by a pair of conductors such that crystal 26 operates as a pulsed doppler mechanism. In one alternate, the crystal may be split into sending and receiving halves with two pairs of conductors emanating therefrom for the continuous mode of doppler operation. As an alternate, the crystal may be located at the end of a wire passing through an additional channel (not shown). The wire would be mechanically rotated by any suitable motor or power source at the user end (not shown), thus causing the crystal to rotate. This rotation enables the crystal to scan the surrounding area, thereby creating a two-dimensional B-mode image of the area. In yet another alternate embodiment, a geometric array of multiple crystals are arranged at distal end 16 of catheter 10, with a corresponding number of pairs of conducting wire. This array could be used, as previously described,

to obtain a gray scale B-mode image with or without a color doppler flow pattern superimposed on the gray scale image.

The various wires emanating from the crystal(s) would be connected at proximal end 14 to any suitable processing equipment, which converts the electrical pulses from the crystal(s) to sounds in the audible range, graphic tracings on a continuous chart recorder, or two-dimensional images on a monitor screen.

In the preferred embodiment, guide wire 28 includes an elongated, flexible and longitudinally inelastic support wire made of stainless steel which has an outer diameter of about 0.012 inches. A pair of electrical connector wires are adjoined to the support wire and provide the necessary electrical connections.

EXAMPLES

Turning now to use of venoscope 10 in accordance with the present invention, the following examples are provided to illustrate the preferred embodiments.

EXAMPLE 1

Sclerotherapy of the greater saphenous vein

Catheter 12 is inserted into the saphenous vein at the level of the lower thigh or calf, where it generally bulges through the skin, and is therefore readily accessible. The leg is elevated to drain nearly all blood therefrom. To clear the inside of the vein for visualization, normal saline would be continuously injected through first passage 18. The injection would be accomplished by a continuous infusion pump, of the sort used for the administration of heparin or other IV drugs in the hospital setting. The junction of the saphenous vein with the femoral vein would be identified with absolute certainty by the following: (a) the femoral vein would be red, since no readily attainable infusion of normal saline could clear all the blood from the femoral vein; (b) the length of catheter 12 to be inserted necessary to reach the saphenofemoral junction would be estimated in advance; and (c) the doppler signal generated by crystal 26 in the femoral vein would be heard. This signal differs markedly from the signal of a more superficial vein, and even more so from that of an artery, where the pulsing of the heart is detected.

Having reached the saphenofemoral junction, catheter 12 would be pulled back slightly, and a careful search would be made for orifices to the notorious tributaries, each of which would be entered and injected. Finally, the main trunk of the saphenous would be re-entered, and, after tilting the treatment table enough so that the direction of blood flow in the vein was toward the foot (to be determined by visual and doppler cues), a strong sclerosant would be injected into the main trunk via second passage 20. Catheter 12 would be withdrawn, and the leg bandaged according to established principles.

EXAMPLE 2

Sclerotherapy of varicose veins originating deep within calf or thigh muscle, or in the pelvis

The basic protocol would be as described above. Catheter 12 would be advanced forward by steps, with an in situ doppler study done at each step. This would continue until either a deep vein was reached (i.e. the popliteal, femoral, or iliac veins), or until an intermediate vein with competent valves were reached (the doppler study would indicate with virtual certainty

5,022,399

**11**

whether the local valves were competent or not). At such a point, catheter 10 Would be slightly withdrawn, and the incompetent veins injected as described above.

While it is apparent that the invention herein disclosed is well calculated to fulfill the objects above 5 stated, it will be appreciated that numerous modifications and embodiments may be devised by those skilled in the art, and it is intended that the appended claims cover all such modifications and embodiments as fall within the true spirit and scope of the present invention. 10

What is claimed is:

1. A venoscope comprising:

a flexible catheter having a proximal end, a distal end, and a plurality of passages extending therebetween;

means for directing a treatment fluid from a fluid 15 source to the distal end of the catheter through at least a first of said passages;

means for viewing areas adjacent the distal end of the catheter through a second of said passages;

means extending through another of said passages for 20 guiding the distal end of said catheter through veins of a patient; and

means for ultrasonically monitoring blood flow in areas adjacent the distal end of the catheter.

2. The venoscope of claim 1 wherein said ultrasonic 25 monitoring means comprises a doppler ultrasound device.

3. The venoscope of claim 2 wherein said doppler ultrasound device comprises one or more piezoelectric crystals capable of operating in various modes to gener- 30 ate blood flow data and an image of the internal vein areas adjacent to said distal end of the catheter.

4. The venoscope of claim 1 wherein said fluid directing means includes at least two first passages in said catheter. 35

5. The venoscope of claim 4 wherein one of said first passages directs saline from a source to the distal end of the catheter and another of said first passages directs an adhesive or sclerosant.

6. The venoscope of claim 1 wherein said first passage 40 directs saline from a source to said distal end of the catheter and wherein said catheter includes a third passage which includes therein a conductive wire extending from an electrical source to said catheter distal end.

7. The venoscope of claim 1 wherein said viewing 45 means comprises optical fibers.

8. The venoscope of claim 7 wherein said viewing means comprises a first optical fiber bundle disposed in said second passage for illuminating said adjacent interior vein areas and a second optical fiber bundle dis- 50 posed in a further passage in said catheter for viewing said areas.

9. The venoscope of claim 8 wherein said second optical fiber bundle is connected at said proximal end of said catheter to an eyepiece. 55

10. The venoscope of claim 8 wherein said second optical fiber bundle is connected at said proximal end of said catheter to a television monitor through a camera.

11. The venoscope of claim 1 further comprising means for removing a portion of interior vein areas 60 adjacent said catheter distal end.

12. The venoscope of claim 11 wherein said removing means extends through a further passage in said catheter and comprises one of means for transmitting a high energy beam or an electrical current therethrough. 65

13. The venoscope of claim 1 wherein said guiding means comprises a guide wire.

14. A venoscope comprising:

**12**

a flexible catheter having a proximal end, a distal end, and a plurality of passages extending therebetween and further including therein;

a first and second of said passages for directing first and second fluids, respectively, to the distal end of the catheter;

a third and fourth of said passages for directing first and second optical fiber bundles, respectively, through the catheter for viewing internal vein areas adjacent the distal end of the catheter;

at least one piezoelectric crystal located on the distal end of said catheter for monitoring at least one of blood flow and direction in areas adjacent thereto; and

means for guiding the distal end of said catheter through veins of a patient, said guiding means extending through at least a portion of a fifth of said passages of said catheter.

15. The venoscope of claim 14 wherein a first fluid passage directs saline from a source to the distal end of the catheter and a second passage directs an adhesive or a sclerosant from a source to said catheter distal end.

16. The venoscope of claim 14 wherein a first fluid passage directs saline from a source to the distal end of the catheter and wherein said catheter further comprises a conductive wire extending through a further passage from an electrical source to said catheter distal end.

17. The venoscope of claim 14 wherein said first optical fiber bundle is operatively associated with means for illuminating said internal vein areas and said second optical fiber bundle includes means for viewing said areas.

18. The venoscope of claim 17 wherein said viewing means includes an eyepiece and said second optical fiber is connected at said proximal end of said catheter to said eyepiece.

19. The venoscope of claim 17 wherein said viewing means includes a video camera and a television monitor, and said second optical fiber is connected at said proximal end of said catheter to said television monitor through said video camera.

20. The venoscope of claim 14 wherein said catheter further comprises means to generate a laser beam to remove a portion of said internal vein areas adjacent to said catheter distal end.

21. The venoscope of claim 20 wherein said guiding means comprises a guide wire.

22. A method for treating varicose veins in a patient which comprises:

inserting into a vein of a patient to be treated, a venoscope comprising a flexible catheter having a proximal end and a distal end, means for directing a treatment fluid from a source to the distal end of the catheter, means for viewing areas adjacent the distal end of the catheter, and means for ultrasonically monitoring areas adjacent the distal end of the catheter, wherein said directing means, viewing means, and monitoring means are located within said catheter;

guiding the distal end of said venoscope to a branch of said vein while viewing said vein through said venoscope viewing means and monitoring blood flow in said vein by said venoscope monitoring means to assure proper position of the distal end of said venoscope in said vein; and

5,022,399

13

directing a treatment through said venoscope treat-
ment directing means to treat said vein of said
patient.

23. A method for delivering a vein treatment solution
which comprises inserting into a vein of a patient to be
treated, a venoscope comprising a flexible catheter hav-
ing a proximal end and a distal end, means for directing
a fluid from a fluid source to the distal end of the cathe-
ter, means for viewing areas adjacent the distal end of
the catheter, and means for ultrasonically monitoring
areas adjacent the distal end of the catheter, wherein
said directing means, viewing means, and monitoring
means are located within said catheter, guiding the
distal end of said venoscope through the vein to assure
proper positioning therein; and introducing said vein
treatment solution through said venoscope fluid direct-
ing means.

24. The method of claim 22 wherein said treatment is
an adhesive.

25. The method of claim 22 wherein said vein is the
greater saphenous vein, and said venoscope distal end is
directed to the branch from the femoral vein.

26. The method of claim 25 which further comprises
sealing tributaries of said greater saphenous vein with
an adhesive or sclerosant prior to treating the greater
saphenous vein itself.

27. The method of claim 26 wherein the adhesive is
an alkyl cyano acrylate, a fatty acid, a hypertonic
sclerosant, or a polypeptide.

28. The method of claim 27 wherein the polypeptide
adhesive is mussel glue.

29. The method of claim 22 which further comprises
treating the vein with a high- energy beam to ablate
obstructions therein.

30. The method of claim 29 wherein said high energy
beam treatment comprises using a laser to treat said
varicose vein.

14

31. The method of claim 22 wherein said treatment
comprises using a conductive wire to cauterize said
vein.

32. A method for delivering a varicose vein treatment
solution which comprises inserting the catheter of claim
1 into a varicose vein of a patient to be treated; guiding
the catheter through the vein to assure proper position-
ing therein; and introducing said solution through said
fluid directing means.

33. The method of claim 31 wherein said treatment is
an adhesive or a sclerosant.

34. The method of claim 32 wherein the adhesive is
an alkyl cyano acrylate, a fatty acid, a hypertonic
sclerosant, or a polypeptide.

35. The method of claim 33 wherein the polypeptide
adhesive is mussel glue.

36. A method for treating veins in a patient which
comprises:
  inserting a venoscope comprising a catheter having a
    proximal end and a distal end into a vein in a patient
    to be treated;
  positioning the distal end of the venoscope at a de-
    sired location in said vein by viewing interior por-
    tions of said vein and ultrasonically monitoring
    blood flow therein adjacent the distal tip of said
    catheter through said venoscope; and
  directing a treatment through said venoscope to treat
    said vein of said patient.

37. The method of claim 36 wherein said treatment is
a schlerosing solution, an adhesive, a high energy beam
or cauterization.

38. The method of claim 37 wherein said adhesive is
an alkyl cyano acrylate, a fatty acid, a hypertonic
sclerosant or a polypeptide.

39. The method of claim 35 which further comprises
guiding the distal end of the catheter through the cathe-
ter to said desired location.

40. The method of claim 35 wherein the treatment of
the vein occurs adjacent the distal end of the catheter.

* * * * *

## UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    :    5,022,399

DATED         :    June 11, 1991

INVENTOR(S)   :    Ken P. Beigeleisen

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page,   the Attorney, Agent or Firm should read "Pennie & Edmonds".

### Signed and Sealed this
### Fifth Day of January, 1993

*Attest:*

DOUGLAS B. COMER

*Attesting Officer*          *Acting Commissioner of Patents and Trademarks*

# Exhibit 4.



*Phlébologie '89*, A. Davy, R. Stemmer eds, © 1989 John Libbey Eurotext Ltd, pp. 419-422

# 147

## Use of the venoscope for the treatment of varicose veins

K. Biegeleisen, R.D. Nielsen

*1619 Third Avenue, New York, N.Y. 10128, USA.*

### INTRODUCTION

The device which we refer to as a "venoscope" is a hypothetical fiberoptic angioscope equipped with one or more piezoelectric crystals in the tip. The creation of such a device was first proposed (Biegeleisen, 1987) as a delivery system for cyanoacrylate adhesive for the sclerosis of large varicose veins.

The venoscope itself should not be thought of as a treatment, but rather as a delivery system. It is designed to overcome some of the difficulties which have plagued practitioners of surgical and injection treatment of varicose veins throughout the 20th century. Historically, treatment failures have almost always been caused by incomplete understanding of patient anatomy, leading to incorrect ligation and division points, missed tributaries, intraarterial injections, etc. In principle, such problems should be obviated by the direct visualization afforded by fiberoptics.

Because of the critical importance of directional blood flow data in the evaluation of venous problems, the proposed venoscope has built-in doppler capabilities. Although dedicated doppler catheters already exist, operating as flowmeters as well as in the B-mode, these catheters have no fiberoptic capabilities.

Lacking a true venoscope, we have begun our studies with existing angioscopes, in the hope that our results will stimulate manufacturers to alter their angioscopes by the addition of piezoelectric crystals to them.

### HOW MIGHT A VENOSCOPE BE USED?

The following is a partial list of situations where a venoscope could provide the basis for better venous therapy than is currently available:

1. Saphenofemoral junction. Failure to ligate and divide each and every one of the proximal 3-8 saphenous tributaries eventually results in recurrences following saphenous vein stripping. Through the venoscope, however, all saphenous tributaries should, in principle, be readily visualized.

2. Incompetent pelvic veins. Pelvic varicosities exacerbate lower extremity varicosities, as well as being a problem in their own right. It seems self-evident that a venoscope would provide an excellent method for approaching pelvic varicosities, without the necessity of performing a laparotomy.

3. Lesser saphenous vein. Varicosities of this vein usually result from reflux at the saphenopopliteal junction, which, however, is notoriously variable in location (Hobbs, 1988). This junction may occur either below, within, or above the popliteal space. In some cases the lesser saphenous may not enter the popliteal vein at all, but may plunge into the posterior thigh to re-emerge on the medial aspect, where it joins the greater saphenous vein. In other cases it may derive its abnormal blood flow from incompetent calf perforators. The venoscope could readily follow reflux in the lesser saphenous vein to its origin, whichever of the above it turned out to be. It should be noted that an in situ doppler study could be done beneath each valve encountered, until the highest incompetent valve was identified, or the deep veins were reached.

4. Arteriovenous communications (AVC's). One of our first findings was that AVC's are readily identified by fiberoptic visualization. Their identities can be further confirmed by in situ doppler studies. In a case where varicosity was known to be secondary to AVC's, these could be located and selectively treated (see below) by venoscopy.

EXAMPLES OF THERAPEUTIC USES OF THE VENOSCOPE

1. Surgical correction of saphenofemoral reflux. Although it may initially seem superfluous, we believe that the venoscope can be a valuable adjunct to surgical division or titanium clipping of the saphenofemoral junction. This is mainly because of its theoretical ability to reliably visualize the anatomy of the junction, and the numbers and locations of all the saphenous tributaries. Also, the light at the angioscope tip is readily visible through the skin, and could guide the surgeon through an accurate operation employing a minimal incision, without the risk of anatomical errors and missed tributaries which otherwise tend to accompany minimal incision surgery.

2. Venoscopically guided sclerotherapy. The venoscope allows the sclerotherapist to treat, for example, the saphenofemoral junction with virtually complete control. The sclerosant can be precisely placed, the vein can be drained entirely of blood to maximize the efficacy of the sclerosant, and the direction in which the injected sclerosant will flow can be contolled. Furthermore, an intraarterial injection, the most dreaded of sclerotherapy complications, becomes almost unthinkable!

420

In our experience, a single controlled injection through the angioscope (models of which were kindly provided by Schott, F.R.G. and Olympus, Japan) has thus far always been sufficient to sclerose the proximal part of the saphenous vein. With the cases on whom angioscopy was performed, the magnitude of saphenofemoral reflux was judged sufficient to render the proximal part of the vein relatively insensitive to sclerosant injection from the surface. Typically in these cases, anywhere from 1-6 surface injections at the junction are required before it fully closes, as determined by ultrasound followup. In many cases, surface injections will never close the proximal saphenous vein.

The long term result of this treatment is not known, and proper followup will require at least 3 years of observations.

Our experience with angioscopic injection of the proximal greater saphenous vein is described in the videotape accompanying this presentation.

3.   Cyanoacrylate embolization.   These remarkable adhesives have been used to obliterate leg varicosities (Biegeleisen, 1987) and varicoceles (varicosities of the internal spermatic vein) (Kunnen, 1984). Lack of F.D.A. approval has severely restricted the scope of our work with this "super sclerosant".

Cyanoacrylates are highly effective but dangerous when injected into lower extremity veins "blindly" from the surface. Accidental introduction of even a single drop of adhesive into the femoral vein or artery could cause total or partial obliteration of these vessels, and therefore the safe administration of cyanoacrylates will require both fiberoptics to confirm the location of the catheter tip, and dopler to control the direction in which the injected adhesive will move if it fails to polymerize instantly (instant polymerization being the usual situation).

As noted previously, our desire to develop a safe delivery system for cyanoacrylates provided our original motivation for developing the venoscope concept.

4.   Electrocauterization.   A conducting wire with a curved tip could be passed along one of the venoscopes injection channels, and could be useful for the cauterization of arteriovenous communications, tributaries, or perhaps even trunk varicosities.

5.   Laser.   Although there are no well-established uses for lasers in the venous system as yet, it should be pointed out that the fiberoptic bundles of the venoscope can conduct coherent light to the treatment area. Laser could conceivably be used as a cauterizing agent, in the same manner as electricity has been used in the past. Also, by analogy with the arterial system, laser could perhaps be used to restore the lumen of an obstructed vein.

TECHNICAL PROBLEMS

We have encountered five major technical problems which must be overcome before venous angioscopy can be widely performed. These are 1) problems inserting the angioscope, 2) difficulty steering the 'scope through very tortuous veins, 3) lack of built-in doppler capability in existing angioscopes, 4) venospasm, and 5) difficulties obtaining a clear visual field near areas of high

421

venous flow (such as the saphenofemoral junction). The last two problems are the most troublesome. We are investigating the possible roles of temperature, venoactive drugs, and intravascular anesthetics in solving the problem of venospasm, which, when severe, can render the angioscope immobile. With respect to flushing the visual field clear of blood, we believe that the new Olympus high speed angioscope pump (kindly provided by Olympus, Japan) will successfully clear blood from high flow areas.

REFERENCES

1. Biegeleisen, K. Tissue adhesives - "super" sclerosants for the future?  Presented at the European-American Symposium on Venous Diseases, Bethesda, Maryland, March 31-April 2, 1987.

2. Hobbs, J.T. (1988): The enigma of the gastrocnemius vein. Phlebology, 3, 19-30.

3. Kunnen, M. & Comhaire, F. (1984): Transcatheter embolization of the internal spermatic vein(s) with Bucrylate: further improvements. Ann. Radiol. 27,303.

422

# Exhibit 5.



**UNITED STA..ES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:    COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 09/374,280 | 08/13/99 | NAVARRO | L | 634.0001USU |

QM12/1115

CHARLES N J RUGGIERO
OHLANDT GREELEY RUGGIERO AND PERLE LLP
ONE LANDMARK SQUARE 9TH FLOOR
STAMFORD CT 06901-2682

| EXAMINER |
|---|
| FARAH, A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3739 | |

DATE MAILED:    11/15/00

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

PTO-90C (Rev. 2/95)
*U.S. GPO: 2000-473-000/44602

1- File Copy

| *Office Action Summary* | Application No. 09/374,280 | Applicant(s) Navaro et al. |
|---|---|---|
| | Examiner Ahmed Farah | Group Art Unit 3739 |

☐ Responsive to communication(s) filed on _____

☐ This action is **FINAL**.

☐ Since this application is in condition for allowance except for formal matters,     **prosecution as to the merits is closed** in accordance with the practice under *Ex parte Quayle,* 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire _____ *three* _____ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claim**

☒ Claim(s) *1-20* _____ is/are pending in the applicat

    Of the above, claim(s) _____ is/are withdrawn from consideration

☐ Claim(s) _____ is/are allowed.

☒ Claim(s) *1-9 and 11-19* _____ is/are rejected.

☒ Claim(s) *10 and* _____ is/are objected to.

☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

☒ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is ☐ approved ☐disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

    ☐ All ☐ Some* ☒ None   of the CERTIFIED copies of the priority documents have been

        ☐ received.

        ☐ received in Application No. (Series Code/Serial Number) _____ .

        ☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    *Certified copies not received: _____

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☒ Notice of References Cited, PTO-892

☒ Information Disclosure Statement(s), PTO-1449, Paper No(s).   *4 and 5*

☐ Interview Summary, PTO-413

☒ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

--- *SEE OFFICE ACTION ON THE FOLLOWING PAGES* ---

Application/Control Number: 09/374,280                                    Page 2

Art Unit: 3739

## DETAILED ACTION

### *Claim Rejections - 35 USC § 112*

1.      The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and
> process of making and using it, in such full, clear, concise, and exact terms as to enable any
> person skilled in the art to which it pertains, or with which it is most nearly connected, to
> make and use the same and shall set forth the best mode contemplated by the inventor of
> carrying out his invention.

Claims 1-8 are rejected under 35 U.S.C. 112, first paragraph, as containing subject matter which
was not described in the specification in such a way as to enable one skilled in the art to which it
pertains, or with which it is most nearly connected, to make and/or use the invention.  A single
means claim, i.e., where a means recitation does not appear in combination with another recited
element of means, is subject to an undue breadth rejection. See MPEP 2164.08(a).  A single means
claim which covers every conceivable means for achieving the stated purpose is held  to be
nonenabaling for the scope of the claim.

### *Claim Rejections - 35 USC § 102*

2.      The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the
basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless --
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or
> on sale in this country, more than one year prior to the date of application for patent in the United States.

Application/Control Number: 09/374,280

Art Unit: 3739

3.    Claims 1-4, 7- 9, 12, 13, 18 and 19 are rejected under 35 U.S.C. 102(b) as being clearly anticipated by Trelles U. S. Pat. No. 5,531,739.

Trelles discloses a method and apparatus for treating a blood vessel located beneath the surface of the skin by using a fiber optic probe advanced to a location underneath the vessel to be treated. Further, Trelles teaches that a visible aiming beam can be used to highlight the locating of the vein in order to place the probe at the treatment site. See Trelles Col. 2, lines 63-67.

In reference to claims 1, 2, and 9 of the present application, Trelles teaches that his method includes the steps of: piercing the skin with the tip of the fiber optic probe; advancing the probe laterally beneath the skin so that the delivery end of the probe is adjacent to the vessel to be treated; and irradiating the vessel with a high power treatment laser beam to coagulate the vessel and cause the vessel to collapse. See claim 1 of Trelles.

In regard to claims 3, 4, and 12, Trelles discloses that the treatment energy is transmitted through an optical fiber mounted within the probe, whereby the diameter of said optical fiber is on the order of 200 to 600 microns. See Trelles Col. 2, lines 41- 44.

In reference to claims 7 and 18, Col. 2 lines 11- 16 of Trelles clearly shows a number of laser, capable to provide the wavelength range of the present claim, that may be used for the treatment. And, in reference to claims 8 and 19, Trelles' method employs a pulsed laser which provides the laser energy in bursts. See Trelles Col. 3, lines 1- 4.

4.    Claims 1, 4, 9, 11, 17, and 19 are rejected under 35 U.S.C. 102(b) as being anticipated by Goldman U. S. Pat. No. 4,564,011.

Application/Control Number: 09/374,280                                      Page 4

Art Unit: 3739

Goldman discloses laser optic device and method for the treatment of blood vessels and

tissue including an elongated fiber optic disposed within a flexible catheter. The catheter is[1]

connected at its distal end to a source of laser energy, which includes a focussing lens so that the

laser beam it produces is directed into the fiber optic to transmit therealong. In reference to

claim 17, Goldman teaches a method for externally applying pressure to vessel prior to applying

the laser energy. See claim 5 of Goldman.

*Claim Rejections - 35 USC § 103*

5.      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness

rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the
> manner in which the invention was made.

6.      Claims 5, 6, 14-16, and 20 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Trelles U. S. Pat. No. 5,531,739 in view of Gay, Jr. U. S. Pat. No. 5,334,207.

Trelles has been described above. However, although Trelles employs fiber optic to

transmit the treatment light, the emitting section is neither rounded nor located at the tip of said

fiber.

Gay, Jr. discloses a laser angioplasty device, having a magnetic steerability and forwarding

imaging capability to guide the tip of said device through a blood vessel. Gay's system includes a

Application/Control Number: 09/374,280

Art Unit: 3739

probe, laser source, and a laser fiber which protrudes from the tip of the probe. Fig. **5** of Gay, Jr. clearly shows fiber optic **38** with a rounded tip **66**. Therefore, it would have been obvious to one having the ordinary skill in the art at the time of the applicant's invention, to modify Trelles' invention in view of Gay, Jr. to have a rounded light emitting means at the tip of the probe in order to diffuse and direct the light pulses more effectively through the blood vessel. Also, it would have been obvious to place a pad over the puncture site in order to prevent bleeding or infection.

## *Allowable Subject Matter*

7.     Claim 10 is objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims.

## *Conclusion*

8.     The prior art made of record and not relied upon is considered pertinent to applicant's disclosure. See the following references:

     1. Gregory et al.                  U. S. Pat. No. 5,334,207.

     2. Leob et al                    U. S. Pat. No. 5,984,915.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to A. Farah whose telephone number is (703)305-5787.

Application/Control Number: 09/374,280                                      Page 6

Art Unit: 3739


  If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Ms. Linda Dvorak, can be reached on (703) 308-0994. The fax number for this Group

is (703)305-3590.

# Exhibit 6.



*#8 / A-N*
*Nun-compli*

578.1001

## UNITED STATES PATENT AND TRADEMARK OFFICE

Examiner: A. Farah          Art Unit: 3739

Re:    Application of:          Luis NAVARRO, et al.

       Serial No.:             09/374,280

       Filed:                  August 13, 1999

       For:                    TREATMENT OF LARGE VEINS

### AMENDMENT

Assistant Commissioner for Patents          March 15, 2001
Washington, D.C. 20231

Sir:

        In response to the Office Action dated November 15, 2000, entry and consideration of the

following amendments and remarks are respectfully requested.

04/02/2001 LFULTON  00000001 500518  09374280
01 FC:103      18.00 CH

I hereby certify that this correspondence and/or
fee is being deposited with the United States
Postal Service as first class mail in an envelope
addressed to "Assistant Commissioner for Patents
Washington, D.C. 20231" on March 15, 2001
STEINBERG & RASKIN, P.C.
BY: *Annette McPherson*

RECEIVED
MAR 2 2 2001
TECHNOLOGY CENTER R3700

RECEIVED
MAR 26 2001
TC 3700 MAIL ROOM

1

**IN THE CLAIMS:**

Please amend the claims as follows:

1. (Amended)  A blood vessel treatment device comprising:

means adapted for insertion into a blood vessel; and

means[,] adapted for intraluminal contact with a wall of [a] said blood vessel, for emitting laser energy to cause a decrease in the diameter of said blood vessel.


Please add new claim 21 as follows:

21.  A method of treating a blood vessel using laser energy, comprising the steps of:

inserting means for emitting laser energy into the blood vessel at a puncture site, wherein said emitting means has a laser emitting section;

placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment site;

emptying the blood vessel; and

emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of said blood vessel.

2

## REMARKS

Reconsideration of the present application, as amended, is respectfully requested.

### I.     Status of the Claims

Claims 1-21 are now pending, claim 1 having been amended and new claim 21 having been added.  New independent claim 21 includes the subject matter of allowable claim 10 and base claim 9.  Thus it is submitted that independent claim 21 is allowable.

### II.     Rejections Under 35 U.S.C. §112

Claims 1-8 were rejected under 35 U.S.C. §112, first paragraph, on the grounds that the claim recited a single means and is therefore subject to an undue breadth rejection.

Independent claim 1 has been amended herein to recite two "means".  Specifically claim 1 has been amended to recite that the claimed device comprises "means adapted for insertion into a blood vessel; and means adapted for intraluminal contact with a wall of said blood vessel, for emitting laser energy to cause a decrease in the diameter of said blood vessel".  Accordingly, it is submitted that the Examiner's rejection of claim 1 under 35 U.S.C. §112, first paragraph has been overcome and should be withdrawn.

3

### III.   Rejection Under 35 U.S.C. §102 (b)

Claims 1-4, 7-9, 12, 13, 18 and 19 were rejected under 35 U.S.C. 102(b) as being clearly anticipated by Trelles U.S. Patent No. 5,531,739. The Examiner's rejection is respectfully traversed.

Independent claim 1 recites a blood vessel treatment device which includes "means adapted for *intraluminal* contact with a wall of said blood vessel, for emitting laser energy to cause a decrease in the diameter of said blood vessel". (emphasis added) Thus the device according to the claimed intention, as shown in Figure 4B, is adapted to be inserted within the vein to be treated so that contact with the blood vessel wall is made *from within the vein* (i.e. intraluminal contact).

It is respectfully submitted that a close review of the Trelles reference reveals that it fails to teach any device which is adapted to make "*intraluminal* contact with a wall of a blood vessel" in the manner of the claimed invention. Trelles discloses a method in which a probe is advanced to a position *underneath* the vessel to be treated. Once in this position the vein is irradiated from a position *exterior* of the vein. This is clearly depicted in Fig. 2 of the Trelles patent. In view of the forgoing it is clear that Trelles fails to disclose a device which is adapted to make intraluminal contact with a wall of a blood vessel in the manner of the claimed invention and therefore cannot anticipate the device recited in claim 1.

4

Claims 2-4 and 7-8 depend directly from claim 1 and thereby incorporate all of the features and limitations recited in claim 1. Therefore it is respectfully submitted that Trelles also fails to anticipate the invention recited in these claims.

Independent claim 9 recites a method which includes the step of "placing said laser emitting section into *intraluminal* contact with the blood vessel at a treatment side". As discussed above with respect to claim 1 Trelles fails to disclose a method wherein a laser emitting section of a device is placed into intraluminal contact with a blood vessel. Rather, as discussed above, Trelles discloses a method wherein the vessel is treated from a exterior position relative to the vessel. Accordingly it is submitted that Trelles cannot anticipate the claimed invention according to independent claim 9. Claims 12, 13 and 18 and 19 depend from claim 9 and therefore incorporate all of the limitations and features thereof. Accordingly it is submitted that Trelles also fails to anticipate claims 12, 13, 18 and 19.

The Examiner further rejected claims 1, 4, 9, 11, 17 and 19 under 35 U.S.C. 102(b) as being anticipated by Goldman U.S. Pat. No. 4,564,011. The Examiner's rejection is respectfully traversed.

Independent claim 1 recites a blood vessel treatment device including means "adapted for *intraluminal contact* with a wall of a blood vessel, for emitting laser energy to cause *a decrease in the diameter of said blood vessel*". (emphasis added) Thus the device according to the claimed invention is arranged inside the vein to be treated and then the laser is directed against a

5

wall of the vein to thereby cause fibrosis of the vein leading to a decrease in the diameter of the vein. (See specification p. 8, lines 16-28). It is respectfully submitted that a close review of the Goldman reference reveals that the device disclosed therein is not adapted to deliver energy *to the vein wall in an intraluminal manner to thereby decrease the diameter of the vein*.

Goldman discloses a laser optic device 11 which includes a needle 27. As shown in Fig. 3 and discussed at column 3, line 44 through column 4, line 32 the needle may be inserted within the vein. However as discussed in the specification of Goldman the laser energy is not directed into the wall of the blood vessel but rather is *used to create a blood clot in the vessel*. Accordingly, unlike the claimed invention, there is no intraluminal contact with the blood vessel nor any delivery of laser energy to the vessel wall to thereby cause a decrease in the size of the vessel. Rather in Goldman a blood clot is generated to thereby cause a stoppage of flow in the vessel which in turn causes a decrease in the diameter of the vessel.

In another application of the device disclosed in Goldman, discussed at column 4, lines 33-66, the needle 27 is inserted in a position *near* the blood vessel to be treated. The tissue *near* the vessel is then subjected to laser energy to cause this tissue to scar. This scar tissue exerts a pressure on the nearby vessel and "effectively stops the flow of blood therethrough". Again however there is no contact with the vessel wall and certainly no intraluminal contact with the blood vessel wall.

6

In view of the above it is submitted that Goldman fails to teach the device recited in claim 1. Claim 4 depends from claim 1 and therefore includes all of the limitations and features recited therein. Accordingly it is submitted that Goldman also fails to anticipate the invention recited in claim 4.

Independent claim 9 recites a method in which laser emitting means is placed in *intraluminal contact* with a blood vessel and laser energy is directed *into the blood vessel wall* to thereby decrease the diameter of the vessel. As discussed above with respect to the claim 1 the Goldman reference fails to teach any such method. Accordingly it is submitted that Goldman fails to anticipate the claimed invention according to claim 9. Claims 10-11, 17 and 19 depend from claim 9 and thus include all of the features and limitations recited therein thus it is submitted that Goldman also fails to anticipate claims 10-11, 17 and 19.

## IV.    Rejection Under 35 U.S.C. §103 (a)

The Examiner further rejected claims 5, 6, 14-16 and 20 under 35 U.S.C. §103(a) as being unpatentable over Trelles U.S. Pat. No. 5,531,739 in view of Gay, Jr. U.S. Pat. No. 5,334,207.

It is submitted that Gay, Jr. fails to overcome the deficiencies of the Trelles reference discussed above. That is, it is submitted that Gay, Jr. fails to disclose a device including means adapted for intraluminal contact with a wall of a blood vessel for emitting laser energy to cause a decrease in diameter of said blood vessel. Likewise it is submitted that Gay, Jr. fails to disclose a method which includes the steps of placing emitting means in intraluminal contact with a blood vessel and emitting laser energy to decrease the diameter of said blood vessel. Since Gay, Jr. fails

7

to overcome the deficiencies of Trelles it is submitted that it cannot be combined therewith to thereby render the claimed invention obvious.

A one-month extension of time extending the time for response from February 15, 2001 until March 15, 2001 is enclosed herewith together with the appropriate extension fee. The fee for the additional claim is also enclosed. If it is determined that any other fee is required, the Patent and Trademark Office is specifically authorized to charge such fee to Deposit Account No. 50-0518 in the name of Steinberg & Raskin, P.C.

According to currently recommended Patent Office policy, the Examiner is specifically authorized to contact the undersigned in the event that a telephonic interview would advance the prosecution of this application.

An early and favorable action on the merits is earnestly solicited.

Respectfully submitted,

STEINBERG & RASKIN, P.C.

Martin G. Raskin
Reg. No. 25,642

Paul J. Higgins
Reg. No. 44,152

Steinberg & Raskin, P.C.
1140 Avenue of the Americas
New York, New York  10036
(212) 768-3800

8

# Exhibit 7.

PATENT APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

'19/1999 JMRTIS   00000028 09374290
FC:101                    760.00 OP

PTO-1556
(5/87)
*U.S. GPO: 1998-433-214/80404

| SERIAL NUMBER | FILING DATE | CLASS | GROUP ART UNIT | ATTORNE |
|---|---|---|---|---|
| 09/374,280 | 08/13/99 | 607 | 3737 | 634 0001U |

**APPLICANT**

LUIS NAVARRO, NEW YORK, NY; NESTOR NAVARRO, BARCELONA, SPAIN;
CARLOS BONE SALAT, MALLORCA, SPAIN; JOAQUINA FRUCTUOSO GOMEZ, MALLORCA,
SPAIN; ROBERT J. MIN, NEW YORK, NY.

**CONTINUING DOMESTIC DATA**********************
VERIFIED   PROVISIONAL APPLICATION NO. 60/119,235 02/09/99
           PROVISIONAL APPLICATION NO. 60/118,050 02/01/99

**371 (NAT'L STAGE) DATA********************
VERIFIED
        (None)

**FOREIGN APPLICATIONS************
VERIFIED
        (None)

IF REQUIRED, FOREIGN FILING LICENSE GRANTED 08/31/99

| Foreign Priority claimed 35 USC 119 (a-d) conditions met | ☐yes ☑no<br>☐yes ☐no ☐Met after Allowance | STATE OR COUNTRY | SHEETS DRAWING | TOTAL CLAIMS | INDEPENDENT CLAIMS |
|---|---|---|---|---|---|
| Verified and Acknowledged _____ Examiner's Initials _____ Initials | | NY | 9 | 20 | 2 |

**ADDRESS**

CHARLES N J RUGGIERO
OHLANDT GREELEY RUGGIERO AND PERLE LLP
ONE LANDMARK SQUARE 9TH FLOOR
STAMFORD CT 06901-2682

CUST # 21831

**TITLE**

ENDOVASCULAR LASER DEVICE AND TREATMENT OF VARICOSE VEINS

| FILING FEE RECEIVED | FEES: Authority has been given in Paper No. _____ to charge/credit DEPOSIT ACCOUNT NO. _____ for the following: | ☐ All Fees<br>☐ 1.16 Fees (Filing)<br>☐ 1.17 Fees (Processing Ext. of time)<br>☐ 1.18 Fees (Issue)<br>☐ Other _____<br>☐ Credit |
|---|---|---|
| $890 | | |

## ABSTRACT OF THE DISCLOSURE

A method is disclosed for treating blood vessels using endovascular techniques to deliver laser energy. Percutaneous access into the vein lumen will be obtained using an angiocatheter through which a fiber optic line will be introduced. The vein will be emptied of blood using elevation of the limb, patient positioning, compression, or other means. Laser energy will be delivered into the vein lumen using wavelengths from about 532 nanometers to about 1064 nanometers. Sufficient power and duration will be used to damage the entire thickness of the vein wall, ultimately causing fibrosis of the treated blood vessel. Fibrosis of the treated blood vessel causes the blood vessel to decrease in diameter or collapse.

20

## ENDOVASCULAR LASER DEVICE AND TREATMENT OF VARICOSE VEINS

## BACKGROUND OF THE INVENTION

5

### 1.    Field of the Invention

The present invention relates to a method for treating varicose veins.  More particularly, the present invention relates
10  to a method of utilizing laser energy delivered into the vessel lumen via endovascular techniques to treat varicose veins.

### 2.    Description of the Prior Art

15  The use of lasers in the treatment of vascular disease has been gaining rapid interest.  Lesions such as port wine stains, facial telangiectasias, and some lower extremity veins have been treated externally by lasers with some success.  Most of these laser procedures irradiate the surface of the skin with laser
20  energy that penetrates the skin, is absorbed by the blood, and coagulates and collapses the blood vessel.

Larger varicose veins are located deeper in the soft tissues.  Such veins have not been successfully treated with
25  laser techniques.  It is believed that treating such larger veins with laser energy delivered from the surface would require higher powers that could lead to increased side effects including scarring and skin hyper- or hypopigmentation.

30  Current accepted treatments of varicose veins include sclerotherapy, ambulatory phlebectomy, and ligation and stripping of the greater saphenous vein in cases of saphenofemoral junction

1

incompetence.  Although there has been wide variation in reported results of sclerotherapy treatment of the greater saphenous vein when saphenofemoral junction reflux is present, most studies report recurrence rates of 30% to 70% after 5 years.  The existing standard for the treatment of saphenofemoral junction reflux is limited ligation and stripping of the greater saphenous vein.

The obvious drawbacks of traditional surgical therapy include the increased risks and costs associated with more extensive anesthesia because general anesthesia is normally used during varicose vein surgery, instead of local anesthesia.  In addition, there are possible complications of the surgery that include bleeding, infection, hypertrophic scars, ankle paresthesia, and a prolonged recovery period.  Ambulatory phlebectomy for treatment of saphenopopliteal junction reflux or isolated perforator incompetence is less invasive than ligation and stripping and can be done with local anesthesia.  However, complications incident to the surgical procedure may still occur.

The search for less invasive techniques to treat varicose veins with acceptable short and long term results has led to the development of additional treatment modalities.  These modalities include ultrasound guided sclerotherapy (echo sclerotherapy), monopolar electrocautery, and a bipolar radio frequency based energy source delivered by a disposable catheter (VNUS).

Although, perhaps more invasive than surface laser irradiation, there are potential advantages to delivering laser

2

energy from below the skin.  Such advantages include a decrease in thermal damage to intervening tissue and minimization of the possible side effects to the skin itself.

5       In Spanish Patent No. 9701586 to Salat et al., electricity is used to treat varicose veins.  The Salat et al. patent describes an endoluminal electrocoagulator for varicose vein operations.  The microsurgical instrument contemplated by that invention is essentially based on the use of an 10 electrocoagulating microhead joined to a conductor wire with adequate flexibility to be inserted percutaneously.  The use of electricity inevitably leads to coagulation of blood within the blood vessel rather than causing fibrosis of the blood vessel itself.  However, it has now been found that fibrosis of the 15 blood vessel is preferred because veins of a much larger diameter may therefore be treated safely and effectively.

In U.S. Patent No. 4,564,011 to Goldman, laser energy is delivered from below the skin.  The Goldman patent provides using laser energy delivered via a hollow needle insertable within a 20 blood vessel to create a blood clot.  The Goldman patent also provides using laser energy immediately adjacent to a damaged blood vessel for creating white scar tissue which tends to push against the vessel, thereby causing the vessel to shrink in size 25 and at least partially disappear from view.  This requires that each single point of damage be treated separately.

In U.S. Patent No. 5,531,739 to Trelles, laser energy is delivered again from below the skin.  The Trelles patent

3

discloses a method in which laser energy is delivered via a fiber optic probe to a location underneath a blood vessel to be treated.  The vessel is irradiated with a treatment beam having a fluence sufficient to coagulate and collapse the vessel at that

5    location.  Yet, again, this procedure must be repeated at multiple sites along the length of the blood vessel so that it will collapse along its length and no longer carry any blood.

In U.S. Patent No. 5,053,033 to Clarke, laser energy is

10   delivered endoluminally.  The Clarke patent describes using laser energy in the range about 240 nanometers to about 280 nanometers delivered via an optical fiber or other waveguide incorporated, for example, into a percutaneous catheter.  In operation, the ultraviolet laser energy kills smooth muscle cells at an

15   angioplasty site, thereby reducing the risk of restenosis, while minimizing damage to surrounding tissue.  However, this technique is used to keep a blood vessel open and, therefore, has little use in the treatment of varicose veins.

20   In U.S. Patent No. 5,161,526 to Hellwing et al., laser energy in the wavelength range of 500 nanometers to 1100 nanometers is used.  The Hellwing et al. patent describes using laser energy to aid in the treatment of hemophilia by biostimulating muscles and joints.  However, this method delivers

25   the laser energy from the surface of the skin.  Thus, blood vessels in the treatment area remain unaffected.

In U.S. Patent No. 5,707,403 to Grove et al., laser energy is used to affect blood vessels.  In the Grove et al. patent,

4

laser energy is delivered at the surface of the skin in the wavelength range 700 nanometers to 1100 nanometers.  Blood vessels within the first 2 millimeters of the dermis can be treated with this method, otherwise the high fluence or energy

5    can cause explosion of surface vessels and burning of the skin. Furthermore, the delivery of laser energy at the surface of the skin inevitably causes coagulation of blood within the blood vessel rather than causing fibrosis of the blood vessel itself.

10    Endovascular delivery of laser energy would decrease the amount of power necessary to treat the vein and virtually eliminate the potential for adverse side effects to the overlying skin and intervening tissues.  In addition, fibrosis of the blood vessel is preferred because veins of a much larger diameter may

15    therefore be treated safely and effectively.

Accordingly, a need exists for an endovascular laser treatment of varicose veins using laser energy in order to produce direct endothelial and vein wall damage with subsequent

20    fibrosis.

5

## SUMMARY OF THE INVENTION

It is an object of the present invention to improve the method of the treatment of varicose veins.

It is another object of the present invention to provide such a method that decreases varicose vein recurrence rates.

It is still another object of the present invention to provide such a method that causes direct endothelial and vein wall damage with subsequent fibrosis.

It is a further object of the present invention to provide such a method that introduces a fiber optic line into the vein lumen to deliver intraluminal laser energy with direct contact of the tip of the fiber optic line with the vein wall.

It is yet another object of the present invention to provide such a method that avoids blood clot formation and maximizes vein wall damage.

These and any other objects of the present invention are achieved by a method for treating varicose veins using a tipped laser energy carrier to deliver laser energy into the blood vessel lumen to produce direct endothelial and vein wall damage with subsequent fibrosis. By delivering laser energy intraluminally, the entire thickness of the vein wall is damaged. This results in fibrosis of the vein and a decrease in the diameter of the varicosity. Preferably, the vein wall will be damaged to the extent that the subsequent fibrosis causes the vein to collapse.

6

## BRIEF DESCRIPTION OF THE DRAWINGS

Fig. 1 is a lateral sectional view of a leg with varicose veins involving a greater saphenous vein;

Fig. 2 shows application of a compression bandage to the leg of Fig. 1;

Fig. 3A shows percutaneous placement of an angiocatheter into the greater saphenous vein of the leg of Fig. 1;

Fig. 3B shows an enlarged, detailed view of a portion of Fig. 3A;

Fig. 4A shows endovascular placement of a tipped laser energy carrier into the greater saphenous vein of the leg of Fig. 1;

Fig. 4B shows an enlarged, detailed view of a portion of Fig. 4A;

Fig. 5 shows a position of the tip of the laser energy carrier under ultrasound guidance in the leg of Fig. 1;

Fig. 6 shows removing of venous blood from the leg of Fig. 1 with elevation and manual compression at the saphenofemoral junction;

Fig. 7A shows manual finger compression over the tip of the fiber optic line during delivery of laser energy to the saphenofemoral junction of the greater saphenous vein of Fig. 1.

5      Fig. 7B and 7C show manual finger compression over the tip of the fiber optic line while simultaneously delivering laser energy and withdrawing the fiber optic line from the greater saphenous vein of Fig. 1.

10      Fig. 8 shows an application of a compression bandage or stocking with foam pads along the course of the treated vein of the leg of Fig. 1;

Fig. 9 shows a prone sectional view of a leg with varicose 15  veins involving a lesser saphenous vein;

Fig. 10 shows an application of a compression bandage to the leg of Fig. 9;

20      Fig. 11 shows percutaneous placement of an angiocatheter into the lesser saphenous vein of the leg of Fig. 9;

Fig. 12 shows positioning of the tip of a laser energy carrier under ultrasound guidance to the leg of Fig. 9;

25      Fig. 13 shows a manual finger compression of the lesser saphenous vein at the tip of the laser energy carrier during delivery of laser energy to the leg of Fig. 9;

8

Fig. 14 shows an application of a compression bandage or stocking with foam pads along the course of the treated vein in the leg of Fig. 9;

5

Fig. 15 shows a supine sectional view of a leg with varicose veins with isolated perforator incompetence;

Fig. 16 shows application of a compression bandage to the leg of Fig. 15.

10

Fig. 17 shows percutaneous placement of an angiocatheter into the varicose vein of the leg of Fig. 15;

Fig. 18 shows positioning of the tip of a laser energy carrier under ultrasound guidance to the leg of Fig. 15;

15

Fig. 19 shows a manual finger compression of the varicose vein of the leg of Fig. 15 at the tip of the laser energy carrier during delivery of laser energy; and

20

Fig. 20 shows an application of a compression bandage or stocking with foam pads along the course of the treated vein of the leg of Fig. 15.

25

9

## DETAILED DESCRIPTION OF THE INVENTION

Referring to the drawings and, in particular, Fig. 1, there is shown a leg generally represented by reference numeral 10.

5 Leg 10 has a varicose, greater saphenous vein 30.  A varicosity in greater saphenous vein is typically due to incompetence of the saphenofemoral valve with reflux at a saphenofemoral junction 32. Additional perforators 34 connect greater saphenous vein 30 to the deep venous system of leg 10.

10      The following is representative of methods of the present invention.

The treatment area is anesthetized following pre-procedure
15 evaluation and informed consent.  As shown in Fig. 2, a compression bandage 36 is applied starting from the distal end of the foot up to the planned entry site of an angiocatheter 38, shown in Fig. 3A.  Compression bandage 36 facilitates emptying of the superficial venous system of leg 10.
20

As shown in Figs. 3A and 3B, angiocatheter 38, or a device of similar function, is placed percutaneously into greater saphenous vein 30.  To aid in the placement of angiocatheter 38, ultrasound imaging, or a similar functioning device, may be used.
25

As an alternative to the use of angiocatheter 38, an incision may be made above greater saphenous vein 30 at the planned entry site of a fiber optic line 40 so that the planned entry site may be visualized.  Then, fiber optic line 40 can be

inserted without the use of angiocatheter 38.   However, use of
angiocatheter 38 is preferred.

   Referring to Figs. 4A and 4B, in a preferred embodiment,
5   fiber optic line 40 is introduced into the vein lumen via
angiocatheter 38.   Fiber optic line 40 has a tip 41 that is
uncoated so as to allow emittance of laser energy.   The remainder
of fiber optic line 40 can be coated with various substances
known to the art.   The coated portion of fiber optic line 40
10   will not emit laser energy.   In addition, the coating provides
fiber optic line 40 with a combination of flexibility and
rigidity to minimizing the risk of breakage during manipulation.
The tip of fiber optic line 40 is preferably rounded in shape,
although other shapes are contemplated.   A rounded tip 41 is
15   preferred because it enables the operator to more easily control
the amount of vein to be treated and decreases the risk of
perforation of the vein during positioning of tip 41.   Tip 41
preferably has an outer diameter about 200 microns to about 600
microns in diameter.

   As illustrated in Fig. 5, tip 41 of fiber optic line 40 is
positioned a few centimeters distal to the saphenofemoral
junction 32.   Positioning of tip 41 is preferably accomplished by
emitting laser energy in the visible spectrum through tip 41.
25   This visible spectrum energy can be seen through the skin and may
be emitted concurrently with laser energy in other wavelengths.
Alternatively, a traditional ultrasound imager, shown generally
as 42, may be used.

11

Then, the patient is placed in trendelenberg position or, as
is shown in Fig. 6, leg 10 is elevated.  In this position,
saphenofemoral junction 32 is compressed, preferably by a hand 44
or ultrasound imager 42, to empty greater saphenous vein 30.  An
5    optional first compression bandage (not shown) may be applied to
the upper portion of leg 10 to aid in keeping greater saphenous
vein 30 empty of blood.  After being emptied of blood, greater
saphenous vein 30 is also compressed, preferably by hand 44 or by
ultrasound imager 42, so that tip 41 of fiber optic line 40 makes
10   direct contact with the vein wall.  Then, laser energy about 500
nanometers to about 1100 nanometers in wavelength is delivered in
bursts through fiber optic line 40 into the vein wall.
Preferably, the laser energy is in the range from about 532
nanometers to about 1064 nanometers and the duration of each
15   burst is about 0.2 seconds to about 10 seconds.  Each burst
delivers from about 5 to about 20 watts of energy into the vein
wall.  While laser energy is delivered in bursts through fiber
optic line 40, the fiber optic line is incrementally withdrawn
from greater saphenous vein 30.  However, the compression of
20   greater saphenous vein 30 around tip 41 is maintained as fiber
optic line 40 is withdrawn.  This method insures damage to the
entire thickness of the vein wall of greater saphenous vein 30,
ultimately resulting in fibrosis of the vein wall.  Fibrosis of
the vein wall leads to a decrease in the diameter of the vein.
25   The amount of fibrosis in the vein wall is determined by the
amount of laser energy delivered thereto.  Preferably, the method
will damage the vein wall to an extent that the subsequent
fibrosis causes the vein to collapse.  Alternatively, fibrosis of
the vein wall will decrease the diameter of the vein such that

12

normal uni-directional blood flow in greater saphenous vein 30 is restored.

Figs. 7A, 7B, and 7C illustrate three selected points of laser energy delivery with manual compression. Preferably, laser energy is first delivered to saphenofemoral junction 32 as shown in Fig. 7A. Beginning the treatment method as saphenofemoral junction 32 ensures that the entire length of greater saphenous vein 30 is treated with laser energy. Then, as shown in Figs. 7B and 7C, compression is maintained over the tip of fiber optic line 40 as it simultaneously delivers laser energy to and is withdrawn from greater saphenous vein 30. The power and burst duration can be modified according to initial clinical observations and obtained results at the discretion of the provider. The range of power is set forth above.

As shown is Fig. 8, after fiber optic line 40 and angiocatheter 38 are removed, one or more foam pads, identified as 46, are used to cover the puncture site and the course of the treated vein. A second compression bandage or stocking 48 may be applied over foam pads 46.

Fig. 9 shows a varicose, lesser saphenous vein 50. Such a varicosity is a typical consequence of the incompetence of saphenopopliteal valve 52 with reflux at the saphenopopliteal junction 52a. The procedure for treating lesser saphenous vein 50 is similar to the procedure used to treat greater saphenous vein 30. Thus, as stated above with reference to treatment of greater saphenous vein 30 and as now illustrated in Fig. 10,

13

compression bandage 36 is applied to leg 10.  Then, percutaneous access into lesser saphenous vein 50 is obtained with angiocatheter 38, or a similar functioning device, as shown in Fig. 11.  Also as stated above with reference to treatment of

5   greater saphenous vein 30 and as now illustrated in Fig. 12, fiber optic line 40 is placed into lesser saphenous vein 50 through angiocatheter 38.  The fiber optic line 40 is positioned a few centimeters distal to saphenopopliteal junction 52.  Again, visible spectrum energy emitted from tip 41, or ultrasound

10  emitted from ultrasound imager 42, is preferably used to facilitate such precise placement.  As illustrated in Fig. 13, leg 10 is then elevated and lesser saphenous vein 50 is drained of blood and compressed.  The drainage of blood is important to insure direct contact of the vessel walls with tip 41 during

15  delivery of laser energy.  Again, the delivered laser energy is about 500 nanometers to about 1100 nanometers in wavelength, preferably about 532 nanometers to about 1064 nanometers, in bursts for about 0.2 seconds to about 10 seconds per burst for a total of about 5 watts to about 20 watts per burst.  The above

20  described procedure is followed, with compression of lesser saphenous vein 50 maintained around tip 41, while fiber optic line 40 is incrementally withdrawn.

Fig. 14 shows that foam pads 46 are applied at the puncture

25  site and along the treated vein after fiber optic line 40 is completely withdrawn.  A second compression bandage or stocking 48 may then be applied over foam pads 46.

Another example of a vein, identified generally as 54,

14

having a varicosity that can be treated with the described
endovascular laser method is illustrated in Fig. 15. The
varicosity in vein 54 is due to an isolated perforator
incompetence, which creates a point of reflux 56 even though the

5  saphenofemoral junction 32 remains intact. The procedure for
treating vein 54 is similar to the procedure for treating both
greater and lesser saphenous veins 30 and 50. As now illustrated
in Fig. 16, first compression bandage 36 is applied to leg 10,
then percutaneous access into vein 54 is obtained with

10  angiocatheter 38, or a device of similar function, as shown in
Fig. 17. Referring to Fig. 18, fiber optic line 40 is then
placed into vein 54 through angiocatheter 38 and positioned a few
centimeters distal to point of reflux 56 by using visible
spectrum energy emitted from tip 41 or by using another

15  instrument, such as ultrasound imager 42. As shown in Fig. 19,
leg 10 is elevated. Then, vein 54 is emptied of blood and
compressed to insure direct contact of the vessel walls with tip
41 during delivery of laser energy. Again, laser energy is
delivered at about 500 nanometers to about 1100 nanometers in

20  wavelength, preferably about 532 nanometers to about 1064
nanometers, for bursts about 0.2 seconds to about 10 seconds per
burst, for a total of about 5 watts to about 20 watts per burst.
The above described procedure continues to be followed as the
process of compression of vein 54 around tip 41 is repeated while

25  fiber optic line 40 is withdrawn.

    Again, Fig. 20 shows that foam pads 46 are applied at the
puncture site and along the treated vein, and then a second
compression bandage or stocking 48 may be applied over foam pads

15

46.

Varicose veins in other locations can be treated with similar endovascular laser techniques.

Although the description above contains specificities, these should not be construed as limiting the scope of the present invention, but as merely providing illustrations of some of the presently preferred embodiments of the present invention.

The present invention having thus been described with particular reference to the preferred forms thereof, it will be obvious that various changes and modifications may be made therein without departing from the spirit and scope of the present invention as defined in the appended claims.

16

What we claim is:

1.    A blood vessel treatment device comprising:

5        means, adapted for intraluminal contact with a wall of a blood vessel, for emitting laser energy to cause a decrease in the diameter of said blood vessel.

2.    The blood vessel treatment device of claim 1, wherein
10  said laser energy causes said blood vessel to collapse.

3.    The blood vessel treatment device of claim 1, wherein said emitting means is about 200 microns to about 600 microns in diameter.

15

4.    The blood vessel treatment device of claim 1, wherein said emitting means is a fiber optic line.

5.    The blood vessel treatment device of claim 1, wherein
20  said emitting means has a laser emitting section located at a tip of said emitting means.

6.    The blood vessel treatment device of claim 5, wherein said tip of said emitting means is rounded.

25

7.    The blood vessel treatment device of claim 1, wherein said laser energy is applied in the range about 500 nanometers to about 1100 nanometers.

30

8.    The blood vessel treatment device of claim 1, wherein said laser energy is delivered in bursts.

17

9.    A method of treating a blood vessel using laser energy, comprising the steps of:

inserting means for emitting laser energy into the blood
5  vessel at a puncture site, wherein said emitting means has a laser emitting section;

placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment
10  site; and

emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of said blood vessel.

15

10.    The method of claim 9, further comprising emptying the blood vessel prior to emitting said laser energy.

11.    The method of claim 9, wherein said emitting means is
20  inserted into the blood vessel through the use of an angiocatheter.

12.    The method of claim 9, wherein said emitting means is about 200 microns to about 600 microns in diameter.
25

13.    The method of claim 9, wherein said emitting means is a fiber optic line.

14.    The method of claim 9, wherein said laser emitting
30  section of said emitting means is located at a tip of said emitting means.

18

15.   The method of claim 14, wherein said tip of said emitting means is rounded.

16.   The method of claim 14, wherein said tip of said emitting means is located at the treatment site through the use of a guidance means.

17.   The method of claim 9, further comprising applying compression externally to the blood vessel prior to applying said laser energy, thereby ensuring contact of said tip of said emitting means with the blood vessel.

18.   The method of claim 9, wherein said laser energy is applied in the range of about 500 nanometers to about 1100 nanometers.

19.   The method of claim 9, wherein said laser energy is delivered in bursts.

20.   The method of claim 9, further comprising:

removing said emitting means after applying said laser energy;

placing foam pads over said puncture site;

placing foam pads over the blood vessel; and

applying a compression means over said foam pads.

19

# Exhibit 8.



Wolf Greenfield
SPECIALISTS IN INTELLECTUAL PROPERTY LAW

John Strand
jstrand@wolfgreenfield.com
direct dial 617.646.8229

September 1, 2004

**BY FEDEX**

Alexandra Stevens, Esq.
McCarter & English
City Place I, 185 Asylum Street
Hartford, CT 06103

       Re:    Diomed, Inc. v. AngioDynamics, Inc. – Claim Construction
             Our File: D0610.60001US00

Dear Alexandra:

       Please find enclosed a copy of Diomed's Proposed Interpretation Of Asserted Claims.

       Very truly yours,

       WOLF, GREENFIELD & SACKS, P.C.

       John L. Strand

cc:    BY FEDEX
      Rodney S. Dowell
      BERMAN & DOWELL
      210 Commercial Street, 5th Floor
      Boston, MA 02109

JLS

Enclosure

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DIOMED, INC.,

       Plaintiff,

v.

ANGIODYNAMICS, INC,

       Defendant.

Civil Action No. 1:04-CV-10019 (RGS)

ANGIODYNAMICS, INC.,

       Counterclaim Plaintiff,

v.

ENDOLASER ASSOCIATES, LLC,

       Counterclaim Defendant.

## DIOMED'S PROPOSED INTERPRETATION OF ASSERTED CLAIMS

Set forth below is Diomed's proposed interpretation of the claims it is asserting against AngioDynamics, Inc., as required by the Court's order dated May 10, 2004.

| Claim | Limitation | Construction |
|-------|-----------|--------------|
| 9, 21 | means for emitting laser energy | any of the stand-alone fiber optic lines disclosed in the '777 patent specification and equivalents thereof (hereinafter "fiber optic line") |
| 9, 21 | inserting means for emitting laser energy into the blood vessel | inserting the fiber optic line into the interior lumen of the blood vessel |
| 9, 21 | laser emitting section | the exposed portion of the fiber optic line from which laser energy is emitted (e.g., the bare, uncoated tip of the fiber optic line) (hereinafter "bare tip") |

| | | |
|---|---|---|
| 9, 21 | placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel | contacting the bare tip and the inner wall of the vessel as the fiber optic line is moved within and along the vessel lumen |
| 9, 21 | emitting said laser energy into the blood vessel ... thereby decreasing the diameter of said blood vessel | emitting sufficient laser energy at the bare tip of the fiber optic line to cause vessel wall tissue damage (e.g., fibrosis) to lead to a decrease in the diameter of the blood vessel |
| 10, 21 | emptying the blood vessel | removing some or all of the blood from the blood vessel |
| 16 | guidance means | an aiming beam or an ultrasound imager and equivalents thereof |

Any language in the claims being asserted by Diomed, not addressed above, should be given its plain and ordinary meaning.

DIOMED, INC., and
ENDOLASER ASSOCIATES, LLC

By its attorneys,

Dated: September 1, 2004

Michael A. Albert (BBO #558566)
malbert@wolfgreenfield.com
James J. Foster (BBO #553285)
jfoster@wolfgreenfield.com
Michael N. Rader (BBO #646990)
mrader@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 720-3500

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document (Diomed's Proposed Interpretation Of Asserted Claims) was served by FedEx, on September 1, 2004, upon the following counsel for AngioDynamics:

Rodney S. Dowell
BERMAN & DOWELL
210 Commercial Street, 5th Floor
Boston, MA 02109

A courtesy copy was also sent by FedEx to Alexandra Stevens, Esq., McCarter & English, City Place I, 185 Asylum Street, Hartford, CT 06103.