UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DIOMED, INC., | ) | 10/21/04 |
| Plaintiff, | ) | |
| v. | ) | |
| ANGIODYNAMICS, INC., | ) CIVIL ACTION NO.: 04-10019-RGS | |
| Defendant. | ) | |
| AND | ) | |
| ANGIODYNAMICS, INC., | ) | |
| Counterclaim-Plaintiff, | ) | |
| v. | ) | |
| DIOMED, INC. AND ENDOLASER, LLC, | ) | |
| Counterclaim-Defendants. | ) OCTOBER 22, 2004 | |

## ANGIODYNAMICS' MEMORANDUM IN OPPOSITION TO DIOMED'S *MARKMAN* MEMORANDUM ON CLAIM CONSTRUCTION

Defendant AngioDynamics hereby opposes Diomed's Markman Memorandum on Claim Construction ("the Diomed Brief") and requests the Court to construe Claims 1, 9-11, 16-19, and 21 of U.S. Patent No. 6,398,777 ("the '777 patent") in accordance with this memorandum and AngioDynamics' Brief in chief, filed October 1, 2004 ("the AngioDynamics Brief").

**I.   Points of Agreement.**

As an initial matter, there now appear to be several points of agreement that lessen the Court's construction burden. Diomed has admitted that "[t]he claim language requires emission of laser energy through an emitting section that 'contacts' the vein wall." Diomed's Brief at 17; 5 ("Contact occurs between the emitting section of the fiber and the wall of the blood vessel, facilitating the desired transfer of laser energy to the vessel wall."). AngioDynamics agrees that the '777 patent only covers emission through the point of contact and asserts that this statement

supports a claim construction that the '777 patent is limited to emissions fired directly into the vessel wall through the point of contact between the uncoated emitting section of the fiber and the wall. As a result, AngioDynamics reiterates its request that the Court explicitly construe the '777 patent claims to exclude any method that narrows a blood vessel by damaging the tissue of the blood vessel wall indirectly, through heat, steam or other energy (including laser energy), or that reaches the vessel wall after having passed into or through some other form of matter such as blood, or blood products, or any other medium or space intervening between the tip and the interior vessel wall.

Diomed also asserts that the '777 patent requires the ability to control contact, admitting that "duration and frequency of contact leading to the desired narrowing of the vessel may be varied." Diomed's Brief at 17. AngioDynamics agrees that this measure of control is required and suggests that this further supports its position that the term "placing . . . into intraluminal contact" be achieved deliberately and systematically and not merely occur incidentally or by accident.

Given these admissions, the real dispute on claim construction focuses on several distinct issues: first, Diomed's assertion that the specification sufficiently links any structure other than a fiber optic line having an uncoated rounded tip to the claim limitation "means for emitting laser energy" and; second, Diomed's assertion that draining and compression are not required to insure the claimed contact between the tip of the laser and the interior wall of the blood vessel. Although Diomed has also tried to avoid addressing claim 1 of the '777 patent, this claim figures in AngioDynamics' counterclaims and is at issue.

2

## II.  The Rounded Tip.

### a.  The "laser emitting section" falls under Section 112 para. 6.

In defining the terms of clause (a) of Claim 9, Diomed tries to split the definition of the claim term "means for emitting laser energy" from the term "laser emitting section" to avoid the specification's disclosure of only a fiber optic line having an uncoated rounded tip. See Diomed Brief at 11-12, 13-14. Diomed relies on this interpretation to then assert that the specification's limited disclosure of only a fiber optic line with an uncoated rounded tip is simply a preferred embodiment that should not be imported into the claims, and that claim differentiation "further establishes that the 'laser emitting section' need not be located at the tip." See Diomed Brief at 13 n.6, 14.

Diomed's interpretation cannot be supported. First, Diomed has taken the claim language out of the context of the claim. The language of the claims, and in particular independent Claims 9 and 21, read "means for emitting laser energy . . . wherein said emitting means has a laser emitting section." Thus, grammatically, the term "wherein said emitting means has" expressly requires any emitting means to include "a laser emitting section." Accordingly, any structure for emitting laser energy must contain a "laser emitting section" to perform the claimed function of "emitting laser energy."

Therefore, in contrast to Diomed's unsupported assertion on page 14 of its Brief that "[t]his is not a means-plus-function claim," the claim's use of the word "has" establishes that the "laser emitting section" is inseparable from and part of the § 112 para. 6 means-plus-function clause. Smiths Indus. Medical Sys. v. Vital Signs, Inc., 183 F. 3d 1347, 1351, 1357-58 (Fed. Cir. 1999) (claim term "means for supplying gas having a hollow interior and first and second

openings at opposite ends thereof" limited by §112 para. 6 to double entry squeeze bags described in specification) (emphasis added); see also Griffin v. Bertina, 285 F. 3d 1029, 1034 (Fed. Cir. 2002) ("wherein" in claim is adverb necessarily requiring subsequent language to be read as limitation of clause preceding "wherein"). Accordingly, the "laser emitting means" of the '777 claims is further limited by § 112 para. 6 to the laser emitting section structures "as shown and described in the specification of the ['777] patent." Smiths, 183 F.3d at 1357-58. As set out in AngioDynamics' Brief the specification discloses only a fiber optic line having an uncoated rounded tip.

    b.    <u>The specification only identifies an uncoated rounded tip.</u>

Diomed relies on several questionable statements to support its assertion that the specification does not limit the "means for emitting laser energy" to fiber optic line having an uncoated rounded tip and equivalents thereof. Diomed cites on page 12 of its Brief to specification references discussing transmitting laser energy "through" a fiber optic line. There is no question that laser energy can pass "through" a fiber optic line, but the only structure linked in the specification to "emitting" laser energy is the uncoated, rounded tip. AngioDynamics' Brief at 17. Diomed asserts that the fiber optic line, and not the rounded "tip" have varying diameters; however, the specification actually reads "[t]<u>ip</u> 41 preferably has an outer diameter about 200 microns to about 600 microns." Col. 4, ll. 64-65 (emphasis added). Diomed asserts that "[a]ll of the fibers disclosed in the specification, regardless of diameter or tip shape, perform the function of 'emitting laser energy,'" which insinuates that the specification describes some other tip shapes. The '777 specification provides Diomed no such support.

Diomed's Brief does not identify any other possible tip shape, and more importantly, fails to point to any part of the '777 specification that does. And even if some other structure could be

imagined for the tip, the specification does not provide disclose any such structure. Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc., 248 F.3d 1303, 1313 (Fed. Cir. 2001); see AngioDynamics' Brief at 17.

Diomed only argues that the specification teaches a "laser emitting means" as a simple stand alone fiber with a "light emitting exposed section of the fiber [that] can contact the inner wall of the vein (which as noted above, is important to success of the procedure)." Diomed Brief at 12 (emphasis added). This argument fails for two reasons. First, the specification undisputably identifies only an uncoated rounded tip to emit laser energy. It states:

> Fiber optic line 40 has a tip 41 that is uncoated so as to allow emittance of laser energy . . . . [t]he tip of fiber optic line 40 is preferably rounded in shape, although other shapes are contemplated. A rounded tip 41 is preferred because it enables the operator to more easily control the amount of vein to be treated and decreases the risk of perforation of the vein during positioning of tip 41. Tip 41 preferably has an outer diameter about 200 microns to about 600 microns in diameter. Col. 4, ll. 53-64.

The '777 specification fails to disclose any other structure for performing the function of emitting laser energy. Second, Diomed's proposed construction is insufficient as a matter of law because identifying a structure that "can perform the recited function" is immaterial. See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc., 248 F.3d 1303, 1313, 1315 (Fed. Cir. 2001) (a disclosed structure's capability to perform function is irrelevant; to be included in list of § 112 para. 6 structures in claim interpretation, specification must clearly link structure to actually performing claimed function). The only structure linked or identified by the specification for emitting laser energy is a fiber optic line having an uncoated rounded tip and equivalent structures.

Diomed's citation to Overhead Door Corp. v. Chamberlain Group, Inc., 194 F.3d 1261, 1273 (Fed. Cir. 1999) is inapplicable because, as Diomed acknowledges in its parenthetical to

the citation, that holding was made in a case where a figure in the specification disclosed a broadening structure. Diomed in the '777 patent that any structure other than a rounded tip emits laser energy.

### c. Claim differentiation does not preclude a rounded tip.

Diomed is incorrect when it argues that the doctrine of claim differentiation precludes the Court from construing Claim 9 to require that the "laser emitting section" be located at the tip, and be rounded. Diomed's Brief at 13 n.6, 14. The Federal Circuit has explicitly held that dependent claims that identify a specific structural limitation, like claims 14 and 15 that Diomed relies on here, do not create a basis for applying the doctrine of "claim differentiation" to prevent independent claims, like claims 9 and 21, from containing the same limitations. Medtronic, 248 F.3d at 1303 (citing Laitram Corp. v. Rexnord, Inc., 939 F. 2d 1533, 1538 (Fed. Cir. 1991) ("independent claims containing means-plus-function limitations do not have the same literal scope as dependent claims reciting specifically the structure that performs the stated function... [t]he independent claim remains broader than [the dependent claim]. Literally, the independent claim covers the structure described in the specification and equivalents thereof. [The dependent claim] does not literally cover equivalents...").

Accordingly, in this case a claim construction limiting independent Claims 9 and 21 to require the rounded tip taught by the specification and equivalent structures does not conflict with dependent Claim 14 (emitting at tip) and Claim 15 (rounded tip), which by definition do not include any equivalent structure. Id. (holding claim differentiation did not preclude reading dependent limitation into independent claim). Furthermore, as discussed in AngioDynamics' Brief at 17, Section 112 para. 6 structure is limited only to structures specifically disclosed in the specification and their equivalents, so Diomed's reliance, in page 12 of its Brief, on the '777

6

patent's statement that "other shapes are contemplated" is misplaced and meaningless. Fonar Corp. v. General Electric Co., 107 F.3d 1543, 1551-52 (Fed. Cir. 1997) (analogous statement fails to identify Section 112 para. 6 structure).

**III.   Draining and compression.**

   a.   The specification expressly requires draining and compression.

Diomed's Brief admits on page 15 that to perform the invention, "contact is needed—[but asserts that] there is no requirement that contact must be achieved in any particular way." Diomed argues that draining and compression are just a preferred embodiment or examples of the invention. Id. (citing as examples Col. 6, ll 11-13 ("drainage of blood is important to insure direct contact of the vessel wall with tip 41 during delivery of laser energy"); and Col. 6, ll 43-46 ("vein 54 is emptied of blood and compressed to insure direct contact of the vessel walls with tip 41 during delivery of laser energy.")). Diomed then simply asserts that: "[c]ontact can of course be achieved (and, in practice, is often achieved) in other ways." Id.

There is no basis for this assertion. Instead, as discussed in AngioDynamics' Brief at pages 20 through 26, the specification and prosecution history make clear that there is no assurance of contact, and therefore no practicing of the invention, without draining and compression. Furthermore, the Federal Circuit's holding in the Irdeto case and in the Astrazeneca case reinforces the arguments and holdings of the cases cited at pages 20 through 26 of AngioDynamics' Brief, and reaffirm that Claims 9 and 21 must be construed to require draining and compression.

In Astrazeneca AB v. Mutual Pharmaceutical Co., Inc., No. 04-1100, 2004 WL 2186672, (Fed. Cir. Sept. 30, 2004) the Federal Circuit held that statements directly analogous to those made in the specification and prosecution history of the '777 patent disavowed claim scope. Id.

7

at *4. The Court noted that the same result occurred regardless of whether the specification and prosecution history are consulted first, to determine plain meaning initially, or are used after initially determining plain meaning from dictionaries to determine whether the patentee disavowed claim scope.. Id. In so holding, the Federal Circuit rejected any notion that lexicography or disavowals require formalistic expressions. Id.

Accordingly, simply because the patentees in this case did not say "I define the term 'placing . . . into intraluminal contact' to mean draining the vein and compressing it against the tip" does not mean that the patentees did not serve as their own lexicographers or define their invention as requiring draining and compression. Id. Similar to the definition of solubilizers listed suitable for practicing its patent in the Astrazeneca case, in this case it is apparent that the patentees expressly or by implication, defined "placing [the tip]. . . into intraluminal contact" with the vessel to require draining and compressing the vein. Col 5, ll. 12-17 ("After being emptied of blood, greater saphenous vein 30 is also compressed, preferably by hand 44 or by ultrasound imager 42, so that tip 41 of fiber optic line 40 makes direct contact with the vein wall."); Col. 6, ll. 11-13 ("drainage of blood is important to insure direct contact of the vessel wall with tip 41 during delivery of laser energy"); and Col. 6, ll. 43-46 ("vein 54 is emptied of blood and compressed to insure direct contact of the vessel walls with tip 41 during delivery of laser energy.").

Similarly, Irdeto Access, Inc. v. Echostar Satellite Corporation, No. 04-1154, 2004 WL 2034085 at page 7 (no * designations) (Fed. Cir. Sept. 14, 2004), requires that the '777 patent's consistent, repeated, and exclusive use of draining and compression in every embodiment, and lack of any suggestion of another method of "placing said laser emitting section of said emitting means into intraluminal contact," implicitly defined that term to require draining and

compression. Id. ("while the specification does not contain any statements of explicit disavowal or words of manifest exclusion, it repeatedly, consistently, and exclusively uses "group" to denote fewer than all subscribers, manifesting the patentee's clear intent to so limit the term. The specification also contains no affirmative indication that group can consist of all subscribers within the system.").

Moreover, just as in Astrazeneca, the statements in the '777 specification disavow methods not using draining and compression because they "describe[] a feature of the invention," here direct contact, and teach that the only way to achieve and maintain that contact is through draining and compression. See also Conopco, Inc. v. May Dept. Stores Co., 46 F.3d 1556, 1561 (Fed. Cir. 1994) (statement that specific ratio is "important" requires reading that ratio into claim). The '777 specification also distinguishes the '777 patent from other inventions that do not achieve and maintain such contact as being incapable of fibrosing the entire vein, requiring multiple treatment sites and producing unwanted blood clots. See Col. 5, ll. 28-31.

Diomed's citation to the Home Diagnostics case is distinguishable from this case because here the '777 patentees specifically defined their invention in both the specification, prosecution history and every embodiment as requiring draining and compression. Diomed's Brief at 9. In Home Diagnostic the District Court narrowed the claim term "suitably stable endpoints" based only on the disclosure in the preferred embodiments of specific timed intervals; however, this was error because the specification, prosecution history and prior publications established that measuring reaction products was another method for measuring endpoints. Home Diagnostics, Inc. v. Lifescan, Inc., 2004 WL 1925613 (Fed. Cir. 2004) at *5-6.

There is no analogous prior art or statements in the specification or prosecution history suggesting any other known method of deliberately achieving or maintaining vessel wall contact

with a fiber optic tip, nor can there be, as this contact, and the draining and compression method of achieving contact, was the essence of the invention. As the '777 patentees pointed out and specifically relied upon in the prosecution history to distinguish themselves over the prior art—draining and compressing to achieve contact during emission was the '777 patent's novel method of treating varicose veins.

      b.    <u>Claim differentiation cannot overcome the specification's clear requirement of draining and compression.</u>

Diomed's reliance on claim differentiation to avoid the specification and prosecution history's explicit requirements of draining and compression, Diomed Brief at 9, 15 & n. 7, places the cart before the horse. As fully laid out in AngioDynamics' Brief at 4-7, 20-26, statements like those made by the '777 patentees in the specification and prosecution history that detail the importance and necessity of draining and compression in order to practice the '777 invention and achieve its touted advantages over the prior art, expressly preclude the application of claim differentiation. <u>Toro Co. v. White Consol. Indus.</u>, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (holding that specification statements about certain aspects being "important" or an advantage precludes applying claim differentiation).

The Federal Circuit has consistently held that "claim differentiation does not serve to broaden claims beyond their meaning in light of the specification and does not override clear statements of scope in the specification and the prosecution history" <u>Id.</u>; <u>Wang Labs., Inc. v. America Online, Inc.</u>, 197 F.3d 1377, 1381 (statements in specification and prosecution history analogous to those here preclude claim differentiation); <u>O.I. Corp. v. Tekmar Co.</u>, 115 F.3d 1576, 1581 (Fed. Cir. 1997) (same); <u>see also</u> <u>Cognex Corp. v. Electro Scientific Industries, Inc.</u>, 214 F. Supp. 2d 110, 120 (D. Mass. 2002) (specification's description of aspects as "important components" of Universal Description Language, precludes claim differentiation). Accordingly,

because the '777 specification and prosecution history in this case repeatedly limited its definition of the invention and claim scope as requiring draining and compression, and specifically identified these acts as important to "insure" that the invention itself was being practiced, the doctrine of claim differentiation does not apply in this case and does not serve to remove draining and compression from the construction of any claim of the '777 patent.

Furthermore, both dependent claims 10 and 17 require limitations in addition to those required by claim 9 and properly construed by AngioDynamics. For example, claim 10 requires "emptying the blood vessel <u>prior</u> to emitting said laser energy," and claim 17 requires "applying compression externally to the blood vessel <u>prior to</u> applying said laser energy." The additional claim limitations of "prior to," over and above just draining and compression preclude claim differentiation from even applying.

Diomed's citation to <u>Liebel Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898, 910 (Fed. Cir. 2004) on pages 9 and 15 of its Brief provides Diomed no support for its position, because the patent specification in <u>Liebel</u>, in contrast to the '777 specification here, "did not suggest that [the limitation sought] is an essential component of the invention." <u>Id.</u> at 908. Instead, the Liebel decision actually strengthens AngioDynamics' claim differentiation argument because the <u>Liebel</u> Court explicitly distinguished itself from, and rather favorably cited, both the <u>Toro</u> and <u>Wang</u> cases and their holdings limiting claim construction.

Diomed's citation to <u>Comark Communications, Inc. v. Harris Corp.</u>, 156 F.3d 1182, 1887 (Fed. Cir. 1998) is similarly inapplicable here as that case dealt only with disclosure of a limitation in a preferred embodiment and did not address a situation, like the one here, or those in the cases cited above, where there is such explicit limiting language in the specification

making clear that draining and compression are necessary to practice the invention and to achieve the claimed beneficial clinical results.

## IV.  Bursts.

Diomed's suggestion that the claim term "bursts" should be read without limitation of duration or time as long as clinical benefit is achieved is unsupported to the extent it suggests that bursts can mean continuous emission throughout a procedure. The term is used in the plural indicating multiple bursts as distinguished from a single continuous emission. This interpretation is consistent with the specification's consistent use of the plural form of the word. See, e.g., Col. 5, ll. 24-25 ("[w]hile laser energy is delivered in bursts...."). As the Federal Circuit held in Conopco, the term "about" could not be expanded indefinitely as Diomed appears to propose for the limitation "bursts" here. Conopco, 46 F.3d 1556 (holding that term "about" did not have ordinary meaning allowing expansion of ratios by four fold). Diomed has provided no basis to justify any construction beyond that detailed on page 38 of AngioDynamics' Brief.

## V.  Emptying.

Diomed's assertion that claim 10 does not require making the vein empty of all blood, but rather should be construed to include a method where only "some" of the blood is removed is inconsistent with both the wording of the claim and the specification and prosecution history, and contrary to law. Diomed's reliance on Bell Communications Research, Inc. v. Fore Systems, Inc., 62 Fed. Appx. 951, 955 (Fed. Cir. 2003), on remand, 2003 WL 22295442 (D. Del. 2003) is misplaced. In Bell the claim language suggested concurrent processes but specifically

recognized that logic, grammar or the specification <u>can</u> require a particular order of claim steps and require that a particular process or act be completed. <u>Id.</u> at 955.[1]

In this case, logic, grammar and statements in the specification of the '777 patent make clear that "emptying" as used in the '777 patent refers to a completed act and does not mean just removing "some" of the blood. Claim 10 explicitly requires "emptying the blood vessel <u>prior</u> to emitting." As to claim 21, as fully described on pages 30-31 of AngioDynamics' Brief, the specification calls for making, and keeping, the vein empty. <u>See, e.g.</u>, Col. 5 ll. 14 ("after being emptied of blood"). The prior art and Diomed's Brief also establish that emitting laser energy into a vein that contains "some" blood creates blood clots, which violates a stated object of the invention and Diomed's positions in other sections of its Brief that distinguish the '777 patent because it does not form blood clots. Diomed Brief at 16 ("It is yet another object of the present invention to provide such a method that avoids blood clot formation").

Diomed must be held to the language it chose when it drafted its claims. The claims cannot be rewritten, even if achieving the result of an "empty" vessel is in Diomeds' words "hard to imagine." <u>Chef America Inc. v. Lamb-Weston Inc.</u>, 358 F.3d 1371, 1374-76 (Fed. Cir. 2004) (affirming refusal to rewrite claim and claim construction holding that claim requires heating bread to temperature that burned it, even though it rendered claim functionally invalid). Diomed's citation to <u>Kumar v. Ovonic Battery Co.</u>, 351 F.3d 1364, 1369 (Fed. Cir. 2003) is similarly off the mark. In <u>Kumar</u>, there were numerous references in the specification suggesting that amorphous crystalline structures are different from totally or completely amorphous structures. <u>Id.</u> In this case, there is simply no suggestion anywhere in the specification that emptying means anything less than making totally empty.

---

[1] On remand the district court's conclusion that an "empty" payload field must contain some data, was based on the particular factual situation of that technology and an admission by opposing counsel that "empty" fields included

## Conclusion

For the reasons set forth above and in AngioDynamics' Brief, filed October 1, 2004, AngioDynamics respectfully requests the Court to construe claims 1, 9-11, 16-19 and 21 of U.S. Patent No. 6,398,777 in accordance with the constructions set out in these Briefs and summarized in the chart attached as Exhibit 2 to AngioDynamics' Brief, along with any additional explicit limitations the Court deems necessary

Dated: October 22, 2004

DEFENDANT
ANGIODYNAMICS, INC.
BY ITS ATTORNEYS

By _____
MARK D. GIARRATANA
ALEXANDRA B. STEVENS
SETH M. WILSON (BBO# 640270)
McCarter & English, LLP
CityPlace I
185 Asylum Street
Hartford, CT 06103
(860) 275-6700
(860) 724-3397 (fax)
smwilson@mccarter.com
astevens@mccarter.com
        -and-
RODNEY S. DOWELL (BBO # 620916)
Berman & Dowell
210 Commercial Street
Boston, MA 02109
(617) 723-9911
(617) 723-6688 (fax)
rdowell@bermandowell.com

placeholders or garbage bits. Id.

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of <u>AngioDynamics' Memorandum in Opposition to Diomed's *Markman* Memorandum on Claim Construction</u> was served upon the attorney of record for the Plaintiff and Counterclaim-Defendants by regular mail on October 22, 2004.

Michael A. Albert, Esq.
Michael N. Rader, Esq.
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210-2206

*/s/ Seth M. Wilson*
Seth M. Wilson

HARTFORD: 624320.01

97353-00062