IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------------

Civil Action No.

**0410019 RGS**

DIOMED, INC.

Plaintiff,

AMICUS CURIAE

v.

BRIEF

ANGIODYNAMICS, INC.

Defendant

-----------------------------------------------------------------

1.     I, Dr. Ken Biegeleisen, who am not a party to this case, do hereby submit this

amicus curiae brief in the public interest.  I believe I can assist the Court in its efforts to

evaluate the testimony before it, and to come to a decision which will improve the health

of the American people, which is otherwise not likely to be an issue in the case.  With the

timely assistance of the Court, sufferers from diseases of the veins may live to see a new

generation of treatments which are superior to any available now.  On the other hand, if

the Court limits its attention strictly to the financial matters brought before it by the

parties to the case, ignoring the public health issues, then one or the other of the parties

may benefit, but the public will lose out.


2.     The best decision in this case is not necessary a decision which would be pleasing

to either of the two parties, since neither of them has persuasively demonstrated that they

really invented the technology they now quarrel over.  It is not my place to comment on

this aspect of the case, but it *is* my place to point out (since the parties won't so point out)

that their instruments do *not* provide better therapy than pre-existing methods did.  Does

1

this concern the Court? I would opine that it does. Creative advertising and the apparently-inexhaustible marketability of anything called "laser" have brought about, in just a few short years, such a windfall of commercial success that there are already, at the very least, not two but *seven* companies (plaintiff, defendant and five others) fighting for control of this deceptively new field. It is therefore already established, and a *fait accompli,* that no real progress will be made in venous medicine as long as such powerful financial incentive clouds the minds of doctors and patients alike, pressuring everyone who desires progress to be channeled into the same mind-numbing path where the money lies, and discouraging everyone from pursuing other paths which might be more beneficial to patients.

3.      The Court is in a position to make a positive contribution to the future of medicine, by preventing both plaintiff and defendant alike from achieving any more financial success or exclusivity than their efforts have openly and honestly earned them.

4.      Your amicus curiae petitioner holds that he is the inventor of intravenous laser (U.S. Patent #5,022,399). That this is the case is adequately attested to by the defendant's brief, which asserts that none of the patents in this case are valid, as they have failed to disclose #5,022,399 as prior art. Furthermore, one of the authors of the plaintiff's patent (Carlos Salat) has referenced my work in his other writings, although he too failed to acknowledge it as prior art in his patent application.

2

5.      "Amicus Curaie" means "Friend of the Court". If the Court holds itself to be a
friend of the People, then I am indeed a friend of the Court, since I intend to create an
instrument which will benefit the patients, *i.e.* people, of the United States and elsewhere;
an instrument which can go where surgeons cannot easily reach, and treat diseases which
cannot now be easily treated. But I cannot do this alone. Unless some sort of external
pressure is brought to bear on the companies which have the wherewithal to create such
an instrument, they will attend only to the "needs" of their stockholders, and not to the
needs of living human patients. The medical-technical industry is blinded by the lure of
quick and easy profits, and has discovered that it can create the illusion of having
"invented" something by taking a pre-existing invention of considerable value to
medicine, and stripping it down to a bare-bones marketing device which does no more
than pre-existing methods did. The Court has the power to make a determination as to
which of the parties before it—if either—invented the instruments they now quarrel
about. That being the case, the parties can be compelled, through the right decision, to
produce a better instrument, which they will not do voluntarily as long as the flood of
money keeps flowing.


7.      In order to avoid distracting the attention of the Court from the main points, I
have removed all further information to Exhibits. Any time spent reading them will be
time well-spent, relative to the matter at hand:

        Exhibit A is a list of the attributes of a true Venoscope.

        Exhibit B is a partial list of publications and presentations on the Venoscope.

        Exhibit C is the history of the concept of intravenous laser ablation of veins.

Exhibit D is a list of companies I have previously corresponded with.

8.    Unless the Court takes a strong interest in all the issues brought by this case, none of us will live long enough to see a decent venous instrument, even though the technology to create one has long existed.  Therefore, I reiterate that this petition is presented in the public interest.

Respectfully submitted,

K. Biegeleisen, M.D., Ph.D.
133 East 73rd Street
New York, N.Y. 10021
(212) 717-4422
kb@VeinDoctorNY.com

I declare, under the penalties of perjury of the United States of America, that the foregoing is true and accurate to the best of my knowledge.

December 31, 2004

K. Biegeleisen

4

# Exhibit A

EXHIBIT A

## Description and properties of a true Venoscope

The Venoscope combines many useful current diagnostic and therapeutic modalities into a single instrument, which not only provides a relatively non-invasive way of dealing with varicose veins, but it also has the capability of *exceeding* the ability of surgery to provide definitive treatments and long-term remissions.

Here is a partial list of some of the abilities of the Venoscope:

1.      The Venoscope has fiberoptic pathways for visualization, so that the internal anatomy of the vein can be seen directly, and treatment, wherever possible, can be done under direct vision.

2.      The Venoscope, furthermore, has piezoelectric crystals, which enable the instrument to do *in situ* flow studies of a precision not possible with surface Doppler. These also enable intravascular ultrasound imaging, which provides "eyes" in parts of the venous system where the blood flow is too rapid to wash out with an intravenous infusion.

3.      The instrument has channels for injecting ordinary "sclerosants" (medicines for the injection treatment of varicose veins) or the recently-approved cyanoacrylate adhesives.  Vascular-grade cyanoacrylate adhesives are on the verge of revolutionizing this field, and will probably eclipse both laser and radiofrequency ablation.

4.      The instrument's channels can be used to insert either a conducting wire for radiofrequency ablation, or a fiberoptic cable for laser ablation.

## Comparison with properties of the plaintiff's and defendant's devices

1.      Both the DIOMED and ANGIODYNAMICS devices have a single ability only:  They deliver a blind, third-degree burn to the inside of a vein.  This will inactivate and perhaps destroy the vein, although destruction of a single vein is generally *insufficient* to achieve good long-term results, since there are always 3-8 parallel tributary veins which must be dealt with if early recurrence is to be prevented.  These devices cannot deal with parallel tributary veins.

# Exhibit B

Exhibit B

Partial list of publications and presentations on the Venoscope

1. (1989) Biegeleisen K. "Use of a Specially Modified Angioscope for Accurate Injection of Sites of Deep-to-Superficial Reflux in Varicose Veins". Presented at the 12th Congress of the Phlebology Society of America, May 18-20, 1989, Kansas City, Missouri, and published in the Proceedings thereof.

2. (1989) Biegeleisen K. "Use of the Venoscope for the Treatment of Varicose Veins". Presented at the 10th World Congress of Phlebology, Strasbourg, France, September 25-29, 1989, and published in Phlebology 89, John Libbey Co., Ltd., London, 1989, pp. 419-422.

3. (1990) Biegeleisen K. "Venoscopy: A Useful Adjunct in Treating Varicose Veins". Presented at the 13th Annual Congress of the Phlebology Society of America, May 10-12, 1990, Chicago, Illinois, and published in the Proceedings thereof.

4. (1992) Biegeleisen K. "Venoscopy (venous angioscopy) as an adjunct to the surgical and non-surgical treatment of varicose veins". Presented at the 11th World Congress of Phlebology, Montréal, Canada, August 30-September 4, 1992, and published in Phlébologie 92, Eds. P. Raymond-Martimbeau *et al*. John Libbey Eurotext, Paris, 1992, pp. 677-679.

5. (1994) Biegeleisen K & Nielsen RD. "Failure of angioscopically-guided sclerotherapy to permanently obliterate greater saphenous varicosity". Phlebology (1994) 9:21-24.

6. (1995) Biegeleisen K. "Macrosclerotherapy and angioscopy". Chapter in *Ambulatory Treatment of Venous Disease*, Ed. Goldman MP, Bergan JJ. Mosby, St. Louis, MO., 1995, pp. 135-140.

# Exhibit C

Exhibit C

## History of intravenous laser ablation of veins

It may seem, when viewed in retrospect, that treatment of varicose veins by intravascular laser was a self-evident treatment just waiting to happen. In reality, however, at the time that amicus curiae petitioner carried out the research leading to the Venoscope, during the latter half of the 1980's, there was no significant literature on, or public discussion of the subject. Moreover, the types of lasers necessary for this work were still in development, and the lasers which were commercially available were not up to the task.

Although the lasers of that period ($CO_2$, argon, copper vapor and others) had been successfully applied in numerous other areas of medicine, no application of laser technology to the treatment of major varicose veins had been attempted. The reason is that the inside of a vein is *wet*, and no one had the slightest idea what would happen when one opened fire with a laser in a blood vessel totally filled with blood, which is, after all, a *fluid*. There would presumably be copious amounts of water vapor introduced to the vascular system. What effect would that have on the human body? What about the charred flesh? Would large and/or small carbon particles embolize, causing pulmonary damage or strokes (in the event of small right→left cardiac shunts)? No one knew.

Moreover, what would be the *purpose* of firing a burst of laser light inside a vein? Would the purpose be to eliminate the vein by literally making the blood boil? Or would it be to inflict a 3rd degree burn upon the intimal (*i.e.,* inner) lining of the vein? Or was there some other intended result? Once again, no one knew, and—prior to petitioner's patent #5,022,399, at least—nothing had been written.

The realization that laser treatment was even possible came about because of amicus curiae petitioner's consideration of the work of the Columbia University vascular surgeon, Roman Nowygrod, who pioneered the art of laser-welding of small arteries.

Vascular surgeons such as Nowygrod were removing lengths of blood vessel from parts of the body where the supply of healthy vessels was adequate, and grafting one or more such harvested vessels into other parts of the body where the circulation had become deficient.   Sometimes the length of a graft was insufficient for the job at hand, and two such grafts had to be connected end-to-end to make one long graft. "Classically" (if such a word can be used for a procedure only a few decades old), the connection would be brought about by sewing. In the operating room, while the patient lay unconscious under anesthesia, the surgeon would painstakingly sew two short grafts together under an operating microscope, using standard suture materials to accomplish the task.

Nowygrod experimented successfully with a technique for replacing suturing with laser *welding.* The object of this research was to cut down on time in the operating room, where, with the patient under anesthesia, time was of the essence. Nowygrod put the two

vessels together, overlapping the ends slightly, and went around the junction with a laser, to obtain the biological equivalent of what, in metallurgy, would be called a *weld*. The technique was successful in terms of the qualitative weld, but in terms of the quantitative strength, known as the "burst strength" of the weld, the procedure produced results which were at the borderline of what would be safe in the arterial system.

Application of laser heat to unmodified grafts gave rise to junctions with burst strengths of about 180 mm Hg, which is somewhat low. It is true that the normal arterial blood pressure is only about 125 mm Hg, but in hypertension, or even in a normotensive patient under physical or emotion stress, a transiently increased blood pressure of 180 or even higher would not be unusual. Under such circumstances an un-enhanced laser weld could burst, with serious consequences or even death.

To increase the strength of the weld, Nowygrod applied fibrinogen to the weld site. Furthermore, he applied the fluorescent dye *fluorescein isothiocyanate* to concentrate the laser light at the junction. This approach was successful, giving rise to welds with burst strengths of about 400 mmHg—vastly in excess of any pressure ever seen under natural conditions in the living human body (reference: Libutti SK, Oz MC, Chuck RS, Treat MR, Nowygrod R, "Dye-Enhanced Tissue Welding Using Fibrinogen and Continuous-Wave Argon Lasers", Vascular Surgery, Vol. 24[9], pp 671-676, November/December, 1990).

The above work was all done with arteries. The veins, in contrast, constitute a low-pressure system relative to arteries. Venous pressures in excess of 100 mm Hg would be unusual, which means that the welding shut of a vein by laser should be possible even without the use of strength-enhancing chemicals such as fibrinogen, or laser-enhancing dyes such as fluorescein. But one problem still remained: Nowygrod's work was done on dry vessels in the open air, on the table of an operating room microscope. The welding shut of a varicose vein would have to be accomplished *inside* the vessel, where the humidity is *always 100%*. Would it be possible? Or would the firing of a laser inside a vein simply cause a lot of smoke, vapor and soot, without attaining a physiologically-useful weld?

Such questions were impossible to answer without research, and no research funds were available. Nevertheless, amicus curiae petitioner added laser-welding to his patent, assuming that the questions would all be answered in the process of time.

Shortly after the patent was granted, petitioner visited Nowygrod at Columbia, and addressed his group on the subject of venous angioscopy and laser welding of veins. They were not at all interested. All their work was with arteries, and they had no intention of expanding into the venous field.

Petitioner also discussed laser-welding of veins with another physician, Dr. Daniel Choy of Lenox Hill Hospital, New York City. Dr. Choy had independently come to many of the same conclusions petitioner had come to with respect to the use of intravenous laser, although he had not invented or patented any instruments for that

purpose. Some pilot studies in animal vessels were discussed, but soon thereafter Choy was side-tracked by neurological projects he had gotten involved with, and he ceased working in the vascular area.

Whether the engineers at DIOMED and ANGIODYNAMICS even know that the instruments they sell are supposed to be performing a tissue weld is not clear. Nevertheless, it cannot be denied that their accomplishments in the area of laser ablation of veins have important clinical value. But it was not their idea, and they should have given credit where credit was due.

# Exhibit D

Exhibit D

## Partial list of individuals and companies with whom amicus curaie petitioner has corresponded regarding development of a Venoscope prototype

1.  Scientific Visualization, Inc.
45 Beekman Ave.
N. Tarrytown (now Sleepy Hollow), N.Y. 10591
914-332-4611
George Glaser, President/Director (914-591-7359)
Glaser is an inventor.  I made a presentation to his company at their N. Tarrytown office
in September 1991.
Outcome:  They were not interested.

2.  Olympus
4 Nevada Drive
Lake Success, N.Y. 11042-1179
Contact:  Richard Geoffrion, former head of marketing.
Olympus, one of the two largest fiberoptic companies in the world, supported my early
research for several years, providing at least $50,000 worth of angioscopic equipment to
experiment with.  In the end, however, they decided against proceeding.
Outcome:  Not interested.

3.  Medscan, Inc.
201 N. Broad Street
Philadelphia, PA 129107
(215) 299-3345
David A. Guerra
Chief Operating Officer
Letter, 8/27/91.
Outcome:  Not interested.

4.  Eli Lilly
Lilly Corporate Center
Indianapolis, IN 46285
317-276-5258
Att:  Paul A. Stewart
Letter, October 9, 1991
Outcome:  Not interested.

5.  GV Medical Co.
3750 Annapolis Lane
Minneapolis, MN 55441
Gary Moore
VP, Engineering
612-559-4000

Initial letter, October 28, 1991
They flew me out to make a presentation shortly thereafter.
Letter of rejection, 12/19/91.

6. HearX
(Subsidiary of 3M)
471 Spencer Drive
West Palm Beach, FL 3349
407-478-8770
Att: Paul Brown, M.D.
Contact was via letters and telephone calls to Brown, the founder of HearX. Brown was
the former CEO of MetPath, once the world's largest clinical laboratory company.
Brown forwarded my proposal to 3M headquarters.
Initial letter dated March 27, 1992
Outcome: Rejection letter from Brown, June 19, 1992

7. Yaeger Securities, Inc.
16633 Ventura Blvd.
Suite 1220
Encino, CA 91436
Att: Lyndon Parker
March 24, 1992
A venture capital group. They tried to start a company called "Veintek" to manufacture
and market my Venoscope. The company foundered because there were too many
business people demanding too many percentage points in exchange for little or nothing
in the way of services or financing.

8. Roman Nowygrod, MD
Dept Surgery, Columbia-Presbyterian Medical Center
622 W. 168 St
New York, N.Y. 10032
April 24, 1992
Nowygrod was the creator of laser-mediated arterial welding (see Exhibit C). After my
patent was granted, I attended a weekly lab meeting of the Nowygrod group, and
presented the Venoscope concept to them. There was no interest.

9. Intramed
Telephone call to Cynthia Drake (800-877-3187), on behalf of John Bergan (former
President of the International Society of Cardiovascular Surgery).
I sent them a Venoscope Proposal, in return for which they sent me an Intramed
Prospectus, and a large envelope of promotional literature for their angioscopic products.
They never formally responded to my proposal.
Outcome: Not interested.

10. United States Surgical Corporation
150 Glover Avenue

Norwalk, CT 06856
203-845-1000
Jeffrey S, White
Senior Director, Corporate Development
Letter January 13, 1993. They wanted me to sign an Unsolicited Disclosure Agreement,
which I signed and mailed.
2nd letter to Jeffrey White February 25, 1993.
Outcome: Not interested.

11. Stroock, Strook & Lavan
Att: Joseph Forstadt
Letter, November 15, 1993.
S, S & L is a major patent law firm which specializes in establishing relationships
between inventors and venture capital groups. Mr. Forstadt, whom I've known for many
years, was unable to generate interest among his clients.

12. George Jasovsky
110 Glenmore Court
Belair, MD 21014
Letter, June 24, 1994
A single individual with connections in venture capital. He is a friend of George Glasser
of Scientific Visualization, Inc. (see above).
Outcome: Not interested.

13. Felix Kramer
895 West End Avenue, New York, NY 10025
Letter, January 24, 1995
Mr. Kramer, an old friend, is the brother of the man who, about 30 years ago, developed
the first laser-sculpturing systems for fabrication of metal parts, for everything from table
lamps to automobile bodies.
Outcome: Not interested.

14. Olympus America
2 Corporate Center Drive
Melville, N.Y. 11747-3157
516-844-5000
Att: Koji Koda, Esq.
Letter, September 3, 1996.
    I had not communicated with Olympus since the resignation of Richard Geffrion (see
above) years earlier. In addition to reminding them of the Venoscope project, I also
offered to sell or license my patent.
    Letter of rejection from Shiro Bito, Design Engineer, June 18, 1997. His reasons: (1)
There is (he says) a "basic and strong patent from another company related to internal
ultrasound diagnosis of the vessel. Therefore it is difficult to develop such a product".
(2) It is estimated (by Olympus), that market volume of the angioscope will not increase
anytime soon. How very wrong they turned out to be.

15. Valleylab, Inc.
Pfizer Hospital Products Group
5920 Longbow Drive
Boulder, CO 80301
Att: John Brooks, General Manager, Emerging Businesses Group
Letter, December 23, 1996.
I offered to sell them the patent.
Letter of rejection: January 7, 1997.

16. The Biotechnology Source Group
1770 Massachusetts Avenue #302
Cambridge MA 02140
617-576-5841
Att: Bradley Ware
I was steered to them by Stella Manne, a patient of mine who works at NY Medical
College. They made and distributed a "Technology Opportunity Bulletin" for new
inventions. They did so for the Venoscope.
Letter, May 29, 1997
Outcome: No response to "Technology Opportunity Bulletin".

17. Circon/ACMI
Gastroenterology-Anesthesiology Division
6500 Hollister Avenue
Santa Barbara, CA 93117
800-654-1263
Att: Kevin Condrin, Product Manager
Letter, September 9, 1997.
Outcome: Not interested.

18. Mrs. Lisa Gable
714 St. James Place
East Windsor, N.J. 08520
609-443-7474
Single inventor who expressed an interest.
Letter, June 15, 1999.
Outcome: Not interested. (Outside her area of expertise).

19. Cardiovascular Imaging Systems (CVIS)
595 North Pastoria Avenue
Sunnyvale CA 94086-2916
408-749-9088
One of 4 companies recommended by patent lawyer Joy Goudie (other three: (1)
Medtronic, Inc, Minn. MN, (2) Heartstent Corp, St. Paul, MN, (3) Edwards Lifesciences
Corp., Irvine CA).
Letter of April 4, 2001.

Outcome:  Not interested.

20.  Diomed (plaintiff in the instant case).  I first learned of Diomed, in 2001, through
Robert Minn's television appearances.  Immediately after seeing him on television for the
first time, I called him at his office at New York Hospital-Cornell Medical Center.  I had
incorrectly presumed that he was a lone inventor who had independently arrived at the
same conclusions I had come to.

   I suggested to him that we collaborate, pointing out, in language as polite as I could
muster, that his device was relatively primitive, and only scratched the surface of what
was already possible with existing technology.  He seemed to grasp the importance of
what I was saying, but showed no interest in actually doing anything about it.  He
directed me to "his company", Diomed, saying that I had to speak to his "contact person"
in the company:
Tony Jacobowsky
630-215-7665
Email: tj@diomed-lasers.com
I spoke to Jacobowsky on June 23, 2001.  He said he would speak to his superiors in the
company, and get back to me.
Outcome:  He never called back.  I subsequently emailed him, but he didn't respond to
that either.  I later wrote directly to the company, and they too failed to respond.

21.  ET Medical Systems
100 Stierli Court, Suite 107
Mr. Arlington, NJ 07856
Att:  David Jenkins, President
Letter of June 4, 2003
Outcome:  Not interested.

22.  AngioDynamics (defendant in the instant case).
Initial contact by letter, mailed 1/27/04.

23.  BTG International Inc.
Five Tower Bridge
300 Barr Harbor Drive, 7th Floor
West Conshohocken, PA 19428-2998
Telephone & email exchange with:
   Laurie V Tzodikov
   Vice President, Client Development
   Phone 610-943-3515
   E-mail: Laurie.tzodikov@btgplc.com
   www.btgplc.com
Date: April 28, 2004
Outcome:  Not interested.

24.  William Kaplan, D.D.S.
7 Secor Road

Scarsdale, N.Y. 10583
Letter of June 21, 2004
Dr. Kaplan introduced me to Neil Singer of Convolve, Inc. (www.convolve.com). Singer
successfully sued Seagate for patent infringement, and considered taking on this case.
Outcome: Not interested.