UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DIOMED, INC., | ) | |
| | ) | |
| Plaintiff, Defendant in Counterclaim, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 04-10444-RGS |
| | ) | |
| VASCULAR SOLUTIONS, INC. | ) | |
| | ) | |
| Defendant, Plaintiff in Counterclaim. | ) | |
| | ) | |
| DIOMED, INC. | ) | |
| | ) | |
| Plaintiff, Defendant in Counterclaim, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 04-10019-RGS |
| | ) | |
| ANGIODYNAMICS, INC. | ) | |
| | ) | |
| Defendant, Plaintiff in Counterclaim. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION TO EXCLUDE UNTIMELY EXPERT OPINIONS

Defendants Vascular Solutions, Inc. ("VSI") and AngioDynamics, Inc. ("AngioDynamics") submit this Memorandum in Support of Motion to Exclude Untimely Expert Opinions relied upon by Plaintiff Diomed, Inc. ("Diomed"). Diomed – the party bearing the burden of proof on infringement and damages in this case – was required to identify its experts and produce its expert reports no later than June 22, 2005. Diomed recently confirmed that it intends to rely on previously undisclosed expert testing, analyses, and opinions in support of its infringement and damages case at trial. That confirmation came more than four months <u>after</u> the deadline for expert disclosures, <u>after</u> Diomed's experts had been deposed, <u>after</u> defendants

submitted their rebuttal reports, and <u>after</u> the deadline for requesting new discovery. Diomed's untimely opinions have <u>still</u> not been fully disclosed to defendants.

VSI and AngioDynamics bring their motion to exclude at this juncture in the case to avoid the prejudice, expense, and significant delay that would result if defendants are forced to respond to Diomed's untimely expert disclosures. With its own expert disclosure deadlines having passed, discovery having closed, and summary judgment deadlines just weeks away, defendants request that the Court decide this issue now, rather than in connection with summary judgment or trial. If the Court does not grant defendants' motion, defendants will need to re-do much of their pre-trial work in the case – defendants will need to re-depose Diomed's expert witnesses, analyze the new opinions, determine if they need to retain a damages expert, possibly conduct new experiments, and submit new expert rebuttal reports.

In support of their motion, defendants rely on this Memorandum, as well as the December 7, 2005 Declaration of Heather D. Redmond, with attached exhibits (referred to as "Tab __").

**I.   PHILIP GREEN'S LOST PROFITS OPINIONS AND DR. LUIS NAVARRO'S INFRINGEMENT TESTING AND OPINIONS SHOULD HAVE BEEN DISCLOSED ON OR BEFORE JUNE 22, 2005**

Discovery in these cases opened in mid-2004. When the parties moved to consolidate their cases for purposes of discovery in early 2005, they also asked the Court to amend the scheduling order. The resulting Order required the party with the burden of proof to identify its experts and produce Rule 26 reports within thirty days of the Court's ruling on claim construction. The Court made *Markman* rulings on April 12, 2005, resulting in a May 12, 2005 deadline for expert reports, and a June 15, 2005 deadline for completion of discovery. Those dates were later extended to June 17, 2005 for expert reports and September 15, 2005 for

2

discovery.[1] At Diomed's request, the parties agreed to extend the date for initial expert disclosures to June 22, 2005. *See* Tab A at 15.

As the plaintiff in this case, Diomed has the burden of proving that defendants infringed United States Patent No. 6,398,777 ("the '777 patent"), as well as the amount of its damages as a result of the alleged infringement. Thus, any expert opinions, testing, or analysis Diomed intends to rely upon in support of infringement or damages should have been disclosed by June 22, 2005.

On June 22, 2005, Diomed served a damages report by Philip Green, and two infringement liability reports – one by Dr. Chieh-Min Fan and another by Dr. Rox Anderson. Diomed also identified two of the '777 patent inventors – Drs. Luis Navarro and Robert Min – as individuals who may be used at trial to present evidence under Fed. R. Evid. 702, 703, or 705. *See* Tab A at 17. Neither Dr. Navarro nor Dr. Min is an employee of Diomed. According to the license agreement between Dr. Navarro's company, Endolaser Associates, and Diomed, Diomed is required to pay Dr. Navarro up to $3,500 per day – in addition to his travel expenses – for his services in connection with an action to enforce the '777 patent. *See* Tab H at 7 ¶ 4.6(d). Nevertheless, Diomed represented that Drs. Navarro and Min were not "retained or specially employed to provide expert testimony in the case," and did not provide expert reports disclosing their analyses or opinions. *See* Tab A at 17. Because Diomed submitted no expert reports from them, defendants expected that, at most, Drs. Navarro and Min might testify as to their opinion on how the procedure in question works based on their prior experience in performing the procedure in their practices. At no time did Diomed suggest that either might be asked to express an opinion based on testing and experiments performed during the course of the

---

[1] On September 13, 2005, the scheduling order was amended to allow the parties to serve discovery requests on or before October 15, 2005. Summary judgment motions are to be filed on or before December 21, 2005. Because the expert deadlines had already passed, there was no extension of time to serve expert reports.

3

litigation, much less after the deadline for expert disclosures.

II.  **MR. GREEN'S WHOLLY NEW LOST PROFITS OPINIONS WERE NOT PROPERLY DISCLOSED AND MUST BE EXCLUDED**

On June 22, 2005, Diomed served the expert report of Philip Green regarding damages caused by defendants' alleged infringement of the '777 patent. *See* Tab D. Mr. Green's damages analysis relied solely on a reasonable royalty theory. In reliance on Mr. Green's report, neither defendant retained a damages expert. Instead, on September 2, 2005, VSI and AngioDynamics disclosed to Diomed that they may rely on opinion testimony by certain employees to rebut Mr. Green's opinions. *See* Tab E. Mr. Green was deposed on September 14, 2005.

At a deposition on October 28, 2005 – four months after the deadline for such disclosures and nearly two months after defendants' rebuttal reports were due – Diomed's counsel indicated that Diomed intended to amend Mr. Green's report to assert a wholly new claim for lost profits. That intention was confirmed in writing on November 2 and November 14, 2005. *See* Tab A at 26-27, 29. Although October 15, 2005 was the last day for parties to request discovery, and summary judgment briefs are due on December 21, 2005, Diomed has <u>still</u> not served the promised supplemental report.

A.  **Mr. Green's Untimely Lost Profits Analysis Should Be Excluded Pursuant To Fed. R. Civ. P. 37(c)**

Federal Rule of Civil Procedure 26(a)(2)(B) is aimed at preventing the unfair surprise that results from a party's failure to fully disclose "a complete statement of all opinions to be expressed" by the party's expert witnesses by the time established by the Court's scheduling order. Fed. R. Civ. P. 26(a)(2)(B); *see Macaulay v. Anas*, 321 F.3d 45, 50 (1st Cir. 2003). In accordance with that Rule, Diomed was under a duty to identify the information its experts would rely on in formulating their opinions <u>and to seek that information early enough in</u>

4

discovery to ensure that complete expert disclosures would be submitted by the required deadline. *See Boucher v. Northeastern Log Homes, Inc.*, No. Civ. 04-84-P-C, 2005 WL 758470 at *6 (D. Me. Mar. 8, 2005); *see also Sheek v. Asia Badger, Inc.*, 235 F.3d 687, 694 (1st Cir. 2000) (parties must ensure that their experts are prepared to timely submit complete expert disclosures).

Federal Rule of Civil Procedure 37(c) provides for the exclusion of expert opinions and other evidence not timely disclosed:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed. R. Civ. P. 37(c)(1). Under Rule 37(c), new expert opinions that are disclosed after the deadline presumptively should be excluded. *See Poulis-Minot v. Smith,* 388 F.3d 354, 358 (1st Cir. 2004); *Klonoski, M.D. v. Mahlab, M.D.*, 156 F.3d 255, 269 (1st Cir. 1998) ("the required sanction in the ordinary case [under rule 37(c)] is mandatory preclusion").

Rule 16(f) also gives the Court the power to exclude untimely-disclosed expert testimony to preserve case deadlines and enforce the Court's Scheduling Order. *See* Fed. R. Civ. P. 16(f) ("If a party or party's attorney fails to obey a scheduling or pretrial order . . . the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D); *see also Boucher,* 2005 WL 758470 at *4; *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995).

Mr. Green's lost profits analysis – which <u>still</u> has not been produced to defendants – is untimely and should be excluded. Diomed has no substantial justification for its failure to disclose Mr. Green's lost profits opinions on or before the June 22, 2005 deadline set forth in the

5

Court's scheduling order. In addition, Diomed's intended late disclosure is far from harmless. Diomed's inexcusable disregard for the Court's scheduling order should result in the exclusion of Mr. Green's untimely opinions.

    **B.**    **Diomed's Untimely Disclosure Of Mr. Green's New Damages Theory Is Not Substantially Justified**

In an attempt to deflect responsibility for its noncompliance, Diomed blames defendants' alleged failure to produce information for its still undisclosed lost profits analysis. *E.g.*, Redmond Decl. Tab A at 26-27, 29. Specifically, Diomed contends that Mr. Green's lost profits analysis required individual sales information, by month, for each of defendants' customers. *Id.* Diomed, however, never requested the information from defendants in formal discovery requests, and never even <u>informally</u> suggested to defendants that it needed that information prior to Diomed's June 22, 2005 expert disclosure deadline. Thus, it was Diomed's own lack of diligence in requesting the information it needed – not defendants' inadequate production – that caused Diomed's inability to perform the analysis prior to the June 22 deadline.

    **1.**    **Diomed Failed To Request Customer-Specific Sales Information From Defendants Prior To Diomed's June 22, 2005 Deadline For Its Damages Expert Report**

AngioDynamics responded to Diomed's first set of document requests in June 2004. *See* Tab C. VSI responded to a nearly identical set of requests in July 2004. *See* Tab B. Although Diomed requested documents showing defendants' monthly unit and dollar gross and net sales of defendants' products, as well as corresponding costs, the requests did not ask defendants to produce documents showing sales data on a <u>per customer basis</u>. *See, e.g.*, Tab B, Request Nos. 13, 14; Tab C, Request Nos.13, 14. VSI produced to Diomed its responsive financial records, as well as monthly reporting packages showing its monthly sales, costs, and profits. AngioDynamics produced its monthly sales information as well. Diomed also requested

correspondence between defendants and their customers, and defendants' customer lists, which both defendants produced. *See* Tab B, Request Nos. 4, 51; Tab C, Request Nos. 22, 52. Diomed never complained that defendants' responses to those requests were incomplete and never brought a motion to compel.

The information Diomed now argues that it needs from defendants to complete its lost profits analysis, includes – for every month since defendants began selling the accused products – a listing of every customer purchasing defendants' products; the number of kits purchased by each customer during the month; the revenue from each customers' kit purchases; the number of laser consoles purchased by each customer during the month; and the revenue from each customers' laser console purchases. Tab A at 24-25. Diomed now argues that it asked for that information from VSI through document requests 42 (financial statements), 48 (documents regarding Diomed's competitors), and 51 (customer lists), and from AngioDynamics through document request 52 (customer lists). *See* Tab A at 20, 29. No reasonable interpretation of Diomed's document requests would encompass such information. *See* Redmond Decl. ¶ 4 (quoting requests).

Until very recently, Diomed's only request for more information simply asked defendants to "supplement" production to reflect any "newer" documents and "updated" financial information. *E.g.*, Tab A at 3-4, 10.[2] Diomed did not communicate with defendants again regarding their sales information at any time prior to June 22, 2005, and Diomed never filed a motion to compel the information from defendants. *See* Redmond Decl. ¶ 5.

    2.    **Diomed's Informal Requests For Customer-Specific Sales Information Came Too Late**

Seven weeks after producing its damages report, Diomed wrote to defendants asking

---

[2] A more detailed history of the communications between the parties can be found in paragraphs 4-8 of the Redmond Declaration.

again that they update their financial information. *See* Tab A at 19; Redmond Decl. ¶ 6. Defendants complied with that request. *Id.* ¶ 7. Again, Diomed never brought a motion to compel additional documents from either defendant.

On October 14, 2005 – the last day the parties were allowed to serve new discovery requests – Diomed sent another letter requesting production of Document "Category B" including: "Sales on a per customer, per kit, and per laser basis, specifically including monthly sales information for kits and lasers that identifies, for each sale, the entity to whom the kit or laser was sold, the price per unit, and the number of units." Tab A at 24-25. That request was the first that defendants had ever received for such information. The request came nearly four months after Mr. Green drafted his initial expert report, six weeks after defendants' rebuttal damages reports were due, and sixteen months after discovery opened in the case – too late for Diomed to use as an after-the-fact justification for its untimely expert disclosure.[3]

### 3. Diomed's Lack Of Diligence Is Not Substantial Justification

Diomed's informal requests for customer-specific sales information from defendants came too late. Instead of promptly asking defendants for the documents and an extension of time to analyze the information, or filing a motion to compel along with a request to extend the deadline for its expert reports, Diomed waited four <u>months</u> after the deadline to identify a wholly new theory of damages. Diomed's lack of diligence is not an excuse for its untimely report. *See Sheek*, 235 F.3d at 694 (party should take steps to request required discovery in advance of the deadline for disclosing expert opinions); *Boucher*, 2005 WL 758470, at *5 ("[I]f [plaintiff] believed his expert needed more information to reach her opinions, he should have initiated that discovery prior to the expert deadline.").

---

[3] Although never served with a formal discovery request, both VSI and AngioDynamics have now produced the sales information by customer as Diomed requested. *See* Redmond Decl. ¶ 8. Defendants, however, reserved the right to object to any attempt by Mr. Green to amend his expert report to include a new theory of damages.

The burden was on Diomed to seek an extension of the deadline for its expert reports before the June 22, 2005 deadline instead of submitting an incomplete expert report. *See Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998), *cited favorably in Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004). Having not done so, Diomed's untimely expert opinions should be excluded. *See, e.g., Poulis-Minot*, 388 F.3d at 358 (excluding each element of expert's testimony that was not fully disclosed by the scheduled date for Rule 26(a)(2)(B) disclosures); *Cytyc Corp. v. Tripath Imaging, Inc.*, No. Civ. A. 03-11142-DPW, Civ.A. 03-12630-DPW, 2005 WL 1527883 (D. Mass. Jun. 21, 2005) (slip copy) (same). This is particularly true because Mr. Green acknowledged in his report that he did not have the information necessary to perform a lost profits analysis. *See* Tab D at 7. Thus, Diomed was well aware on or before the June 22, 2005 deadline that it needed additional discovery if it wanted to assert a claim for lost profits. Still, Diomed waited nearly seven weeks after submitting Mr. Green's report before it made even an informal inquiry about additional documents, and another two months before it specified exactly what it wanted.

### C.   **Diomed's Untimely Disclosure Of Mr. Green's New Opinion Is Not Harmless**

In reliance on Mr. Green's report, VSI and AngioDynamics concluded that they did not need to retain damages experts to rebut his reasonable royalty analysis. On September 2, 2005 – the date rebuttal reports were due – both defendants sent letters to Diomed disclosing individuals within their respective companies who may be used at trial to offer opinion testimony rebutting Mr. Green's reasonable royalty report. *See* Tab E. Although not formal expert reports, those letters disclosed the testimony and opinions defendants would rely on in rebutting Diomed's damages case. *Id.*

Diomed's disclosure of a new damages theory after the scheduled deadline will unfairly prejudice defendants – who must now hurriedly attempt to depose Mr. Green on his new

9

opinions, determine if they must retain an expert to rebut the new opinions, and supplement their own expert disclosures pursuant to Rule 26(e). *Macaulay*, 321 F.3d at 52 ("Common sense suggests that when a party makes a last-minute change that adds a new theory of liability, the opposing side is likely to suffer undue prejudice."); *Poulis-Minot,* 388 F.3d at 358; *see also Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico,* 248 F.3d 29, 34 (1st Cir. 2001) (quoting trial court's ruling that "to the extent that there is a disadvantage created by the expert's failure to disclose, it must be born[e] by the party retaining the expert witness"); *Boucher,* 2005 WL 758470 at *4 ("Defendant's decisions with respect to its own expert testimony, the work that was done on the site visit, the follow up questions that could have been asked at [the expert's] deposition, and the questions that were asked at the witness's depositions were all affected . . . . It is absolute prejudice to the Defendant to sustain the expense of a deposition of an expert only to have her opinion change in such a fundamental and material fashion.").

Even if the Court allows defendants to attempt to re-do their damages defenses, Diomed's untimely disclosure will almost surely delay resolution of this case. Diomed has not even disclosed Mr. Green's new opinions, and the deadline for requesting new discovery has already passed. Facing a deadline for summary judgment motions just weeks away, defendants will need to analyze Diomed's new theories, depose Mr. Green a second time, determine if they need to retain a responsive damages expert, and prepare and serve a rebuttal report. In short, defendants will need to start over again in their defense of Diomed's damages claims. No amount of diligence on the part of defendants could accomplish those tasks before the December 21 deadline for summary judgment motions. That type of inevitable delay cannot be said to be harmless. *See Peterson v. Scotia Cruises, Inc.*, 222 F.R.D. 216, 217 (D. Me. 2004) (untimely

expert disclosure "could only delay further the trial of this case" and "cannot be said to be harmless at this stage of the proceeding").

Accordingly, pursuant to Fed. R. Civ. P. 37(c) or 26(f), Diomed's intended disclosure of a lost profit theory of damages, and Mr. Green's testimony regarding that new theory, must be excluded.

### III. DR. NAVARRO'S NEW EXPERIMENTS AND OPINIONS WERE NOT DISCLOSED TO DEFENDANTS PRIOR TO JUNE 22, 2005 AND SHOULD BE EXCLUDED

On the day its infringement expert reports were due, Diomed served the reports of Dr. Fan and Dr. Anderson. Dr. Anderson performed no experiments in support of his opinions. Dr. Fan performed a number of experiments, all designed to show that the endovenous laser therapy procedure requires contact between the laser fiber and the vessel wall in order to effectively treat varicose veins. Dr. Fan was deposed on August 19, 2005, and Dr. Anderson was deposed September 23, 2005.

Also on June 22, Diomed disclosed that two inventors of the '777 patent – Drs. Min and Navarro – may be used to present opinion testimony at trial. Tab A at 17. Although Dr. Navarro is not an employee of Diomed, Diomed did not produce an expert report, claiming that Dr. Navarro was not retained or specially employed to provide expert testimony. *Id.* However, under Endolaser's license agreement with Diomed, Diomed is required to pay Dr. Navarro up to $3500 per day for his services in connection with an infringement case such as this one.

Dr. Navarro was deposed by defendants on May 12, 2005. Although Dr. Navarro expressed opinions regarding the mode of action of endovenous laser treatment (based on his involvement in the '777 invention and his prior experience in performing the procedure in connection with his practice), at no time during his deposition did he disclose an intention to perform any experiments in an effort to prove his theories or the possibility that he may offer

11

opinions specifically regarding defendants' alleged infringement.

In reliance on Diomed's timely expert disclosures, on October 14 defendants produced rebuttal reports by Drs. Russell Samson and Thomas Proebstle addressing the opinions of Drs. Fan and Anderson.[4] AngioDynamics also disclosed Dr. Lowell Kabnick as a witness who might offer opinion testimony at trial. Like Drs. Min and Navarro, Dr. Kabnick has extensive prior experience in performing endovenous laser treatments, and based on that experience, he may offer his opinion on how the procedure works. Diomed deposed Dr. Proebstle on November 18 and Dr. Samson on November 21.

Dr. Navarro was scheduled to appear for a second deposition day on October 27, 2005.[5] Three days before the deposition, and without any prior notice, Diomed produced to defendants a series of slides from testing that Dr. Navarro had performed. *See* Redmond Decl. ¶ 9. The slides showed that some of Dr. Navarro's experiments followed procedures that were used by Dr. Fan in preparing her expert report for Diomed. *See* Tab F at 362. They also showed that Dr. Navarro was conducting some of his tests using equipment developed by Dr. Fan for her experiments. When Dr. Navarro was deposed on October 27, he testified that his experiments were not yet complete. *See* Tab F at 354.

Since Dr. Navarro's deposition on October 27, 2005, Diomed has produced six additional disks relating to Dr. Navarro's work that include hundreds of photographic images and several videos. *See* Redmond Decl. ¶ 9; Tab A at 31, 32, 33. Among those disks were two videos of procedures taped by Dr. Navarro on November 17 and November 30, 2005. The disk relating to

---

[4] The parties stipulated that rebuttal reports would be due 30 days after the deposition of each party's primary experts.

[5] Diomed designated Dr. Navarro as a corporate representative to testify as to numerous topics in both defendants' Rule 30(b)(6) notices. The parties agreed that both defendants were entitled to question Dr. Navarro for a seven-hour day.

12

the November 30 video was produced at the third day of Dr. Navarro's deposition on December 5, 2005. *See* Tab G at 3-4.[6] Dr. Navarro testified at his December 5 deposition that the two latest disks were prepared in response to questions asked of him by VSI's counsel at his October 27, 2005 deposition and were produced for purposes of this litigation. *Id.* at 4-6. By the time of his latest deposition, Dr. Navarro had performed approximately ten tests, experiments, and/or procedures upon which he intends to base his opinion testimony at trial, all of which were performed after the June 22, 2005 deadline by which Diomed had to disclose such evidence. In addition, defendants knew nothing of his work (despite the fact that the testing had been going on for at least a couple of months, *see* Tab F at 354) until well after their technical experts had completed their reports. *See* Redmond Decl. ¶ 9. By e-mail dated November 14, 2005, Diomed confirmed that it intends to rely at trial on Dr. Navarro's testimony and late-produced evidence and expert opinions regarding the experiments he performed. *See* Tab A at 29.

    A.    **Dr. Navarro's Newly-Disclosed Experiments Should Have Been Disclosed By The June 22, 2005 Deadline For Diomed's Infringement Opinions**

"[A]ny part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of [Federal Rule of Evidence] 702 is governed by the ... corresponding disclosure requirements of the Civil ... Rules." Fed. R. Evid. 701 advisory committee's note; *Freedom Wireless, Inc. v. Boston Communications Group, Inc.*, 369 F. Supp. 2d 155, 158 (D. Mass. 2005). Although a person with expert qualifications can give lay testimony based on his or her personal observations of a relevant event (for example, Dr. Navarro's prior experience in inventing the patented method or performing the procedure in connection with his practice), a witness is not permitted to give opinions based on specialized knowledge without first submitting a Rule 26 disclosure. *See Freedom Wireless*, 369 F. Supp.

---

[6] Because Dr. Navarro was deposed only three days prior to the filing of this motion, only a rough transcript of his deposition was available. Excerpts from that deposition are attached as Tab G to the Redmond Declaration.

2d at 157 and n.1 (excluding testimony where an expert's opinion was derived by "applying his specialized knowledge" to disputed case-issues and was "several degrees removed from [his] actual experience" in implementing his invention in real-world situations); *see also Garcia v. City of Springfield Police Dep't*, 230 F.R.D. 247, 249 (D. Mass. 2005) (Rule 26 reports are necessary unless an expert witness' testimony is based on "personal knowledge and … observations" and the expert was not "specially retained in connection with the litigation or for trial").

Dr. Navarro's late-disclosed experiments and opinions are precisely the type of expert opinion testimony contemplated by the expert disclosure requirements of Rule 26. Although some of the experiments he performed were done to support a presentation he planned to give at an American College of Phlebology Congress, there is no question that all of the experiments were directly aimed at proving Diomed's infringement theories in this case. For example, Dr. Navarro examined VSI and AngioDynamics' instructions for use and marketing literature, *see* Tab F at 297; used AngioDynamics' and VSI's fibers for much of the testing he performed, *see id.* at 299, Tab G at 5-6; reviewed the videos and expert reports produced by defendants' rebuttal experts Drs. Samson and Proebstle (which he received from Diomed's attorneys), *see* Tab F at 301, 307-08; and consciously followed exactly defendants' instructions for use, rather than following his usual procedure, *see id.* at 301-305. He did all of this to support his view on key issues in the case. *See* Tab F at 354. In fact, the latest video footage he produced of procedures he performed following VSI's and AngioDynamics' instructions for use was in direct response to VSI counsel's questioning of him during his deposition *See* Tab G at 4-6. Those procedures were performed solely for the purposes of this litigation. Tab G at 5.

The fact that Dr. Navarro is <u>also</u> a fact witness does not make the new experiments he

conducted and his opinions based thereon any less a product of his specialized knowledge. In any event, Dr. Navarro's experiments were performed and disclosed to defendants well after Diomed's deadline for disclosing its expert opinions and analyses to defendants, and should be excluded on that basis even if the testing was performed for some other purpose.

Diomed's bare disclosure to defendants that Dr. Navarro may provide opinion testimony at trial is insufficient to justify its failure to provide a complete Rule 26 report. *See Morris Graphics, Inc. v. Casey Printing, Inc.*, No. 97-688T, 1999 WL 726958 at *6-7 (D.R.I. Feb. 12, 1999) (the "mere mention[]" in a discovery disclosure that a percipient witness will provide expert opinions fails to satisfy Rule 26, which requires a full disclosure of an expert witness' opinions and their bases); *MSM Indus., Inc. v. Zurich Am. Ins. Cos.*, C.A. No. 93-12014-NG, 1997 WL 260059 at *6-7 (D. Mass. 1997).

Dr. Navarro's new experiments and opinions do not fall within the exclusion in Rule 26 for individuals not "retained or specially employed to provide expert testimony in the case." Fed. R. Civ. P. 26(a)(2)(B); *see also MSM Indus., Inc. v. Zurich Am. Ins. Cos.*, 1997 WL 260059, at *7 (D. Mass. March 25, 1997) (while expert may have originally been retained for another purpose, it seemed "highly likely that his present engagement [was] for the purpose of giving opinion testimony (for which he charges $150 per hour)"); *see also Vanguard Savings & Loan Ass'n v. Banks*, 1995 WL 71293, at *3 (E.D. Va. Feb. 17, 1995) ("When a party places an expert on its payroll for the sole purpose of deriving facts and opinions for use at trial, that expert has been retained in anticipation of litigation."). The recent experiments Dr. Navarro conducted are directly aimed at proving Diomed's infringement theories. Diomed had sufficient opportunity to conduct such experiments and disclose them in connection with their expert reports submitted on June 22, and it failed to do so. Diomed should not be allowed to bring in entirely new evidence

and expert opinions at this stage of the case.

Even if Diomed mistakenly thought that no expert report was required, Dr. Navarro's untimely opinions should be excluded. A party's unsubstantiated claim that it believed no Rule 26 report was required for a particular witness does not provide the substantial justification required to prevent exclusion of untimely expert testimony. *See MSM Indus.*, 1997 WL 260059 at *7. Similarly, even if Diomed did not know about Dr. Navarro's experiments until a few weeks before his deposition, "to the extent that there is a disadvantage created by the expert's failure to disclose, it must be born[e] by the party retaining the expert witness." *Ortiz-Lopez*, 248 F.3d at 34.

**B.    The Late Disclosure Of Dr. Navarro's Opinions Will Prejudice Defendants In This Case**

Allowing Diomed to present expert opinions without first submitting a Rule 26 report will materially prejudice defendants, who will have lost the benefit of relying on the expert report to prepare for numerous depositions and will have to re-submit rebuttal reports based on the new experiments. *See Morris Graphics*, 1999 WL 726958 at *6-7; *Peterson,* 222 F.R.D. at 217-218. By injecting Dr. Navarro's experiments into the case four months after the deadline for Diomed's expert disclosures, Diomed is forcing defendants to start their defense in this case anew – after defendants have already spent seventeen months on discovery in this case. Additional discovery will be required; new rebuttal experiments may need to be conducted; new rebuttal reports will have to be written; and additional depositions will need to be taken. To prevent this unfair surprise and prejudice to defendants, Diomed's previously undisclosed expert testimony must be excluded under Rule 37(c). *See Peterson,* 222 F.R.D. at 217-218 (finding that delay caused by late expert disclosure would not be harmless and granting motion to exclude untimely opinions).

## CONCLUSION

For the foregoing reasons, defendants VSI and AngioDynamics respectfully request that the Court exclude Diomed's untimely expert opinions.

Respectfully submitted,

VASCULAR SOLUTIONS, INC.

By its counsel,

_____
Steven L. Feldman, Esq. (BBO #162290)
Ruberto, Israel & Weiner, P.C.
100 North Washington Street
Boston, Massachusetts 02114-2128
Telephone: (617) 742-4200

~and~

J. Thomas Vitt, Esq., MN #183817
Heather D. Redmond, Esq., MN #313233
Todd R. Trumpold, Esq., MN #313890
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, Minnesota 55402-1498
Telephone: (612) 340-2600


ANGIODYNAMICS, INC.

By its counsel,

_____
William H. Bright, Jr. (CT 02494)
Mark D. Giarratana (CT 10410)
McCarter & English, LLP
CityPlace I, 36th Floor
185 Asylum Street
Hartford, Connecticut 06103
Telephone: (860) 275-6700

Dated: December 9, 2005

U:\CPR\Steven Feldman\Vascular Solutions\Diomed Patent\VSI-Angio MemoSupportMotionExclude.doc