UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIOMED, INC., </br></br>　　Plaintiff/Defendant in Counterclaim, </br></br>　v. </br></br>VASCULAR SOLUTIONS, INC. </br></br>　　Defendant/Plaintiff in Counterclaim. | Civil Action No.: 04-10444-RGS |
| DIOMED, INC. </br></br>　　Plaintiff/Defendant in Counterclaim, </br></br>　v. </br></br>ANGIODYNAMICS, INC. </br></br>　　Defendant/Plaintiff in Counterclaim. | Civil Action No.: 04-10019-RGS |

**DEFENDANT VASCULAR SOLUTIONS, INC.'S
MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Vascular Solutions, Inc. ("VSI") is entitled to summary judgment for the following reasons:

　　1.　　Diomed has no evidence from which a reasonable jury could find direct infringement of Diomed's '777 patent by users of VSI's VariLase products. Diomed has no evidence that even one VSI customer has deliberately put the laser emitting section in physical contact with the wall of the blood vessel, nor does Diomed have evidence that any VSI customers have maintained the laser emitting section in physical contact with the vessel wall while laser energy is being emitted.

2.      Even if Diomed had evidence of direct infringement, no reasonable jury could find that VSI has actively induced infringement. VSI recommends avoiding contact, and therefore cannot fairly be accused of having a specific intent to cause contact. Moreover, the record makes clear that Diomed's theory, that the use of tumescent anesthesia necessarily leads to infringement, is wrong.

3.      Finally, even if Diomed's infringement claim survives, Diomed's claim for damages should be dismissed. Diomed seeks damages based on all of VSI's VariLase sales, but cannot offer any evidence to link even one sale with an act of actual infringement.[1]

## ARGUMENT

**I.      VSI IS ENTITLED TO SUMMARY JUDGMENT ON DIOMED'S CLAIM OF PATENT INFRINGEMENT**

### A.      Diomed's Burden of Proof

Diomed alleges that VSI infringes claims 9-14, 16-19, and 21 of Diomed's '777 patent. All of the asserted claims are method claims. Local Rule 56.1 Statement of VSI ("LR 56.1") ¶ 1. Because only method claims are asserted, only physicians practicing the claimed method can directly infringe the '777 patent. Diomed's claim against VSI is that VSI has induced infringement, through the sales of its VariLase products and VSI's accompanying instructions for use and training materials.

To survive summary judgment, Diomed must present evidence from which a reasonable jury could find that: (1) physicians using VSI's VariLase products have directly infringed the asserted claims; and (2) VSI actively induced physicians to directly infringe Diomed's asserted claims. See Alloc, Inc. v. Int'l Trade Comm'n, 342 F.3d 1361, 1374 (Fed. Cir. 2003).

---

[1]      VSI also joins in the argument made in part IV.D of AngioDynamics' brief. To avoid repetition, VSI will rely on AngioDynamics' brief.

2

Claim 9 is the principal independent claim of the '777 patent and the focus of this case. LR 56.1 ¶ 2. Under the Court's claim construction, to prove direct infringement of Claim 9, Diomed has to prove that a physician using VSI products performed the following steps:

> Step 1: The physician inserts a fiber optic line with an uncoated tip, or laser emitting section, into a blood vessel at a puncture site.
>
> Step 2: The physician deliberately puts the laser emitting section in physical contact with the wall of the blood vessel, which requires the drainage of blood and compression of the vein.
>
> Step 3: The physician maintains the tip-interior surface in physical contact with the vessel wall while laser energy is emitted to decrease the diameter of the blood vessel.

LR 56.1 ¶¶ 3-5.

In addition to proving direct infringement by users of VSI products, Diomed must prove that VSI "actively induced" infringement. 35 U.S.C. § 271(b) (2005). Inducement requires proof of specific intent: Diomed must prove that VSI had a "specific intent to encourage another's infringement and not merely that [VSI] had knowledge of the acts alleged to constitute inducement." Ferguson Beauregard/Logic Controls v. Mega Sys., LLC, 350 F.3d 1327, 1342 (Fed. Cir. 2003), quoting Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990); see also Hewlett-Packard Co. v. Bausch and Lomb, Inc., 909 F.2d 1464, 1469 (Fed. Cir. 1990) (inducement requires "proof of actual intent to cause the acts which constitute the infringement"). Mere knowledge of infringement, without the specific intent to induce infringement, is not sufficient. See Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1364 (Fed. Cir. 2003) ("[i]n the absence of any evidence that [defendant] has or will promote or encourage doctors to infringe the . . . method patent, there has been raised no genuine issue of material fact"); Catapano v. Wyeth Ayerst Pharmaceuticals, Inc., 88 F. Supp. 2d 27, 30 (E.D.N.Y. 2000) ("Even if the Defendants are aware that doctors and hospitals are using the

3

vaccine to [practice the patented method], such knowledge alone does not suffice to hold the Defendants liable for inducement.").

The Court's claim construction thus requires Diomed to prove that VSI specifically intends to have physicians deliberately put the laser emitting section in physical contact with the vessel wall, and to have physicians maintain that contact while laser energy is being emitted. This delivery of laser energy via deliberate, maintained contact with the vessel wall is the defining feature of the invention. LR 56.1 ¶¶ 43, 48-50. It is important to note that Diomed's patent and file history stress, repeatedly, that laser emitting section-vessel wall contact is the key aspect of Diomed's claimed method. Diomed's inventors were not the first to deliver laser energy inside a blood vessel; as the Court will recall from the claim construction hearing, the inventors cited the need for laser energy delivery via direct physical contact with the vessel wall as the critical distinction between Diomed's method and the prior art. This is not a case, therefore, where the doctrine of equivalents plays any role: if the physician does not deliberately cause and maintain contact between the laser emitting section and vessel wall, but instead has the laser emitting section touching and firing in to the blood inside the blood vessel, the physician is clearly not practicing Diomed's claimed method.

It is important for the Court to understand that it is not easy to deliberately cause and maintain contact between the laser emitting section and the vessel wall. The "laser emitting section" of the laser fiber is tiny. LR 56.1 ¶ 7. VSI's laser fibers are 600 microns in diameter. Id. The "laser emitting section" is only the very tip or flat front face of that 600-micron laser fiber. Id. By contrast, the varicose veins being treated can be very large. A diseased great saphenous vein, before treatment, will range in size from 5 millimeters in diameter to 20 or even 30 millimeters, although that diameter is reduced before treatment begins. LR 56.1 ¶¶ 13, 64(b).

4

During the procedure, the laser fiber is inside an introducer sheath that is 2.4 millimeters in external diameter, four times the 600-micron diameter of the laser emitting section. LR 56.1 ¶ 10. Only the last 2.5 centimeters of the laser fiber protrudes from the introducer sheath. LR 56.1 ¶ 11. In addition, the laser energy is emitted only while the fiber-sheath assembly is being pulled back through the vein. LR 56.1 ¶ 12.

Diomed's '777 patent teaches a simple, common-sense approach to causing the desired contact: the patent teaches that the physician should physically push down with his fingers, or with the ultrasound probe, to cause the vessel wall to press down on to and contact the laser emitting section. LR 56.1 ¶ 43. It is not disputed that VSI does not teach external manual compression as shown in the patent. LR 56.1 ¶ 14. Diomed's case thus depends on proving that, during procedures performed using VSI products, the 600-micron diameter laser emitting section is not in contact with and firing in to the blood inside the vessel. Instead, Diomed must prove that, without manual compression, the vessel wall is somehow being deliberately forced down on to the tiny, 600-micron diameter laser emitting section, and that that contact is then maintained while the laser energy is being emitted and the fiber-sheath assembly is being withdrawn through the blood vessel. No reasonable jury could reach that conclusion.

### B. Diomed Has No Evidence of Direct Infringement

VSI is entitled to summary judgment because Diomed has no evidence from which a jury could find direct infringement. Diomed can offer no evidence that a single doctor, using VSI's VariLase products, deliberately put the laser emitting section in physical contact with the wall of the blood vessel during a procedure. LR 56.1 ¶¶ 31, 33-41. Diomed also can present no evidence that a single doctor, using VSI products, performed a procedure where he or she maintained the laser emitting section in physical contact with the vessel wall while emitting laser energy. LR 56.1 ¶¶ 32-41. The Court need examine the issues in this case no further, for

Diomed's failure on this point is fatal to its claims. Met-Coil Sys. Corp. v. Korners Unltd., Inc., 803 F.2d 684, 687 (Fed. Cir. 1986)

### C. Diomed's Claim Must Also Be Dismissed Because VSI Has Not Actively Induced Infringement of the Patent

#### 1. Diomed's Theory of Inducement

Without any proof of direct infringement, Diomed contends that the recommendation of the use of tumescent anesthesia by VSI induces infringement of Diomed's patent. LR 56.1 ¶ 14. According to Diomed, the application of tumescent anesthesia along the great saphenous vein causes the vein to "completely collapse," so that the vessel wall folds down on to and contacts the front emitting face of the laser fiber. LR 56.1 ¶¶ 51-52. Diomed's principal witnesses describe this tumescent effect as causing the complete "obliteration" of the blood vessel lumen at and in front of the laser fiber tip. LR 56.1 ¶ 53. According to Diomed's theory, this tumescent effect also causes the contact with the laser emitting face to be "maintained", through a process of continuing collapse down on to the sheath-fiber assembly and folding over on to the flat emitting face, even as the fiber-sheath assembly is being withdrawn during the procedure.[2] LR 56.1 ¶¶ 54-55.

#### 2. VSI's Instructions for Use and Training Materials

There is no dispute that VSI does not teach physicians to cause contact between the laser emitting section and the blood vessel wall. There is also no dispute that VSI does not teach physicians to maintain contact between the laser emitting section and the vessel wall while laser energy is being emitted. LR 56.1 ¶ 24. Instead, VSI affirmatively teaches doctors to avoid

---

[2] Diomed also contends that VSI's recommendation of Trendelenberg position ("head down") in its instructions for use induced infringement. LR 56.1 ¶ 14. VSI's customers have rarely, if ever, used the Trendelenberg position. LR 56.1 ¶¶ 2-23. VSI has subsequently eliminated the recommendation from its instructions for use. LR 56.1 ¶ 18.

6

contact. LR 56.1 ¶¶ 25-30. VSI's Clinical Instruction Guide, in its step-by-step description of the procedure, states as follows:

> **IMPORTANT:** Originally, physicians compressed the vein while pulling back the fiber to have the fiber contact the vessel wall. This is NOT the manner we recommend. Contact of the fiber to the vessel wall is not required for closure of the vein to occur. Therefore, we instruct that no pressure be held over the site while the laser is firing, and that there is no contact of the fiber to the vessel wall.

LR 56.1 ¶ 26. VSI's seminar training materials similarly warn doctors: "Do NOT compress on vein wall!" LR 56.1 ¶ 28. VSI cannot be held to have "actively induced" infringement, because it expressly teaches not to have contact. Warner Lambert Co., 316 F.3d at 1364-65 (Fed. Cir. 2003).

VSI's instructions for use do recommend the use of tumescent anesthesia, but not for the purpose of causing continuous vein wall contact. LR 56.1 ¶¶ 15, 17. VSI's current instructions for use state as follows:

> Deliver local anesthetic perivenously throughout the entire treatment area to provide analgesia and protection of surrounding tissue from thermal damage. Deliver a sufficient volume of anesthetic agent to achieve a separation between the vein wall and the fascial sheath.

LR 56.1 ¶ 17. The previous version of VSI's instructions for use stated:

> Deliver local anesthetic (between 100 and 200 ml depending upon the treatment area) perivenously throughout the entire treatment area to provide analgesia and protection of surrounding tissue from thermal damage.

LR 56.1 ¶ 15. Diomed can only prove infringement if VSI's mere recommendation of delivery of "a sufficient volume of anesthetic agent to achieve separation between the vein wall and the fascial sheath" will inevitably cause contact between the laser emitting section and the vessel

7

wall, and will also cause that contact to be maintained while laser energy is being emitted.[3] Diomed's theory necessarily has to be that the mere recommendation of the use of tumescent anesthesia, regardless of all other variables in the procedure, always causes contact, and always causes that contact to be maintained during the emission of laser energy. As set forth below, no reasonable jury could make such a finding.

### 3. The Mere Recommendation of the Use of Tumescent Anesthesia Does Not Induce Infringement

The testimony of Diomed's inventors and clinical expert establishes that the application of tumescent anesthesia, without additional actions, will not cause and maintain the necessary contact. According to Diomed, the use of tumescent anesthesia <u>alone</u>, without the use of external manual compression or any other techniques, <u>can</u> cause and maintain the necessary contact between the laser emitting section and the vessel wall. LR 56.1 ¶ 51. It is undisputed, however, that Diomed's inventors and clinical expert follow a very particular technique, a technique that is not taught by VSI, to achieve this claimed result. LR 56.1 ¶ 58.

Diomed's doctors testified that they want to see the tumescent anesthesia cause the great saphenous vein to visibly and completely collapse on to the laser emitting section of the fiber. LR 56.1 ¶¶ 60, 62. The goal, according to Diomed's doctors, is the "obliteration" of the lumen, so that there is no space and no blood at and around the fiber tip. LR 56.1 ¶ 60. To achieve this desired result, Diomed's doctors apply tumescent anesthesia under ultrasound guidance. LR 56.1 ¶ 59. All of Diomed's doctors testified that they apply tumescent anesthesia until they visibly observe on the ultrasound image the "complete collapse" effect that they are seeking. LR 56.1 ¶ 60.

---

[3]   The issue of whether Diomed is entitled to damages for VSI's use of the prior version of its instructions for use turns, in part, on whether VSI's mere recommendation of delivery of "between 100 and 200 ml [of anesthetic] depending upon the treatment area" will inevitably cause and maintain contact.

If Diomed's doctors do not observe the "complete collapse" effect they claim is critical to causing and maintaining the necessary contact, all of them use **additional techniques**. LR 56.1 ¶ 61. These techniques include:

- Diomed's doctors will continue to apply **more tumescent anesthesia** until they see the complete collapse effect. LR 56.1 ¶ 61(a).

- If the application of additional tumescent anesthesia is still not sufficient, Diomed's doctors will use additional maneuvers to achieve contact, including Trendelenberg positioning, raising the leg, reducing the temperature in the room, and manually milking the vein. LR 56.1 ¶ 61(b).

- Two of the Diomed inventors, Dr. Bone and Dr. Navarro, **always use hand compression**. Dr. Fan and Dr. Min also occasionally use hand compression. LR 56.1 ¶¶ 61(c), (d).

Diomed's doctors testified that the amount of tumescent anesthesia necessary to achieve their goal of "complete collapse" varies according to many different variables. LR 56.1 ¶ 63. These include:

- The length of the vein segment to be treated varies from patient to patient. LR 56.1 ¶ 64(a).

- The diameter of the diseased vein varies from patient to patient. LR 56.1 ¶ 64(b).

- The diameter of the diseased vein varies along its length in a single patient. LR 56.1 ¶ 64(c).

- A number of other variables affect the amount of tumescent anesthesia, including the age of the patient, the gender of the patient, the thinness or obesity of the patient, and even the temperature of the room. LR 56.1 ¶ 64(d).

See also LR 56.1 ¶¶ 65-66. Therefore, it cannot reasonably be disputed that the mere recommendation of the use of tumescent anesthesia "to achieve a separation between the vein wall and the fascial sheath" is not sufficient to cause contact, and is clearly not sufficient to cause contact to be maintained during the emission of laser energy. It also cannot be disputed that VSI does not teach anything like the particular technique espoused by the Diomed doctors. VSI does not teach and has never taught physicians to apply tumescent anesthesia until they visually

9

observe the "complete collapse" of the vein and "obliteration" of the vessel lumen. LR 56.1 ¶ 67. VSI does not teach and has never taught physicians to add more anesthetic or perform additional actions if "complete collapse" is not seen. Given this record, no reasonable jury could find that VSI's recommendation of tumescent anesthesia induces infringement of Diomed's patent.

In addition to the testimony from Diomed's inventors and its clinical expert, the experiments performed by the defendants' experts, Dr. Samson and Dr. Proebstle, foreclose any realistic dispute on this point. Dr. Samson and Dr. Proebstle each followed the VSI instructions for use. LR 56.1 ¶¶ 68-71. Dr. Samson and Dr. Proebstle used tumescent anesthesia in ranges and amounts similar to those recommended in the previous version of VSI's instructions for use. LR 56.1 ¶¶ 69, 71. Dr. Samson and Dr. Proebstle also placed the patients in the Trendelenberg position during the procedure. LR 56.1 ¶¶ 69, 70. Dr. Samson and Dr. Proebstle made ultrasound videotapes of the procedures. LR 56.1 ¶¶ 72-73. Those ultrasound videotapes establish that there is not contact between the laser emitting section and the vessel wall during the procedure. LR 56.1 ¶ 72. Instead, it can be visibly observed that there is a lumen present, that there is blood in the lumen, and that the laser emitting section is firing laser energy in to blood, causing a cone of steam bubbles at and in front of the fiber tip. LR 56.1 ¶ 73.

## II.    DIOMED'S CLAIM FOR DAMAGES SHOULD BE DISMISSED

Even if Diomed could survive summary judgment on infringement issues, as a matter of law it is entitled to no damages. As outlined above, Diomed cannot establish that any physician using VSI's products to perform endovenous laser treatment directly infringes the '777 patent. LR 56.1 ¶¶ 31-41. In addition, Diomed has made no attempt to prove that any of VSI's customers actually follow VSI's instructions for use – much less that any customer does so in such a way as to infringe the '777 patent. LR 56.1 ¶ 41. Having no evidence that any particular

sale by VSI induces or contributes to direct infringement of the '777 patent, Diomed is not entitled to damages.[4]

The Patent Act provides that damages for infringement are to be "adequate to compensate for the infringement." 15 U.S.C. § 284 (emphasis added). There can be no inducement of or contribution to patent infringement without proof of direct infringement. Met-Coil Sys. Corp. v. Korners Unltd., Inc., 803 F.2d 684, 687 (Fed. Cir. 1986); Standard Havens Prods., Inc. v. Gencor Indus., Inc., 953 F.2d 1360, 1374 (Fed. Cir. 1991). Thus, before any amount of damages can be assessed, Diomed must show sufficient proof of the relationship of each sale of the accused products to an instance of inducing direct infringement.

The Standard Haven case, for example, involved a patented method for producing asphalt. The defendant was found to have contributed to and induced infringement by producing an asphalt plant that, when put into production, infringed the patented method. Damages were assessed for each sale of the infringing plant. On appeal, however, the Federal Circuit reversed and remanded the damages award, finding that the district court could award damages only for those sales that were actually infringing – that is, the sales that resulted in direct infringement. Standard Haven, 953 F.2d at 1374. Similarly, in Oak Indus., Inc. v. Zenith Elecs. Corp., 726 F. Supp. 1525 (N.D. Ill. 1989), the court granted defendant's motion for partial summary judgment limiting plaintiff's recovery only to products which plaintiffs could prove were used to infringe the patented method. Oak Indus., 726 F. Supp. at 1543. See also Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 1 Fed. Appx. 879, 883-84, 2001 WL 21304 (Fed. Cir. 2001) ("[I]f not every sale leads to an instance of infringement, it logically follows that not every lost sale profit should be compensated by the party inducing infringement . . . . In cases in which

---

[4] VSI also moved to exclude Diomed's untimely expert opinions regarding Diomed's alleged lost profits.

there is a question whether every sale leads to an instance of direct infringement, a patentee must . . . establish the connection between sales and direct infringement.").[5]

Here, Diomed does not accuse VSI of directly infringing the patented methods through sales of its laser consoles or procedure kits. The '777 patent is only infringed if a purchaser of the product – a physician – actually uses the products in a way that is covered by the '777 patent claims. As set forth in greater detail above, Diomed has no proof that any of VSI's sales have ever resulted in a direct infringement of the '777 patent. See supra Section I.B. And, although Diomed claims that VSI's mere instruction to use tumescent anesthesia in connection with the procedure induces infringement, Diomed has made no effort to prove that physicians follow VSI's instructions for use. LR 56.1 ¶ 41. Thus, even if Diomed can survive summary judgment as to the question of infringement, there is no dispute that Diomed cannot prove a fundamental element of its damages claim – that there is a connection between the allegedly infringing sales and direct infringement of the '777 patent. VSI is, accordingly, entitled to summary judgment that Diomed is entitled to no damages in the case.

---

[5] Two cases deny a motion for summary judgment on damages based on a failure to prove direct infringement. See Hilgraeve, Inc. v. Symantec Corp., 272 F. Supp. 2d 613 (E.D. Mich. 2003) and Imagexpo, LLC v. Microsoft Corp., 284 F. Supp. 2d 365 (E.D. Va. 2003). In both of those cases, however, the plaintiff came forward with circumstantial evidence linking defendant's sales to a directly infringing use. As is explained more fully above, Diomed has no evidence – circumstantial or otherwise – linking VSI's sales with directly infringing uses.

## **CONCLUSION**

For the reasons stated above, VSI requests summary judgment of non-infringement of the '777 patent, and dismissing Diomed's damages claims.

                    Respectfully submitted,

                    VASCULAR SOLUTIONS, INC.

                    By its counsel,

                    /s/ Steven L. Feldman
                    Steven L. Feldman, Esq. (BBO #162290)
                    Ruberto, Israel & Weiner, P.C.
                    100 North Washington Street
                    Boston, Massachusetts 02114-2128
                    Telephone: (617) 742-4200

                    *~and~*

                    J. Thomas Vitt, Esq., MN #183817
                    Heather D. Redmond, Esq., MN #313233
                    Todd R. Trumpold, Esq., MN #313890
                    Dorsey & Whitney LLP
                    50 South Sixth Street, Suite 1500
                    Minneapolis, Minnesota 55402-1498
                    Telephone: (612) 340-2600

Dated:  December 21, 2005