THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIOMED, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>ANGIODYNAMICS, INC,<br><br>    Defendant. | Civil Action No. 04-10019 RGS |
| DIOMED, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>VASCULAR SOLUTIONS, INC.,<br><br>    Defendant. | Civil Action No. 04-10444 RGS<br>**(CONSOLIDATED UNDER<br>04-10019 RGS)** |

## DIOMED'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON VALIDITY AND ENFORCEABILITY OF U.S. PATENT NO. 6,398,777

Michael A. Albert
Michael N. Rader
John L. Strand
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8000

COUNSEL FOR
PLAINTIFF DIOMED, INC.

## TABLE OF CONTENTS

I.    BACKGROUND ..................................................................................................................1

II.   DEFENDANTS CANNOT SHOW ANTICIPATION OF THE
      '777 PATENT BY CLEAR AND CONVINCING EVIDENCE ........................................3

      A.    Legal Standards for Anticipation .............................................................................3

      B.    O'Reilly Does Not, Either Expressly or Inherently,
            Disclose Contact, Compression, or Drainage ..........................................................4

            1.    Contact ........................................................................................................4

            2.    Compression and Drainage ..........................................................................6

      C.    Biegeleisen Fails to Disclose Use of a Bare-Tipped Laser Fiber,
            Contact of the Fiber Tip With the Vessel Wall, Compression,
            Drainage, or a Decrease in the Diameter of the Blood Vessel................................8

            1.    Use of a Bare-Tipped Fiber in Contact With the Vessel Wall....................8

            2.    Compression and Drainage ..........................................................................9

            3.    Decrease in Vessel Diameter ....................................................................10

      D.    The Puglisi Video is Not Prior Art, and Neither It Nor the
            Puglisi Article Discloses Every Limitation of Claim 9 .........................................10

            1.    The Puglisi Video Is Not Prior Art ...........................................................11

            2.    Even If the Puglisi Video Were Prior Art, Neither It Nor the
                  Puglisi Article Discloses Use of a Fiber Optic Line With an
                  Uncoated Tip, Or Contact Between a Bare Tip and Vein Wall................12

            3.    The Puglisi Video and Article Fail to
                  Disclose Drainage and Compression .........................................................14

      D.    Farley Employs a Diffuser Fiber (Not a Bare Tip)
            And Fails to Disclose Compression or Drainage...................................................15

      E.    The Mazza Video Is Not Prior Art;
            In Any Event, It and the Mazza Article Fail
            To Disclose Several Limitations of Claim 9........................................................ 16

**TABLE OF CONTENTS (cont'd)**

| | | | |
|---|---|---|---|
| III. | | DEFENDANTS CANNOT SHOW OBVIOUSNESS OF THE '777 PATENT BY CLEAR AND CONVINCING EVIDENCE | 18 |
| | A. | Legal Standards for Obviousness | 18 |
| | B. | No Prior Art Discloses Contact, Compression or Drainage In the Context of a Laser Treatment Procedure | 19 |
| | C. | Defendants Have Identified No Motivation to Combine Prior Art References | 21 |
| IV. | | THE '777 PATENT IS NOT INVALID UNDER 35 U.S.C. § 112 | 21 |
| V. | | THE '777 PATENT IS ENFORCEABLE | 22 |
| | A. | The Law of Inequitable Conduct | 23 |
| | B. | The Defendants' Inequitable Conduct Allegations Are Without Merit | 24 |
| | 1. | The O'Reilly Article | 24 |
| | | a. Mr. Sunstein's Hypothetical Timeline Is Baseless; There Was No Intent To Deceive The PTO | 24 |
| | | b. O'Reilly Is Not Material | 28 |
| | 2. | The Biegeleisen and Puglisi Articles | 33 |
| VI. | | CONCLUSION | 34 |

Defendants have taken a shotgun approach to attacking Diomed's U.S. Patent No. 6,398,777 ("the '777 patent"), citing eight different references that they allege constitute prior art invalidating the asserted claims of the '777 patent.

Their own technical expert (Dr. Russell Samson) admits that none of these eight references anticipate even the broadest claim asserted by Diomed (claim 9). He concedes that *none* of the references disclose intraluminal contact between a bare laser fiber tip and a vein wall as claimed. This admission alone entitles Diomed to partial summary judgment on anticipation, but there is also no question of material fact that other claim limitations, such as compression and drainage of the vein, are also absent from every reference. Defendants cannot meet their burden of clear and convincing evidence to invalidate the claims of the '777 patent.

Defendants' contention that the '777 patent is unenforceable for inequitable conduct is based on the testimony of a patent lawyer "expert" who (1) invented a timeline of events that he was later forced to admit has no factual basis; (2) made a key scientific assumption that Defendants' own expert explained is untrue; and (3) relied upon an erroneous legal principle.

Defendants can point to no evidence (let alone clear and convincing evidence) either that any '777 patent inventor intended to deceive the Patent and Trademark Office ("PTO"), or that the article allegedly withheld from the PTO was material to patentability. For these independent reasons, the Defendants' inequitable conduct allegation should be resolved as a matter of law.

Summary judgment should be granted to Diomed that the '777 patent is both valid and enforceable.

## I.    BACKGROUND

Defendants counterclaimed in their answers to Diomed's complaint that the '777 patent is invalid under either 35 U.S.C. §§ 102, 103, or 112. Defendants have since indicated their intention to rely upon the following eight references, which were reviewed by Dr. Samson in an invalidity expert report (attached as Ex. 1 to the Declaration of Michael N. Rader):

- O'Reilly et al., Transcatheter Fiberoptic Laser Coagulation of Blood Vessels. Radiology 142:777-780, March 1982 **("O'Reilly")** (attached as Ex. 10 to the Declaration of Dr. Chieh-Min Fan);

- Beigeleisen et al., Use of the venoscope for the treatment of varicose veins. Phlebologie 1989, pp. 419-422 **("Biegeleisen article")** (Ex. 11 to Fan Decl.);

- U.S. Patent No. 5,022,399 **("Beigeleisen patent")** (Ex. 12 to Fan Decl.);

- Puglisi et al., Application of the ND-Yag laser in the treatment of varicose syndrome. Phlebology 1989, pp. 839-842 **("Puglisi article")** (Ex. 13 to Fan Decl.);

- A video of a surgery by Dr. Puglisi **("Puglisi video")** (Ex. 14 to Fan Decl.)[1];

- U.S. Patent No. 6,033,398 **("Farley")** (Ex. 15 to Fan Decl.);

- Mazza et al., Use of Argon Laser in the Treatment of Ideopathic Varices in the Lower Limbs. Minerva Angiologica, 1993 **("Mazza article")** (Ex. 16 to Fan Decl.); and,

- A video of a surgery by Dr. Mazza **("Mazza video")** (Ex. 17 to Fan Decl.).

Claim 9 of the '777 patent, the broadest claim asserted by Diomed in this case, is set forth below with the Court's claim construction (Docket # 55) in *italics*.[2] If claim 9 is not anticipated by the prior art, then none of the other (narrower) claims[3] are anticipated either. E.g., Automotive Techs. Int'l v. BMW of N. Am., 378 F. Supp. 2d 780, 794 (E.D. Mich. 2005) ("[A] dependent claim will not be anticipated if the claim upon which it depends [is] not anticipate[d].")

9.    A method of treating a blood vessel using laser energy, comprising the steps of:

- inserting means for emitting laser energy [*a fiber optic line with an uncoated tip at its end capable of emitting laser energy*] into the blood vessel at a puncture site, wherein said emitting means has a laser emitting section;

- placing said laser emitting section of the said emitting means into intraluminal contact with the blood vessel at the treatment site [*deliberately putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel, which requires the drainage of blood and compression of the vein*]; and

- Emitting said laser energy into the blood vessel through said laser emitting section of said emitting means [*maintaining of the tip-interior surface in physical contact with the vessel wall while laser energy is emitted to decrease the diameter of the blood vessel*].

---

[1] Videos are provided as video files on computer-readable CD's labeled with corresponding exhibit numbers.

[2] Background on the '777 patent invention is provided in Diomed's summary judgment motion on infringement. A copy of the '777 patent is attached as Exhibit 9 to the Rader Declaration.

[3] The other claims either depend from claim 9 or – in the case of claim 21 – have an additional limitation not found in claim 9.

Though the Defendants attempt to argue that the eight cited references invalidate claim 9, they fail to present clear and convincing evidence to support their conclusions.

## II.   DEFENDANTS CANNOT SHOW ANTICIPATION OF THE '777 PATENT BY CLEAR AND CONVINCING EVIDENCE.

### A.   Legal Standards for Anticipation

Under 35 U.S.C. § 282, patents are entitled to a statutory presumption of validity which can be overcome only by "clear and convincing evidence." U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1563 (Fed. Cir. 1997). In deciding a motion for summary judgment regarding patent validity, "the burden of proof must be considered." Natl. Presto Indus. v. West Bend Co., 76 F.3d 1185, 1189 (Fed. Cir. 1996) (affirming summary judgment that patent not invalid).

A patent claim is invalid for anticipation only when *each and every limitation of the claim* is described in a single prior art reference. If even one claim limitation is missing from the reference, the claim is not anticipated. Crown Operations Intl., Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002); 35 U.S.C. § 102. Furthermore, to anticipate a patent claim, the single prior art reference "must describe the patented subject matter with sufficient clarity and detail to establish that the subject matter existed in the prior art and that such existence would be recognized by persons of ordinary skill in the field of the invention." Id. (citations omitted).

Disclosure of claim limitations must generally be explicit, although under narrow circumstances a limitation may be regarded as "inherent" (even though not explicit) in a prior art reference. Id. at 1377. In arguing that a limitation is "inherent," the patent challenger must show by clear and convincing evidence that the limitation was *necessarily present* in the prior art reference. Id. This means that inherency "may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." Id. (affirming summary judgment of no anticipation where patent challenger did not rebut prima facie case that cited reference lacked inherent claim limitation).

- 3 -

**B.    O'Reilly Does Not, Either Expressly or Inherently,
Disclose Contact, Compression, or Drainage.**

There is no question of material fact that the O'Reilly article fails to disclose multiple

limitations of claim 9 of the '777 patent.[4]  Defendants cannot present clear and convincing

evidence upon which a reasonable jury could find O'Reilly to anticipate claim 9.

O'Reilly describes using an optical fiber with a 200 micron diameter to deliver a lengthy

pulse of laser energy into a rabbit ear artery, as a feasibility study for laser ablation of cerebral

aneurysms.  It does not address the treatment of varicose veins.  O'Reilly fails to disclose at least

three limitations of claim 9 as construed by the Court: (1) contact between the laser fiber tip and

the vessel wall; (2) compression of the vessel; and (3) drainage of blood from the vessel.

**1.    Contact**

Defendants' expert concedes that O'Reilly does not expressly disclose contact between

the laser fiber tip and the vessel wall. See Ex. D to 6/22/05 Samson Rep. (attached as Ex. 1 to

Rader Decl.) at pp. D-1, D-3.[5]  Dr. Chieh-Min Fan, Diomed's invalidity expert, agrees. (Fan

Decl. ¶ 68).  Accordingly, there is no dispute – let alone a genuine dispute – that O'Reilly fails to

expressly disclose contact between the laser fiber tip and the vessel wall.

Defendants attempt to argue that O'Reilly "inherently" discloses such contact, but fail to

set forth clear and convincing evidence upon which a reasonable jury could rely.  Indeed, the

only illustration of the procedure disclosed in O'Reilly illustrates a *lack* of contact between the

laser fiber tip and the artery wall, with the laser fiber centered in the artery (see Fan Decl. ¶ 68):

---

[4] Claim 9 is a independent claim.  As noted above (supra note 3) it is the broadest of the asserted claims in the '777 patent – and if valid, the remaining claims are necessarily valid as well.  Accordingly, this brief focuses on claim 9.

[5] Dr. Samson also conceded at deposition that he could not tell from reading O'Reilly whether contact would have occurred: "[I]t could be that it was centered in such a way that the tip, emitting tip, could not touch.  Or it could have been in such a way that there was enough floppiness of the fiber there that a portion of it could touch the vessel tip." See 9/19/05 Samson Depo. (Exhibit 5 to Rader Decl.) at 77.  This admitted doubt negates clear and convincing evidence as a matter of law.



(O'Reilly at 778).

Defendants' expert concedes that the laser fiber was not moved during the procedure. See 9/19/05 Samson Depo. (Ex. 5 to Rader Decl.) at 84. Rather, the fiber was kept stationary for 60-120 seconds as the laser was fired (O'Reilly at 778), negating the possibility of contact occurring due to movement of the fiber through the artery while firing. (Fan Decl. ¶ 68).

The only damage caused to the artery was "distal to the tip of the optical fiber. (O'Reilly at 778). Defendants' expert concedes that damage "distal to the tip" was not caused by contact between the fiber tip and the artery wall. (9/19/05 Samson Depo. at 63-64). Had the tip been in contact with the wall, there would have been damage *at* the tip of the fiber. (Fan Decl. ¶ 68).

The article also notes that "no case of arterial rupture occurred," despite the fact that the laser was fired in a single location for 60-120 seconds. (O'Reilly at 778). Had the fiber tip been in contact with the vein wall during this firing, a rupture certainly would have occurred. (Fan Decl. ¶ 68). This further evidences that contact was not disclosed in O'Reilly.

Defendants are unable to fill the gap in O'Reilly with "recourse to extrinsic evidence … mak[ing] clear that the missing descriptive matter is necessarily present." Cont'l Can Co. v. Monsanto Co., 948 F.2d 1264, 1268 (Fed. Cir. 1991). Instead, they offer only the argument of an expert who admits that he could not tell from O'Reilly whether contact would have occurred:

> [I]t could be that it was centered in such a way that the tip, emitting tip, could not touch. Or it could have been in such a way that there was enough floppiness of the fiber there that a portion of it could touch the vessel tip.

(9/19/05 Samson Depo. at 77).

Dr. Samson's testimony is not clear and convincing extrinsic evidence upon which a reasonable jury could rely to find for the Defendants on the inherency issue. Crown, 289 F.3d at 1377-78 (holding that inherent limitation cannot be shown by contentions alone).

Summary judgment should be granted for Diomed that O'Reilly does not, either explicitly or inherently, anticipate contact between a laser fiber tip and a vessel wall as claimed.

### 2. **Compression and Drainage**

Dr. Samson concedes in his expert report that O'Reilly "[d]oes not teach drainage" and "[d]oes not teach compression." (Ex. D to 6/22/05 Samson Rep. at pp. D-1, D-2). Accordingly, there is no question of material fact that O'Reilly fails to explicitly disclose compression and drainage, two limitations of claim 9 as construed by the Court. Defendants argue, however, that these limitations would be "inherent" in O'Reilly.

*Drainage.* Defendants argue that "displacement" of blood – which they suggest is akin to drainage – would be inherent in O'Reilly's procedure, due to the laser fiber occupying space within the vessel lumen. In other words, they argue that the volume of blood flowing within the vessel would decrease due to the presence of the fiber.

Defendants' argument is baseless as a matter of law. Under the Court's claim construction, "drainage" of blood would not encompass mere "displacement," given that the '777 patent teaches draining blood through compression (e.g., with manual pressure or by tightly wrapping the leg) – *not* through displacement of blood by the laser fiber.

In any event, Defendants have no evidence (let alone clear and convincing evidence) that the volume of blood flowing through the vessel decreased in O'Reilly. Dr. Samson admitted at deposition that he had no idea whether or not this would have been the case:

- 6 -

Q: So it's possible that the volume of blood flowing per unit time could decrease?

A: Yes.

Q: Is it also possible that the volume of blood per unit time could remain constant with the velocity of the flow simply increasing, depending on those factors that you mentioned?

A: Yes.

Q: Do you have any knowledge as to how those factors would apply in a rabbit ear?

A: No.

(9/19/05 Samson Depo. at 58-59).

Dr. Samson's testimony negates clear and convincing evidence on this point as a matter of law. Moreover, as Dr. Fan explains, the blood flow in the rabbit ear of O'Reilly, which is under relatively high pressure, would *not* have decreased due to introduction of the fiber. The artery simply would have expanded to permit continued flow. (Fan Decl. ¶ 68). Indeed, O'Reilly notes that, after removal of the fiber, there was active bleeding requiring *five (5) minutes* of compression to stop the flow. (O'Reilly at 777). This further confirms that blood flow was maintained in the artery during the procedure. (Fan Decl. ¶ 68).

*Compression.* Defendants proffer an unsupported statement from their expert, Dr. Samson, that O'Reilly would inherently include "arterial spasm and clamping about the fiber." (Ex. D to 6/22/05 Samson Rep. at p. D-2). At deposition, however, Dr. Samson admitted that he could not recall whether, during his only experience treating rabbit ears with needles, there was any arterial spasm or what the degree of that spasm might have been. (9/19/05 Samson Depo. at 30, 59-60).

Defendants have presented *no* evidence that spasm would occur during the O'Reilly procedure, let alone clear and convincing evidence that it would *necessarily* occur as required for inherency. Crown, 289 F.3d at 1377. In fact, Dr. Samson testified that spasm is *not* a necessary result of O'Reilly's procedure, or any procedure. See 9/19/05 Samson Depo. at 29-30 ("[I]t doesn't always happen. And it may happen in a patient on one day and not on another day.").

Diomed should be granted summary judgment that O'Reilly does not, either explicitly or

inherently, disclose drainage or compression as required by the Court's claim construction.

## C.     Biegeleisen Fails to Disclose Use of a Bare-Tipped Laser Fiber, Contact of the Fiber Tip With the Vessel Wall, Compression, Drainage, or a Decrease in the Diameter of the Blood Vessel.

The bulk of the Biegeleisen article says nothing about laser treatment. It describes a

hypothetical venoscope – an "angioscope equipped with one or more piezoelectric crystals in the

tip" – for the visual guidance in a vein. (Biegeleisen at 419; Fan Decl. ¶ 69). The following is

Biegeleisen's entire one-paragraph disclosure about the *hypothetical* use of lasers with the scope:

> Although there are no well-established uses for lasers in the venous system as yet, it should be pointed out that the fiberoptic bundles of the venoscope can conduct coherent light to the treatment area. Laser could conceivably be used as a cauterizing agent, in the same manner as electricity has been used in the past. Also, by analogy with the arterial system, laser could be used to restore the lumen of an obstructed vein.

(Biegeleisen article at 421).

Biegeleisen does not disclose at least the following limitations of claim 9: (1) use of a

bare-tipped fiber; (2) contact between the bare fiber tip and the vessel wall; (3) compression of

the vein; (4) drainage of blood from the vein; or (5) a resulting decrease in the diameter of the

blood vessel. Defendants cannot show, by clear and convincing evidence, that *any* of these

limitations – let alone all of them – are present in Biegeleisen.

### 1.     Use of a Bare-Tipped Fiber in Contact With the Vessel Wall

Defendants' expert, Dr. Samson, concedes that Biegeleisen does not disclose a bare-

tipped laser fiber, let alone one used in contact with a vessel wall. See 9/19/05 Samson Depo. at

121 ("I don't think it describes anything about the tip one way or the other."). Indeed, the

"fiberoptic bundle" described in Biegeleisen, while useful for visualization, *could not be used to

treat varicose veins*. (Fan Decl. ¶ 69). The "piezoelectric crystals in the tip" of the scope

(Biegeleisen at 419) – components that enable the detection of sound waves – are made of heat-

sensitive materials that are rendered useless at high temperatures. (Fan Decl. ¶ 69).

The parties agree that temperatures at the fiber tip during laser treatment can reach 700-1000 degrees Celcius. See Proebstle Depo. (Ex. 7 to Rader Decl.) at 104. A device tipped with a piezolelectric crystal would not function (indeed, would be damaged) if used in a high-temperature laser ablation process. (Fan Decl. ¶ 69). Accordingly, one of skill in the art would immediately recognize that the fiberoptic bundle of Biegeleisen cannot be used to deliver laser energy for vein treatment, let alone in contact with a vessel wall as claimed.

Diomed should be granted summary judgment that, as Dr. Samson admitted, Biegeleisen does not disclose the use of a bare-tipped laser fiber, let alone one in contact with a vein wall, as required by the Court's claim construction.

## 2.    Compression and Drainage

*Compression.*  Dr. Samson also admitted at deposition that Biegeleisen does not disclose compression of the vein. (9/19/05 Samson Depo. at 121).

In fact, Biegeleisen teaches just the opposite: that vasospasm, a form of compression, is *undesirable*, as it "can render the angioscope immobile." (Biegeleisen at 421-22).

*Drainage.*  Defendants' expert report points to a brief mention in Biegeleisen of draining blood from the vein when *sclerotherapy* is performed. (Ex. E to 6/22 Samson Rep. at p. E-1). This is wholly unrelated to the laser embodiment. Dr. Samson admitted at deposition that it would be a "stretch" to reach the conclusion that Biegeleisen teaches drainage in connection with the laser embodiment. (9/19/05 Samson Depo. at 121-22). A "stretch" is hardly "clear and convincing evidence" to show that the limitation is disclosed.

Defendants also proffer the same "displacement" argument addressed above with regard to O'Reilly. The argument fails for the same reasons discussed above. Notably, there is no disclosure in Biegeleisen of either the size of the venoscope or the size of the veins within which it might (hypothetically) be used. Thus, there is no basis upon which to conclude that flow rate would be decreased, "displacing" blood (let alone draining it).

Diomed should be granted summary judgment that, as Dr. Samson admitted, Biegeleisen

does not disclose compression or drainage as required by the Court's claim construction.

### 3.    Decrease in Vessel Diameter

Biegeleisen does not describe any effect that a laser would have on a vein after using his

hypothetical scope, let alone suggest a decrease in vein diameter. (Fan Decl. ¶ 69).

Dr. Samson contends, without support, that "Biegeleisen's procedure would inherently

result in a decrease in the diameter of the blood vessel." (Ex. E to 6/22 Samson Rep. at p. E-3).

Inherency, again, is not about "probabilities or possibilities." Crown, 289 F.3d at 1377.

Biegeleisen only spends one paragraph describing his laser embodiment and provides no

procedure for using it; it is pure conjecture that the *hypothetical* scope described there could be

used to effect a reduction in vessel diameter. (Fan Decl. ¶ 69).

In sum, the Biegeleisen article[6] unquestionably lacks at least four limitations of – and

thus cannot invalidate – the '777 patent claims, entitling Diomed to summary judgment.

### D.    The Puglisi Video is Not Prior Art, and Neither It Nor the
### Puglisi Article Discloses Every Limitation of Claim 9.

The Puglisi video is a four-and-a-half minute video of a venous surgery performed by Dr.

Brunello Puglisi in Italy. The Puglisi article and video describe and illustrate a method of using

an ND-Yag laser and a covered (*not* bare) laser fiber in the treatment of a varicose vein.

As a threshold matter, an allegedly anticipating reference such as the Puglisi video cannot

even be *considered* if it does not qualify as prior art. Norian Corp. v. Stryker Corp., 363 F.3d

1321, 1330 (Fed. Cir. 2004) (affirming JMOL that a patent was not invalid for anticipation even

though both parties agreed that the relevant reference – available only on individual request and

thus not published within the meaning of 102(b) – described the invention).

---

[6] Defendants' expert, Dr. Samson, does not address the Biegeleisen patent in his report. The Biegeleisen patent discloses almost nothing about using a laser. Defendants have come forward with no evidence that the Biegeleisein patent invalidates any claim of the '777 patent, and Diomed should be granted summary judgment that it does not.

Defendants do not have clear and convincing evidence that the Puglisi video constitutes

prior art, i.e., by qualifying as a "printed publication" under 35 U.S.C. § 102(b).  Moreover, even

if the video were prior art, neither it nor the Puglisi article discloses each limitation of claim 9.

### 1.      The Puglisi Video Is Not Prior Art.

When there are no disputed factual issues, the determination of what constitutes a

"printed publication" is a question of law for the Court. In re Cronyn, 890 F.2d 1158, 1159 (Fed.

Cir. 1989).  In determining whether a reference qualifies as a printed publication, the Court

should evaluate (1) the dissemination and public accessibility of the reference; (2) the transient

nature of the display; and (3) the ease or difficulty by which viewers could copy and retain the

information from the display. Id. at 1160; Regents of the Univ. of Cal. v. Howmedica, Inc., 530

F. Supp. 846, 860 (D.N.J. 1981) (cited and discussed as persuasive authority by In re

Klopfenstein, 380 F.3d 1345 (Fed. Cir. 2004)).  Applying these factors to the undisputed facts in

this case, the Puglisi video does not constitute a "printed publication" as a matter of law.

Defendants' only evidence of public disclosure is Dr. Puglisi's testimony that he showed

the video at some conferences in Europe. See Puglisi Depo. (Ex. 10 to Rader Decl.) at 87-90.

The video is quite transient in nature, being only four and a half minutes in length, and it would

have been extremely difficult for viewers to copy and retain information from it.  There is no

evidence that Dr. Puglisi ever handed out copies of the video to anyone.

In Howmedica, the court found that a slide show containing pictures and a drawing of the

invention (a prosthetic knee), made to 30 individuals of ordinary skill in the art could not

constitute a "printed publication" because the presentation was "limited in duration," and the

public did not have access to the slides as no prints were made. 530 F. Supp. at 860.  Citing

Howmedica, the Federal Circuit has made clear that "the mere presentation of slides

accompanying an oral presentation at a professional conference is not *per se* a printed

publication." Klopfenstein, 380 F.3d at 1349 n. 4.

- 11 -

Unlike a slide presentation, in which individual slides are often shown, described and discussed for minutes at a time, a video does not stop to provide an opportunity for review. There is no time for a member of the audience to copy or otherwise capture what is being described in the video. Accordingly, a video is considerably less likely to constitute a printed publication than a slide presentation. *Indeed, Diomed is unaware of any court that has ever held a video merely presented at a conference to constitute a printed publication.*

It is important to note that the doctors on both sides of this case consistently testified that none of them had ever even heard of Dr. Puglisi or his work until this suit. See 9/19/05 Samson Depo. at 39; 5/12/05 Navarro Depo. (Ex. 11 to Rader Decl.) at 153; Bone Depo. (Ex. 12 to Rader Decl.) at 127; Mackay Depo. (Ex. 13 to Rader Decl.) at 141; 10/21/05 Min Depo. (Ex. 14 to Rader Decl.) at 425. Dr. Puglisi and his work simply were not (and are not) publicly known.

Based on the undisputed facts regarding Dr. Puglisi's video, the Court can and should decide as a matter of law that it does not constitute a printed publication.

> **2. Even If the Puglisi Video Were Prior Art, Neither It Nor the Puglisi Article Discloses Use of a Fiber Optic Line With an Uncoated Tip, Or Contact Between a Bare Tip and Vein Wall.**

Even assuming *arguendo* that the Puglisi video were prior art (which it is not), there is no question of material fact that it fails to disclose contact between a fiber optic line with an uncoated (i.e., bare) tip and a vessel wall. The same is true of the Puglisi article.

*The Video.* Dr. Samson admitted that, after watching the Puglisi video, one of skill in the art is *unable* to tell what kind of fiber tip (covered or bare) Dr. Puglisi used. See 9/19/05 Samson Depo. at 94-95; 100 ("Q: [H]aving just reviewed that video, was there anything in that video that enables you to say with a high degree of confidence that the fiber tip is either bare or glass covered? A: No."). Dr. Fan agrees. (Fan Decl. ¶ 70). The consistent testimony of Drs. Samson and Fan on this issue negates, as a matter of law, the existence of "clear and convincing evidence" that the Puglisi video discloses a fiber optic line with an uncoated (bare) tip.

While this would hold true even if Dr. Puglisi claimed (in deposition testimony or otherwise) to have used a bare tip – since the issue is not what he *did*, but what he *published*, Scripps Clinic & Rsch. Fnd. v. Genentech, 927 F.2d 1565, 1576 (Fed. Cir. 1991) – Dr. Puglisi's testimony in any event confirms that the fiber tip he used was covered. Dr. Puglisi testified that the diameter of the fiber was 600-800 microns, but increased to about 1500 microns because of the added thickness of the cover. (Puglisi Depo. at 103-104). Indeed, when asked about differences between his procedure and the '777 patent, *he brought this one up*. (Id. at 103).[7]

*The Article.*  Dr. Samson admitted at his deposition that there is no disclosure in the Puglisi article of using a bare fiber tip. (9/19/05 Samson Depo. at 89).

Moreover, there is substantial evidence from the article that the fiber tip was *covered* (not bare).  The Puglisi article (at 841) describes the fiber as a "1.7mm diameter optical fiber."   This is the diameter of a *covered* fiber with a core of approximately 600 microns and a tip covering (such as glass) totaling about another 1100 microns. (Fan Decl. ¶ 70). Defendants have presented no evidence to the contrary.

In sum, neither the Puglisi video (which is not prior art) nor the article (which is prior art) discloses the use of a laser fiber with an uncovered (bare) tip

Dr. Samson also conceded in his expert report that the Puglisi video and article do "not teach deliberately putting the uncoated flat face (or laser emitting section) of the fiber in physical contact with the wall of the blood vessel." (Ex. F to 6/22/05 Samson Rep. at p. F-2). This provides an independent reason why Diomed should be granted summary judgment that the Puglisi video and article do not anticipate the '777 patent claims.

---

[7] At some (apparently later) point in time Dr. Puglisi may have experimented with different fiber configurations, including "cut[ting] the point of the cable in 90 degrees and us[ing] it that way," but it is unclear what this means and when he did it. (Puglisi Depo. at 65). Indeed, at his deposition Dr. Samson backed away from statements in his expert report suggesting that the fiber tip Dr. Puglisi used was cut at "90 degrees" and uncovered. (Ex. F to 6/22/05 Samson Rep. at p. F-1).  Dr. Samson admitted that upon a closer review of Dr. Puglisi's deposition transcript he was "confused as to whether [Dr. Puglisi] did or did not have a cover." (9/19/05 Samson Depo. at 117-18).

### 3.    The Puglisi Video and Article Fail to Disclose Drainage and Compression.

Finally, the Puglisi article and video both fail to disclose drainage of blood from the vein or compression of the vein, limitations that are part of the Court's construction of claim 9.

*Drainage.* The Puglisi article and video describe a "crossectomy," in which Dr. Puglisi ligates (or ties off) the top and bottom of the greater saphenous vein. Defendants' expert initially argued that ligation of the vein would result in the vein being emptied. (Ex. F to 6/22/05 Samson Rep. at p. F-2). He admitted at deposition, however, that after ligation the vein continues to be filled with blood. (9/19/05 Samson Depo. at 32-34; 102). Dr. Fan agrees. (Fan Decl. ¶ 70).

Dr. Samson's expert report also suggested that the Puglisi article describes a "total absence of blood" in the vessel during the procedure. (Ex. F to 6/22/05 Samson Rep. at p. F-2). Once again, however, Dr. Samson admitted at deposition that this statement in the Puglisi article refers to the vein *after* it has been treated with the laser. (9/19/05 Samson Depo. at 102). Dr. Fan agrees. (Fan Decl. ¶ 70).

*Compression.* Both the Puglisi video and article likewise fail to disclose compression of the vein. Dr. Samson argued in his report that Dr. Puglisi's manipulation of the patient's skin in the video constituted compression of the vein. (Ex. F to 6/22/05 Samson Rep. at pp. F-1, F-2). To one of skill in the art watching the video, however, it is unclear what effect this manipulation would have on the vein. (Fan Decl. ¶ 70). Indeed, at his deposition, Dr. Samson admitted that he could not tell whether compression resulted without the benefit of ultrasound. (9/19/05 Samson Depo., p. 99). There is no disclosure of vein compression in the article either.

There is no evidence at all – let alone clear and convincing evidence – that either the Puglisi video (if it were to constitute prior art) or the Puglisi article discloses drainage or compression of the vein. Diomed should be granted summary judgment that they do not.

- 14 -

###    E.    Farley Employs a Diffuser Fiber (Not a Bare Tip)
###           And Fails to Disclose Compression or Drainage.

The fourth reference cited by Defendants is Farley, a patent relating primarily to use of an electrode catheter for vein and valve repair. A single embodiment is provided in which a laser (rather than electrodes) is employed as the thermal energy source. The laser embodiment uses a diffuser, specially designed to *avoid* direct contact of the bare laser fiber tip and the vein wall, and also lacks any disclosure of drainage or compression of the vein.

*No Disclosure of a Bare Tip or Contact.* The only embodiment of the Farley patent involving use of a laser is Figure 25, shown below and described at Col. 17, lines 30-50.



FIG. 25

The catheter 130 contains an optical fiber 134 that is connected to a "light diffusing device 136 such as a sapphire crystal." (Col. 17, line 35). Dr. Samson accordingly admits that Farley lacks any disclosure of using a bare-tipped laser fiber. (Ex. G to 6/22/05 Samson Rep. at pp. G-1, G-2).

Likewise, Dr. Samson admitted at deposition that the sapphire diffuser tip *prevents* the optical fiber itself from making contact with the vein wall. (9/19/05 Samson Depo. at 140).

Thus, Farley lacks any disclosure of using a bare-tipped fiber, and of putting a bare tip in contact with the vein wall.

*No Disclosure of Compression or Drainage.* Farley also fails to disclose compression and drainage in connection with the laser embodiment. Dr. Samson admitted at his deposition that, in his report, he "extrapolated" the teaching of compression from other, non-laser embodiments in the Farley patent. (9/19/05 Samson Depo. at 145). This "extrapolation" does not constitute clear and convincing evidence on which a reasonable jury could find that Farley discloses the use of compression in the laser embodiment.

- 15 -

Dr. Samson's sole argument with respect to the drainage limitation is a reiteration of the "displacement" concept rebutted above. Furthermore, Farley describes focal treatment of limited portions of the vein (such as incompetent valves) leaving intervening vein segments untouched. (Fan Decl. ¶ 71). The goal in Farley is to tighten floppy valves, not to occlude and ultimately fibrose and eliminate the vein. (Id.). As such, vein patency and preservation of blood flow are desired during the Farley procedure, *not* vein emptying. (Id.).

Diomed should be granted summary judgment that Farley fails to anticipate the '777 patent claims, at least because it lacks any disclosure of using a bare-tipped fiber, placing the bare tip in contact with a vein wall, and compressing and draining a vein in a laser procedure.

**E.     The Mazza Video Is Not Prior Art;
In Any Event, It and the Mazza Article Fail
To Disclose Several Limitations of Claim 9.**

As with the Puglisi video, the Defendants cannot present clear and convincing evidence that the Mazza video is prior art to the '777 patent. In any event, it fails to disclose several limitations of claim 9, independently entitling Diomed to summary judgment.

*The Mazza Video is Not Prior Art.* As noted previously, when there are no disputed factual issues, the determination of what constitutes a prior art "printed publication" is a question of law for the Court. In re Cronyn, 890 F.2d 1158, 1159 (Fed. Cir. 1989). Evaluating the undisputed facts about the Mazza video against the relevant legal standards – namely, (1) the dissemination and public accessibility of the reference; (2) the transient nature of the display; and (3) the ease or difficulty by which viewers could copy and retain the information from the display – Mazza fails to constitute prior art as a matter of law.

The Mazza video is only six and a half minutes long. Defendants' only evidence of public disclosure is Dr. Puglisi's testimony that he saw it presented *once* at a conference in Genoa, Italy. (Puglisi Depo. at 98). There is *no* evidence that the video was accessible to anyone but Dr. Mazza and Dr. Puglisi after the presentation.

- 16 -

The Howmedica decision (which has been cited favorably by the Federal Circuit), held a slide show presented at a conference *not* to constitute a prior art printed publication. Howmedica, 530 F. Supp. at 860. This, coupled with the lack of *any* judicial authority for the proposition that a video merely presented at a conference can ever constitute a printed publication, entitles Diomed to summary judgment on the Mazza video. The Defendants have insufficient evidence to meet their clear and convincing burden of proof in establishing the Mazza video as prior art.

*The Mazza Video and Article Fail to Disclose a Bare Tip and Contact.* Even if the Mazza video were a prior art printed publication (which it is not), both it and the Mazza article fail to disclose use of a bare fiber tip and contact of that tip with the vein wall.

The Mazza video and article disclose the use of a *metal-covered* fiber tip. The metal cover is clearly shown during the Mazza video, (Fan Decl. ¶ 72) and is the fiber is described in the article as being "equipped with a closed metal tip with a diameter of 2 mm." (Mazza article at ANG26097). Dr. Samson conceded at deposition that the fiber tip in both the video and the article was metal-covered. (9/19/05 Samson Depo. at 150).

The Mazza video and article also fail to disclose contact of a bare fiber tip with the vein wall. (Fan Decl. ¶ 72). Although the video does appear to show a side gap in the metal housing, through which light from the fiber can be emitted, the article states that this emitted light energy is completely absorbed by hemoglobin (i.e., in blood). (Fan Decl. ¶ 72). Thus, neither the video nor the article discloses contact of the bare (laser emitting) section of the fiber and the vein wall.

In any event, Dr. Samson testified that he was confused by the Mazza disclosures, and as one of skill in the art, he could not tell what Mazza is describing. (9/19/05 Samson Depo. at 151). This too requires summary judgment for Diomed, since the Defendants bear the burden of establishing invalidity by clear and convincing evidence.

- 17 -

***The Mazza Video and Article Fail to Disclose Drainage and Compression.*** Dr. Samson admits that the Mazza article does not expressly disclose drainage. (9/19/05 Samson Depo. at 151). Dr. Samson's report suggested (as it did with regard to Puglisi) that because the Mazza video and article show Dr. Mazza tying off the vein being treated, the procedure would inherently result in drainage of blood from the vein. (Ex. H to 6/22/05 Samson Rep. at p. H-2). Once again, however, he was later forced to concede that this is wrong. (9/19/05 Samson Depo. at 32-34; 102). The Defendants have no evidence of drainage in the Mazza video or article.

Nor does Mazza disclose compression of the vein. Dr. Samson testified that the Mazza article does not mention compression, and that he did not recall seeing any compression in the video either. (9/19/05 Samson Depo. at 151-152). Dr. Fan agrees. (Fan Decl. ¶ 72).

There is no question of material fact that the Mazza video and article fail to disclose drainage and compression. Diomed should be granted summary judgment that neither the Mazza article or video anticipate the '777 patent claims.

## III. DEFENDANTS CANNOT SHOW OBVIOUSNESS OF THE '777 PATENT BY CLEAR AND CONVINCING EVIDENCE.

### A. Legal Standards for Obviousness

While anticipation under 35 U.S.C. § 102 requires that every limitation of a patent claim be present in a single prior art reference, invalidity under § 103 requires that the claim as a whole be deemed obvious in light of the prior art. More than one prior art reference can be considered in an obviousness analysis, so long as there is a "suggestion, motivation, or teaching in the prior art that would have led a person of ordinary skill in the art to select the references and combine them in the way that would produce the claimed invention." Karsten Mfg. Corp. v. Cleveland Golf Co., 242 F.3d 1376, 1385 (Fed. Cir. 2001) (reversing summary judgment of obviousness because the defendant "offered no source of motivation or suggestion, other than hindsight ... to select and combine" the relevant structures from the prior art).

By definition, every claim limitation must be disclosed in at least one of the prior art references that are being combined to allege obviousness of the claim. If the prior art fails to disclose one or more limitations, the claim is not obvious as a matter of law. E.g., CFMT, Inc. v. Yieldup Int'l, Corp., 349 F.3d 1333, 1342 (Fed. Cir. 2003).

Obviousness of a patent claim under 35 U.S.C. § 103 is a legal conclusion based on the following underlying facts: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of non-obviousness. Crown, 289 F.3d at 1375. Where the relevant facts are not in dispute, it is appropriate to resolve the question of obviousness on summary judgment. E.g., Crown, 289 F.3d at 1375 (affirming summary judgment of non-obviousness); Biotec Biologische v. Biocorp, Inc., 249 F.3d 1341, 1354-55 (Fed. Cir. 2001) (same).

## B.    No Prior Art Discloses Contact, Compression or Drainage In the Context of a Laser Treatment Procedure.

As a threshold matter, Defendants have not shown – let alone provided clear and convincing evidence – that several limitations of claim 9 are present in the prior art.

First, as discussed in Section II, no prior art reference discloses contact of a bare fiber tip and a vein wall – the precise feature regarded by the PTO as rendering the claims patentable. Thus, the "differences between the claimed invention and the prior art," Crown, 289 F.3d at 1375, show that the '777 patent is not obvious. Defendants, favoring their anticipation case, have not submitted evidence on this point (nor have they submitted evidence on the other three obviousness factors).

Likewise, no prior art reference discloses compression or drainage of a vein in the context of a laser vein treatment. In fact, the prior art *teaches away* from compressing and draining the vein because, as Defendants acknowledged at the Markman stage, early treatments sought to coagulate blood within the vein rather than directing laser energy into the vein wall.

- 19 -

Prior art U.S. Patent No. 4,564,011 to Goldman, discussed in some detail at the <u>Markman</u> hearing, provides a good example of this, as Figure 3 from that patent illustrates:



In suggesting that the '777 patent is nevertheless obvious, Defendants have submitted only conclusory statements by their expert, Dr. Samson, in connection with each piece of prior art he discusses, that "compression" of the vein would have been obvious to one of skill in the art before the '777 patent application was filed. Dr. Samson opines, without explanation, that it was "within the knowledge of one skilled in the art more than a year prior to the '777 patent filing date to use tumescent anesthesia as a local anesthetic in connection with" the procedures disclosed in the various references, thus resulting in compression.

Dr. Samson provides, however, no evidence (in the form of citations to literature or otherwise) to support the assertion. "It is well settled that conclusory statements of counsel or a witness that a patent is invalid do not raise a genuine issue of fact." <u>Biotec</u>, 249 F.3d at 1353 (Fed. Cir. 2001); <u>Cabot Safety Intermediate Corp. v. Arkon Safety Equipment, Inc.</u>, 979 F. Supp. 929, 932 (D. Mass. 1997) (granting summary judgment of non-obviousness and explaining that since the defendant's experts had provided "no support for their contention that a combination of the prior art rendered" the patent obvious, the defendant had failed to meet its "heavy burden of proving invalidity").