With regard to the Puglisi article and its disclosure of using "local" anesthesia, Dr. Samson admitted at his deposition that he, as one of ordinary skill in the art, would read "local" anesthesia to mean "*without* a large volume of fluid," i.e., *not* tumescent anesthesia. (9/19/05 Samson Depo. at 101) (emphasis added). This admission negates clear and convincing evidence of obviousness over Puglisi as a matter of law.

      C.    **<u>Defendants Have Identified No Motivation to Combine Prior Art References</u>**.

Even if the Defendants had identified prior art references disclosing each limitation of the '777 patent claims (they have not done so), they plainly have not identified any motivation to combine disparate teachings as required for a § 103 analysis. Absent such evidence, Diomed is entitled to a finding of non-obviousness as a matter of law. E.g., <u>Teleflex, Inc. v. Ficosa N. Am. Corp.</u>, 299 F.2d 1313, 1334 (Fed. Cir. 2002) ("The showing of a motivation to combine must be clear and particular, and it must be supported by actual evidence."); <u>Karsten Mfg. Corp.</u>, 242 F.3d at 1385 (reversing finding of obviousness on summary judgment because, "[a]s a matter of law, absent such suggestion or motivation or teaching [to combine] in the prior art," a patent cannot be considered obvious). Indeed, as discussed above, the prior art specifically discouraged ("taught away from") maneuvers, such as compression and drainage, which are required under the Court's claim construction and would have made contact – an express limitation of claim 9 – more likely. This is the opposite of a motivation to combine.

**IV.    THE '777 PATENT IS NOT INVALID UNDER 35 U.S.C. § 112**

In their answers and counterclaims, the Defendants asserted that the '777 patent is invalid under 35 U.S.C. § 112. However, neither Defendant ever substantiated such a defense, in response to discovery or otherwise. The Defendants' interrogatory responses requesting that they "state the basis" for their invalidity defenses contain nothing about § 112. (Ex. 21, 35, 36 to Rader Decl.). This defense has been waived, and summary judgment should be granted thereon.

V.   THE '777 PATENT IS ENFORCEABLE.

According to the Federal Circuit, the "habit of charging inequitable conduct in almost every major patent case has become an absolute plague," and such charges are often made on the "slenderest grounds." Burlington Indus. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1988).

This District recently reinforced that courts "generally disfavor" inequitable conduct claims precisely "because they are often filed without adequate factual support." Smith & Nephew, Inc. v. Surgical Solutions, Inc., 353 F. Supp. 2d 135, 140 (D. Mass. 2004) (Gorton, J.).

This suit unfortunately provides a textbook example of what Judge Gorton and the Federal Circuit have lamented. The primary inequitable conduct allegation is this case based on so-called "expert" testimony from a patent lawyer (Bruce Sunstein) who (1) assumed in his Rule 26 report a timeline of events that he was later forced to admit has no factual basis; (2) made a key scientific assumption that the Defendants' own technical expert explained is simply untrue; and (3) relied upon an erroneous formulation of a fundamental legal principle.[8]

Only AngioDynamics has signed on to Mr. Sunstein's expert report. VSI declined to participate in retaining him.[9] VSI has not, however, withdrawn its inequitable conduct claim. Apparently, VSI still hopes to piggy-back off of AngioDynamics and Mr. Sunstein, should their allegations stick. This motion accordingly seeks summary judgment against both Defendants.

The Defendants' counterclaims allege that the '777 patent inventors improperly withheld three articles from the PTO. Notably, Mr. Sunstein opined on just one. The other allegations were even thinner than the "slenderest grounds" referred to by the Burlington court.

---

[8] Even if summary judgment was not called for here (which it is, as explained in this brief), it would be inappropriate for Mr. Sunstein to testify as an expert witness at trial. Testimony of patent law "experts" inappropriately seeks to usurp the role of the Court. E.g., Revlon Consumer Prod. Corp. v. L'Oreal S.A., 1997 WL 158281, *3 (D. Del. 1997) (declining to allow a patent law expert to testify regarding the "duties and responsibilities of an inventor [and] his or her attorney or agent"). The serious error of law made by Mr. Sunstein in his report (discussed below) strongly reinforces this. Herbert v. Lisle Corp., 99 F.3d 1109, 1115-17 (Fed. Cir. 1996) (reversing judgment of unenforceability for inequitable conduct and "tak[ing] note of the extent to which the incorrect law was announced by a patent law expert witness").

[9] See Sunstein Depo. (Ex. 8 to Rader Declaration) at 4.

Indeed, the first time any of the inventors even saw the other two articles was in this litigation, when they could not have been "deliberately withheld" from the PTO as required to show inequitable conduct. Accordingly, the allegations about those articles appear to have been dropped.

In any event, there is no genuine dispute that all three references are *immaterial* to patentability. Thus, even had the inventors known about them while the '777 patent was pending, they had no obligation to disclose them to the PTO. Moreover, the Defendants have no evidence – let alone anything approaching clear and convincing evidence – that the inventors acted with an intent to deceive the PTO, a required element of the charge. Every piece of evidence on that issue points in the opposite direction. Summary judgment for Diomed is in order.

A. **The Law of Inequitable Conduct**

Patent applicants have a duty, under 37 C.F.R. § 1.56, to disclose to the PTO "all information known ... to be material to patentability as defined in this section."

A prior art reference is "material to patentability" if it "establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim." Id. § 1.56(b)(1).[10] This standard is further explained in the last paragraph of the Rule:

> A prima facie case of unpatentability is established when the information **compels a conclusion** that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

37 C.F.R. § 1.56 (emphasis added).[11]

---

[10] Rule 56 also provides that information – such as experimental data – can be material if it "refutes, or is inconsistent with" a position taken before the PTO. Id. § 1.56(b)(2). This prong of the Rule, however, is not at issue in this case.

[11] This version of the Rule was enacted in 1992 and governs here because the '777 patent was filed after 1992.

A patent may only be held unenforceable if all of the following are proven by *clear and convincing evidence:* (a) the inventors violated their duty of disclosure by withholding prior art; (b) the withheld prior art was material to patentability; (c) the inventors *knew* that the prior art was material to patentability when they withheld it; and (d) the inventors acted with an intent to deceive the PTO. Warner-Lambert v. Teva Pharms., 418 F.3d 1326, 1342-43 (Fed. Cir. 2005).[12]

Given the high burden of proof, as well as the slender grounds on which inequitable conduct claims are often pled, summary judgment is an appropriate procedure for weeding out unworthy inequitable conduct allegations and streamlining trial. E.g., ATD Corp. v. Lydall, Inc., 159 F.3d 534, 547 (Fed. Cir. 1998) (finding inequitable conduct an appropriate matter for summary judgment in patentee's favor).[13]

### B. The Defendants' Inequitable Conduct Allegations Are Without Merit.

#### 1. The O'Reilly Article

##### a. Mr. Suntein's Hypothetical Timeline Is Baseless; There Was No Intent to Deceive the PTO.

The defendants' counterclaims allege intentional failure to disclose O'Reilly to the PTO. (Docket # 70 ¶¶ 18, 21, 33, 37; Docket # 69 ¶¶ 10, 13, 24, 28).

In his report, Mr. Sunstein fleshes out the allegation. He claims that Dr. Min (one of the inventors) wrote a protocol describing the procedure, with a bibliography of references including O'Reilly, and submitted that protocol to an Institutional Review Board (IRB). According to the hypothesis that underlies Mr. Sunstein's opinion, Dr. Min thereafter removed the bibliography from the protocol document and forwarded the "stripped" version of the protocol to the attorney

---

[12] Even if the clear and convincing standard of proof were met as to all four prongs of the analysis, the Court would still have to independently evaluate whether equity warrants a finding of inequitable conduct in the particular case. Ulead Sys., Inc. v. Lex Computer & Mgmt. Co., 351 F.3d 1139, 1144 (Fed. Cir. 2003).

[13] The questions of materiality, knowledge thereof and intent to deceive are to be resolved by the Court if a trial on inequitable conduct is held. Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1584 (Fed. Cir. 1995). When, as here, a defendant is unable to proffer any evidence on these questions (let alone clear and convincing evidence), a trial is unnecessary and the Court may appropriately decide the issue on summary judgment.

who was prosecuting the application – all in direct response to a letter from the attorney informing Dr. Min of the duty to disclose prior art to the PTO. Mr. Sunstein further supposes that O'Reilly was the first reference listed in the bibliography because Dr. Min considered it to be particularly relevant. See Sunstein Report (Ex. 4 to Rader Decl.) ¶¶ 15-20, 26.

Mr. Sunstein's chronology, even if true, would not lead to a finding of inequitable conduct. In any event, he simply gets the facts wrong. What actually happened is:

- Dr. Min wrote a description of the procedure in about January 1999. (Ex. 6 to Min Decl.). He sent this protocol to patent counsel *that month* as background information.

- At about the same time, Dr. Min performed a patent search and provided the results (which included the references later cited by the PTO) to patent counsel as well.

- In about April 1999, Dr. Min was advised that his IRB submission should include a list of medical literature demonstrating the safety of firing lasers in the body. Dr. Min performed a search and created a bibliography as suggested. He submitted the protocol (with bibliography) to the IRB in May 1999. (Ex. 7 to Min Decl.).

- In August 1999 – months *after* sending the original protocol and search results to counsel – Dr. Min received a letter reminding him of the duty of disclosure.

(Min Decl. ¶¶ 22-29).

Mr. Sunstein is not a fact witness. His conclusion expressly <u>assumes</u> facts for which he admits he has no evidence. The only evidence – Dr. Min's declaration and the documents themselves – contradicts his assumptions. In particular, Mr. Sunstein errs in his assumption that the study protocol was created with the bibliography in the first instance. In fact, he was forced to admit at deposition that he has "no personal knowledge of which one [i.e., the protocol with the bibliography or the version without it] was created first." (Sunstein Depo. at 133-134).

Mr. Sunstein's sole basis for asserting that Dr. Min "stripped" the study protocol and sent the stripped version to patent counsel, all in response to counsel's letter about the duty of disclosure, and all after the non-stripped version had *already* been sent to the IRB, is the Bates Numbering of documents from the patent file. Specifically, Mr. Sunstein assumed that the successive Bates Numbers of the letter from counsel and the original study protocol document (Ex. 6 to Min Decl.) means that the latter was sent in response to the former.

- 25 -

The allegation is baseless. "Bates Numbering" is not evidence,[14] and Mr. Sunstein's supposition is directly contradicted by the only evidence available on this issue: Dr. Min's testimony. At deposition, Mr. Sunstein himself admitted that his supposition was "only an inference, and inferences can be dispelled by facts to the contrary." (Sunstein Depo. at 133).[15] The facts here are most certainly to the contrary. The defendants have *no* evidence – let alone clear and convincing evidence – to support the accusation of PTO fraud that Mr. Sunstein, speculating from the litigation Bates Numbering of two documents, unfairly attributes to one of the nation's leading interventional radiologists in the field of varicose vein treatment.

Because the defendants have no evidence of intent, Diomed is entitled to summary judgment. E.g., Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1331 (Fed. Cir. 2004) (affirming summary judgment of no inequitable conduct where patent attorney's testimony on intent was unrebutted); Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 265 F.3d 1294, 1307 (Fed. Cir. 2001) (affirming summary judgment of no inequitable conduct: "Medtronic provides no independent showing of intent. Accordingly, Medtronic has failed to carry its burden.").

Mr. Sunstein's further assumption, that Dr. Min regarded O'Reilly as particularly relevant because it was listed first in the bibliography, is also disproven by the only evidence available on the subject: Dr. Min's testimony. O'Reilly was listed first because it was the oldest reference on the list (dating back to 1982). In fact, the next article listed was the second oldest reference (also dating to 1982). This list, in fact, like many bibliographies, is roughly chronological. (Min Decl. ¶ 28).

---

[14] The notion that consecutive litigation Bates Numbering means one document was sent in response to another, or that the two were created in any particular time frame, or frame of mind, is absurd. Although hardly necessary to explain this to the Court, Diomed's rebuttal expert (a patent attorney who worked for many years as a Patent Examiner and a senior official in the PTO) does address the issue in his report. See Rzucidlo Rep. (Ex. A to Rzucidlo Decl.) ¶ 65.

[15] See also Sunstein Depo. at 130-131 ("There are plenty of assumptions with respect to what happened there. I certainly can't be sure.").

When questioned about his conclusion that Dr. Min found O'Reilly particularly relevant, Mr. Sunstein could not recall Dr. Min's testimony on this issue. (Sunstein Depo. at 115). Prior to Sunstein's outlandish assumption, Dr. Min had testified that he did not recall any particular reason for the order in which the references on the bibliography were listed, but that he knew O'Reilly was far afield from the invention from a patentability perspective since it concerned arteries rather than veins. See 5/13/05 Min Depo. (Ex. 16 to Rader Decl.) at 192-196. In light of Mr. Sunstein's accusation, Dr. Min has since examined the bibliography more closely and refreshed his recollection that he listed in the items in chronological order. (Min Decl. ¶ 25).

Since the Defendants bear the burden of providing clear and convincing evidence of intent to deceive the PTO, Dr. Min's unrebutted testimony that he did not believe O'Reilly was material to patentability provides an independent ground on which Diomed is entitled to summary judgment.[16] Warner-Lambert, 418 F.2d at 1346-47 (no inequitable conduct, even though withheld information was "of relatively high materiality," because inventors "did not appreciate its materiality"); Dayco Products, Inc. v. Total Containment, Inc., 329 F.3d 1358, 1367 (Fed. Cir. 2003) (reversing inequitable conduct finding because "[i]ntent to deceive cannot be inferred simply from the decision to withhold the reference where the reasons given for the withholding are plausible."); Abbott Labs. v. Torpharm, 300 F.3d 1367, 1380 (Fed. Cir. 2002) (affirming summary judgment of no inequitable conduct where "Torpharm fails to dispute Abbott's claim that Abbott scientists believed" the compound did not include the thing that would make it material.); Allied Colloids, Inc. v. American Cyanamid Co., 64 F.3d 1570, 1578 (Fed. Cir. 1995) ("It is not inequitable conduct to omit telling the patent examiner information

---

[16] This is true even if O'Reilly is ultimately deemed to be material (a conclusion that would be erroneous as explained below), because the requirement that the inventor *know* of the materiality of the withheld reference is an independent point that must be proven by clear and convincing evidence. Warner-Lambert Co., 418 F.3d at 1342-43 ("One who alleges inequitable conduct arising from a failure to disclose prior art must offer **clear and convincing proof of** the materiality of the prior art [and] **knowledge** chargeable to the applicant of that prior art and **of its materiality**.") (emphasis added).

that the applicant in good faith believes is not material to patentability."); Nova Biomedical Corp. v. Mallinckrodt Sensor Sys., Inc., 997 F. Supp. 187 (D. Mass. 1998) (Stearns, J.) (granting summary judgment of no inequitable conduct where defendant had no evidence to rebut inventor's affidavit that he did not consider the allegedly withheld prior art material).

### b. O'Reilly Is Not Material.

The materiality of O'Reilly may most easily be measured against claim 9, because it is the broadest claim asserted by Diomed. If O'Reilly is not material to the patentability of claim 9, a fortiori is cannot be material to the patentability of the remaining (narrower) claims either.

This proposition is identical to the one stated above concerning validity, specifically that if a broad independent claim is found valid, the remaining narrower dependent claims must also be valid in light of the same prior art. In re Fritch, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("Dependent claims are nonobvious if the independent claims from which they depend are nonobvious.").

In brief, claim 9 recites a method for treating a blood vessel comprising the steps of (a) inserting means for emitting laser energy (a fiber optic line with an uncoated tip) into the blood vessel; (b) placing the uncoated tip into intraluminal contact with the blood vessel; and (c) emitting laser energy into the blood vessel, thus decreasing its diameter.

The defendants successfully argued during Markman claim construction proceedings in this case that, to be consistent with the '777 patent specification, the "placing … into intraluminal contact" step of claim 9 must be interpreted to require both compression and drainage of the vein. E.g., Docket # 40 (AngioDynamics Brief) at 23 ("[T]he statements in the specification require that the limitations of draining and compressing be read into the construction of … Claim 9."); Docket # 55 (Court's Claim Construction Order) at 11(construing "placing … into intraluminal contact" step to require compression and drainage of the vein).

As discussed in Section V(A) above, Rule 56 dictates that a prior art reference is only material to patentability if, by itself or in combination with other information, it **"compels a conclusion that a claim is unpatentable ... giving each term in the claim its broadest reasonable construction consistent with the specification**." (emphasis added).

O'Reilly fails the applicable test.

In their pleadings, the Defendants assert that O'Reilly constituted "material" prior art, but provide no substantive explanation of the assertion. (Docket # 69 ¶ 32; Docket # 70 Counterclaims ¶ 21).

Mr. Sunstein's report provides some more detail. On the issue of materiality, he observes that O'Reilly discloses two limitation of claim 9 – delivery of laser energy into the blood vessel lumen, and collapse of the vessel. He concedes, however, that these steps were also disclosed by the Goldman and Trelles references considered by the PTO during prosecution. (Sunstein Rep. ¶ 22). Accordingly, the teachings of O'Reilly that Mr. Sunstein cites are cumulative of the prior art of record. As a matter of law, cumulative prior art is not material. 37 C.F.R. § 1.56(b) (prior art is only material "when it is not cumulative to information already of record").

Mr. Sunstein concedes explicitly that O'Reilly does not disclose the third substantive limitation of claim 9 – "intraluminal contact" of a bare fiber tip with the vessel wall. See Ex. 3 to Sunstein Rep.; see also Sunstein Depo. at 76 ("The [O'Reilly] article does not recite contact with the vessel wall."). This was the key claim limitation that led to issuance of the '777 patent by the PTO – an important fact that Mr. Sunstein does not acknowledge anywhere in his report. See Rzucidlo Rep. (Ex. A to Rzucidlo Decl.) ¶¶ 24, 28.

In short, Mr. Sunstein concedes that O'Reilly's teachings are cumulative of the prior art of record, and that O'Reilly lacks any disclosure of the key claim limitation found by the PTO to render claim 9 patentable. It is black-letter law that such a reference is not material to patentability.

At deposition, Mr. Sunstein attempted to salvage the Defendants' materiality allegation by arguing that, although not explicitly taught by O'Reilly, the intraluminal contact limitation would be "inherent" therein. (Sunstein Depo. at 151). His sole basis for arguing that contact would be inherent in O'Reilly was that the diameter of the rabbit ear artery is approximately the same as that of the laser fiber used in the O'Reilly experiments – 0.2 millimeters (or 200 microns) – creating a "tight squeeze" in which contact would be inevitable. He emphasized this point repeatedly during his deposition:

- "I know by personal experience looking at rabbits -- this is not deep physiological knowledge. I have looked at rabbits, and I have seen ears of rabbits. I can report that in my experience of looking at ears of rabbits is that I can see blood vessels in those ears. Those blood vessels are remarkably small. I have not measured their diameter, but I can say that as an order of magnitude they are approximately the same size ... The blood vessels, in terms of the diameter, the diameter of those blood vessels is in order of magnitude of 200 microns." (Sunstein Depo. at 76-77).
- "The optical fiber is .2 millimeters in diameter, and as I mentioned earlier, my observation as a human the blood vessels in the ear of a rabbit is that in the order of magnitude they are approximately that size." (Id. at 102).
- The Patent Examiner "has that tight geometry based on the fact that the blood vessels of the rabbit are so small." (Id. at 153).

The assumption made by Mr. Sunstein, who admittedly is not a specialist in biology, medicine, or rabbits[17] and who never measured the diameter of a rabbit ear artery (id. at 77), is wrong. The Defendants' own technical expert (retained by *both* AngioDynamics and VSI), Dr. Russell Samson, who has actually done experimental research on rabbit ear arteries, testified that they are between 1 and 2 mm in diameter. (9/19/05 Samson Depo. at 26) Mr. Sunstein was off by a factor of between 5 and 10. The "tight fit" he insisted upon at deposition does not exist.[18]

---

[17] Mr. Sunstein concentrated in applied mathematics and literature as an undergraduate, and later completed course work for a Ph.D. in English literature, but never focused on medicine or biology. (Sunstein CV attached to his report at Exhibit 1).

[18] This error further demonstrates the irrelevance and inappropriateness of testimony from a patent lawyer about issues with which he has no technical familiarity – particularly when the goal of that testimony is to incorrectly malign the integrity of an esteemed physician.

- 30 -

What is more, the article itself makes clear that O'Reilly was not performing a contact procedure. It does so in both illustrations and in writing (several times):

- The laser fiber tip is depicted, in a drawing of the experimental setup, as being centered within the vessel and *not* in contact with the vein wall.

- The laser fiber tip was held stationary during firing of the laser, rather than being moved through the vessel as in the endovenous laser procedure[19] -- movement can contribute to contact as the fiber drags along the tortuous vessel wall. Importantly, Mr. Sunstein misunderstood this and assumed in his analysis that the laser fiber was withdrawn during firing in the O'Reilly experiments.

- The investigators reported no perforations of the vessel wall – despite firing for 60-120 seconds in one location. Perforations certainly would have occurred if the fiber tip had contacted the wall of the vessel.

- The damage to the vessel wall is described as occurring "distal" to the laser fiber tip, rather than directly at the tip, and the article repeatedly refers to impact of the laser "beam" with the vessel wall rather than physical contact of the fiber tip with the wall.

(Fan Decl. ¶ 68).

In summary, the only substantive basis for Mr. Sunstein's conclusion that O'Reilly would "inherently" involve contact of the laser fiber tip and the vein wall is wrong according to the Defendants' own technical expert, and the O'Reilly article itself depicts a non-contact procedure.

Because O'Reilly does not disclose, teach or suggest (either explicitly or inherently) this critical limitation of the '777 patent claims, which the PTO concluded renders those claims patentable, O'Reilly does not – as a matter of law – compel a conclusion that any claim of the '777 patent is invalid. 37 C.F.R. § 1.56. It therefore is not material to patentability.[20] Id.

In addition to lacking the "intraluminal contact" limitation of claim 9, O'Reilly also lacks the "compression" and "drainage" limitations of that claim. Mr. Sunstein admitted this in Exhibit 3 to his report and again at deposition. (Sunstein Depo. at 101).

---

[19] Defendants' technical expert agrees. (9/19/05 Samson Depo. at 49).

[20] Presumably recognizing this, Mr. Sunstein sidesteps the Rule 56 standard and instead purports to apply various other standards, claiming for example that a Patent Examiner would "likely regard the O'Reilly reference as fully anticipating the subject matter claimed in claim 9." (Sunstein Rep. ¶ 23). Even under this (incorrect) standard, however, O'Reilly still would not be material. Mr. Sunstein never worked as a Patent Examiner. Mr. Rzucidlo, who spent many years as an Examiner and a senior PTO official, explains in his report that no Patent Examiner would regard a reference that is missing critical claim limitations as anticipating the claim. (Rzucidlo Rep. ¶¶ 34-35).

This provides a further reason why O'Reilly could not be suggest, let alone "compel," a conclusion that claim 9 is unpatentable. (Rzucidlo Rep. ¶ 45).

Rule 56 requires that, when considering whether a prior art reference is material to the patentability of a claim, the claim must be given its "broadest reasonable interpretation *consistent with the specification*." Both AngioDynamics and VSI argued strenuously (and successfully) in Markman proceedings in this case that the only interpretation of claim 9 that is consistent with the '777 patent specification includes the requirements of compression and drainage. E.g., Docket # 40 at 23 ("[T]he statements in the specification require that the limitations of draining and compressing be read into the construction of…Claim 9.")  They ought not now be permitted to contradict themselves by contending, when it suits them, that the contrary is true.

Mr. Sunstein's report, interestingly, appears to assume (contrary to the Court's claim construction) that "compression" and "drainage" do not limit claim 9. (Ex. 3 to Sunstein Rep.). Mr. Sunstein appears to have left out these limitations because he has misapprehended the Rule 56 standard.

Mr. Sunstein claims, both in his report and in his deposition, that inequitable conduct allegations should be assessed against claims that are given their "broadest possible meaning" (emphasis added) rather than their "broadest reasonable construction consistent with the specification" as required by Rule 56. (Sunstein Rep. ¶¶ 23, 25; Sunstein Depo. at 145-146, 148).

Under the proper Rule 56 standard, the Defendants' arguments at the Markman stage preclude them from now contesting that claim 9 includes *three* limitations that are completely lacking in O'Reilly: (1) intraluminal contact; (2) compression; and (3) drainage. Under these circumstances, there can be no genuine dispute that O'Reilly is not material.

The Defendants' argument for the materiality of O'Reilly is based not only on admittedly incorrect factual assumptions (e.g., the diameter of a rabbit ear artery), but on the application of a manifestly incorrect legal standard as well. This is the kind of inequitable conduct claim that the Federal Circuit has lamented as a "plague" on the patent bar and the courts. Burlington, 849 F.2d at 1422.

### 2. The Biegeleisen and Puglisi Articles

The Defendants' counterclaims assert inequitable conduct based on the alleged withholding of two additional prior art references – articles by Biegeleisen and Puglisi. See Docket # 69 ¶¶ 14-27; Docket # 70 ¶¶ 22-37. These allegations, which are even weaker than the O'Reilly allegation discussed above, appear to have been dropped.

Mr. Sunstein, who reviewed the Defendants' "disclosure obligations" generally (Sunstein Rep. ¶¶ 5-7) and testified that he reviewed both the Biegeleisen and Puglisi articles in preparing his report (Sunstein Depo. at 73, 90) nevertheless *declined* to opine that inequitable conduct occurred in connection with either article. (Sunstein Rep. at 16). Neither does he intend to offer such an opinion at trial. (Sunstein Depo. at 25-26).

In any event, there plainly can be no inequitable conduct with respect to either Biegeleisen or Puglisi because none of the '777 patent inventors had ever so much as seen either of those references until this litigation. The only inventor whom Defendants have suggested may have seen the Biegeleisen reference, Dr. Bone, has unequivocally and without rebuttal testified that he did not see the reference. Dr. Bone listed Biegeleisen in a bibliography that he was required to put together for his Masters Degree thesis in 1998, *but he had never actually seen or read the article.* (Bone Depo. at 93-95).

Because a bibliography was a formal requirement for the thesis, Dr. Bone's professor told him to compile one. Dr. Bone identified titles of articles in the general field of his thesis by perusing a French Phlebology magazine, and added those titles to the thesis. He did not see Biegeleisen, let alone read it or have any knowledge of what it disclosed. (Id.).

The Puglisi article is even farther afield. No inventor ever saw, read, mentioned, listed, or even heard of the article. (Bone Depo. at 127; 5/12/05 Navarro Depo at 153-55; 10/21/05 Min Depo. at 425-426). In sum, the inventors never saw Biegeleisen or Puglisi, and thus could not have deliberately withheld those references from the PTO.

Even if these references had been material to patentability (which they are not, see Rzucidlo Rep. ¶¶ 29-51, 73), they could not support a claim of inequitable conduct as a matter of law because the '777 patent inventors were wholly unaware of them. Warner-Lambert, 418 F.3d at 1342-43 ("One who alleges inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of ... knowledge chargeable to the applicant of that prior art.").

## VI.   CONCLUSION

For the above reasons, Diomed's Motion for Summary Judgment on Validity and Enforceability of U.S. Patent No. 6,398,777 should be granted.

Diomed specifically requests summary judgment on Defendant AngioDynamics' first, second, third, fourth, and eighth affirmative defenses,[21] on AngioDynamics' second counterclaim (Declaratory Judgment of Invalidity of Patent), and on AngioDynamics' third counterclaim (Declaratory Judgment of Patent Unenforceability).

---

[21] AngioDynamics' sixth affirmative defense is not relevant to the instant motion because Diomed has not asserted claims 1-8 of the '777 patent in this case.

Diomed specifically requests summary judgment on the affirmative defenses set forth in paragraphs 30-33 of VSI's Second Amended Answer and Counterclaim and on VSI's invalidity and unenforceability declaratory judgment counterclaims (paragraphs 8-29 on pages 4-7 of VSI's Second Amended Answer and Counterclaim).

Respectfully submitted,

DIOMED, INC.

By its attorneys,

Dated: December 20, 2005

_____
Michael A. Albert (BBO #558566)
malbert@wolfgreenfield.com
Michael N. Rader (BBO #646990)
mrader@wolfgreenfield.com
John L. Strand (BBO #654985)
jstrand@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8000