UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DIOMED, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>VASCULAR SOLUTIONS, INC. )<br>)<br>Defendant. ) | Civil Action No.: 04-10444-RGS |
| DIOMED, INC. )<br>)<br>Plaintiff, )<br>)<br>)<br>ANGIODYNAMICS, INC. )<br>)<br>Defendant. ) | Civil Action No.: 04-10019-RGS |

**DECLARATION OF RUSSELL H. SAMSON IN OPPOSITION
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF
INFRINGEMENT**

I, Russell H. Samson, M.D., FACS, RVT, declare:

1. I have been retained in this matter by defendants Vascular Solutions, Inc. ("VSI") and AngioDynamics, Inc. ("AngioDynamics") to consider whether the methods of endovenous laser treatment taught by VSI and AngioDynamics infringe the asserted claims of United States Patent No. 6,398,777 ("the '777 patent"). I am a vascular surgeon and a Distinguished Fellow of the Society for Vascular Surgery. As part of my practice, I have performed numerous endovenous laser therapy procedures. A copy of my *curriculum vitae* was submitted as Exhibit

A to my December 20, 2005 Declaration filed in support of Defendants' Motion for Summary Judgment.

2. In my first declaration, dated December 20, 2005 and filed with Defendants' Motion for Summary Judgment, I described the results of procedures performed using the VSI and AngioDynamics products and following their instructions for use. In my expert report, I explained in detail the reasons why the procedures recommended by VSI and AngioDynamics do not result in infringement of Diomed's '777 patent. A true and correct copy of my report is attached as Exhibit A to this Declaration. All of the statements in that report are true and correct.

3. In this Declaration, I will address some of the points raised by Diomed in support of its motion for summary judgment. Many of the issues are already covered in detail in my previous declaration and in my expert report, so in this declaration I will try respond to Diomed's points without undue repetition.

4. The primary mechanism of action of the endovenous laser procedure, as recommended by VSI and AngioDynamics, is the delivery of laser energy directly into blood that is in the vessel lumen. The procedures recommended by VSI and AngioDynamics do not work by means of contact between the laser emitting section of the laser fiber and the vessel wall. The procedures I performed prove this, as the ultrasound video of the procedures clearly shows that the laser emitting section of the laser fiber is firing into blood, and the laser emitting section is not in contact with the vessel wall while the fiber is firing and being pulled back through the vessel. (See Paragraphs 3-8 of my December 20, 2005 Declaration and pages 4-8 of my October 14, 2005 Rebuttal Report). It is consistently visible on the ultrasound that there is a blood-filled lumen at and in front of the fiber tip, that the fiber tip is in blood, and that while the laser fiber is firing there is a cone of steam bubbles and heated blood rapidly circulating at and in

front of the laser fiber tip. This cone of steam bubbles and heated blood indicates that there is a lumen present and that there is space at and in front of the fiber tip, not vessel wall tissue; this is often clearly visible on the ultrasound.

5.  The goal of the procedure is thermal damage circumferentially to the entire vessel wall, leading to closure of the vein. Damage caused by contact between the laser emitting section of the fiber tip and the vessel wall is not desirable and is something that should be avoided. Such contact could lead to perforations of the vessel, which can cause patient discomfort and bruising. Further, contact of the fiber and the wall would cause only a segment of the circumference to be "treated," not the total circumference which is desirable.

6.  Diomed's witnesses claim that contact between the laser emitting section of the fiber and the vessel wall is necessary for reliable closure to occur. I do not agree. It is an elementary proposition, but cannot be stressed enough in this context, that one does not need to have contact between the laser emitting section and the vessel wall in order to cause thermal damage to the vessel wall. Dr. Anderson testified, and I agree, that the laser fiber tip becomes extremely hot during the procedure. A paper by Dr. Robert Weiss, relied on by Dr. Anderson and others, found that the average temperature of the laser fiber tip measured during endovenous laser procedures was 700° Celsius, with peak temperatures of 1300° Celsius.

7.  The necessary thermal damage to the vessel wall does not require temperatures at anywhere near the levels generated during this procedure. Dr. Anderson testified, and I agree, that the collagen in the vessel wall will be denatured almost instantly at temperatures of 70° Celsius. The VNUS RF closure procedure achieves closure using temperatures of approximately 85° Celsius. It is simply not necessary to cause and maintain contact between the vessel wall

and the laser emitting section in order to generate temperatures at this level, considering the extremely high temperatures generated at and near the fiber tip during this procedure.

8. As can be readily observed on the ultrasound videos submitted with my previous declaration, the laser emitting section of the laser fiber is firing into blood and is not in contact with the vessel wall during the procedure. The blood absorbs the laser energy, creating very high temperatures at and near the fiber tip. One can expect that the blood also carbonizes on the fiber tip; carbon is an excellent chromophore for laser light and will absorb the laser energy, generating even higher temperatures. The extremely high temperatures at the fiber tip result in rapid and extensive steam bubble formation. The steam bubbles and super-heated blood and blood products near the fiber tip circulate and will cause thermal damage to the entire circumference of the blood vessel tissue and to a varying depth within the vessel wall. Typically, the patients will complain that they smell and taste a sensation similar to burnt cigarette butts. This is because their blood has been burned and is further evidence that hot blood is circulating and causing damage to the vein wall.

9. Diomed contends that the use of tumescent anesthesia in amounts between 100 and 200 ml. will inevitably cause the complete collapse of the vessel so that the vessel lumen is obliterated, and the vessel wall will contact the laser emitting section of the laser fiber as it is being withdrawn. This is not correct. I have explained the reasons why this is not correct in detail in my report, attached as Exhibit A, at pages 4-8, and the ultrasound videos of the procedures I performed show that the conditions hypothesized by Diomed do not occur.

10. The current version of VSI's Instructions for Use instructs the physician to "deliver a sufficient volume of anesthetic agent to achieve a separation between the vein wall and the fascial sheath." See Fan Ex. 2. As I understand it, VSI has eliminated the specific

recommendation to use between 100-200 ml. of local anesthetic. For the reasons noted in my report, VSI's new instruction will not result in vein wall-fiber tip contact. The "separation" between the vein wall and the fascial sheath is to provide a heat sink to protect tissues outside the vein from injury, and to provide anesthetic to the area.

11.     In Paragraph 13 of his declaration, Dr. Min states that "physicians skilled in the art understand VSI's instructions – specifically the reference to "achieving a separation between the vein wall and the fascial sheath" – to call for a 10-millimeter "wheel" of tumescent fluid around the vein. Dr. Min does not offer any basis for his statement, and it is not correct. VSI's Instructions for Use do not call for anything more than what they say: a separation between the vein wall and the fascial sheath—and it is my opinion that ordinary physicians performing this procedure would understand the instructions to call for a separation sufficient to create a heat sink to protect the surrounding tissue.

12.     In Paragraph 32 of his declaration, Dr. Min states that "a portion of the flat energy emitting face of the laser fiber tip was in contact with the vessel wall" at time stamp 38:45 of my ultrasound video. Dr. Min is incorrect. At this particular moment, you can observe that the side of the fiber is close to and may be touching the anterior wall of the vein. However, you can also observe that there is an open lumen, and that the laser emitting surface at the tip of the fiber is not in contact with the vessel wall, but instead is firing into the blood in the lumen. A cone of steam bubbles can be seen streaming out from the region of the fiber tip into the open vessel lumen.

13.     Dr. Min also contends that he sees "collapse of the vein wall" at 28:15 and 36:27, and "clear contact between the wall and the tip of the laser fiber" at 30:35. But the fiber is not in the sheath at these time-stamps, and you can see the fiber being threaded into the sheath just after

time-stamp 30:35. There is no "contact" at 30:35, because there is no fiber in the vessel. I should note that these various time-stamps are not all from a single procedure. There are six procedures on the videotape. The two time stamps where Dr. Min claims he sees contact, 38:45 and 30:35, are from two different procedures.

14. Dr. Min and Dr. Fan criticize the procedures I performed, claiming that in some instances I did not properly inject tumescent anesthesia into the fascial sheath. Dr. Min and Dr. Fan are not correct.

15. As is my normal practice, I injected the tumescent anesthesia into the fascial sheath in these procedures. The ultrasound videos of the procedures show this. (I should note that the videos do not show the entire time period of the application of tumescent anesthesia for these procedures). There are occasions during the application of tumescent anesthesia where the anesthetic does not go into the fascial space; I can observe this on ultrasound as I am applying the anesthetic, and when it happens I typically make another injection to apply the anesthetic inside the fascial space. I followed this practice with these procedures.

16. Diomed and Dr. Fan also completely misstate my testimony concerning the application of tumescent anesthesia. In Paragraph 58 of her declaration, Dr. Fan says that I admitted that I "incorrectly administered tumescent anesthesia outside the fascial compartment," citing page 78 of my deposition. I did not admit any such thing. In the deposition on page 78, I noted for counsel one particular location on the video where tumescent anesthesia was not in the right location—but in the very next set of questions, on page 79, I explained to counsel that the tumescent anesthesia later did get placed in a significant amount inside the fascial compartment.

17. On page 17 of their brief, Diomed claims that I "admittedly" failed to inject tumescent anesthesia properly, and cited pages 158-59 of my deposition. But I did not say

anything like what Diomed claims I said. Instead, Diomed's counsel asked me whether I recalled whether I had achieved a 1-centimeter wheel of tumescent fluid around the vein at any locations shown on my videos. I told him I would have to go back and review the videos to determine whether a 1-centimeter "wheel" could be observed. This can scarcely be described as "admitting" that I did not inject tumescent anesthesia properly.

18.     It should be noted that it is not possible to always inject the tumescent anesthesia into the fascial sheath, and that it takes considerable skill to consistently do so. Drs. Fan and Min may have a different view as to what constitutes sufficient tumescent anesthesia. The significant point is that I performed these procedures, injecting tumescent anesthesia in the amounts and at the location consistent with my usual practice. The procedures were safe and effective. Throughout my practice of endovenous laser therapy, I have had very high success rates performing the procedure in this manner.

19.     Further, there are occasions where the saphenous vein is not in the fascial sheath. Under these circumstances tumescence is injected into the subcutaneous tissue for the same reason that it is injected into the fascial sheath: to place local anesthetic around the vein to prevent the patient from feeling pain, and to act as a heat sink to prevent heat injury to surrounding tissues and skin.

20.     Dr. Navarro and Dr. Min contend that the great saphenous vein is soft and pliable, like a "windsock", that will easily collapse and fold over on to the laser emitting face of the fiber even while the fiber is being withdrawn. This is not correct. None of Diomed's witnesses are vascular surgeons (Dr Navarro is a general surgeon, and Dr. Min and Dr. Fan are radiologists). I do not believe that any of Diomed's witnesses have the experience and intimate knowledge of the great saphenous vein that I do. As a vascular surgeon, I and my colleagues deal with the

saphenous vein on a daily basis. In my practice, I have stripped many, many saphenous veins in the past. I have also harvested the saphenous vein on numerous occasions for use as an alternative to an artery for bypass surgery.

21.     The saphenous vein in fact is a relatively muscular vein (hence its ability to go into spasm). Thus, it usually does not just flop in on itself, even in thin-walled veins when *ex vivo*. During a procedure, moreover, the saphenous vein will tend to be held open by surrounding tissue, by intraluminal blood, and by the tributary veins that are entering the saphenous vein along its length.

22.     Dr. Navarro claims in his paragraph 10 that "physicians' hands have limited dexterity" and thus doctors performing the procedure periodically shut off the laser to reposition their hands during withdrawal. That is not my practice, as I can and typically do perform the procedure in one consistent pull-back.

23.     I disagree with Dr. Fan's statement that the use of Trendelenburg positioning ensures vein wall apposition. I used the Trendelenburg position in the procedures I performed, and as my ultrasound videos show, contact with the laser emitting section of the fiber did not result. Depending on the patient and other variables, the use of Trendelenburg positioning will result in a slightly reduced volume of blood in the vein; it will not, however, lead to complete collapse of the vessel wall on to the laser emitting section of the laser fiber.

24.     As I noted in my report and my first declaration, the geometry of the sheath and fiber assembly will tend to prevent contact of the laser emitting section with the vessel wall during the procedure. See ¶ 8 of my December 20, 2005 Declaration. The fiber tip is only 600 microns in diameter, while the sheath diameter is significantly larger—for example, I understand that the external diameter of the VSI sheath is 2.4 millimeters, and the external diameter of the

AngioDynamics sheaths are 2.0 and 2.4 millimeters. As the laser is being fired, the physician is pulling back on the sheath and fiber assembly, which will tend to create space for the fiber as it travels back through the vessel. Dr. Fan tries to dispute this, by stating flatly that the sheath will have no centering effect. I disagree with her. The laser fiber is a relatively rigid fiber, and is extended only 2-2.5 centimeters from the end of the sheath during the procedure. At that extension the sheath will definitely tend to have a centering effect as a physician pulls back on the sheath-fiber assembly.

25. Dr. Fan claims, in Paragraph 48, that I testified that perforation of the vessel wall indicates that contact with the fiber tip has occurred, citing pages 33-34 of my deposition. Dr. Fan is unclear about what she means by "fiber tip," but if she is trying to claim that a perforation proves that contact must have occurred with the laser emitting section, she is mistaken. In my deposition, I said that I did not want contact with the laser emitting section because it can lead to perforations. That is true, but certainly I did not say and do not believe that *only* contact can cause perforations. As I noted in my report, Dr. Fan's videotape of her first experiment showed that extreme damage, including perforations, can be caused by the intense heat generated during the procedure and can and does occur without contact with the laser emitting section of the fiber.

26. Dr. Fan and Diomed also mischaracterize my testimony in other places. Dr. Fan cites pages 85 and 91 of my deposition, claiming that I "conceded explicitly" that there was quite a bit of contact shown in the video, including fiber tips that drag along the wall of the vein. This is not correct. At page 85-86, I was being asked about contact with the <u>sheath</u>, not the laser emitting section of the fiber, and I explained to Diomed's counsel on page 86 that "the tip's in a completely different portion of the vein" than was shown in the particular image he was showing me. At page 91, I was discussing what can be seen at time-stamp 5:30:25. This picture is similar

to what can be seen at time-stamp 38:45, discussed above in Paragraph 12. It does not show contact between the laser emitting section of the fiber and the vessel wall.

27. Diomed also refers to page 84 of my deposition, where I discussed the image at 5:22:31, stating in my deposition that the fiber appeared to be "touching a tiny portion of the circumference of the vein." At this point in the video, the fiber is not firing and is not being pulled back, but instead is just coming out of the sheath. At time-stamp 5:22:32, you can see that the fiber tip is clearly not touching the vessel wall.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: February 10, 2006.

_____
Russell H. Samson

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on

2/13/06