# EXHIBIT A

to the Declaration of Russell H. Samson in Opposition to Plaintiff's Motion for Summary Judgment of Infringement

REBUTTAL REPORT OF RUSSELL H. SAMSON, M.D., FACS, RVT

*Diomed, Inc. v. AngioDynamics, Inc. and Vascular Solutions, Inc.*
Case No. 04-CV-10019-RGS
United States District Court
District of Massachusetts

I.  **INTRODUCTION**

I have been retained in this matter by defendants AngioDynamics, Inc. ("AngioDynamics") and Vascular Solutions, Inc. ("VSI"). I have been asked to consider whether the methods of endovenous laser treatment taught by AngioDynamics and VSI infringe the asserted claims of United States Patent No. 6,398,777 (the '777 Patent). It is my understanding that the asserted claims are claims 9-14, 16-19, and 21. Compensation for my work on this matter is at the rate of $350 per hour. I am compensated $3,000 per day of deposition testimony, and $5,000 per day of trial testimony. My qualifications and a list of the publications I have authored are set forth in my *curriculum vitae*, which was included with the previous expert report I submitted in this case. A list of the cases in which I have testified as an expert at trial or by deposition within the previous four years is also included with that previous report.

This report is current as of October 14, 2005. I reserve the right to supplement my opinions and the bases for my opinions based on newly-produced documents, interviews, or deposition testimony, or in response to further disclosures from Diomed. Further, I may also testify at trial in response to arguments or evidence introduced by Diomed that is within my area of expertise.

II.  **OPINIONS AND BASIS**

A) I have reviewed the training materials and instructions for use used by both AngioDynamics and VSI. I have also reviewed the '777 Patent, the written decision by the Court concerning the construction of the '777 Patent, the expert reports of Drs. Fan and Anderson, the deposition testimony of Drs. Fan and Anderson, and DVDs provided of Dr. Fan's experiments.

I have performed many procedures using the AngioDynamics laser and kit, and have also performed procedures using the VSI laser and kit. At trial, I will explain the endovenous laser treatment procedure as recommended by VSI and AngioDynamics. I may present a videotape of an actual procedure. Included as Exhibit A is a DVD containing ultrasound videos of procedures I performed using VSI's and AngioDynamics' products. I will rely on the ultrasound videos, as explained below, during my testimony.

B) The primary mechanism of action of the endovenous laser treatment procedure, as recommended by VSI and AngioDynamics, is the delivery of laser energy directly into blood that is in the vessel lumen. Contrary to Diomed's position, the VSI and AngioDynamics procedures do not work by means of contact between the laser emitting section of the laser fiber and the vessel wall. As can be readily observed on the DVD containing the ultrasound procedures attached as Exhibit A, the laser emitting section of the laser fiber is firing into blood and is not in contact with the vessel wall. The blood absorbs the laser energy, creating very high temperatures at and near the fiber tip. Again, as can be seen on the ultrasound videotapes, this results in rapid and extensive steam bubble formation. The steam bubbles and superheated blood and blood products near the fiber tip circulate and cause thermal damage to the entire circumference of the blood vessel tissue and to a varying depth within the vessel wall. Typically, the patient will complain that they smell and taste a sensation similar to burnt cigarette butts.

2

This is because their blood has been burned, and is further evidence that hot blood is causing the damage to the vein wall.

Thermal damage to the entire circumference of the vessel wall is desirable in the procedure, and results in closure of the vein. Damage caused by contact between the laser emitting section of the fiber tip and the vessel wall is not desirable and is something that should be avoided during the procedure. Such contact could lead to perforations of the vessel, along with patient discomfort and bruising.

In addition, Diomed's claim that damage via direct contact is the primary mechanism of action in the procedure ignores the vein anatomy. The laser emitting section of the fiber is relatively small, only 600 microns in diameter. The diseased greater saphenous veins treated in this procedure can range in diameter from 4-7 mm. all the way to 25 or even 30 mm. in diameter. It is important to realize that, unlike Diomed's claims, the vein does not compress down to such a minimal circumference that the vein wall comes into contact with the 600 micron fiber tip. The saphenous vein is actually quite a thick-walled structure which does not allow such constriction even in the case of extreme spasm and compression. At most, even if one could insure that the entire laser emitting section of the fiber tip was in contact with the vessel wall (which is definitely not the case in the procedure as recommended by AngioDynamics and VSI), that still would result in damage only to a very small percentage of the vessel wall tissue, not the full circumferential damage that is desirable in this procedure.

C)   It is my understanding that the Court has construed the claim term "placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment site" to require "deliberately putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel, which requires the drainage of blood and compression

3

of the vein." The procedures recommended by VSI and AngioDynamics do not meet this claim term, for the reasons stated below.

    1. VSI and AngioDynamics do not teach or recommend "deliberately putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel." In fact, both VSI and AngioDynamics teach specifically that a physician should avoid such contact during the procedure.

    2. The procedure as taught by VSI and AngioDynamics does not result in physicians "deliberately putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel."

        a) The ultrasound videos of the procedures I performed show that the laser emitting section of the fiber optic line is not in physical contact with the vein wall during the procedure, though there may be rare moments of incidental contact. One can readily observe that there is a lumen present where the tip is located, that there is blood in the lumen, that the tip is in the lumen, and the laser energy is being fired into the blood without contact with the vessel wall. At the point after the tumescent anesthesia has been administered, but before laser firing begins, one can observe on ultrasound that there is a lumen in front of and at the laser emitting section of the fiber, and using duplex ultrasound techniques one can observe that the blood flow continues at and around the laser fiber tip. During the procedure, when the laser is being fired, one can also readily observe the formation of a cone of steam bubbles in the lumen, at and extending beyond the laser fiber tip and down the lumen away from the tip. Those steam bubbles show that there is a lumen present and that the laser emitting section of the fiber is not in contact with the vein wall. This cone of heated blood and steam also serves to push the vein wall away from the fiber tip.

4

As noted above, I would expect that there may be moments when the fiber tip makes incidental contact with the vein wall as it is being pulled back during the procedure. However, I did not see any definitive moments of contact on the ultrasound videos of the cases I performed, and from that one can conclude that such moments of contact, if they occur, are rare and merely incidental to the procedure. Further, any such moments of contact would touch only a fraction of the interior surface of the vein wall.

      b) The geometry of the sheath and fiber assembly will tend to prevent contact of the laser emitting section of the fiber with the vessel wall during the procedure. The fiber tip is only 600 microns in diameter, while the external diameter of the sheath is significantly larger than that. As the laser is being fired during the procedure, the physician is pulling back the sheath and fiber assembly. Even if there was a significant collapse of the vessel around the sheath and fiber assembly, the relatively large diameter of the sheath would tend to create space for the relatively rigid fiber as it travels through the vessel. The sheath will also tend to maintain the fiber centered in the vessel lumen away from the vein wall.

      c) Diomed's theory, as I understand it from my review of Dr. Fan's and Dr. Anderson's testimony, is that the use of tumescent anesthesia, in the amounts recommended by VSI and AngioDynamics, will result in the complete collapse of the vein and the obliteration of the vessel lumen at and in front of the fiber tip, resulting in the vessel wall collapsing down on and covering the laser emitting section of the fiber. They are wrong.

         i) One can observe on the ultrasound videos that there is a lumen present even after the administration of tumescent anesthesia. In the procedures shown on the DVD, I administered approximately 240-250 ccs of tumescent anesthesia, more than is recommended in the VSI and AngioDynamics instructions for use. Contrary to Diomed's position, this does not

5

result in complete collapse and obliteration of the vessel lumen, nor does it result in contact between the vessel wall and the laser emitting section of the laser fiber.

    ii) Diomed's theory, as I understand it from review of Fan's and Anderson's testimony, is that the lumen continues to collapse down on to the laser emitting section during the procedure, as the fiber is being fired and withdrawn. This is not correct. As noted above, in the ultrasound videos one can readily observe that there is a lumen present, with a cone of steam bubbles forming at and in front of the laser fiber tip. There is a misconception about the saphenous vein that has crept into Diomed's logic, possibly because their experts do not have intimate knowledge of the saphenous vein. As a vascular surgeon, I and my colleagues deal with the saphenous vein on a daily basis, and I have stripped many, many saphenous veins in the past. I have also harvested the saphenous vein on numerous occasions for use as an alternative to an artery in patients requiring bypass surgery. The saphenous vein is a relatively muscular vein (hence its ability to go into spasm). Thus, it usually does not just flop in on itself, even in thin-walled veins when *ex-vivo* and not held open by surrounding tissue and intraluminal blood. Diomed's theory of complete collapse of the vein *in vivo* is not consistent with clinical reality.

    iii) Diomed's theory also ignores the clinical realities and history of the use of tumescent anesthesia in this procedure. Tumescent anesthesia was not originally proposed to compress the vein. Rather, tumescent anesthesia was originally proposed to provide local anesthesia so that the procedures could be performed without the need for general anesthesia. This would reduce the risk of the procedure and possibly allow it to be performed in an outpatient or office facility. Through experience it has been realized that tumescent anesthesia may also provide benefit as a "heat sink" around the vein to prevent damage to surrounding

tissues. Experience has also demonstrated that it will often reduce the vessel diameter and bring the vessel walls of the diseased vein closer to the laser fiber during the procedure. This has the benefit of making the procedure more efficient, allowing the heated blood and steam a closer approximation to the vein wall.

I do not use tumescent anesthesia to try to obtain the "complete collapse" of the vessel wall on to the laser emitting section of the fiber tip, as posited by Diomed. VSI and AngioDynamics both teach not to seek such a result, by teaching that physicians should avoid contact during the procedure. As noted above, it is well known that contact as posited by Diomed is a likely source of perforations and bruising, and is therefore a negative and unwanted outcome. Further, blood around the fiber tip is essential for this technique, since heated blood is the method that is required to injure the vein wall such that effective closure occurs.

It is important to understand that there are many clinical variables present in an endovenous laser treatment procedure. The length of vein to be treated, the diameter of the vein, the thickness of the vein wall, and the anatomy and reaction of a particular blood vessel all vary from patient to patient, and the diameter of the vein and thickness of the vein in an individual patient typically vary along the vein's length. Thus, the amount of compression effect a physician will achieve with a given amount of tumescent anesthesia will vary, from patient to patient and also at varying points along an individual patient's vessel. I do not believe that it is possible that the "complete collapse" of the vessel wall so that it covers and makes contact with the laser emitting surface of the laser fiber could ever be created by tumescent anesthesia. In the DVD, this variability is shown quite distinctly, with one frame showing the vein re-dilated up to 15 mm. in diameter. Even if tumescent anesthesia could "completely collapse" the vein onto the laser emitting section, which I do not believe, the mere recommendation of the use of a variable

7

amount of tumescent anesthesia, in this case between 100-200 ml., would not reliably create the "complete collapse" effect that Diomed claims. Instead, physicians would have to deliberately attempt to create that effect, using variable amounts of tumescent anesthesia to do so. That would be directly contrary to what VSI and AngioDynamics recommend in their training materials. It could also result in a dangerous volume of anesthetic agent being administered.

        d) Dr. Anderson assumes that carbonization in the vessel wall itself or carbon remnants on the laser fiber are proof of contact between the vessel wall and the laser emitting section of the laser fiber. This is not correct. Indeed, Dr. Anderson testified, and I agree, that carbonization can occur in blood alone, as blood matter can and will carbonize. His report and testimony also seem to indicate, and I agree, that contact is not necessary for carbonization; instead, intense heat of the type present near the fiber tip in this procedure can result in carbonization in the vessel wall.

    3. The procedure as recommended by VSI and AngioDynamics does not result in "drainage of the blood", as required by the Court's claim construction. The use of tumescent anesthesia will result in some reduction in the diameter of the vein, which will cause a reduction in the volume of the blood in the vein. However, this reduction in volume cannot be considered to be "drainage of the blood," because the '777 patent makes clear that the purpose of the "drainage of the blood" is to remove blood from the area at the laser emitting section, to avoid firing the laser directly into blood as was known in the prior art, and to optimize contact with the vessel wall. In the procedure as recommended by VSI and AngioDynamics, one can readily observe that the laser fiber tip is in blood. Also, the vein lumen, although reduced in diameter, remains full of blood at the laser fiber tip location. It should be realized that the vascular system is a closed system and as such there cannot be an area entirely devoid of blood.

8

4. The use of tumescent anesthesia, as noted above, will cause a compression of the great saphenous vein and a reduction in the vein diameter. This effect generally occurs along the entire length of the vein segment to be treated. The patent teaches applying particularized compression, by hand or other mechanical means applied at the location of the laser fiber tip itself, to achieve contact. I do not believe that consistent contact between the laser emitting section of the fiber and the vessel wall can be obtained in any other manner. Further, compression at the fiber tip as taught by the patent is counterproductive, since this can lead to vessel perforation and will displace the tumescence thus bringing the adjacent tissues closer to the vessel, allowing for more damage to these tissues with subsequent pain and bruising.

D) I understand that the claim term "emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of the blood vessel" has been construed by the Court to "require the maintaining of the tip-interior surface in physical contact with the vessel wall while laser energy is emitted to decrease the diameter of the blood vessel."

The procedures recommended by VSI and AngioDynamics do not meet this claim term. As discussed above, VSI and AngioDynamics teach that contact should be avoided, and the procedures as recommended by VSI and AngioDynamics do not result in the maintaining of contact between the laser emitting section of the fiber and the vessel wall while laser energy is being emitted.

E. I have reviewed Dr. Fan's videos and testimony concerning her experiments. Nothing in her experiments proves her hypothesis that thermal injury requires the direct contact of the laser fiber tip with the vessel wall. Her first experiment actually tends to prove the opposite, as it shows that significant thermal injury occurs without direct physical contact. In the

video of the experiment, you can observe that the small artery segments maintain their circumferential size and shape and are in no way collapsed or compressed down on to the laser emitting face of the fiber. Contact between the laser emitting face of the fiber and the vessel wall during the laser firing thus almost certainly did not occur, as is apparent from the videotape. I also note that Dr. Fan testified, at pages 129-30 of her deposition, that she placed the laser system in the jig as centered as she could make it, which would place the fiber tip in the center of the lumen of the vessel, not in physical contact with the vessel wall. Despite the fact that she almost certainly did not have contact, the video of what she calls the "small artery" segments in her first experiment show severe damage, with multiple perforations on both sides of the vessel, and hot blood and steam visibly escaping from the vessel. Her first experiment also establishes the critical importance of blood to the procedure.

Dr. Fan's second experiment is not a valid or relevant experiment. In her construct, she pointed the laser fiber at a 90° angle down towards the vein in an open container, and pulsed the laser for one second pulses. This construct means that all of the heat, steam, and heated blood will flow up, away from the vein, and be dissipated. Placing the fiber in this orientation, in an open container, 2 and 5 millimeters away from the vein flap, and pulsing the laser for one second, simply bears no relationship to the situation inside the vein during an actual procedure.

Dr. Fan's third experiment also does not prove her hypothesis concerning direct contact. It is important to note that Dr. Fan testified that she increased the pressure in this experiment until she visibly observed the collapse of the vessel. That is not what VSI or AngioDynamics teach, so this experiment is not a valid test of what occurs during a procedure following the recommendations made by VSI or AngioDynamics. Even with the laser fiber centered with the centering device and thus kept some distance away from any possible contact with the vessel

wall, there is still thermal damage to the vessel wall. Also, on the videotape of this experiment, you do not observe the vessel wall segments that are placed under pressure collapsing down on to the fiber tip as the fiber is withdrawn, as Dr. Fan incorrectly claims happens in actual practice.

Dated: October 14, 2005

_Russell H. Samson_
Russell H. Samson

11