UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIOMED, INC. | Civil File No. 104-CV-10444-(RGS) |
| Plaintiff, | |
| v. | |
| VASCULAR SOLUTIONS, INC. | |
| Defendant. | |

**and**

| | |
|---|---|
| DIOMED, INC., | Civil Action No. 04-CV-10019 (RGS) |
| Plaintiff, | |
| v. | |
| ANGIODYNAMICS, INC., | |
| Defendant. | |

**MEMORANDUM OF DEFENDANT ANGIODYNAMICS, INC. IN OPPOSITION TO DIOMED'S MOTION FOR SUMMARY JUDGMENT OF VALIDITY AND ENFORCEABILITY OF U.S. PATENT NO. 6,398,777**

Page

I. Introduction ..................................................................................................1

II. Argument .....................................................................................................2

    A. Summary Judgment Standard ...........................................................2

    B. Anticipation And Obviousness Involve Numerous Issues of Fact Precluding
    Summary Judgment.............................................................................2

    C. Dr. Puglisi Was The First To Invent ILA, And He Widely Published His Teachings
    Many Years Prior To The '777 Critical Date. ...................................3

    D. The '777 Inventors Did Not Discover The Use Of Tumescent Anesthesia To
    Achieve Drainage And Compression, But Rather Copied This From Others..........................4

    E. Under Diomed's Impermissibly Broad Infringement Assertions, The Claims Read
    On The Prior Art. ...............................................................................5

    F. Dr. Puglisi's Article And Video Anticipate And/Or Render Obvious The Asserted
    Claims.................................................................................................6

        1. Dr. Puglisi's ILA ....................................................................6

        2. Puglisi Taught A Fiber Optic Line With An Uncoated Tip. .............9

        3. Puglisi Taught Contact.........................................................10

        4. Puglisi Taught Drainage. .....................................................10

        5. Puglisi Taught Compression. ...............................................11

    G. O'Reilly Anticipates and/or Renders Obvious The Asserted Claims. ................................11

        1. O'Reilly Disclosed ILA Using A Fiber Optic Line With An Uncoated Tip. .................12

        2. O'Reilly Disclosed Contact And Drainage.................................12

    H. U.S. Patent No. 6,638,273 To Farley et al. Anticipates And/Or Renders Obvious
    The '777 Claims.................................................................................14

        1. Farley '273 Anticipates The '777 Claims. ..............................16

        2. Farley '273 Renders Obvious The Asserted Claims. ..............17

i

Table of Contents
(continued)

Page

I. U.S. Patent No. 6,033,398 to Farley et al. Anticipates And/Or Renders Obvious The '777 Claims.................................................................................................................18

  1. Farley '398 Discloses A Fiber Optic Line With An Uncoated Section At The Tip.........19

  2. Farley '398 Discloses Manual Compression. ................................................................19

  3. Farley '398 Discloses Drainage. ..................................................................................21

J. The Asserted Claims Are Obvious Over Mazza. ..............................................................22

K. The Asserted Claims Are Obvious Over Biegeleisen. .....................................................24

L. The Puglisi And Mazza Videos Are Prior Art Under 35 U.S.C. § 102(b)........................25

  1. Puglisi First Published His Article And Video At The Worldwide Phlebology Conference In Strasbourg in 1989.................................................................................26

  2. Dr. Puglisi's Objective In Publishing His Video And Speaking On The Topic Was To Teach As Many Other Physicians As Possible About ILA. ..................................26

  3. Puglisi's Video Presentation At Strasbourg Was Made To Hundreds Of Physicians That Were Interested In Learning About ILA, And Were Skilled Specialists In The Field. ..............................................................................................27

  4. Puglisi Presented His Video On Many Other Occasions To Hundreds Of Interested Physicians Prior To The '777 Critical Date........................................................27

  5. Other Physicians Learned From Puglisi's Video And Began To Practice ILA Themselves, And Interested Companies Like Diomed Were Aware Of The Video And Contacted Him, All Prior To The '777 Critical Date........................................................28

  6. Dr. Mazza Also Published His Video.........................................................................29

III. Invalidity Under 35 U.S.C. § 112 .................................................................................30

IV. There Are Material Issues Of Fact That Preclude A Summary Judgment of Enforceability.................................................................................................................31

  A. Issues Relating To Inequitable Conduct Are Fact Intensive And Not Typically Suitable For Summary Judgment.................................................................................31

Table of Contents
(continued)

Page

B.  Determining Whether Inequitable Conduct Was Committed Requires A Balancing Test Between Materiality And Intent To Deceive. ...................................................32

C.  The Evidence Establishes That O'Reilly Was Material. ........................................33

   1.  Diomed Has Misstated The Law For Determining Materiality. ......................33

   2.  Anticipation Is Not required To Prove Materiality. ........................................34

   3.  The O'Reilly Reference Is Clearly Material And Not Cumulative. ................36

D.  Questions Of Material Fact Exist As To The Inventor's Intent In Withholding O'Reilly. ...................................................................................................................40

   1.  Dr. Min's Claim That He Determined O'Reilly Was Not Relevant Because It Dealt With Arteries, Not Veins, Is Not Believable. ...........................................40

   2.  Dr. Min Identified The O'Reilly Reference Prominently In His Safety Study Protocol...................................................................................................................42

E.  Summary Judgment Of Enforceability Is Not Appropriate Here. ........................45

V.  Conclusion ..................................................................................................................46

## I.    Introduction

Defendant, AngioDynamics, Inc., submits this Memorandum in opposition to Diomed's Motion for Summary Judgment of Validity and Enforceability of U.S. Patent No. 6,398,777 ("the '777 patent"). Diomed's motion should be denied because:

1. In asserting infringement of the '777 patent, Diomed seeks to erase meaningful limitations from the claims, and to impermissibly expand the scope of the claims to cover procedures where there is only contact between the side of the fiber and the blood vessel wall, or where there is only incidental momentary contact between the fiber tip and vessel wall. If this Court were to adopt Diomed's impermissibly broad assertion of claim scope, the claims would read on the prior art. Under the correct claim scope as set forth in this Court's Markman Ruling, there are numerous underlying disputed issues of fact necessary to determining whether the asserted claims are anticipated by or obvious over the prior art that preclude summary judgment of validity of the asserted claims.

2. During prosecution of the '777 patent application, one of the inventors, Dr. Min, knew of the O'Reilly prior art, was intimately familiar with its contents, prominently cited it in a regulatory disclosure as relevant to his procedure, and withheld it from the PTO in violation of his duty of disclosure. O'Reilly taught specific elements that Min and his co-inventors argued to the PTO were missing from the prior art, including (i) inserting a fiber optic line having an uncoated tip at its end capable of emitting laser energy into a blood vessel at a treatment site, and (ii) emitting laser energy into the walls of the vein to decrease the diameter of the vein by treating the vein wall. O'Reilly was highly material, and not just cumulative to the prior art considered by the '777 examiner. Dr. Min possessed the O'Reilly reference, read it, understood its significance, and knew he had a duty to disclose it to the PTO. Diomed has no credible

1

evidence to rebut the inference that Dr. Min intended to deceive the PTO.  At the very

least, there are disputed issues of fact that preclude summary judgment on the

enforceability of the '777 patent.

## II.    Argument

### A.    Summary Judgment Standard

Summary judgment is appropriate where no genuine issue as to any material fact

facts exist and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c).  Thus, summary judgment may be granted when no "reasonable jury could

return a verdict for the nonmoving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248, 91 L. Ed. 2d 202 , 106 S. Ct. 2505 (1986).  In determining whether there is a

genuine issue of material fact, the evidence is viewed in the light most favorable to the

party opposing the motion with doubts resolved in favor of the opponent.  Transmatic,

Inc. v. Gulton Indus., Inc., 53 F.3d 1270, 1274, (Fed. Cir. 1995).

### B.    Anticipation And Obviousness Involve Numerous Issues of Fact Precluding Summary Judgment.

Anticipation is a question or fact, including whether or not an element is inherent

in the prior art.  Atlas Powder Company v. Ireco, Inc., 190 F.3d 1342, 1346 (Fed. Cir.

1999).  "To anticipate a claim, a prior art reference must disclose every limitation of the

claimed invention, either explicitly or inherently."  In re Schreiber, 128 F.3d 1473, 1477

(Fed. Cir. 1997).  Anticipation of a patent claim requires a finding that the claim at issue

"reads on" a prior art reference.  Atlas Powder, 190 F.3d at 1346.  "In other words, if

granting patent protection on the disputed claim would allow the patentee to exclude the

public from practicing the prior art, then that claim is anticipated, regardless of whether it

also covers subject matter not in the prior art."  Id.

2

Obviousness is a legal question involving numerous underlying issues of fact. "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." Graham v. John Deere Co., 383 U.S. 1, 17, 86 S. Ct. 684, 693, 15 L. Ed. 2d 545, 556 (1966).

There are numerous disputed issues of material fact that preclude summary judgment on the question of whether the '777 claims are either anticipated or rendered obvious by the prior art.

C.     **Dr. Puglisi Was The First To Invent ILA, And He Widely Published His Teachings Many Years Prior To The '777 Critical Date.**

Contrary to Diomed's assertion, Drs. Min, Navarro and Salat were not the first to invent "intraluminal (also called endovenous) laser ablation ("ILA"), in which a laser is fired *within* the affected vein", or "an endovascular laser treatment that treats the vein wall rather than just injuring endothelium and/or clotting the blood." (Memorandum In Support Of Diomed's Motion For Summary Judgment On Patent Infringement at 1 and 4, Dkt. # 88) (hereinafter referred to as "Diomed's Infringement Memo."). Dr. Brunello Puglisi invented ILA, published articles and videos on it, and spoke widely on the topic throughout Europe for many years prior to the '777 critical date. Dr. Puglisi taught inserting a fiber optic line having an uncoated tip at its end capable of emitting laser

energy into a blood vessel at a puncture site. Dr. Puglisi also taught drainage of blood, compression of the vein, contact between the fiber tip and vessel walls, and emission of laser energy into the walls of the vein to decrease the diameter of the vein. Dr. Puglisi further taught treating the vein wall, and not just injuring endothelium and/or clotting the blood. Like AngioDynamics' and VSI's procedures, Dr. Puglisi's ILA was extremely successful. Dr. Puglisi reported as early as 1989 that he had "perfected a technique for the treatment of venous insufficiency". (Puglisi Article at 839, Exhibit B).

**D.**     **The '777 Inventors Did Not Discover The Use Of Tumescent Anesthesia To Achieve Drainage And Compression, But Rather Copied This From Others.**

Diomed claims that Min, Navarro and Salat's alleged "breakthrough" involved applying "tumescent anesthesia along the length of the vein to be treated, within a well-defined 'fascial space' that envelopes the GSV", and that the "wheel of tumescent fluid causes the vein to collapse, obliterating the lumen." (Diomed's Infringement Memo. at 4). In stark contrast to Diomed's assertion, Min, Navarro and Salat did not even recognize at the time of filing the '777 patent application that tumescent anesthesia could be used to drain and compress the vein, and did not even consider it as an alternative to manual compression until later discovering that other doctors were not manually compressing the vein. (Exhibits N, S-T). The '777 claims are necessarily limited to manually compressing the vein and draining the blood by manual compression or elevation of the leg, and if the claims are interpreted more broadly to cover any drainage and compression caused by the use of tumescent anesthesia only, then the claims are invalid for failure to comply with the written description requirement of 35 U.S.C. § 112. (See AngioDynamics, Inc.'s Memorandum Of Law In Support Of Its Motion For

4

Summary Judgment Of Non-Infringement Of U.S. Patent No. 6,938,777 at 18-23, Dkt. # 100.)

**E.    Under Diomed's Impermissibly Broad Infringement Assertions, The Claims Read On The Prior Art.**

The Markman Ruling states that the '777 claims require deliberately putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel, and maintaining of the tip-interior surface in physical contact with the vessel wall while laser energy is emitted. (Memorandum and Order On Claims Construction at 11-13). In asserting infringement of the '777 patent, however, Diomed seeks to effectively erase these limitations from the claim, and to impermissibly expand the scope of the claims to cover endovenous methods wherein only "the side of the laser fiber [not the uncoated tip or tip-interior surface] touches the vein wall during the procedure". (Diomed's Infringement Memo. at 14). Diomed even asserts that it is not necessary that the alleged infringing procedure involve "maintaining of the tip-interior surface in physical contact with the vessel wall while laser energy is emitted" (Memorandum and Order On Claims Construction at 12-13), but rather that only incidental momentary or fleeting contact between the fiber tip and vessel wall is sufficient to infringe the patent. Diomed argues: "doctors are still practicing the claimed method *during whatever time such contact is occurring* while the laser emits energy because sufficient damage results to reduce the vein diameter." (Diomed's Infringement Memo. at 16 (emphasis added)). By Diomed's own admission, Dr. Puglisi's ILA procedure necessarily involved such contact, and therefore if this Court were to adopt Diomed's impermissibly broad assertion of claim scope, the '777 claims would "read on", and therefore be anticipated by or obvious over the prior art. Atlas Powder, 190 F.3d at 1346.

5

Under the correct interpretation of the claims as set forth in this Court's Markman Ruling and argued by Defendants in their motions for summary judgment of non-infringement, there are numerous disputed issues of material fact that preclude summary judgment on whether the '777 claims are invalid as anticipated by or obvious over the prior art.

**F.    Dr. Puglisi's Article And Video Anticipate And/Or Render Obvious The Asserted Claims.**

Dr. Puglisi is a vascular surgeon and is currently the director of vascular surgery at Garibaldi Hospital in Catania, Italy. (Puglisi Depo. at 8-10, Exhibit A). Dr. Puglisi invented ILA during a trip to Phoenix, Arizona in the 1985-86 time frame when he attended a seminar on using lasers to re-open arteries blocked by arterial sclerosis. (Puglisi Depo. at 30-31, Exhibit A). When reflecting on the seminar, Dr. Puglisi realized that he could use laser energy to close saphenous veins. Following his trip, he tested the procedure on saphenous vein samples that had been removed by stripping. Then, he asked patients if he could experiment in limited regions of their veins, and in doing so he discovered that "the vein would close up perfectly." (Puglisi Depo. at 30-32, Exhibit A).

**1.    Dr. Puglisi's ILA**

Dr. Puglisi's ILA was strikingly similar to the procedure disclosed and claimed in the '777 patent. Dr. Puglisi's article and video taught the following:

1. The patient was placed lying down on the table and anesthetized. (Puglisi Article. at 840, Exhibit B). Dr. Puglisi testified that tumescent anesthesia was a commonly used local anesthetic in the early 1990s, that it was particularly useful in the knee region, and that he used tumescent anesthesia 50 or 60 percent of the time. (Puglisi Depo. at 15-17, 19-21, 75-77, Exhibit A).

6

2.  The upper and lower ends of the saphenous vein and its branches were then tied off to isolate the vein. (Puglisi Article at 840, Exhibit B; Puglisi Depo. at 48-52, Exhibit A). These steps drained the blood and reduced the diameter of the vein. (Puglisi Depo. at 50-53; 73-74; 78-79, Exhibit A).

3.  A fiber optic line having an uncoated tip at its end for emitting laser energy was then inserted into the vein up to the groin region. The fiber optic line was essentially the same as that used today. It was a 1.7 mm diameter optical fiber connected to a model 2100 Sharplan Nd-YAG laser. (Puglisi Article at 840-841, Exhibit B). Dr. Puglisi testified that "the best solution was to cut the point of the cable at 90 degrees and use it that way." (Puglisi Depo. at 65, Exhibit A). Introduction of the optical fiber into the vein further reduced the amount of blood within the vein and at this point the vein was "practically empty". (Puglisi Depo. at 53, 54, Exhibit A).

4.  The laser was then fired, and the optical fiber was pulled back to heat the walls of the vein and thereby close the vein. "After making the tip of the fiber ascent as far as the groin region, we will perform one or more pulses of variable intensity between 10 and 20 Watts for 6-12 seconds. After visually inspecting the most appropriate combination to alter the intimal and medial layers of the vein, we withdraw the fiber backwards and produce a series of variably spaced (2-5 cm) pulses in order to target the areas of collateral and perforating branches. This procedure is made possible thanks to the transparency of the skin, which allows us to visualize the guide light at each point in time and, as a result, the exact position of the fiber tip." (Puglisi Article at 841, Exhibit B). During the procedure Dr. Puglisi would feel "considerable" resistance when pulling back on the fiber when emitting laser energy indicating that the fiber was "hanging on" or

7

"sticking" to the wall of the vein. (Puglisi Depo. at 58-61, Exhibit A). Dr. Puglisi

testified that it was "the same resistance that you feel when a fish hangs on . . . the hook",

and that it happened every time he fired the laser. (Exhibit A at 62). As taught on Dr.

Puglisi's video (Exhibit C), he would use his fingers to pinch the skin adjacent to the vein

during firing of the laser. (Puglisi Video, Exhibit C; and Puglisi Depo. at 60-61, Exhibit

A). This form of manual compression would immobilize the vein and further decrease its

diameter. (Puglisi Depo. at 61-62, Exhibit A). In addition, because the fiber would stick

to the walls of the vein and create a resistance to pullback (like "when a fish hangs on . . .

the hook"), his finger positioning would enable him to feel for movement of the fiber as it

was pulled away from contact with the walls of the vein. (Puglisi Depo. at 61-62, Exhibit

A). Dr. Puglisi published that the effect of the laser energy was to "alter the intimal and

medial layers of the vein", and he testified that the treated vein changed color because the

thermal damage "changed the structure of the wall." (Puglisi Article at 841, Exhibit B;

and Puglisi Depo. at 56-57, Exhibit A).

     5.  Dr. Puglisi had "perfected" his procedure by the time he published his article

in 1989. (Puglisi Article at 839, Exhibit B). Further, his procedure was highly successful

and he announced in his article the following advantages: "there is a total absence of

pain, even in the period immediately following the procedure"; "The total absence of

blood in the vessel of the saphenous vein eliminates not only post-operative hematomas

and edemas, but also the troubling effect of secondary fibrosis"; "[T]he new method we

propose can fulfill the standards of radical treatment for varicose syndrome; it also allows

us to achieve this goal with so little trauma that we believe it can be carried out at the

Day-Hospital." (Puglisi Article at 841-842, Exhibit B).

8

Diomed argues that Puglisi did not teach the use of a fiber optic line with an uncoated tip, contact between a bare tip and the vein wall, or drainage and compression. (Diomed's Validity/Enforceability Memo. at 12-14). Diomed is wrong on each argument. Diomed does not dispute that Puglisi taught the other limitations of the claims.

### 2. Puglisi Taught A Fiber Optic Line With An Uncoated Tip.

There is no suggestion whatsoever in either Dr. Puglisi's article or video that the optical fiber tip was "covered" as argued by Diomed. Diomed's only purported support for this argument is Dr. Puglisi's testimony concerning the body of the fiber, and the "cover" that extends along the body of the fiber. (Puglisi Depo. at 103-104, Exhibit A). Dr. Puglisi was referring specifically to the "cover" or "outer jacket" that extends along the entire length of the fiber. Dr. Puglisi testified that the fiber had an "origin" or core that was "600 to 800 microns" in diameter, and an outer "cover" that gave the fiber a "diameter of about a millimeter and a half". (Puglisi Depo. at 103-104, Exhibit A). When squarely asked about the shape of the tip, Dr. Puglisi unambiguously stated: "the best solution was to cut the point of the cable at 90 degrees and use it that way". (Puglisi Depo. at 65, Exhibit A). This is exactly what is shown on Dr. Puglisi's video. (Puglisi Video, Exhibit C). As can be seen, he introduced the optical fiber into the vein through a very small entry needle. (See also Puglisi Depo. at 66-67, Exhibit A). The still shots of Exhibit C are copied from the Puglisi Video and show the uncovered fiber tip being inserted through the entry needle. (Exhibit C). If the fiber tip were "covered" as asserted by Diomed, it would never fit through the tiny entry needle as shown. Diomed has no evidence that Dr. Puglisi taught a "covered" tip, but rather attempts to create the illusion that he used a "covered" tip by having its expert witness muddle the issue. At the very least, there is a disputed issue of fact that precludes summary judgment.

9

### 3.    Puglisi Taught Contact.

Diomed does not argue that Puglisi's tip was placed in contact with the vein wall,

but rather argues that Puglisi did not place a "bare tip" in contact with the vein wall.  This

is not surprising given that Dr. Puglisi's video shows and his testimony bears out that the

fiber tip would always stick or hang on the vein wall when the laser was fired, and that

this sticking would create a resistance to pullback of the fiber that was like "when a fish

hangs on . . . the hook".  (Puglisi Depo. at 61-62, Exhibit A; Puglisi Video, Exhibit C).

Accordingly, Puglisi taught putting the tip of the fiber optic line in physical contact with

the wall of the blood vessel, and maintaining of the tip in physical contact with the vessel

wall while laser energy was emitted to decrease the diameter of the blood vessel.

Diomed argues that "even if 'only' the side of the fiber contacts the vein wall"

this is sufficient to infringe the '777 claims.  (Diomed's Infringement Memo. at 14-15).

Although AngioDynamics disagrees with this impermissibly broad assertion of claim

scope, in the unlikely event the Court were to adopt Diomed's view, the claims would

indisputably read on either Puglisi's video or article, and therefore be anticipated.[1]

### 4.    Puglisi Taught Drainage.

Dr. Puglisi testified that the isolation of the vein necessarily drained the blood and

reduced the diameter of the vein.  (Puglisi Depo. at 50-53; 73-74; 78-79, Exhibit A).  Dr.

---

[1]     Diomed makes this argument based on two flawed theories.  First, Diomed argues that the side wall includes the "circumference of the flat front face" and therefore Diomed asserts that contact with the coated side wall necessarily involves contact with the uncoated front face.  (Diomed's Infringement Memo. at 14).  Second, Diomed argues that the cladding on the side of the fiber "degrades immediately after treatment begins, and the laser emitting portion grows from the flat front face, to become a rounded tip encompassing portions of the side of the fiber."  (Id. at 15).  Although these theories are wrong for the reasons set forth in AngioDynamics' Opposition to Diomed's Motion for Summary Judgment of Infringement filed herewith, in the unlikely event the Court were to adopt either theory and conclude there is infringement, the claims necessarily would read on Puglisi and be invalid.  It is undisputed that the side of Puglisi's fiber was put into contact with the walls of the vein, and Diomed's "degradation" theory equally would apply to the optical fiber used in Puglisi's ILA.

10

Puglisi further testified that when he introduced the optical fiber into the vein it was "practically empty". (Puglisi Depo. at 53, 54, Exhibit A). Accordingly, it is indisputable that Dr. Puglisi's procedure disclosed drainage of blood from the vein.

### 5.    Puglisi Taught Compression.

Dr. Puglisi's video shows, and his testimony confirms that the fiber was "sticking" to the walls of the vein during each ILA. Dr. Puglisi's testimony confirms that this considerable resistance to pullback was "like when a fish hangs on . . . the hook", and further bears out that the vessel wall was compressed into engagement with the fiber. (Puglisi Depo. at 58-62, Exhibit A). Dr. Puglisi's video further taught using the fingers to pinch the skin adjacent to the vein during firing of the laser. (Puglisi Video, Exhibit C; and Puglisi Depo. at 60-61, Exhibit A). This form of manual compression would immobilize the vein and further decrease its diameter. (Puglisi Depo. at 61-62, Exhibit A). Accordingly, Puglisi's video and article disclosed compression of the vein.

In sum, under Diomed's impermissibly broad infringement assertion, Puglisi anticipates the asserted claims. Alternatively, as set forth below, the claimed invention would have been obvious over Puglisi. There are numerous disputed issues of material fact that preclude summary judgment on these issues.

### G.    O'Reilly Anticipates and/or Renders Obvious The Asserted Claims.

Diomed argues that O'Reilly does not disclose (1) contact between the laser fiber tip and the vessel wall; (2) compression of the vessel; and (3) drainage of blood from the vessel. (Diomed's Validity/Enforceability Memo. at 4). Diomed does not assert that O'Reilly fails to disclose any other limitations of the '777 claims.

O'Reilly discloses inserting a fiber optic line having an uncoated tip at its end capable of emitting laser energy into a blood vessel at a treatment site, putting the tip into

11

contact with the walls of the vein, draining the blood, and emitting laser energy into the walls of the vein to decrease the diameter of the vein by treating the vein wall, and not just injuring endothelium and/or clotting the blood.

As set forth below in Section IV, Dr. Min knew of the O'Reilly prior art during prosecution of the '777 patent application, was intimately familiar with its contents, cited it in a regulatory disclosure, and nevertheless withheld it from the PTO, thus committing inequitable conduct and rendering the '777 patent unenforceable.

### 1.    O'Reilly Disclosed ILA Using A Fiber Optic Line With An Uncoated Tip.

O'Reilly teaches inserting into a blood vessel "a quartz optical fiber (core diameter 200 μm)." (O'Reilly Article at 777, Exhibit D).  Not only did the optical fiber define a flat uncoated emitting tip, but the cladding at the sides of the tip was removed: "The fiber was prepared by cutting and stripping a 5-mm length of the Teflon coating and silicone cladding from each end.  A 'scribe and break' technique, using a tungsten-carbide scribe under 10X magnification, produced a flat surface to the ends of the quartz core." (O'Reilly Article at 777, Exhibit D).  The laser was a "Spectra-Physics Argon laser (Model 164) capable of delivering a maximum power of 1400 mW at a wavelength of 514.5 nm . . . ." (Id.)

### 2.    O'Reilly Disclosed Contact And Drainage.

In O'Reilly's ILA, the uncoated fiber tip was introduced through a catheter into the blood vessel "to a point 1 cm beyond the catheter (Fig. 1)." (O'Reilly Article at 778, Exhibit D).  The laser was then fired at "powers of 800-1000 mW at exposures of 60-120

seconds . . . ." (Id.)  O'Reilly further disclosed the drainage or removal of blood from the treatment site, and transmission of laser energy directly into the vessel walls to damage the walls and obliterate the lumen.  First, O'Reilly states "[t]he tip of the optical fiber was observed in all cases to be completely free of blood clot or debris." (Id. at 778).  Second, "[o]n withdrawal of the optical fiber no blood flow occurred." (Id.)  O'Reilly further states: "The immediate effect following laser application was a small localized skin blister through which the blackened outline of the occluded artery was observed.  * * * At the treatment site of maximal laser injury the central auricular artery is completely obliterated and replaced by collagen." (Id. at 778-779).  O'Reilly further states: "In the center of the laser injury complete obliteration of the artery had occurred, with replacement by connective tissue (Fig. 3d)." (Id. at 779).

Although O'Reilly does not specifically discuss contact between the fiber tip and vessel wall, such contact was inherent in his disclosure.  O'Reilly's treatment sites were located in the central auricular artery.  (Id. at 777 and 779).  O'Reilly shows in Figure 2 an exemplary "focally occluded" branch of a rabbit's central auricular artery.  Although the branch sizes of the central auricular artery vary depending on where the measurement is taken, such branches have been reported to be as small as 140 μm to 150 μm in diameter -- less then the diameter of O'Reilly's uncoated fiber tip (200 μm).  (Siphanto et al., Lasers in Surgery and Medicine, "Imaging of Small Vessels Using Photoacoustics: An In Vivo Study", 35:354,  356-57 (2004), Exhibit E).  Accordingly, O'Reilly's teaching inherently discloses inserting the fiber optic line into a blood vessel having a diameter very close to, if not less than the diameter of the uncoated fiber tip, and therefore necessarily discloses contact between at least the side of the fiber and the vessel

wall. Moreover, unlike with AngioDynamics' fibers, O'Reilly removed the cladding

from the side of the fiber tip. (O'Reilly Article at 777, Exhibit D).

Diomed argues that "even if 'only' the side of the fiber contacts the vein wall"

this is sufficient to infringe the '777 claims. (Diomed's Infringement Memo. at 14-15).

Although AngioDynamics disagrees with this impermissibly broad assertion of claim

scope, in the unlikely event the Court were to adopt Diomed's view, the claims would

indisputably read on O'Reilly and therefore be anticipated. Alternatively, under the

correct interpretation of the claims as set forth in the Markman Ruling, the claims are

obvious over O'Reilly for the reasons summarized below.

### H.    U.S. Patent No. 6,638,273 To Farley et al. Anticipates And/Or Renders Obvious The '777 Claims.

The Farley '273 patent teaches inserting a catheter having a tip that is capable of

emitting laser energy into a blood vessel at a puncture site; deliberately putting the

emitting section of the catheter in physical contact with the wall of the blood vessel

through drainage of blood and compression of the vein; and maintaining the tip surface in

physical contact with the vessel wall while laser energy is emitted to decrease the

diameter of the blood vessel.

In the illustrated embodiment, Farley '273 discloses "an apparatus for minimally

invasive treatment of venous insufficiency and valvular incompetency" that uses an

"energy delivery catheter for applying energy to a selected tissue site". (Farley '273 at

col. 4, ll. 10-16; and col. 6, ll. 14-15, Exhibit F). Farley '273 teaches a catheter 20 having

a working end 24 that is deliberately put in physical contact with the wall of the blood

vessel, and is maintained in contact while energy is emitted from the working end to

decrease the diameter of the blood vessel. Although in the illustrated embodiment the

14

working end 24 of the catheter 20 includes electrodes 22 for delivering RF energy, Farley

'273 teaches that other forms of energy – including radiant light and laser energy –

equally may be used: "Although described as applying RF energy from the electrodes, it

is to be understood that other forms of energy such as . . . radiant light, and LASERs

may be used . . . ." (Farley '273 at col. 18, ll. 59-65, Exhibit F). Farley '273 further

discloses that "the step of applying energy includes the step of applying laser energy,

wherein the energy application device includes a laser." (Farley '273 at col. 20, ll. 8-11,

Exhibit F).

Farley '273 also explicitly teaches applying external compression to drain the

blood and put the working end 24 of the catheter 20 in physical contact with the wall of

the blood vessel, and to maintain such contact while energy is emitted:

> Referring now to FIGS. 12 and 13, a pressure application device 100 can be applied externally to the area of the treatment site 102 and is adjusted to exert pressure thereon sufficient to compress the underlying vein to substantially the desired reduced diameter. * * * The reduction in diameter by the pressure application device prior to the application of energy pre-sets the vein to the final, desired diameter. * * * After terminating the energy application to shrink the vein wall to the size at which the external pressure application device is holding it, the pressure application device 100 can be released.
>
> * * *
>
> In an example of a process employing an external pressure application device 100 shown in FIGS. 12 and 13, an anti-coagulation dosage of Heparin is administered into the treatment site by dripping through a sheath. A catheter 20 is then introduced at the site through the sheath, and venous blood flow is stopped by the application of a tourniquet 101 applied at a position distal to the treatment site 102. The external pressure application device 100 is then pressurized to reduce the vein surrounding the treatment site 102 to the desired final diameter. The catheter arms 26 are then expanded so as to offer maximum vein wall apposition . . . . * * * At the time when the set temperature is reached, the [working end 24 is] maintained at full apposition with the vein wall for a selected time period to shrink the wall to the desired diameter set by the external pressure device 100.

15

(Farley '273 at col. 13, ll. 4-21; col. 16, ll. 14-25, and ll. 42-47, Exhibit F, emphasis added).

### 1.     Farley '273 Anticipates The '777 Claims.

Although Farley '273 does not explicitly mention the use of a fiber optic line having an uncoated tip, such teaching is inherent in the Farley '273 disclosure. Farley '273 explicitly teaches that "the step of applying energy includes the step of applying laser energy, wherein the energy application device includes a laser." (Farley '273 at col. 20, ll. 8-11; see also col. ll. 59-65, Exhibit F). Further, Farley '273 explicitly teaches putting the tip of the energy application device into contact with the wall of the blood vessel to emit the energy into the wall. (Farley '273 at col. 13, ll. 4-21; col. 16, ll. 14-25 and 42-47, and col. 19, ll. 5-19, Exhibit F). Thus, one of ordinary skill in the art necessarily would have been required to use a fiber optic line to transmit the laser energy from the laser to the blood vessel, and would have put the tip into contact with the vessel wall because that is specifically what Farley '273 teaches. Further, the fiber optic line necessarily would have included an uncoated section at the tip because otherwise the laser energy could not be emitted from the tip into the wall as taught by Farley. As indicated above, Farley taught contact, drainage, compression, maintaining such contact, emitting the laser energy directly into the vessel wall, and reducing its diameter. Accordingly, Farley '273 explicitly or inherently discloses every limitation of the '777 claimed invention, and therefore anticipates the asserted claims. Continental Can Co. USA, Inc. v. Monsanto Co., 948 F.2d 1264, (Fed. Cir. 1991) (A prior art reference which does not explicitly disclose an aspect of a claimed invention, may nevertheless serve to render that claim unpatentable if the element is inherent therein.).

2.    **Farley '273 Renders Obvious The Asserted Claims.**

Alternatively, the '777 claimed invention is obvious over either Puglisi or

O'Reilly in view of Farley '273, or over Farley '273 in view of either Puglisi or O'Reilly.

Diomed claims that Puglisi and O'Reilly do not teach contact, drainage and compression.

Although AngioDynamics disagrees with these contentions for the reasons set forth

above, Farley '273 indisputably teaches contact, drainage and compression. It would

have been obvious to one of ordinary skill in the art to modify either Puglisi's or

O'Reilly's ILA to include contact, drainage and compression as taught by Farley'273, or

to modify the Farley '273 ILA to include a fiber optic line having an uncoated section at

its tip as taught by either Puglisi or O'Reilly.

As a threshold matter, "a person of ordinary skill in the art relevant to the subject

matter of the '777 patent is a vascular surgeon or an angiologist (interventional

radiologist with knowledge of venous procedures), as well as their equivalents in foreign

countries." (Expert Report of Dr. Samson at 5, Exhibit G). Diomed does not address the

issue of the level of ordinary skill in the pertinent art, much less take a position on this

critical factor. Custom Accessories, Inc. v. Jeffrey-Allen Indus., Inc., 807 F.2d 955, 962

(Fed. Cir. 1986) (the determination of the level of ordinary skill in the art is critical to an

obviousness analysis); Environmental Designs, Ltd. v. Union Oil Co., 713 F.2d 693, 696-

97 (Fed. Cir. 1983) (same).

Farley '273 teaches the advantages of applying external compression in order to

ensure contact between the working end of the catheter and the walls of the blood vessel,

and of maintaining such contact during emission of the energy to durably reduce the

diameter of the blood vessel. (Exhibit F). Further, Farley '273 teaches application of the

method with lasers, or modification of the method to apply laser energy instead of RF

17

energy. (Farley '273 at col. 18, ll. 59-65, col. 5, ll. 9-12, and col. 20, ll. 8-11, Exhibit F). Accordingly, one of ordinary skill in the art would have applied Farley's steps of contact, drainage and compression to either Puglisi's ILA or O'Reilly's ILA not only because Farley '273 suggests application of the method for use with lasers as taught by Puglisi and O'Reilly, but also to obtain the benefits and advantages of such steps as taught by Farley '273. In re Sernaker, 702 F.2d 989, 994-5 (Fed. Cir. 1983) (the strongest motivation for combining references is a recognition, expressly or impliedly in the prior art that some advantage or expected beneficial result would have been produced by their combination).

Similarly, one of ordinary skill in the art would have modified Farley's method to include a fiber optic line having an uncoated tip as taught by either O'Reilly or Puglisi because Farley '273 suggests modifying the method to use laser energy, and O'Reilly and Puglisi both teach using a fiber optic line having an uncoated tip for the purpose suggested by Farley. In re Rouffet, 149 F.3d 1350, 1357 (Fed. Cir. 1998)(the motivation to combine references can be found where the prior art references are in the same field of endeavor); Ruiz v. A.B. Chance, Co., 234 F.3d 654, 665 (Fed. Cir. 2000) (patent held invalid on grounds of obviousness in view of several prior art references all relating to the same field); and Ryko v. Nu-Star, 950 F.2d 714 (Fed. Cir. 1991) (same).

Accordingly, the '777 claims are obvious over Farley '273 in view of O'Reilly and/or Puglisi, or over Puglisi and/or O'Reilly in view of Farley '273, for at least these reasons. There are numerous underlying disputed issues of fact that preclude summary judgment on these issues.

**I.      U.S. Patent No. 6,033,398 to Farley et al. Anticipates And/Or Renders Obvious The '777 Claims.**

The Farley '398 patent teaches inserting a catheter having a tip that is capable of emitting laser energy into a blood vessel at a puncture site; deliberately putting the emitting section of the catheter in physical contact with the wall of the blood vessel; and maintaining the tip surface in physical contact with the vessel wall while laser energy is emitted to decrease the diameter of the blood vessel.

Diomed claims that Farley '398 does not teach "a bare tip or contact" or "compression or drainage". (Diomed's Validity/Enforceability Memo. at 15). Diomed is wrong on both arguments. Diomed does not dispute that Farley '398 teaches the other limitations of the asserted claims.

### 1.    Farley '398 Discloses A Fiber Optic Line With An Uncoated Section At The Tip.

The '777 claims do not recite a "bare tip" as asserted by Diomed, but rather require "a fiber optic line with an uncoated tip at its end capable of emitting laser energy". (Memorandum and Order On Claims Construction at 9). Farley '398 discloses with reference to FIG. 25 a catheter 130 having a tip 132 that is uncoated at 136 to emit laser energy. (Farley '398 at col. 17, ll. 30-38, Exhibit F). The catheter 130 has mounted within it an optical fiber 134 which it must have in order to transmit the laser energy from the laser to the treatment site. (Id.) Accordingly, the catheter 130 includes within it an optical fiber 134, and has on its end an uncoated section to emit the laser energy from the fiber into the vessel wall in contact therewith. Alternatively, as summarized below, it would have been obvious to one of ordinary skill in the art to substitute either Puglisi's or O'Reilly's fiber optic line for the catheter in Farley '398.

### 2.    Farley '398 Discloses Manual Compression.

19

Farley '398 also discloses manual compression in order to ensure contact between the tip and vessel wall. First, Farley '398 emphasizes deliberately putting the uncoated section of the tip in physical contact with the vessel wall, and maintaining such contact during the emission of laser energy by teaching a variety of structures to ensure this occurs. In connection with FIG. 25, Farley '398 states: "A tip deflecting wire or strut 140 is shown in this embodiment to be deployed for placing the optical energy radiating tip 132 in apposition with the vein wall; however, other devices may be used for accurate placement of the energy source, such as a balloon shown in FIG. 20." (Farley '398 at col. 17, ll. 43-51, Exhibit F).

Farley '398 also teaches applying manual compression to further ensure that contact is achieved and maintained: "The physician may also palpate the vein into apposition with the electrodes to achieve good contact between the electrodes and the vein wall." (Farley '398 at col. 7, ll. 24-27, Exhibit F). Diomed does not dispute that Farley '398 teaches manual compression, but rather argues that this teaching does not apply to the "laser embodiment". (Diomed's Validity/Enforceability Memo. at 15). Diomed is wrong. First, in describing the laser embodiment of FIG. 25, Farley '398 specifically incorporates teachings from the other disclosed embodiments (e.g., the embodiment of FIG. 20) for purposes of ensuring contact (or "apposition") between the catheter tip and vessel wall. (Farley '398 at col. 17, ll. 43-47, Exhibit F). Second, it is axiomatic that Farley '398 must be viewed in its entirety for all that it teaches. In re Fritch, 972 F.2d 1260, 1264 (Fed. Cir. 1992) ("It is well settled that a prior art reference is relevant for all that it teaches to those of ordinary skill in the art."). Farley '398 indisputably teaches with reference to each disclosed embodiment the importance of

achieving and maintaining contact, and nowhere does Farley '398 indicate that the various procedures disclosed for ensuring such contact (including manual finger compression) can only be used on certain embodiments and not others.

### 3.      Farley '398 Discloses Drainage.

Diomed asserts in its infringement argument that compression necessarily causes drainage. (Diomed's Infringement Memo. at 10). Diomed cannot have it both ways. It cannot argue a broader assertion of the claims for purposes of infringement, and a more restrictive one for validity. Lemelson v. General Mills, Inc., 968 F.2d 1202, 1206 (Fed. Cir. 1992), cert. denied, 506 U.S. 1053 (1993)(the "same interpretation of a claim must be applied to all validity and infringement issues in the case"); White v. Jeffrey Mining Machinery Co., 723 F.2d 1553, 1560 (Fed. Cir. 1983). Farley '398 indisputably teaches manual compression and therefore by Diomed's own admission inherently discloses drainage as required by the claims. Accordingly, Farley '398 anticipates the '777 claims.

Alternatively, if the Court were to find that Farley '398 does not anticipate the claimed invention, the asserted claims are obvious over Farley '398 in view of O'Reilly or Puglisi, and/or in view of Farley '273. As set forth above, O'Reilly and Puglisi each teach ILA using a fiber optic line having an uncoated tip. Farley '398 also teaches ILA, and therefore it would have been obvious to one of ordinary skill in the art to substitute either O'Reilly's or Puglisi's fiber optic line for the one shown in Farley '398. In addition, Farley '273 teaches applying external compression in connection with ILA to ensure contact between the catheter tip and the walls of the blood vessel, and for maintaining such contact during emission of the energy to durably reduce the diameter of the blood vessel. (Exhibit F). Accordingly, it would have been obvious to one of

21

ordinary skill in the art to apply such teaching to the ILA of Farley '398 and arrive at the claimed invention.

Accordingly, the '777 claims are obvious over Farley '398 in view of O'Reilly or Puglisi, and/or Farley '273, for at least these reasons. There are numerous underlying disputed issues of fact that preclude summary judgment on these issues.

**J.     The Asserted Claims Are Obvious Over Mazza.**

Diomed argues that Mazza fails to disclose "a bare tip", contact, drainage and compression. (Diomed's Validity/Enforceability Memo. at 17-18). Diomed does not dispute that Mazza discloses the other limitations of the asserted claims.

The '777 claims do not recite a "bare tip" as asserted by Diomed, but rather require "a fiber optic line with an uncoated tip at its end capable of emitting laser energy". (Memorandum and Order On Claims Construction at 9). Although Mazza's fiber optic line included a closed metal tip, it also included an uncoated section for emitting laser energy. Mazza states in his article: "The device we employ is equipped with a closed metal tip with a diameter of 2 mm, which is capable of developing a thermal effect at the powers employed by us (4-5 W for 8-10 seconds), adequate for bringing about phleboendosclerosis of the Saphenous vein. The employment of argon as the laser's active medium offers the advantage of emitting a bluish green monochromatic light, which is fully absorbed by red. In vivo, the absorption is totally by the hemoglobin. Hence the biological effect develops within the vessel with scant deep penetration." (Mazza Article at 3, Exhibit H). Accordingly, Mazza's fiber optic line necessarily had an uncoated laser emitting section because it emitted "a bluish green monochromatic light" that was absorbed "totally by the hemoglobin". (Id.) This can be seen clearly in the Mazza Video. (Mazza Video, Exhibit I). However, Mazza does not disclose the

22

uncoated section being located at the tip; rather, Mazza's emitting section is located adjacent to the tip because this is where the "bluish green monochromatic light" is emitted. (See Mazza video, Exhibit I). As set forth above, O'Reilly and Puglisi each teach ILA with a fiber optic line having an uncoated tip. Mazza also teaches ILA, and therefore it would have been obvious to one of ordinary skill in the art to substitute either O'Reilly's or Puglisi's fiber optic line for the one taught by Mazza and arrive at the '777 claimed invention.

With respect drainage, Mazza isolated the vein as taught by Puglisi, and therefore necessarily drained the blood and reduced the diameter of the vein. (See Mazza's video, Exhibit I). Dr. Mazza's article states that he performed a traditional crossectomy "under general or local or regional anesthesia", and that the "isolation of the large Saphenous vein must be precise, so as to allow for ligature of every collateral vein, which can vary in number (from 2 to 7) and in location." (Mazza Article at 2, Exhibit H). As testified by Dr. Puglisi, these steps had the effect of draining the blood and reducing the diameter of the vein. (Puglisi Depo. at 50-53; 73-74; 78-79, Exhibit A). Then, when the fiber optic line was introduced into the vein, this further reduced the amount of blood within the vein to the point of being "practically empty". (Puglisi Depo. at 53, 54, Exhibit A).

Mazza does not explicitly mention contact or compression. However, as set forth above, Puglisi's ILA inherently involved contact and compression, and according to Dr. Puglisi, the only difference between his ILA and Mazza's was that Mazza's "was being done with a different laser". (Puglisi Depo. at 99, Exhibit A). Accordingly, Mazza's ILA inherently involved contact and compression for the reasons explained above in connection with Puglisi. Alternatively, Farley '273 teaches the application of contact and

23

compression to ILA.  It would have been obvious to one of ordinary skill in the art to modify Mazza's ILA to include contact and compression as taught by Farley '273, not only because Farley '273 suggests application of its method for use with lasers as taught by Mazza, but also to obtain the benefits and advantages of such steps as taught by Farley '273.

Accordingly, the '777 claims are obvious over Mazza in view of Farley '273, for at least these reasons.  There are numerous underlying disputed issues of fact that preclude summary judgment on these issues.

### K.    The Asserted Claims Are Obvious Over Biegeleisen.

Diomed argues that Biegeleisen does not disclose the use of a "bare-tip" laser fiber, contact of the fiber tip with the vessel wall, compression, drainage, or a decrease in the diameter of the blood vessel.  (Diomed's Validity/Enforceability Memo. at 8).  With respect to the laser fiber, Biegeleisen teaches "that the fiberoptic bundles of the venoscope can conduct coherent light to the treatment area.  Laser could conceivably be used as a cauterizing agent, in the same manner as electricity has been used in the past." (Biegeleisen at 421, Exhibit J).  The prior procedures that used electricity required physical contact between the probe and the wall of the blood vessel.  (Samson Report at C-2, Exhibit G).  Accordingly, Biegeleisen inherently disclosed physical contact between the fiber optic and the vessel wall.  Although Biegeleisen does not explicitly mention a "fiber optic line with an uncoated tip at its end", O'Reilly and Puglisi each disclose such a fiber optic line for use in ILA, and therefore it would have been obvious to one of ordinary skill in the art to use the fiber optic line of either O'Reilly or Puglisi in Biegeleisen's ILA.

24

With respect to drainage and compression, Farley '273 teaches the application of contact, drainage and compression to ILA. It would have been obvious to one of ordinary skill in the art to modify Biegeleisen's ILA to include contact, drainage and compression as taught by Farley '273 not only because Farley '273 suggests application of its method for use with lasers as taught by Biegeleisen, but also to obtain the benefits and advantages of such steps as taught by Farley '273. Farley '273 further teaches that such steps coupled with emission of laser energy decrease the diameter of the blood vessel.

Accordingly, the '777 claims are obvious over Biegeleisen in view of Farley '273 and O'Reilly and Puglisi, for at least these reasons. There are numerous underlying disputed issues of fact that preclude summary judgment on these issues.

**L.** **The Puglisi And Mazza Videos Are Prior Art Under 35 U.S.C. § 102(b).**

The question of whether an item is a "publication" under § 102(b) requires a finding that it was disseminated and "sufficiently accessible to the public interested in the art." In re Klopfenstein, 380 F.3d 1345, 1348 (Fed. Cir. 2004). The term "disseminated" has been broadly defined in this context to mean that the information was made available or "to foster general knowledge of." Id. However, "distribution and/or indexing" are not required; instead, "public accessibility" is considered the touchstone in determining whether a reference constitutes a "printed publication" bar under § 102(b). Id. at 1349 (citing In re Hall, 781 F.2d 897, 898-99 (Fed. Cir. 1986)). Whether a document is a prior publication under § 102(b) is a question of law involving underlying issues of fact. Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1330 (Fed. Cir. 2004). Both the Puglisi and Mazza videos were widely disseminated and publicly accessible to those of ordinary

25

skill in the art many years prior to the '777 critical date, and therefore are prior art to the '777 patent under § 102(b). At the very least, the question of whether these videos are publications under § 102(b) involves numerous underlying disputed issues of fact that preclude summary judgment.

### 1. Puglisi First Published His Article And Video At The Worldwide Phlebology Conference In Strasbourg in 1989.

Dr. Puglisi's teachings at the Worldwide Congress of Phlebology in 1989 were widely disseminated: "The proceeding was distributed . . . to everybody that had been at the Congress. Then to everyone that worldwide was a subscriber of the Phlebology Magazine. Then due to the importance of Phlebology Magazine, all the medical societies and medical studies or university or schools have this publication in their libraries." (Puglisi Depo. at 38, 39, 41-42, Exhibit A). The phlebology publication containing his 1989 article "is the most diffused kind of review in Europe, certainly in Europe and perhaps all around the world." (Id. at 40).[2]

### 2. Dr. Puglisi's Objective In Publishing His Video And Speaking On The Topic Was To Teach As Many Other Physicians As Possible About ILA.

Dr. Puglisi testified: "I hoped that the publication of the procedure would have brought to others the possibility of using the same, and obtaining good results from the use of that procedure." (Id. at 68-69). Dr. Puglisi "tried within the possibilities to have the method known in public", and his presentation at the Strasbourg Congress was very important in this regard "because it was a worldwide phlebology congress." (Id. at 69). Dr. Puglisi never discouraged the taking of notes, nor told anyone that his procedure was

---

[2]      "Phlebology" is "the study of diseases related to the veins". (Puglisi Depo. at 26-27, Exhibit A).

26

confidential; rather, he had the opposite intent: "My motivation was to make it public and for everybody to use, and I don't see I should have been asking that." (Id. at 87).

### 3.   Puglisi's Video Presentation At Strasbourg Was Made To Hundreds Of Physicians That Were Interested In Learning About ILA, And Were Skilled Specialists In The Field.

Puglisi's video presentation at Strasbourg was made during a session devoted to his procedure, and was accompanied by "a vocal presentation in English because the Congress being a worldwide Congress, presentations had to be in English." (Id. at 84, 87). There were 200 to 300 people in the room including "representatives from all around the world. There were Europeans, Americans, Canadians, [and] South Americans." (Id. at 84-86). Dr. Puglisi testified that the Congress was "[o]nly for . . . specialists which were interested in phlebology." (Id. at 85). These doctors were skilled specialists at performing venous procedures, and therefore were capable of understanding his teachings and applying them in their own practices. For example, the attendees knew how a vein stripping procedure would be performed, and various steps performed in such procedures also were performed in Puglisi's ILA. (Id. at 28, 29, 48-54, 85, 86).

### 4.   Puglisi Presented His Video On Many Other Occasions To Hundreds Of Interested Physicians Prior To The '777 Critical Date.

Following Strasbourg Dr. Puglisi presented the video to his colleagues at work and at a vascular conference at Brussels University. (Id. at 87-88). The video presentation in Brussels occurred in 1989 or 1990 and was made to about 150 attendees. (Id. at 88, 90). "They were all surgeons who specialized in vascular surgery." (Id.) Dr. Puglisi's video was later presented at other large phlebology conferences: "I had the Congress in Austria in Graz, and I also had the Congress in Camargue in France." (Id. at 90). The presentation in Camargue was in 1993 or 1994, the presentation in Graz was in

27

1993, and both involved 180 to 200 people. (Id. at 90-91). In Graz, the presentation was made to specialists familiar with vein stripping procedures. (Id. at 91). "In Camargue it was a presentation to doctors who were interested in general to laser-type techniques, so there were general surgeons, phlebologists and even dentists." (Id.) Dr. Puglisi also presented his video in medical association conferences "in Milano or Como or to anybody that would come and ask about this type of procedure." (Id. at 89). There were about 10 or 12 of these Italian conferences, and there were about 60 to 100 people at each conference. (Id. 89-90). All of these video presentations occurred between 1989 and 1995 or 1996. (Id. at 91-92). Dr. Puglisi always made an oral presentation in connection with his video presentation: "I always spoke during the presentation either in French or in Italian because the . . . duration of the video can be reduced, but that will become a base for a conversation, a larger conversation either in French or Italian." (Id. at 88-89).

### 5. Other Physicians Learned From Puglisi's Video And Began To Practice ILA Themselves, And Interested Companies Like Diomed Were Aware Of The Video And Contacted Him, All Prior To The '777 Critical Date.

Dr. Puglisi was aware of different physicians that started practicing his procedure after seeing the video. For example, Dr. Mazza learned the procedure from Dr. Puglisi, and later published his article on the procedure using an argon laser. (Id. at 92, 96; see also Mazza Article, Exhibit H). In addition, there were companies – including Diomed – that contacted Dr. Puglisi about his procedure as a result of his video presentations: "There were different companies that came to speak with me. Diomed from Milano, for example, was interested . . . to propose the use of diodes in this type of procedure with the objective of closing veins." (Id.) Diomed first contacted Dr. Puglisi in 1995, told him they had known of his procedure, and set up an appointment with him: "They did

28

not tell me how they [Diomed] had known of my procedure, but they had been informed

that I was doing . . . laser surgery for varicose veins." (Id. at 109). The Diomed

representatives then visited Dr. Puglisi in 1995 and performed the ILA procedure with

him: "I did . . . a laser procedure with them with a laser device that they brought with a

fiber that they brought and the powers that they indicated." (Id. at 110-111). One of the

attendees, Mr. Servella was the "executive of reference of Diomed in Europe", and the

other attendee, Mr. Caldera, was "the sales representative for the area". (Id. at 110).

### 6.     Dr. Mazza Also Published His Video.

Dr. Mazza similarly made several public presentations of his video. (Id. at 98).

Dr. Puglisi attended Dr. Mazza's video presentation in Genoa in 1992. There were "more

or less 200" physicians at Dr. Mazza's Genoa presentation. (Id. at 98-99). The

procedure on Dr. Mazza's video is essentially the same as the procedure taught and

publicized by Dr. Puglisi in 1989, "except that it is being done with a different laser."

(Id. at 99).

In Klopfenstein, the court held that a slide presentation made at a trade conference

and university (in one case for less than a day), and that was attended by persons

interested and skilled in the art without any prohibition on note taking, constituted a

"printed publication" under § 102(b). 380 F.3d at 1348. The holding in Klopfenstein

dictates the same conclusion here. The Puglisi and Mazza Videos were shown to

hundreds of persons interested and skilled in the art. Not only was the Puglisi Video

shown on numerous different occasions to hundreds of interested physicians, but Dr.

Puglisi would show it "to anybody that would come and ask about this type of

procedure." The presentations were accompanied by oral discussion, there was never any

prohibition on note taking, and the purpose of the presentations was to teach others how

to practice ILA. It is difficult to conceive of a situation where a video presentation could
have been made more accessible to persons interested and skilled in the art.

Diomed's reliance on In re Cronyn, 890 F.2d 1158 (Fed. Cir. 1989) and Regents
of Univ. of Cal. v. Howmedica, Inc., 530 F. Supp. 846, 860 (D.N.J. 1981) is misplaced.
In Cronyn the thesis dissertations were not accessible to the public at all. In Howmedica
the single slide presentation was shown to only 30 people, and did not even disclose
enough about the invention to allow a person skilled in the art to make or use it. In stark
contrast, Puglisi's and Mazza's Videos were shown to hundreds of physicians and each
taught in detail how to perform ILA.

### III.   Invalidity Under 35 U.S.C. § 112

As set forth in AngioDynamics' memorandum in support of its motion for
summary judgment of non-infringement at 18-23 which is incorporated herein, the '777
claims are limited to manually compressing the vein and draining the blood by manual
compression or elevation of the leg, and if the claims are interpreted more broadly to
cover any drainage and compression caused by the use of tumescent anesthesia only, then
the claims are invalid as a matter of law for failure to comply with the written description
requirement of 35 U.S.C. § 112.

Diomed did not identify in its Complaint the specific claims of the '777 patent
that it asserts to be infringed. Accordingly, AngioDynamics counterclaimed that the
apparatus claims of the '777 patent are invalid under 35 U.S.C. § 112. Diomed then
indicated that it was not asserting the apparatus claims. Accordingly, AngioDynamics
withdraws its claims with respect to the unasserted apparatus claims of the '777 patent
because there is no justiciable controversy with respect to these claims. In light of this it
would be inappropriate for the Court to grant or deny a motion for summary judgment as

to whether "the '777 patent is valid" as requested by Diomed.  Rather, any such ruling

must be with respect to only the claims at issue.

## IV.   There Are Material Issues Of Fact That Preclude A Summary Judgment of Enforceability.

### A.   Issues Relating To Inequitable Conduct Are Fact Intensive And Not Typically Suitable for Summary Judgment.

Inequitable conduct requires findings based on all the evidence, a procedure that

will often preclude summary determination.  Paragon Podiatry Lab., Inc. v. KLM Labs.,

Inc., 984 F.2d 1182, 1190 (Fed. Cir. 1993).  Good faith, intent to deceive, scienter and

honest mistake are all questions of fact rarely free from dispute, and have been deemed

not to be readily determined within the confines of Fed. R. Civ. P. 56.  Kangaroos U.S.A.

v. Caldor, Inc., 778 F.2d 1571, 1573, 1576 (Fed. Cir. 1985) (Summary judgment is

inappropriate where the party's intent was a genuine issue of material fact.).  In addition,

the Federal Circuit has urged caution in granting summary judgment in patent cases that

require the determination of complex factual issues such as an applicant's state of mind.

Monsanto Co. v. Bayer BioScience N.V., 363 F.3d 1235 (Fed Cir. 2004) (Summary

judgment was improper where dispute of fact as to intent of party existed.); Ulead Sys.,

Inc. v. Lex Computer & Mgmt. Corp., 351 F.3d 1139 (Fed. Cir. 2003) (Summary

judgment on claim of inequitable conduct reversed where genuine issue of material fact

as to intent remained.); Go Med. Indus. Pty., Ltd. v. C.R. Bard, Inc., 2000 U.S. App.

Lexis 18363 (Fed. Cir. 2000) ("summary judgment should be used sparingly when

motive and intent play leading roles."); Schneider Inc. v. C.R. Bard, Inc., 18 U.S.P.Q.2d

1076, 1080 (D. Mass. 1990) ((citing Hewlett-Packard Co. v. Bausch & Lomb Inc., 882

F.2d 1556, 1562 (Fed. Cir. 1989) ("The 'intent to deceive' element, which involves the

applicant's state of mind, is particularly unsuitable for resolution at the summary judgment stage.")).

Because this case involves such fact intensive issues, the inequitable conduct claim cannot be resolved by summary judgment.

**B.     Determining Whether Inequitable Conduct Was Committed Requires A Balancing test Between Materiality And Intent To Deceive.**

The question at the heart of AngioDynamics' inequitable conduct claim is whether Diomed failed to disclose material prior art (the O'Reilly reference) to the U.S. Patent & Trademark Office ("PTO") during prosecution of the '777 patent with an intent to deceive the examiner. To establish inequitable conduct, a party must show by "clear and convincing evidence" based on all surrounding circumstances that the inventors violated their duty of disclosure by withholding prior art; the prior art was material to patentability; the inventors knew that the prior art was material to patentability when they withheld it; and the inventors acted with an intent to deceive the PTO. Warner-Lambert v. Teva Pharma., 418 F.3d 1326, 1342-1343 (Fed. Cir. 2005). The scope and content of the prior art and what the prior art teaches are questions of fact. Para-Ordinance Mfg., Inc. v. SGS Importers Int'l, Inc., 73 F.3d 1085, 1088 (Fed. Cir. 1995).

Proof of high materiality and that the patent applicant knew or should have known of that materiality makes it difficult to establish subjective good faith sufficient to overcome an inference of intent to mislead. Critikon v. Becton Dickinson, 120 F.3d. 1253, 1257 (Fed. Cir. 1997). The more material the omission, the lower the level of intent required to establish inequitable conduct. Semiconductor Energy Lab. Co. v. Samsung Elecs. Co., 204 F.3d 1368 (Fed. Cir. 2000); Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226 (Fed. Cir. 2003).

32

As an initial matter, it is undisputed that Dr. Min knew of the O'Reilly prior art, was intimately familiar with its contents, cited it in a regulatory disclosure, and withheld it from the PTO during prosecution of the '777 patent.[3]  With regard to the other factual elements establishing Diomed's inequitable conduct, AngioDynamics presents sufficient evidence below to establish that genuine issues of material fact exist such that a reasonable trier of fact could find in favor of AngioDynamics.

### C.    The Evidence Establishes That O'Reilly Was Material.

#### 1.    Diomed Has Misstated The Law For Determining Materiality.

Diomed admits to withholding the O'Reilly reference but nonetheless attempts to convince the Court that O'Reilly would not have been material to patentability because it fails, under 37 CFR 1.56(b)(1), to compel a conclusion that claim 9 is unpatentable. (Diomed's Validity/Enforceability Memo. at 29).  In support of its assertion, Diomed limits its analysis on patentability solely to the issue of anticipation.

An applicant is under a duty to disclose prior art that is material to patentability. Dayco Products, Inc. v. TCI, 329 F.3d 1358, 1366 (Fed. Cir. 2003).  However, even where materiality is in doubt the Federal Circuit encourages disclosure rather than the unilateral determination by the applicant. LaBounty Mfg. v. United States ITC, 958 F.2d 1066, 1076 (Fed. Cir. 1992); Critikon, 120 F.3d at 1257 (To avoid a finding of inequitable conduct, doubts concerning whether information is material should be resolved in favor of disclosure.).

In determining whether a breach of the applicant's duty of disclosure rises to the level of inequitable conduct, the Federal Circuit has applied the "materiality" standard

---

[3]    Where the "failure to disclose" form of inequitable conduct is alleged, there must be proof of "knowledge chargeable to applicant of...prior art or information and of its materiality."  FMC Corp. v. Manitowoc Co., 835 F.2d 1411, 1415 (Fed. Cir. 1985).

found in the current version of 37 C.F.R. 1.56 ("Rule 56") for patents prosecuted after the 1992 amendment. Rule 56 defines "materiality" as information not cumulative to information already of record in the application, and (1) that establishes by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) that refutes or is inconsistent with a position the applicant takes in: (i) opposing an argument of unpatentability relied on by the PTO, or (ii) asserting an argument of patentability. Purdue Pharma v. Endo Pharma., 410 F.3d 690, 695 (Fed. Cir. 2005) (citing 37 C.F.R. 1.56(b) (2004)); Molins v. Textron, Inc., 48 F.3d 1172, 1179 (Fed. Cir. 1995).

However, while giving deference to the PTO's current definition, the Federal Circuit has been reluctant to abandon years of precedent utilizing the pre-1992 Rule 56 "reasonable examiner" standard.[4] Hoffmann-La Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1368 (Fed. Cir. 2003) (stating that this new standard was not intended to constitute a significant substantive break with the pre-1992 standard); Digital Control, Inc. v. Charles Machine Works, 2006 U.S. App. LEXIS 2991 at 12-19 (Fed. Cir. 2006) (a finding under either standard is sufficient). As set forth below, in light of all the circumstances, the evidence dictates a conclusion that the withheld O'Reilly reference was highly material under both standards, and that there remains a genuine dispute as to key factual issues that should be properly resolved by trial on the merits.

### 2.    Anticipation Is Not required To Prove Materiality.

Diomed's contention that O'Reilly is not material because it does not teach each and every element of claim 9 of the '777 patent is incorrect as a matter of law. Even

---

[4]    The pre-1992 standard for determining whether information withheld from the PTO was material to patentability required a finding that there was "a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue." Hoffman-La Roche, 323 F.3d at 1367.

assuming, *arguendo*, that O'Reilly does not anticipate claim 9, it is axiomatic that a reference can be highly material and still not contain every element of the claimed invention.[5] The Federal Circuit has repeatedly stated that "materiality is not dependent on a single element…rather it is judged based upon the overall degree of similarity between the omitted reference and the claimed invention in light of the other prior art before the examiner." Baxter Internat'l. Inc. v. McGaw, Inc., 149 F.3d 1321, 1327 (Fed. Cir. 1998). Simply because the prior art lacks the critical element does not make it likely that a reasonable examiner would consider the reference unimportant in deciding whether to allow the patent. Id. Therefore, Diomed's assertion that the O'Reilly reference is not material because, as it contends, it does not teach or contain each and every element of claim 9 of the '777 patent is wrong.[6]

Moreover, Diomed ignores the fact that an obviousness rejection under § 103 also goes to patentability and would qualify as a ground under Rule 56 to find that a withheld reference is material for purposes of finding inequitable conduct. The court in Baxter upheld the lower court's finding of inequitable conduct, and refused to accept the patentee's argument that a reference was not material due to the fact that it failed to teach a critical element of the claimed invention, by pointing out that references lacking different elements are often combined to reject an application under § 103. 149 F.3d at 1327. Furthermore, Diomed ignores that for purposes of determining materiality the

---

[5]    This has been affirmed in view of the current PTO Rule 56 "materiality" standard. The court in Purdue Pharma. v. Endo Pharma held that materiality "is not limited to matters reflected in the claims of a patent…under the PTO's current materiality standard, information may be material if it refutes or is inconsistent with the applicant's patentability arguments, which may be independent of the claims." 410 F.3d 690, 697 (Fed. Cir. 2005).
[6]    In any event, as set forth above, under Diomed's impermissibly broad assertion of claim scope, O'Reilly anticipates the asserted '777 claims.

proper inquiry focuses on how the examiner would view the withheld reference, not the patentee.[7]

### 3.    The O'Reilly Reference Is Clearly Material And Not Cumulative.

A withheld prior art reference has been deemed highly material, and not cumulative, in cases where it shows a combination for which the examiner had relied upon two separate references to reject the claims, or when it discloses a more complete combination of relevant features, even if those features are before the examiner in other references. Molins, 48 F.3d at 1179.

The inventors of the '777 patent saw fit to cite the Goldman and Trelles references which disclose the delivery of laser energy into a blood vessel to induce blood coagulation or thrombosis, but do not teach compression, drainage or contact with the vein wall. Yet, in his deposition testimony, Dr. Min admitted that the Goldman and Trelles references were material to patentability. (Min Depo. at 35-36, Exhibit K). The Trelles and Goldman references contain only one, and two elements, respectively, in common with claim 9 of the '777 patent. (Sunstein Declaration at ¶4). The O'Reilly reference contains four elements in common with claim 9 of the '777 patent. (Id.) Therefore, O'Reilly is not merely cumulative to either of the cited references before the examiner, alone or in combination. Most importantly, and as admitted by Dr. Min, the O'Reilly reference was the only piece of prior art that taught damage to the vessel wall by contact of the laser energy with the wall. (1/10/06 Min Depo. at 79-80, Exhibit K; Rzucidlo Depo. At 93-94, Exhibit L; see also Diomed Validity/Enforceability Memo. at 31).

---

[7]     "Materiality is determined from the viewpoint of a reasonable examiner...and not the subjective beliefs of the patentee." Bristol-Myers Squibb v. Rhone Poulenc, 326 F.3d 1226, 1237 (Fed. Cir. 2003).

The '777 examiner also considered Trelles and Goldman material to patentability as evidenced by the rejection of the claims under 35 USC § 103. The applicants successfully traversed the examiner's obviousness rejection by distinguishing the claimed method from the teachings of Goldman and Trelles; arguing that the invention was not obvious because the method includes, <u>inter alia</u>, the essential step of causing damage to the vein wall in order to shrink and occlude the vein. (Memorandum and Order on Claims Construction at 5 and 10). However, as indicated above, Diomed admits that O'Reilly expressly teaches direct damage to the vessel wall by directing laser energy into it. Therefore, not only was O'Reilly not cumulative, but it was highly material as evidenced by the fact that its express teachings formed the basis of Diomed's argument for patentability. (Sunstein Declaration at ¶7).

In addition, unlike Goldman and Trelles, O'Reilly actually involved placing the fiber in the blood vessel. Trelles placed the fiber on the outside of the vein. Goldman directed the laser energy through a needle. Of the three, only O'Reilly taught using a fiber optic line for insertion into the blood vessel as does the '777 patent. (Sunstein Declaration at ¶7). Thus it is difficult, if not impossible, to reconcile these facts with Diomed's conclusions that O'Reilly is cumulative to Goldman and Trelles, and that even if not withheld, the reasonable examiner would not have considered O'Reilly highly material to patentability.

Applying the pre-1992 "reasonable examiner" standard, a reasonable examiner would be substantially likely to consider the O'Reilly reference important in deciding whether to allow Diomed's application to issue as a patent.[8] Diomed has admitted that

---

[8]    "Materiality is not limited to prior art but embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a

37

O'Reilly teaches a combination of elements more complete than Goldman. Therefore, a reasonable examiner would have wanted to know whether and to what extent the O'Reilly reference taught the person of ordinary skill in the art to practice the method of the invention. As such, AngioDynamics has established that there exists a genuine issue of material fact as to whether O'Reilly is material for purposes of inequitable conduct under the pre-1992 "reasonable examiner" standard.

Notwithstanding the analysis under the reasonable examiner standard, AngioDynamics provides that the same conclusion of materiality results when the issue is analyzed under the amended materiality definition of 37 C.F.R. § 1.56(b)(2) (1992). Diomed attempts to convince the Court that under the current version of 37 C.F.R. § 1.56, a prior art reference is only "material" if "it compels a conclusion that a claim is unpatentable...." (Diomed's Validity/Enforceability Memo. at 22). Diomed conspicuously ignores the remainder of Rule 56, unilaterally and incorrectly asserting in a footnote that the second prong of the Rule is not presently at issue. (Diomed's Validity/Enforceability Memo. at 23).

As indicated above, the 1992 amendment to Rule 56(b)(2) also provides that a withheld reference is considered material to patentability if the reference refutes or is inconsistent with a position the applicant takes in: (i) opposing an argument of unpatentability relied on by the PTO, or (ii) asserting an argument of patentability. 37 C.F.R. § 1.56(b)(2) (2004). In view of all of the facts and circumstances, the withheld

---

patent." Bristol-Myers Squibb v. Rhone-Poulenc, 326 F.3d 1226, 1234 (Fed. Cir. 2003) (citing GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1273 (Fed. Cir. 2001)). That a claimed invention is patentable over cited and withheld prior art is not the test for materiality. Merck & Co. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1421 (Fed. Cir. 1989); A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1396 (Fed. Cir. 1986).

O'Reilly prior art satisfies the conditions for materiality under both (b)(2)(i) and (b)(2)(ii).

In <u>Baxter</u>, the court affirmed the lower court ruling of inequitable conduct where the withheld prior art reference contained an element missing from the prior art of record, and which the patentee considered essential to patentability. 149 F.3d 1328-29. As previously described, Goldman and Trelles were cited by the '777 examiner to reject the claims for obviousness under § 103. Diomed overcame Goldman by arguing that it teaches directing laser energy into blood, not the vessel wall. In Diomed's feeble attempt to argue that O'Reilly is cumulative to the references before the examiner it conspicuously fails to adequately reconcile the patentability arguments made during prosecution that Goldman <u>does not</u> teach the critical element of causing damage to the vessel wall, with the admission in its memorandum in support of summary judgment that O'Reilly <u>does</u> teach inducing damage to the vessel wall. Diomed's blatant contradiction should be viewed by the court as additional evidence supporting the finding of an intent to deceive for purposes of inequitable conduct.

In light of the evidence presented above, AngioDynamics has shown that O'Reilly should be deemed material under both provisions of Rule 56(b)(2). Because Diomed has admitted that O'Reilly contained elements not in references cited to the examiner, the withheld prior art reference was not cumulative and was, indeed, highly material. (Sunstein Declaration at ¶10). As such, AngioDynamics has established by clear and

convincing evidence that the O'Reilly reference easily satisfies this prong of the

threshold determination of inequitable conduct.[9]

### D.    Questions Of Material Fact Exist As To The Inventor's Intent In Withholding O'Reilly.

Summary judgment in favor of Diomed on the issue of deceptive intent is not

appropriate in this case because a genuine issue of material fact exists. The reasonable

fact finder could infer from the evidence that at least Dr. Min intended to deceive the

PTO by withholding the highly material O'Reilly prior art.

Diomed tries to convince the Court that O'Reilly was withheld without the

requisite level of deceptive intent. Intent need not be proven by direct evidence. Baxter,

149 F.3d at 1328. In most cases, in fact, direct proof of intent is not available but may be

inferred from the surrounding facts and circumstances. LaBounty, 958 F.2d at 1076.

Where a withheld prior art reference has been found to be highly material, gross

negligence has been sufficient to justify an intent to deceive the PTO. J.P. Stevens & Co.

v. Lex Tex, Ltd., 747 F.2d 1553 (Fed. Cir. 1984).[10] Also, "a patentee facing a high level

of materiality and clear proof that it knew or should have known of that materiality, can

expect to find it difficult to establish 'subjective good faith' sufficient to prevent the

drawing of an inference of intent to mislead." Critikon, Inc. v. Becton Dickinson

Vascular Access, Inc., 120 F.3d 1253, 1257 (Fed. Cir. 1997).

### 1.    Dr. Min's Claim That He Determined O'Reilly Was Not Relevant Because It Dealt With Arteries, Not Veins, Is Not Believable.

---

[9]    First, the court must determine whether the withheld information meets the threshold level of materiality. Second, the court must determine whether the evidence shows a threshold level of intent to mislead the PTO. Halliburton Co. v. Schlumberger Tech. Corp., 925 F.2d 1435, 1439 (Fed. Cir. 1991).
[10]    Deceptive intent may be proven by "showing acts the natural consequences of which are presumably intended by the actor...proof of deliberate scheming is not needed; gross negligence is sufficient. Gross negligence is present when the actor, judged as a reasonable person in his position should have known of the materiality of a withheld reference." J.P. Stevens, 747 F.2d at 1563.

Diomed offers no evidence of its purported good faith basis for withholding O'Reilly from the PTO. Instead, Diomed attempts to sidestep the issue of deceptive intent by offering Dr. Min's statement that he believed O'Reilly to be "far afield from the invention from a patentability perspective since it concerned arteries rather than veins." (Diomed's Validity/Enforceability Memo. at 27). This statement, as the court stated in Merck v. Danbury Pharmacal, "strains credulity." 873 F.2d 1418, 1420-22 (Fed. Cir. 1989). The assertion that a prior art reference, which teaches application of laser energy via a fiber optic line into a <u>blood vessel</u> resulting in damage to the vessel wall, is not highly relevant to an invention directed to a method for delivering laser energy via a fiber optic line into a <u>blood vessel</u> to induce damage to the vessel wall, is absurd. This is nothing more than a self-serving statement by an interested party, an inventor of the patent, and is not deserving of any weight.

Moreover, it is undisputed that the method recited in claim 9 of the '777 patent is directed to use with "blood vessels." Arteries are blood vessels, and are clearly within the scope of the patent. Additionally, Dr. Min admitted in his deposition testimony that the effect of laser energy on arteries and veins would be identical. (1/10/06 Min Depo. at 94-95, Exhibit K). Therefore, O'Reilly should be viewed as being highly material. It is repugnant to the policies underlying the Patent Laws to allow an inventor to claim a broad scope such as "blood vessels," and then attempt to avoid the duty of disclosure by withholding material prior art relating to species within that scope.[11]

---

[11] In addition to arguing that O'Reilly is too "far afield" from Diomed's methods, Dr. Min attempts to justify his failure to disclose O'Reilly based on technical distinctions. However, Dr. Min admits that he was not aware of these technical distinctions at the time of the prosecution of the '777 patent. (1/10/06 Min Depo. p78, line 19 to p79, line 15). Therefore, Dr. Min's statements should not be given any weight or consideration as proof of "good faith" for purposes of finding inequitable conduct.

##    2.    Dr. Min Identified The O'Reilly Reference Prominently In His Safety Study Protocol.

It is undisputed that Dr. Min, while working with his attorney on the application for the '777 patent, also listed O'Reilly as his first reference supporting a study protocol of the procedure covered by the patent application. (Sunstein Declaration at ¶5). This fact creates a reasonable inference that Dr. Min intended to deceive the PTO by not disclosing this reference he obviously considered material to his procedure. (Sunstein Declaration at ¶10.) Diomed tries to rebut this inference by suggesting that the references listed in the Independent Review Board Study Protocol ("IRB") were not listed according to relevance but were merely in chronological order. (Diomed's Validity/Enforceability Memo. at 25). However, this assertion is expressly contradicted by the IRB, which does not contain bibliographic references in chronological order. (Exhibit 31). In Dr. Min's recent deposition he tried to qualify his earlier statement by suggesting that the references were organized into subgroups based on relevance to the procedure, and that O'Reilly was the earliest reference in the first subgroup – "endovascular use." (1/10/06 Min Depo. at 71-73, Exhibit K). Even if true, this admission is sufficient for the trier of fact to reasonably conclude that Dr. Min considered O'Reilly highly material based on its inclusion in the most relevant subgroup. (Sunstein Declaration at ¶3). Min's testimony on this and other topics mandate the conclusion that summary judgment in this case is particularly inappropriate because the finder of fact could reasonably determine that the inventor and person making the statements, Dr. Min, is undeserving of any credibility.

Diomed cites  Dayco Products, Inc. v. Total Containment, Inc., for the proposition that intent to deceive cannot be inferred where patentee offers a plausible reason for withholding the reference.  329 F.3d 1358, 1367 (Fed. Cir. 2003).  Dayco, however,

involved facts and circumstances clearly distinguishable from the present case. In <u>Dayco</u>, the patents at issue related to solving problems associated with underground gas containment systems. The withheld reference at issue pertained to an entirely unrelated field of electrical conduits. While there was no issue regarding the reference's materiality, the court found that the patentee legitimately, and in good faith, considered the technology to be unrelated. <u>Id.</u> at 1366. <u>Dayco</u> has no bearing on the facts in this case. Both the invention and the reference here deal with the same exact field – treating blood vessels intraluminally with laser energy directed to the vessel wall.

Diomed also relies on <u>Allied Colloids, Inc. v. American Cyanamid Co.</u> for the proposition that it is not inequitable conduct to omit informing the examiner about a reference that the patentee believes in good faith is not material. 64 F.3d 1570, 1578 (Fed. Cir. 1995). Apparently, Diomed intends the Court to believe not only that O'Reilly is not material but that the patentees did not, in good faith, appreciate its relevance. However, as explained above, the facts indicate that both propositions are untenable. Diomed, similar to the patentee in <u>Bristol-Myers</u>, essentially asks the Court to substitute Diomed's view of the evidence and credibility of the witnesses for the Court's careful and thorough fact finding. 326 F.3d at 1234. In <u>Bristol-Myers</u>, a case with very similar facts to these, the court held that the deceptive intent element was satisfied despite the patentee's assertion that the withheld reference was "irrelevant." The court characterized the patentee's assertion as unpersuasive or credible, contradicted by explicit statements in the reference, and no more than the "self-serving testimony of an interested witness' and was supported by neither objective evidence nor by the testimony of any independent expert." <u>Id.</u> at 1237.

43

As indicated above, Diomed's contention that O'Reilly was "far afield" because it showed the delivery of laser energy via a fiber optic line into an arterial vessel wall instead of a vein wall is not deserving of serious consideration.  Dr. Min possessed the reference, read it, understood its significance, and could have disclosed it to the PTO at any time during prosecution of the '777 patent.  This is clear and convincing evidence sufficient to establish the requisite intent to deceive for a court to find inequitable conduct on the part of the inventors and to hold the patent unenforceable.

Furthermore, the Federal Circuit has consistently held that inferring intent to deceive is particularly appropriate where, as here, the inventor apparently found the reference sufficiently relevant to cite in a regulatory disclosure but subsequently chose not to disclose the material reference to the PTO.  See Merck v. Danbury Pharmacal., 873 F.2d 1418, 1421 (Fed. Cir. 1989) (court affirmed finding of inequitable conduct where evidence that patentee knew of the significance of the reference, and submitted the reference to the FDA but withheld it from the PTO during prosecution was "damning" evidence of intent to deceive); and Bruno v. Acorn, 394 F.3d 1348, 1350-54 (Fed. Cir. 2005) (court affirmed finding of inequitable conduct due in part to "damning" evidence of intent to deceive because Bruno failed to disclose to the PTO information that it had submitted to the FDA in seeking approval to sell its stair lift).

In this case, it is undisputed that Dr. Min possessed the O'Reilly prior art, knew of its significance and his duty of disclosure, and cited it in the bibliography of the IRB in May 1999.  (Diomed's Validity/Enforceability Memo. at 25).  Dr. Min admitted that at the time he prepared the IRB bibliography he knew that O'Reilly taught damage to the vessel wall, and was aware of his ongoing duty of disclosure to the PTO. (1/10/06 Min

44

Depo. at 79, Exhibit K).   It is also undisputed that Dr. Min failed to disclose the O'Reilly

reference, despite having ample opportunities to disclose it even after Diomed's attorney

reminded him of the duty of disclosure. (1/10/06 Min Depo. at 28-30, 32, and 100-101,

Exhibit K).   As discussed above, even more telling is the fact that Dr. Min had sorted the

IRB references into categories based on their overall relevance; the first of which was

"Endovascular Use" and included the O'Reilly reference.  Thus, Dr. Min obviously

recognized the high degree of relevance of the O'Reilly reference to the claimed method

when he failed to execute his duty to properly disclose it to the PTO.

Similar to the patentees in Merck and Bruno, Dr. Min chose not to cite the

material prior art reference to the PTO notwithstanding knowledge of his duty to disclose.

Diomed's mere denial of deceptive intent is insufficient under the circumstances to

preclude a finding that by failing to disclose the highly material reference, intent to

deceive should be inferred.  GFI, Inc. v. Franklin Corp., 265 F.3d 1268, 1273 (Fed. Cir.

2001) (Inequitable conduct found where inventor failed to disclose material references to

the examiner, the references were highly material, and clear proof that he knew or should

have known of that materiality was sufficient to infer intent to mislead.).  Mere denial of

intent to mislead will not suffice.  Id.  As such, AngioDynamics has demonstrated by

clear and convincing evidence Dr. Min's intent to deceive the PTO.

**E.**      **Summary Judgment Of Enforceability Is Not Appropriate Here.**

Because the trier of fact could conclude that both threshold elements necessary for

finding inequitable conduct, i.e., materiality and intent to deceive the PTO, have been

proven by clear and convincing evidence, and that Diomed has failed to establish any

plausible good faith excuse for failing to disclose the O'Reilly reference, a grant of

summary judgment in favor of Diomed is inappropriate.

45

## V.    Conclusion

For the foregoing reasons, it is respectfully requested that Diomed's motion for summary judgment of validity and enforceability of the '777 patent be denied.

Dated:  February 13, 2006

Respectfully Submitted,

**I hereby certify that a true copy of the above document was served upon the attorney of record for the Plaintiff and Counterclaim-Defendant Diomed, Inc. by electronic mail and Federal Express on February _13_, 2006**

Mark D. Giarratana

DEFENDANT
ANGIODYNAMICS, INC.
BY ITS ATTORNEYS

By
RODNEY S. DOWELL (BBO # 620916)
Berman & Dowell
210 Commercial Street
Boston, MA  02109
(671) 723-9911
(617) 723-6688 (fax)
rdowell@bermandowell.com
            -and-
MARK D. GIARRATANA
WILLIAM H. BRIGHT
McCarter & English, LLP
CityPlace I
185 Asylum Street
Hartford, CT  06103
(860) 275-6700
(860) 724-3397 (fax)
mgiarratana@mccarter.com
wbright@mccarter.com

Doc. # 5482330

46