REPORT OF RUSSELL H. SAMSON, M.D., FACS, RVT

*Diomed, Inc. v. AngioDynamics, Inc. and Vascular Solutions, Inc.*
Case No. 04-CV-10019-RGS
United States District Court
District of Massachusetts

## I.  INTRODUCTION

I have been retained in this matter by defendants AngioDynamics, Inc., through the law

firm of McCarter & English, LLP, and Vascular Solutions, Inc., through the law firm of Dorsey

& Whitney, LLP.  Compensation for work on this matter is at the rate of $350 per hour.

I have been asked to consider whether certain claims of United States Patent No.

6,398,777 (the '777 patent) are invalid in light of the prior art, and whether certain prior art was

material to the prosecution of the '777 patent.  The pieces of prior art that I have considered are:

1.  United States Patent 4,564,011, Goldman, issued Jan.14,1986 ("Goldman")

2.  O'Reilly GV, Colucci VM, Astorian DG et al., *Transcatheter fiberoptic laser coagulation of blood vessels*. Radiology 142: 777-780, March 1982 ("O'Reilly")

3.  Puglisi B, Tacconi A, San Fillippo F., *Application of the ND-Yag laser in the treatment of varicose syndrome*. Phlebology '89, A. Davy, R. Stemmer eds © 1989 John Libbey Eurotext Ltd, pp 839-84; and video of technique ("Puglisi" and "Puglisi video")

4.  United States Patent 6,033,398, Farley et al., issued March 7, 2002 ("Farley")

5.  Biegeleisen K, Nielson RD., *Use of the venoscope for the treatment of varicose veins*, Phlebologie '89 A. Davy, R. Stemmer eds © 1989 John Libbey Eurotext Ltd, pp 419-422 ("Biegeleisen"), and U.S. Patent No. 5,022,399, issued 1991 ("Biegeleisen patent")

6.  Drago, GW, Kiss A., Lanfranchii, Mazza A and Vitale L., *The Use of Argon Laser In the Treatment Of Ideopathic varices in the lower limbs*.  Minerva Angiologica, Vol. 19, 1993; and video of technique ("Mazza" and "Mazza video")

## II.  SUMMARY OF OPINIONS

It is my opinion that O'Reilly, Biegeleisen and Puglisi were material to the prosecution of

the '777 patent at the time the patent was applied for.  If the AngioDynamics and VSI procedures

*Witness: Russell Samson*
***Plaintiff Diomed Depo. Ex. 305***

***Diomed v. AngioDynamics***
***Civil Action No: 04-10019***

are incorrectly determined to infringe any claim of the '777 patent, the limitations of any such claim would also necessarily be met by O'Reilly, Biegeleisen, Puglisi, Farley, and Mazza, rendering the asserted claim invalid.  The bases for my opinions are set forth in this Report and its attachments.

### III.    SUMMARY OF BACKGROUND

A copy of my Curriculum Vitae and list of publications is attached as Exhibit A to this Report.  A list of the deposition and trial testimony I have given in the past four years is attached as Exhibit B to this Report.

### IV.    INFORMATION CONSIDERED

The list of documents I have reviewed in preparing this report is attached as Exhibit C.

### V.    LEGAL PRINCIPLES

#### A.    Reading and Understanding Patent Claims

##### 1.    Claim Construction

I understand, based on discussions with counsel, that terms in a patent claim are given the meaning that they would to one of ordinary skill in the art at the time the invention was made.  I also understand that the Court has already defined certain terms used in the '777 patent.  I understand that the Court defined these terms:

"Means for emitting laser energy" as used in claims 9 and 21 means a fiber optic line with an uncoated tip at its end capable of emitting laser energy.

"Intraluminal contact" as used in claims 9 and 21 requires physical contact between the vessel wall and the laser emitting section of the optic line.

"Placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel," as used in claims 9 and 21, means deliberately putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel, which requires the drainage

2

of blood and compression of the vein. It is not sufficient that laser energy is emitted into the vein's interior or the blood within it. Furthermore, step 3 of claims 9 and 21, which teaches "<u>emitting said laser energy into the blood vessel through said laser emitting section of said emitting means</u>," requires the maintaining of the tip-interior surface in physical contact with the vessel wall while laser energy is emitted to decrease the diameter of the blood vessel.

"Emptying" as used in claim 10 means the process of emptying most, but not necessarily all of the blood from the blood vessel.

### 2.    Independent and Dependent Claims

I also understand, based on discussions with counsel, that patent claims may be written in independent or dependent form. An independent claim does not incorporate limitations from any other claim. A dependent claim, on the other hand, incorporates all the limitations of the claim on which it "depends," and adds one or more further limitations. For example, an independent claim 1 might recite a device comprising A, B, and C. A dependent claim 2 might recite "the device as recited claim 1, wherein component C is made of plastic." In the '777 patent, claims 9 and 21 are independent claims. Claims 10-14, and 17-19 depend on claim 9, and claim 16 depends on claim 14

### 3.    Method Claims (with means-plus-function limitations)

I understand that the claims Diomed is asserting in this lawsuit are method claims, rather than apparatus claims, and that those claims generally describe a procedure for inserting a fiber optic line inside a blood vessel to enable a laser energy source to cause fibrosis of the blood vessel. I also understand that some of the steps in claims 9 and 21 are written in "means plus function" format, expressing both a procedural step in the process and a corresponding structure necessary to perform that function.

3

B.     **Invalidity**

1.     Anticipation

I understand that a patent claim is invalid if the claim is "anticipated" under 35 U.S.C. § 102 by prior art. From discussions with counsel, I have learned that a patent claim is anticipated if a single prior art reference teaches all of the limitations of that claim. In other words, "that which would literally infringe if later in time anticipates if earlier than the date of the invention." I understand, however, that a prior art reference may teach a limitation expressly or inherently. A limitation is inherent in a reference, where, although not expressly stated, it necessarily results from practicing what is expressly taught. In other words, if the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function the limitation is inherently present in the reference.

2.     Obviousness

I understand that a patent claim is invalid if the claim is rendered "obvious" under 35 U.S.C. § 103 by prior art. From discussions with counsel, I have learned that a patent claim is obvious if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. I understand that obviousness may render a claimed invention invalid where the record contains a suggestion or motivation to modify the prior art teaching to obtain the claimed invention. That motivation may come from the nature of the problem to be solved, the teachings of the prior art, and the knowledge of persons of ordinary skill in the art.

### 3.    Level of Ordinary Skill in the Art

It is my opinion that a person of ordinary skill in the art relevant to the subject matter of the '777 patent is a vascular surgeon or an angiologist (interventional radiologist with knowledge of venous procedures), as well as their equivalents in foreign countries.

### C.    Unenforceability

I understand that patent applicants are held to a strict duty of candor in applying for a patent. I also understand that applicants must disclose to the Patent Office all material information within their knowledge regarding the patent issue presented in the application. Failure to disclose such information, when coupled with an intent to deceive, constitutes inequitable conduct and renders the patent unenforceable.

I understand that the concept of "materiality" includes any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent. I further understand that an otherwise material reference need not be disclosed if it is merely cumulative of or less material than other references already disclosed.

## VI.    SCOPE AND CONTENT OF THE PRIOR ART

### A.    Goldman

Goldman was the most material piece of prior art that was cited to the patent examiner. The argument to support the '777 patent as being novel claimed that the Goldman patent, although using laser energy in a vein, specifically did not imply that the laser energy was applied directly to the vein wall through intraluminal contact as claimed in the '777 patent. Rather, Goldman claimed a method to apply laser energy into a vein to cause a blood clot. Subsequent research by Proebstle suggests convincingly that the laser energy imparted to the blood would

5

have resulted in wall damage just as happens with all current laser devices including the AngioDynamics and VSI devices. (*See* Exhibit C).

**B.    O'Reilly**

In an effort to find new means to treat intracranial aneurysms the authors developed a method to transmit laser energy intra-arterially via the tip of a catheter system. Their protocol involved rabbit ear central arteries. The technique clearly caused thermal energy to be applied directly to the artery resulting in its destruction, as opposed to causing the clinical effect via clot as described in Goldman. This was evidenced by clinical evaluation of the ear as well as pathological specimens.

The journal that O'Reilly was published in ("Radiology") is well known and recognized by those of ordinary skill in the art, and often cited. In fact, the O'Reilly article was cited by Robert J. Min, one of the inventors listed on the '777 patent, in a study protocol in May 1999. My review of the issued patent and prosecution history shows that O'Reilly was not provided to the patent examiner during the prosecution of the '777 patent.

**C.    Biegeleisen**

In 1989, a phlebologist, Ken Biegeleisen MD, together with RD Nielson, published a manuscript in Phlebologie '89 (A. Davy, R. Stemmer eds © 1989 John Libbey Eurotext Ltd, pp 419-422). In this manuscript on page 412 they write that a venoscope could deliver "coherent light to the treatment area" in a vein. "Laser could conceivably be used as a cauterizing agent." Laser cauterizing of the vein is different than the method taught in the Goldman patent of using laser to form a clot, and would be in keeping with the '777 description of application of laser energy to the vessel wall. Biegeleisen also wrote of laser cauterization in subsequent manuscripts all published prior to the '777 patent application. The Biegeleisen patent further teaches using laser energy to achieve ablation of the venous intima.

6

One of the inventors listed in the '777 patent, Dr. Salat, published a manuscript in September of 1999, in which he describes the endoluminal treatment of varices with a laser diode. In this manuscript, he states that the idea came to him from previous works using a rigid endoscope. Dr. Salat cited Dr. Biegeleisen's article published in the Phlebology '89 journal. Biegeleisen's teachings were not submitted to the patent examiner during the prosecution of the '777 patent.

**D.    Puglisi**

Dr. Puglisi, an Italian vascular surgeon, first began treating patients in 1987, and published his results in 1989. These results were presented at a Congress in Strasbourg, France, and the results were published in the same publication, Phlebologie '89, that Biegeleisen's work was published, and the same journal from which Dr. Salat cited in his 1999 manuscript. At the meeting in Strasbourg, he showed a 4 1/2 minute film demonstrating his technique. Dr. Puglisi has also produced a longer film demonstrating the entire process. In Dr. Puglisi's method, a laser fiber is inserted via a cut-down, but also by a direct puncture technique, as a method of treating venous insufficiency.

The Phlebologie '89 publication was the proceedings of the Vein Congress in Strasbourg, France. I expect that this Congress was very well attended and that material presented at the Congress was widely disseminated. Dr. Puglisi in his deposition states that there were at least 200 doctors at that meeting. Dr. Puglisi also conveyed his information to other physicians, including Dr. Mazza and other doctors who came to watch him perform this type of laser treatment. He states that his goal was to make his technique public. He also presented his technique, and the video, at meetings in Brussels, Austria, Milan, Montreal (1992 – Nd-Yag laser

and Argon laser for the radical and cosmetical treatment of the varicose syndrome, Puglisi, Mazza and San Filippo) and the Camargue.

Dr. Puglisi states that a representative from the Diomed Company spoke to him about his device and technique prior to the time of the '777 patent application. Dr. Puglisi's teachings were not submitted to the patent examiner during the prosecution of the '777 patent.

### E.   Farley

The Farley patent describes a technique to deliver directional energy to the vessel wall via the tip of a catheter with such energy being provided by a LASER. Unlike Goldman, Farley specifically teaches the use of external compression to ensure good contact with the vessel wall. The application for the Farley patent was filed in 1997, and the patent issued March 7, 2002. The Farley patent was not submitted to the patent examiner during the prosecution of the '777 patent.

### F.   Mazza

Dr. Mazza collaborated with Dr Puglisi on a presentation in Montreal in 1992 and produced a video of his technique which closely or even exactly compares to that of Puglisi. Dr. Mazza published his work with co-authors in Minerva Angiologica. He also presented his work at the ninth national Congress in Genoa, Italy on December 3, 1992. Dr. Mazza teaches the use of a laser to heat a 2-3mm metal tip to heat and cauterize the blood vessel wall. Dr. Mazza's teachings were not disclosed to the patent examiner during the prosecution of the '777 patent.

8

## VII.    OPINIONS

### A.    Materiality

It is my opinion that O'Reilly, Biegeleisen, and Puglisi were material to the prosecution of the '777 patent application. My detailed analyses of the content of those pieces of prior art, as compared to the claims asserted in the '777 patent, are contained in claim charts attached to this report as Exhibits D, E, and F.[1] A summary and the conclusions I reached as to each piece of prior art is below.

#### 1.    O'Reilly

O'Reilly was material to the prosecution of the '777 patent. *See* Exhibit D. Although the O'Reilly procedure was performed on the auricular arteries of rabbits, a person of ordinary skill in the art would recognize that the same procedure can be performed on human veins. In addition, the '777 patent claims do not specify the type of blood vessel (vein or artery), nor does it mandate that the procedure be used on humans.

O'Reilly is significantly more material to the teachings of the '777 patent than was Goldman, the most material reference cited to the patent examiner. The inventors of the '777 patent admitted that, unlike their invention, in Goldman, "there is no intraluminal contact with the blood vessel *nor any delivery of laser energy to the vessel wall.*" *See* File History (emphasis added). In direct similarity to the '777 patent, and different than Goldman (who taught the use of laser energy to create a blood *clot* in the vessel), O'Reilly taught the use of laser energy to cause damage to the *wall* of the blood vessel, specifically describing blackening of the artery, blistering, thermal injury, and fibrosis.

---

[1] The claim charts specifically address only claims 9-12 and 16-19. The "fiber optic line" limitation of dependent claim 13 and the "located at a tip" limitation of dependent claim 14 are subsumed within the Court's construction of "laser emitting section" in claim 9. All of the limitations of independent claim 21 are found in independent claim 9 and dependent claim 10. Thus, I have not separately addressed those claims and intend to apply the same analysis to them as to their counterparts.

At least one inventor of the '777 patent, Robert Min, knew of the existence and teachings of O'Reilly prior to the patent application, and of O'Reilly's applicability to the laser treatment of varicose veins, and cited O'Reilly in a study protocol in May 1999. However, O'Reilly was not disclosed to the Patent Office.

### 2.    Biegeleisen

Biegeleisen was material to the prosecution of the '777 patent, and in fact, is more material to the teachings of the '777 patent than was Goldman. *See* Exhibit E. In direct similarity to the '777 patent, and different than Goldman, Biegeleisen taught that laser could be used as a cauterizing agent in the same manner as electricity had been used in the past. The prior procedures that used electricity required physical contact between the probe and the wall of the blood vessel.

At least one inventor of the '777 patent knew of the existence and teachings of Biegeleisen at the time of filing the patent application, and of Biegeleisen's applicability to the laser treatment of veins. Dr. Salat cited Dr. Biegeleisen's Phlebology '89 article in a manuscript published in September 1999. However, Biegeleisen was not disclosed to the Patent Office.

### 3.    Puglisi

Puglisi also was more material to the prosecution of the '777 patent application than was Goldman. *See* Exhibit F. Puglisi teaches a method of treating venous insufficiency (blood vessels) by introducing into the blood vessel a fiber optic line having an uncoated tip that emits laser energy. In Puglisi's method the vein is tied off, and reference is made to a "total absence of blood". Puglisi further teaches that a local anesthetic, including tumescent anesthesia, could be used. Puglisi teaches withdrawal of the fiber and a series of variably spaced pulses in target areas. In the Puglisi video, the physician pinches the skin on either side of the fiber tip while the fiber is withdrawn through the vein during the procedure. In further contrast to Goldman, Puglisi

10

teaches damage to the vessel wall that decreases the diameter of the blood vessel rather than acting on the blood to cause clotting.

Dr. Salat cited Dr. Biegeleisen's Phlebology '89 article from the same manuscript that contained Dr. Puglisi's article. Further, Dr. Puglisi's teachings were widely disseminated in various locations throughout Europe, including to Diomed, during the nine year period prior to the filing of the '777 patent application. In light of this, the relatively small phlebology community in Europe at the time, Salat's keen interest in the use of lasers to treat veins and his research on the topic, it is inconceivable that he did not know about Puglisi's teachings during the pendency of his patent application. Neither Puglisi's article nor video were cited to the Patent Office.

**B.    Invalidity**

It is my opinion that the prior art I have identified is closer to the method of the '777 patent than the procedures taught by AngioDynamics and VSI. Thus, if it is incorrectly determined that the procedures taught by AngioDynamics or VSI infringe on any claim of the '777 patent, it is my opinion that the '777 patent must be found to be invalid as anticipated or obvious in light of the prior art I have described. My detailed comparisons of O'Reilly (*see* Exhibit D), Biegeleisen (*see* Exhibit E), Puglisi (*see* Exhibit F), Farley (*see* Exhibit G), and Mazza (*see* Exhibit H), to the relevant claims of the '777 patent are included as exhibits to this report.

06/22/2005 13:43 FAX
06/22/2005 14:20 FAX  8607243397                McCARTER & ENGLISH LLP                    ☑ 002
                                                                                          ☑ 002/002

This report is current as of June 22, 2005. My research and discovery into this matter are ongoing. As a result, my opinions and conclusions should be considered preliminary, pending my review of any additional information learned through discovery or otherwise obtained by me. I reserve the right to supplement my opinions and the bases for my opinions based on newly-produced documents, interviews, or deposition testimony, or in response to the opinions and the bases provided for such opinions by Diomed or any expert retained by it. Further, I expect to provide testimony regarding additional subject matter that is raised at trial and is within my area of expertise. I may also testify on rebuttal as to subject matter responsive to arguments made by Diomed at trial.

Dated: June 22nd 2005

Russell H. Samson

REBUTTAL REPORT OF RUSSELL H. SAMSON, M.D., FACS, RVT

*Diomed, Inc. v. AngioDynamics, Inc. and Vascular Solutions, Inc.*
Case No. 04-CV-10019-RGS
United States District Court
District of Massachusetts

## I.    INTRODUCTION

I have been retained in this matter by defendants AngioDynamics, Inc.

("AngioDynamics") and Vascular Solutions, Inc. ("VSI"). I have been asked to consider

whether the methods of endovenous laser treatment taught by AngioDynamics and VSI infringe

the asserted claims of United States Patent No. 6,398,777 (the '777 Patent). It is my

understanding that the asserted claims are claims 9-14, 16-19, and 21. Compensation for my

work on this matter is at the rate of $350 per hour. I am compensated $3,000 per day of

deposition testimony, and $5,000 per day of trial testimony. My qualifications and a list of the

publications I have authored are set forth in my *curriculum vitae*, which was included with the

previous expert report I submitted in this case. A list of the cases in which I have testified as an

expert at trial or by deposition within the previous four years is also included with that previous

report.

This report is current as of October 14, 2005. I reserve the right to supplement my

opinions and the bases for my opinions based on newly-produced documents, interviews, or

deposition testimony, or in response to further disclosures from Diomed. Further, I may also

testify at trial in response to arguments or evidence introduced by Diomed that is within my area

of expertise.

## II.    OPINIONS AND BASIS

A) I have reviewed the training materials and instructions for use used by both AngioDynamics and VSI. I have also reviewed the '777 Patent, the written decision by the Court concerning the construction of the '777 Patent, the expert reports of Drs. Fan and Anderson, the deposition testimony of Drs. Fan and Anderson, and DVDs provided of Dr. Fan's experiments.

I have performed many procedures using the AngioDynamics laser and kit, and have also performed procedures using the VSI laser and kit. At trial, I will explain the endovenous laser treatment procedure as recommended by VSI and AngioDynamics. I may present a videotape of an actual procedure. Included as Exhibit A is a DVD containing ultrasound videos of procedures I performed using VSI's and AngioDynamics' products. I will rely on the ultrasound videos, as explained below, during my testimony.

B) The primary mechanism of action of the endovenous laser treatment procedure, as recommended by VSI and AngioDynamics, is the delivery of laser energy directly into blood that is in the vessel lumen. Contrary to Diomed's position, the VSI and AngioDynamics procedures do not work by means of contact between the laser emitting section of the laser fiber and the vessel wall. As can be readily observed on the DVD containing the ultrasound procedures attached as Exhibit A, the laser emitting section of the laser fiber is firing into blood and is not in contact with the vessel wall. The blood absorbs the laser energy, creating very high temperatures at and near the fiber tip. Again, as can be seen on the ultrasound videotapes, this results in rapid and extensive steam bubble formation. The steam bubbles and superheated blood and blood products near the fiber tip circulate and cause thermal damage to the entire circumference of the blood vessel tissue and to a varying depth within the vessel wall. Typically, the patient will complain that they smell and taste a sensation similar to burnt cigarette butts.

2

This is because their blood has been burned, and is further evidence that hot blood is causing the damage to the vein wall.

Thermal damage to the entire circumference of the vessel wall is desirable in the procedure, and results in closure of the vein. Damage caused by contact between the laser emitting section of the fiber tip and the vessel wall is not desirable and is something that should be avoided during the procedure. Such contact could lead to perforations of the vessel, along with patient discomfort and bruising.

In addition, Diomed's claim that damage via direct contact is the primary mechanism of action in the procedure ignores the vein anatomy. The laser emitting section of the fiber is relatively small, only 600 microns in diameter. The diseased greater saphenous veins treated in this procedure can range in diameter from 4-7 mm. all the way to 25 or even 30 mm. in diameter. It is important to realize that, unlike Diomed's claims, the vein does not compress down to such a minimal circumference that the vein wall comes into contact with the 600 micron fiber tip. The saphenous vein is actually quite a thick-walled structure which does not allow such constriction even in the case of extreme spasm and compression. At most, even if one could insure that the entire laser emitting section of the fiber tip was in contact with the vessel wall (which is definitely not the case in the procedure as recommended by AngioDynamics and VSI), that still would result in damage only to a very small percentage of the vessel wall tissue, not the full circumferential damage that is desirable in this procedure.

C)    It is my understanding that the Court has construed the claim term "placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment site" to require "deliberately putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel, which requires the drainage of blood and compression

3

of the vein." The procedures recommended by VSI and AngioDynamics do not meet this claim term, for the reasons stated below.

1. VSI and AngioDynamics do not teach or recommend "deliberately putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel." In fact, both VSI and AngioDynamics teach specifically that a physician should avoid such contact during the procedure.

2. The procedure as taught by VSI and AngioDynamics does not result in physicians "deliberately putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel."

a) The ultrasound videos of the procedures I performed show that the laser emitting section of the fiber optic line is not in physical contact with the vein wall during the procedure, though there may be rare moments of incidental contact. One can readily observe that there is a lumen present where the tip is located, that there is blood in the lumen, that the tip is in the lumen, and the laser energy is being fired into the blood without contact with the vessel wall. At the point after the tumescent anesthesia has been administered, but before laser firing begins, one can observe on ultrasound that there is a lumen in front of and at the laser emitting section of the fiber, and using duplex ultrasound techniques one can observe that the blood flow continues at and around the laser fiber tip. During the procedure, when the laser is being fired, one can also readily observe the formation of a cone of steam bubbles in the lumen, at and extending beyond the laser fiber tip and down the lumen away from the tip. Those steam bubbles show that there is a lumen present and that the laser emitting section of the fiber is not in contact with the vein wall. This cone of heated blood and steam also serves to push the vein wall away from the fiber tip.

4

As noted above, I would expect that there may be moments when the fiber tip makes incidental contact with the vein wall as it is being pulled back during the procedure. However, I did not see any definitive moments of contact on the ultrasound videos of the cases I performed, and from that one can conclude that such moments of contact, if they occur, are rare and merely incidental to the procedure. Further, any such moments of contact would touch only a fraction of the interior surface of the vein wall.

b) The geometry of the sheath and fiber assembly will tend to prevent contact of the laser emitting section of the fiber with the vessel wall during the procedure. The fiber tip is only 600 microns in diameter, while the external diameter of the sheath is significantly larger than that. As the laser is being fired during the procedure, the physician is pulling back the sheath and fiber assembly. Even if there was a significant collapse of the vessel around the sheath and fiber assembly, the relatively large diameter of the sheath would tend to create space for the relatively rigid fiber as it travels through the vessel. The sheath will also tend to maintain the fiber centered in the vessel lumen away from the vein wall.

c) Diomed's theory, as I understand it from my review of Dr. Fan's and Dr. Anderson's testimony, is that the use of tumescent anesthesia, in the amounts recommended by VSI and AngioDynamics, will result in the complete collapse of the vein and the obliteration of the vessel lumen at and in front of the fiber tip, resulting in the vessel wall collapsing down on and covering the laser emitting section of the fiber. They are wrong.

i) One can observe on the ultrasound videos that there is a lumen present even after the administration of tumescent anesthesia. In the procedures shown on the DVD, I administered approximately 240-250 ccs of tumescent anesthesia, more than is recommended in the VSI and AngioDynamics instructions for use. Contrary to Diomed's position, this does not

5

result in complete collapse and obliteration of the vessel lumen, nor does it result in contact between the vessel wall and the laser emitting section of the laser fiber.

ii) Diomed's theory, as I understand it from review of Fan's and Anderson's testimony, is that the lumen continues to collapse down on to the laser emitting section during the procedure, as the fiber is being fired and withdrawn. This is not correct. As noted above, in the ultrasound videos one can readily observe that there is a lumen present, with a cone of steam bubbles forming at and in front of the laser fiber tip. There is a misconception about the saphenous vein that has crept into Diomed's logic, possibly because their experts do not have intimate knowledge of the saphenous vein. As a vascular surgeon, I and my colleagues deal with the saphenous vein on a daily basis, and I have stripped many, many saphenous veins in the past. I have also harvested the saphenous vein on numerous occasions for use as an alternative to an artery in patients requiring bypass surgery. The saphenous vein is a relatively muscular vein (hence its ability to go into spasm). Thus, it usually does not just flop in on itself, even in thin-walled veins when *ex-vivo* and not held open by surrounding tissue and intraluminal blood. Diomed's theory of complete collapse of the vein *in vivo* is not consistent with clinical reality.

iii) Diomed's theory also ignores the clinical realities and history of the use of tumescent anesthesia in this procedure. Tumescent anesthesia was not originally proposed to compress the vein. Rather, tumescent anesthesia was originally proposed to provide local anesthesia so that the procedures could be performed without the need for general anesthesia. This would reduce the risk of the procedure and possibly allow it to be performed in an outpatient or office facility. Through experience it has been realized that tumescent anesthesia may also provide benefit as a "heat sink" around the vein to prevent damage to surrounding

6

tissues. Experience has also demonstrated that it will often reduce the vessel diameter and bring the vessel walls of the diseased vein closer to the laser fiber during the procedure. This has the benefit of making the procedure more efficient, allowing the heated blood and steam a closer approximation to the vein wall.

I do not use tumescent anesthesia to try to obtain the "complete collapse" of the vessel wall on to the laser emitting section of the fiber tip, as posited by Diomed. VSI and AngioDynamics both teach not to seek such a result, by teaching that physicians should avoid contact during the procedure. As noted above, it is well known that contact as posited by Diomed is a likely source of perforations and bruising, and is therefore a negative and unwanted outcome. Further, blood around the fiber tip is essential for this technique, since heated blood is the method that is required to injure the vein wall such that effective closure occurs.

It is important to understand that there are many clinical variables present in an endovenous laser treatment procedure. The length of vein to be treated, the diameter of the vein, the thickness of the vein wall, and the anatomy and reaction of a particular blood vessel all vary from patient to patient, and the diameter of the vein and thickness of the vein in an individual patient typically vary along the vein's length. Thus, the amount of compression effect a physician will achieve with a given amount of tumescent anesthesia will vary, from patient to patient and also at varying points along an individual patient's vessel. I do not believe that it is possible that the "complete collapse" of the vessel wall so that it covers and makes contact with the laser emitting surface of the laser fiber could ever be created by tumescent anesthesia. In the DVD, this variability is shown quite distinctly, with one frame showing the vein re-dilated up to 15 mm. in diameter. Even if tumescent anesthesia could "completely collapse" the vein onto the laser emitting section, which I do not believe, the mere recommendation of the use of a variable

7

amount of tumescent anesthesia, in this case between 100-200 ml., would not reliably create the "complete collapse" effect that Diomed claims. Instead, physicians would have to deliberately attempt to create that effect, using variable amounts of tumescent anesthesia to do so. That would be directly contrary to what VSI and AngioDynamics recommend in their training materials. It could also result in a dangerous volume of anesthetic agent being administered.

d) Dr. Anderson assumes that carbonization in the vessel wall itself or carbon remnants on the laser fiber are proof of contact between the vessel wall and the laser emitting section of the laser fiber. This is not correct. Indeed, Dr. Anderson testified, and I agree, that carbonization can occur in blood alone, as blood matter can and will carbonize. His report and testimony also seem to indicate, and I agree, that contact is not necessary for carbonization; instead, intense heat of the type present near the fiber tip in this procedure can result in carbonization in the vessel wall.

3. The procedure as recommended by VSI and AngioDynamics does not result in "drainage of the blood", as required by the Court's claim construction. The use of tumescent anesthesia will result in some reduction in the diameter of the vein, which will cause a reduction in the volume of the blood in the vein. However, this reduction in volume cannot be considered to be "drainage of the blood," because the '777 patent makes clear that the purpose of the "drainage of the blood" is to remove blood from the area at the laser emitting section, to avoid firing the laser directly into blood as was known in the prior art, and to optimize contact with the vessel wall. In the procedure as recommended by VSI and AngioDynamics, one can readily observe that the laser fiber tip is in blood. Also, the vein lumen, although reduced in diameter, remains full of blood at the laser fiber tip location. It should be realized that the vascular system is a closed system and as such there cannot be an area entirely devoid of blood.

8

4. The use of tumescent anesthesia, as noted above, will cause a compression of the great saphenous vein and a reduction in the vein diameter. This effect generally occurs along the entire length of the vein segment to be treated. The patent teaches applying particularized compression, by hand or other mechanical means applied at the location of the laser fiber tip itself, to achieve contact. I do not believe that consistent contact between the laser emitting section of the fiber and the vessel wall can be obtained in any other manner. Further, compression at the fiber tip as taught by the patent is counterproductive, since this can lead to vessel perforation and will displace the tumescence thus bringing the adjacent tissues closer to the vessel, allowing for more damage to these tissues with subsequent pain and bruising.

D) I understand that the claim term "emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of the blood vessel" has been construed by the Court to "require the maintaining of the tip-interior surface in physical contact with the vessel wall while laser energy is emitted to decrease the diameter of the blood vessel."

The procedures recommended by VSI and AngioDynamics do not meet this claim term. As discussed above, VSI and AngioDynamics teach that contact should be avoided, and the procedures as recommended by VSI and AngioDynamics do not result in the maintaining of contact between the laser emitting section of the fiber and the vessel wall while laser energy is being emitted.

E. I have reviewed Dr. Fan's videos and testimony concerning her experiments. Nothing in her experiments proves her hypothesis that thermal injury requires the direct contact of the laser fiber tip with the vessel wall. Her first experiment actually tends to prove the opposite, as it shows that significant thermal injury occurs without direct physical contact. In the

9

video of the experiment, you can observe that the small artery segments maintain their circumferential size and shape and are in no way collapsed or compressed down on to the laser emitting face of the fiber. Contact between the laser emitting face of the fiber and the vessel wall during the laser firing thus almost certainly did not occur, as is apparent from the videotape. I also note that Dr. Fan testified, at pages 129-30 of her deposition, that she placed the laser system in the jig as centered as she could make it, which would place the fiber tip in the center of the lumen of the vessel, not in physical contact with the vessel wall. Despite the fact that she almost certainly did not have contact, the video of what she calls the "small artery" segments in her first experiment show severe damage, with multiple perforations on both sides of the vessel, and hot blood and steam visibly escaping from the vessel. Her first experiment also establishes the critical importance of blood to the procedure.

Dr. Fan's second experiment is not a valid or relevant experiment. In her construct, she pointed the laser fiber at a 90° angle down towards the vein in an open container, and pulsed the laser for one second pulses. This construct means that all of the heat, steam, and heated blood will flow up, away from the vein, and be dissipated. Placing the fiber in this orientation, in an open container, 2 and 5 millimeters away from the vein flap, and pulsing the laser for one second, simply bears no relationship to the situation inside the vein during an actual procedure.

Dr. Fan's third experiment also does not prove her hypothesis concerning direct contact. It is important to note that Dr. Fan testified that she increased the pressure in this experiment until she visibly observed the collapse of the vessel. That is not what VSI or AngioDynamics teach, so this experiment is not a valid test of what occurs during a procedure following the recommendations made by VSI or AngioDynamics. Even with the laser fiber centered with the centering device and thus kept some distance away from any possible contact with the vessel

wall, there is still thermal damage to the vessel wall. Also, on the videotape of this experiment,

you do not observe the vessel wall segments that are placed under pressure collapsing down on

to the fiber tip as the fiber is withdrawn, as Dr. Fan incorrectly claims happens in actual practice.

Dated:   October 14, 2005

Russell H. Samson

