00001

2  UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF MASSACHUSETTS
3  --------------------------x
   DIOMED, INC.,
4
        Plaintiff,
5
     vs.        CA No.
6               04-10019 RGS
   ANGIODYNAMICS, INC.,
7         Defendant.
   --------------------------x
8  DIOMED, INC.,
        Plaintiff,
9   vs.        Consolidated Under
               04-10019 RGS
10 VASCULAR SOLUTIONS, INC.,
        Defendant.
11 --------------------------x   Volume III

12

13               January 10, 2006

14               8:08 a.m.

15

16   CONTINUED DEPOSITION of ROBERT J. MIN

17 taken by AngioDynamics, pursuant to

18 agreement, held at the offices of McCarter &

19 English, 245 Park Avenue, New York, New York,

20 before Amy E. Sikora, CRR, CSR, RPR,

21 Certified Realtime Reporter, Certified

22 Shorthand Reporter, Registered Professional

23 Reporter, and Notary Public within and for

24 the State of New York.

**Min, Robert 1/10/06**                    **Page 1**

00028

2  Goldman and Trelles, what was your
understanding of your duty of disclosure to
3  the Patent and Trademark Office in connection

4  with this patent application?

5      A.    At the time of the provisional

6  patent, my initial thought on what made

7  something patentable was very much related to

8  doing a patent search online to see if any

9  prior patents had been issued.  So that is

10  why I went to the USPTO site and put in

11  certain key words that I thought might bring

12  up patents that would relate to our patent.

13  And during that search these were the two

14  patents that I thought were somewhat related

15  but obviously not enough so that they would

16  not make our procedure patentable.

17      Q.    Well, my question is, did -- at

18  that time did you understand that you had any

19  duty to disclose information to the patent

20  office?

21      A.    Well, the presumption, I guess

22  it goes hand in hand.  If I had known of

23  anything in my search that was directly

24  related to what we were trying to patent,

**Min, Robert 1/10/06**                    **Page 28**

00029

2  sure, I -- I would know to disclose that to
either the patent office or presumably my

3  understanding was that would in itself make

4  our patent nonissuable, I guess would be the

5  term, or make our procedure not patentable,

6  if there was something in existence that was

7  directly related.

8      Q.    Did you understand your duty to

9  disclose to be you only had to disclose art

10  that would make your patent unpatentable or

11  your invention unpatentable?

12      A.    Well, I thought that the two

13  went hand in hand.  If there was a -- a --

14  any procedure that was already being done,

15  even if it wasn't patented, if it was -- for

16  example, let's break it down to the most

17  basic.  If I had known that someone was

18  performing endovenous laser ablation via

19  contact between the laser fiber tip and the

20  vein wall, just because that wasn't -- just

21  because there wasn't a patent issued, I would

22  know that that would not -- that that would

23  be something that would not make endovenous

24  laser ablation patentable by us.

**Min, Robert 1/10/06**                          **Page 29**

00030

2      Q.    Did you understand that -- one
second.  Did you understand that you had a

3  duty to disclose information that a

4  reasonable examiner would consider important

5  in deciding whether to allow the application

6  to issue as a patent?

7      A.    Yes.

8      Q.    Okay.  When did you first have

9  that understanding that you had that

10  obligation?

11     A.    I think in a general term in

12  terms of what we discussed, that was pretty

13  early on in terms of knowing that if --

14  whether it's the -- like I said, if someone's

15  already performing the procedure that we were

16  doing, it would not be patentable, and

17  obviously that would be something that I

18  would disclose or I wouldn't pursue the

19  patent, if that were the case in the first

20  place.  But I think that what you're reading

21  from is a correspondence we got from Charles

22  Ruggiero regarding the duty to disclose prior

23  to the nonprovisionable patent being filed.

24          So I -- certainly in terms of,

**Min, Robert 1/10/06**                    **Page 30**

00032

2  just yes or no, did you have discussions with
   Mr. Ruggiero about your obligations to

3  disclose information to the Patent and

4  Trademark Office?

5      A.    I don't recall specific

6  discussions in that regard.

7      Q.    In the third paragraph --

8      A.    Yes.

9      Q.    -- Mr. Ruggiero, in the second

10  sentence, says, "Included in the duty is the

11  duty to disclose to the PTO all information

12  known to be material to the patentability of

13  this application.  Information is considered

14  material if there is substantial likelihood

15  that a reasonable examiner would consider it

16  important in deciding whether to allow the

17  application to issue as a patent."

18          Did you understand that you had

19  that obligation prior to receiving

20  Mr. Ruggiero's letter?

21      A.    Yes.

22      Q.    And did you understand that you

23  had that obligation at the time that you

24  prepared the provisional application?

**Min, Robert 1/10/06**                    **Page 32**

00035

2  patents, but, yes, I believe we had
   discussions regarding the relevance of some
3  of his findings.

4      Q.    Okay. I'm going to go back to

5  Exhibit 26, which is the patent itself. And

6  it has a number of prior art references

7  identified there on the front page of the

8  patent.

9          My first question is, can you

10 tell me which of those references identified

11 you reviewed?

12         MR. STRAND: At what time?

13         MR. BRIGHT: During the

14     prosecution.

15     A.    I don't specifically recall

16 reviewing any of those during the

17 prosecution. I recall -- other than the two

18 that I had found that I thought were most

19 relevant.

20     Q.    Can you tell me which of the

21 patent documents listed in Exhibit 26 you

22 discussed with Mr. Ruggiero?

23     A.    The two that we had discussed in

24 the provisional, the Goldman --

**Min, Robert 1/10/06**                    **Page 35**

00036

2    Q.    And Trelles?

    A.    -- and Trelles.

3    Q.    Of the prior art that's

4  identified on Exhibit 26, did you view

5  Goldman and Trelles as the two most material

6  references?

7    A.    I believe so.  I -- I don't

8  recall the -- the actual other references in

9  any detail.  And I'm sure that largely

10  relates to the fact that Trelles and Goldman

11  were reviewed more substantially by myself

12  even prior to this.  So I don't recall the

13  other references in detail.

14    Q.    Okay.  If you could turn in

15  Exhibit 26, which is the '777 patent, and to

16  columns 7 and 8.

17    A.    Yes.

18    Q.    Which is where the claims exist?

19    A.    Yes.

20    Q.    The title of the patent is

21  "Endovascular Laser Device and Treatment of

22  Varicose Veins."

23         The claims relate to treating

24  blood vessels.  Why was the-- why were the

**Min, Robert 1/10/06**                                        **Page 36**

00071
2 might go to a -- an existing piece of
   literature such as a book on lasers and try
3 to assemble a bibliography from some of their

4 references.  It was probably a combination of

5 those.

6     Q.    Did you read the references that

7 are cited in Exhibit 31?

8         MR. STRAND:  Objection.  Asked

9     and answered.

10    A.    I may -- I don't know if I

11 reviewed every word of every one.  But many

12 times what we would do is review the

13 abstracts, if there are abstracts, and try to

14 get a sense of relevance to the purpose of

15 demonstrating safe and effective use.

16        For example, if in the -- in

17 perusing the abstract if one of these -- one

18 of these articles had said that there was

19 100 percent mortality, certainly that would

20 not support my position that laser use was

21 safe in humans.  So I think it was done on

22 that sort of level.

23    Q.    At your last deposition, you

24 said you couldn't recall the reason why you

00072

2  put the references in the order that you did.
   And I believe in your declaration, which we

3  looked at today, you say you've refreshed

4  your recollection on that?

5      A.    When -- I didn't -- at the

6  initial deposition, I didn't look at the list

7  of references very closely.  I subsequently

8  have been asked to do so, and certainly when

9  I review the references it strikes me and is

10  obvious that a lot of these were put in

11  general categories in chronological order.

12         I think if you start looking at

13  these, O'Reilly is '82, Choy is '82, Ginsburg

14  is '84, Weber is 1997, Oesterle is 1998, and

15  so on and so forth.  So in reviewing this in

16  more depth, it would seem that that was one

17  of the logical thoughts behind listing the

18  references.

19      Q.    Now, on page MIN00166, as you

20  continue down after Goldman and Fitzpatrick,

21  which is '99, then there's a reference to a

22  '93 article, then '96, '98, and then '95.

23         Can you tell me why you didn't

24  maintain the chronology throughout?

**Min, Robert 1/10/06**                    **Page 72**

00073

2    A.    If you look at some of the background, it looks as though in that we

3  were just using the general medical

4  application of lasers to then go and find how

5  they've been used in the different areas

6  safely.

7          So if you look at the first

8  several in chronological order, they are

9  somewhat related to endovascular use.  The

10  next group seems to be related somewhat to

11  dermatologic use.  The next group with some

12  of the breast photocoagulation seems to be --

13  involves interstitial laser therapy, and so

14  on and so forth.  Finishing up with urology

15  and ENT.

16          So what -- you know, we've said

17  we know that lasers have been used throughout

18  the body.  We knew that.  When asked to

19  demonstrate the potential safety or the

20  minimal risk of our procedure, one would then

21  logically do a -- some sort of literature

22  search to justify the safe use in each of

23  these categories and then list them

24  chronologically as we had done or in some

**Min, Robert 1/10/06**                                **Page 73**

00078

2          MR. STRAND: Objection. Asked
and answered.

3     A.    When I reviewed -- and, of

4  course, please keep in mind that we're going

5  back a fair amount of time.

6     Q.    Absolutely.

7     A.    But in rereviewing the article,

8  it had -- it dealt with arteries. It never

9  mentioned contact between the fiber and

10  the -- in this case, the arterial walls. And

11  it never talked about any means to get that

12  contact.

13          So to me, the blood clot issue

14  might have come up, but it didn't even come

15  close in terms of, in my mind, meeting

16  relevance to our procedure because of the

17  differences that I just cited.

18     Q.    Okay. Let me ask you to go to

19  in your declaration paragraph 23.

20     A.    Yes.

21          MR. STRAND: Whenever you're

22  ready to break.

23          MR. BRIGHT: Sure. Let me just

24  go through this and I think we'll be

**Min, Robert 1/10/06**                    **Page 78**

00079

2       ready for a break.

         Q.    Paragraph 23, the second

3    sentence says, "The 514 nm wavelength of the

4    argon laser used by O'Reilly - unlike the

5    wavelengths used by Diomed, AngioDynamics and

6    VSI - largely passes through blood, such that

7    it would impact the artery wall even with the

8    fiber centered in the artery."

9            How do you know that?

10      A.    Well, you know, this was

11   prepared after I was asked to review the

12   O'Reilly article in --

13      Q.    In this litigation?

14      A.    -- in greater detail.

15      Q.    Okay.

16      A.    And, you know, in doing so a lot

17   of the damage that they talk about to the

18   vein wall is 2 to 3 millimeters away from the

19   fiber tip.  So the presumption is that there

20   must be enough penetration by the laser of

21   wavelength energy to have caused that damage

22   to the vein wall at that distance.  So, you

23   know, versus what we see through direct

24   contact, which is really damage centered on

**Min, Robert 1/10/06**                          **Page 79**

00080

2  where the fiber contact is with the vein wall.

3      Q.    So let me just -- your statement

4  in your declaration that the 514-nanometer

5  wavelength largely passes through blood,

6  that's a presumption that you made?

7      A.    When you read the article, that

8  is presumption.  I will tell you, you know,

9  at some point I've also learned, and you

10  probably know because it's in our original

11  patent, the -- the wavelengths that we talk

12  about, such as the 810, have less penetration

13  through blood on the order of less than a

14  millimeter, probably .3 millimeters.

15          The argon laser that they're

16  talking about do have greater penetration.

17  The exact number, you know, I wouldn't be --

18  I'm not a physics expert, you'll have to talk

19  about that.  But that is known, you know,

20  that basic principle.  The support of that is

21  the pathology that they see which is

22  described in the article.

23      Q.    But the -- the analysis that is

24  set forth in paragraph 23 is analysis that

**Min, Robert 1/10/06**                    **Page 80**

00094

2     A.    It will in how it relates to
contact versus noncontact. It's not -- the

3   intent of that was not necessarily to

4   specifically say, if you contact an arterial

5   wall --

6     Q.    Yeah.

7     A.    -- with a laser fiber that that

8   reaction versus a vein at the point of

9   interaction would be that much different.

10        The -- the basis of that was in

11  terms of what the mechanism of delivery of

12  laser energy would be in an artery versus a

13  wall, meaning it would be much harder to use

14  what we're describing in an artery to ensure

15  the contact versus the delivery of laser and

16  entry to the vein wall through compression.

17    Q.    Okay.  So you weren't here

18  talking about the way the wall reacts to it

19  in the different vessels, but how hard it was

20  to get contact in the different vessels?

21    A.    In a sense.  Just what is the

22  mechanism behind, you know, what we're trying

23  to do in a vein versus how would you do that

24  in an artery.  It would be very different.

00095

2  You couldn't do the same steps that we're
   doing necessarily in an artery of equivalent

3  size, and deliver laser energy to the walls

4  in a similar fashion.  It wouldn't

5  necessarily be contact.  It would be through

6  the laser beam interaction with the vein

7  wall.

8      Q.    Is it possible to compress an

9  artery to get contact with a fiber tip?

10     A.    I think that that would be

11  dependent on factors such as the size of the

12  artery and what you were using to compress

13  the vein.  What you were doing with an artery

14  is you're not just overcoming the rigidity of

15  the increased muscle within the vein wall,

16  but you also have to presumably overcome the

17  blood pressure within an artery versus a

18  vein, which is much higher in arteries.  So

19  you would have to deliver a lot more

20  compression.  Orders of magnitude higher than

21  with a vein.

22     Q.    Okay.  Paragraph 25 in your

23  declaration is the paragraph in which you say

24  you provided Mr. Ruggiero a copy of the study

00100

2    A.    -- that described exactly what
   you and I are talking about.

3    Q.    Okay.  It may not have had the

4    purpose line in there that talked about the

5    purpose of a study, but it had the overview

6    and the background and the procedure?

7    A.    Without exact dated documents

8    which Exhibit 30 doesn't -- I don't think

9    anyone would say that this was the exact one

10   (indicating).  We can look, as we discussed,

11   but I think that would be difficult.

12   Q.    Now, after you received the

13   letter from Mr. Ruggiero, Exhibit 27 --

14   A.    Yes.

15   Q.    -- did you go back and look at

16   any of the materials that are listed in the

17   bibliography to Exhibit 31 to examine whether

18   they would be material under the standards

19   set forth by Mr. Ruggiero?

20   A.    I didn't specifically go back

21   and look at those particular articles, as I

22   recollect.

23   Q.    And is that because you had

24   already considered those, in light of what

**Min, Robert 1/10/06**                                    **Page 100**

00101

2  Mr. Ruggiero said you had to do?

   A.    Yes.

3     Q.    After receiving the August 17,

4  1999, letter from Mr. Ruggiero, did you do

5  review of any other documents to determine

6  whether they were material?

7     A.    I don't -- I'm sure that I gave

8  it thought, but there were no particular

9  references or articles or any material in

10 addition to what I had provided to him before

11 that I thought was material.

12    Q.    Did you ever mention to

13 Mr. Ruggiero that you had prepared a

14 bibliography to the study protocol?

15       MR. STRAND:  Objection.

16    Instruct the witness not to answer

17    based on attorney-client privilege.

18       MR. BRIGHT:  I don't have any

19    problem with that instruction, so long

20    as you're not going to take -- you're

21    not going to waive the privilege later

22    at trial to have Dr. Min testify that

23    he either did or didn't talk about the

24    study -- the bibliography with -- with

**Min, Robert 1/10/06**                    **Page 101**