UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Diomed, Inc., | ) |
|     Plaintiff/Defendant in Counterclaim, | ) |
|         v. | ) Civ. No. 04-10019-RGS |
| Angiodynamics, Inc., | ) |
|     Defendant/Plaintiff in Counterclaim, | ) |

**Expert Report of Bruce D. Sunstein**
**With Respect to Conduct in Prosecution of United States Patent 6,398,777**

Introduction............................................................... 2

1. Disclosure Obligations under the Patent Laws and the
   Law of Inequitable Conduct............................................... 3

2. Nature of the Invention and the Prior Art.......................... 5

3. The Patent Prosecution Background................................. 7

4. Handling of the Disclosure Obligations in the Context of the Patent.......... 13

Conclusion............................................................ 16

Exhibits.............................................................. 17

- 1 -

**Expert Report of Bruce D. Sunstein**
**With Respect to Conduct in Prosecution of United States Patent 6,398,777**

### Introduction

1. I, Bruce D. Sunstein, present below my report setting forth my views on conduct in prosecution of United States Patent 6,398,777 (the "Patent"), particularly with respect to identifying disclosure obligations imposed by the patent laws on the inventors of the Patent and their patent counsel and addressing the manner in which those obligations were handled.

2. I am a partner and co-founder of Bromberg & Sunstein LLP, a Boston intellectual property firm of approximately 40 attorneys founded in 1979, where I chair its patent practice group. My personal practice in the firm emphasizes all phases of patent law, including patent prosecution, licensing, and litigation. I hold a B.S. degree from the Massachusetts Institute of Technology, an M.A. from Indiana University, and a J.D. from Boalt Hall School of Law of the University of California at Berkeley. I am admitted to practice in California (since 1973) and Massachusetts (since 1977) and the United States Patent and Trademark Office (since 1974). My further credentials are presented in the curriculum vitae attached hereto as Exhibit 1.

3. Working with inventors and technology-based companies in patent prosecution matters has been a key aspect of my practice for more than 25 years. In the course of my patent prosecution practice, I regularly make determinations in identifying disclosure obligations, imposed by the patent laws, on inventors and their employers, as well as on me and my firm as patent counsel. Similarly, in the course of my patent practice, I regularly make determinations about how to handle those disclosure obligations. As set

forth in my curriculum vitae, I have lectured and published extensively in the area of
patent prosecution.

    4. In preparation of this report, I reviewed the Patent, the procedural history of the
Patent, and the references cited in the course of prosecution of the Patent. I also reviewed
various documents relating to the present litigation, including the depositions of Drs.
Robert J. Min and Luis F. Navarro, two of the inventors listed on the Patent, the exhibits
to those depositions, and of Dr. Brunello Puglisi, various additional prior art references
discussed in this report, as well as other documents and items referred to herein.

### 1. Disclosure Obligations under the Patent Laws and the Law of Inequitable Conduct

*Patent Policy and the importance of disclosure.*

    5. The integrity of the patent system depends on disclosure. The patent document
itself is a disclosure of an invention, with enough detail so that a person of ordinary skill
in the field of the invention can carry out the invention. 35 U.S.C. § 112. In exchange for
the disclosure to the public that is in a patent, the owner of the patent is given the
opportunity to exclude others from making, using, or selling the patented invention for a
period of time. Constitution Article I, Section 8, Clause 8; 35 U.S.C. §§ 271 and 154.

    6. A patent is supposed to be issued only if the invention for which it is filed is
new and non-obvious. 35 U.S.C. §§ 102 and 103. If the invention is not new or is
obvious, the public gets no benefit from the disclosure in the patent. In order to determine
whether the invention is new and non-obvious, a patent application is subject to
examination by the Patent and Trademark Office. 35 U.S.C. § 131.

    7. The integrity of the examination process depends critically, among other things,
on disclosure by the inventors and their attorneys of information material to examination

of the application. 37 C.F.R. § 1.56. Often the closest prior art is known by the inventors

and cannot easily, if at all, be found by the patent examiners. In fact, the Patent and

Trademark Office has prescribed rules governing the manner of disclosure of prior art. 37

C.F.R. §§ 1.97 and 1.98.

*The elements of inequitable conduct.*

8. When the disclosure obligation of inventors or their attorneys is breached in a

flagrant manner, the courts have long refused to enforce the resulting patent, under a

doctrine formerly called "fraud on the Patent Office" and today called "inequitable

conduct." *FMC Corp v Manitowoc Co, Inc.*, 835 F.2d 1411, 1415 (Fed. Cir.

1987)(Markey, C.J.); *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370,

1375 (Fed. Cir. 2001); *Bruno Independent Living Aids, Inc. v. Acorn Mobility Services,*

*Ltd.*, 394 F.3d 1348, 1351 (Fed. Cir. 2005).

9. The elements of inequitable conduct in the context of a failure disclose are not

complicated. "[T]o prove inequitable conduct, in accordance with *FMC Corp. v.*

*Manitowoc Co.*, 835 F.2d 1411, 5 USPQ2d 1112 (Fed.Cir.1987), one alleging 'failure to

disclose' type inequitable conduct must prove with sufficient clarity that: (1) information

exists that is material; (2) the applicant or his or her attorney knew of this information

and that it was material; and (3) the applicant or his or her attorney failed to disclose the

information with the intent to mislead the PTO." *Brasseler,* 267 F.3d at 1375. With

respect to the third element in the inequitable conduct analysis, "the degree of intent to

mislead necessary to trigger culpability varies in proportion to the materiality of the

information." *Id.*, citing *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120

F.3d 1253 (Fed. Cir. 1997). Moreover, "depending on the facts of each particular case,

intent may be inferred where a patent applicant knew, or should have known, that

withheld information could be material to the PTO's consideration of the patent

application." *Id.* Finally, "a patentee's failure to appreciate the legal significance of the

facts that it failed to disclose [does] not absolve it of its duty to disclose." *Id.*

## 2. Nature of the Invention and the Prior Art

10. United States patent 6,398,777 (the "Patent") is entitled "Endovascular Laser

Device and Treatment of Varicose Veins." The Patent was applied for on August 13,

1999 and issued on June 4, 2002. The Patent includes claims covering the delivery of

energy from a laser to a location directly within the passageway (called the "lumen") of a

blood vessel (which may be a varicose vein) and using the delivered energy to decrease

the diameter of the blood vessel. See, for example, claim 9. The energy decreases the

diameter of the blood vessel by causing damage to the wall of the blood vessel, ultimately

causing fibrosis, and the fibrosis leads to a smaller diameter or collapse of the blood

vessel. See, for example, the abstract and col. 5, lines 17-39.

11. Although the Patent and Trademark Office was not aware of it in the course of

proceedings on the application for the Patent, there were already a number of other

publications describing a substantially similar approach:

- O'Reilly and others published an article in 1982 describing the delivery of energy

  from a laser to a location within a blood vessel and using the delivered energy to

  occlude the blood vessel. In the lesion, it was noted that "the lumen was filled in

  with fibrous tissue with an intact elastic lamina and a fibrotic media," while in the

  center of the laser injury, "complete obliteration" resulted "with replacement by

connective tissue". P. 779, first column. O'Reilly et al., "Transcatheter Fiberoptic Laser Coagulation of Blood Vessels," Radiology 142: 777-780, March 1982.

- Puglisi and others published an article in 1989 describing the delivery of energy from a laser to a series of locations within a varicose vein and using the delivered energy to treat the varicose condition. Puglisi et al. "299/ L'application du laser ND-YAG dans le traitement du syndrome variqueux" ["299/ Application of the ND-YAG laser in the treatment of varicose syndrome"], Tenth UIP Conference, Strasbourg, 25-29 September 1989, Phlebology '89, A. Davey, R. Stemmer, eds., pp. 839-842.

- Kiss and others published an article in 1993 also describing similar use of laser energy for treating varicose conditions, wherein the laser energy is used to achieve "obliteration of the vascular lumen, a fibrosis in the middle with preservation of the periadventitial tissues". Kiss et al., "L'uso dell'argon laser nel trattamento delle varici essenziali degli arti inferiori" ["The use of argon laser in the treatment of idiopathic varices in the lower limbs"], Minerva Angiologica 18:1-4, 1993.

- Biegeleisen and Nielsen published an article in 1989 describing use of a proposed fiberoptic angioscope[1] that would also be used, among other things, with a laser source for delivering laser energy for cauterization in a manner analogous to electrical cauterization. Biegeleisen and Nielsen, "147/Use of the venoscope for

---

[1] An angioscope permits viewing of a blood vessel from within the lumen of the blood vessel. See, for example, Lanzino G et al., "Angioscopy-assisted aneurism clipping," Neurosurgery, 1999 Sep;45(3):609-13 (Angioscopy has the potential to become a useful adjunct during intracranial aneurysm clipping because it provides real-time endoluminal viewing).

the treatment of varicose veins," Phlebology '89, A. Davey, R. Stemmer, eds., pp. 419-422.

A reading of these articles makes clear that each of them is prior art that is closer to the subject matter of claim 9 of the Patent than the prior art of record during prosecution of the Patent. If each reference does not anticipate the subject matter of claim 9, it certainly renders such subject matter obvious. The heightened relevance of each reference to the subject matter of the Patent imposed, on each inventor and on patent counsel, if any, who was aware of such reference, an obligation under 37 C.F.R. § 1.56 to disclose it to the Patent and Trademark Office. We consider this obligation in detail below in the context of the O'Reilly article.

12. Although this prior art prevents the invention described in the application for the Patent from being non-obvious, the focus in examining the disclosure obligations associated with the application for the Patent must be on what information the group applying for the Patent actually had awareness of—and how that group handled that information.

### 3. The Patent Prosecution Background

*The Inventors and the Bibliography.*

13. There are five inventors listed on the Patent. One of those inventors, Dr. Min, had a fellowship at Stanford in vascular medicine. Min deposition, p. 11, lines 6-6. He went to medical school at Cornell University, and has held a faculty position there since 1999, Min Deposition, p. 7, line 7, to p. 8, line 8. He is currently Associate Professor and Vice-Chairman of Radiology on a full-time basis and practices medicine in his capacity

as a faculty member of Cornell. Id. Dr. Min is an author or co-author of at least a dozen articles in the area of vascular medicine, as evidenced by Exhibit 2, showing the results of a search of the PubMed data base (a service of the National Library of Medicine).

14. Dr. Min started practicing medicine with Dr. Navarro, another one of the inventors, shortly after completion of Dr. Min's surgery internship in July 1991 at New York Presbyterian Hospital, of Cornell. University, Min Deposition, p. 5, line 23 to p. 6, line 18. Dr. Min began collaborating with Dr. Navarro and Dr. Boné Salat (yet another one of the inventors) in 1998, Min Deposition, p. 10, lines 5-24, and, although they have separate offices, Dr. Min continues to collaborate with Dr. Navarro "on things that usually pertain to the treatment of venous disease." Min Deposition, p. 6, line 19 to p. 7, line 6.

15. The Study Protocol for Endovascular Treatment of Varicose Veins, Exhibit 15 to Deposition of Dr. Navarro (Bates number MIN00161-MIN00169), was submitted to the Independent Review Board, namely Chesapeake Research Review, Inc. Navarro Deposition, p. 206, line 14 to p. 208, line 22. A date stamp on the document shows that it was in the possession of Chesapeake Research Review, Inc. at least as early as May 25, 1999. This document describes a study to be conducted using the invention described in the Patent. The purpose of the document, and of the bibliography at the end of the document, was to assist in demonstrating that the study would be conducted in a manner that was safe or ethical. Min Deposition, p. 195, line 24 to p. 196, line 5; Navarro Deposition, p. 208, line 16 to p. 209, line 20.

16. The very first reference listed in the bibliography at the end of the "Study Protocol" document is the O'Reilly article discussed above. The bibliography at the end

of the "Study Protocol" document occupies 5 pages (Bates numbers: MIN00165-MIN00169), and begins on a page (Bates number: MIN00165) that includes two paragraphs as follows:

Since endovascular laser treatment of varicose veins is a novel technique, no published literature is available documenting the long term recurrence rates for varicose veins following endovascular laser treatment. Approximately 20 subjects have been treated in Spain with endovascular laser treatment for varicose veins without any adverse reactions. The potential side effects of the treatment are outlined in the letter submitted with the original protocol. *Additionally, journal articles studying the efficacy and safety of laser treatment throughout the body, including endovascular use, are listed below.* [emphasis added]

Literature documenting the recurrence rates and risks of the current alternative treatments, i.e., surgical ligation and stripping or sclerotherapy of the saphenofemoral junctions, are cited below. The recurrence rates of varicose veins following endovascular laser treatment are not yet known, but will likely fall between the recurrence rates of the current available treatments.

17. The "Study Protocol" document was authored by Dr. Min "in conjunction with the other investigators and R. Navarro." Min Deposition, p. 191, lines 11-20. Dr. Navarro reviewed and made some corrections to the document. Navarro Deposition, p. 210, line 8 to p. 211, line 9. (Apparently, these corrections were sent by fax to Chesapeake Research Review, Inc. on July 13, 2000, as evidenced by the "Fax Note" on the first page of the document and by the fax legend placed on the bottom of each page of the document.) Dr. Min assembled the bibliography. Min Deposition, p. 191, lines 21-23;

Navarro Deposition, p. 211, lines 19-21. Dr. Min included the O'Reilly article in the bibliography, along with some other articles, for "demonstrating that lasers had been used in humans and in some cases animals safely." Min Deposition, p. 193, lines 7-11; p. 195, lines 16-19. Dr. Min believes that either Dr. Navarro or Dr. Min probably provided their patent counsel with the IRB protocol. Min Deposition, p. 197, line 12 to p. 198, line 7. Dr. Navarro says he did not review the references in the bibliography and that Dr. Min is "very capable". Navarro Deposition, p. 211, line 19 to p. 212, line 11.

18. Accordingly, the record is unambiguous in showing that Dr. Min included the O'Reilly reference in the bibliography to show safety of the procedure that was being proposed in the "Study Protocol" document. It appears difficult, if not impossible, to avoid the conclusion that the O'Reilly article was listed first in the bibliography because it was deemed by Dr. Min to be highly relevant to the safety of the procedure being proposed. Like the proposed procedure, the procedure in O'Reilly involved energy from a laser being delivered directly into the blood vessel, and wherein the blood vessel is occluded as a result of delivery of such energy. And O'Reilly provided data showing that clotting is avoided, and suggesting that the procedure would involve low risk.

19. Less than two months after the receipt on May 25, 1999, by Chesapeake Research Review, Inc. of the "Study Protocol" document with its bibliography, Dr. Min was sent a letter by Charles N.J. Ruggiero, his patent counsel, on August 17, 1999 (Bates numbers: D029490-D029491) reminding Dr. Min as follows:

The U.S. Patent and Trademark Office (PTO) imposes a duty of candor and good faith on each individual involved SUBSTANTIALLY in the preparation or prosecution of a patent application. Included in the duty is the duty to disclose

to the PTO all information known to be material to the patentability of this application. Information is considered MATERIAL if there is substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. Failure to comply fully could result in the patent application being stricken form the files of the PTO or the resulting patent held unenforceable.

20. A version of the "Study Protocol" document ended up in the hands of the patent counsel handling the application for the Patent, and it bears document numbers (Bates numbers: D029492-D029495) which are immediately next in sequence to the document numbers for Mr. Ruggiero's letter of August 17, 1999. Thus, it appears that this version of the "Study Protocol" document was received by patent counsel in response to Mr. Ruggiero's letter. But the version of the "Study Protocol" document in the hands of patent counsel lacked the bibliography. Consequently the patent attorneys did not learn about the O'Reilly reference, and the O'Reilly reference was not cited to the Patent and Trademark Office, not when patent counsel filed an Information Disclosure Statement on November 12, 1999 nor when patent counsel filed a Supplemental Information Disclosure Statement on September 6, 2000, nor at any other time.

21. *The Prior Art of Record.* The attorneys applying for the Patent cited, to the Patent and Trademark Office, some prior art that in turn the Patent and Trademark Office had cited back to the applicants. The closest references among these are patents to Goldman (4,564,011) and to Trelles (5,531,739). These were the main references cited by the Patent and Trademark Office in its action on the application for the Patent on November 15, 2000. Goldman discloses a system for delivering laser energy into the

lumen of a blood vessel, but the energy is used to create a blood clot. See, for example, the abstract. Trelles does not deliver energy directly into the blood vessel, but rather the probe is placed underneath the blood vessel in question. See, for example, the abstract. *The O'Reilly Reference.*

22. The O'Reilly reference is more powerful than either Goldman or Trelles. Like Goldman, and unlike Trelles, the O'Reilly reference teaches delivering the energy from the laser directly into the lumen of the blood vessel. Like Trelles, however, and unlike Goldman, the O'Reilly reference teaches using the energy to cause collapse of the blood vessel rather than causing a clot. The table attached hereto and incorporated herein as Exhibit 3 shows in detail how the limitations of claim 9 of the Patent, as interpreted by the Court herein, are addressed by the O'Reilly reference in relation to the Goldman and Trelles references.

23. In terms of its power in meeting the limitations of claim 9, the O'Reilly reference is white hot. Under the rules of examination, an examiner is required to give a claim its broadest possible meaning. Manual of Patent Examining Procedure § 2100, citing, among other things, *In re Morris,* 127 F.3d 1048, 1054-55,(Fed. Cir. 1997) ("The court held that the PTO is not required, in the course of prosecution, to interpret claims in applications in the same manner as a court would interpret claims in an infringement suit. Rather, the 'PTO applies to verbiage of the proposed claims the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or otherwise that may be afforded by the written description contained in applicant's specification.'"). Such a meaning would likely be broader than the reading given by the

Court following its *Markman* hearing in this litigation, because the examiner in an administrative context is not bound, for example, by doctrines such as prosecution history estoppel. *See also* 37 C.F.R. § 1.56(b) (information is material to patentability when it is not cumulative to information already of record and establishes a prima facie case of unpatentability by reference to a claim in which each term thereof is given its broadest reasonable construction consistent with the specification). An examiner would therefore likely regard the O'Reilly reference as fully anticipating the subject matter claimed in claim 9 of the Patent.

24. The O'Reilly reference is therefore highly material, and a patent practitioner would expect that an examiner would use the O'Reilly reference to reject the claim 9 (among other claims) as fully anticipated (under 35 U.S.C. § 102) by this reference. Accordingly, the O'Reilly reference establishes by itself a prima facie case of unpatentability of a claim, and it would need to be disclosed to the Patent and Trademark Office under 37 C.F.R. § 1.56 by an inventor or patent lawyer who was aware of it. But its heat never came close to the pending claims of the Patent because the reference was never brought to the attention of patent counsel for the inventors.

### 4. Handling of the Disclosure Obligations in the Context of the Patent

25. In applying the law of inequitable conduct to the present situation, we address in order the elements of inequitable conduct that were described above:

(1)    *information exists that is material*. The O'Reilly reference is material. Indeed it is white hot. This reference is a far better reference in relation to claim 9 than any of the references cited during prosecution of the Patent. Because under the rules of examination, an examiner must give a claim its broadest possible meaning, as discussed

- 13 -

above, an examiner would likely regard the O'Reilly reference as fully anticipating the subject matter of claim 9, a circumstance making the reference highly material.

(2)    *the applicant or his or her attorney knew of this information and that it was material.*    Dr. Min testified that he cited the O'Reilly reference because it helped to show that the procedure being proposed in the "Study Protocol" document was safe. Because Dr. Min is a faculty member of a major national school of medicine and a well-published author of articles in his field, it seems difficult, if not impossible, to imagine that he could appreciate the great relevance of the O'Reilly reference to safety of the procedure he invented without also appreciating the great relevance of the O'Reilly reference to patentability of the same procedure.

(3)    *the applicant or his or her attorney failed to disclose the information with the intent to mislead the PTO.*    Under the law of inequitable conduct, "the degree of intent to mislead necessary to trigger culpability varies in proportion to the materiality of the information." *Brasseler,* 267 F.3d at 1375., citing *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253 (Fed. Cir. 1997). Moreover, "depending on the facts of each particular case, intent may be inferred where a patent applicant knew, or should have known, that withheld information could be material to the PTO's consideration of the patent application." *Id.* Finally, "a patentee's failure to appreciate the legal significance of the facts that it failed to disclose did not absolve it of its duty to disclose." *Id.*

26. It is clear that Dr. Min knew of the O'Reilly article, and cited it in the number 1 position in his 5-page bibliography for the "Study Protocol" document to show that the procedures of his invention should be considered to be safe. Because Dr. Min plainly

understood the great relevance of this reference to safety of his invention, it is beyond likely that Dr. Min also understood the great materiality of this reference to patentability of his invention. Within weeks after filing the "Study Protocol" document with the Independent Review Board, Dr. Min was sent a letter from patent counsel advising him of the need to inform the Patent and Trademark Office of material information. Indeed, the record before us makes clear that Dr. Min reasonably knew the importance of the "Study Protocol" document to patentability, because a copy of it went to patent counsel— but the document arrived without the bibliography and without the white-hot O'Reilly article. This is precisely a case where the white-hot materiality of this article makes it clear that intent to mislead may be inferred. The great materiality of this article imposed on Dr. Min a high duty of disclosure to the Patent and Trademark Office. This circumstance makes it hard for Dr. Min to argue that he failed to appreciate the legal significance of failure to disclose the O'Reilly article. Moreover, the law says that any failure on his part to appreciate the legal significance of failing to disclose it does not absolve him of the duty to disclose it. Indeed, having availed himself of the benefits of the patent system, he should not be permitted to ignore the critical duty of disclosing material prior art. He knew about the article, he used it to his advantage before the Independent Review Board; he was more than reckless in failing to disclose it to patent counsel and to the Patent and Trademark Office. This analysis is summarized in the table attached hereto as Exhibit 4.

## Conclusion

For the foregoing reasons, it is my opinion that (i) the O'Reilly reference was material to patentability of claim 9 of the Patent; (ii) ) the O'Reilly reference was required to be disclosed to the Patent and Trademark Office under 37 C.F.R. § 1.56; and (iii) the failure to disclose this reference to the Patent and Trademark Office was inequitable conduct in the prosecution of the Patent, by which reason the Patent should be held to be unenforceable.


Respectfully submitted,


Bruce D. Sunstein
Bromberg & Sunstein LLP
125 Summer Street, Suite 1110
Boston, MA 02110
Tel. (617) 443-9292
Fax  (617) 443-0004
bsunstein@bromsun.com

- 16 -

**Exhibits**

1. Curriculum Vitae of Bruce D. Sunstein

2. PubMed listing of articles by Dr. Min

3. Table: How Close is Cited and Uncited Prior Art to Claim 9 of Patent 6,398,777?

4. Table: Elements of Inequitable Conduct

125 SUMMER STREET  BOSTON MA 02110-1618

BROMBERG ✶ SUNSTEIN LLP

T 617 443 9292  F 617 443 0004  WWW.BROMSUN.COM

# BRUCE D. SUNSTEIN

## Curriculum Vitae

### *Legal Experience*

**Partner, Bromberg & Sunstein LLP** (1979-present).
*Co-founder of firm; Chair, Patent Practice Group*

*Intellectual property matters*: work in all phases, including licensing of, litigation concerning, and prosecution of applications for copyrights, trademarks, and patents. Strategic advice for development and enforcement of intellectual property rights and for the structure and implementation of technology-related business transactions. Patent prosecution matters involving electronic circuits, and systems, computer hardware and software, communications and speech, biopharma technologies, bioinformatics, as well as biomedical devices, optical, mechanical, and materials technologies. Contracts for licensing and development of computer software and acquisition and development of computer hardware. Copyright matters involving literary works, works of the performing and visual arts. Experience in related matters such as trade secrets, unfair competition, and antitrust law.

*General business matters*: work including formation and dissolution of partnerships and corporations, securities, tax research and planning, employment and consulting agreements, business acquisitions and financing, commercial and real estate transactions, and business litigation.

**Individual Practice, Boston** (1977-1979).

Intellectual property and general business practice as above.

ATTORNEYS AT LAW

**Associate, Cooper White & Cooper, San Francisco** (1973-1977).

*General business matters*: business formation, acquisition, and dissolution, blue sky and federal securities matters, taxation, secured and unsecured real and personal property transactions, employment agreements, newspaper syndication agreements, various antitrust and labor matters, and trust and estate matters.

*Intellectual property matters*: patent and trademark prosecution, assignments, and licensing, and all phases of copyright law.

## Academic Background

*Boalt Hall, University of California, Berkeley* (J.D. 1973).

*Indiana University* (M.A. English Literature 1969). Course work for Ph.D. completed; Teaching Associate, English Composition (1965-1969).

*Massachusetts Institute of Technology* (B.S. 1965). Concentration in applied mathematics and literature.

## Bar Admissions

California, 1973; Massachusetts, 1977; United States Patent and Trademark Office, 1974; United States District Court for the Northern District of California, 1973; United States District Court for the District of Massachusetts, 1978; United States Court of Appeals for the Ninth Circuit, 1973; First Circuit, 1978; Federal Circuit, 1982; United States Tax Court, 1977; and Supreme Court of the United States, 1977.

## Engineering Experience

Summer employment with Boeing-Vertol (1964), General Electric (1966), and General Atronics (1967), in areas of rotor design research (fluid mechanics), computerized optical design, and signal processing respectively.

*Professional Associations*

American Bar Association, Section of Business Law and Section of Intellectual Property Law (member, 1976-1979, Committee on Inventors); American Intellectual Property Law Association (member, 2003-2005, Program Committee); The Boston Patent Law Association (Chairman, 1979-1980, Committee on Invention Development); Licensing Executives Society; Patent Law Association of San Francisco (1975-1977; Chairman, 1976-1977, Committee on Anti-Trust and Licensing); Massachusetts Bar Association; Boston Bar Association; Bar Association of San Francisco (1974-1979); Lawyers for the Arts (1979-1983), an organization of the Artists Foundation, Boston; Authors Guild; and Institute of Electrical and Electronics Engineers.

*Lectures and Publications*

"Making Words Mean Just What We Choose Them to Mean: Patent Claim Interpretation in Light of *Phillips v. AWH*" (with Rebecca Hanovice), *Intellectual Property & Technology Law Journal,* Vol. 16, No. 12 (Dec. 2004); "When Lost Profits Are Lost: Damages in Patent Assertion on Litigation with an IP Holding Company" (AIPLA, May 2004, article and presentation); "Patent Portfolio Management and Technical Standard Setting: How to Avoid Loss of Patent Rights" (AIPLA, June 2002, article and presentation); "Competitive Intelligence in Patent Portfolio Building" (AIPLA, October 2002, article and presentation); "Building a Patent Portfolio for Strategic Advantage" (SMI conference, London, Jan. 2003, article and presentation); "IP Due Diligence and the Value Proposition: Developing and Evaluating BioPharma IP Portfolios for Strategic Investment Benefits", *The Journal of BioLaw & Business,* 2003, Vol. 6, No. 3, pp. 5-10; "Global Trademark Protection for Biotech and Life Science Companies: What It Takes to Get through the Trademark Thicket", *The Journal of BioLaw & Business,* 2001, Vol. 4, No. 4; "When Is It Safe to Tout Technology? Avoiding Unintended Patent Consequences Resulting from Premature Announcements", *The Journal of BioLaw & Business,* 2000, Vol. 3, No. 4, pp.47-50; "Recent Federal Case Undermines Multi-Filing Patent Strategies: A Routine Foreign Filing Trips Up a Patent Holder", *The Journal of Biolaw & Business,* 2000, Vol. 3, No. 4, pp. 43-46;. "Inventorship Disputes Vex Biotechnology Industry" *The Journal of Biolaw & Business,* 1998, Vol. 1, No. 4, pp. 39-41.

Chairman, *Intellectual Property Practice Basics,* program of Massachusetts Continuing Legal Education, Inc. (1995 - 2004); editor and contributor of work of same title; and contributor in programs including Fifth Annual New England Intellectual Property Conference (MCLE, 6/14/02; "Drafting Patent Applications After *Festo and Johnson & Johnston*" (MCLE Fifth Annual New England Intellectual Property Conference 6/14/02 [article and presentation]); *Intellectual Property Conference '98, Patent Litigation and Intellectual Property Rights on the Internet* (MCLE, 1998) ("Database Protection: When It Is Merely 'Sweat of the Brow' and When is Protection

Available?"); *Computer and Telecommunications Law Institute* (Boston Bar Association, 1995 and 1996); *Protecting Intellectual Property Assets* (MCLE, 1995, 1997 and 1998); *Corporate Operations* (MCLE, 1996); *Patenting Computer Software* (Licensing Executives Society, December 13, 1994); *Enforcing and Defending Intellectual Property Rights* (MCLE, November 30, 1994); *Basic Issues in Patent Law* (MCLE, February 24, 1994).

### Expert Testimony

*Truebro, Inc. v. Pumberex Specialty Products, Inc. et al.*, C.A. No. 11619 REK, D. Mass. (testimony given in 2003) Patent law expert for plaintiff in connection with patent infringement litigation concerning protective devices for under-sink plumbing in disability-equipped lavatories. Judgment of infringement with enhanced damages was awarded to plaintiff.

*Weiss v. Security Dynamics Technologies, Inc.* (now known as RSA Security, Inc.), AAA case 11160 31399, Boston, Massachusetts (testimony given in 2000-1). Patent expert for Mr. Weiss in connection with claim for patent rights (involving primarily computer and related security systems) against company he founded.

*Martin Annis et al. v. American Science and Engineering et al.*, C.A. No. 93-4889-A, Massachusetts Superior Court, Middlesex County. Testimony for American Science and Engineering for claim against Annis, the former president, for theft of trade secrets (involving x-ray cargo inspection systems) that were patented by Annis after conclusion of his employment by the company. Injunctions were issued against Annis. Brown Rudnick Freed & Gesmer, attorneys for American Science and Engineering.

*Bassil v. Finn*, C.A. No. 87-111, Massachusetts Superior Court, Suffolk County. Professional liability claim asserted against business lawyer for negligent handling of sale of business involving deferred payout and assumption of liabilities; deposition testimony provided for plaintiff concerning applicable standard of attorney conduct; case settled on terms favorable to plaintiff following deposition. George F. Gormley, Cambridge, Massachusetts, attorney for plaintiff.

### Arbitrator

Member of a panel of arbitrators (including Ralph Oman, former Register of Copyrights of Dechert, Price & Rhoades, Washington, D.C. and Kenneth M. Kaufman of Davis Wright Tremain, Washington, D.C.) for AAA case No. 11 133 00519 99, Information Mapping, Inc. and Performance Technology Association, Inc., involving a claim for copyright infringement. Matter settled following involvement of the panel.

00002/BDS  204234.2

Entrez PubMed

**NCBI**    **PubMed**    National Library of Medicine NLM

My NCBI
[Sign In] [Register]

| All Databases | PubMed | Nucleotide | Protein | Genome | Structure | OMIM | PMC | Journals | Books |

Search PubMed    for Min rj    Go    Clear    Save Search

Limits    Preview/Index    History    Clipboard    Details

Display Summary    Show 20    Sort by    Send to

All: 12    Review: 3

Items 1 - 12 of 12                                                                                    One page.

☐ **1:** Min RJ, Khilnani NM.                                                    Related Articles, Links

Re: Cutaneous thermal injury after endovenous laser ablation of the great saphenous vein.
J Vasc Interv Radiol. 2005 Apr;16(4):564; author reply 564-5. No abstract available.
PMID: 15802464 [PubMed - in process]

☐ **2:** Andrews RT, Spies JB, Sacks D, Worthington-Kirsch RL, Niedzwiecki GA, Marx MV, Hovsepian DM, Miller DL, Siskin GP, Raabe RD, Goodwin SC, Min RJ, Bonn J, Cardella JF, Patel NH; Task Force on Uterine Artery Embolization and the Standards Division of the Society of Interventional Radiology.                                                    Related Articles, Links

Patient care and uterine artery embolization for leiomyomata.
J Vasc Interv Radiol. 2004 Feb;15(2 Pt 1):115-20. Review. No abstract available.
PMID: 14963177 [PubMed - indexed for MEDLINE]

☐ **3:** Min RJ, Khilnani NM.                                                    Related Articles, Links

Endovenous laser treatment of saphenous vein reflux.
Tech Vasc Interv Radiol. 2003 Sep;6(3):125-31.
PMID: 14614697 [PubMed - indexed for MEDLINE]

☐ **4:** Khilnani NM, Min RJ.                                                    Related Articles, Links

Duplex ultrasound for superficial venous insufficiency.
Tech Vasc Interv Radiol. 2003 Sep;6(3):111-5.
PMID: 14614694 [PubMed - indexed for MEDLINE]

☐ **5:** Min RJ, Khilnani NM, Golia P.                                          Related Articles, Links

Duplex ultrasound evaluation of lower extremity venous insufficiency.
J Vasc Interv Radiol. 2003 Oct;14(10):1233-41. Review.
PMID: 14551269 [PubMed - indexed for MEDLINE]

☐ **6:** Min RJ, Khilnani N, Zimmet SE.                                         Related Articles, Links

Endovenous laser treatment of saphenous vein reflux: long-term results.
J Vasc Interv Radiol. 2003 Aug;14(8):991-6.
PMID: 12902556 [PubMed - indexed for MEDLINE]

About Entrez
Text Version
Entrez PubMed
Overview
Help | FAQ
Tutorial
New/Noteworthy
E-Utilities
PubMed Services
Journals Database
MeSH Database
Single Citation Matcher
Batch Citation Matcher
Clinical Queries
Special Queries
LinkOut
My NCBI (Cubby)
Related Resources
Order Documents
NLM Catalog
NLM Gateway
TOXNET
Consumer Health
Clinical Alerts
ClinicalTrials.gov
PubMed Central

Entrez PubMed

☐ 7: <u>Zimmet SE, Min RJ.</u>                                          Related Articles, Links

Temperature changes in perivenous tissue during endovenous laser treatment in a swine model.
J Vasc Interv Radiol. 2003 Jul;14(7):911-5.
PMID: 12847199 [PubMed - indexed for MEDLINE]

☐ 8: <u>Forrestal MD, Fronek HS, Isaacs MN, Min RJ, Todd KL 3rd, Zimmet SE.</u>                                          Related Articles, Links

Endovenous laser treatment.
Dermatol Surg. 2003 Mar;29(3):312-3; author reply 313-4. No abstract available.
PMID: 12614433 [PubMed - indexed for MEDLINE]

☐ 9: <u>Min RJ, Khilnani NM.</u>                                          Related Articles, Links

Lower-extremity varicosities: endoluminal therapy.
Semin Roentgenol. 2002 Oct;37(4):354-60. Review. No abstract available.
PMID: 12455132 [PubMed - indexed for MEDLINE]

☐ 10: <u>Min RJ, Zimmet SE, Isaacs MN, Forrestal MD.</u>                                          Related Articles, Links

Endovenous laser treatment of the incompetent greater saphenous vein.
J Vasc Interv Radiol. 2001 Oct;12(10):1167-71.
PMID: 11585882 [PubMed - indexed for MEDLINE]

☐ 11: <u>Navarro L, Min RJ, Bone C.</u>                                          Related Articles, Links

Endovenous laser: a new minimally invasive method of treatment for varicose veins--preliminary observations using an 810 nm diode laser.
Dermatol Surg. 2001 Feb;27(2):117-22.
PMID: 11207682 [PubMed - indexed for MEDLINE]

☐ 12: <u>Min RJ, Navarro L.</u>                                          Related Articles, Links

Transcatheter duplex ultrasound-guided sclerotherapy for treatment of greater saphenous vein reflux: preliminary report.
Dermatol Surg. 2000 May;26(5):410-4; discussion 413-4.
PMID: 10816225 [PubMed - indexed for MEDLINE]

| Display | Summary | Show | 20 | Sort by | Send to |
|---------|---------|------|-----|---------|---------|

Write to the Help Desk
NCBI | NLM | NIH
Department of Health & Human Services
Privacy Statement | Freedom of Information Act | Disclaimer

http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?CMD=search&DB=pubmed (2 of 2)6/19/2005 9:21:00 AM

**Exhibit 3**
**How Close is Cited and Uncited Prior Art**
**to Claim 9 of Patent 6,398,777?**

| Limitation of Claim 9: | Counterpart in Trelles reference of Record? | Counterpart in Goldman of Record? | Counterpart in the uncited article by O'Reilly et al.? |
|---|---|---|---|
| *Inserting means for emitting laser energy into the blood vessel* | No. Inserted under the vessel Abstract and col. 2, lines 60-62 | Yes. | Yes. Passim. |
| *Said emitting means has a laser emitting section (fiber optic line with an uncoated tip at end)* | Almost yes, but side firing and not at end of probe. Col. 2, lines 33-54. | No, because light from the optical fiber is focused through a needle at the tip. Col. 3, lines 16-45. | Yes. P. 778, col. 1. |
| *Placing laser emitting section of emitting means into intra luminal contact with the blood vessel at a treatment site (including drainage of blood and compression of vein)* | No. | Almost, but no recited contact with the blood wall and used only for the purpose of clotting. Col. 4, lines 1-13, and Fig. 3. | Almost yes, but no recited use of compression, although effect likely present, since blood vessels here are small. |
| *Emitting laser energy into the blood vessel through the laser emitting section of the emitting means* | No, not from within blood vessel. | Yes. | Yes. P. 778, col. 2. |
| *Thereby decreasing the diameter of the blood vessel* | Yes. | No, not really. Forms clot killing off circulation and thereafter leading to shrinkage, but not the direct result of laser energy. Col. 4, lines 51-55; col. 2, lines 49-55. | Yes. P. 778, col. 2 (occlusion). And no clotting. P. 778, col. 3. |
| **Totals** | No=3, Yes=1, Almost=1 | No=2, Yes=2, Almost=1 | Yes=4, Almost=1 |

**Exhibit 4**

**Elements of Inequitable Conduct**

|   | Element | Conduct |
|---|---------|---------|
| 1 | *information exists that is material* | O'Reilly reference is white hot (see Exhibit 3) |
| 2 | *applicant knew of this information and that it was material* | Used by Dr. Min as lead reference in a 5-page list of references in a filing to show safety of the procedure of the invention to the IRB |
| 3 | *applicant failed to disclose the information with the intent to mislead the PTO* | Applicant was informed of disclosure duty by letter from counsel. Counsel received IRB filing but without 5-page list of references. Intent may be inferred where applicant knew, or should have known, that withheld information could be material. Failure to appreciate legal significance of the facts that it failed to disclose does not absolve applicant of its duty to disclose. When reference is highly material, less intent to mislead need to be shown, and this reference is white hot. |