UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIOMED, INC. | Civil File No. 104-CV-10444-(RGS) |
| Plaintiff, | |
| v. | |
| VASCULAR SOLUTIONS, INC. | |
| Defendant. | |

**and**

| | |
|---|---|
| DIOMED, INC., | Civil Action No. 04-CV-10019 (RGS) |
| Plaintiff, | |
| v. | |
| ANGIODYNAMICS, INC., | |
| Defendant. | |

**ANGIODYNAMICS, INC.'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,398,777**

**I.    PRELIMINARY STATEMENT**

AngioDynamics, Inc. ("AngioDynamics") submits this reply in response to Diomed Inc.'s ("Diomed's") Opposition to Defendants' Motion for Partial Summary Judgment of Non-Infringement. This memorandum specifically addresses the arguments set forth in Diomed's opposition memorandum, which arguments misstate the undisputed facts, misapply the law and completely ignore this Court's claim construction.

Perhaps most telling in Diomed's opposition is its attempt to focus the Court on the concept of "contact" completely outside of the context in which the term was given meaning by the Court in its claim construction. As Diomed knows full well, the Court's claim construction requires "**deliberately** putting the uncoated tip of the fiber optic line in physical contact with the

1

blood vessel wall." (Memorandum and Order on Claims Construction dated April 12, 2005 at p. 11) (emphasis added). The Court further construed the patent as requiring "the **maintaining** of the tip-interior surface in physical contact of the vessel wall while laser energy is emitted to decrease the diameter of the blood vessel." (Id. at pp. 12-13) (emphasis added). Despite this, Diomed's opposition, astonishingly, does not (except in one heading) even mention the words deliberate or deliberately. Furthermore, Diomed addresses the issue of maintaining contact in a single sentence without a single reference to any evidence in the record or the Court's claim construction ruling. (Diomed Opposition at p. 9).

As more fully set forth below, only by eliminating these limitations from the claims, can Diomed hope to avoid summary judgment of non-infringement. The undisputed evidence and the correct application of the law result in the undeniable conclusion that AngioDynamics neither teaches nor induces others to cause deliberate and maintained contact between the bare tip of the fiber and the vessel wall. Nor does such contact occur in procedures as taught by AngioDynamics.

Furthermore, Diomed fails to address that under its unduly broad assertion of claim scope the patent is invalid for failure to comply with the written description requirement of 35 U.S.C. § 112. The '777 specification and file history are unambiguously limited in their teachings of drainage and compression, and do not teach or suggest any form of drainage and compression other than by elevation of the leg, application of a compression bandage, and manual compression. In addition, the '777 file history discloses that the use of tumescent anesthesia alone is not enough to insure the contact essential to the invention. Accordingly, AngioDynamics' use of tumescent anesthesia alone cannot be held to infringe the patent, and AngioDynamics should be granted summary judgment of non-infringement.

II. **ARGUMENT**

    A. **Diomed Has Produced No Evidence Of Deliberate Maintained Contact During An Endovenous Laser Procedure Following AngioDynamics' Teachings.**

Diomed repeatedly claims that the evidence in this case is "overwhelming" that "endovenous laser procedures result in contact between the fiber tip and the vein wall." (Diomed Opposition at p. 2). Of course, merely saying so does not make it so. In fact, the evidence relied upon by Diomed does not in any way prove that the required contact occurs during an AngioDynamics' procedure.[1] In particular, Diomed's reliance on the evidence it cites is misplaced for the following reasons:

- Physical Manifestations of Contact – None of the evidence of vein wall carbonization, perforation and ablative trenching is from AngioDynamics' procedures. Consequently, they provide no evidence of any contact, let alone deliberate or maintained contact, during an AngioDynanamics procedure. Furthermore, the undisputed testimony of AngioDynamics' expert, Dr. Proebstle, and Diomed's expert, Dr. Anderson, is that such carbonization can occur without direct contact between the laser-emitting section of the fiber and the vein wall. (Proebstle Declaration at ¶ 27; Bright Exhibit 2 at pp. 135-136).

- Ultrasound Photographs from Dr. Kabnick – A plain look at the photographs upon which Diomed relies specifically shows that the sheath in which the much smaller fiber is located is removed from the vein wall. (Radar Exhibit 33; Kabnick Declaration at ¶ 23; Golan Declaration at ¶11; Bright Exhibit 6 at p. 110). These photographs certainly do not show that the laser-emitting section of the fiber is in contact with the vein wall. And it is impossible to conclude that they show deliberate and maintained contact between the laser-emitting section of the fiber and the vein wall.

- Ultrasound Video from Dr. Kabnick – The video segment upon which Diomed relies actually shows the laser-emitting section of the fiber not in contact with the vein wall, but instead firing in the blood. (Min Exhibit 10 at 36:05-36:16; Kabnick Declaration at ¶14). It certainly does not show that, if any such contact existed (which it did not), that it was maintained during laser firing.

---

[1] It appears that Diomed's choice of words is deliberately imprecise. In the quote above, Diomed does not say what part of the fiber tip comes into contact with the vein wall. The Court's claim construction requires that it be the laser-emitting section of the fiber that comes into contact with the vein wall. Second, Diomed does not say that the resulting contact is either deliberate or maintained, as required by the Court's claim construction. Third, Diomed does not say that the evidence establishes that endovenous laser procedures performed as taught by AngioDynamics result in the required contact.

3

- Ultrasound Video Provided by Defendants' Experts – These videos provide perhaps the best evidence that deliberate and maintained contact does not occur during a procedure performed pursuant to AngioDynamics' teachings. (Proebstle Declaration at ¶ 10; Samson Declaration at ¶ 8). For example, Dr. Min could point to just two single moments of contact in two out of the six procedures performed by Dr. Samson. (Samson Declaration at ¶ 13). These videos provide no evidence of deliberate and maintained contact during an AngioDynamics procedure.

- Laboratory Experiments of Drs. Fan and Navarro – These experiments do not replicate in any way an actual endovenous laser procedure as taught by AngioDynamics. (Proebstle Declaration at ¶ 50-66). In fact, one of Dr. Fan's experiments actually shows that significant vein wall damage, including perforations, can be caused even in the absence of contact between the laser-emitting section of the fiber and the vein wall. (Proebstle Declaration at ¶ 51; Proebstle Exhibit I).

Based on the above, AngioDynamics' statement that Diomed has failed to produce any evidence that proves deliberate and maintained contact between the laser-emitting section of the fiber and the vein wall during the procedure as taught by AngioDynamics is 100% accurate.

**B.   AngioDynamics' Procedure Is Different Than That Taught In The '777 Patent Or As Practiced By Diomed's Witnesses.**

In an effort to avoid this utter lack of evidence, Diomed claims that it does not need evidence regarding the AngioDynamics' procedure because every endovenous laser procedure is "performed the same way." (Diomed Opposition at p. 3). Of course, the undisputed evidence proves just the opposite.

As noted in AngioDynamics' Opening Brief, AngioDynamics goes to great lengths to teach physicians to avoid contact between the laser-emitting section of the fiber and the vein wall. (AngioDynamics' Opening Brief at pp. 8-9). Diomed provides no such teaching. Instead, Diomed instructs physicians to take steps, like placing the patient in the Trendelenburg (head down/leg up) position, to ensure that blood is drained from the vein prior to the procedure being

performed. It is undisputed that AngioDynamics instructs its physicians to place the patient in a Reverse Trendelenburg (head up/leg down) position. (Bright Exhibit 11).

Furthermore, the first named inventor on the '777 patent, and one of Diomed's experts, Dr. Luis Navarro, has testified that consistent with the teachings of the patent, he regularly uses external hand compression during the endovenous laser procedure. (Bright Exhibit 1 at pp. 526-527). It is undisputed that AngioDynamics explicitly instructs its physicians to avoid any such manual compression. (Kabnick Declaration at ¶ 21; Golan Declaration at ¶ 21; Bright Exhibit 6 at pp. 155-156).

Furthermore, each of the witnesses upon which Diomed relies, Drs. Fan, Navarro and Min, all testified that they inject tumescent anesthesia under ultrasound guidance until they can see the lumen of the vein completely obliterated and the vein wall collapsed onto the tip of the laser fiber. (AngioDynamics Opening Brief at 9). It is undisputed that AngioDynamics does not teach this method of applying tumescent anesthesia. (Id.). It is further undisputed that its doctors do not apply tumescent anesthesia in this manner. (Golan Declaration at ¶ 9; Kabnick Declaration at ¶ 13; Bright Exhibit 6 at pp. 160-161).

Consequently, there is a world of difference between how the procedure is performed following AngioDynamics' teachings versus Diomed's teachings.

C.  **Diomed Misstates and Misapplies The Law Regarding Non-Infringing Uses.**

Because, as noted above, the evidence is clear that AngioDynamics' products can be used in a non-infringing manner, i.e., without contact between the laser-emitting section of the fiber and the vein wall, Diomed suggests that AngioDynamics would nonetheless be liable for inducing infringement if its products <u>could</u> be used in an infringing manner. In doing so, Diomed misstates the law as it applies to claims of inducement. First, two of the three cases upon which Diomed relies were not in fact inducement cases. <u>Hilgraeve Corp. v. Symantec</u>

5

Corp., 265 F.3d 1336 (Fed. Cir. 2001) and Bell Communications Research Inc. v. Vitalink Communications Corp., 55 F.3d 615 (Fed. Cir. 1995) both involved claims of direct infringement. In both cases the court did nothing more than state the general patent law that a product that sometimes infringes a patent is an infringing product.[2] In fact, Diomed has completely ignored the well-established law cited by AngioDynamics in its opening brief that where a manufacturer prescribes only a non-infringing use for its products, it can not be liable for inducing infringement. (AngioDynamics Opening Brief at p. 14).[3]

Finally, Diomed places great reliance on Cross Medical Products Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293 (Fed. Cir. 2005). In doing so, Diomed misstates the procedural posture of the case and ignores key differences between the "contact" at issue in that case and the deliberate and maintained contact which is at issue in this case. First, Cross Medical was not brought to the Federal Circuit on the denial of Medtronic's motion for summary judgment of non-infringement, as Diomed suggests. (Diomed Opposition at p. 5). Instead, the primary focus of the appeal was the trial court's granting of summary judgment of infringement against Medtronic. Thus, the primary focus of the Federal Circuit's opinion was whether there was sufficient evidence that warranted a reversal of the trial court's granting of summary judgment. The Court found, based on the evidence Diomed likens to AngioDynamics' evidence,

---

[2] Diomed's reliance on a single quote from Hilgraeve is misplaced for two reasons. First, it is merely dicta in a case that did not involve a claim of inducing infringement. Second, the court specifically said that non-infringing uses would not save a defendant from a claim of inducement if those non-infringing uses occurred in "unusual circumstances." In this case, the procedure as taught by AngioDynamics is not "an unusual circumstance." It is also not a theoretical use as suggested by Diomed. The procedure as taught by AngioDynamics, which involves no deliberate or maintained contact between the laser-emitting section of the fiber and the vein wall, is the usual way the procedure is performed.

[3] The third case relied upon by Diomed, Phillips Electronics North America Corp. v. Contact Corp., F. Supp. 2d, 2006 WL4434 (D. Del. Jan. 9, 2006), while an inducement case, involved no discussion of inducement. Instead, the court focused on the fact that the defendant admitted that its product when used by customers infringed the patent and the defendant provided instructions on "how to use the patented method." Id. at 3. Those facts are in stark contrast to this case where the undisputed evidence proves that AngioDynamics explicitly instructs away from the patented method.

6

that the trial court erred in granting summary judgment.[4] On the issue of Medtronic's motion for summary judgment of non-infringement, the Federal Circuit said nothing more than that the denial of that summary judgment motion was within the discretion of the trial court and that the court could not reverse that finding under the abuse of discretion standard. 424 F.3d at 1324.

Thus, the task of the Federal Circuit in Cross Medical was much different than the task before this Court. Unlike the Federal Circuit, here the Court must decide whether Diomed has presented sufficient evidence to create a material issue of fact as to whether AngioDynamics induces others to cause and maintain deliberate contact between the laser-emitting section of the fiber and the vein wall during an endovenous laser procedure. Diomed has not.

Furthermore, the issue in Cross Medical was whether any contact occurred during the procedure. That is not the issue here. In this case, in order to avoid summary judgment of non-infringement, Diomed must have evidence of <u>deliberate</u> and <u>maintained</u> contact occurring during an AngioDynamics procedure. As stated above, no such evidence exists. While incidental or occasional contact may have been sufficient in the Cross Medical case, it is clearly not sufficient here.

### D. AngioDynamics Has Never Admitted That Deliberate And Maintained Contact Occurs During Its Procedures.

Lacking any evidence to support its claim that deliberate and maintained contact occurs during an AngioDynamics procedure, Diomed resorts to misstating and taking out of context statements made by AngioDynamics' physician trainers. For example, Diomed claims that Dr. Lowell Kabnick teaches physicians that in an AngioDynamics procedure tumescent anesthesia is used to "'<u>achieve better vein wall contact</u>' with the fiber tip." (Diomed Opposition at p. 6) (emphasis in original). Diomed knows that this is not what Dr. Kabnick said. In fact, the

---

[4] If anything, the decision in Cross Medical provides clear guidance as to why this Court should deny Diomed's Motion for Summary Judgment of Infringement.

7

presentation slide to which Diomed refers has nothing to do with the laser procedure and makes no reference to the "fiber tip." The quote actually refers to "catheter electrodes" which are used only during the radiofrequency ("RF") procedure, which requires vein wall contact. (Kabnick Declaration at ¶¶ 19-20). Similarly, Diomed's attempted reliance on the out of context statements of other physicians is misplaced. The reasons for this are fully detailed in AngioDynamics' Memorandum in Opposition to Diomed's Motion for Summary Judgment of Infringement and the sworn testimony of the individuals who made the statements. (AngioDynamics Memo in Opp. at pp. 8-9; Bright Exhibit 6 at pp. 160-161; Sichlau Declaration at ¶ 4; Appling Declaration).

### E. AngioDynamics' Recommendation To Use Tumescent Anesthesia Does Not Provide Circumstantial Evidence Of Deliberate Contact.

Recognizing that there is no actual evidence of deliberate and maintained contact between the laser-emitting section of the fiber in the vein wall during an AngioDynamics procedure, Diomed claims that there is circumstantial evidence to support its claim. The only circumstantial evidence to which Diomed refers is AngioDynamics' recommendation that physicians use between 100 and 200 ccs of tumescent anesthesia and that in doing so they create a 10 mm "wheel" of tumescent fluid around the vein. (Diomed Opposition at pp. 8-9).[5] The linchpin to this argument is the claim that injection of these amounts of tumescent anesthesia in this manner will necessarily, without additional steps, result in contact between the laser-emitting section of the fiber and the vein wall. As set forth in AngioDynamics' Opening Brief and in its Opposition to Diomed's Motion for Summary Judgment of Infringement, the undisputed evidence proves that the foundation for Diomed's circumstantial evidence claim is missing.

---

[5] AngioDynamics' Instructions for Use included an instruction to create a 10 mm wheel only during a limited period of time between March and December 2005. (AngioDynamics' Memo in Opp. at p. 17, footnote 7; Bright Exhibit 11).

8

(AngioDynamics' Opening Brief at pp. 8-9; AngioDynamics Memo in Opp. at pp. 17-18). Even Dr. Fan, upon whom Diomed places primary reliance, acknowledged in her expert report and at her deposition that even in a "Post-Tumescent" state there can be space between the laser-emitting section of the fiber and the vein wall. (Bright Exhibit 4 at pp. 200-201; Bright Exhibit 5).

The cases relied upon by Diomed do not change this conclusion. In each of those cases, following the instructions <u>necessarily</u> led to infringement of the patent in question. As noted above, that is not the case here.[6]

### F. Diomed Completely Ignores The Requirement That Contact Be Maintained While The Laser Is Firing During The Procedure.

Diomed does not even attempt to claim that there is any evidence that contact between the laser-emitting section of the fiber and the vein wall is maintained during the AngioDynamics procedure. Instead, it makes a one sentence claim, unsupported by any evidence, the Court's claim construction, or the language of the patent, that all that is required is that "the fiber tip maintain contact with the vein wall during a sufficient portion of the procedure to result in reduction of the vein's diameter (thereby achieving a clinically effective treatment)." (Diomed Opposition at p. 9). Diomed never attempts to specifically state what constitutes a "sufficient portion." In doing so it ignores this Court's claim construction and the language of the patent which requires that the contact be maintained as the laser fiber is withdrawn. (AngioDynamics' Memo in Opp. at pp. 25-26). In any event, Diomed offers <u>absolutely no evidence</u> that contact is maintained over a sufficient portion of the vein during an AngioDynamics procedure. Certainly,

---

[6] Furthermore, while one may infer in the absence of evidence to the contrary that physicians would follow the AngioDynamics' Instructions for Use, the undisputed evidence here, both from AngioDynamics and Diomed, is that physicians do not follow Instructions for Use when performing the endovenous laser procedures. (AngioDynamics Memo in Opp. at p. 25, footnote 9).

9

the isolated moments of contact Dr. Min claims to see in the Samson video are not sufficient. Without any such evidence, AngioDynamics is entitled to summary judgment.

### G. Because AngioDynamics' Procedure Is Performed In A Non-Infringing Manner, AngioDynamics Does Not Contributorily Infringe The Patent.

AngioDynamics can only be liable for contributory infringement if there are no non-infringing uses for its products. (AngioDynamics Memo. In Opp. at p. 18). As set forth above, there is a very clear non-infringing use for AngioDynamics' products. They can be and are used regularly in endovenous laser procedures without deliberate and maintained contact between the laser-emitting face of the fiber and the vein wall. Consequently, AngioDynamics is entitled to a summary judgment that it does not contribute to infringement of the '777 patent.

### H. AngioDynamics Does Not Induce Infringement Because It Specifically Instructs Against Deliberate And Maintained Contact Between The Laser-Emitting Section Of The Fiber And The Vein Wall.

As set forth in AngioDynamics' Opening Brief, the undisputed evidence shows that AngioDynamics repeatedly and consistently instructs physicians to avoid contact between the laser-emitting section of the fiber and the vein wall. Diomed suggests that these instructions are ineffectual because they do not explain how to avoid such contact.

The answer is really quite simple. One would not use manual compression and would not inject tumescent anesthesia watching to make sure that the vein lumen is obliterated and that the vein wall has collapsed onto the fiber tip. It is undisputed that it is absolutely possible to inject tumescent anesthesia in the amounts suggested by AngioDynamics and not achieve contact between the laser-emitting section of the fiber and the vein wall. No further instruction on how to avoid contact is necessary.

The only evidence Diomed can point to to suggest an intent to achieve the required contact is AngioDynamics' recommendation to use tumescent anesthesia. As noted above

though, tumescent anesthesia can be used in a manner that does not result in deliberate and maintained contact between the laser-emitting section of the fiber and the vein wall. Because tumescent anesthesia can be used in such a way, Diomed cannot show that AngioDynamics has the specific intent to induce others to infringe the '777 patent. (AngioDynamics' Opening Brief at 17).[7]

Furthermore, the cases relied upon by Diomed that mere labeling is not sufficient to avoid summary judgment have little applicability here. Unlike the cases cited by Diomed, this is not a case where, but for the warning given, infringement would necessarily occur. In this case, there is no evidence that deliberate and maintained contact would necessarily occur during an AngioDynamics procedure. In addition, each of those cases involved a single label or warning on its otherwise infringing product. Here, AngioDynamics has instructed physicians in its Instructions for Use, Physicians Training Video and in training seminars to heat blood and not contact the vein wall with the laser-emitting section of the fiber. It does so not merely to avoid infringing the patent, but because the scientific literature confirms that that is exactly how the procedure works. (Proebstle Declaration at ¶ 16; Proebstle Exhibits A through E).

Diomed attempts to buttress its reading of the cases on which it relies by pointing to an excerpt it lifts from the Fed. Cir. Bar Association's Model Patent Jury Instruction 8.12.1. Diomed's failure to include the remainder of that instruction is telling. When read in its entirety, the instruction only reinforces the fact that Diomed has presented no evidence from which a

---

[7] Diomed's car analogy is not apt because the steps set forth in the analogy would necessarily cause the car to move forward. As set forth above though, the undisputed evidence is clear that the use of tumescent anesthesia, without additional steps, does not necessarily cause deliberate and maintained contact between the laser-emitting section of the fiber and the vein wall. In fact, AngioDynamics disputes whether it is even possible to get such contact by only using tumescent anesthesia. (Proebstle Declaration at ¶¶ 48-49). A more apt analogy would be one that included all of the steps identified by Diomed but said "avoid traveling at 50 mph." While taking the steps identified by Diomed could result in a car traveling over 50 mph, it is entirely possible to take those steps and still avoid going that fast by simply applying less gas. In this case, a physician can avoid achieving contact between the laser-emitting section of the fiber and the vein wall by simply applying less tumescent anesthesia.

reasonable jury could conclude that AngioDynamics induces infringement of the '777 patent. The instruction requires, prior to a conclusion of inducement of infringement, that plaintiff show: 1) "defendant encouraged or instructed another person how to use a product or perform a process in a manner" that a jury finds infringes the patent claims; and 2) that defendant knew of the patent; and 3) that defendant knew or should have known that his encouragement or instructions would likely result in the other person doing that which the jury finds to be an infringement; and 4) the other person actually did infringe the patent. "If and only if, you are persuaded of each of these four things may you find that defendant induced patent infringement." Id.

As one might expect, this instruction is entirely consistent with the Federal Circuit's statements on what intent must be proven to make out a case of inducement. In Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990), the court held that inducing infringement required not only that the alleged infringer "intended to cause the acts that constitute infringement" but also that he "knew or should have known that his actions would induce actual infringement." In this case, the undisputed evidence shows that the only element for which there is any evidence is that AngioDynamics knew about the patent. There is certainly no evidence that AngioDynamics intends that physicians achieve deliberate and maintained contact during its procedures.[8]

---

[8] Diomed places great emphasis on the fact that AngioDynamics at one point considered and decided not to pursue a centering device that would prevent any contact between the fiber and the vein wall. (Diomed Opposition at pp. 10-11). As set forth in Mr. Appling's Declaration, the centering device was considered only if any contact between the fiber and the vein wall needed to be avoided. Such a centering device was not therapeutically necessary. Once it was confirmed for AngioDynamics that the patent required deliberate and maintained contact, AngioDynamics decided not to pursue a centering device because it knew that its procedure involved neither deliberate nor maintained contact. (Appling Declaration at ¶¶ 14-16). It is for this same reason that Diomed's reliance on any negotiation between AngioDynamics and some of the inventors of the '777 patent over a potential license is misplaced. Those negotiations, which were initiated by the inventors, took place before AngioDynamics had developed its products or received the non-infringement opinion from outside counsel. (Hobbs Deposition at pp. 107-113 (attached hereto as Exhibit1); Appling Exhibit B). After receiving the opinion from outside counsel, AngioDynamics correctly concluded that it was not practicing the invention and no license was required. (Hobbs Deposition at pp. 124-131).

Finally, Diomed's statement of the intent requirement for inducement, with which AngioDynamics agrees, does not help Diomed. As Diomed notes, it must prove an "actual intent to cause the acts which constitute the infringement." (Diomed Opposition at p. 12). In this case, the acts which constitute the infringement are deliberate and maintained contact between the laser-emitting section of the fiber and the vein wall. Consequently, Diomed must have some evidence that AngioDynamics intends to cause such contact. As noted above, no such evidence exists. In fact, the undisputed evidence is to the contrary. Consequently, AngioDynamics is entitled to summary judgment.

### I.   Diomed Fails To Address The Fact That Under Its Unduly Broad Assertion Of Claim Scope The Patent Is Invalid For Failure To Comply With The Written Description Requirement Of 35 U.S.C. § 112.

Contrary to Diomed's assertion, AngioDynamics is not attempting "to reargue claim construction" or advance "a new and unfounded position". (Diomed's Reply at p. 16). Rather, AngioDynamics is only requesting the Court to clarify what is inherent in its Markman Ruling. To the extent it is necessary for the Court to supplement its claim construction, the Court is free to do so at any time. See, e.g., Adv. Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 2000 U.S. Dist. LEXIS 7201 (S.D. Ind. Feb. 9, 2000), rev'd on other grounds, 261 F.3d 1329 (Fed. Cir. 2001).

At the time of the Markman briefing, AngioDynamics understood the claim limitations of drainage and compression to mean the type disclosed and enabled by the '777 specification, i.e., by elevation of the leg, application of a compression bandage and manual compression. However, following the Markman briefing, Diomed asserted for the first time that the use of tumescent anesthesia itself satisfies these limitations. As a result of Diomed's post-Markman contention there is an ambiguity in the Court's claim construction that must be resolved, i.e., whether the limitations of "drainage and compression" can be any type of drainage and

13

compression regardless of whether taught or enabled by the specification, or whether these limitations must be properly limited to the scope of the '777 specification. If this ambiguity is not resolved, and in the unlikely event the Court were to adopt Diomed's overly broad assertion of claim scope, the claims would be invalid for failure to comply with the written description requirement and summary judgment of invalidity should be granted in favor of AngioDynamics.[9]

In Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1474 (Fed. Cir. 1998) the patent concerned "a unit of a sectional sofa in which two independent reclining seats ('recliners') face in the same direction." The defendant argued that the claims in which "the location of the recliner controls is not limited to the console" were invalid for failure to satisfy the written description requirement. Similar to Diomed's argument here, the patentee claimed that "the disclosure represented only [its] preferred embodiment, in which the controls are on the console, and therefore supports claims directed to a sofa in which the controls may be located elsewhere." Id. at 1478. The Federal Circuit rejected this argument finding there was no description or support whatsoever for the claimed feature, the controls, being located anywhere other than on a console. Id. at 1479-80 ("Sproule's disclosure unambiguously limited the location of the controls to the console."). Accordingly, the claims in which the location of the controls was not limited to the console were held invalid.

Similarly, in Tronzo v. Biomet, Inc., 156 F.3d 1154 (Fed. Cir. 1998) the patent concerned a cup implant for insertion into a hip bone. The Federal Circuit held that the patent disclosure was limited to "only conical shaped cups and nothing broader", and therefore the patent failed to

---

[9] This is precisely the type of ambiguity that the court referred to in Phillips v. AWH Corp., 415 F.3d 1303, 1326 (Fed. Cir. 2005) (en banc) (the court stated that construing claims to preserve their validity is proper when ambiguity persists even after claim construction). Diomed's argument that any ambiguity in the terms "drainage and compression" cannot be resolved because these terms do not appear in the claim itself is a red herring. These terms define the claim language, and thus any ambiguity in these terms is an ambiguity in the claim language itself.

provide the written description necessary to support the "generic claims as to the shape of the cup". Id. at 1158-59.

In Lizardtech, Inc. v. Earth Resource Mapping, Inc., 424 F.3d 1336, 1345 (Fed. Cir. 2005), Reh'g en banc denied, 433 F.3d 1373 (Fed. Cir. 2006) the claim was "directed to creating a seamless array of DWT coefficients generically." The court found that the specification "is directed at describing a particular method for creating a seamless DWT, . . . and it teaches only that method of creating a seamless array." Id. The Federal Circuit held "that the description of one method for creating a seamless DWT does not entitle the inventor of the '835 patent to claim any and all means for achieving that objective." Id. at 1346. Accordingly, the court held the claims not limited to the particular method disclosed invalid for failure to comply with the written description requirement.

Gentry Gallery, Tronzo, and Lizardtech dictate that the '777 claims must be limited to the specific type of drainage and compression disclosed, and if not, that the claims be held invalid for failure to comply with the written description requirement of § 112. The '777 specification and prosecution history do not describe or support in any way Diomed's assertion that the claimed drainage and compression can be any type, such as that purportedly caused by the use of tumescent anesthesia alone. Rather, the '777 specification and prosecution history are unambiguously limited in their teachings of "drainage and compression" to elevation of the leg, application of a compression bandage, and manual compression. Further, there is no teaching or suggestion whatsoever in the '777 specification or file history that the disclosed drainage and compression can be eliminated and replaced by the use of tumescent anesthesia as asserted by Diomed. Nor does the '777 specification enable one of ordinary skill how to use tumescent anesthesia only to achieve the drainage and compression necessary to insure the contact essential

to the invention.[10] To the contrary, the '777 specification and file history teach that even if tumescent anesthesia is used, it is nevertheless necessary to drain and compress by elevating the leg, applying a compression bandage, and manual compression to "insure" the "direct contact" of the invention.

Diomed fails to address the fact that under its asserted claim scope the '777 patent is invalid under § 112, much less point to any disclosure in the '777 specification or file history to support its asserted claim scope. The following undisputed facts dictate a finding that if the claims are applied as broadly asserted by Diomed they are invalid for failure to comply with the written description requirement. Diomed has failed to controvert these facts, much less introduce any countervailing evidence, and therefore these facts should be deemed admitted.

1. The '777 specification and file history only teach drainage and compression by elevation of the leg, compression bandage and manual compression, and do not suggest any variation in these teachings. (Exh. A at col. 5, ll. 6-17, 25-30, 39-40, and 45-48; col. 6, ll. 9-13, 18-21, 43-46 and 50-53; Exh. U2 at pp. 4-5, 6, 8 and 9). Further, the '777 specification and prosecution history teach that such drainage and compression are necessary to "insure" the "direct contact" essential to the invention. (Id.)

2. The '777 provisional patent applications did not include any claims but did include a "Summary Of The Invention".[11] (Exh. U2 at p. 4, l. 29 – p. 5, l. 4). Consistent with the '777 disclosure, the "Summary Of The Invention" makes clear that the broadest original invention was directed to the specific type of drainage and compression disclosed, stating: "we will empty

---

[10] The "written description" requirement of section 112 requires that the invention be described sufficiently to convey to a person of ordinary skill that the patentee had possession of the claimed subject matter at the time of filing; and such description must "'enable one of ordinary skill to practice 'the full scope of the claimed invention' ...." Lizardtech, 424 F.3d at 1345 (emphasis added).

[11] It is axiomatic that the "Summary Of The Invention" sets forth what the patentee considers to be a concise summary of his invention, and can properly support a narrow reading of the claims. C.R. Bard v. US Surgical, 388 F.3d 858, 864 (Fed. Cir. 2004).

the vein of blood <u>with elevation</u>, application of a <u>compression bandage</u> from distal to proximal, and <u>manual compression</u> of the vein at the laser fiber tip during delivery of intraluminal laser energy. This will <u>insure direct contact</u> of the bare tip of the laser fiber with the vein wall in order to avoid blood clot formation and maximize vein wall damage." (<u>Id</u>.).

3. The '777 specification states that an object of the invention is to "deliver intraluminal laser with direct contact of the tip of the fiber optic line with the vein wall", and that drainage and compression by elevation of the leg, application of a compression bandage and manual compression is "necessary" to "insure" such "direct contact". It necessarily follows that if such drainage and compression are not performed the object of the invention will not be achieved. (Exh. A at col. 3, ll. 6-9; col. 6, ll. 9-13 and ll. 42-46).

4. During prosecution of the '777 patent application, the patentee specifically relied on the portions of the specification that teach drainage and compression by elevation of the leg, application of a compression bandage and manual compression to distinguish over the prior art and to obtain the allowance of the claims. (Markman Ruling, p. 11).

5. The '777 provisional patent applications initially disclosed the use of tumescent anesthesia, and furthermore, taught that even if tumescent anesthesia were used it would be necessary to perform drainage and compression by elevating the leg, applying a compression bandage, and manual compression in order to "insure" the contact essential to the invention. (Exh. U2 at p. 4, l. 29 – p. 5. l. 4, p. 7, ll. 10-11, p. 8, ll. 3-10, p. 8, l. 28 – p. 9, l. 2, and p. 9, ll. 11-15).

6. Inventors Navarro and Bone admitted, and Diomed does not dispute, that at the time of filing each of the '777 patent applications, although they used tumescent anesthesia for venous treatment, they did not think that tumescent anesthesia functioned to drain and compress the

vein, and did not consider it as an alternative to manual compression until later discovering that other doctors were not manually compressing the vein. (Exhibits N, S-T).

These uncontroverted facts dictate that under Diomed's improperly broad assertion of claim scope the patent would be invalid for failure to comply with the written description requirement.

The cases relied on by Diomed are inapposite. First, the primary case cited by Diomed, Anheuser-Busch Cos. v. Crown Cork & Seals Techs. Corp., 121 Fed. Appx. 388, 394 (Fed. Cir. Dec. 23, 2004), is an unpublished decision that is not properly citable as precedent and should not be considered by the Court for at least this reason.[12] Further, in stark contrast to this case, the court found that the full scope of the claim was described in the specification, and therefore this case is distinguishable on its facts. The GoLight, SRI, and Rexnord cases do not relate at all to whether the claim scope asserted by Diomed violates the written description requirement, but rather deal with other issues.

In the end, Diomed cannot base its claim of infringement on a technique, the use of tumescent anesthesia alone, that is not in any way supported by the '777 specification, and that was disclosed in the prosecution history as being inadequate for the invention to work. Because AngioDynamics does not perform any of the techniques supported by the '777 specification, AngioDynamics is entitled to summary judgment of non-infringement.

### J. AngioDynamics Agrees With Vascular Solutions Inc.'s Motion For Summary Judgment As To Damages.

Diomed argues that AngioDynamics' failure to make the same damages argument as VSI reflects AngioDynamics' view that the argument is without merit. Nothing could be farther from the truth. VSI is absolutely correct that Diomed must be able to prove which procedures

---

[12] See Fed. Cir. R. 47.6 ("any opinion so designated must not be employed or cited as precedent...").

18

practiced by which physicians are infringing acts in order to be entitled to damages for inducing or contributing to such infringements. Because deliberate and maintained contact is not necessary in an endovenous laser procedure, and because the undisputed facts show that physicians perform the procedure without such contact, merely looking at the number of lasers or kits sold by the defendants is not sufficient to satisfy the legal standard for damages. Yet, that is all the evidence Diomed has to offer.

VSI's damages argument is really another way of saying that summary judgment must be granted because Diomed cannot prove, either directly or circumstantially, that physicians practicing the AngioDynamics procedure are actually infringing the patent. There is no question that AngioDynamics has made this argument consistently from its opening brief. The bottom line is that without evidence of actual infringement, Diomed cannot meet its liability or damages burdens, and summary judgment should be granted for both defendants.

### III.     CONCLUSION

For all of the foregoing reasons, AngioDynamics' Motion for Summary Judgment of Non-Infringement should be granted.

Dated: February 28, 2006

Respectfully Submitted,

DEFENDANT
ANGIODYNAMICS, INC.
BY ITS ATTORNEYS

By _____
   MARK D. GIARRATANA
   WILLIAM H. BRIGHT
   McCarter & English, LLP
   CityPlace I
   185 Asylum Street
   Hartford, CT 06103
   (860) 275-6700
   (860) 724-3397 (fax)
   mgiarratana@mccarter.com
   wbright@mccarter.com
      -and-
   RODNEY S. DOWELL (BBO # 620916)
   Berman & Dowell
   210 Commercial Street
   Boston, MA 02109
   (671) 723-9911
   (617) 723-6688 (fax)
   rdowell@bermandowell.com

**I hereby certify that a true copy of the above document was served upon the attorney of record for the Plaintiff and Counterclaim-Defendant Diomed, Inc. by electronic mail and Federal Express on February 28, 2006**

_____
William H. Bright, Jr.