```
00001
 1         UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS
 2

 3  ------------------------
    DIOMED, INC.,         )
 4       Plaintiff,   ) CIVIL ACTION NO.
                  ) 04-10019 RGS
 5    vs         )
                  )
 6  ANGIODYNAMICS, INC.,   )
         Defendant.   )
 7  ------------------------
    DIOMED, INC.,         )
 8       Plaintiff,   ) CIVIL ACTION NO.
                  ) 04-10444 RGS
 9    vs         )
                  )
10  VASCULAR SOLUTIONS, INC.,) (CONSOLIDATED UNDER
         Defendant.   )  04-10019 RGS)
11  ------------------------

12

13
    --------------------------------------------------
14        Deposition of: EAMONN HOBBS
    --------------------------------------------------
15

16

17
      Taken before Tina M. Davis, Stenographer and
18  Notary Public in and for the State of Connecticut,
    pursuant to notice, at the offices of
19  McCARTER & ENGLISH, CityPlace I, 185 Asylum Street,
    Hartford, Connecticut, on Friday, September 23, 2005
20  scheduled to commence at approximately 10:30 a.m.

21

22

23       Tina M. Davis, LSR
           License No. 00221
24      Brandon Smith Reporting Service
           44 Capitol Avenue
25         Hartford, CT  06106
           (860) 549-1850
```

00107
1            MR. GIARRATANA: Off the record.
2
3       (An off-the-record discussion was held.)
4
5  BY MR. STRAND:
6    Q. You were involved in some matter in the
7  negotiations between Endolaser and AngioDynamics?
8    A. I was.
9    Q. And those took place in 2002?
10   A. I believe in August/September 2002.
11   Q. What was AngioDynamics's goal during those
12 negotiations?
13   A. The goal was to ascertain whether or not a
14 license -- an exclusive license to the 777 patent was
15 obtainable.
16      We were not at that time, at the time of the
17 negotiations, at all certain that we wanted to license
18 it, but that possibility had popped up once the patent
19 issued. So the way we structure our -- business deal
20 first and then due diligence after that.
21   Q. Were term sheets or draft licenses exchanged
22 between the parties?
23   A. Yes.
24   Q. Did you review those before they were exchanged?
25   A. Yes.

00108
1   Q. What were the royalty rates that AngioDynamics
2  was proposing to Endolaser at the time?
3   A. The proposal that we made was 15 percent, up to a
4  maximum of $50 per kit, and $1,000 per laser.
5   Q. Are those numbers shown anywhere in Exhibit 344?
6   A. I believe they're shown in Sections 3.1 and 3.2.
7   Q. And during these negotiations what were your
8  assumptions regarding the average selling price of the
9  kits?
10   A. In the time frame of August and September 2002 my
11  personal assumptions were that the average selling price
12  of laser kits was going to be a premium to the market --
13  average selling price of the VNUS kits, which would have
14  been in excess of $750.
15   Q. So doing some quick math, the royalty would not
16  have exceeded $50 in the consumable products?
17   A. That is correct.
18   Q. With your assumptions of what the average selling
19  price would be?
20   A. Well, it had no bearing on average selling price.
21  It was $50 regardless. That's right.
22   Q. Right.
23   A. Regardless of what ASP was. Max. Max of $50.
24      I did not really pay much attention to the top --
25  the percentage royalty, because it did not come into

00109
1  play.

2  Q. What do you mean it did not come into play?

3  A. Well, with the maximum of $50, we would never

4  come anywhere close to 15 percent royalties.

5  Q. With your assumptions regarding the selling price

6  of the kits?

7  A. That is correct.

8  Q. While these negotiations were going on, was

9  AngioDynamics relying upon your assumptions regarding

10  the average selling price of $750?

11  A. I don't know. When you say was AngioDynamics, I

12  don't know what that means. I can certainly say that I

13  was. I don't know what was in the mind of the rest of

14  the team. They certainly heard my view.

15  Q. Did others share your view?

16  A. There was -- there was definitely some agreement,

17  but there was some disagreement, as well.

18  Q. What was Bill Appling's view?

19  A. I don't remember what Bill Appling's view was.

20  Being a research guy, I wasn't really keying off him.

21  Q. Who else was involved in these negotiations with

22  Endolaser from AngioDynamics?

23  A. Rob Rossell.

24  Q. What were Rob Rossell's -- did he express his

25  thoughts regarding the average selling price?

00110
1   A. He was cautiously optimistic that we could
2   maintain an average selling price that high.
3   Q. On the laser, what did you assume the average
4   selling price of the laser would be?
5   A. We believed it would be $45,000. Well, I
6   shouldn't say we. I believed it was $45,000. Yeah.
7   Q. What were Mr. Rossell's views?
8   A. I don't remember. I don't remember a lot of
9   disagreement on the laser price.
10      And I would like to clarify that this was based
11  on the assumption of an exclusive license (witness
12  indicates).
13  Q. Now, you were aware during these negotiations
14  that Dr. Robert Min was not a member of
15  Endolaser Associates; is that correct?
16  A. I was not.
17  Q. So when you were performing these negotiations
18  you thought that it was going to be exclusive in the
19  sense that you would be the only company with the
20  license to practice the invention described in the 777
21  patent?
22  A. That is correct.
23  Q. You were not aware of Dr. Min's agreements with
24  Diomed at the time?
25  A. I had numerous conversations with Dr. Min and

00111
1  Dr. Navarro who both led me to believe that there was
2  the availability of an exclusive license.
3      Now, to answer your question, I heard of the
4  agreement between Min and Diomed. I never saw anything
5  to that effect and was led to believe that it wasn't
6  airtight by the two previously mentioned physicians. So
7  it wasn't clear to us at all that there was one inventor
8  off the table.
9  Q. And this was -- you're referring to the time
10 period of September and August of 2002?
11 A. That's right.
12 Q. Okay. So when you say you had numerous
13 conversations with Dr. Min and Navarro who led you to
14 believe that there was the availability of an exclusive
15 license, that was at that time frame?
16 A. That is correct, yes. That was certainly my
17 understanding.
18 Q. With these price -- with the $50 maximum of
19 consumable products and the $1,000 on the laser if
20 AngioDynamics had an exclusive license, you were
21 comfortable entering into an agreement under those
22 terms?
23 A. I wouldn't say I was comfortable entering into
24 the agreement. As of this time?
25 Q. As of the time of the negotiations.

00112
1    A.  No.  I would not have been comfortable yet,
2  because we hadn't conducted our due diligence.
3        We were -- we were pursuing a hypothetical
4  business probability.  If we had come to agreeable
5  business terms, I would still not be comfortable.  I
6  would be comfortable that there's a probability of
7  arriving at a deal assuming the due diligence proved
8  itself, which we hadn't even begun yet.
9    Q.  What due diligence are you referring to?
10   A.  We had no idea what the patent was or what
11  validity it might have or might not have at that time.
12  We had not -- we had, as you can -- as I've already
13  stated, we didn't have any understanding of whether we
14  were going to be able to get an exclusive or
15  nonexclusive or what the contractual agreements were
16  between Endolaser or Min and Diomed.  It was a very
17  tangled web at that stage, and we had not conducted any
18  due diligence along those lines.
19        In addition, we had not conducted our own due
20  diligence on the cost of goods to validate that our
21  assumptions had any bearing on realty.  We just hadn't
22  made the investments yet.
23        And I think I'm forgetting something else that we
24  normally would do in due diligence, but you get the
25  general ideas.  After we arrive at acceptable business

00113
1  terms and agree to agree point in time in the
2  negotiations, that's when we initiate our serious due
3  diligence to make sure that there's a deal to be had.
4    Q. Besides the royalty numbers presented here that
5  we've been discussing, what other business terms would
6  have been needed to negotiate.
7       MR. GIARRATANA: (Addressing the Court
8  Reporter) Would you mind reading that question back? I
9  don't think I understood it.
10
11       (The previous question was
12       repeated by the Court Reporter.)
13
14   A. What other businesses terms would need to be
15  negotiated? Well, all of them.
16 BY MR. STRAND:
17   Q. Let me reference you back here. You said if we
18  had come to agreeable business terms. One of those
19  business terms, I'm assuming, is the royalty rate of
20  what the patent license would have been. Were you
21  negotiating, for instance, marketing ideas with
22  Dr. Navarro and Endolaser or what other types of
23  agreements were you looking for besides a straight
24  license of the patent?
25       MR. GIARRATANA: Objection to the form.

00124
1  remember. Yeah.

2  Q. When was the first time you were aware that a

3  patent may issue on laser ablation, vascular laser

4  ablation?

5  A. I believe it was in July of 2002.

6  Q. So you're not aware of the potential of the

7  patent before it issued?

8      MR. GIARRATANA: Objection. John, are you

9  referring in this line of questioning to the 777 patent?

10     MR. STRAND: What became the 777 patent,

11 yes.

12     MR. GIARRATANA: Okay.

13 A. I have no recollection of anything to do with

14 that patent prior to it issuing.

15 BY MR. STRAND:

16 Q. Okay. Let me show you what's previously been

17 marked as Exhibit 76.

18     MR. STRAND: For the record, this is the 777

19 patent.

20 BY MR. STRAND:

21 Q. So you became first aware of this patent in July

22 of '02?

23 A. Well, maybe in June of '02 now. I thought it was

24 July it was issued, so my mistake.

25 Q. Okay. How did you first become aware of it?

00125
1  A. I have no idea. I don't remember.
2  Q. Do you remember having any conversations with
3  Mr. Appling concerning this patent in June or July of
4  '02?
5  A. Oh, I remember we had a lot of conversations
6  about this patent.
7  Q. What was the substance of those conversations?
8  A. Well, from my perspective, the -- once this
9  patent was brought to my attention, I wanted to
10 understand what impact it may have on the -- our
11 agreement with Biolitec, if it was going to have an
12 impact on our agreement with Biolitec, what its
13 availability might be. I think that -- yeah, I think
14 that would be where I was coming from.
15 Q. Okay. What did you do to assess its impact on
16 the Biolitec agreement?
17 A. I didn't do anything.
18 Q. What did AngioDynamics do?
19 A. Certainly Bill Appling would be a better fellow
20 to ask.
21    What I did was ask Bill Appling to do everything
22 we needed to do, whatever that may be. So that was
23 really the extent of it for me in the June, July time
24 frame.
25 Q. You were not aware prior to its issuance of the

00126
1  possibility of this patent issuing?
2  A. No. In conversation, if a physician,
3  hypothetically, tells me that they have filed a patent,
4  what does that mean? It doesn't mean anything. When a
5  patent issues, then we can start the process of
6  understanding what that means. So I had no
7  comprehension of what this -- if or what this patent may
8  or may not be. I don't have any -- I don't have any
9  recollections of any conversations with Min where he
10 told me he filed a patent until after it issued.
11 Q. Okay.
12 A. It became very obvious.
13 Q. Did Mr. Appling report back to you on what the
14 effect of this patent would have on the Biolitec
15 agreement?
16        MR. GIARRATANA: I want to caution the
17 witness. It's okay for you to testify about your
18 communications with patent counsel in connection with
19 the opinion that was issued in this case. And I think
20 that's the subject matter that Mr. Hobbs is referring to
21 when he says the effect on the agreement. To the extent
22 that your testimony might reveal discussions with
23 counsel about legal issues in connection with the
24 Biolitec agreement, those I'm going to instruct you not
25 to reveal.

00127
1   A. Uh-huh.

2       MR. GIARRATANA: Okay. So go ahead and
3   answer based on that instruction.

4   A. Could you repeat the question?

5   BY MR. STRAND:

6   Q. Sure.

7       Actually, first just a yes or no question. Did
8   Mr. Appling report back to you on what effect this would
9   have on the agreement?

10  A. I don't remember Mr. Appling ever reporting back
11  to me with an answer on that specific issue. I don't --
12  I don't believe he -- well, I wouldn't ask him to report
13  his own opinions, so everything he would be reporting
14  back to me would typically be related to the outside
15  counsel's opinion, which I did receive. I don't
16  remember if Mr. Appling gave it to me or somebody else
17  did, but I got it.

18  Q. In June or July of '02 did you review this
19  patent?

20  A. Did I review it?

21  Q. In other words, did you spend time and study, to
22  the best of your ability, these claims?

23  A. I remember reading it after it was provided to me
24  in June or July, probably more July. And then I put it
25  aside until we got more information on it.

00128

1   Q. Okay. Let me show you what's been previously

2  marked as Exhibit 77.

3   A. Okay.

4   Q. Do you recognize this document?

5   A. I do.

6   Q. What is this document?

7   A. This is the outside counsel's opinion on the 777

8  patent.

9       MR. STRAND: I'm sorry. Just off the record

10  for a second.

11

12      (An off-the-record discussion was held.)

13

14  BY MR. STRAND:

15   Q. Did you request Mr. Appling to get this opinion?

16   A. I believe I did.

17   Q. When did you request him to do that?

18   A. I don't remember. Shortly -- some time between

19  the patent issuing in June and shortly after I was made

20  aware of the patent, I would believe.

21   Q. Okay. Did you review this opinion in around the

22  October 2002 period?

23   A. I did.

24   Q. Did you communicate with Mr. McAulay regarding

25  this opinion?

00129
1   A. I had a number of questions after I received the
2  opinion that Mr. McAulay answered for me.
3   Q. Were those communications directly with
4  Mr. McAulay?
5   A. They were in a conference call, I believe. There
6  were other people there. I believe Mr. Appling was
7  there.
8   Q. What were your questions?
9   A. I don't remember. They really pertained to
10 making sure I understood his opinion and felt
11 comfortable with it.
12  Q. What specifically do you remember regarding that
13 conference call?
14  A. I remember that at the end of it the conclusion I
15 reached was that I felt comfortable that we were not
16 infringing the 777 patent, which was. . . .
17  Q. And you felt comfortable selling the ELVS kits
18 and ELVS lasers in light of this opinion?
19  A. Yes.
20  Q. Okay. Did you have any discussions with
21 Mr. McAulay regarding tumescent anesthesia?
22        MR. GIARRATANA: Are you asking in
23 connection with Mr. McCauley's issuance of his opinion?
24        MR. STRAND: Yes, in connection with the
25 issuance of the opinion.

00130
1  BY MR. STRAND:
2  Q. In the time frame that he was drafting this, in
3  other words, before October of 2002 or shortly
4  thereafter when you had questions for him regarding what
5  the opinion was about, that time frame did you have
6  discussions with Mr. McAulay regarding tumescent
7  anesthesia?
8  A. I don't remember any.
9  Q. Did you forward any documents to Mr. McAulay
10 before he authored this opinion?
11 A. Me? No.
12 Q. Did you request anyone else to forward certain
13 documents of Mr. McAulay?
14 A. No, not to my recollection.
15 Q. Okay. Was Mr. Appling in charge of making sure
16 that Mr. McAulay had all the materials that he needed?
17 A. Yes, he was.
18 Q. What in particular from this opinion made you
19 comfortable selling the ELVS products?
20 A. What in particular? Well, I mean there wasn't
21 anything specifically that I would pick out as a
22 particular item that made me comfortable.
23 Q. Okay.
24 A. It seemed to be a very well thought through
25 objective analysis of the situation. My experience with

00131
1  Lloyd McAulay is that he's a conservative fellow by
2  nature, so that when he issues his opinions I feel very
3  comfortable that they're not in the gray, they're pretty
4  black.  So that's really what I walked away from this
5  opinion with.
6    Q. After its issuance did you have any discussions
7  with Dr. Min regarding the 777 patent prior to October
8  of 2002?
9        MR. GIARRATANA: After the issuance of the
10 patent?
11       MR. STRAND: Yes.  So in that time frame.
12       MR. GIARRATANA: Yes.
13   A. I don't believe so.
14 BY MR. STRAND:
15   Q. Okay.  Prior to the issuance of this opinion,
16 have you read any articles by Dr. Min concerning laser
17 vein ablation?
18   A. I don't recall whether it was before that date.
19 I think I've read all his articles, yes.
20   Q. So at some time -- you have read all his
21 articles?
22   A. I believe so, yes.
23   Q. Prior to October of 2002 have you read any
24 articles by Dr. Robert Weiss?
25   A. I have.