THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIOMED, INC., <br><br>         Plaintiff, <br><br> v. <br><br> ANGIODYNAMICS, INC, <br><br>         Defendant. | Civil Action No. 04-10019 RGS |
| DIOMED, INC., <br><br>         Plaintiff, <br><br> v. <br><br> VASCULAR SOLUTIONS, INC., <br><br>         Defendant. | Civil Action No. 04-10444 RGS <br> **(CONSOLIDATED UNDER 04-10019 RGS)** |

**DIOMED'S CONSOLIDATED REPLY TO DEFENDANTS'
OPPOSITIONS TO DIOMED'S MOTIONS FOR SUMMARY JUDGMENT**

Michael A. Albert
Michael N. Rader
John L. Strand
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8000

COUNSEL FOR
PLAINTIFF DIOMED, INC.

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

ARGUMENT ............................................................................................................. 2

I.    THE PRESUMPTION OF VALIDITY HAS NOT BEEN REBUTTED. ............................ 2

    A.    The Puglisi And Mazza Videos Are Not Prior Art. ....................................... 2

    B.    None Of The Asserted References Disclose Contact Between A Vein Wall
       And A Bare Laser Fiber Tip. .......................................................................... 3

    C.    The '777 Patent Is Not Obvious In Light Of Any Combination Of The Identified
       References............................................................................................................ 7

        1.    The Combinations Are Improper. ........................................................ 7

        2.    The Combinations, Even If Proper, Would Not Render The '777 Patent Claims
           Obvious. ............................................................................................... 9

        II.    DEFENDANTS DO NOT HAVE CLEAR AND CONVINCING EVIDENCE
           OF INEQUITABLE CONDUCT AS REQUIREDTO RENDER THE '777
           PATENT UNENFORCEABLE. ........................................................................ 10

    A.    Defendants Have Dropped Their Inequitable Conduct Claims Based
       On The Biegeleisen And Puglisi Articles. .................................................... 10

    B.    Summary Judgment Should Also Be Granted With Respect To The O'Reilly
       Article. ........................................................................................................... 11

        1.    There Was No Intent To Deceive The PTO.......................................... 11

        2.    O'Reilly Is Not Material. .................................................................... 12

III.   THE DEFENDANTS INFRINGE THE '777 PATENT. ..................................................... 13

    A.    Direct Infringement Of The '777 Patent Claims........................................... 14

        1.    The Defendants' Instructions For Use And Physician Training
           Establish Direct Infringement Because Tumescent
           Anesthesia Is A Method Of Deliberately Causing Contact.. ............................14

        2.    Contact Is Maintained During The Laser Ablation Procedure. ........... 15

         3.    Emission Of Laser Energy From The Side Of The Tip Infringes......................... 17

B.   The Defendants Induce Direct Infringement And Cannot
Avoid Inducement By Including "Disclaimers". ............................................................ 17

C.   Defendants Contributorily Infringe The '777 Patent. ................................................... 20

**CONCLUSION** ........................................................................................................................ 20

## <u>INTRODUCTION</u>

Diomed should be granted summary judgment that the asserted claims of the '777 patent are valid, enforceable, and infringed.

To overcome the statutory presumption that the '777 patent is valid, the defendants must prove by clear and convincing evidence that those skilled in the art would discern every limitation of the asserted claims in the prior art. Strikingly (indeed, dispositively), the defendants attempt to substitute attorney argument for the required evidence of what the prior art teaches to one skilled in the art. As a matter of law, such attorney argument fails to create issues of fact regarding patent validity. In any event, the undisputed evidence – not just from Diomed's expert but from the defendants' own expert as well – is that several claim limitations are missing entirely from the prior art. For example the defendants have failed to identify a single reference disclosing <u>contact</u> between an uncoated laser fiber tip and a vessel wall.

Unenforceability for "inequitable conduct" is also readily disposed of on summary judgment. As a threshold matter, the defendants have dropped two thirds of their inequitable conduct case. Their remaining allegation is baseless. Absent any evidence that Dr. Min, a preeminent doctor and one of the founders of this field, had <u>any</u> intent to deceive the Patent Office (indeed, he performed his own patent search and supplied the results of that search the to Patent Office), it would be legal error to allow this defamatory allegation to remain in the case.

Finally, concerning infringement, defendants attempt to create the <u>perception</u> that fact issues remain by submitting declarations from multiple physicians. These declarations share a common flaw: they do not contradict Diomed's infringement case. Diomed, AngioDynamics, and VSI undisputedly make essentially the same product. People also use these kits in materially the same way: As instructed by the defendants, they insert a bare-tipped laser fiber into the vein, then deliberately surround the vein with tumescent anesthesia to drain and compress the vein,

which then contacts the tip.  The fact that doctors follow these simple steps is evidenced by, among other things, the very instructions that the defendants provide with the kits.

Contact between the laser fiber tip and the vein wall is proven not only by the defendants' pre-litigation admissions, but by tell-tale signs of contact in <u>every</u> excised vein presented in this case, whether it be from Diomed's experts, defendants' own doctors, studies published by the defendants' expert, or elsewhere in the published literature.  Defendants' litigation-driven efforts to take back their prior statements, presentations and histologies do not create a *genuine* fact issue on infringement.

<u>**ARGUMENT**</u>

**I.    THE PRESUMPTION OF VALIDITY HAS NOT BEEN REBUTTED.**

In order to overcome the presumption of patent validity under 35 U.S.C. § 282, the defendants need clear and convincing evidence that every limitation of the '777 patent claims "*would be recognized by persons of ordinary skill in the field of the invention*" in the prior art. <u>Crown Operations Int'l v. Solutia Inc.</u>, 289 F.3d 1367, 1375 (Fed. Cir. 2002) (emphasis added).

The defendants, however, set forth <u>no</u> evidence of what one of skill in the art would recognize from the references.  Instead they improperly rely upon attorney argument.  Tellingly, in the thirty (30) pages devoted to their invalidity arguments, the defendants cite their expert's opinion just twice. (D.I. 119 at 17 and 24).  This lack of citation is because their expert <u>conceded</u> at his deposition that limitations of the '777 patent claims are <u>not</u> disclosed in any of the identified references.  Dr. Samson's testimony, which is consistent with the testimony of Diomed's own experts, establishes that the defendants have not mustered clear and convincing evidence that the '777 patent is invalid.  Accordingly, Diomed is entitled to summary judgment.

**A.    <u>The Puglisi And Mazza Videos Are Not Prior Art</u>.**

As a threshold matter, the Puglisi and Mazza videos do not qualify as "printed publications" and cannot be considered prior art to the '777 patent under 35 U.S.C. § 102. (D.I.

88 at 10).  Defendants spend several pages on the issue (D.I. 119 at 25-30), but fail to apply the

applicable test from in In re Klopfenstein, 380 F.3d 1345 (Fed. Cir. 2004).  Specifically, the

defendants do not address the transient nature of the display of these brief videos, and the

difficulty that a viewer would have in copying or retaining the information they contain.  These

elements of the Klopfenstein test require a finding, as a matter of law, that the videos do not

constitute "printed publications."  Indeed, the defendants were unable to cite a single case in

which any court has ever held the mere display[1] of a video to constitute a printed publication.[2]

### B.      None Of The Asserted References Disclose Contact Between A Vein Wall And A Bare Laser Fiber Tip.

Diomed's expert, Dr. Fan, and the defendants' expert, Dr. Samson, agree that none of the

identified references disclose contact between an uncoated laser fiber tip and a blood vessel wall.

For this reason alone, Diomed is entitled to summary judgment of validity.[3]

*O'Reilly.*  The defendants concede that O'Reilly does not expressly disclose contact. (D.I.

119 at 13).  Therefore, they attempt to argue that O'Reilly "inherently" shows contact, although

they fail to provide any evidence – as required by black-letter Federal Circuit law – (1) that

contact would "necessarily" have been present in the procedures described by O'Reilly, and (2)

that "a person of ordinary skill in the art would recognize its presence." Crown, 289 F.3d at 1377.

Defendants use attorney argument to cite several passages from O'Reilly that contact

would have occurred, but the only evidence on point – from the defendants' own expert –

establishes that one of skill in the art could not draw this conclusion: "[I]t could be that it was

---

[1] It is undisputed neither video was distributed at the conferences where they were displayed.

[2] Even slides, which are typically displayed for a longer period of time, are much easier to transcribe and retain, and are generally discussed in detail by the presenter, may not constitute printed publications because of their transient nature. Regents of the Univ. of Cal. v. Howmedica, Inc., 530 F. Supp. 846, 860 (D.N.J. 1981) (cited and discussed as persuasive authority by In re Klopfenstein, 380 F.3d at 1350-511).

[3] As explained in Diomed's opening brief, it is also undisputed that the prior art lacks any teaching of the additional claim limitations of compression or drainage.  (D.I. 88 at 6-7, 9, 14-16).  For brevity, this reply is limited primarily to the "contact" limitation.

centered in such a way that the tip, emitting tip, could not touch.  Or it could have been in such a way that . . . a portion of it could touch the vessel tip."  (Samson Depo. at 77 (Ex. 5 to D.I. 99)).

Defendants have no answer other than attorney argument.  Biotec Biologische v. Biocorp, Inc., 249 F.3d 1341, 1353 (Fed. Cir. 2001) ("It is well settled that conclusory statements of counsel or a witness that a patent is invalid do not raise a genuine issue of fact.").[4]  As a matter of law, their own expert's concession that one of skill in the art cannot tell whether contact would have occurred, precludes a finding that the limitation is "inherently" disclosed.  Dayco Prod., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1369 (Fed. Cir. 2004) (vacating summary judgment of invalidity as no evidence set forth from one of skill in the art regarding references).[5]

***Puglisi Article and Video.***  Defendants prominently display Dr. Puglisi's deposition testimony in an attempt to explain various aspects of his article and video.  But his deposition is not prior art to the '777 patent.  Reliance on extrinsic evidence such as Dr. Puglisi's deposition transcript is inappropriate and invites legal error.  Scripps Clinic & Rsch. Fnd. v. Genentech, 927 F.2d 1565, 1576 (Fed. Cir. 1991).  The real question is what the Puglisi article itself discloses to one of skill in the art.  Crown, 289 F.3d at 1377.  Other procedures that Dr. Puglisi may have done in Europe, and his characterizations of his article (or video), are legally irrelevant.

Nonetheless, Dr. Puglisi's testimony proves that the tip of his fiber was indeed covered, not bare.  He volunteered this point, when asked about the differences between his procedure and

---

[4] In their opposition brief, the defendants attempt to argue that contact would have been inherent in the O'Reilly procedures by introducing an article stating that *branches* of the central auricular artery in a rabbit's ear can range between 140 and 150 microns (0.14-0.15 mm) in diameter. (D.I. 119 at 13 & Ex. E).  O'Reilly clearly states, however, that *the* "central auricular artery" was treated – not one of its far smaller branches. (Ex. 10 to Fan. Decl. (D.I. 98) at 777).  In other words, the defendants are now focused on the wrong artery.  Defendants also fail to address the testimony of their own technical expert – who himself did experiments on rabbit ear arteries – that the artery treated by O'Reilly is between 1 and 2 mm in diameter.  (9/19/05 Samson Depo. at 26).

[5] The same is true of compression and drainage.  The defendants' technical expert conceded that he could not tell from reading O'Reilly whether the procedures described in the article would have resulted in either compression or drainage. (D.I. 88 at 6-7).  Again, the defendants have no answer to this dispositive admission.

that taught in the '777 patent, stating: "I was introducing an optical fiber which [was] covered." (Puglisi Depo. (Ex. 10 to D.I. 99) at 103 (emphasis added)).[6]

Lacking evidence, defendants simply state a desired conclusion as though it were true. For instance, they assert several times that the Puglisi article and video disclose a "fiber optic line having an uncoated tip at its end for emitting laser energy," (D.I. 119 at 3, 7 and 9), but provide no citation to any evidence for that conclusion. Cf. Biotec, 249 F.3d at 1353 (attorney argument does not raise a genuine issue of fact for trial).

The only evidence is to the contrary. Dr. Samson conceded at his deposition that the Puglisi article does not disclose using a bare laser fiber tip. As for the video, he testified as one of skill in the art that he was unable to tell from viewing it whether the tip was covered or not. (9/19/05 Samson Depo. at 89, 94-95). Diomed's technical expert Dr. Fan agrees. (Fan Decl. (D.I. 98) ¶ 70). Accordingly, all of the expert evidence in this case is consistent that neither the article nor the video expressly or inherently disclose use of a bare-tipped fiber.[7] Defendants do not have "clear and convincing evidence" that Puglisi disclosed a bare tip in any prior art.

***Mazza Article and Video.*** The defendants have conceded that neither the article nor the video discloses an uncoated fiber tip: "Mazza does not disclose the uncoated section being at the tip," instead the tip is covered with metal. (D.I. 119 at 22-23). For this reason alone, Diomed is entitled to summary judgment that the Mazza references do not anticipate the '777 patent claims.

---

[6] Defendants misleadingly cite Dr. Puglisi's testimony that at one point in time he "cut the point of the cable at 90 degrees and use[d] it that way." (D.I. 119 at 9). This testimony does not refer to the procedures described or shown in his article or video. Indeed, later in his deposition, Dr. Puglisi explained the common-sense reason that he used a covered fiber tip (i.e., one with a cover over the sharp cleaved end of the fiber): one would not insert a bare-tipped fiber into a vein because it would pierce through and "come out of the vein." (Puglisi Depo. at 104). Today, bare-tipped fibers are inserted within special sheaths to prevent such punctures.

[7] Defendants also now attempt to argue that if the "tip were 'covered' … it would never fit through the tiny entry needle as shown" in the video. (D.I. 119 at 9). They have provided *no* support for this attorney argument (not even a statement from their hired expert) – and it is their burden to present clear and convincing evidence of invalidity.

***Biegeleisen Article.***  Defendants no longer claim that the Biegeleisen article[8] anticipates the asserted claims, and instead rely on it only in the obviousness context.  (D.I. 119 at 24). Diomed is entitled to summary judgment that Biegeleisen does not anticipate the `777 patent.

***Farley '398 patent.***  The defendants' expert admitted at his deposition that the sapphire crystal disclosed in the Farley '398 patent <u>prevents</u> the tip of the laser fiber from making contact with the vein wall as required by the '777 patent. (9/19/05 Samson Depo. at 140).  Defendants do not refute this testimony. (D.I. 119 at 19).  It is undisputed that the Farley `3983 patent lacks any disclosure of putting the bare tip of a laser fiber in contact with the vein wall.

***U.S. Patent No. 6,638,273.***  Ever a moving target, defendants argue for the first time in their opposition brief that a newly-cited patent, U.S. Patent No. 6,638,273 ("the '273 patent"), provides the invalidity evidence that continues to elude them.  The reliance is improper as the '273 patent was not identified in their interrogatory answers (Ex. 3 & 4 to 2d Strand Decl.), their Rule 30(b)(6) depositions (Ex. 5 to 2d Strand Decl.), nor even in their expert report (Ex. 4 to D.I. 99).  Only after seeing Diomed's validity brief did the defendants come up with this <u>ninth</u> reference that they allege – again without the required support from one of skill in the art – invalidates the '777 patent.  The reference does not defeat summary judgment.

Defendants expressly concede that the '273 patent does not disclose use of <u>any</u> fiber optic line, let alone one with a bare tip. (D.I. 119 at 16).  Defendants instead attempt (yet again) to argue that the use a fiber with a bare tip would be an inherent teaching of the patent – <u>without</u> the benefit of testimony from one of skill in the art as required by Federal Circuit law. (<u>Id.</u>).

As noted above, for a limitation to be "inherent" in a reference, defendants must show by clear and convincing evidence that the limitation is <u>necessarily</u> present in the disclosure of that reference. <u>Crown</u>, 289 F.3d at 1377.  The use of fiber with a bare tip is <u>not</u> "necessarily present"

---

[8] Dr. Samson's expert report also made passing reference to a *patent* to Dr. Biegeleisen.  That patent discloses almost nothing about using a laser.  In any event, the defendants have come forward with no evidence that the Biegeleisen patent invalidates any claim of the '777 patent, and appear to have dropped their reliance on it.

in the disclosure of the '273 patent. (2d Fan Decl. ¶ 5). The '273 patent's focus is on radiofrequency energy, not lasers. Even if a practitioner were motivated, by the '273 patent's passing reference to "radiant light" energy, to employ a laser, and were further motivated to introduce a fiber optic line into the vessel (something that is nowhere mentioned in the '273 patent), it is far from "inherent" that the fiber optic line would be bare-tipped.[9] The '273 patent does not disclose that a of a bare-tipped fiber optic line was "necessarily" used.

Diomed is entitled to summary judgment that the defendants' references – including the newly-identified '273 patent – do not anticipate the asserted claims of the '777 patent.

## C.    The '777 Patent Is Not Obvious In Light Of Any Combination Of The Identified References.

### 1.    The Combinations Are Improper.

Defendants present a hodgepodge of fourteen different combinations of the references that they contend render the '777 patent obvious.[10] This scattershot method of arbitrarily placing different references in combination with each other, however, falls far short of applicable Federal Circuit standards for proving obviousness by clear and convincing evidence.

Patents are not invalid simply because references exist with some – or even many – of the same elements. For a patent to be obvious in light of multiple prior art references, there <u>must</u> be a "suggestion, motivation, or teaching in the prior art that would have led a person of ordinary skill in the art to select the references and combine them in the way that would produce the

---

[9] For example, the fiber could be equipped with a sapphire diffuser cover shown in the Farley '398 patent, or with a metal cover as in Mazza. Indeed, as pointed out in "Lasers in Cutaneous and Aesthetic Surgery," a laser textbook published in 1997, one of skill in the art might well have been motivated to *avoid* using a bare tip. (Ex. 6 to 2d Strand Decl. (emphasizing the importance of having "special absorbent coatings and surfaces" on laser probes)).

[10] These combinations include: (1) Puglisi alone, (2) Puglisi in light of Farley '273, (3) O'Reilly in light of Farley '273, (4) Farley '273 in light of Puglisi, (5) Farley '273 in light of O'Reilly, (6) Farley '398 in light of Puglisi, (7) Farley '398 in light of O'Reilly, (8) Mazza in light of O'Reilly, (9) Mazza in light of Puglisi, (10) Mazza in light of Farley '273, (11) Biegeleisen in light of O'Reilly, (12) Biegeleisen in light of Puglisi, (13) Biegeleisen in light of Farley '273, and finally, (14) Biegeleisen in light of Farley '273, O'Reilly, and Puglisi. (D.I. 119 at 11, 17-19, 23-25). Furthermore, the defendants never actually identify *which* Puglisi reference or *which* Mazza reference (article or video) they rely upon, and it is undisputed that the articles and videos have different disclosures.

claimed invention." <u>Karsten Mfg. Corp. v. Cleveland Golf Co.</u>, 242 F.3d 1376, 1385 (Fed. Cir. 2001) (reversing obviousness finding). <u>See also</u> <u>Crown</u>, 289 F.3d at 1375 (affirming summary judgment of non-obviousness); <u>Biotec</u>, 249 F.3d at 1354-55 (same). Instead of identifying a motivation to combine the references they cite, the defendants misstate the holdings of Federal Circuit cases in an attempt to read the "motivation to combine" requirement out of existence.[11]

Defendants incorrectly argue that <u>In re Rouffet</u>, 149 F.3d 1350 (Fed. Cir. 1998) stands for the proposition that "the motivation to combine references can be found where the prior art references are in the same field of endeavor." (D.I. 119 at 18). But <u>Rouffet</u> did not hold that the mere existence of references in the "same field" is enough. On the contrary, the Federal Circuit overturned a finding of obviousness by the Patent Board because it failed to identify a motivation to combine, even though the references were from the same field. 149 F.3d at 1357.

Even if each of Defendants' references were prior art (the Mazza and Puglisi videos are not), Defendants adduced <u>no</u> motivation in the prior art to combine them – let alone one that meets the clear and convincing evidentiary standard. <u>See id.</u> at 1358 ("[T]he suggestion to combine requirement stands as a critical safeguard against hindsight analysis. . . .").

Defendants also mischaracterize <u>Ruiz v. A.B. Chance, Co.</u>, 234 F.3d 654 (Fed. Cir. 2000), stating that it involved a "patent held invalid on grounds of obviousness in view of several prior art references all relating to the same field." (D.I. 119 at 18). In <u>Ruiz</u>, the Federal Circuit actually <u>vacated</u> the district court's finding of obviousness for failing to identify the motivation to combine the references. 234 F.3d at 666, 673. The Federal Circuit explained that if "combination claims can be declared invalid merely upon finding similar elements in separate

---

[11] Moreover, as explained below, even if there were a motivation to combine references in one of the many ways that the defendants suggest, such combination still would not render the '777 patent claims obvious.

prior patents [within the same field]," the test "would necessarily destroy all patents and cannot be the law under the statute, § 103." Id. at 665 (citations omitted).[12]

The only evidence on motivation to combine comes from Diomed's expert Dr. Fan, who explains that one of skill in the art would not have been motivated to us a bare tipped laser fiber at the time of the '777 patent invention. (Fan Decl. ¶¶ 66-67; 2d Fan Decl. ¶¶ 2-3). The defendants present no rebuttal evidence.[13] For this reason alone, Diomed is entitled to summary judgment that the asserted claims of the '777 patent are not invalid as being obvious.

### 2. The Combinations, Even If Proper, Would Not Render The '777 Patent Claims Obvious.

Diomed is entitled to summary judgment on obviousness for the additional and independent reason that not one of the fourteen combinations suggested by the defendants would include every limitation of the '777 patent claims as required for obviousness.

By definition, every claim limitation must be disclosed in at least one of the prior art references that are being combined to allege obviousness of the claim. If the prior art fails to disclose one or more limitations, the claim is not obvious as a matter of law. E.g., CFMT, Inc. v. Yieldup Int'l, Corp., 349 F.3d 1333, 1342 (Fed. Cir. 2003).

In this case, no prior art reference cited by the defendants discloses the key claim limitation that resulted in allowance of the '777 patent claims by the PTO: contact of the bare fiber tip with the vessel wall. Accordingly, no "combination" of references discloses this limitation either, and the defendants' obviousness case fails as a matter of law.

---

[12] Defendants similarly misstate or overstate the holdings of In re Sernaker, 702 F.2d 989 (Fed. Cir. 1983) and Ryko v. Nu-Star, 950 F.2d 714 (Fed. Cir. 1991).

[13] Defendants also fail to address the fact that there are substantial secondary considerations that weigh in favor of finding the '777 patent not obvious. See Ruiz, 234 F.3d at 667 ("Evidence of secondary considerations may often be the most probative and cogent evidence in the record."). Since the defendants failure to present any evidence on motivation to combine, Diomed does not feel it necessary to address secondary considerations in this brief.

## II.   DEFENDANTS DO NOT HAVE CLEAR AND CONVINCING EVIDENCE OF INEQUITABLE CONDUCT AS REQUIRED TO RENDER THE '777 PATENT UNENFORCEABLE.

Defendants' inequitable conduct claim was originally built on the testimony of their inequitable conduct expert, attorney Bruce Sunstein.

In its opening brief, Diomed explained that Mr. Sunstein's report was based on (1) a timeline with no factual basis; (2) an assumption on a technical point that defendants' own technical expert testified is untrue; and (3) and an erroneous formulation of a legal principle.

In their opposition brief, therefore, the defendants understandably decline to rely upon Mr. Sunstein's testimony in attempting to survive summary judgment on the issue of inequitable conduct.  They instead seek to substitute attorney argument for Mr. Sunstein's assumptions.  The new strategy fails as well.

### A.   Defendants Have Dropped Their Inequitable Conduct Claims Based On The Biegeleisen And Puglisi Articles.

As a preliminary matter, the defendants have dropped two thirds of their inequitable conduct defense.  In their pleadings, the defendants asserted that the '777 patent inventors committed inequitable conduct by withholding three references from the PTO: the Biegeleisen article, the Puglisi article, and the O'Reilly article. (D.I. 70 ¶¶ 15-38; D.I. 69 ¶¶ 9-29).

The defendants' opposition brief confirms Diomed's point (D.I. 88 at 33-34) that the arguments based on the Biegeleisen and Puglisi articles were not supported by evidence.  It is silent about Biegeleisen and Puglisi, and affirmatively indicates that its claim is now based only on O'Reilly. (D.I. 119 at 32). Accordingly, Diomed is entitled to summary judgment on the defendants' inequitable conduct claims based on the Biegeleisen and Puglisi articles.

**B.    Summary Judgment Should Also Be Granted
With Respect To The O'Reilly Article.**

**1.    There Was No Intent To Deceive The PTO.**

In his expert report, Mr. Sunstein opined that Dr. Min prepared a study protocol

pertaining to the '777 patent invention, complete with a bibliography, then intentionally removed

that bibliography and forwarded the "stripped" version of the protocol to patent counsel.  Based

on this hypothetical timeline of events, Mr. Sunstein opined that Dr. Min had intended to deceive

the PTO by burying his bibliography.

Attorney Sunstein arrived at his hypothetical timeline based solely on the "Bates

Numbering" of certain documents.  Defendants do not now dispute that the timeline was false.

(Sunstein Decl. (D.I. 121) ¶ 6).  Accordingly, the defendants have abandoned the erroneous

timeline which originally formed the basis for the intent prong of their inequitable conduct claim.

Instead, they now assert that intent can be inferred solely from the fact that Dr. Min was aware of

the O'Reilly article (which he listed among dozens of articles in a bibliography relating to the

safety of using lasers – a task that occurred after Dr. Min had completed his prior art search and

in good faith disclosed all of his results to patent counsel). (D.I. 119 at 40-42; D.I. 88 at 26-27)).

The defendants argue that the O'Reilly article was listed first in the safety bibliography

because Dr. Min believed it important.  But the sole evidence on this issue is to the contrary.  Dr.

Min explained that the articles were broken down into categories, and then organized

chronologically within those categories. (Id.).  O'Reilly was the oldest reference in the

"endovascular use" section, so it came first. (D.I. 119 at 42).

Defendants cite no contrary evidence.  Instead, they argue that Dr. Min's "credibility"

must be tested at trial, but there is no evidence to create a genuine issue of his credibility.

Dr. Min's explanation of how he organized the bibliography is logical; his testimony and

the order of documents in the bibliography itself bear this out.  A trial in which Dr. Min would

merely reiterate his testimony would waste the time and resources of the parties and the Court, as

the applicable evidence is undisputed.  This is particularly true for a subject such as inequitable conduct, in which the defendants bear a very high burden to support their allegation (which the Federal Circuit has called a "scourge" on patent litigation).  Summary judgment is appropriate.

Finally, as established in Diomed's opening brief, Diomed should be granted summary judgment for the independent reason that, as Dr. Min testified, he believed in good faith that O'Reilly was far afield from the present invention. (D.I. 88 at 27-28) (citing numerous cases holding that testimony of good-faith belief in lack of relevance of missing reference precludes a finding of inequitable conduct).  The defendants' only response is to re-argue that the placement of O'Reilly in the bibliography somehow shows lack of such a belief.  The argument is circular.  Dr. Min explained that the place of the article within the bibliography was unrelated to its relevance, and the defendants have no documentary or testimonial evidence to the contrary.[14]

## 2.    O'Reilly Is Not Material.

The defendants cannot dispute that O'Reilly lacks three limitations of claim 9 of the '777 patent: (1) contact between the laser emitting section of the fiber tip and the vessel wall; (2) compression of the vessel; and (3) drainage of blood from the vessel. (D.I. 88 at 28-33).

The defendants' base their materiality argument on a lone case holding that a reference lacking a single claim limitation might still be material under the right circumstances. Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1328 (Fed. Cir. 1998) ("A difference in a single element … important to the patented invention, is not automatically dispositive of the issue of materiality.") (emphasis added).  The court's language strongly suggests what would otherwise be evident anyway: the absence of multiple claim limitations in a reference (as here) does deprive that reference of materiality.

---

[14] In addition, because O'Reilly's materiality is so low – as it is missing three of the elements of the broadest claim in the '777 patent – heightened evidence of intent would be necessary. Abbot Labs. v. TorPharm, Inc., 300 F.3d 1367, 1380 (Fed. Cir. 2002) (affirming summary judgment of no inequitable conduct).  The defendants have none.

Here, the O'Reilly article indisputably lacks not one, not two, but three key limitations of even the broadest claim of the '777 patent, therefore precluding the O'Reilly reference from presenting a prima facie case of invalidity as required by Rule 56(b)(1).

The defendants also raise the second part of Rule 56 – under which information that "refutes, or is inconsistent with" a position taken before the PTO can be considered material (D.I. 119 at 38-39) – but offer no explanation of what relevance it has here.[15]

## III.   THE DEFENDANTS INFRINGE THE '777 PATENT.

In its opening brief, Diomed set forth overwhelming evidence that (a) customers use the defendants' kits in procedures that directly infringe the '777 patent; and (b) the defendants train and instruct their customers to perform procedures that constitute direct infringement. (D.I. 92 at 8-16; 19-23).

In response, the defendants advance two primary arguments.  First, they claim that Diomed lacks sufficient evidence of infringement by specific, individual customers using the defendants' branded hardware.  This argument depends on the assumption that their kits are somehow different, or used differently, in a material respect.  The proposition is flatly untrue (D.I. 92 at 7; D.I. 125 at 3), *and neither defendant presents a scintilla of evidence for it*.

---

[15] The defendants suggest that O'Reilly could be considered material because it is "the only piece of prior art that taught damage to the vessel wall by *contact of the laser energy* [not the laser fiber tip] *with the wall*." (D.I. 119 at 36) (emphasis added).  In other words, even though O'Reilly does not disclose contact of the laser fiber tip with the vessel wall as claimed in the '777 patent, the defendants seem to argue that it discloses a procedure in which laser energy emitted from the fiber tip would reach the vessel wall rather than first being absorbed in a coating or in the blood (as in other references).  The defendants appear to be suggesting that O'Reilly would "refute" a position taken by the applicants during prosecution because it discloses absorption of laser energy by the vessel wall.  If this is their argument, it is wrong.  In response to the one substantive Office Action during prosecution of the '777 patent, the applicants distinguished the Goldman patent because, "unlike the claimed invention, there is no intraluminal contact with the blood vessel." (Response (Ex. 1 to the 2d Strand Decl.) at 6 (emphasis added).  Contrary to the defendants' assertion, the patentees did not overcome Goldman by arguing about the direction of the laser energy, but instead focused on the lack of contact in Goldman, one of the same key elements that is missing from O'Reilly.  Thus, as a matter of law, O'Reilly does not "compel a conclusion that the claim is unpatentable" as required by the version of Rule 56 in effect today and applicable to the prosecution of the '777 patent.  The defendants further suggest that they might fare better under the pre-1992 version of Rule 56, but cite no authority for the proposition that a reference lacking three claim limitations can be considered material, even under that standard (or any other materiality standard). (D.I.119 at 37-38).

- 13 -

In point of fact, the defendants' kits are essentially identical, and their customers uniformly follow their directions (presented in instructions-for-use, training presentations and marketing materials) to deliberately inject tumescent anesthesia, which compresses the vein, drains blood from the vein, and results in contact between the laser fiber tip and the vessel wall.

The defendants' second primary argument is that by using disclaimers "warning" their customers not to make contact, they evidence a lack of intent to induce infringement.  This argument fails as a matter of law.

    **A.**       **Direct Infringement Of The '777 Patent Claims.**

        **1.**     **The Defendants' Instructions For Use And Physician Training Establish Direct Infringement Because Tumescent Anesthesia Is A Method Of Deliberately Causing Contact.**

The defendants do not dispute that they instruct their customers to deliberately inject tumescent anesthesia into the compartment around the vein before performing a procedure.  The defendants also do not dispute that their customers follow this instruction, knowing that their deliberate injection of tumescent anesthesia will lead to compression of the vein and drainage of its blood. (D.I. 92  at 10-11).[16]  Finally, contrary to litigation-driven declarations proffered recently, the defendants have repeatedly admitted in public documents that, in turn, this deliberate injection of tumescent anesthesia leads to contact between the laser fiber tip and the vessel wall. (D.I. 92  at 12-14).

The defendants now claim that they teach the use of tumescent anesthesia only to dull pain and act as a heat sink, and that although they desire "some" compression, they do not "intend" for the vein to compress sufficiently that contact with the fiber tip ensues.  However, contrary to VSI's assertion, this case is analogous to the situation in <u>Dow Chemical</u>, where the Federal Circuit explicitly held that a method claim can be infringed even if one of the steps is

---

[16] Diomed hereby incorporates its arguments regarding validity under § 112 from its opposition brief.  (D.I. 125). Defendants' arguments do not preclude a finding of validity on summary judgment in Diomed's favor.

performed for a different purpose than that stated in the patent specification. <u>Dow Chem. Co. v. Mee Indus., Inc.</u>, 341 F.3d 1370, 1380 (Fed. Cir. 2003).  Thus, the '777 patent is necessarily infringed because the (admittedly deliberate) step of injecting tumescent anesthesia leads to the claimed result: contact between the laser fiber tip and the vessel wall – regardless of claims about "intention" to the contrary.

Both defendants admonish Diomed for allegedly failing to present direct evidence that specific procedures performed with the defendants' branded products by specific physicians in their offices in fact result in contact. (D.I. 126 at 4-5; D.I. 134 at 6-8).  The argument is a factual red herring.  Diomed presents substantial evidence that *all* endovenous laser procedures performed with the defendants' kits (which are essentially identical to one another and to Diomed's kit, <u>see</u> D.I. 92 at 7; D.I. 125 at 3) involve injection of tumescent anesthesia around the vein and result in contact. (D.I. 92 at 9-14, 19; D.I. 7-9).  Moreover, Diomed presents specific evidence of infringement when the defendants' kits were used by individuals such as Drs. Navarro and Min, as well as the defendants' own experts. (D.I. 92 at 16-18).

The argument is also legally irrelevant (and invites legal error), because the Federal Circuit has repeatedly held – including just two weeks ago – that direct evidence of infringement is unnecessary in this context. <u>E.g.</u>, <u>Golden Blount, Inc. v. Robert H. Peterson Co.</u>, -- F.3d --, 2006 WL 335607, at *4 (Fed. Cir. Feb. 15, 2006) ("We reject Peterson's argument that Golden Blount could not rely on the instruction sheets to prove acts of direct infringement by end-users.").

### 2.     <u>Contact Is Maintained During The Laser Ablation Procedure</u>.

Contrary to defendants' assertions (D.I. 126 at 25-26; D.I. 134 at 5-6), Diomed does not claim that only "fleeting" contact with the vein wall is sufficient to infringe the '777 patent..

First, contact *is* sustained during the entire procedure performed by users of defendants' kits. (D.I. 92  at 16-18).

- 15 -

Second, as construed by the Court, the claim language requires that the laser energy is emitted from the tip while contact is maintained with the vessel wall such that the energy causes sufficient damage to the vein to "decrease the diameter of the blood vessel." (Claim Construction Order (D.I. 55) at 12-13)  This construction requires that the contact be "maintained" for a sufficient time to cause a therapeutically effective treatment, and Diomed has overwhelming evidence that this is exactly what happens. (D.I. 92  at 16-18).  The construction certainly does not exclude the possibility of moments when contact is lost between the laser fiber tip and vessel wall. Cf. Arthrocare Corp. v. Smith & Nephew, Inc., 406 F.3d 1365, 1376 (Fed. Cir. 2005) (claim that required a *lack* of contact was infringed even if contact *was* achieved at some points).

Once again, Defendants' argument concerning the necessity of "direct evidence" of what specific procedures are being performed in private offices (D.I. 126 at 4-5; D.I. 134 at 6-8) is both factually incorrect (because Diomed presents ample evidence that *all* such procedures result in maintained contact, including several performed with the defendants' kits) and legally flawed (because direct evidence is unnecessary in any event).

Furthermore, both defendants' suggestions that infringement has not been proven because their customers may not perform effective, reliable procedures to reduce the diameter of the vein (D.I. 134 at n. 9; D.I. 126 at n. 4) are disingenuous in light of their own marketing to the contrary. (E.g., Ex. 2 to 2d Strand Decl. (website printouts of defendants' websites regarding the purported effectiveness of procedures using their kits)). See Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 859 n. 11 (Fed. Cir. 1988) (admonishing defendant for making different claims of effectiveness of device in court and in marketing).

**3.      Emission Of Laser Energy From The Side Of The Tip Infringes.**

The defendants argue that under the Court's claim construction, the "tip" of the fiber must be limited solely to its flat front face. (D.I. 134 at 15; D.I. 126 at 28).  Yet the Court's interpretation specifies that the tip be "uncoated," i.e., merely leaving the core bare and able to emit laser energy.  This definition comports with the ordinary meaning of "tip," which would include the approximately 2cm section extending beyond the protective jacket.  The defendants themselves have acknowledged this definition encompasses more than just the extreme front end itself.  ((D.I. 99, Ex. 19 (Dr. Kabnick Depo.) at 238 (referring to the "**end** of the fiber tip") (emphasis added); Ex. 42 (Root Depo.) at 155 (referring to the "**side** of the fiber **tip**") (emphasis added)).  Moreover, this ordinary construction of "tip" encompasses the portion of the laser fiber tip where the cladding has degraded, revealing the uncoated silica core (a phenomenon about which there is no genuine dispute[17]).  Thus, contact of that uncoated portion with the vein wall will infringe the claims. (D.I. 92  at 15-16).

**B.      The Defendants Induce Direct Infringement And Cannot Avoid Inducement By Including "Disclaimers".**

In addition to the multiple cases cited in Diomed's briefs for the proposition (D.I. 92 at 11; D.I. 125 at 10), this month the Federal Circuit once again reaffirmed that when "instruction sheets teach an infringing" method, those sheets "prove acts of direct infringement by end-users." Golden Blount, 2006 WL 335607 at *6.

The defendants say that a "paradox" exists in Diomed's argument, claiming that it does not make sense that the defendants' customers would follow their instructions concerning the application of tumescent anesthesia, while disregarding their instructions to "not make contact." (D.I. 134 at 11; D.I. 126. at 26-27).  No paradox exists, however, as defendants admitted pre-litigation, the instruction to "not make contact" is impossible to follow. (D.I. 92 at 12-14).

---

[17] VSI's CEO Howard Root explained the phenomenon at his deposition. (Ex. 42 at 150 to D.I. 99).

Indeed, despite the disclaimers, the defendants' products are unquestionably designed for *contact-based* procedures.   Both defendants have developed and applied for patents on "centering" devices specifically designed to prevent contact between the laser fiber tip and the vessel wall, **yet neither defendant has commercialized such a device**. (D.I. 125 at 10).

Any reasonable jury would conclude that the defendants' disclaimers, which directly contradict their own admissions that contact is inevitable in the absence of a centering device, were concocted to avoid liability and do not negate the defendants' inducement of infringement.

Even without the extensive evidence that defendants' disclaimers are meaningless, courts have consistently held that "labeling a product to warn against infringing uses is not sufficient to avoid liability for inducing infringement." John Hopkins Univ. v. CellPro, 1997 U.S. Dist. Lexis 24162, *41 (D. Del. July 24, 1997), vacated in part on other grounds, 152 F.3d 1342 (Fed. Cir. 1998). See also Lifescan, Inc. v. Can-Am Care Corp., 859 F. Supp. 392, 396 (N.D. Cal. 1994) (denying a motion for summary judgment of no inducement based on such a disclaimer); Am. Standard Inc. v. Pfizer Inc., 722 F. Supp. 86, 103 (D. Del. 1989) ("[I]t is well settled that the mere labeling of a product . . . is insufficient as a matter of law to avoid infringement.").  Both as a factual matter and as a matter of law, the disclaimers are irrelevant.

Moreover, as discussed above, when the end users of the defendants' kits inject tumescent, they necessarily cause contact between the laser fiber and the vessel wall.  The repeated evidence of carbonization and trenching shown in the literature and as produced in this case proves that direct contact occurs with tumescent anesthesia and that the contact is what causes the ultimate, reliable closure of the vein.[18] (D.I. 92  at 18).

---

[18] This evidence of carbonization, much of which was created before AngioDynamics included the "10mm wheel" instruction in their IFUs, shows that it is the application of tumescent anesthesia (i.e., a large amount of fluid to create a "tumescence," or swelling of the tissues (Amer. Heritage Dict. at <dictionary.com>) that causes the contact. AngioDynamics' specific "10mm wheel" instruction is not necessary to create the contact and infringement. Regardless, even if it was necessary, AngioDynamics would be liable for past damages for the period of time in which it included the 10mm wheel instruction in its IFUs.

The defendants attempt to circumvent this evidence by manipulating Dr. Anderson's testimony, in which he states that damage in the vein wall occurs at temperatures at 60 degrees centigrade. (D.I. 126 at 12-14; D.I. 134 at 13-14). To begin, with every quote the defendants take from Dr. Anderson's testimony, they omit the fact that the hypothetical set up by defendants during questioning (i.e., maintaining a 1 mm separation between the tip and the vein wall) "would be very unlikely" during an actual procedure. (Anderson Depo. at 135). Dr. Anderson continued that if there was separation between the vein wall and the laser fiber tip, he "would not expect to see carbonization of the wall." (Id.).[19] Defendants do not contest, however, that there is carbonization on the published slides from their own expert, in other articles showing excised veins after ILA procedures, in the slides produced by Diomed's expert Dr. Fan, and in slides produced by Dr. Navarro of veins treated with laser fibers, including the defendants' laser fibers. (D.I. 92 at 18; Fan Decl. ¶¶ 48-52). Thus, this carbonization is evidence of the contact between the laser fiber tip and the vessel wall, and the defendants' infringement.

Defendants further attempt to impeach Dr. Anderson by stating that all his analysis is "theoretical." This label does not take away from the fact, however, that his calculations show how Dr. Proebstle's theory of vein wall damage (i.e., steam bubbles) is physically impossible. (D.I. 92 at 5-6). Defendants provide no rebuttal to show how only 2% of the laser energy could cause permanent collapse of the vein, while the other 98% is absorbed by the vein tissue.[20]

For these reasons, there is no question of material fact that defendants induce the end users of their kits to directly infringe the '777 patent. Diomed is entitled to summary judgment.

---

[19] Defendants' citation to Dr. Anderson's patent concerning the *transdermal* treatment of vessels is also misplaced. While he does claim in that patent that a vein can be damaged through the skin, preventing laser fiber tip contact, in those cases the vein is *not* carbonized as it is only brought to a temperature of 60 degrees centigrade by transdermal application of laser energy. In this case of endoluminal ablation, however, every excised vein evidences carbonization, the sign of vein wall/laser fiber tip contact. (D.I. 92 at 5-6, 18).

[20] Defendants highlight in their briefs quotes from Dr. Min concerning the "steam bubble" theory, but these statements do not create any issue of fact. Diomed and its experts, including Dr. Min, do not disagree that the steam bubbles play some role in the damage to the vein, they merely conclude that the bubbles cannot be the primary mechanism by which the vein is destroyed. (D.I. 92 at 5-6).

## C.     Defendants Contributorily Infringe The '777 Patent.

Defendants' only argument as to why they do not contribute to infringement of the '777 patent is their contention that there are substantial non-infringing uses of their products.  Similar to defendants' inducement arguments, they claim that doctors use their kits as to not cause contact between the laser fiber tip and the vessel wall, even though they admit the end users apply tumescent anesthesia. (D.I. 134 at 18-19; D.I. 126 at 28-29).  The end users of defendants' kits necessarily infringe the '777 patent as each user uses tumescent anesthesia in the procedures and cannot prevent contact without a specialized device designed to prevent the contact. (D.I. 125 at 9-10).  For this reason, Diomed is entitled to summary judgment that defendants contributorily infringe the '777 patent.

## CONCLUSION

For the reasons above and those set forth in Diomed's opening briefs, Diomed respectfully requests the Court grant Diomed's motions for summary judgment (D.I. 87, 89).

Respectfully submitted,

DIOMED, INC.

By its attorneys,

Dated: February 28, 2006

/s/ Michael A. Albert
Michael A. Albert (BBO #558566)
malbert@wolfgreenfield.com
Michael N. Rader (BBO #646990)
mrader@wolfgreenfield.com
John L. Strand (BBO #654985)
jstrand@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8000

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document is being filed through the Court's electronic filing system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF).  Any counsel for other parties who are not registered participants are being served by first class mail on the date of electronic filing.


<u>/s/ Michael A. Albert        </u>
Michael A. Albert