THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2/28/06

| | |
|---|---|
| DIOMED, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>ANGIODYNAMICS, INC,<br><br>        Defendant. | Civil Action No. 04-10019 RGS |
| DIOMED, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>VASCULAR SOLUTIONS, INC.,<br><br>        Defendant. | Civil Action No. 04-10444 RGS<br>**(CONSOLIDATED UNDER<br>04-10019 RGS)** |

## SECOND DECLARATION OF JOHN L. STRAND

1.    I, John L. Strand, am an attorney with Wolf, Greenfield & Sacks, P.C., counsel for Diomed in the above captioned matter.

2.    Attached as Exhibit 1 is a true and accurate copy of an office action response dated March 15, 2001 (paper number 8) from the file history of the patent application that led to the '777 patent

3.    Attached as Exhibit 2 is a true and accurate copy of print-outs from the websites of the defendants dated February 27, 2006

4.    Attached as Exhibit 3 is a true and correct copy of Defendant Angiodynamics, Inc.'s Supplemental Answers To Plaintiff's First And Second Sets Of Interrogatories To Defendant Angiodynamics, Inc.

989334.1

5.    Attached as Exhibit 4  is a true and correct copy of Defendant's Supplemental Answers To Plaintiff's First Set Of Interrogatories To Defendant Vascular Solutions, Inc.

6.    Attached as Exhibit 5 is a true and correct copy of  a portion of William Appling's Deposition (Angiodynamics' Rule 30(b)(6) deposition on validity ) taken on November 10, 2005.

7.    Attached as Exhibit 6 is a true and correct copy of  portions of a book entitled, Lasers In Cutaneous and Aesthetic Surgery, Kenneth A. Arndt, M.D., Jeffrey S. Dover, M.D., Suzanne M. Olbricht, M.D., Lippincott-Raven Publishers (1997 ).

I swear under the pains and penalties of perjury that the foregoing is true and accurate to the best of my knowledge and belief.


Dated: February 28,  2006                            _____/s/ John L. Strand_____


John L. Strand

#8/ A file
non-compliss
578.1001



## UNITED STATES PATENT AND TRADEMARK OFFICE

Examiner: A. Farah          Art Unit: 3739

Re:    Application of:          Luis NAVARRO, et al.

Serial No.:          09/374,280

Filed:          August 13, 1999

For:          TREATMENT OF LARGE VEINS

### AMENDMENT

Assistant Commissioner for Patents                    March 15, 2001
Washington, D.C. 20231

Sir:

In response to the Office Action dated November 15, 2000, entry and consideration of the

following amendments and remarks are respectfully requested.

04/02/2001 LFULTON 00000001 500518 09374280
01 FC:103          18.00 CH

RECEIVED

MAR 2 2 2001

TECHNOLOGY CENTER R3700

I hereby certify that this correspondence and/or
fee is being deposited with the United States
Postal Service as first class mail in an envelope
addressed to "Assistant Commissioner for Patents
Washington, D.C. 20231" on March 15, 2001
STEINBERG & RASKIN, P.C.

BY: Jeanette McPherson

RECEIVED
MAR 26 2001
TC 3700 MAIL ROOM

1

D028422

**IN THE CLAIMS:**

Please amend the claims as follows:

1. (Amended) A blood vessel treatment device comprising:

means adapted for insertion into a blood vessel; and

means[,] adapted for intraluminal contact with a wall of [a] said blood vessel, for emitting laser energy to cause a decrease in the diameter of said blood vessel.

Please add new claim 21 as follows:

21. A method of treating a blood vessel using laser energy, comprising the steps of:

inserting means for emitting laser energy into the blood vessel at a puncture site, wherein said emitting means has a laser emitting section;

placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment site;

emptying the blood vessel; and

emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of said blood vessel.

2

D028423

## REMARKS

Reconsideration of the present application, as amended, is respectfully requested.

### I.     Status of the Claims

Claims 1-21 are now pending, claim 1 having been amended and new claim 21 having been added. New independent claim 21 includes the subject matter of allowable claim 10 and base claim 9. Thus it is submitted that independent claim 21 is allowable.

### II.     Rejections Under 35 U.S.C. §112

Claims 1-8 were rejected under 35 U.S.C. §112, first paragraph, on the grounds that the claim recited a single means and is therefore subject to an undue breadth rejection.

Independent claim 1 has been amended herein to recite two "means". Specifically claim 1 has been amended to recite that the claimed device comprises "means adapted for insertion into a blood vessel; and means adapted for intraluminal contact with a wall of said blood vessel, for emitting laser energy to cause a decrease in the diameter of said blood vessel". Accordingly, it is submitted that the Examiner's rejection of claim 1 under 35 U.S.C. §112, first paragraph has been overcome and should be withdrawn.

3

D028424

### III.    Rejection Under 35 U.S.C. §102 (b)

Claims 1-4, 7-9, 12, 13, 18 and 19 were rejected under 35 U.S.C. 102(b) as being clearly anticipated by Trelles U.S. Patent No. 5,531,739. The Examiner's rejection is respectfully traversed.

Independent claim 1 recites a blood vessel treatment device which includes "means adapted for *intraluminal* contact with a wall of said blood vessel, for emitting laser energy to cause a decrease in the diameter of said blood vessel". (emphasis added) Thus the device according to the claimed intention, as shown in Figure 4B, is adapted to be inserted within the vein to be treated so that contact with the blood vessel wall is made *from within the vein* (i.e. intraluminal contact).

It is respectfully submitted that a close review of the Trelles reference reveals that it fails to teach any device which is adapted to make "*intraluminal* contact with a wall of a blood vessel" in the manner of the claimed invention. Trelles discloses a method in which a probe is advanced to a position *underneath* the vessel to be treated. Once in this position the vein is irradiated from a position *exterior* of the vein. This is clearly depicted in Fig. 2 of the Trelles patent. In view of the forgoing it is clear that Trelles fails to disclose a device which is adapted to make intraluminal contact with a wall of a blood vessel in the manner of the claimed invention and therefore cannot anticipate the device recited in claim 1.

4

D028425

Claims 2-4 and 7-8 depend directly from claim 1 and thereby incorporate all of the features and limitations recited in claim 1. Therefore it is respectfully submitted that Trelles also fails to anticipate the invention recited in these claims.

Independent claim 9 recites a method which includes the step of "placing said laser emitting section into *intraluminal* contact with the blood vessel at a treatment side". As discussed above with respect to claim 1 Trelles fails to disclose a method wherein a laser emitting section of a device is placed into intraluminal contact with a blood vessel. Rather, as discussed above, Trelles discloses a method wherein the vessel is treated from a exterior position relative to the vessel. Accordingly it is submitted that Trelles cannot anticipate the claimed invention according to independent claim 9. Claims 12, 13 and 18 and 19 depend from claim 9 and therefore incorporate all of the limitations and features thereof. Accordingly it is submitted that Trelles also fails to anticipate claims 12, 13, 18 and 19.

The Examiner further rejected claims 1, 4, 9, 11, 17 and 19 under 35 U.S.C. 102(b) as being anticipated by Goldman U.S. Pat. No. 4,564,011. The Examiner's rejection is respectfully traversed.

Independent claim 1 recites a blood vessel treatment device including means "adapted for *intraluminal contact* with a wall of a blood vessel, for emitting laser energy to cause *a decrease in the diameter of said blood vessel*". (emphasis added) Thus the device according to the claimed invention is arranged inside the vein to be treated and then the laser is directed against a

5

D028426

wall of the vein to thereby cause fibrosis of the vein leading to a decrease in the diameter of the vein. (See specification p. 8, lines 16-28). It is respectfully submitted that a close review of the Goldman reference reveals that the device disclosed therein is not adapted to deliver energy *to the vein wall in an intraluminal manner to thereby decrease the diameter of the vein.*

Goldman discloses a laser optic device 11 which includes a needle 27. As shown in Fig. 3 and discussed at column 3, line 44 through column 4, line 32 the needle may be inserted within the vein. However as discussed in the specification of Goldman the laser energy is not directed into the wall of the blood vessel but rather is *used to create a blood clot in the vessel.* Accordingly, unlike the claimed invention, there is no intraluminal contact with the blood vessel nor any delivery of laser energy to the vessel wall to thereby cause a decrease in the *size* of the vessel. Rather in Goldman a blood clot is generated to thereby cause a stoppage of flow in the vessel which in turn causes a decrease in the diameter of the vessel.

In another application of the device disclosed in Goldman, discussed at column 4, lines 33-66, the needle 27 is inserted in a position *near* the blood vessel to be treated. The tissue *near* the vessel is then subjected to laser energy to cause this tissue to scar. This scar tissue exerts a pressure on the nearby vessel and "effectively stops the flow of blood therethrough". Again however there is no contact with the vessel wall and certainly no intraluminal contact with the blood vessel wall.

6

In view of the above it is submitted that Goldman fails to teach the device recited in claim 1. Claim 4 depends from claim 1 and therefore includes all of the limitations and features recited therein. Accordingly it is submitted that Goldman also fails to anticipate the invention recited in claim 4.

Independent claim 9 recites a method in which laser emitting means is placed in *intraluminal contact* with a blood vessel and laser energy is directed *into the blood vessel wall* to thereby decrease the diameter of the vessel. As discussed above with respect to the claim 1 the Goldman reference fails to teach any such method. Accordingly it is submitted that Goldman fails to anticipate the claimed invention according to claim 9. Claims 10-11, 17 and 19 depend from claim 9 and thus include all of the features and limitations recited therein thus it is submitted that Goldman also fails to anticipate claims 10-11, 17 and 19.

## IV.    Rejection Under 35 U.S.C. §103 (a)

The Examiner further rejected claims 5, 6, 14-16 and 20 under 35 U.S.C. §103(a) as being unpatentable over Trelles U.S. Pat. No. 5,531,739 in view of Gay, Jr. U.S. Pat. No. 5,334,207.

It is submitted that Gay, Jr. fails to overcome the deficiencies of the Trelles reference discussed above. That is, it is submitted that Gay, Jr. fails to disclose a device including means adapted for intraluminal contact with a wall of a blood vessel for emitting laser energy to cause a decrease in diameter of said blood vessel. Likewise it is submitted that Gay, Jr. fails to disclose a method which includes the steps of placing emitting means in intraluminal contact with a blood vessel and emitting laser energy to decrease the diameter of said blood vessel. Since Gay, Jr. fails

7

D028428

to overcome the deficiencies of Trelles it is submitted that it cannot be combined therewith to thereby render the claimed invention obvious.

A one-month extension of time extending the time for response from February 15, 2001 until March 15, 2001 is enclosed herewith together with the appropriate extension fee. The fee for the additional claim is also enclosed. If it is determined that any other fee is required, the Patent and Trademark Office is specifically authorized to charge such fee to Deposit Account No. 50-0518 in the name of Steinberg & Raskin, P.C.

According to currently recommended Patent Office policy, the Examiner is specifically authorized to contact the undersigned in the event that a telephonic interview would advance the prosecution of this application.

An early and favorable action on the merits is earnestly solicited.

Respectfully submitted,

STEINBERG & RASKIN, P.C.

Martin G. Raskin
Reg. No. 25,642

Paul J. Higgins
Reg. No. 44,152

Steinberg & Raskin, P.C.
1140 Avenue of the Americas
New York, New York 10036
(212) 768-3800

8





## About VenaCure™?

**Q    How is a laser procedure different from surgery?**

**A**    Surgery involves considerable preparation, general anesthesia, the risk of infection, pain in the affected areas, and a lengthy recovery period. The medical laser technology used in VenaCure eliminates all of that.

It's "minimally invasive." The entry point through which your physician gets the laser fiber to the target area is extremely small, not even requiring stitches.

There is really no "recovery" to speak of. In fact, you'll be up and walking as soon as it's over, able to return to full normal activity.

The risk of infection is extremely low.

It's not painful.

**Q    I've heard about lasers being used in medicine but I'm not sure how they work. Are they safe?**

**A**    Simply put, a laser is a highly concentrated beam of light. Medical lasers work by delivering this light energy to the targeted tissue with extreme precision so as not to affect the surrounding tissue. And they've proven their safety and effectiveness through years of use in all kinds of medical procedures, from ophthalmology to dermatology. In the hands of a skilled physician, lasers offer far less risk and complications than conventional surgery.

**Q    Exactly how does a laser treat varicose veins?**

**A**    Your veins carry blood from the capillaries to the heart. In your leg, this means the blood has to flow upward, against gravity. Consequently, these veins have one-way valves to prevent the blood from backflowing. Over time these valves can fail to close tightly, allowing blood to pool and causing the bulging and twisting characteristic of varicose veins.

VenaCure fixes this problem at the source by delivering just the right wavelength of laser energy to just the right tissue, causing the incompetent vein to close. Your body automatically routes the blood to other healthy veins.

**Q    What is the actual procedure like?**

**A**    It takes about 45 minutes and requires just local anesthesia. Your physician then inserts a thin laser fiber into the vein through a sheath and the laser light is emitted through the fiber. While you might feel some unfamiliar sensation, it is not painful. And it's all done in an outpatient setting like your physician's office or a one-day surgery center

### Step into your future without varicose veins and without surgery, thanks to VenaCure™, a true non-surgical laser procedure for varicose veins.

If you've been living with varicose veins for fear the treatment is too complicated, painful and risky, the questions and answers at left should make you feel a lot better about your future. Because thanks to VenaCure from AngioDynamics, the news couldn't be better: No, you don't have to live with varicose veins. And no, you don't need surgery to get rid of them.



**AngioDynamics
Precision 810™/Precision 980™ Laser**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Patient 1



**Before VenaCure Treatment**

Patient - About VenaCure Laser Vein Treatment                     http://www.venacure.com/patient/about/index.htm

**Q  How do I prepare?**

**A**  Simply avoid taking any food or liquid two hours before the procedure.

**Q  How long before I see the results?**

**A**  There may be some slight swelling right after the procedure, but you could start seeing results immediately.

**Q  Will they last?**

**A**  VenaCure has proved to be 97% effective—an outstanding record of success. Therefore, you should experience no reoccurrence in the veins that have been treated. Follow-up procedures may be desired to obtain optimal aesthetic results.

**Q  Will my insurance cover it?**

**A**  Check your policy and call your insurance provider to find out what their exact coverage will be.

**As you can see, the news is all good—no surgery, no pain, no recovery...and no varicose veins. If you suffer from this condition, now might be the time to do something about it. Ask your physician about the procedure and find out if VenaCure is right for you.**

**back to top**



**After VenaCure Treatment**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Patient 2**



**Before VenaCure Treatment**



**After VenaCure Treatment**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**About VenaCure | Testimonials | Articles and Journal Reports| News | Request More Information | Home**
Copyright © 2002, 2003, 2004 AngioDynamics, Inc. **Disclaimer**

   

« HOME

# Vari-Lase Endovenous Laser Therapy.

« Back to Products

Vari-Lase 810nm Laser Console »

Vari-Lase Endovenous Procedure »
Kit

Vari-Lase 940 Endovenous »
Procedure Kit

Procedure Packs »

AutoFill & VacLok »

The Vari-Lase Endovenous Laser System is designed to help physicians provide advanced treatment for varicose veins in the leg. Endovenous laser therapy is a patient-friendly alternative to surgical vein-stripping for the treatment of varicose veins.

In endovenous laser therapy, a thin laser fiber is inserted into the varicosed vein, generally through a small puncture in the leg above where the visual symptoms appear. The physician then delivers laser energy through the fiber which causes the vein to close as the fiber is gradually removed. Endovenous laser therapy can be performed in a physician's office in less than one hour, and the patient is encouraged to walk immediately following the procedure.

**Click here** to learn how the Vari-Lase endovenous laser therapy kit helps physicians treat varicose veins.



## Our Products.
Select a product to learn more
about our solutions.





Duett, Duett Pro, Diagnostic Duett Pro, Pronto, Langston, Max-Support and ThrombiGel are trademarks of Vascular Solutions, Inc. D-Stat, Vari-Lase, Acolysis are registered trademarks of Vascular Solutions, Inc.

©1999-2006 Vascular Solutions Inc. All rights reserved. Terms of Use

**Vascular Solutions, Inc.**
6464 Sycamore Court
Minneapolis, MN 55369
763.656.4300

Site by Electric Pulp

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIOMED, INC.,                                     )
                                                 )
                              Plaintiff,          )
                                                 )
       v.                                        )
                                                 )
ANGIODYNAMICS, INC.,                             )   CIVIL ACTION NO.: 04-10019(RGS)
                                                 )
                              Defendant.          )
                                                 )
              AND                                )
                                                 )
ANGIODYNAMICS, INC.,                             )
                                                 )
                      Counterclaim-Plaintiff,    )
                                                 )
       v.                                        )
                                                 )
DIOMED, INC. AND ENDOLASER, LLC,                 )
                                                 )
                      Counterclaim-Defendants.   )
DIOMED, INC.,                                    )
                                                 )
                              Plaintiff,          )
                                                 )   CIVIL ACTION NO.: 04-10444(RGS)
       v.                                        )
                                                 )
VASCULAR SOLUTIONS, INC.,                        )
                                                 )
                              Defendant.          )

May 6, 2005

**DEFENDANT ANGIODYNAMICS, INC.'S SUPPLEMENTAL ANSWERS TO
PLAINTIFF DIOMED'S FIRST AND SECOND SETS OF INTERROGATORIES
TO DEFENDANT ANGIODYNAMICS, INC.**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local

Rules of this Court, Defendant AngioDynamics, Inc. ("AngioDynamics") submits these

supplemental answers to Plaintiff Diomed, Inc.'s ("Diomed") First and Second Sets of

Interrogatories.  Defendant continues its investigation and answers only based on its present

sufficient for the Court to decide whether to grant or deny a motion for summary judgment" is

vague, ambiguous, and calls for a legal conclusion.

**SUPPLEMENTAL ANSWER:**    AngioDynamics further objects to Interrogatory No. 13 as

premature and states that it may provide additional documents responsive to this point in its

expert reports. Without waiving and subject to this and the foregoing objections,

AngioDynamics states that documents and things providing updated information responsive to

Interrogatory 13 have been produced to Diomed in pleadings and filings associated with the

Markman Hearing in this case; and is also included at least in documents and things produced

and identified to Diomed in previous correspondence including at least documents ANG 11145-

ANG 11161, ANG 11184 – ANG 11194, ANG 26000-26012, ANG 26014-26022 and ANG

26093 – ANG 26103; the deposition testimony of Dr. Puglisi and the exhibits identified therein;

the ENL-NAV 00072 - 00092; the Biegeleisen patent and paper; prior art or other documents

produced or identified by Diomed; as well as in documents produced to Diomed on July 23,

2004, April 18, 2005 and/or in documents being produced to Diomed today, May 6, 2005.

**Interrogatory No: 14**      **State the basis for AngioDynamics' Fourth Affirmative
Defense, in detail sufficient for the Court to decide whether to grant or deny a motion for
summary judgment thereon.**

  **ANSWER:**    AngioDynamics incorporates its General Objections set forth above as

though fully set forth herein. AngioDynamics further objects to Interrogatory No. 14 on the

grounds that it is premature in light of the Court-ordered Scheduling Order in this case.

AngioDynamics also objects to Interrogatory No. 14 on the grounds that the phrase "in detail

sufficient for the Court to decide whether to grant or deny a motion for summary judgment" is

vague, ambiguous, and calls for a legal conclusion.

**SUPPLEMENTAL ANSWER:**    AngioDynamics further objects to Interrogatory No. 14 as

premature and states that it may provide additional documents responsive to this point in its

expert reports.  Without waiving and subject to this and the foregoing objections,

AngioDynamics states that documents and things providing updated information responsive to

Interrogatory 14 have been produced to Diomed in pleadings and filings associated with the

Markman Hearing in this case; and is also included at least in documents and things produced

and identified to Diomed in previous correspondence including at least documents ANG 11145-

ANG 11161, ANG 11184 – ANG 11194, ANG 26000-26012,  ANG 26014-26022 and ANG

26093 – ANG 26103; the deposition testimony of Dr. Puglisi and the exhibits identified therein;

the ENL-NAV 00072 - 00092; the Biegeleisen patent and paper; prior art or other documents

produced or identified by Diomed; as well as in documents produced to Diomed on July 23,

2004, April 18, 2005 and/or in documents being produced to Diomed today, May 6, 2005.

**Interrogatory No. 15:**    State the basis for AngioDynamics' Fifth Affirmative Defense,
in detail sufficient for the Court to decide whether to grant or deny a motion for summary
judgment thereon.

**ANSWER:**    AngioDynamics incorporates its General Objections set forth above as

though fully set forth herein.  AngioDynamics further objects to Interrogatory No. 15 on the

grounds that it is premature in light of the Court-ordered Scheduling Order in this case.

AngioDynamics also objects to Interrogatory No. 15 on the grounds that the phrase "in detail

14

Dated: May 6, 2005

**DEFENDANT**
**ANGIODYNAMICS, INC.**
**BY ITS ATTORNEYS**

I hereby certify that a true copy
of the above document was served
upon the attorneys of record for
the Plaintiff and Counterclaim-
Defendants and attorneys for the Defendant in
the consolidated action by fax and regular mail
on May 6, 2005

By _____

MARK D. GIARRATANA
SETH M. WILSON (BBO# 640270)
McCarter & English, LLP
CityPlace I
185 Asylum Street
Hartford, CT 06103
(860) 275-6700
(860) 724-3397 (fax)
smwilson@mccarter.com
mgiarratana@mccarter.com
-and-
RODNEY S. DOWELL (BBO # 620916)
Berman & Dowell
210 Commercial Street
Boston, MA 02109
(671) 723-9911
(617) 723-6688 (fax)
rdowell@bermandowell.com

Seth M. Wilson

HARTFORD: 639425.01

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DIOMED, INC.                                    Civil File No. 04-CV-10444-(RGS)

           Plaintiff,

v.

VASCULAR SOLUTIONS, INC.

           Defendant.

and

DIOMED, INC.,                                   Civil Action No. 04-CV-10019 (RGS)

           Plaintiff,

v.

ANGIODYNAMICS, INC.,

           Defendant.

## DEFENDANT'S SUPPLEMENTAL ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT VASCULAR SOLUTIONS, INC.

**TO:** Plaintiff Diomed, Inc. and its attorneys Michael A. Albert, Wolf, Greenfield & Sacks, P.C., 600 Atlantic Avenue, Boston, Massachusetts 02210.

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of this Court, Defendant Vascular Solutions, Inc. ("VSI") submits these supplemental answers to Plaintiff's First Set of Interrogatories.

Defendant's investigation is ongoing and its answers are based on present knowledge and belief. VSI reserves the right to modify or supplement its responses if additional or different information is discovered at a later time.

**SUPPLEMENTAL RESPONSE:**    VSI further objects to Interrogatory

No. 15 on the grounds that it seeks the discovery of irrelevant information. The relevant

question is whether VSI actively induces physicians following its Vari-Lase procedure to

"deliberately put[] the uncoated tip of the fiber optic line in physical contact with the wall

of the blood vessel, which requires the drainage of blood and compression of the vein,"

and to "maintain[] the tip-interior surface in physical contact with the vessel wall while

laser energy is emitted to decrease the diameter of the blood vessel." VSI's recommended

procedure does not suggest or require these steps. VSI further states that, following its

recommended procedure, the laser emitting section of the laser fiber transmits laser

energy to the blood in the blood vessel. The laser emitting section is at the flat end of the

very tip of the fiber optic line. That laser emitting section will typically not be in physical

contact with the wall of the blood vessel during the emission of laser energy, but rather

will be located inside the vessel where the blood is located, because the physical

geometry of the sheath, the cladding, the blood, and the fiber will cause the laser emitting

section of the fiber to be in that location.

**INTERROGATORY NO. 16:**    **Identify all documents and things, including all Prior Art, that support your argument that one or more claims of the '777 patent is invalid.**

**RESPONSE:**    VSI incorporates its General Objections set forth above as

though fully set forth herein. Without waiving and subject to the foregoing objections,

VSI states that it will produce documents in response to Interrogatory 16 upon entry of a

suitable protective order.

**SUPPLEMENTAL RESPONSE:**     VSI further objects to Interrogatory 16 as premature and states that it will address the invalidity issue and identify Prior Art on which it plans to rely in its expert reports. Without waiving that objection, VSI states that it may rely on the following Prior Art:  1) the Puglisi article, videotape, and other documents identified as exhibits during Puglisi's recent deposition; 2) the Farley patent; and 3) the Biegeleisen article and patent.

**INTERROGATORY NO. 19:     Identify, by date and location, all training programs you have provided with respect to Laser Vein Treatment, identify all individuals involved in and/or attending such programs, and identify all documents concerning such programs.**

**RESPONSE:**     VSI incorporates its General Objections set forth above as though fully set forth herein.  VSI further objects to Interrogatory No. 19 on the grounds that its request for the identity of "all documents" is overly broad and unduly burdensome.  Without waiving and subject to the foregoing objections, VSI states that documents containing information responsive to Interrogatory 19 will be produced upon entry of a suitable protective order.

**SUPPLEMENTAL RESPONSE:**     Without waiving and subject to the foregoing objections, VSI states that at least documents VSI 022107-022109 contain information regarding VSI's training programs.  VSI further states that Deborah Neymark, Nancy Arnold, Tony Jakubowski and Lisa Rathpun (since 2005) have conducted training on behalf of VSI.

8

**INTERROGATORY NO. 22:**    Identify each person consulted in connection the with the preparation of responses to the foregoing interrogatories, and/or consulted in connection with this lawsuit in any way, and identify the subject matter discussed with each such person.

**RESPONSE:**    VSI incorporates its General Objections set forth above as though fully set forth herein. VSI further objects to Interrogatory No. 22 to the extent that it seeks information protected from discovery by the attorney-client privilege and the work-product doctrine. Without waiving and subject to the foregoing objections, VSI states that, in conjunction with counsel, Howard Root oversaw the preparation of the interrogatory responses and consulted with the following VSI employees: Nancy Arnold, Mike Nagle, Deborah Neymark, and Tony Jakubowski.

**SUPPLEMENTAL RESPONSE:**    Without waiving and subject to the foregoing objections, VSI states that, in conjunction with counsel, Howard Root oversaw the preparation of the supplemental interrogatory responses.

Dated: May 6, 2004

DORSEY & WHITNEY LLP

By _____
J. Thomas Vitt MN #0183817
Todd R. Trumpold MN #0313890
50 South Sixth Street, Ste. 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

9

Steven L. Feldman (BBO #162290)
100 N. Washington St.
Boston, MA 02114
Telephone: (617) 742-4200

Attorneys for Defendant
Vascular Solutions, Inc.

```
 1                  UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2
 3      --------------------------
        DIOMED, INC.,                   )
 4               Plaintiff,        ) CIVIL ACTION NO.
                                   ) 04-10019 RGS
 5               vs                )
                                   )
 6      ANGIODYNAMICS, INC.,       )
                 Defendant.        )
 7      --------------------------
        DIOMED, INC.,                   )
 8               Plaintiff,        ) CIVIL ACTION NO.
                                   ) 04-10444 RGS
 9               vs                )
                                   )
10      VASCULAR SOLUTIONS, INC.,) (CONSOLIDATED UNDER
                 Defendant.     )  04-10019 RGS)
11      --------------------------
12
13
                           VOLUME II
14      ------------------------------------------------
              Deposition of: WILLIAM APPLING
15      ------------------------------------------------
16
17          Taken before Tina M. Davis, Stenographer and
        Notary Public in and for the State of Connecticut,
18      pursuant to notice, at the offices of
        McCARTER & ENGLISH, CityPlace I, 185 Asylum Street,
19      Hartford, Connecticut, on Thursday,
        November 10, 2005 scheduled to commence at
20      approximately 1:00 p.m.
21
22
23                      Tina M. Davis, LSR
                         License No. 00221
24               Brandon Smith Reporting Service
                        44 Capitol Avenue
25                     Hartford, CT  06106
                         (860) 549-1850
```

William Appling, Vol. 2                                                11/10/2005.

Page 310

1  objective with search and development products is," et
2  cetera, et cetera, 70 percent?
3     A. 70 percent is our target.
4     Q. But when I read that it looked to me like it was
5  suggesting that your target might be something different
6  for products that weren't search and development
7  products, and that's what I'm trying to understand.
8     A. No, that's not what it means. We're going to
9  apply the same objectives for gross margin to products
10  regardless of their origin.
11     Q. Okay. On page 34479 it says, "Our goal is to
12  evolve to gross margins of 70 percent in the USA,
13  50 percent in the rest of the world." By that I --
14     A. That's right.
15     Q. -- assume that that means that the company is
16  currently not at that goal yet; is that right?
17     A. That's right.
18     Q. Now, under the section entitled Implementation
19  Plan, all of which has been erased or redacted on
20  page 34483, what generically would have been included in
21  this category? Would this be how you would describe how
22  you're going to implement getting to your goal?
23     A. I don't know. I don't recall what's been
24  redacted.
25     Q. Who is responsible for preparing the strategic

Page 311

1  plan?
2     A. The management staff.
3     Q. So if you don't know what would have been under
4  this section, who would know that?
5     A. There was no -- there was no implementation plan
6  in this document. What this would have said would have
7  referred on to other plans, other departmental plans not
8  included in the strategic plan.
9     Q. Other departmental plans?
10     A. Just more categorical plans.
11     Q. Has AngioDynamics conducted any studies of the
12  laser emitting properties of the tip of a fiber after
13  procedure has been done with VenaCure?
14     A. Not that I'm aware of.
15     Q. Are you aware of whether any laser energy emits
16  from anything other than the flat face of the fiber
17  after or during the course of a procedure?
18     A. Repeat that question, please.
19     Q. Yes.
20        Do you know one way or the other whether any
21  laser energy is emitted by the tip of a fiber from, say,
22  the side of the tip, rather than the front of the tip
23  during the course of a VenaCure procedure?
24     A. It's my opinion that there is no energy laser
25  energy emitted from the side of a fiber during the

Page 312

1  course of a procedure.
2     Q. My question is do you know one way or the other
3  whether that's the case based on any evidence that you
4  have had brought to your attention by anyone or anything
5  that you've done yourself to make that determination?
6     A. I don't know one way or another. I have not done
7  any testing.
8     Q. Okay. If someone were to say that the cladding
9  degrades on the side of the tip during the course of a
10  procedure and that laser energy emits from the side.
11  You wouldn't know one way or the other whether they're
12  right or wrong?
13        MR. BRIGHT: Objection to the form of the
14  question, foundation. It's a hypothetical. You can
15  answer if you can.
16  BY MR. ALBERT:
17     Q. Well, I think that's what you said before. I'm
18  just making sure.
19     A. Say that again.
20     Q. Yes. If you were shown evidence that energy
21  emits from the side of the fiber tip because the
22  cladding has degraded during the course of a procedure,
23  my question is do you have any evidence one way or the
24  other as to whether that is true?
25        MR. BRIGHT: Objection to the form of the

Page 313

1  question. You can answer it.
2     A. I do not have any evidence.
3  BY MR. ALBERT:
4     Q. You're not aware that the company has any such
5  evidence; right?
6     A. I'm not aware of it.
7     Q. Or any expert witness who is consulting on behalf
8  of the company in this lawsuit?
9     A. Not that I'm aware of.
10     Q. I'd like to ask you what the basis is for
11  AngioDynamics contention that the 777 patent is invalid?
12     A. That the -- a few examples would be that relevant
13  prior art was not disclosed to the patent office during
14  the prosecution of a patent, prior art that was known by
15  inventors at the time.
16     Q. Okay. Are you referring to the information
17  that's discussed in the reports provided by Dr. Sampson
18  and by Mr. Sunstein?
19     A. Yes, I am.
20     Q. Okay. Is it the company's position that those
21  reports and that the testimony provided by those two
22  individuals represents the company's position as to why
23  the patent is invalid or unenforceable?
24     A. There may be additional arguments to be made, but
25  those -- those expert reports contain some of the

24 (Pages 310 to 313)

William Appling, Vol. 2                                           11/10/2005

Page 314

1  reasons we feel that the patent is invalid.
2     Q. All right. I'd like to know what all the reasons
3  are. We have a very detailed report from Mr. Sunstein,
4  a very detailed report from Dr. Sampson, accompanying
5  materials, and in both cases some expert testimony that
6  has been given at depositions. I'd like to know whether
7  the company has any other basis, other than what's in
8  those expert reports and the accompanying materials, for
9  taking the position that the patent is invalid?
10    And I ask you that as the 30(b)(6) witness of the
11 company if you want to confer with counsel to understand
12 what that means. That's what I'd like to know.
13    MR. BRIGHT: Just the -- well, let me just
14 talk to you for a second.
15    THE WITNESS: Yes.
16
17    (Off the record.)
18
19    MR. BRIGHT: Let me also say that I don't
20 have in front of me our interrogatory responses, and
21 there may be --
22    MR. ALBERT: You can add to that to the list
23 of things that are the basis for the company's position
24 or not.
25    MR. BRIGHT: That's all I'm saying.

Page 315

1     MR. ALBERT: Okay.
2     MR. BRIGHT: In addition to what's in the
3  expert reports and in the interrogatory responses and
4  then whatever else Mr. Appling wants to add.
5     MR. ALBERT: All right. Just so we're
6  clear, Mr. Appling was identified as the 30(b)(6)
7  witness on this topic?
8     MR. BRIGHT: You are correct. Your question
9  is absolutely appropriate. He's the witness on this.
10    A. State the question again, please.
11 BY MR. ALBERT:
12    Q. Yes.
13    Other than the expert reports of Mr. Sunstein,
14 Dr. Sampson and the materials that they replied on and
15 statements that they made in their depositions and other
16 than the interrogatory responses that have been provided
17 to us by AngioDynamics through counsel, are you aware of
18 any basis to believe that the 777 patent is invalid?
19    A. I'm aware that Mr. Sunstein's report focused on
20 the -- mainly on --
21    THE WITNESS: Is it O'Neil?
22    MR. BRIGHT: O'Riley.
23    THE WITNESS: O'Riley. I'm sorry.
24    A. -- O'Riley's reference.
25    In my opinion, the Salat Spanish patent, which

Page 316

1  wasn't discussed, I don't believe, in Sunstein's report
2  was also pretty relevant. Although, it was disclosed in
3  the patent prosecution, I don't think they adequately
4  disclosed that Salat had discussed that the device in
5  his Spanish patent could have been a laser device, as
6  well.
7  BY MR. ALBERT:
8     Q. So it's your position that although the Salat
9  Spanish patent was disclosed to the patent office, you
10 feel that there was something about that patent that was
11 not disclosed?
12    A. In the -- the inventors submitted, I believe, an
13 IDS with the Salat patent, but provided the explanation
14 that that was an electric coagulation device, not a
15 laser device. The actual teachings of that patent was
16 discussed laser.
17    Q. Okay. Do you have any knowledge one way or the
18 other as to whether disclosure of a reference without
19 sufficiently describing what it is to the patent office
20 does or doesn't make the patent enforceable?
21    MR. BRIGHT: Objection, calls for a legal
22 conclusion.
23 BY MR. ALBERT:
24    Q. Well, that's fine. If your answer is that you're
25 not a lawyer and so you don't know, that's fine. I just

Page 317

1  want to know what your position is.
2     A. My position is that if the examiner understood
3  that Salat had -- that that device was a laser or
4  electric coagulation device, that that would have had an
5  impact on the patent prosecution.
6     Q. What makes you believe that wasn't disclosed to
7  the patent office?
8     A. I've read the file history.
9     Q. What is it that specifically should have been
10 said to the patent office, in your opinion, that wasn't
11 said?
12    A. It's my opinion that he should have said that
13 device should have been or could have been or was
14 explained in the patent -- I believe it was a Spanish
15 patent, originally in Spanish anyway. That in his
16 explanation he should have stated that his teachings
17 included that that product was either an electric
18 coagulation device or a laser device.
19    Q. You don't know one way or the other whether that
20 would have made a difference to the patent examiner; is
21 that right?
22    A. I don't know.
23    Q. You're not a patent lawyer?
24    A. I'm not a patent lawyer.
25    Q. Do you know why Mr. Sunstein's expert report

25 (Pages 314 to 317)

Page 318

1   didn't mention that issue that you're raising now for
2   the first time?
3        MR. BRIGHT: Objection, foundation.
4   A. I don't know why.
5   BY MR. ALBERT:
6   Q. Other than what you've now told me and the list
7   that we put in the record a couple minutes ago, is there
8   anything else that you believe undermines the validity
9   of the 777 patent?
10  A. I'm not sure if Sunstein's report included
11  Bukaliasin (phonetic) and a few other references.
12  Q. I have it here if you want to see it. Or is your
13  answer that you just want to add certain references to
14  the record?
15  A. No. You asked me a question, and I was trying to
16  answer it.
17  Q. I'm sorry. I didn't mean to interrupt if you
18  were in the middle of giving your answer. Here is his
19  report.
20  A. Okay. The one that appears to be missing is my
21  feelings on Salat.
22  Q. Okay. Nothing else?
23  A. Not that I know of.
24  Q. Is there any other basis other than what you've
25  testified to in your first deposition for your company's

Page 319

1   position that it doesn't infringe the patent?
2        MR. BRIGHT: Objection to the form of the
3   question.
4   BY MR. ALBERT:
5   Q. And you can add to that all of your expert
6   reports and all of your interrogatory answers.
7        MR. BRIGHT: That's fine. I just don't — I
8   don't know if the witness remembers what he said in his
9   first deposition, and I don't want it to be a memory
10  test as to what he said at his first deposition on
11  infringement.
12  BY MR. ALBERT:
13  Q. Okay. I don't want to repeat everything that we
14  went through at his deposition.
15       MR. BRIGHT: I agree.
16       MR. ALBERT: So let me just ask him to the
17  best of his knowledge today whether he has any by basis
18  other than what he's previously testified to or what the
19  experts have covered in their analyses or the
20  interrogatory answers for your position that you don't
21  infringe the patent. I just want to know if there's
22  anything new that --
23  A. I have nothing new to add.
24  BY MR. ALBERT:
25  Q. Have you ever discussed with Dr. Andrews the

Page 320

1   issue of how the laser vein treatment procedure works?
2   A. Not that I recall.
3   Q. Were you at his presentation at SIR in
4   New Orleans this year?
5   A. I don't remember if I was.
6   Q. Are you familiar with Exhibit 352 that we marked
7   earlier today which is a three-page abstract of
8   Dr. Andrew's presentation?
9   A. I don't remember having had looked at it before.
10  Q. Okay. Have you discussed the issue with
11  Dr. Andrews of whether steam bubbles cause the damage to
12  the vein wall or whether something else causes the
13  damage to the vein wall during a VenaCure procedure?
14  A. I don't recall having that conversation with
15  Dr. Andrews.
16  Q. Do you recall discussing with Dr. Andrews the
17  issue of whether contact happens between the fiber tip
18  and the vein wall during the VenaCure procedure?
19  A. Repeat the question.
20       MR. ALBERT: Could you read it back,
21  please?
22
23       (The previous question was
24       repeated by the court reporter.)
25

Page 321

1   A. I don't recall having that conversation.
2   BY MR. ALBERT:
3   Q. Is it AngioDynamics' position that, as
4   Dr. Kabnick teaches, a 10 millimeter of tumescent
5   anesthesia should be placed around the vein prior to
6   starting a laser?
7   A. Well, that's in our Instructions For Use
8   currently.
9   Q. Is it your position that doctors should follow
10  your Instructions For Use?
11  A. That would be the purpose of the
12  Instructions For Use.
13  Q. But you've never discussed these issues with
14  Dr. Andrews?
15  A. I have never discussed a 10 millimeter wheel with
16  Dr. Andrews.
17  Q. Do you have any knowledge of whether Dr. Andrews
18  believes that contact happens between the fiber tip and
19  the vein wall during the course of a VenaCure procedure?
20  A. I have seen Dr. Andrews -- a slide in one of his
21  presentations that said something about contact. I
22  can't recall the detail of it.
23  Q. If you look at the first page of Exhibit 532, do
24  you see under Definitions and Goals where he says, "The
25  goals of tumescent anesthesia are threefold." And after

26 (Pages 318 to 321)

# LASERS

# IN CUTANEOUS

# AND AESTHETIC

# SURGERY



ESC Seattle

Clinical Dept.

**EDITORS**

**KENNETH A. ARNDT**

**JEFFREY S. DOVER**

**SUZANNE M. OLBRICHT**

## Delivery Devices

### ARTICULATED ARM

An articulated arm is a precision assembly of hollow tubes, mirrors, and joints. It permits the delivery of a light beam, through simple reflection, from the laser head to the operating site. The beam emerging from the distal end of the arm retains the same spatial and temporal characteristics of the original laser beam and can be focused or defocused by lenses to produce the spot size and resulting power density appropriate for a particular application.

The articulated arm is widely used for $CO_2$ lasers, whose infrared beam cannot pass through flexible quartz fiberoptics. Though these devices make the laser considerably more versatile, the complex mechanical joints render them cumbersome. Rough treatment of the delicate mirrors, or poor maintenance, can lead to degradation of the beam quality. Moreover, if a second laser beam is employed for aiming (as in the $CO_2$ laser), it is possible for the two beams to be misaligned, resulting in inaccurate targeting of the treatment beam.

### MICROMANIPULATORS

Many applications of laser energy require or benefit from manipulation of the laser beam through an optomechanical mechanism. Such a device, referred to as a *micromanipulator* or *joystick,* is generally used with a surgical microscope. As the joystick is manipulated the laser beam is moved around the surgical site while in direct magnified view of the surgeon. The motion of the beam can be controlled directly by the surgeon or directly by a computer. Computer or microprocessor control permits the surgeon to simply outline an area for treatment, and then the computer scans the beam within the outlined area.

### SCANNERS

With the advent of the scanner, an accurate and repeatable microprocessor-controlled delivery of pulsed or cw laser output was possible, circumventing the problems posed by inconsistent freehand methods. The scanner's nonaligned treatment pattern allows the thermal energy in adjacent tissue to cool adequately between pulses of laser energy. The scanner has proved of value to both dermatologists and plastic surgeons.

### FIBEROPTICS

The most common and convenient way of delivering laser energy to tissue is through flexible optical fibers. They can be used with micro-



manipulators or handpieces or can be passed through most standard operating endoscopes. Fiberoptics are composed of two or more concentrically arranged optical materials, and light is carried along the length of the fiber by total internal reflection.

Surgical fiberoptics are relatively inexpensive and are far more convenient than articulated arms. They can carry power from any cw laser that operates in the visible or near-infrared regions of the spectrum. Disposable fibers and fibers with integrated specialized handpieces have now largely replaced reusable fibers, which required periodic recleaving or polishing of the distal quartz surface.

Once light is captured in the fiber, it is transmitted the length of the device, so that there is no alignment problem with aiming and treatment beams. On the other hand, the beam does lose coherence as it passes down the fiber, resulting in a slightly divergent beam and increased spot size at the treatment site. Lenses and contact probes can be used to focus this emergent beam.

## ENDOSCOPIC DEVICES

In the beginning, endoscopy was an exclusively diagnostic technique, though early in the 20th century limited therapeutic procedures were carried out using this technology. Over the past decade, small-incision endoscopic surgery has revolutionized the treatment of numerous diseases. This is attributable to the simultaneous development of practical laser systems (capable of vaporizing and coagulating via flexible fiberoptics) and the achievement of technological advances in high-resolution charge-coupled device (CCD) cameras; endoscopic ligating, suturing, and clipping devices; safer electro-surgery instruments; flexible endoscopes; and an expanding array of fine manipulating instruments. Though lasers do not deserve sole credit for this revolution, and are not the appropriate endoscopic treatment modality in all settings, the ability to cut or ablate tissue endoscopically with simultaneous hemostasis has largely eliminated one of the most problematic aspects of small-incision surgery.

## CONTACT ND:YAG LASER

The ultimate concern in laser surgery is the tissue effect. Photothermal lasers produce their surgical effect through the transformation of light energy into heat, usually as a result of light energy being absorbed by tissue. When affixed to the distal end of a fiberoptic, contact laser probes can alter the optical, mechanical, and thermodynamic properties of the delivery device.

Whereas light emerges from a fiberoptic as a slightly divergent beam, it refracts within a contact tip. Depending on such factors as the angle of convergence and the size and shape of the distal face, the beam can be emitted as a divergent or convergent beam or it can be

laterally radiated from the sides of the contact tip. Contact probes are made of durable, rigid materials with high melting points. They can be used mechanically and brought in contact with tissue, unlike a bare fiberoptic that can break or melt easily. A 2.5-mm-diameter cylindrical probe can provide a surface area to tamponade a bleeding vessel, together with a laser power density suitable for coagulation. A contact laser scalpel, tapered to 0.2 mm in diameter, can provide the small spot size and high-power density needed for fine incision with minimal coagulation.

The most important property of contact laser probes is the manner in which they titrate the light and thermal energy that emerges from the delivery device. Rather than delivering a beam of pure light energy that is converted to heat entirely within the tissue, special absorbant coatings and surfaces on the contact laser probes can transform a predetermined portion of the light energy into heat at the probe's surface. This modifies the surface temperature and tissue temperature gradient to suit the surgical need. Therefore, rather than selecting a laser type according to the absorption coefficient that produces the desired effect in the tissue, one can choose the contact laser probe or scalpel that creates the appropriate temperature gradient.

Contact laser probes can be employed with any cw laser operating in the visible or near-infrared regions of the spectrum. One cannot, however, increase the penetration of a laser beam with a relatively high absorption coefficient, such as the green light lasers. Though a contact probe will enable them to cut well, it cannot increase their capacity for deep coagulation. With longer-wavelength lasers, such as the diode or Nd:YAG, it is possible to use the full penetration or, when deep thermal effects are not wanted, to reduce penetration by transforming more light energy into heat at the probe surface. In this way, a single laser can be made to mimic the tissue effects of many lasers of different wavelengths, while adding optical and mechanical features not available with a simple fiberoptic device.

## References

1. Maiman TH. Stimulated optical radiation in ruby. Nature 1960;187:493–494.
2. Patel CKN, McFarlane RA, Faust WL. Selective excitation through vibrational energy transfer and optical maser action in $N_2$-$CO_2$. Phys Rev 1964; 13:617–619.
3. Johnson LF. Optical maser characteristics of rare-earth ions in crystals. J Appl Physics 1963;34:897–909.

## Bibliography

Hecht J. The laser guidebook. Blue Ridge Summit, PA: TAB Books, 1992.