# REBUTTAL REPORT OF THOMAS M. PROEBSTLE, MD, MSc

Diomed v. AngioDynamics, Inc.
Diomed v. Vascular Solutions, Inc.
Docket Nos. 04-10019 and 04-10444
United States District Court
District of Massachusetts

## I.    INTRODUCTION

I have been retained in this matter by AngioDynamics, Inc. ("AngioDynamics") and Vascular Solutions, Inc. ("VSI") to provide expert opinion testimony as to whether endovenous laser treatment as taught by AngioDynamics and VSI infringes certain claims of U.S. Patent No. 6,398,777 (the "'777 patent"). In particular, I have reviewed the AngioDynamics and VSI procedures in light of claims 9-14, 16-19 and 21. My understanding is that these are the only claims as to which Diomed, Inc. ("Diomed") alleges infringement. I am being compensated for my work on this matter on an hourly basis at a rate of $250 per hour. No part of my compensation is contingent on the outcome of this matter.

## II.    PROFESSIONAL BACKGROUND

My curriculum vitae is attached hereto as Exhibit A. I am a practicing physician in the field of dermatology. Over the past five years I have regularly performed endovenous laser treatments, primarily on the greater saphenous vein. I have performed over 1,000 such procedures. For the vast majority of these procedures I used a Dornier 940nm laser and compatible fiber. I have however performed procedures using both the VSI 810nm laser, procedure kit and instructions for use ("IFU") and the AngioDynamics 980nm laser, procedure kit and IFU.

I write and speak extensively about endovenous laser treatment of the greater saphenous vein. In connection with this work, I have done considerable research on the mode of action in

1

endovenous laser procedures. That research has resulted in peer-reviewed articles that explain what causes the endovenous laser procedure to be effective in treating varicose veins. I also review regularly and am familiar with the scientific literature written by others regarding endovenous laser procedures.

### III.  PREVIOUS TESTIMONY

Within the last four years I have given testimony in the following medical malpractice cases, all of which took place in Germany.

Landgericht Limburg a. d. Lahn, Schiede 14, 65549 Limburg,

**Aktenzeichen  1 O 114 /04**

Landgericht Mannheim, 68149 Mannheim,

**Aktenzeichen  6 OH 6/04**

Landgericht Kaiserslautern, Bahnhofstr. 24, 67655 Kaiserslautern,

**Aktenzeichen  4 O 100/03**

Landgericht Limburg a. d. Lahn, Schiede 14. 65549 Limburg,

**Aktenzeichen  5 O 19/03**

### IV.  MATERIALS REVIEWED AND BASIS FOR OPINIONS

In connection with this matter I have reviewed AngioDynamics' and VSI's lasers, procedure kits, IFUs and training materials. I have also reviewed the '777 patent, the district court's memorandum on claim construction, expert reports of Drs. Fan and Anderson, deposition testimony of Drs. Fan and Anderson, videos of Dr. Fan's experiments and a photograph taken by Dr. Anderson of what has been represented to be a Diomed fiber after it was used in an endovenous laser procedure.

In addition to the materials identified above, my opinions in this case are based on my experience as a doctor who regularly performs this procedure, my extensive research on how the procedure works, and other scientific literature relating to the procedure.

Furthermore, in connection with this case, I undertook a number of specific steps to determine whether AngioDynamics' and VSI's endovenous laser procedures infringe any of the asserted claims. In particular:

1. I performed four procedures using AngioDynamics' 980nm laser, procedure kits and IFUs and four procedures using VSI's 810nm laser, procedure kits and IFUs. Three procedures of each type were recorded via continuous ultrasound imaging during their relevant parts. DVDs containing the ultrasound videos and still shots taken from those ultrasound videos are included with this report.

2. I performed an experiment where both AngioDynamics' 980nm laser and VSI's 810nm laser were fired close to, but not touching, human vein flaps, both with and without a film of human blood on the flaps. The purpose of the experiment was to determine if carbonization will occur if the light-emitting face of the laser fiber is not touching the vein wall. A DVD of this experiment is included with this report.

3. I fired an AngioDynamics 980nm laser and a VSI 810nm laser directly into vials of blood. The purpose of this experiment was to determine if a blood clot or carbon ball would form on the fiber tip in the absence of any vein wall tissue. A DVD of this experiment is included with this report.

3

## V. OPINIONS

Based on my work in the area of endovenous laser treatment and my work on this matter I have the following opinions.

It is my understanding that Diomed and its experts contend that during an endovenous laser treatment performed pursuant to either AngioDynamics' or VSI's teachings the light-emitting face of the fiber tip is deliberately placed in contact with the vein wall, and that such contact is maintained throughout the procedure during the emission of laser energy. They are wrong on both counts.

I continuously taped ultrasound images during the relevant parts of three procedures with each of the VSI and AngioDynamics lasers, procedure kits and IFUs. Ultrasound guidance was used from the beginning to end of each procedure.

In each case, I applied either 130 cc (one 980 nm procedure) or 150 cc (five remaining cases) of local tumescent anesthesia (0.15% lidocaine with epinephrine) into the perivenous fascial space surrounding the greater saphenous vein after the sheath and fiber had been inserted into the vein and before the laser was fired, all in accordance with the AngioDynamics and VSI IFUs. After tumescent anesthesia was applied the laser was fired, with the patient in a slight Trendelenberg position, in a continuous mode at the wattage and pull-back rates recommended in the IFUs.

The ultrasound imaging revealed several things that unquestionably establish that, except for rare inadvertent occasions, if any, there was no direct contact between the light emitting face of the fiber tip and the vein wall in any of the procedures I performed. First, after tumescent anesthesia was applied and before the laser was fired, ultrasound imaging clearly showed the

existence of a vein lumen, within which the fiber tip, and the fiber and the sheath along their length can be seen. The existence of a visible lumen with the fiber tip inside it proves that the light-emitting face of the fiber is not in contact with the vein wall, but instead is directed to the blood inside the vessel lumen.

Second, duplex ultrasound imaging prior to laser firing in the cases in which it was used showed the presence of blood flow around the fiber tip after tumescent anesthesia had been applied. If the veins were totally collapsed onto the fiber tip, as suggested by Drs. Anderson and Fan, blood flow around the tip would not be possible.

Third, when the laser was fired, the lumen in front of the fiber tip was still visibly present in each procedure. Again, the presence of the lumen contradicted any notion of direct contact between the light-emitting face of the fiber and the vein wall.

Fourth, when the lasers were fired, jets of steam bubbles and heated blood can be seen moving away from the fiber tip predominantly in the opposite direction of where the fiber is being withdrawn. These jets contain both gas and liquids, similar to the milk foam prepared for Italian Cappuccino. These jets traveled within the lumen and contacted the vein walls in their whole circumference providing the relevant heat damage to the vein walls leading to final occlusion of the vein. The dispersal of the heated blood and steam bubbles in front of the fiber tip means that there is space between the fiber tip and vein walls where this mixture was traveling.

Fifth, all of the procedures were effective in occluding the treated veins. Given that the ultrasound imaging showed no contact between the light-emitting face of the fiber tip and vein

wall, this confirmed to me that the AngioDynamics and VSI endovenous laser procedures are fully effective in the absence of any such contact.

The above observations and conclusions drawn are consistent with the over 1000 procedures I have previously performed and my research into the mode of action in endovenous laser treatment. In the procedure I regularly perform, I always observe the existence of the lumen and space between the fiber tip and vein after the application of tumescent anesthesia and prior to firing the laser. When I perform a procedure, the final position of the fiber tip before firing the laser can always be seen by ultrasound inside a clearly visible lumen. While the laser is firing, I regularly see, and sometimes even hear and feel (from the surface of the skin) the presence of steam bubbles that result from boiling blood. Within 10 to 15 seconds after I begin laser firing, patients frequently report a barbecue-like taste or smell which is caused by the blood inside the vein being cooked or boiled, which sensations can only be transferred by circulating blood.

I have never seen in my procedures using a fiber inside a sheath direct contact between the light-emitting face of the fiber and the vein wall. In fact, given the geometric relationship of the fiber to the vein wall (essentially parallel) and the physical reactions caused and energy created by the firing of the laser, I cannot see how such direct contact, except for rare inadvertent contact, is even possible if one follows AngioDynamics' and VSI's IFUs. Surely, it would take deliberate, concerted efforts, neither practiced by me nor taught by AngioDynamics or VSI, to have any chance of obtaining such contact.

Direct contact between the light-emitting face of the fiber and the vein wall is not the mode of action in endovenous laser procedures in general, and certainly not in the procedures as

6

practiced by me and taught by AngioDynamics and VSI. Effective occlusion of the greater saphenous vein requires circumferential heating of the vein wall. The endothelial lining and the collagen in the vein wall must be damaged throughout the vein to cause effective closure. Focal contact of the laser-emitting face of the fiber and the vein wall will only cause damage to one very small area of the vein wall. This mechanism of action was discussed by me and others in a published peer-reviewed Journal more than 2 years ago. Furthermore, direct contact of the vein and the fiber tip should not be forced – e.g. by external manual pressure to the overlaying skin - because it can facilitate perforation of the vein wall, which can in turn lead to enhanced bruising in the patient, and, to an even more serious problem, a broken fiber tip in the patient. For this reason, AngioDynamics, VSI and I specifically teach physicians to avoid any measures intended to force contact between the fiber tip and vein wall.

The mode of action in endovenous laser treatment, at least as practiced by me and taught by AngioDynamics and VSI, is that firing the laser into blood causes the blood to be heated. This heated blood, and the steam bubbles created during laser firing, contact the vein walls throughout causing circumferential damage to the endothelial layer and collagen of the vein walls. This immediately leads to limited shrinkage of the vein diameter and subsequent complete occlusion of the vein by a clot, or thrombus or accumulation of blood by-products, that remains in the vein after treatment. Over time, this thrombus scars and the vein is durably closed.

The circumferential damage that occurs and the existence of a thrombus cannot be caused by the focal contact suggested by Drs. Fan and Anderson. The diameter of the light-emitting face of the fiber is only 600 microns or 0.6 mm. The greater saphenous veins in the six AngioDynamics and VSI procedures discussed above, even under tumescent anesthesia had

7

diameters of 3 mm, up to 9 mm. A focal injury of 0.6 mm is simply not sufficient to cause the circumferential damage that occurs over a much larger surface.

In addition, the existence of a thrombus that fills the lumen after the procedure confirms the existence of blood during and after the procedure. The presence of blood during the procedure and the presence of a thrombus in the lumen after the procedure negates the possibility that the lumen is completely obliterated by vein wall shrinkage (windsock effect) during the procedure, as Drs. Fan and Anderson claim.

Drs. Fan and Anderson claim that carbonization of vein wall tissue that occurs during an endovenous laser procedure proves that there is direct contact between the laser-emitting face of the fiber and the vein wall. They are wrong.

First, Dr. Anderson admitted in his deposition that carbonization of the vein wall can occur if the light-emitting face of the fiber is close to, but not touching, the vein wall. I agree.

In fact, I performed an experiment to test this point prior to reading Dr. Anderson's testimony. To do so, I mounted dissected human vein flaps on a board. I then fired both the AngioDynamics 980nm laser and VSI 810nm laser at the vein flaps. The fiber tip was always close to the vein flap, but never touching. I did this both on vein flaps with no blood present and vein flaps with small amounts of blood on them. With both lasers the flaps without blood showed only a trace of carbonization which did not have well defined margins. The vein flaps with blood showed significant carbonization in the absence of contact with a narrow carbon trace with sharp margins. This confirmed that blood is a powerful chromophore and is critical to effective endovenous laser treatments. The pattern of carbonization caused by directing the laser energy through the blood was completely consistent with and identical to the type of

8

carbonization one sees when viewing histological slides of explanted veins that have undergone laser treatment. Thus, carbonization of the vein wall definitely does not require direct contact with the light-emitting face of the fiber, and during endovenous laser treatments is most likely caused simply by the light-emitting face being very close to the vein wall.

Dr. Fan's Experiment 1 further confirms this point. I have read Dr. Fan's description of her experiment and watched videos of the experiments being performed. In Experiment 1, Dr. Fan mounted pig arteries on a jig and filled the arteries with either blood or saline. The laser fiber was then inserted into the blood-filled or saline-filled artery. The laser was then fired and the fiber withdrawn at a rate of 2-3 mm/sec. Given the size of the artery, the placement of the fiber in the artery, and the lack of any compression, it was not possible for the light-emitting face of the fiber to be in contact with the vessel wall. In addition, the video of the experiment showed that the vessel wall was in no way compressed onto the fiber tip. Despite this fact, the video of the smaller blood-filled arteries show the arteries being violently perforated with a mixture of hot blood and steam bubbles escaping from the perforated vessel. By contrast, the saline filled arteries did not result in any perforations through which any steam bubbles were observed during laser firing.

Thus, Dr. Fan's Experiment 1 confirms that great damage can be done to blood vessel walls when the fiber tip is close to but not touching the vessel walls in the presence of blood.

Dr. Fan's large artery experiments with median diameters of 14 mm are far from the true situation in vivo, particularly with respect to the dimensions of the vessels. In Dr. Fan's small artery experiments, the most relevant result is that the damage of the vein wall was greater in blood-filled, than in saline-filled vessels. This further demonstrates the fact that intravascular

9

blood plays an important role during the whole procedure. Dr. Fan's conclusions about contact during laser action are based on assumptions which contradict each other. Under Experiment 1, Hypothesis (page 25) Dr. Fan states that arteries were chosen because "arteries maintain their tubular cylindrical shape enabling better central lumen positioning of the laser fiber...." Under Conclusions (page 27) Dr Fan states that the results of the experiments support the hypothesis that "thermal damage in ILA results from direct contact between the LFT and vessel wall...", and later (same section page 28) that in small arteries there was "more opportunity for LFT to touch the wall...." These conclusions are highly speculative because the experiment set-up was chosen to center the laser fiber within the vein, not to touch it. The experiments by Dr. Fan only prove that the laser energy, i.e., the laser beam, was directed toward the vessel wall, and that most likely there was not any contact between the light-emitting face of the fiber and the vessel wall.

Dr. Fan's Experiment 2 fails to prove her hypothesis that "[s]ignificant thermal injury during ILA requires the direct contact of the laser fiber tip with the vessel wall." The experiment involved transmitting a 1-second pulse, at a 90 degree angle, in an open container allowing steam and heat to dissipate upwards, from 2 and 5 mm away, and thus did not bear any relationship to clinical practice, much less prove that significant thermal injury during ILA requires direct contact between the fiber's light-emitting face and the vessel wall.

Dr. Fans's Experiment 3 also fails to prove her hypothesis because in the AngioDynamics and VSI procedures there is not a "complete collapse" of the vessel wall on to the fiber tip. Dr. Fan testified that in this experiment she pumped the tumescent fluid in until she visually observed the collapse of the vessel wall on to the fiber. However, this is directly contrary to what VSI and AngioDynamics teach. Further, in practice, even with such increased pressure one

10

cannot see movement of the vessel wall towards the energy emitting face of the fiber nor substantial shrinkage of the vein.

Dr. Anderson stated in his deposition that the appearance of carbon on the fiber after the endovenous laser procedure is performed is further evidence of direct contact between the light-emitting face of the fiber and the vein wall. In making this statement, Dr. Anderson relied on a photo that he purportedly took of a Diomed fiber that was used in an endovenous laser procedure performed by Dr. Fan. It is my understanding that Dr. Anderson was not present during the procedure and did not see the fiber removed from the patient. It is further my understanding that Dr. Anderson does not know how the fiber was handled or kept or how much time passed between when the procedure was performed and when he photographed it.

In any event, the presence of carbon on the fiber photographed, or on any other fiber, in no way proves contact between the fiber tip and the vein wall. Carbon on a fiber can be and is caused by burnt blood sticking to the fiber. In fact, during his deposition, Dr. Anderson stated that the ball on the fiber in his photograph was made, at least in part, of blood by-products.

Even prior to Dr. Anderson's testimony, I performed an experiment to test whether blood alone can cause carbonization on or near the fiber tip. I fired both the AngioDynamics 980nm laser and the VSI 810nm laser into vials of blood and then examined the fiber tips after firing. The lasers were fired from 3-20 seconds in the blood, a small fraction of the time the laser is fired into blood during an endovenous laser procedure. Even at these short firing durations, carbon/burnt blood balls appeared on the tips of both the AngioDynamics and VSI fibers. This confirmed that carbonization of the fiber tip during an endovenous laser procedure does not

11

require contact between the laser-emitting face of the fiber and the vein wall and is caused by contact with blood, as taught by AngioDynamics and VSI.

Drs. Fan and Anderson both claim that the use of tumescent anesthesia causes blood to drain from the vein which leads to direct contact between the light-emitting face of the fiber and the vein wall. They are not correct.

The use of tumescent anesthesia, as taught by AngioDynamics and VSI does cause the vein walls to move closer to the fiber and the sheath through which the fiber is introduced. This results in the size of the vein lumen being reduced and consequently the amount of space for blood being reduced. Nevertheless, blood is not intentionally "drained" from the vein to ensure contact between the light-emitting face of the fiber and the vein wall. To the contrary, the remaining lumen contains nothing else but blood, including at and near the light-emitting section of the laser fiber. Blood is crucial to the AngioDynamics and VSI procedures because it is by heating the blood that the procedure works. It helps the effectiveness of the procedure to have the vein wall close to the fiber so that the heated blood and resulting steam bubbles get to the vein wall before their heat dissipates, but the presence of blood is absolutely essential for the procedure to work.

In my observations of the VSI and AngioDynamics procedures I performed, blood was always present between the fiber tip and vein wall after tumescent anesthesia was applied.

Dr. Anderson claimed during his deposition that during an endovenous laser procedure, the protective cladding on the fiber is burned back from the tip allowing light to be emitted from the sides of the fiber, into the vein wall. My experience with lasers in this procedure proves that

any incidental removal of the cladding and the resulting light emission to the sides, which may be occasionally observed at the end of a procedure, is insignificant.

Every laser used in an endovenous laser treatment has two beams - a visible red aiming beam and an invisible infrared treatment beam. The red aiming beam is the same wavelength as the beam of a laser pointer. Because the treatment beam is not visible when leaving the fiber tip, the aiming beam is used so that the physician can know exactly to where the invisible infrared beam is being directed, particularly when the fiber is still outside the patient. Consequently, the aiming beam serves an important safety purpose. In addition, the aiming beam can also be used to ensure that the fiber in use is in good condition. Prior to performing any procedure, including the AngioDynamics and VSI procedures, I aim the laser fiber tip at a white surface, like a piece of paper or a gauze, to observe the aiming beam. I do this to ensure that the beam shoots straight ahead and is focused. If the beam is not straight ahead and focused, forming a precisely circular spot on the target, there may be a defect in the fiber or the flat cut at the light emitting part of the fiber may be damaged. After completion of the endovenous laser procedure, and after inspection of the fiber tip to confirm the integrity of the tip as a whole, I again point the fiber tip at a white surface as described above and observe the aiming beam. I am again looking to see if the aiming beam is straight ahead and focused. This is of particular importance if in the same treatment session another vein of the patient is going to be treated with the fiber. A circumferential glowing at the sides of the tip of the fiber indicates an early stage of damage of the fiber tip, namely the beginning of destruction of the originally present cladding at the sides of the fiber tip. Such a glowing also indicates that a negligible portion of the laser energy is beginning to be emitted from the sides of the fiber. However, if a straight forward light beam is still present after the procedure, then virtually all of the laser energy continues to be emitted from the flat emitting

face of the fiber. If such a straight forward beam can no longer be observed, the fiber tip is destroyed and no longer used.

After performing the AngioDynamics and VSI procedures I directed the used fibers at a piece of paper. In each case, the aiming beam was still present. This proves that during the AngioDynamics and VSI procedures all of the laser energy is emitted through the flat face of the fiber. As noted above, the flat face of the fiber is in blood, not touching the vein walls, during AngioDynamics' and VSI's procedures.

Dr. Fan's Experiment 3, further proves that vessel wall damage is caused without direct contact between the laser-emitting face of the fiber and the vein wall. In her Experiment 3, Dr. Fan mounted bovine saphenous veins onto the same jigs used in Experiment 1. She then filled the veins with blood. She then inserted a laser fiber, both with and without a centering device, into the vein. She then placed some of the veins under "tumescent effect" through the use of a pressurized saline chamber. I watched Dr. Fan's video of this experiment to see if the "tumescent effect" caused the vessel wall to collapse onto the laser-emitting face of the fiber.

My observations indicated no such contact. As the fiber was fired and pulled back, the vein retained its shape. Were Dr. Fan's and Dr. Anderson's hypothesis correct, you would expect to see the vein collapse immediately behind the flat end of the fiber tip as the fiber was withdrawn. This did not happen.

Nevertheless, in every sample in which blood was the "interface" there was damage to the vessel wall. Dr. Fan speculates that the most significant damage was caused by direct contact between the laser-emitting face of the fiber and the vein wall. However, for the reasons noted

above, this conclusion is wrong. At most, the laser-emitting face of the fiber was close to, but not touching, the vein walls.

In my opinion, the damage seen by Dr. Fan was caused by the blood being heated and acting on the vein walls. The fact that less damage was seen with a centering device is not at all surprising. Such a device would increase the distance between where the blood is heated and the vein wall and furthermore it would avoid pointing the laser beam towards one part of the vein wall as it often happens during endovenous laser treatment where veins are not completely straight and laser fibers are not always centered within the vein. This means effects of blood in conjunction with direct laser impact (not direct fiber tip contact) to the vein wall – like demonstrated in our in-vitro experiment - will not be observable. Therefore the centering in Dr. Fan's experiment resulted in less damage of the vein wall

## VI.   CONCLUSIONS

Based on all of the above, I have also reached the following conclusions.

Neither AngioDynamics nor VSI teach "deliberately putting the uncoated tip of the fiber optic line [the light-emitting face of the fiber] in physical contact with the wall of the blood vessel." In fact, they both teach that one should deliberately <u>avoid</u> contact between the light-emitting face of the fiber and blood vessel wall. It is my understanding that the Court has construed the asserted claims as requiring such deliberate contact, and therefore the procedures taught by AngioDynamics and VSI cannot possibly infringe these claims.

Similarly, even if occasional, unintended contact between the laser-emitting face of the fiber and the vein wall were to occur during an AngioDynamics or VSI procedure, such contact

15

would be fleeting and would not be "maintained" while laser energy is emitted. It is my understanding that the Court has construed the asserted claims to require that fiber tip to vein wall physical contact must be maintained while the laser is firing, and therefore the procedures taught by AngioDynamics and VSI do not infringe these claims.

Finally, any incidental contact that might occur in an AngioDynamics or VSI procedure is unwanted and is not intended "to decrease the diameter of the blood vessel." It is my understanding that the Court has construed the asserted claim as requiring that contact be for this purpose. If this is correct, the AngioDynamics and VSI procedures do not infringe the claims because they teach that the laser-emitting face of the fiber is placed in contact with blood, not the vein wall. It is the contact with blood that ultimately results in the decrease in the diameter of the blood vessel.

This report is current as of October 14, 2005. I reserve the right to supplement my opinions and the bases for my opinions based on newly-produced documents, interviews, or deposition testimony, or in response to further disclosures from Diomed. Further, I may also testify at trial in response to arguments or evidence introduced by Diomed that is within my area of expertise.

Dated: October 14, 2005

Thomas M. Proebstle, M.D., MSc