## DIOMED'S PROPOSED JURY INSTRUCTIONS

## TABLE OF CONTENTS

Page No.

PROPOSED PRELIMINARY INSTRUCTIONS ....................................................................1

I.　　The Nature of the Action and the Parties ....................................................................1

II.　　Burdens of Proof ..........................................................................................................2

III.　　The Patent System, Generally ......................................................................................3

　　　A.　　The Parts of a Patent ..........................................................................................4

　　　B.　　The Significance of Patent Claims .....................................................................5

IV.　　Issues To Be Decided ...................................................................................................6

　　　A.　　Diomed's Contentions ........................................................................................6

　　　　　1.　　Direct Infringement .................................................................................6

　　　　　2.　　Indirect Infringement .............................................................................7

　　　　　3.　　Damages ..................................................................................................8

　　　　　4.　　Willful Infringement ...............................................................................9

　　　B.　　AngioDynamics and VSI Contentions ...............................................................9

V.　　Trial Procedure ............................................................................................................10

Appendix A to Preliminary Instructions – Glossary of Patent Terms ........................................11

Appendix B to Preliminary Instructions – Glossary of Technical Terms....................................12

PROPOSED FINAL INSTRUCTIONS .........................................................................................12

PART I – GENERAL INSTRUCTIONS ......................................................................................13

　　　Note Taking .....................................................................................................................17

Credibility ...........................................................................................................18

Prior Inconsistent Statements...........................................................................19

Expert Witness ...................................................................................................20

Corporate Parties...............................................................................................21

Deposition Testimony ........................................................................................21

Burden of Proof..................................................................................................21

PART II – SPECIFIC QUESTIONS IN VERDICT FORM ......................................23

General Overview ...............................................................................................23

Patent...................................................................................................................23

Summary of Patent Issues ..................................................................................24

Diomed's Infringement Claim ...........................................................................26

Claim Construction ............................................................................................28

Infringement........................................................................................................39

Literal Infringement ...........................................................................................30

Doctrine of Equivalents .....................................................................................33

Indirect Infringement .........................................................................................35

Inducing Infringement .......................................................................................35

Contributory Infringement .................................................................................38

Monetary Damages .............................................................................................40

Lost Profits-Defined...........................................................................................43

Reasonable Royalty as a Measure of Damages .................................................45

Willful Patent Infringement ...............................................................................47

PART III – PROCEDURES DURING DELIBERATIONS ......................................51

## PROPOSED PRELIMINARY INSTRUCTIONS

Members of the jury:

Now that you have been sworn, I have the following preliminary instructions for your guidance on the nature of the case and your role as jurors.

## I.    The Nature of the Action and the Parties

This is a patent case. The patent involved in this case relates to a new way of treating varicose veins. Varicose veins are typically caused by defective valves, which cause blood to pool in the blood vessel rather than flowing back to the heart. Apart from being unsightly, varicose veins can lead to serious medical problems.

During the trial, the parties will offer testimony to familiarize you with this technology. For your convenience, we will distribute a glossary of some of the technical terms to which the parties may refer during the trial.

The plaintiff – the party that brought the case – is Diomed, Inc., a company based in Andover Massachusetts, which I will refer to as Diomed. The defendants are AngioDynamics, Inc., a company based in New York, which I will refer to as AngioDynamics, and Vascular Solutions, Inc., a company based in Minnesota, which I will refer to as Vascular Solutions or simply VSI. Diomed, AngioDynamics, and VSI all sell lasers and "procedure kits" that practitioners use to treat patients with varicose veins.

Diomed claims that AngioDynamics and VSI have infringed United States Patent No. 6,398.777, which I will refer to as the '777 patent or simply "Diomed's patent." The United States Patent and Trademark Office granted this patent to Dr. Luis Navarro, Dr. Robert Min, and three other people for an invention relating to the varicose vein treatment technology that I mentioned a minute ago. Diomed is now an owner of the patent.

1

Source:         Adapted from American Intellectual Property Law Association's Model Patent
                Jury Instructions (2005) (hereinafter "AIPLA Model Instructions").

## II.    Burdens of Proof

In any case, facts must be proven by a specified standard, known as the "burden of proof." In a patent case, one of two different burdens of proof will be used, depending on the issue being decided.

The first burden of proof requires that, in order for a party to prevail, you must be persuaded that what the party seeks to prove is more probably true than not. This is called proof by a preponderance of the evidence. It is the standard that Diomed will need to meet when proving most of its case.

The second burden of proof is a higher standard. It requires that you must be persuaded that it is highly probably that what the party seeks to prove is true. This is called proof by clear and convincing evidence. There is only one issue in this case that involves the higher standard. I will explain more about this later.

You may have heard of a burden of proof used in criminal cases called "beyond a reasonable doubt." That burden of proof is the highest standard. It does not apply to a patent case such as this one, and you should therefore put it out of your mind.

I will now give you some background about the nature of this case and the issues you will be deciding. For each issue, I will instruct you as to the burden of proof that will apply. At the end of the trial I will review for you which burden of proof, either the more probable than not standard or the highly probable standard, to apply to each issue in this case.

Source:         Adapted from ABA Model Jury Instructions: Patent Litigation (hereinafter "ABA
                Model Instructions") and Federal Circuit Bar Association Model Patent Jury
                Instructions (hereinafter "Federal Circuit Bar Association Model Instructions").

### III.    The Patent System, Generally

Patents are issued by the United States Patent and Trademark Office, which is part of our government.  The government is authorized by the United States Constitution to enact patent laws and issue patents to protect inventions.  Inventions that are protected by patents may be of products, compositions, or of methods for doing something, or for using or making a product or composition.

The owner of a patent has the right, for the life of the patent, to prevent others from making, using, offering for sale, selling or importing the invention covered by the patent.

A patent is granted for a set period of time, which, in this case, is 20 years from 1999 – the date when the inventors filed the application for the patent.  Once the patent expires in 2019, everyone will be free to use the method covered by the patent.

During the term of the patent, however, if another person performs a method covered by the patent without the patent owner's consent, that person is said to directly infringe the patent. In addition, third parties can sometimes "indirectly infringe" the patent by "inducing" acts of infringement or otherwise "contributing to" them.  For example, imagine that someone had a patent on a method of solving the "Rubik's cube" puzzle.  If someone else sold puzzles along with directions describing how to solve the puzzle in the way covered by the patent, the people buying the puzzles and following the directions would be directly infringing the patent. Obviously, however, it would be impractical to file claims against all of those customers. Instead, the law allows the patent owner to bring suit against the company selling the puzzles.

I will explain this concept of "indirect infringement" later.

The patent owner enforces a patent against persons believed to be infringers in a lawsuit in federal court, such as in this case.

You may have heard about particular patents being found "invalid" or "unenforceable." You do not have to worry about these issues. The defendants asserted some defenses like these, but I have already decided that the '777 patent is valid and enforceable.

Source:          Adapted from ABA Model Instructions and Federal Circuit Bar Association Model Instructions. Rubik's Cube example based on <u>Moleculon Research Corp. v. CBS, Inc.</u>, 793 F.2d 1261 (Fed. Cir. 1986).

Instruction that the court has previously decided validity and enforceability issues is based on this Court's summary judgment decision (Diomed v. AngioDynamics, 450 F. Supp. 2d 130 (D. Mass. 2006) and the jury charge in <u>Read Corp. v. PowerScreen of America, Inc.</u> (D. Mass. Feb. 23, 2001) (96-CV-11025) (Young, J.), the relevant portion of which is attached as Exhibit 2).

## A.      The Parts of a Patent

I am now going to get into a little more detail regarding what a patent actually is. Don't worry if you miss some details here. I will be providing you with a short glossary of patent-related terms. Like the glossary of technical terms that I mentioned before, you can refer to this glossary throughout the trial. Also, I will give you further instructions before you begin deliberating to reach a verdict.

A patent includes two basic parts: first, a written description of the invention, which may include drawings and which is referred to as the "specification" of the patent; and, second, the patent claims.

You have been provided with a copy of the '777 patent. Please refer to the patent (at the front of your binders) as I explain its different sections.

The cover page of the '777 patent provides identifying information, including the date the patent issued and the patent number along the top, as well as the inventor's name, the filing date, and a list of the prior art publications considered in the Patent Office in issuing the patent.

4

The specification of the '777 patent begins with an abstract, found on the cover page. The abstract is a brief statement about the subject matter of the invention.

Next are the drawings, which appear as Figures 1 to 20 on the next 9 pages. The drawings depict various aspects or features of the invention. They are described in words later in the patent specification.

The written description of the invention appears next. In this portion of the patent, each page is divided into two columns, which are numbered at the top of the page. The lines on each page are also numbered. The written description of the '777 patent begins at column 1, line 1, and continues to column 7, line 2.

The specification is followed by one or more numbered paragraphs. These are called the claims. The claims may be divided into a number of steps, referred to as "claim limitations." In the '777 patent, the claims begin at column 7, line 4 and continue to the end of the patent, at column 8, line 40.

Source:    Adapted from ABA Model Instructions; Federal Circuit Bar Association Model Instructions.

**B.    The Significance of Patent Claims**

The claims of a patent are a main focus of a patent case because the claims define the patent owner's rights under the law. That is, the claims define what the patent owner may exclude others from doing during the term of the patent.

The claims of a patent serve two purposes. First, they state the boundaries of the invention. Second, they provide notice to the public of those boundaries. Thus, when a process is accused of infringing a patent, it is the patent claims that must be compared to the accused

method to determine whether or not there is infringement.  It is the claims of the patent that are infringed when patent infringement occurs.

Diomed's patent has 21 claims in all, but you only need to worry about claim 9.  Diomed contends that AngioDynamics and VSI infringe this claim.  AngioDynamics and VSI contend that they do not.

The language of patent claims may not be clear to you, or the parties may dispute its meaning.  A the end of the case, I will describe the meaning of some of the claim language.  You must use the meanings I give you when you decide whether AngioDynamics and VSI infringe the '777 patent.

Source:      Adapted from ABA Model Instructions and Federal Circuit Bar Association Model Instructions.

## IV.    Issues to Be Decided

I will now give you some information about the issues that will be presented to you at this trial and the law that you must follow in reaching your verdict.  At the close of the trial, you will be given a verdict form and questions that you must answer in reaching your verdict.  I will then give you more specific instructions to follow.

### A.    Diomed's Contentions

I will first describe Diomed's contentions to you.

#### 1.    Direct Infringement

Diomed contends that practitioners who buy VenaCure products from AngioDynamics or Vari-Lase products from VSI for the treatment of varicose veins infringe claim 9 of Diomed's patent as a result of following the directions that come with the products and/or the training that AngioDynamics and VSI provide.  This is called direct infringement.  Direct infringement does

not require any particular intent – a person can infringe a patent without even knowing that the patent exists.

Diomed seeks to prove direct infringement in one of two ways.  The first is called "literal" infringement.  To prove literal infringement, Diomed must prove that it is more probable than not that practitioners using AngioDynamics or VSI products perform each of the steps recited in one or more of the '777 patent claims.

The second way to prove direct infringement is by the "doctrine of equivalents."  To prove infringement under the doctrine of equivalents, Diomed must prove that it is more probable than not that, for each claim limitation that does not literally occur when practitioners use the AngioDynamics or VSI products, the users perform an equivalent step.  In order to be equivalent, the differences between Diomed's claim limitation and the practitioners' allegedly equivalent step must be insubstantial.  I will explain this in more detail in my final instructions.

Source:        Adapted from ABA Model Instructions and Federal Circuit Bar Association
               Model Instructions, with additional material based on <u>Dow Chem. Co. v.
               Mee Indus., Inc.</u>, 341 F.3d 1370, 1380 (Fed. Cir. 2003) ("[T]he motive of the
               accused infringer when performing a claimed method simply is not relevant.").

### 2.        Indirect Infringement

Diomed believes that AngioDynamics and VSI infringe claim 9 as well – by encouraging the purchasers of their products to infringe or otherwise contributing to their infringement.  In fact, the individual users are not involved in this case at all.  Instead, Diomed has focused on the companies that sell the products.

This is called indirect infringement, and there are two different types: contributory infringement and inducing infringement.  In either case, Diomed must prove that people using AngioDynamics or VSI products directly infringe the '777 patent.

To prove contributory infringement of the '777 patent claims, Diomed must also prove that it is more probable than not that the products AngioDynamics and/or VSI sold to practitioners represent a material part of the patented invention and is not suitable for other significant uses. Finally, Diomed must show that AngioDynamics and/or VSI knew that the products were especially made for use in an infringing manner.

To show induced infringement, Diomed must show by a preponderance of the evidence that practitioners using the AngioDynamics and/or VSI products directly infringe Diomed's patent and that AngioDynamics and/or VSI has knowingly induced infringement with the intent to encourage the infringement. The defendant must have intended to cause the acts that constitute direct infringement and must have known or should have known that its action would cause the direct infringement.

As jurors, you are entitled to conclude that AngioDynamics or VSI had the required intent to induce infringement if you find that it is more likely than not that AngioDynamics or VSI (1) knew about Diomed's patent and (2) intended to encourage practitioners to perform the acts that constitute direct infringement.

Source:       Adapted from ABA Model Instructions; Federal Circuit Bar Association Model
              Instructions, with additional material based on <u>DSU Med. Corp. v. JMS Co.</u>, 471
              F.3d 1293, 1304-06 (Fed. Cir. 2006) (en banc); <u>Golden Blount, Inc. v. Robert H.
              Peterson Co.</u>, 438 F.3d 1354, 1364 n.4 (Fed. Cir. 2006) and <u>MEMC Elec.
              Materials, Inc. v. Mitsubishi Materials Silicon Corp.</u>, 420 F.3d 1369, 1378 n.4
              (Fed. Cir. 2005).

### 3.     Damages

Diomed contends that it has suffered damages as a result of AngioDynamics and VSI selling products that practitioners use to perform the patented method. Specifically, Diomed claims that it has lost profits as a result of users buying products from AngioDynamics or VSI instead of Diomed. Diomed also claims that VSI's infringement has reduced the price that

Diomed can charge for its products.  At the minimum, Diomed seeks a reasonable royalty on

each sale by AngioDynamics or VSI of a product for use in performing the patented method.  I

will explain to you at the end of the case how lost profits are calculated and how a reasonable

royalty is determined.  Diomed must prove the damages it has suffered as a result of the

defendants' infringement by the more probable than not standard.

Source:        Adapted from ABA Model Instructions and Federal Circuit Bar Association
               Model Instructions.

### 4.        Willful Infringement

Diomed asserts that AngioDynamics and VSI have knowingly and willfully infringed the

'777 patent claims.  To prove that the infringement was willful, Diomed must show that the

defendants knew about Diomed's patent and sold their products without having a sound belief

that they had a right to do so.  In other words, Diomed must show that a prudent company in the

shoes of AngioDynamics or VSI would not have marketed the VenaCure or Vari-Lase products

without permission from Diomed.

Asserting willful infringement requires a higher burden of proof—the highly probable

standard—than Diomed's other claims, which require proof by the more probable than not

standard.  I will explain in more detail at the end of the case how you decide whether

AngioDynamics and/or VSI willfully infringed Diomed's patent claims or not.

Source:        Adapted from ABA Model Instructions and the Federal Circuit Bar Association
               Model Instructions, with additional material from SRI Int'l, Inc. v. Advanced
               Tech. Labs. Inc., 127 F.3d 1462, 1465 (Fed. Cir. 1997).

### B.        AngioDynamics and VSI Contentions

I will now instruct you on the contentions of AngioDynamics and VSI.  The defendants

claim that practitioners who purchase AngioDynamics or VSI products do not infringe the '777

patent.  Even if users do infringe the patent, AngioDynamics and VSI contend that they do not

induce or contribute to that infringement.

During an earlier stage of this case, AngioDynamics and VSI also contended that the

'777 patent was invalid and/or unenforceable.  As I explained previously, I have already rejected

those arguments and ruled that the .  This means that you will just be deciding whether

AngioDynamics and VSI have  infringed the patent and, if so, the amount of damages that

Diomed suffered as a result and whether the infringement was willful.

Source:        Instruction that the court has previously decided validity and enforceability issues
               based on this Court's summary judgment decision (Diomed v. AngioDynamics,
               450 F. Supp. 2d 130 (D. Mass. 2006) and the jury charge in Read Corp. v.
               PowerScreen of America, Inc. (D. Mass. Feb. 23, 2001)  (96-CV-11025) (Young,
               J.), the relevant portion of which is attached as Exhibit 2).

## V.    Trial Procedure

We are about to commence the opening statements in the case.  Before we do that, I want

to explain to you a little bit about the procedures that we will be following during the trial and

the format of the trial.  This trial, like all jury trials, comes in six phases.  We already have been

through the first phase, which is to select you as jurors.  We are now about to begin the second

phase, the opening statements.  The opening statements of the lawyers are statements about what

each side expects the evidence to show.  The opening statements are not evidence in the case.

The evidence comes in the third phase, when the witnesses will take the witness stand

and the documents will be offered and admitted into evidence.  In the third phase, Diomed goes

first in calling witnesses to the witness stand.  These witnesses will be questioned by Diomed's

counsel in what is called direct examination.  After the direct examination of a witness is

completed, the opposing side has an opportunity to cross-examine the witness. After Diomed has

presented its witnesses, AngioDynamics and VSI will call their witnesses, who will also be

examined and cross-examined.  Some witnesses may not be present in Court.  In that case, the parties may present the testimony of a witness by reading from their deposition transcript or playing a videotape of the witness' prior deposition testimony.  A deposition is the sworn testimony of a witness taken before trial and is entitled to the same consideration as if the witness had testified at trial.

The evidence often is introduced somewhat piecemeal, so you as jurors need to keep an open mind as the evidence comes in. Wait until all the evidence comes in before you make any decision. In other words, keep an open mind throughout the entire trial.

After we conclude the third phase, the lawyers again have an opportunity to talk to you in what's called "closing argument," which is the fourth phase.  Again, what the lawyers say is not evidence.  The lawyers' closing arguments to you are for the purpose of helping you in making your decisions.

The fifth phase of the trial is when I read you the jury instructions. In that phase, I will instruct you on the law.  I have already explained a little bit about the law to you.  But later, in this fifth phase of the trial, I will explain the law in much more detail.

Finally, in the sixth phase of the trial it will be time for you to deliberate. You can then evaluate the evidence, discuss the evidence among yourselves and make a decision in the case. You are the judges of the facts. I will explain to you the rules of law that apply to this case, and I will also explain to you the meaning of the patent claims. You must follow my explanation of the law and the claims whether you agree with me or not. Nothing I say or do during the course of the trial is intended to indicate what your verdict should be.

Source:        Adapated from AIPLA Model Instructions.

**Appendix A to Preliminary Instructions –**
**Glossary of Patent Terms**

**Application** – The initial papers filed by the applicant in the United States Patent and Trademark Office (also called the Patent Office or PTO).

**Assignment –** Transfer of ownership rights in a patent or patent application from one person or company to another.

**Claims** – The numbered sentences appearing at the end of the patent that define the invention. The words of the claims define the scope of the patent owner's exclusive rights during the life of the patent.

**License** – Permission to use the patented invention, which may be granted by a patent owner (or a prior licensee) in exchange for a fee called a "royalty" or other consideration.

**Royalty –** Amount of money a licensee is required to pay to a patent owner for permission to make and sell the patented invention. Typically, a royalty is calculated as a fixed amount per unit sold or as a percentage of the selling price of the patented products.

**Specification** – The information that appears in the patent and concludes with one or more claims. The specification includes the written text, the claims, and the drawings. In the specification, the inventor sets forth a description telling what the invention is, how it works, and how to make and use it so as to enable others skilled in the art to do so and what the inventor believed at the time of filing to be the best way of making his or her invention.

Source:    Adapted from 2005 AIPLA Instructions.  Additional material from Uniform Jury Instructions for Patent Cases in the United States District Court for the District of Delaware (hereinafter Delaware Uniform Instructions).

**Appendix B to Preliminary Instructions –**
**Glossary of Technical Terms**

[Will seek to reach agreement with defendants' counsel.]

PROPOSED FINAL INSTRUCTIONS

MEMBERS OF THE JURY:

You have heard the evidence and the closing arguments in this case.  It is now my duty to instruct you on the law that you must follow and apply.  In any jury trial there are, in effect, two judges.  I am one of the judges and you, collectively, are the other.  It is my duty to preside over the trial and to determine what testimony and evidence is relevant under the law for your

consideration.  It is also my duty at the end of the trial to instruct you on the law applicable to the case.  You, as jurors, are judges of the facts.  But in determining what actually happened in this case, that is, in reaching your decision as to the facts, it is your sworn duty to follow the law as I am about to define it for you.  When I have finished, you will begin your discussion with each other, what we call your deliberations.

To help you understand and remember these instructions on the law, I will divide them into three parts: First, opening general instructions intended to guide you throughout your deliberations; second, instructions about the claims, about questions you will be asked to answer (as stated in the Verdict Form), and about the law you must apply in considering these questions; and third, some additional general instructions about procedures during your deliberations.

These instructions are somewhat complicated, and I ask you to pay very careful attention.  I will need to read them to you because I cannot commit to memory all of the law about which I have to instruct you.  I will also submit to you a written copy of this charge when you go to the jury room. I want to caution you right away, however, not to dwell on any one particular portion of it, if you decide to review it at all, because you must consider these instructions as a whole and not just one individual particular instruction.  So I ask you to do your best to stay with me.

Source:        Adapted from Charge to Jury, Brine, Inc. v. STX, LLC (Nov. 13, 2003) (99-CV-40167) (Gorton, J.) (hereinafter Brine charge); and Charge to Jury, EMC Corp. v. Hewlett-Packard Co. (May 14, 2004) (00-CV-40188) (Gorton, J.) (hereinafter "EMC charge").

## PART I -- GENERAL INSTRUCTIONS

All of my instructions are about the law you must apply.  I do not mean any of my instructions to be understood by you as a comment by me on the facts or on the evidence in this case.  It is your function to determine the facts.  Although the law allows a trial judge in this

court to comment on evidence, I deliberately do not do so and instead leave the fact finding entirely in your hands. You are to be the sole and exclusive judges of the facts.

Fortunately, you do not need to resolve every dispute of fact raised by the evidence. In order to know which fact disputes are important, you need to know what rules of law to apply. I have explained some of the rules to you during the course of the trial, and I will explain others to you now. The lawyers were allowed to comment during their arguments on some of these rules of law, but if what they have said about the law differs in any way from my instructions, you must be guided only by the instructions on the law as I state them.

You must follow all of the rules as I explain them to you. A single sentence or statement might not refer to an exception or qualification that I have stated elsewhere in these instructions, so you must consider all these instructions together, as a unit.

Even if you disagree with one or more of the rules of law, or don't understand the reasons for them, you are bound to follow them. This is a fundamental part of our system of government by law rather than by the individual views of the judge or jurors who have the responsibility for deciding a case. If I make any mistake in instructing you about the law, fair and even-handed application of the law to this and other cases is nevertheless assured, because any mistake I make on the law can be corrected on appeal.

In contrast, it is your job to resolve disputed facts. So long as there is support for your findings in the record, your decision cannot be overturned.

In your fact finding, you are not to be swayed by bias, prejudice, sympathy or antagonism. It is your function to find the facts fairly and impartially, on the basis of the evidence.

14

The evidence in the case consists of all exhibits received into evidence, all facts that may have been admitted or stipulated and all of the sworn testimony of the witnesses. A stipulation means simply that the parties accept the truth of a particular proposition or fact. Since there is no disagreement, there is no need for evidence apart from the stipulation. Statements and arguments of counsel are not evidence in the case. "Chalks", "charts" and "demonstrative exhibits" that were used to illustrate or explain witness testimony are not evidence. Any evidence ordered stricken by the Court must also be disregarded. Anything you may have seen or heard outside the courtroom is not evidence and you must disregard it entirely. Your verdict must be based solely on the evidence presented in this courtroom and in accordance with my instructions. Also, from the facts proved, you may draw reasonable inferences about additional facts. An inference is a deduction or conclusion. An inference is an additional finding that your experience, reason and common sense lead you to draw from facts that you find are proved by the evidence.

Two more phrases often used in discussions about evidence received in a trial are "direct evidence" and "circumstantial evidence."

Testimony of a witness showing first-hand observation of a fact by that witness is direct evidence. For example, the testimony of an eyewitness just about what he or she saw is direct evidence. If the witness is permitted to go beyond what he or she saw and is permitted to state a conclusion, or inference, or opinion, that part of the answer is not direct evidence. Instead, it is one kind of circumstantial evidence.

Circumstantial evidence is proof of some facts, including events and circumstances, on the basis of which the jury may infer the existence or nonexistence of additional facts.

For example, let's suppose that you have been in this courtroom for a few hours and you have not been able to look outside. A man comes into this courtroom wearing a wet raincoat and

carrying a dripping umbrella.  You may draw the inference from those circumstances that it is raining outside.  That is what we call circumstantial evidence as opposed to direct evidence which would be the testimony of the man in the wet raincoat taking the stand and telling you that it is raining outside.

As another example, suppose that a company sells Rubik's cubes along with instructions on how to solve the puzzle.  You may draw the inference from those circumstances that people who buy the product follow the directions and solve the puzzle.

Direct and circumstantial evidence have equal standing in law.  That is, with respect to what weight shall be given to evidence before you, the law makes no distinction between direct and circumstantial evidence.  No greater degree of certainty is required of circumstantial evidence than of direct evidence.  You are to consider all the evidence in the case and give each item of evidence the weight you believe it deserves.

Any inference that you draw from the facts proved must be a reasonable one and not merely conjecture or guesswork.  You might decide that you do not have a sufficient basis to decide what inference to draw.  It is for you, as judges of the facts, to decide whether the evidence before you is or is not sufficient for you to draw an inference. Ultimately, in drawing inferences, you should use your common sense.

If any reference by the Court or by the lawyers to matters of evidence is different from the way you remember the evidence, let your collective memory control.

At times during the trial you heard lawyers object to questions asked by the other lawyer, and to answers by witnesses. It is a proper function of lawyers to object. In objecting, a lawyer is requesting that I make a decision on a question of law. Do not draw from such objections, or from my rulings on the objections, any inferences about facts. The objections and my rulings

16

related only to legal questions that I had to determine. They should not influence your thinking about the facts.

When I sustained an objection to a question, the witness was not allowed to answer. Do not attempt to guess what the answer might have been. And, if you heard an answer to the question before my ruling, you are to disregard it. In your deliberations, do not consider or talk about any question to which I sustained an objection or any answer or other statement that I excluded, or struck, or told you not to consider.

Also, during the course of the trial I may have made comments to the lawyers, or spoken to a witness concerning the manner of his testifying.  Do not assume from anything that I may have said that I have any opinion concerning any of the issues in this case.  Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

Source:          Adapted from Brine charge and EMC charge, with additional material and the
                 Rubik's cube hypothetical drawn from Moleculon Research Corp. v. CBS, Inc.,
                 793 F.2d 1261 (Fed. Cir. 1986), a leading Federal Circuit decision concerning the
                 use of circumstantial evidence to prove infringement.  See id. at 1272
                 ("Circumstantial evidence is not only sufficient, but may also be more certain,
                 satisfying and persuasive than direct  evidence.").

## Note Taking

At the beginning of the trial, I instructed you about taking notes.  I remind you that notes taken by any juror are not evidence in the case and must not take precedence over your independent recollection of the evidence received in the case.  Notes are only an aid to recollection and are not entitled to any greater weight than actual recollection or the impression of each juror as to what the evidence actually is.

Source:          Brine charge and EMC charge.

17

## Credibility

An important part of your job as jurors will be deciding whether or to what extent you believe what each witness had to say, and how important that testimony was. You are the sole judges of the credibility of each witness. In deciding whether to believe a witness or how much weight to give a witness's testimony, you may consider anything that reasonably helps you to assess that testimony. The following are the kinds of questions you may want to consider in evaluating a witness's credibility. Did the person seem honest? Did he or she have some reason not to tell the truth? Did the witness have an interest in the outcome of the case? Did he or she gain any personal advantage by testifying in this case? Did the witness seem to have a good memory? Did the witness's testimony differ from his or her earlier testimony or from the testimony of other witnesses? Was the witness's testimony different on cross and direct examination? What was the witness's manner while testifying? These are some, but, of course, not all, of the kinds of things that will help you decide how much weight to give to what each witness said.

You may also consider any demonstrated bias, prejudice or hostility of a witness in deciding what weight to give to the testimony of that witness.

The mere number of witnesses or exhibits or the length of the testimony has no bearing on what weight you give to evidence, or on whether you find that the burden of proof has been met. Weight does not mean the amount of the evidence. Weight means your judgment about the credibility and importance of the evidence.

You may consider inconsistencies or differences as you weigh evidence, but you do not have to discredit testimony merely because an inconsistency or difference exists. Two or more

witnesses may see or hear things differently.  Innocent misrecollection, like failure of

recollection, is a common experience.  In weighing the effect of any inconsistency or difference,

consider whether it concerns a matter of importance or an unimportant detail, and whether it

results from innocent error or intentional falsehood.

On the other hand, you are not required to accept testimony, merely because it is

uncontradicted. You may decide, because of the witness' bearing and demeanor, or because of

inherent improbability, or for whatever reason, that testimony is not worthy of belief. You may

accept all of a witness' testimony or you may reject all of it, or you may accept part and reject

another part.

Source:        Adapted from <u>Brine</u> charge and <u>EMC</u> charge.


## Prior Inconsistent Statements

You have heard evidence that at some earlier time a witness has said or done something

which counsel argue is inconsistent with the witness's trial testimony.  Evidence of a prior

inconsistent statement is not to be considered as affirmative evidence in determining credibility.

Rather, it was placed before you for the more limited purpose of helping you decide whether, or

how much, if any, of that witness's trial testimony to believe.

In making this determination, you may consider whether the witness purposely made a

false statement or made an innocent mistake; whether the inconsistency concerns an important

fact or a small detail; whether the witness had an explanation for the inconsistency, and if so,

whether it appeals to your common sense.

During the trial, depositions of witnesses have been referred to by the attorneys and

shown to witnesses.  A deposition is sworn, recorded answers to questions asked of the witnesses

in advance of trial by one or more attorneys for the parties.

Source:          Adapted from <u>Brine</u> charge and <u>EMC</u> charge.

## **<u>Expert Witness</u>**

During the trial you have heard testimony from individuals having specialized skill or knowledge.  Such a witness is referred to as an "expert witness."  The mere fact that a witness is allowed to testify as one having specialized knowledge or experience does not indicate that you must believe that testimony. Nor should you substitute the expert's testimony for your own reasonable judgment and common sense. The credibility of each witness if for you to determine.

The law allows a person having specialized knowledge or experience to state an opinion in court about matters in that person's particular field. The fact that such a witness expressed an opinion does not mean, however, that you must accept that opinion. It is for you to decide whether the opinions expressed were mere speculations or guesses, which you should disregard, or were instead based on sound reasons, judgment and facts.

If you find that part or all of the opinion testimony was based on stated or unstated assumptions, and you further find that those assumptions are contrary to what you find on the evidence before you, then you will disregard any part of the opinion testimony that was based on assumptions contrary to your factual findings.

Also, your decision whether or not to rely upon opinion testimony by an expert witness will depend on your judgment about whether the witness' training and experience is sufficient for him to give the opinion that you heard.

It is up to you, bearing all these considerations in mind, to decide whether you believe and choose to rely on the testimony of a witness having specialized knowledge or experience. You may accept all of it, part of it, or none of it, as you find appropriate.

Source:        Adapted from <u>Brine</u> charge and <u>EMC</u> charge
.

## **Corporate Parties**

All of the parties in this case are corporations.  The mere fact that a given party is a corporation does not mean that it is entitled to any lesser consideration by you.  All litigants are equal before the law, and corporations, big or small, are entitled to the same fair consideration as you would give any other individual party.

Source:        Adapted from <u>Brine</u> charge and <u>EMC</u> charge

## **Deposition Testimony**

During the trial, certain testimony was presented to you by the reading of deposition transcripts and by presentation of a videotape of a deposition.  A deposition is simply a procedure where the attorneys for one side may question a witness or an opposing party under oath in the presence of a court reporter prior to trial.  This is part of the pretrial discovery, and each side is entitled to take depositions.  This sworn testimony is entitled to the same consideration you would give it had the witness personally appeared in court.

Source:        Adapted from <u>Brine</u> charge and <u>EMC</u> charge.

## **Burden of Proof**

On most of its claims in this case, Diomed has the burden of proving disputed elements by a preponderance of the evidence.  For those claims or defenses to claims where a different standard applies, I will specifically mention that.

To establish something by a preponderance of the evidence means to prove that it is more likely true than not true.  It means that such evidence, when considered and compared with that opposed to it, has more convincing force and produces in your mind the belief that what is sought to be proved is more likely true than not true.

In determining whether any fact in issue has been proved by a preponderance of the evidence in this case, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them. The burden of proof has not been carried if, after considering all the evidence, you find that you must speculate, guess or imagine that one or more of the necessary facts is true.  This rule does not, of course, require proof to an absolute certainty.

To establish something by clear and convincing evidence means that the evidence produces an abiding conviction that the truth of a factual contention is highly probable.  Proof by clear and convincing evidence is thus a higher burden of proof than proof by a preponderance of the evidence.  In this case, the clear and convincing standard applies only to one issue that you must decide.

You may have heard the phrase "proof beyond a reasonable doubt" from criminal cases. That burden of proof is the highest standard.  It does not apply to a patent case such as this one, and you should therefore put it out of your mind.

Source:      Adapted from Brine charge and EMC charge, with additional material from ABA Model Patent Instructions and Federal Circuit Bar Association Model Instructions.

## Part II – SPECIFIC QUESTIONS IN VERDICT FORM

In this case, I will submit specific questions to you in a verdict form, I will summarize the claims and explain to you how to apply the law to each of those claims, so that you can answer the specific questions.

## General Overview

This case involves claims by Diomed, Inc., which I will refer to simply as Diomed, against AngioDynamics, Inc., which I will refer to as AngioDynamics, and Vascular Solutions, Inc., which I will refer to as Vascular Solutions or simply VSI.   Diomed claims that AngioDynamics and VSI have infringed claim 9 of Diomed's United States Patent No. 6,398.777 (which I will refer to as the '777 patent).

## Patent

As you have heard, the patent infringement alleged in this case relates to a method of treating varicose veins.  In this lawsuit, Diomed accuses AngioDynamics and VSI of infringing the '777 patent by selling laser consoles and procedure kits used by practitioners.

Diomed contends that users who purchase these products from AngioDynamics or VSI directly infringe claim 9 of the '777 patent when they use the products.  Later in these instructions, I will explain to you what I mean by "claim."

Diomed further contends that AngioDynamics and VSI infringe the same claims of the '777 patent.  First, Diomed contends that AngioDynamics and VSI contribute to the practitioners' infringement by selling the products while knowing how the buyers use them.  Second, Diomed contends that AngioDynamics and VSI induce infringement by instructing or in

some other way encouraging practitioners to use the products in a way that infringes the claims of the '777 patent that I previously mentioned.

Diomed also alleges that it is entitled to money damages for the AngioDynamics' and VSI's infringement, and furthermore that the infringement was willful.

AngioDynamics and VSI respond that they have not infringed the asserted claims of the '777 patent. Previously, AngioDynamics and VSI had also contended that the '777 patent was invalid. As I explained at the beginning of the case, however, I have already rejected this defense and ruled that the patent claims are valid and enforceable. In other words, you only need to consider the questions of infringement, willful infringement, and damages.

I will now explain these patent law concepts to you in greater detail.

Source:        Adapted from <u>Brine</u> charge and <u>EMC</u> charge.

               Instruction that the court has previously decided validity and enforceability issues
               is based on this Court's summary judgment decision (Diomed v. AngioDynamics,
               450 F. Supp. 2d 130 (D. Mass. 2006) and the jury charge in <u>Read Corp. v.</u>
               <u>PowerScreen of America, Inc.</u> (D. Mass. Feb. 23, 2001) (96-CV-11025) (Young,
               J.), the relevant portion of which is attached as Exhibit 2).

## <u>Summary of Patent Issues</u>

In light of the parties' respective positions, this case presents several issues which you, the jury, need to decide.

First, you must determine whether Diomed has proven, by a preponderance of the evidence, that AngioDynamics and/or VSI infringe Diomed's patent as a result of selling products that practitioners use to treat varicose veins. If you decide that the patent has been infringed, you must determine what amount of damages is adequate to compensate Diomed. If you decide that the patent has been infringed, you also must determine whether the infringement has been willful.

Before we get to the verdict form that my deputy clerk will hand out, however, I will explain by way of background some fundamental terms and concepts of patent law.

A patent is a property right granted by the United States. A patent gives the patent owner the right to exclude others from making, using, offering for sale or selling the invention.

A patent, such as Diomed's '777 patent in this case, consists of three parts. First, there are the drawings. These are followed by what is called the specification, which is a written description of the invention. The specification concludes with one or more "claims".

The claims are the numbered paragraphs at the end of specification.  The claims of a patent are the main focus of a patent case because the claims define, in words, the legal boundaries of the invention.  That is, the claims define what it is that the holder of the patent has the right to prevent others from making, selling or using under the law.

Now, how is a patent obtained? The United States Patent and Trademark Office, often referred to as the Patent Office or the PTO, is the federal agency that examines patent applications.  When an application for a patent is submitted to the Patent Office, it is reviewed by a patent examiner to determine whether it meets the requirements of the patent laws.

The purpose of the patent system is to help advance science and technology by encouraging invention. The patent owner, in exchange for a full and clear public disclosure of the invention, is granted the right of exclusion for a limited period of time. This disclosure, it is assumed, will stimulate ideas and the eventual development of further significant advances in the art. In this regard, it is not improper to study a patent and use it to improve the art with another product.

In return for the disclosure of the invention, the owner of a patent is given the right, for 20 years, to exclude any other person from making, using, offering for sale or selling the

invention covered by the patent anywhere in the United States or from importing the invention into the United States.

Once the patent term has expired, the invention passes into the "public domain", which means that anyone is free to use it, provided that its use does not infringe another unexpired patent.

The deputy clerk will now distribute copies of the verdict form to you and we will review it together as I explain the elements of those questions.

Source:        Adapted from <u>Brine</u> charge and <u>EMC</u> charge.

### Diomed's Infringement Claim

**Question 1:**  Do you find, by a preponderance of the evidence, that AngioDynamics has induced infringement of claim 9 of Diomed's U.S. Patent No. 6,398,777?

**Question 2:**  Do you find, by a preponderance of the evidence, that AngioDynamics has contributorily infringed claim 9 of Diomed's U.S. Patent No. 6,398,777?

**Question 5:**  Do you find, by a preponderance of the evidence, that Vascular Solutions has induced infringement of claim 9 of Diomed's U.S. Patent No. 6,398,777?

**Question 6:**  Do you find, by a preponderance of the evidence, that Vascular Solutions has contributorily infringed claim 9 of Diomed's U.S. Patent No. 6,398,777?

As I mentioned previously, Diomed asserts in this lawsuit that AngioDynamics and VSI have infringed the '777 patent by selling their VenaCure and Vari-Lase products while knowing that the practitioners using those products perform the method covered by the '777 patent. Diomed also asserts that AngioDynamics and VSI have infringed the '777 patent by encouraging users to perform those methods.

Patent law provides that whomever, without the patent owner's permission, performs a method legally protected by at least one claim of a patent before the patent expires, infringes that patent.

26

Rather than filing a lawsuit against the many people who may be performing the method, patent law provides that a patent owner may enforce his rights by filing a lawsuit against the companies that sold the products that the people used to perform the method. This is called indirect infringement, and consist of either "contributory infringement" or "inducement of infringement." I will explain these concepts in more detail later.

Therefore, if you find that Diomed has proven, by a preponderance of the evidence, that

- first, practitioners using the AngioDynamics VenaCure products and/or the VSI Vari-Lase products have performed the method covered one or more of the '777 claims and

- second, AngioDynamics and/or VSI have contributed to or induced this infringement,

then you must find that AngioDynamics and/or VSI (as appropriate) infringed the '777 patent.

A person or entity may directly infringe a patent without knowledge that what it is doing is an infringement of the patent. Thus, a patent can be found to be infringed even though, in good faith, the accused infringer believes that what it is doing is not an infringement of any patent. It is no defense to a claim of infringement that the alleged infringer only infringes a little bit. Infringement is not a question of degree. A patent is infringed if any claim of that patent is infringed.

Determination of patent infringement is a two-step process. The first step in this process is a determination of what each claim means. Claim interpretation is my task. I will instruct you as to the proper interpretation of the disputed terms in the asserted claims of the '777 patent.

The second step, after the meaning of each claim is determined, is to compare the allegedly infringing method with each patent claim. It is your job to perform this second task. You must compare the allegedly infringing method with each asserted claim and look to see if each element of the claim then under consideration is found in the accused product.

27

Keep in mind that the question is whether practitioners using the AngioDynamics or VSI products infringe claim 9 of the '777 patent. The focus is on the claim itself.

Thus, before you can decide whether practitioners have infringed the asserted claims of the '777 patent and whether AngioDynamics and/or VSI has induced or contributed to that infringement, you will need to consider the language of claim 9.

Patent claims are "word pictures" (albeit sometimes very complicated "word pictures") intended to define, in words, the boundaries of the invention described and illustrated in the patent. The claims define what the holder of the patent has the right to prevent others from making, selling or using under the law.

The purpose of having the claims define the invention is to provide public notice to others of the limits beyond which one would infringe. Thus, you should focus on claim 9 itself rather than the specification or drawings in the patent.

Only the claims of the patent can be infringed. Neither the specification, which is the written description of the invention, nor the drawings of the patent can be infringed. By the same token, matter included in the written description of the invention or in the drawings should not be considered to be a part of a claim unless specifically recited in the claim. Each of the claims must be considered individually. To prove patent infringement, Diomed need only establish that one claim of the patent then under consideration has been infringed.

Source:        Adapted from <u>Brine</u> charge and <u>EMC</u> charge.

## **Claim Construction**

In this case, the parties disagree about the meaning of certain parts of the claims. As I mentioned earlier, it is my duty under the law to define what the disputed patent claims mean and

I did that before the trial. You must apply the meaning I have given to the disputed patent terms in your deliberations.

I will now outline for you the meaning of several disputed terms and phrases from Claim 9 of the '777 patent.  You must apply these meanings in your deliberations concerning infringement.  Claim 9 reads as follows:

A method of treating a blood vessel using laser energy, comprising the steps of:

inserting means for emitting laser energy into the blood vessel at a puncture site, wherein said emitting means has a laser emitting section;

placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment site; and

emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of said blood vessel.

The first main clause of claim 9 requires inserting a fiber optic line having an uncoated tip at its end capable of emitting laser energy.

The second main clause of claim 9 – placing said laser emitting section of said emitting means into intraluminal contact with the blood vessel at a treatment site -- means "putting the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel, which requires the drainage of blood and compression of the vein."   Here, drainage means removing some – but not necessarily all – of the blood from the vein.

The third and final main clause of claim 9 -- "emitting said laser energy into the blood vessel through said laser emitting section of said emitting means, thereby decreasing the diameter of the blood vessel" -- means "maintaining of the tip-interior surface in physical contact with  the vessel wall while laser energy is emitted to decrease the diameter of the blood vessel.

There are words and phrases of the claims which I will not describe. These words are, nevertheless, part of the claims, but I believe they do not require further interpretation.  You

29

should give the rest of the words in the claims their ordinary meaning in the context of the patent specification and prosecution history.

Source:        Adapted from <u>Brine</u> charge and <u>EMC</u> charge, with additional material from the AIPLA model instructions.

               Claim interpretations based on Judge Stearns' April 2005 Markman Order (D.I. 55).

### Infringement

Now that you have heard my interpretation of the claims at issue, it is your job to apply those definitions to determine the patent infringement issue in this case. As I mentioned earlier, Diomed contends that practitioners using AngioDynamics VenaCure or VSI Vari-Lase products directly infringe claims 9 of the '777 patent. Diomed relies on two different theories of direct infringement – both literal infringement and infringement under the doctrine of equivalents. Diomed also alleges that AngioDynamics and VSI themselves indirectly infringe claim 9 of the '777 patent by contributing to and/or inducing the practitioners' infringement. I will now explain these concepts, starting with literal infringement.

Source:        Adapted from <u>Brine</u> charge and <u>EMC</u> charge.

### Literal Infringement

To prove literal infringement, Diomed must show that every element of any one claim is found in the accused methods of treating varicose veins. Each element must be considered and no claim element may be omitted.

To prove that practitioners using AngioDynamics VenaCure or VSI Vari-Lase products infringe any one of the Claims of the '777 patent, Diomed must establish, by a preponderance of the evidence, that practitioners perform each element of any one of those claims.

Remember, as I instructed you earlier, Diomed can prove its case using circumstantial evidence. In particular, it is not necessary for Diomed to identify specific instances in which particular practitioners infringed the '777 patent as a result of using AngioDynamics VenaCure products or VSI Vari-Lase products to treat varicose veins. Instead, Diomed may identify an entire category of users and show by a preponderance of the evidence that the users infringe as a result of following the instructions and/or other training that AngioDynamics and VSI provide with their products.

When trying to establish by a preponderance of the evidence that practitioners infringe Diomed's patent when they use AngioDynamics or VSI products, Diomed does not need to rule out the possibility that a user could *theoretically* use the products to perform the procedure without infringing any patent claims. In other words, the sale of a device can infringe a patent even if it is capable of non-infringing uses in unusual circumstances.

Also remember that the question is whether the methods practiced by practitioners using the AngioDynamics or VSI products infringe claim 9 of the '777 patent and not whether those methods are or are not similar to the method that Diomed teaches. In other words, the comparison is a "claim-to-method" comparison and not a "method-to-method" comparison.

Finally, as I told you before, direct infringement does not require any particular state of mind. When determining whether practitioners infringe Diomed's patent, you should focus on the physical steps that they perform with the AngioDynamics and VSI products – not whether they had a deliberate attempt to infringe. In fact, someone can directly infringe a patent without knowing that what they are doing is an infringement of the patent. They also may infringe even though they believe in good faith that what they are doing is not an infringement of any patent.

Claim 9 of the '777 patent that I just referred to a moment ago us the only claim that you need to address. In other words, the question is whether practitioners using AngioDynamics or VSI products infringe claim 9.

The beginning part of claim 9 – called the preamble – uses the transitional phrase "comprising." In patent claims, "comprising" or "comprises" mean that the claims are open-ended. This means that each claim is not limited to only what is specifically set forth in that claim. In other words, if you find that the methods practiced by practitioners using AngioDynamics VenaCure or VSI Vari-Lase products include each of the steps of claim 9, it doesn't matter if the users do other things too. In other words, adding additional steps beyond the ones recited in the claim does not avoid infringement. All that Diomed must establish is that practitioners using the VenaCure or Vari-Lase products perform at least the steps recited in claim 9.

If, however, you find that a method performed by practitioners does not include particular elements of claim 9, you must find that the method does not infringe.

Source:    Adapted from <u>Brine</u> charge and <u>EMC</u> charge.

Additional material added to reflect the current state of the law regarding the use of circumstantial evidence to prove infringement by an entire category of users. <u>Golden Blount, Inc. v. Robert H. Peterson Co.</u>, 438 F.3d 1354, 1362-63 (Fed. Cir. 2006) ("[G]iven the evidence showing that DX34 was packaged with each EMB, that both the DX30 and DX34 instruction sheets teach an infringing configuration, and that the demonstration device assembled by Peterson at trial exemplified an infringing configuration, we conclude that the district court did not clearly err in finding that more likely than not, each time an EMB was attached to a primary burner by either Peterson or an end-user, the combination was infringing."); <u>Arthrocare Corp. v. Smith & Nephew, Inc.</u>, 406 F.3d 1365, 1377 (Fed. Cir. 2005); <u>Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings</u>, 370 F.3d 1354 (Fed. Cir. 2004) ("To support the verdict, the record does not need to contain direct evidence that every physician performed the 'correlating' step. It is hornbook law that direct evidence of a fact is not necessary."); <u>Dynacore Holdings Corp. v. U.S. Philips Corp.</u>, 363 F.3d 1263, 1274 (Fed. Cir. 2004); <u>3M v. Chemque</u>, 303 F.3d

1294, 1305 (Fed. Cir. 2002) (overturning jury verdict: "The record indicates that Chemque was aware of the 3M patents and supplied the infringing products to T & B and other customers with instructions on how they were to be used, which, when followed, would lead to infringement."); Oxford Gene Tech Ltd. v. Mergen Ltd., 345 F. Supp. 2d 444, 463-66 (D. Del. 2004) ("It is clear that Mergen sold its microarry kit, encouraged its customers to follow the instruction manual describing the intended method of use, and that its customers did so use it, resulting in the direct infringement of claims 9 and 10….[I]f use of the component by the defendant's customers necessarily infringes the patent, actual proof of an instance of direct infringement is not required.").

Additional material also added to reflect the law regarding "unusual" uses. Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 1343 (Fed. Cir. 2001) (vacating summary judgment of non-infringement: "[T]he sale of a device may induce infringement of a method claim, even if the accused device is capable of non-infringing modes of operation in unusual circumstances."). See also Bell Commc'ns Research Inc. v. Vitalink Commc'ns Corp., 55 F.3d 615, 622-23 (Fed. Cir. 1995) ("[A]n accused product that sometimes, but not always, embodies a claimed method nonetheless infringes."); Philips Elecs. N. Am. Corp. v. Contec Corp., 411 F. Supp. 2d 470, 474-75 (D. Del. 2006) (granting summary judgment for patentee "[E]ven though Defendants' [products] sometimes, but not always, embodies the claimed method, they infringe."), aff'd, 177 Fed. Appx. 981, 988 (Fed. Cir. 2006).

Additional material also added to distinguish direct infringement from indirect infringement and explain that the former is a strict liability tort. See Dow Chem. Co. v. Mee Indus., Inc., 341 F.3d 1370, 1380 (Fed. Cir. 2003) ("[T]he motive of the accused infringer when performing a claimed method simply is not relevant."); Symbol Techs., Inc. v. Metrologic Instruments, Inc., 771 F. Supp. 1390, 1404-06 & n.12 (D.N.J. 1991) (granting summary judgment of inducement because "[c]ase law makes clear that infringement of a patent does not require willful or deliberate attempt to infringe on part of infringer."). See also AIPLA Model Instructions § 3.1.

## Doctrine of Equivalents

Diomed also asserts that practitioners directly infringe the '777 patent under the doctrine of equivalents. The doctrine of equivalents prevents an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality.

In order to prove infringement under the doctrine of equivalents, Diomed must prove, by a preponderance of the evidence, that practitioners using the accused AngioDynamics VenaCure or VSI Vari-Lase products do so in a way that embodies every essential step of the invention set forth in one or more of the claims of the patent.

Even if particular steps of the users' methods do not come within the literal words of a claim in the '777 patent, the practitioners still infringe the patent if the steps differ from the claim only because of elements that perform substantially the same function in substantially the same way to produce substantially the same results as the element of the invention set forth in the claims. In other words, if an equivalent for each step recited in a claim is found in the methods that practitioners perform using the AngioDynamics or VSI products, and if each equivalent performs substantially the same function in substantially the same way to produce substantially the same results as the step recited in the claim, then the claim is infringed. You may determine equivalency from the testimony you have heard, from the documents which have been introduced into evidence, and from the disclosures of the prior art.

In applying the test for the doctrine of equivalents, the claims cannot be construed in a manner inconsistent with any limitations which were added or arguments made during any part of the prosecution in the Patent Office to render the claims patentable. Keep in mind that the doctrine of equivalents may not be used to effectively eliminate an element from a patent claim. Because of this, some patent limitations may be written in such a way as to have no equivalents.

Source:          Adapted from <u>Brine</u> charge and <u>EMC</u> charge


**Indirect Infringement**

As I explained earlier, Diomed contends that practitioners using the AngioDynamics VenaCure and VSI Vari-Lase products are infringing the asserted claims of the '777 patent. This case is not against users of the device, but rather its manufacturers.

Instead, Diomed has brought claims against AngioDynamics and VSI for indirect infringement. Indirect infringement occurs when one or more persons directly infringe the patent and another party is responsible for that infringement in ways that I will explain shortly. Thus, in order to prove that AngioDynamics and VSI are indirectly infringing claim 9 of Diomed's patent, Diomed must prove, by a preponderance of the evidence, that at least one person is or has been directly infringing claim 9. This is why Diomed put forward evidence that practitioners using the AngioDynamics VenaCure and VSI Vari-Lase products are infringing the asserted claims of the '777 patent even though the individual users themselves are not parties to this case. As I explained before, the underlying direct infringement may be shown by direct or circumstantial evidence.

Source:      Adapted from <u>EMC</u> charge. Additional material added to prevent juror confusion as to why Diomed's evidence relates in significant part to practitioners who are not involved in the case.

## **Inducing Infringement**

One kind of indirect infringement is called "inducing infringement."

To show induced infringement, Diomed must show by a preponderance of the evidence that someone using the AngioDynamics VenaCure or VSI Vari-Lase product has directly infringed the '777 patent and that AngioDynamics and/or VSI has knowingly induced infringement with the intent to encourage the infringement. The defendant must have intended to cause the acts that constitute direct infringement and must have known or should have known that its action would cause the direct infringement.

35

In other words, there is an intent requirement for inducing infringement. This is different from direct infringement, which as I explained previously can occur even if the practitioners have no knowledge of Diomed's patent or whether what they are doing falls within the scope of one or more of the asserted claims.

As jurors, you are entitled to conclude that AngioDynamics or VSI had the required intent to induce infringement if you find that it is more likely than not that AngioDynamics or VSI (1) knew about Diomed's patent and (2) intended to encourage practitioners to perform the acts that constitute direct infringement.

Diomed can establish this intent through direct or circumstantial evidence. You must decide whether AngioDynamics and/or VSI induced practitioners to infringe Diomed's patent by providing, for example, labeling, advertising or other sales methods, instructions for use, directions to perform the infringing act, training in the use of their kits, or by designing their kits in a particular way.

You may find that defendant induced infringement even if there is an express warning against the infringement, if the material containing the warning nonetheless invites the infringing activities under the circumstances.

Source:

> First paragraph (not counting opening sentence) – <u>DSU Med. Corp. v. JMS Co.</u>, 471 F.3d 1293, 1304-06 (Fed. Cir. 2006) (en banc).

> Second paragraph drafted to emphasize the differences between inducement and direct infringement.

> Third paragraph -- <u>Golden Blount, Inc. v. Robert H. Peterson Co.</u>, 438 F.3d 1354, 1364 n.4 (Fed. Cir. 2006); <u>MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.</u>, 420 F.3d 1369, 1378 n.4 (Fed. Cir. 2005) ("[I]t is undisputed that SUMCO had knowledge of the '302 patent. Thus, assuming that MEMC is able to demonstrate that SUMCO had intent to induce the specific acts constituting infringement, intent additionally to cause an infringement can be presumed."); <u>3M v. Chemque</u>, 303 F.3d

1294, 1305 (Fed. Cir. 2002)  (overturning jury verdict:  "The record indicates that Chemque was aware of the 3M patents and supplied the infringing products to T & B and other customers with instructions on how they were to be used, which, when followed, would lead to infringement.")

Fourth paragraph – <u>Water Technologies Corp. v. Calco, Ltd.</u>, 850 F.2d 660, 668 (Fed. Cir. 1988); Uniform Delaware Instructions § 3.6.  Specific ways of proving inducement:

> Instructions – <u>Golden Blount</u>, 438 F.3d at 1364 ("Peterson intended to cause the acts that led to infringement because Peterson packaged its DX34 instruction sheet with the EMB and intended to have customers assemble the apparatus in accordance with the instructions.; <u>3M v. Chemque</u>, 303 F.3d 1294, 1305 (Fed. Cir. 2002) (reversing the denial of JMOL where defendant "was aware of the … patents and supplied the [relevant] products to…customers with *instructions on how they were to be used, which, when followed, would lead to infringement*") (emphasis added); <u>Water Techs. Corp.</u> 850 F.2d at 668; <u>Moleculon</u>, 793 F.2d at 1272 (upholding finding of inducement where defendant had disseminated an instruction sheet inducing users to practice the claimed method); <u>Vesture Corp. v. Thermal Solutions, Inc.</u>, 284 F. Supp. 2d 290, 317 (M.D.N.C. 2003) (granting summary judgment based upon evidence that the defendant had provided "user manuals that specifically instruct the user how to perform infringing methods").

> Marketing and training – <u>Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.</u>, 145 F.3d 1303, 1311-12 (Fed. Cir. 1998) (affirming summary judgment of inducement based on advertisements); <u>Metabolite Labs., Inc. v. Lab. Corp. of Am.</u>, 370 F.3d 1354, 1365 (Fed. Cir. 2004); <u>Young v. Lumenis Inc.</u>, 301 F. Supp. 2d 765, 770-71 (S.D. Ohio 2004) (basing inducement decision on instructional materials and sales demonstrations); <u>NTP, Inc. v. Research in Motion, Ltd.</u>, 261 F. Supp. 2d 423, 437 (E.D. Va. 2002) (granting summary judgment: "RIM, by advertising, offering to sell, and selling the BES and BlackBerry Pagers, knowingly and intentionally induced others to infringe the Campana patents.")

> Customer support efforts – <u>University of California v. Hansen</u>, 54 U.S.P.Q.2d 1473, 1479 (E.D. Cal. 1999) (training)

> Product design decisions -- <u>Oxford Gene Techs</u>., 345 F. Supp. 2d at 464 (design of "kits" including all of the components required to perform the relevant directly infringing acts).

Fifth paragraph -- From Uniform Delaware Instructions § 3.6.  <u>See also</u> <u>Acco Brands Inc. v. ABA Locks Manufacturer Ltd.</u>, 74 U.S.P.Q.2d 1947, 1951 (E.D. Tex. 2005) (defendant found to have induced purchasers of its computer security locks to operate them in a way that infringed the patented method even though its instructions instructed purchasers to use the locks in a manner that would not infringe.); <u>John Hopkins University v. CellPro</u>, 1997 U.S. Dist. LEXIS 24162 (D. Del. July 2, 1997) ("It is

established that merely labeling a product to warn against infringing uses is not sufficient to avoid liability for inducing infringement."), <u>vacated in part on other grounds</u>, 152 F.3d 1342 (Fed. Cir. 1998); <u>American Standard Inc. v. Pfizer Inc.</u>, 722 F. Supp. 86, 103 (D. Del. 1989).

## **Contributory Infringement**

A second kind of indirect infringement is called contributory infringement. Contributory infringement can occur when a supplier provides a product for another for use in a patented system or method. In order for there to be contributory infringement the person who received the product must infringe the patent.

In order for Diomed to prove that a defendant committed contributory infringement, Diomed must prove, by a preponderance of the evidence that practitioners using the defendant's products directly infringed claim 9 of Diomed's patent, that the defendant knew of the patent and of the infringing use of its own product, and that the defendant's product lacks a substantial non-infringing use.

In other words, there is a "knowledge requirement" but not an "intent requirement" for contributory infringement. Here, both defendants have acknowledged that they knew about Diomed's patent. If you find that practitioners using AngioDynamics and VSI products directly infringe the patent, you must also find that the defendants contributorily infringe the patent if you determine that (1) the defendants knew about the activities that you found to infringe and (2) the products lack any substantial non-infringing use.

A product is capable of substantial noninfringing use if people can use it for reasons other than performing the patented method and those other uses are not occasional, farfetched, impractical, experimental, or hypothetical. In other words, determining whether a possible non-infringing use is substantial requires determining how likely and often the use will occur – taking

into account its quality, quantity, and efficiency.  It is not enough for a product to be physically capable of a non-infringing use.

One factor to consider in determining whether a product has any substantial non-infringing use is to consider whether the instructions that come with the product describe such a use.

When considering whether a product has a substantial non-infringing use, you should look at the product as a whole rather than particular components or parts.

Source:    First paragraph adapted from <u>EMC</u> charge.

Second paragraph based on <u>Diomed, Inc. v. AngioDynamics, Inc.</u>, 450 F. Supp. 2d 130, 148 (D. Mass. 2006) ("To prevail on a claim of contributory infringement, the plaintiff must prove direct infringement, that the defendant knew of the patent and of the infringing use of its own product and that the defendant's product lacks a substantial non-infringing use.").

Third paragraph based on <u>Hewlett-Packard Co. v. Bausch & Lomb Inc.</u>, 909 F.2d 1464, 1469 (Fed. Cir. 1990) ("[O]nly proof of a defendant's *knowledge*, not *intent*, that his activity cause infringement [is] necessary to establish contributory infringement.") and <u>Sandisk Corp. v. Lexar Media, Inc.</u>, 91 F. Supp. 2d 1327, 1335 (N.D. Cal. 2000) ("All that is required for a finding of contributory infringement is (1) defendant's knowledge of the *activity* that is alleged to be infringing…and (2) defendant's knowledge of the patent).

Fourth paragraph based on Uniform Delaware Instructions § 3.7; <u>Mentor H/S, Inc. v. Medical Device Alliance, Inc.</u>, 244 F.3d 1365, 1379 (Fed. Cir. 2001) (jury "was entitled to reject [an accused infringer's] assertions that [the accused infringer's device] had other potential uses because the record does not indicate any actual uses of the device other than [the patented process]"); <u>Hoffman-La Roche Inc. v. Promega</u>, 33 U.S.P.Q.2d 1641, 1648 (N.D. Cal. 1994) (explaining the need for a "quantitative element" in the "staple/nonstaple analysis"); and <u>Vesture Corp.</u>, 284 F. Supp. 2d at 31 (granting summary judgment in favor of the patentee because while the defendant's product certainly had "possible" non-infringing functions, it was "not enough…that a product…be physically capable…of a noninfringing use").

Fifth paragraph based on <u>Golden Blount</u>, 438 F.3d at 1363-64 (affirming finding of contributory infringement where instructions only taught an infringing configuration).

Last paragraph based on <u>Hodosh v. Block Drug Co.</u>, 833 F.2d 1575, 1576 (Fed. Cir. 1987).  <u>See also</u> <u>Oxford Gene Tech. Ltd.</u>, 345 F. Supp. 2d at 466 (as a whole, defendant's medical kit was only suitable for carrying out plaintiff's patented method); <u>Hoffmann-La Roche, Inc. v. Promega Corp.</u>, 33 USPQ2d 1641, 1648 (N.D. Cal. 1994) ("Even if nTaq, the ingredient, has non-PCR uses, Promega may still be liable for contributory infringement if it packages nTaq with a combination of other ingredients and thereby makes the kit, as a whole, unsuitable for substantial noninfringing use"); <u>Rhone-Poulen Agrochime, S.A. v. Biagro Western Sales, Inc.</u>, 35 USPQ2d 1203, 1207 (E.D. Cal. 1994) (focus in determining substantial noninfringing use was on the defendant's entire fertilizer/fungicide product, not on the individual phosphoric acid ingredient of that product);

## **Monetary Damages**

If you find that AngiodDynamics and/or VSI infringed claim 9 of Diomed's patent (whether by inducement or contributory infringement), the next step is determining the amount of damages to which Diomed is entitled:

**Question 3:**    If you have answered YES to either Question 1 or Question 2, or both [inducement or contributory infringement by AngioDynamics], indicate the amount of damages that you find that Diomed has proven by a preponderance of the evidence to have suffered as a result of this infringement:

**Question 7:**    If you have answered YES to either Question 5 or Question 6, or both [inducement or contributory infringement by VSI], indicate the amount of damages that you find that Diomed has proven by a preponderance of the evidence to have suffered as a result of this infringement:

Patent law provides that in the case of infringement of a patent claim, the patent owner shall be awarded damages adequate to compensate for the infringement, but in no event less than what is called a "reasonable royalty", for the use made of the invention by the infringer.  Damages are compensation for losses suffered as a result of the infringement.

40

Adequate compensation should return Diomed to the position it would have occupied had there been no infringement. You must consider the amount of injury suffered by Diomed without regard to the gains or losses of AngioDynamics and/or VSI from the infringement.

If you consider damages, you must determine the date on which damages began. Patent law only permits damages to accrue from and after the time the infringer was notified of the infringement.

Keep in mind that you are only permitted to award damages which have occurred in the past and not those that might occur in the future.

Under patent law, Diomed is entitled to all damages that can be proven with "reasonable certainty." Reasonable certainty does not require proof of damages with mathematical precision. Diomed is not entitled to speculative damages, that is, you should not award any amount for loss, which, although possible, is wholly remote or left to conjecture and/or guess. You may base your evaluation of "reasonable certainty" on opinion evidence and the testimony of qualified experts.

Bear in mind that recovery will not be barred because there may be lack of certainty in Diomed's proof of aspects of loss that, by their nature, are not susceptible of precise calculation.

In particular, Diomed is not required to prove specific acts of direct infringement in order to collect damages. In other words, there is no need to demonstrate a one-to-one correspondence between units that AngioDynamics or VSI sold and particular practitioners who may have infringed Diomed's patent. Instead, you can consider potential infringement by entire categories of users. I described this concept when explaining the standards for proving infringement.

Also, if you award damages, you are not to include any amount for prejudgment interest. The law provides for interest on any damages awarded; such calculations in this case are not for the jury.

In your determination of what damages are warranted in this case, there are two categories or measures of damages you will be asked to consider:

1) lost profits; and

2) a reasonable royalty for use of the patented invention.

I will instruct you on both measures of damages, but, this should not be construed by you as expressing any view of the Court with respect to the appropriate measure of damages or whether damages should be awarded at all. That determination is for you to make.

Diomed contends that it should be awarded damages based on its lost profits and, for those infringing lasers and kits sold by AngioDynamics and VSI for which lost profits are not awarded, a reasonable royalty. AngioDynamics and VSI contend that Diomed is not entitled to lost profits and that Diomed's calculation is too speculative to be reliable. Instead, AngioDynamics and VSI contend that damages, if any, should be calculated based solely upon a reasonable royalty.

Source:      Adapted from Brine charge and EMC charge, with additional material based on Dynacore, 363 F.3d at 1274, Diomed, 450 F. Supp. 2d at 151 ("[Diomed's] failure to connect its monetary damages to particular acts of infringement does not negate a damages claim under the theory that [AngioDynamics and VSI customers] as a class infringe the '777 patent."); Hilgraeve, Inc. v. Symantec Corp., 272 F. Supp. 2d 613, 621 (E.D. Mich. 2003) ("[T]here is no legal basis for Defendant's claim that Plaintiff must prove specific instances of direct infringement in order to recover damages from inducement with regard to those products that are capable of a non-infringing mode of operation."); Imagexpo, LLC v. Microsoft Corp., 284 F. Supp. 2d 365, 369-70 (E.D. Va. 2003) ("[T]he plaintiff is not required to demonstrate a one-to-one correspondence between units sold and directly infringing customers.")

## <u>Lost Profits-Defined</u>

In this case, Diomed is seeking damages partly in the form of lost profits.  Thus, the first issue that you must decide is whether Diomed is entitled to recover its lost profits resulting from the infringing sales made by AngioDynamics and VSI.  If, however, you find that Diomed is not entitled to lost profits, you must then determine damages caused by the infringement based upon a reasonable royalty.

Lost profits may be in the form of diverted sales. In this respect, it is Diomed's burden to establish, by a reasonable probability, that Diomed would have made the sales that AngioDynamics and VSI made "but for" the alleged infringement.  In other words, Diomed needs to show that there was a reasonable probability that it would have sold its own lasers and procedure kits had AngioDynamics and VSI not sold the allegedly infringing VenaCure and Vari-Lase products.

Diomed may make this showing by proving the following four factors:

(1)    the demand for its patented method in the marketplace;
(2)    the absence of acceptable, non-infringing substitutes;
(3)    the manufacturing and marketing capability to meet the demand for products used to perform the  patented method; and
(4)    the amount of profit Diomed would have made but for the sales by AngioDynamics and VSI.

A showing of all four of these factors must be made to infer reasonably that the lost profits were, in fact, caused by the infringing sales.

I will now explain each of these four factors in more detail.

First, you must consider whether a demand for the patented product exists in the marketplace.  This demand must be attributable to the patented invention and not to other market influences.  Demand for the patented method can be proven by significant sales of Diomed,

43

AngioDynamics, and/or VSI products used to perform the method.  This demand must be attributable to the patented invention and not to other market influences.

Second, Diomed must prove that there is an absence of acceptable, non-infringing substitutes.  The mere presence of a competing procedure, however, does not make that method an acceptable substitute. To be an acceptable substitute, the procedure must have the advantages of the patented invention.

Third, you should consider whether Diomed had the manufacturing and marketing capability to meet the demand for products to perform the patented method.  Diomed must prove, by a preponderance of the evidence, that it would have had the capability to manufacture and sell the additional products for which it is now claiming lost profits.

Fourth, Diomed must prove, with reasonable certainty, the amount of profit it would have made had AngioDynamics and VSI not sold any of their lasers and procedure kits.

If you find that a showing of the four described factors has been made, you may reasonably infer that the lost profits were, in fact, caused by the infringing sales thus entitling Diomed to recover its lost profits.

Lost profits may be calculated by computing the amount of lost sales for Diomed's lasers and procedure kits less the amount of additional incremental costs that it would have incurred in making the sales of those products.  In computing lost profits as a result of lost sales, the sale price should be the price at which the sale would have been made but for the infringement.

In addition to lost sales, Diomed also seeks to recover lost profits due to having to lower its prices, or being unable to raise its prices, because of VSI's infringement.  Diomed must prove that it lowered its prices, or did not raise them, because of the infringement, and not for some

other reason.  In that case, you may also award as additional damages the amount represented by the difference between the amount of profits that Diomed would have made by selling its product at the higher price and the amount of profits that Diomed actually made by selling its product at the lower price that Diomed actually charged.  This type of damage is referred to as price erosion damages.  If you find that Diomed suffered price erosion damages, you may also use the higher price in determining Diomed's lost profits from sales lost because of the infringement.  You must take into account any decrease in sales that might have occurred if Diomed had charged a higher price than it did.

Source:        Adapted from <u>Brine</u> charge, with additional material regarding price erosion from ABA Patent Litigation Model Jury Instructions § 11.7; Federal Circuit Bar Association Model Patent Jury Instructions § 12.3.4; and AIPLA Model Instructions § 12.10.

## <u>Reasonable Royalty as a Measure of Damage</u>

If you find that AngioDynamics and/or VSI has infringed Diomed's patent but Diomed is not entitled to recover damages based upon lost profits, then you should calculate damages based upon a reasonable royalty.  Diomed is entitled to a reasonable royalty for all infringing sales for which lost profits damages have not been awarded.

A royalty is the amount of money a licensee is required to pay to a patent owner for permission to make and sell the patented invention. Typically, a royalty is calculated as a fixed amount per unit sold or as a percentage of the selling price of the patented products.

A reasonable royalty is the amount of money that would be agreed to in a hypothetical, arms-length negotiation between a willing owner of a patent, in this case, Diomed, and a willing licensee, in this case, AngioDynamics and/or VSI.

In determining a reasonable royalty, it is important to place yourself at the point in time just before liability for the alleged infringement would begin.  In the hypothetical, arms- length negotiation, you must assume that the person negotiating on behalf of AngioDynamics and VSI, and who was willing to take a license, would have considered Diomed's patent infringed by AngioDynamics or VSI (as appropriate). You should also assume that the parties knew all pertinent information at the time of the hypothetical negotiations.

In determining such a reasonable royalty, the following are some of the factors that may be considered:

1) Diomed's established policy and marketing program for maintaining its patent exclusivity by granting licenses under special conditions designed to preserve that exclusivity;

2) the commercial relationship between Diomed on the one hand and AngioDynamics and VSI on the other, such as, whether they were competitors in the same territory in the same line of business;

3) the established profitability of the product made under the patent, its commercial success, and its popularity;

4) the utility and advantages, if any, of the patented method over older ways to treat varicose veins;

5) the nature of the patented invention, the character of its commercial embodiment as owned and produced by Diomed, and the benefits to those who have used the invention;

6) the extent to which AngioDynamics and VSI have made use of the invention, and any evidence probative of the value of that use;

7) the percentage of profit that may be customary in the medical device business to allow for the use of the patented method;

8) the portion of the realizable profit that should be credited to the patented invention as distinguished from non-patented aspects of the AngioDynamics and VSI products, the manufacturing process, business risks, or significant features or improvements added by AngioDynamics or VSI;

9) the Opinion testimony of qualified experts;

10) any other economic factor, which, in your mind, would have increased or decreased the royalty that AngioDynamics or VSI would have been willing to pay and that Diomed would have been willing to accept, all companies acting as normally prudent businesses at the time.

Source:        Adapted from <u>Brine</u> charge.


### Willful Patent Infringement

**Question 4:**    If you have answered YES to either Question 1 or Question 2, or both [inducement or contributory infringement by AngioDynamics], do you find that AngioDynamics' infringement was willful?

**Question 8:**    If you have answered YES to either Question 1 or Question 2, or both [inducement or contributory infringement by VSI], do you find that VSI's infringement was willful?


If you find on the basis of the evidence and the law as I have explained it that AngioDynamics and/or VSI infringes claim 9 of Diomed's patent, you must then decide whether or not Diomed has proven, by clear and convincing evidence, that the infringement by AngioDynamics and/or VSI was willful.  The clear and convincing evidence standard is a higher standard of proof than the preponderance of the evidence standard.

Willful infringement is established if Diomed proves two things: first, that the particular defendant (i.e., either AngioDynamics or VSI) was aware of Diomed's patent at the time that it marketed its allegedly infringing lasers and kits; and second, that the defendant had no reasonable good faith basis for concluding that it did not infringe Diomed's patent.  In fact, the defendants have acknowledged that they knew about Diomed's patent before they began selling the VenaCure and Vari-Lase products.

Therefore, AngioDynamics and VSI had a duty to exercise "due care" to determine whether or not their activities would infringe Diomed's patent.  Your job is to determine whether

AngioDynamics and VSI had sound reason to believe that they had the right to sell the VenaCure and Vari-Lase products. In other words, did AngioDynamics and VSI act prudently and ethically? The rules of patent infringement are rules of business ethics, and require prudent commercial actions in accordance with law.

There are no hard and fast rules for determining when defendants willfully infringe a patent. Instead, you must determine willfulness based on what we call the "totality of circumstances."

One factor to consider in deciding this question is whether AngioDynamics and/or VSI obtained and followed competent legal advice from attorneys after learning about Diomed's patent and before beginning or continuing the allegedly infringing activities. Competent legal advice means an opinion by counsel based on a reasonable examination of the facts and law relating to the infringement issues, consistent with the standards and practices generally followed by competent lawyers. The competency requirement applies to both the qualifications of the person giving the opinion and to the content of the opinion itself. Qualifications, alone, of the person giving the opinion do not make the opinion competent. For example, the opinion may be incompetent if the company seeking the opinion failed to provide its attorney with complete information about the product that the attorney was supposed to be considering.

If you find that outside counsel provided competent legal advice, you should then consider whether AngioDynamics and/or VSI actually relied upon and followed that advice. For example, if the conclusions in the opinions depended upon certain factual assumptions, did AngioDynamics and VSI take steps to confirm those assumptions? If AngioDynamics and VSI made significant changes to their products or instructions for use, did they return to their attorneys to confirm that the changes were permissible? Were AngioDynamics and VSI

sincerely relying upon what their attorneys had to say, or were they just looking for documents that they could show in court in cases like this?

When considering these questions, you should also consider the timing of AngioDynamics' and VSI's request for attorney opinions.   If they did not request such opinions until after they made firm plans to develop and sell the products, you may conclude that the opinions were not obtained in a reasonable and sincere effort to determine whether selling the products would be permissible.

Another factor to consider in determining whether Diomed has proven willful infringement is whether AngioDynamics and/or VSI deliberately copied the ideas or design of another.

These are just some examples of factors to address.  For instance, you could also consider

- whether AngioDynamics and/or VSI unsuccessfully tried to get permission to sell products for use in performing the patented method

- whether AngioDynamics and/or VSI faced market pressure to introduce their own varicose vein treatment products to compete with Diomed's [Applied Med. Resources, 435 F.3d at 1365 (patentee "presented evidence from which a jury could reasonably infer that U.S. Surgical desperately needed a universal seal trocar to remain competitive in the surgical business, that U.S. Surgical's management did not properly oversee or adequately participate in the development of Versaport II, and that U.S. Surgical's management placed intense time pressure on their engineers to create a new product"); Rosemount, Inc. v. Beckman Instruments, Inc., 727 F.2d 1540 (Fed. Cir. 1984); Datascope Corp. v. SMEC, Inc., 879 F.2d 820, 828 (Fed. Cir. 1989) (district court

"underestimated the court's own findings about the market pressure and urgency faced by SMEC"]

No one factor by itself is conclusive on the issue of whether infringement was or was not willful. As I explained before, in assessing willfulness, you should consider the totality of the circumstances and all of the evidence demonstrating the intentions of AngioDynamics and VSI.

Patent infringement can continue for as long as a company sells particular products. You should therefore look at the circumstances in place when AngioDynamics and VSI began selling their VenaCure and Vari-Lase products in the first place, but also consider the situation later on. Changing circumstances can mean that infringement that starts out non-willfully can later become willful.

Keep in mind that willful infringement requires a finding of infringement in the first place. These are separate issues for you to decide during your deliberations.

Finally, whether infringement is willful is a question of the alleged infringer's intent and belief. You must focus, therefore, on the intent and reasonable belief of the officers and employees of AngioDynamics and VSI in deciding this question.

Source:      Material in black adapted from Brine charge, with additional material from Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209 (Fed. Cir. 2006); nCube Corp. v. Seachange Int'l, Inc., 436 F.3d 1317, 1324 (Fed. Cir. 2006); Applied Medical Resources Corp. v. U.S. Surgical Corp., 435 F.3d 1356, 1365 (Fed. Cir. 2006): Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1343 (Fed. Cir. 2004); Vulcan Eng'g Co., Inc. v. Fata Aluminium, Inc., 278 F.3d 1366, 1378 (Fed. Cir. 2001); Stryker Corp. v. Davol Inc., 234 F.3d 1252, 1259 (Fed. Cir. 2000); WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1354 (Fed. Cir. 1999); Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1191 (Fed. Cir. 1998); SRI Int'l, Inc. v. Advanced Tech. Labs. Inc., 127 F.3d 1462, 1465-67 (Fed. Cir. 1997); Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1259 (Fed. Cir. 1997); Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1221–22 (Fed. Cir. 1995); Therma-Tru Corp. v. Peachtree Doors Inc.,, 44 F.3d 988, 997 (Fed. Cir. 1995); Am. Med. Sys. v. Med. Eng'g Corp., 6 F.3d 1523, 1531 (Fed. Cir. 1993); Datascope Corp. v. SMEC, Inc.,

879 F.2d 820, 828 (Fed. Cir. 1989); Sessen-Schurr Stahlecker & Grill GMBH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1084 (Fed. Cir. 1987); Rosemount, Inc. v. Beckman Instruments, Inc., 727 F.2d 1540 (Fed. Cir. 1984); Central Soya Co., Inc. v. Geo. A. Hormel & Co., 723 F.2d 1573, 1577 (Fed. Cir. 1983); Underwater Devices, Inc. v. Morrison-Knudsen Co., 717 F.2d 1380, 1390 (Fed. Cir. 1983); Dickey-John Corp. v. Int'l Tapetronics Corp., 710 F.2d 329, 332-33 (7th Cir. 1983); Applied Medical Resources Corp. v. U.S. Surgical Corp., 353 F. Supp. 2d 1075, 1081-82 (C.D. Cal. 2004).

References to defendants' knowledge of patent based on AngioDynamics Response to Request for Admission No. 48 (Aware of '777 patent by at least June 2002); VSI Response to Request for Admission No. 48 (Aware of '777 patent by at least June 2003).

## PART III – PROCEDURES DURING DELIBERATIONS

When you go to the jury room to begin considering the evidence in this case, the foreperson, _____, will assure that every juror is present during all of your deliberations and that all jurors, the foreperson included, will have equal and full opportunity to participate in the deliberations. Once you are in the jury room, if you need to communicate with me, the foreperson will send a written message to me. However, do not tell me how you stand, either numerically or otherwise, on any issue before you, until after you have reached a verdict. On matters touching simply on the arrangements for your meals, schedule and convenience, you are free to communicate with the marshal orally rather than in writing. You are not to communicate with anyone other than me about the case, however, and then only in writing.

I have read to you what is called the verdict form. A verdict form is simply the written notice of the decision that you reach. You will have the original and copies of this form in the jury room and, when you have reached your verdict, you will have your foreman fill in, date, and sign the original to state the verdict upon which you agree. You will then report, in writing to the marshal, that you have reached a verdict after which you will be invited to return with your

verdict to the courtroom.  Your verdict must be unanimous.  That is, you must be unanimous as to the answer to each of the questions you answer.

It is my practice, absent special circumstances, to allow a jury to recess before dinner and begin deliberation again in the morning of the next regular court day.

It is not yet time for you to start deliberating. I will have a sidebar conference with counsel and you can be at ease for a few minutes. I will then have some brief final instructions to give you before you retire to deliberate.

[SIDEBAR]

Members of the jury, it is now time for the case to be submitted to you.  You may commence your deliberations.  All of you who are the jury must be together at all times when you are deliberating.  Whenever you need a recess for any purpose, your foreperson, _____, may declare a recess.  Do not discuss the case during a recess in your deliberations.  All your discussion of the case should occur only when you are all together and your foreman has indicated that deliberations may proceed.  This should be your procedure so that everyone in the jury will have equal opportunity to participate and to hear all of what other members of the jury have to say.

I will give you a copy of these instructions to take with you into the jury room for your reference, but keep in mind that your job is to find facts to which you are to apply the law as I have instructed you in order to answer the questions on the jury form. Do not get bogged down in the details of these instructions and try to keep your focus on the issues before you. You may go to the jury room and may commence your deliberations.