UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

DIOMED, INC.,                                    Civil Action No. 04-CV-10019 (NMG)

               Plaintiff,

v.

ANGIODYNAMICS, INC.,

               Defendant.

_____

DIOMED, INC.                                     Civil Action No. 04-CV-10444 (NMG)

               Plaintiff,

v.

VASCULAR SOLUTIONS, INC.

               Defendant.

_____

**DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE,
FOR A NEW TRIAL**

# Table of Contents

Page

I. PRELIMINARY STATEMENT ...................................................................................1

II. ARGUMENT ...........................................................................................................2

    A.    Legal Standard. ................................................................................................2

    B.    Defendants Are Entitled To Judgment As A Matter Of Law, Or A New Trial, Because No Reasonable Jury Could Have Found Direct Infringement...............................................................................................2

        1.    The Uncontradicted Evidence From Actual Procedures Compels Judgment As A Matter Of Law That Diomed Failed To Prove Direct Infringement............................................4

        2.    The Testimony Of Diomed's Witnesses Provides Further Proof That Defendants' Instructions Concerning Tumescent Anesthesia Are Not Sufficient To Cause Deliberate, Maintained Contact. ...................................................................8

        3.    Diomed's Other Theories Do Not Address The Issue Of Whether There Is Deliberate And Maintained Contact During The Emission Of Laser Energy. ......................................9

    C.    The Defendants Are Entitled To Judgment As a Matter Of Law On Diomed's Inducing Infringement Claim Because No Reasonable Jury Could Have Found That Diomed Had Proved That The Defendants Possessed The Requisite Intent Necessary To Support A Finding Of Inducement. ...........................................................................12

        1.    Diomed Was Required To Prove Specific Intent To Induce Infringement.............................................................................12

        2.    The Evidence At Trial Failed To Prove Specific Intent By Defendants To Induce Infringement ............................................13

    D.    In The Alternative, The Defendants Are Entitled To A New Trial On The Issue Of Inducement Because The Court's Instruction On Inducement Was Legally Insufficient...................................................16

    E.    The Defendants Are Entitled To Judgment As a Matter Of Law On Diomed's Contributory Infringement Claim Because No Reasonable Jury Could Have Found That Diomed Had Proven That The Defendants' Products Have No Substantial Non-Infringing Use. ...................................................................................18

i

## Table of Contents
(continued)

Page

F.  It Was Legal Error For The Court To Charge The Jury On Doctrine Of Equivalents Infringement, And Therefore Defendants Are Entitled To A New Trial. ................................................................................18

G.  In The Alternative, Defendants Are Entitled To Judgment As A Matter Of Law On Diomed's Doctrine Of Equivalents Infringement Claim Because No Reasonable Jury Could Conclude That Contact Between The Sidewall Of The Fiber And Vessel Wall Is Equivalent To The Deliberate, Maintained Contact Between the Uncoated Tip and Vessel Wall Required By The Claims. ...............................................................................21

H.  Defendants Are Entitled To Judgment As A Matter Of Law That Diomed Cannot Recover Lost Profits Or Price Erosion Damages. ......................23

    1.  The Jury's Lost Profits Damages Award Was Speculative, Excessive, And Not Supported By Substantial Evidence. .........................24

        (a) Diomed Would Not Monopolize The Market In The Absence Of Defendants' Sales..........................................25

        (b) Diomed Failed To Establish To A Reasonable Degree Of Certainty Its Expected Profits From The Alleged Lost Sales. .......................................................27

    2.  No Substantial Evidence Supported Diomed's Price Erosion Theory............................................................28

    3.  Remittitur Is Appropriate In This Case....................................29

I.  The Defendants Are Entitled To A New Trial Because The Court Incorrectly Rejected Other Issues Raised By The Defendants. .............................30

III. CONCLUSION.................................................................................31

ME1 6296005v.5

# I. <u>PRELIMINARY STATEMENT</u>

Throughout the trial of this matter, Diomed made no attempt to prove its claims of infringement with evidence of what physicians actually do with Defendants' products. Nor did Diomed even attempt to offer any evidence that the Defendants intend that physicians use their products in an infringing manner. Diomed ignored the mounds of direct evidence that clearly proved that physicians regularly use those products in a non-infringing manner, and that they do so because the Defendants specifically tell the doctors to avoid the deliberate maintained contact between the uncoated tip of the laser fiber and vein wall that is at the heart of Diomed's infringement claim.

Instead, Diomed's case focused on theories and evidence of experiments and procedures unrelated to the Defendants' instructions on how to perform endovenous laser procedures. Diomed then suggested repeatedly to the jury that it should find infringement because the Defendants' products and procedures look very similar to Diomed's. While such a claim is legally irrelevant to whether Defendants induced or contributed to infringement of the *method* claim at issue, Diomed's approach, coupled with the Court's erroneous charges on inducement and the doctrine of equivalents, misled the jury to a finding of infringement that was wholly unsupported by, and contrary to, the evidence.

Because no reasonable jury could find either direct infringement or indirect infringement on the evidence presented, the Court should set aside the verdict and enter judgment as a matter of law for the Defendants. Alternatively, because of errors in the Court's charge, and for the reasons set forth in the Defendants' in limine motions denied by the Court prior to trial, the Court should order a new trial. Finally, because the damages award is unsupported by competent

evidence and is the product of speculation, the Court should set it aside and either order a

remittitur or a new trial as to damages.

## II. ARGUMENT

### A. Legal Standard.

Rule 50 of the Federal Rules of Civil Procedure authorizes entry of judgment as a matter

of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for a

party. Fed. R. Civ. P. 50. A district court may grant such a motion if, after considering the

evidence of record and drawing all reasonable inferences in favor of the nonmoving party, "the

record reveals no sufficient evidentiary basis for the verdict." *Zimmerman v. Direct Fed. Credit

Union*, 262 F.3d 70, 75 (1st Cir. 2001); *see also Koito Mfg. Co., Ltd. v. Turn-Key-Tech., LLC*,

381 F.3d 1142, 1149 (Fed. Cir. 2004).

Even if there is substantial evidence that would prevent judgment as a matter of law, it is

"the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the

verdict is against the clear weight of the evidence, or is based upon evidence which is false, or

will result in a miscarriage of justice." *Borras v. Sea-Land Serv., Inc.*, 586 F.2d 881, 886-87 (1st

Cir. 1978); *see also Dall v. Coffin*, 970 F.2d 964, 969 (1st Cir. 1992); *Johnson v. Spencer Press

of Maine, Inc.*, 364 F.3d 368, 375 (1st Cir. 2004).

### B. Defendants Are Entitled To Judgment As A Matter Of Law, Or A New Trial, Because No Reasonable Jury Could Have Found Direct Infringement.

To prove direct infringement, Diomed had the burden of proving that doctors using

Vascular Solutions, Inc.'s ("VSI's") and AngioDynamics' products performed each of the three

steps of Diomed's patent:

> Step 1: Inserting a "means for emitting laser energy," defined as a
> fiber optic line with an uncoated tip at its end capable of emitting
> laser energy. The tip is defined as the extremity or top end of the

2

> thing, especially the pointed or rounded end of anything long and
> slender:  the top, summit, apex, very end.
>
> Step 2:  Deliberately putting the uncoated tip of the fiber optic line
> in physical contact with the wall of the blood vessel, which
> requires drainage of blood and compression of the vein.
>
> Step 3:  Maintaining the tip-interior surface in physical contact
> with the vessel wall while laser energy is emitted to decrease the
> diameter of the blood vessel.

*See* Jury Charge, 3-26 Tr., p. 115; Dkt. # 55, pp. 9, 11, 12-13.

Diomed did not attempt to present any evidence of individual acts of direct infringement by customers of VSI or AngioDynamics.  Instead, Diomed's case rested entirely on the theory that all doctors using Defendants' products and following Defendants' instructions necessarily infringe, because the use of tumescent anesthesia as instructed by the Defendants necessarily causes the deliberate and maintained contact required by Claim 9.

It was not disputed at trial that both AngioDynamics and VSI instruct doctors to avoid contact between the uncoated tip of the laser fiber and the vessel wall during the firing of the laser.  *See, e.g.*, Exs. 1012-26 (AngioDynamics' Instructions for Use ("IFUs")); Exs. 1030, 1032 (AngioDynamics' physician training video);  see also Exs. 1037 (VSI's Clinical Instruction Guide), 1035, and 1038 (VSI's Vein Care Essentials).  Diomed's position at trial was that Defendants' instructions to avoid contact were a sham, impossible to follow, because VSI and AngioDynamics also instructed doctors to use tumescent anesthesia.

AngioDynamics' IFUs instructed physicians to administer 100 to 150 or 100-200 ccs of tumescent anesthetic perivenously.  Exs. 1012-26.  AngioDynamics also had a version of its IFU, in use for a short time, that instructed doctors to "create a 10 mm wheel" of anesthetic fluid around the vein. Ex. 1019.  Before approximately November 2005, VSI instructed physicians to deliver between 100 and 200 ml of local anesthetic perivenously.  Ex. 1029.  After November

3

2005, VSI instructed physicians to "deliver local anesthetic perivenously" and to "deliver a sufficient volume of anesthetic agent to achieve a separation between the vein wall and the fascial sheath." Ex. 1028. *See also* Ex. 1035, Slide 89, 111, and 114 (VSI's training materials advise doctors to "look for separation around vein, not collapse").

The direct infringement issue considered by the jury, then, can be simply stated: Will doctors following VSI's and AngioDynamics' IFUs concerning tumescent anesthesia necessarily cause <u>deliberate</u> contact between the uncoated tip of the laser fiber and the vessel wall, and necessarily cause <u>maintained</u> contact between the tip-interior surface and the vessel wall *while laser energy is being emitted*?

### 1.    The Uncontradicted Evidence From Actual Procedures Compels Judgment As A Matter Of Law That Diomed Failed To Prove Direct Infringement.

Defendants presented extensive evidence from actual procedures proving that there was not deliberate and maintained contact *while the laser energy was being emitted.*  Diomed did not materially contest Defendants' evidence, and indeed presented no evidence from which a reasonable jury could have found that there was deliberate and maintained contact *while the laser energy was being emitted.*

Defendants' expert Dr. Thomas Proebstle testified that he performed six procedures according to the Defendants' IFUs. 3-20 Tr., p. 110. All six procedures were taped during the emission of laser energy, so the jury could see what was happening *while the laser energy was being emitted. Id., see* Ex. 1116. Dr. Proebstle showed the jury much of an entire procedure, explaining that there was always a visible, open lumen at and in front of the laser fiber tip; that throughout the procedure the uncoated tip of the fiber was firing into blood and was not in contact with the vessel wall; and that steam bubbles were being created at and in front of the laser fiber. 3-20 Tr., pp. 123-27. Dr. Proebstle further testified that this procedure was

4

consistent with all six procedures and with what he sees in his normal practice, and that in <u>none</u>

of the six procedures was there maintained contact between the uncoated tip and the vessel wall

*while the laser energy was being emitted.*  3-20 Tr., p. 127.

Diomed did not dispute Dr. Proebstle's testimony on these six procedures in any material

way.  Diomed did not present any evidence of *maintained contact while laser energy was being*

*emitted* during <u>any</u> of Dr. Proebstle's six procedures.  Instead, Diomed's only response to Dr.

Proebstle's testimony on the six live procedures was Dr. Min's testimony concerning

demonstrative 175, attached as Exhibit A.  That demonstrative showed <u>one still shot</u>, which, even

if the jury accepted Dr. Min's characterization, at most showed only <u>one</u> moment of contact

during <u>one</u> procedure; Dr. Min definitely did not show that Dr. Proebstle's procedures involved

deliberate and maintained contact while the laser energy was being emitted.  3-22 Tr., pp. 157-

59.

Dr. Samson, like Dr. Proebstle, taped six procedures he performed following Defendants'

IFUs.  <u>See</u> Ex. 1124.  Dr. Samson testified that at no point during the procedures was there

contact between the uncoated tip of the laser fiber and the vessel wall.  Instead, like Dr.

Proebstle, Dr. Samson explained that the ultrasound videos show that the uncoated tip of the

laser fiber is firing into blood, and is not in contact with the vessel wall during the emission of

laser energy; that there is an open lumen at and in front of the laser fiber tip; and that you can see

on the ultrasound a vortex of steam and hot blood circulating in front of the laser fiber tip.  3-22

Tr., pp. 61-65, 69-72.  Diomed did not present <u>any</u> substantive evidence to respond to Dr.

Samson's six videotaped procedures.  Not one Diomed witness claimed that there was <u>any</u>

contact, let alone deliberate and maintained contact, during Dr. Samson's procedures.[1]

---

[1] Diomed's only criticism was to have Dr. Min comment on *one* spot during *one* of Dr. Samson's six procedures in which Dr. Samson initially injected tumescent anesthesia into the subcutaneous fat.  3-13 Tr., p. 199-200.  Dr.

5

Dr. Lowell Kabnick, an AngioDynamics trainer, presented his webcast, a videotape of an actual procedure from April 2005. *See* Ex. 1007. Dr. Kabnick testified that there was no contact between the uncoated tip of the laser fiber and the vessel wall while laser energy was being emitted. 3-21 Tr., pp. 55-60. Dr. Kabnick testified that he performs the procedure without contact, that he teaches other doctors to do so, and that this procedure was consistent with his regular practice. 3-21 Tr., pp. 51, 56, 59-60. Again, Diomed had no substantive response to Dr. Kabnick's testimony and his webcast. Dr. Min testified concerning one <u>still shot,</u> which he claimed showed that tumescent anesthetic had compressed the vein onto the fiber and the sheath. 3-13 Tr., pp. 12-13. But Dr. Min did not testify that this moment showed contact with the uncoated tip *during the emission of laser energy,* and neither Dr. Min nor anyone else from Diomed testified that Dr. Kabnick's webcast involved deliberate and maintained contact between the uncoated tip of the laser fiber and the vessel wall during pullback of the fiber, *while laser energy was being emitted.*

Dr. Golan, like Dr. Kabnick, Dr. Samson, and Dr. Proebstle, testified that he regularly performs the procedure without contact, and teaches other doctors to do the same. 3-22 Tr., pp. 120-28. Dr. Golan testified that 98 times out of 100, the laser fiber tip is "nicely positioned in the central portion of the vein, not in contact with the vein wall" after tumescent anesthesia is applied; and if he sees contact, he adjusts the laser fiber tip to avoid it and insure that the laser fiber is firing into blood. 3-22 Tr., p. 133.

Defendants also presented Exhibit 1105, a 2002 videotape from Dr. Andrews used by AngioDynamics' David Doster to train physicians to heat the blood to cause steam bubbles. 3-29 Tr., pp. 201-203. Again, Dr. Andrews' videotape shows, consistently, that the uncoated tip of

---

Samson testified that this is common, and that he subsequently found the perivenous space and injected the anesthesia as instructed. 3-22 Tr., p. 108-110.

ME1 6296005v.5

the laser fiber is firing into blood, without contact with the vessel wall. Ex. 1105. Diomed made no substantive response to Dr. Andrews' videotape.

Diomed, through Dr. Navarro and Dr. Min, offered testimony concerning two procedures allegedly following AngioDynamics and VSI's IFUs. Exhibit 539 is Dr. Navarro's procedure allegedly following AngioDynamics' IFU, and Exhibit 540 is Dr. Navarro's procedure allegedly following VSI's IFU. With respect to Exhibit 539 Dr. Navarro admitted that he did not put the patient in the reverse Trendelenberg position and therefore did not follow the AngioDynamics IFU. Again, Diomed offered no testimony concerning these procedures to prove that there was actual maintained contact while the laser energy was being emitted. Instead, Diomed focused on demonstrative 106, attached as Exhibit B, which showed <u>one moment</u> of alleged contact, a moment when the laser was not being fired.[2] 3-13 Tr., pp. 12, 184-186.

In summary, Defendants presented testimony from four different doctors and introduced into evidence tapes of <u>14</u> actual procedures. In all of those procedures, the doctors testified without any substantive rebuttal that there was not <u>maintained contact</u> between the uncoated tip of the laser fiber and the vessel wall *while laser energy was being emitted*. Because this evidence is clear and because Diomed could not and did not offer any substantive proof of maintained contact while laser energy was being emitted during procedures performed according to Defendants' instructions, this Court should reverse the jury's verdict and grant judgment as a matter of law to Defendants.[3] In fact, just last year the Federal Circuit affirmed a trial court's

---

[2] Dr. Proebstle testified that these two procedures did not involve maintained contact. As the Court will recall, Dr. Proebstle narrated during the actual firing of one of the procedures, to show that it involved firing the laser fiber in the blood, with visible steam bubbles in front of the laser fiber tip, an open lumen, and no contact between the laser fiber tip and the vessel wall during firing. 3-20 Tr., pp. 137-38. Diomed's witnesses never rebutted Dr. Proebstle's testimony. Diomed did not present any witness who showed the jury the procedures *during firing* and testified that, in fact, there was maintained contact.

[3] Diomed focused extensively on still shots showing a transverse view after the application of tumescent anesthesia. <u>See</u> Diomed demonstrative 61, attached as Exhibit C. But none of those still shots were relevant: The "bullseye"

granting of a judgment as a matter of law for this very reason.  Kim v. ConAgra Foods, Inc., 465

F.3d 1312, 1320 (Fed. Cir. 2006).

> **2.     The Testimony Of Diomed's Witnesses Provides Further Proof That Defendants' Instructions Concerning Tumescent Anesthesia Are Not Sufficient To Cause Deliberate, Maintained Contact.**

Diomed's witnesses provided compelling evidence that Defendants' instructions to use

tumescent anesthesia are not sufficient to cause deliberate and maintained contact.  First, both

Dr. Fan and Dr. Anderson testified that doctors can control the amount of tumescent anesthesia

that they use.  3-19 Tr., pp. 62-63; 3-15 Tr., pp. 53-54.  This obvious point is dispositive of

Diomed's case.  Dr. Fan testified that a doctor can "choose to stop applying tumescent" and that

it is possible to stop applying tumescent before the fiber tip is in contact; indeed, she even

provided a picture, Ex. 1076, of exactly that.  3-19 Tr., pp. 62-63.

Second, the testimony of Dr. Navarro, Dr. Min, Dr. Salat and Dr. Fan provides further

proof that a mere instruction to use a certain range of tumescent anesthesia, by itself, is not

sufficient to cause deliberate and maintained contact.  Dr. Min testified that there are at least nine

different variables that affect how much tumescent anesthesia is necessary to obtain the complete

collapse of the vein onto the laser fiber tip that he claims to desire: 1) length of the vein segment;

2) starting diameter of the vein; 3) responsiveness of the patient to tumescent anesthesia; 4)

anxiety level of the patient; 5) skill level of the physician; 6) temperature of the room; 7)

previous damage to the vein; 8) gender of the patient; and 9) age of the patient.  3-14 Tr., pp. 18-

21.

---

photographs did not show the *tip of the laser fiber*, and, as Dr. Min testified, the transverse view cannot tell you where the tip of the laser fiber is located. 3-22 Tr., pp. 149-50; *see also* 3-20 Tr., p. 137, where Dr. Proebstle explains the same point.  The "bullseye" images certainly did not show contact between the laser fiber tip and the vessel wall while the laser energy was being emitted.

ME1 6296005v.5

Because of these variables, no reasonable jury could find that merely instructing doctors to apply tumescent anesthesia, by itself, is enough to cause deliberate and maintained contact. Instead, Diomed's witnesses all follow a very specific set of techniques to get the deliberate and maintained contact they claim to want; none of these techniques is taught by AngioDynamics or VSI.

Dr. Navarro, Dr. Min, and Dr. Fan all apply tumescent anesthesia until they visually observe the complete collapse of the vein onto the laser fiber; and they continue to pump in anesthetic fluid until they see that result. 3-13 Tr., pp. 76-77; 3-14 Tr., pp. 16-18; 3-19 Tr., pp. 56, 61. With a longer vein, Dr. Fan stops in the middle to check whether she has sufficient anesthesia, and will pump in additional anesthesia to insure maintained contact. 3-19 Tr., p. 64. Dr. Navarro, Dr. Min, and Dr. Salat all use the Trendelenberg position (head below the legs) to facilitate contact.[4] 3-13 Tr., p. 77; 3-14 Tr., p. 9; 3-22 Tr., pp. 140-41. Dr. Navarro and Dr. Salat nearly always use manual compression to get maintained contact, 3-13 Tr., p. 77; 3-22 Tr., pp. 141-42, which Dr. Fan describes as a "standard component" of the procedure. See Ex. 1080. Dr. Min and Dr. Fan sometimes use manual compression. 3-14 Tr., p. 10; 3-19 Tr., p. 55. Dr. Navarro physically "milks" the vein, 3-13 Tr., p. 78, and Dr. Min cools the room to constrict the vein. 3-14 Tr., p. 10.

### 3. Diomed's Other Theories Do Not Address The Issue Of Whether There Is Deliberate And Maintained Contact During The Emission Of Laser Energy.

As outlined above, Diomed offered no evidence of maintained contact during an actual procedure following Defendants' IFUs, and Diomed was not able to substantively respond to the

---

[4] AngioDynamics teaches physicians to use the reverse Trendelenberg position. See Ex. 1014-26. In the early days, VSI had an instruction concerning use of the Trendelenberg position, Ex. 1029, but that instruction was eliminated long ago. Ex. 1028. In any event, Mr. Jakubowski testified that VSI customers never use that position. 3-21 Tr., p. 172.

MEI 6296005v.5

14 actual cases presented by Defendants which prove the absence of deliberate, maintained contact.  Instead, Diomed successfully obscured matters by focusing on evidence that did not even address the key issue of whether there is deliberate, maintained contact between the uncoated tip of the laser fiber and the vessel wall *while laser energy is being emitted.*

Diomed's main theory of infringement was the "footprint of carbon."  The problem with Diomed's "footprint of carbon" theory is that it offers no evidence from which a jury could find that following Defendants' instructions necessarily results in a "footprint of carbon."  This evidence thus has no bearing on whether Defendants' instructions concerning tumescent anesthesia will necessarily lead to deliberate and maintained contact.

Diomed did not show any carbonized veins from a procedure performed according to AngioDynamics' instructions.  Diomed, through Dr. Navarro, offered a picture of one small segment of exteriorized vein supposedly taken from the procedure he performed allegedly following VSI's instructions.  *See* Ex. 540.  That one segment proves nothing about whether there is maintained contact during a VSI or AngioDynamics procedure.  Neither VSI nor AngioDynamics recommend pulling the vein out of the body and running the laser fiber along it, as Dr. Navarro evidently did.  Dr. Samson explained, without contradiction, that exteriorizing this last segment of vein is a completely different situation than what occurs inside the body.  3-22 Tr., p. 111.  In any event, a small segment of carbonized, exteriorized vein proves nothing about whether there was maintained contact inside the body during the emission of laser energy.

Diomed relied heavily on demonstrative exhibits of a few photographs and histologies taken from articles by Drs. Spreafico, Goldman, and Anastasie, without any attempt to explain what method those doctors were using.  *See, e.g.,* Demos. 77-78, attached as Exhibits D and E, and 3-13 Tr., p. 48.  This evidence cannot support the jury verdict.  First, at most, these pictures

MEI 6296005v.5

show <u>short segments or moments</u> of contact from a very few procedures, not that deliberate and

maintained contact necessarily results from the application of tumescent anesthesia.

Second, Diomed did not offer evidence from which the jury could conclude that <u>any</u> of

these doctors were following VSI's and AngioDynamics' IFUs, rather than Diomed's

instructions to seek contact or Diomed's instructions to use manual compression to cause

contact.  We can be certain that the picture they focused on the most, the histology  from Dr.

Proebstle's article (Demo. 78), was not performed according to VSI's or AngioDynamics'

instructions.  That picture is taken from one of Dr. Proebstle's papers published in 2002 before

either Defendant had started selling its products.  Dr. Proebstle's papers specifically state that he

was following *Dr. Navarro's* recommended technique.[5]  *See* Exs. 1110, p. 730 n. 8 (indicating

Dr. Proebstle used "the protocol adapted from the paper of Navarro"), and 1111, p. 596 (citing

Ex. 1110 and stating that "EVLT was applied as previously described in detail" in his previous

paper).

Finally, Diomed's witnesses repeatedly opined that the procedure simply will not work

reliably unless there is maintained contact between the laser fiber tip and the vessel wall while

laser energy is being emitted.  Yet Diomed never explained why "contact" was necessary, given

that the collagen molecules in the vessel wall instantly "flip" at 70 degrees, *see* 3-15 Tr., pp. 25,

27, and Dr. Weiss's paper established the temperature was several hundred degrees millimeters

away from the tip.  Ex. 1056.  Nor could Diomed explain how "contact" at one 600 micron spot

adequately damages the entire 30-millimeter circumference of the typical diseased vein.  3-20

Tr., pp. 98-100.  Diomed is certainly free to make its belief that contact is necessary part of its

---

[5] Dr. Navarro's and Dr. Fan's various experiments to show carbonization resulting from alleged contact, or conditions "likely" to result in contact, are irrelevant to what happens in real-life procedures following Defendants' IFUs.

ME1 6296005v.5

sales pitch, but such general statements of opinion do not provide evidence to meet Diomed's

burden of proof. Diomed had the burden of proving that following Defendants' instructions

necessarily causes deliberate and maintained contact while laser energy is being emitted.

Diomed failed to meet that burden, and just saying, over and over again, that Defendants must

have contact does not cure that failure. *Kim v. ConAgra*, 465 F.3d at 1320.

**C.     The Defendants Are Entitled To Judgment As a Matter Of Law On Diomed's Inducing Infringement Claim Because No Reasonable Jury Could Have Found That Diomed Had Proved That The Defendants Possessed The Requisite Intent Necessary To Support A Finding Of Inducement.**

**1.     Diomed Was Required To Prove Specific Intent To Induce Infringement.**

In December 2006, the Federal Circuit, *en banc*, clarified the plaintiff's burden of proof

when alleging inducement of infringement under 35 U.S.C. § 271(b). "To establish liability

under section 271(b), a patent holder must prove that once the defendant knew of the patent,

'they actively and *knowingly* aid[ed] and abett[ed] another's direct infringement.'" *DSU Medical*

*Corp. v. JMS Co, LTD,* 471 F.3d 1293, 1305 (Fed. Cir. 2006)(citations omitted)(emphasis in

original). The court went on to explain that to meet its burden the patent holder must prove that

the defendant "'possessed specific intent to encourage another's infringement.'" 471 F.3d at

1306 (citation omitted). The court concluded by holding, "[a]ccordingly, inducement requires

evidence of culpable conduct, directed to encouraging another's infringement, not merely that

the inducer had knowledge of the direct infringer's activities." *Id.*

Based on the evidence presented at trial, no reasonable jury could find that Diomed met

its burden of proving that AngioDynamics and VSI specifically intended that doctors using their

products infringe the '777 patent and that the Defendants committed culpable acts directed to

encouraging infringement.

**2.    The Evidence At Trial Failed To Prove Specific Intent By Defendants To Induce Infringement**

As noted above, direct infringement of Claim 9 of the '777 patent requires deliberate and maintained contact of the uncoated tip of the laser fiber with the vein wall while the laser is firing. *Supra*, pp. 2-3. Consequently, to prove inducement to infringe, Diomed was required to offer evidence from which a reasonable jury could find that the Defendants specifically intended such contact and engaged in culpable acts to encourage doctors to achieve such contact. The record is devoid of any such evidence. In fact, all of the evidence proves that the Defendants specifically intended that such contact <u>not</u> occur and took specific steps to discourage doctors from achieving such contact.

Diomed's entire focus was the instructions given by the Defendants to doctors to inject tumescent anesthesia perivenously. According to Diomed, the use of tumescent anesthesia in the amounts recommended by the Defendants, injected into the fascial sheath as recommended by the Defendants, would necessarily result in deliberate and maintained contact between the uncoated fiber tip and the vein wall. *See*, *e.g,*. 3-13 Tr., pp. 19-21, 24-26, 204. The instruction to use tumescent anesthesia is the only "culpable" act to which Diomed could point that was, according to Diomed, designed to encourage direct infringement. *Id*.

There are two problems with Diomed's theory and the proof it presented. First, as noted above, the uncontroverted evidence established that the use of tumescent anesthesia, as recommended by the Defendants, will not necessarily lead to deliberate and maintained contact. Consequently, Defendants' instruction to use tumescent anesthesia cannot, without more, constitute a culpable act designed to encourage infringement.

Second, there was no evidence presented by Diomed to prove that Defendants ever understood or believed that tumescent anesthesia alone would lead to deliberate and maintained

contact between the uncoated tip of the fiber and the vein wall and that they gave instructions to use tumescent anesthesia with the specific intent that doctors achieve such contact. In fact, all of the evidence was to the contrary.[6]

First, it is undisputed that the '777 patent does not teach the use of tumescent anesthesia to achieve the required contact. Ex. 1001; 3-13 Tr., p. 209. Instead it teaches other maneuvers, specifically external manual compression to cause such contact. *Id.*; 3-13 Tr., pp. 207-209. Further, Diomed and the inventors consistently taught through 2002 to use manual compression to achieve the required contact. Exs. 1096, 1099, 1053-1055. Thus, when each of the Defendants introduced their products nobody reading the patent understood that teaching the use of tumescent anesthesia could lead to infringement of the patent.[7] 3-20 Tr., pp. 43-44, 81; 3-21 Tr., pp. 107-108.

By the fall of 2002, some doctors, including Dr. Weiss and Dr. Proebstle, published articles teaching that contact between the fiber tip and vein wall led to adverse results, including excess bruising and pain. Exs. 1056, 1110, 1111. Dr. Proebstle specifically taught that the fiber should be fired into blood to cause steam bubbles that would heat the vein wall indirectly,

---

[6] Diomed will likely argue that the Defendants' investigation of centering or spacer devices is evidence that they understood that contact between the fiber tip and vein wall would occur with the use of tumescent anesthesia. The evidence at trial failed to support such a contention. The unrebutted evidence at trial proved that the centering and spacer devices investigated by the Defendants were designed to prevent any contact, principally unwanted or inadvertent, that could lead to vein wall perforations. 3-19 Tr., pp. 155-158; 3-20 Tr., pp. 53-54, 78-79, 3-21 Tr., p. 137. In fact, the patent applications upon which Diomed placed primary reliance referred to avoiding "possible" contact or contact that "may" occur. Exs. 23, 27, 426. There was no evidence that such devices were necessary or intended to prevent the deliberate, maintained contact called for by the '777 patent. In fact, at the time that AngioDynamics first started investigating a centering device in the summer of 2002, nobody, including the inventors of the '777 patent, understood that tumescent anesthesia could be used to achieve the contact called for in the patent.

Similarly, any reliance by Diomed on internal AngioDynamics documents from the summer of 2002 is misplaced. These documents also do not discuss whether simply inserting a laser fiber into a vein will result in deliberate and maintained contact. Further, they discussed possible contact only in relation to a prior art device much different than the 600 micron fibers used by the defendants. 3-20 Tr., pp. 30-32.

[7] In fact, it was not until sometime well into this litigation that the defendants were first made aware that that was what Diomed was claiming.

14

eliminating the need for contact. Exs. 1110, 1111. The uncontroverted evidence established that other doctors, including Drs. Kabnick, Golan, Samson and Proebstle have followed this teaching since 2002, and do not intend to achieve contact between the uncoated tip of the fiber and the vein wall, and do not use tumescent anesthesia for this purpose. 3-21 Tr., pp. 41-42, 49-50; 3-22 Tr., pp. 63-68, 118-121.

Consistent with the testimony of these doctors, the evidence established that since introducing their products the Defendants have relied on Dr. Proebstle's teachings, consistently and always instructing physicians to avoid contact between the uncoated tip of the fiber and the vein wall. Exs. 1012-1026, 1030, 1032, 1035-1038, 1040-1044, 1104 (slide 17); 3-20 Tr., pp. 199-201; 3-21 Tr., pp. 170-176. In fact, the evidence established that prior to selling his rights to Diomed in September 2003, Dr. Min frequently quoted Dr. Proebstle and agreed that the procedure worked by heating the blood and not through contact between the fiber tip and the vein wall. Exs. 1060, 1061. Further, Dr. Fan admitted during her testimony that there is to this day debate and disagreement within the medical community about how the procedure works and whether contact between the fiber tip and vein wall is required. 3-19 Tr., p. 53.

Regardless of the answer to this medical debate, if the Defendants had reason to believe that the procedure works without the contact required by the patent and taught physicians to avoid contact based on that good faith belief, they necessarily could not have possessed the requisite specific intent to induce infringement. Based on the evidence presented, no reasonable jury could have found that such a specific intent existed. In fact, to find such an intent, the jury would have had to conclude that Dr. Proebstle's theory is not just wrong, but is a fraud and that the Defendants knew it to be so, as do those still on that side of the medical debate, and as do the

15

other doctors who testified that they believe contact between the fiber tip and vein wall should be avoided. No reasonable jury could have reached such a conclusion here.

**D.    In The Alternative, The Defendants Are Entitled To A New Trial On The Issue Of Inducement Because The Court's Instruction On Inducement Was Legally Insufficient.**

A court's jury instructions must be read as a whole and a party is entitled to a new trial where the instructions read as a whole clearly misled the jury. *DSU Medical,* 471 F.3d at 1305. In this case, the Court's instruction on inducement misled the jury because it failed to instruct that Diomed was required to prove that the Defendants *specifically* intended that doctors infringe the '777 patent.

The Court's entire charge on inducement read as follows:

> To prove inducement of infringement, Diomed must show by a preponderance of the evidence that someone else directly infringed the '777 patent and that the defendant then under consideration--AngioDynamics or Vascular Solutions--has knowingly induced such infringement with the intent to encourage infringement.

> The defendant then under consideration must have intended to cause the acts that constitute direct infringement and must have known or should have known that its acts would cause direct infringement. In other words, there is an intent requirement for inducing infringement. That is, different than direct infringement, which as I explained before can occur even if the practitioners have no knowledge of Diomed's patent or whether what they are doing falls within the scope of the asserted claim.

> As jurors, you may conclude that the defendant then under consideration--AngioDynamics or Vascular Solutions-- had the required intent to induce infringement if you find that the defendant, first, knew about Diomed's patent and, second, intended to encourage practitioners to perform acts that constitute direct infringement. It's not enough, however, for Diomed to prove that AngioDynamics or Vascular Solutions had knowledge of their customers' activities that are alleged to infringe the '777 patent.

3-26 Tr., pp. 117-118.

16

The problem with the Court's charge is that it focuses on intent to encourage the *acts* that constitute infringement, and does not instruct the jury that a specific intent to encourage infringement itself is required. The Federal Circuit clearly stated in *DSU Medical* that the plaintiff must establish "specific intent to encourage another's infringement" and "culpable conduct, directed to encouraging another's infringement." 471 F.3d at 1307.

The difference between an intent to encourage the acts that constitute infringement and intent to encourage infringement itself is critical in this case. Here, Diomed argued throughout the trial that the act that constituted infringement was the use of tumescent anesthesia to compress the vein resulting in deliberate and maintained contact between the uncoated tip of the fiber and the vein wall. Thus, based on the Court's instruction, the jury could find inducement to infringe if the Defendants intend that doctors engage in the act that Diomed claimed led to infringement, the use of tumescent anesthesia. In particular, the Court's instruction in the third paragraph above, which is the only place in which the Court told the jury what was necessary to establish intent, would precisely lead the jury to that result. The Court specifically instructed the jury that it could find inducement if the Defendants knew about the patent (which was not in dispute) and they "intended to encourage practitioners to perform acts that constitute direct infringement." This instruction would mislead the jury to a finding of inducement even though the Defendants did not understand and did not specifically intend that the use of tumescent anesthesia alone would cause infringement.

The instruction thus eliminated the specific intent requirement set forth in *DSU Medical*. In fact, the Court's instruction never says that Diomed must prove that the Defendants specifically intended that physicians purchasing their products infringe the '777 patent.[8] The

---

[8] The Defendants specifically requested such a charge. Dkt. # 195, p. 15.

ME1 6296005v.5

Court's charge was legally deficient and the Defendants are entitled to a new trial on the issue of inducement.

**E.     The Defendants Are Entitled To Judgment As a Matter Of Law On Diomed's Contributory Infringement Claim Because No Reasonable Jury Could Have Found That Diomed Had Proven That The Defendants' Products Have No Substantial Non-Infringing Use.**

To prove contributory infringement, Diomed had the burden of proving that there are no substantial, non-infringing uses for the Defendants' products. 3-26 Tr., p.119. In this case, that means that Diomed had the burden of proving that the Defendants' products could not be used without deliberate and maintained contact between the uncoated tip of the fiber and the vein wall while the laser is firing. As set forth above, no reasonable jury could conclude that the Defendants' products can only be used with such contact. The uncontroverted evidence proved that Drs. Kabnick, Golan, Samson, Proebstle and Andrews all perform the procedure without deliberate and maintained contact while the laser is firing. As noted above regarding direct infringement, Diomed presented insufficient evidence from which a reasonable jury could conclude that doctors using the Defendants' products always and necessarily get the required contact. Without such evidence the jury similarly could not have found the lack of a substantial, non-infringing use.

**F.     It Was Legal Error For The Court To Charge The Jury On Doctrine Of Equivalents Infringement, And Therefore Defendants Are Entitled To A New Trial.**

Diomed argues under the doctrine of equivalents that the coating (or "cladding") on the sidewalls of Defendants' fibers degrades during endovenous laser procedures, that laser energy is purportedly emitted from the sidewall of the fiber, and that under the doctrine of equivalents the

18

sidewall is insubstantially different from the "means for emitting laser energy" (i.e., the uncoated tip) limitation of Claim 9. [9]

This Court construed the "means for emitting laser energy" limitation to mean "a fiber optic line with an uncoated tip at its end capable of emitting laser energy", and defined the "tip" as "the 'extremity or top end of a thing; *esp.* the pointed or rounded end of anything long and slender; the top, summit, apex, very end.'" Dkt. # 55, p. 9. Accordingly, the question under the doctrine of equivalents is whether contact between the sidewall of the fiber and the vessel wall as argued by Diomed is equivalent to the claim limitations of deliberately putting the uncoated tip into physical contact, and maintaining such contact during emission of laser energy.

Diomed cannot as a matter of law assert doctrine of equivalents infringement with respect to the "means for emitting laser energy limitation". This is a "means plus function" limitation under 35 U.S.C. § 112, ¶ 6 that is entitled to doctrine of equivalents infringement only for cases involving "later developed" technology. It is undisputed that Defendants' kits use coated fibers as described in the '777 patent itself. Accordingly, this case does not involve later developed technology, and Diomed is not entitled to doctrine of equivalents infringement on this limitation. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1311 (Fed. Cir. 1998); and *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1379 (Fed. Cir. 2004).

Further, the '777 specification explicitly disclaims any possibility that the coated sidewalls of the fiber can perform the claimed function of "emitting laser energy into the blood vessel", and therefore excludes any such structure from the scope of the "means for emitting

---

[9] Diomed argued at closing: "Now, Judge Gorton will also instruct you about a very important provision of the patent called the doctrine of equivalents. * * * So, for example, the defendants say it has to be the front face that emits the energy. We disagree. We think even if the side of the tip emits the energy, it's the same procedure. But it's an insubstantial difference." (3-26 Tr., pp. 83-84).

laser energy" limitation. The '777 specification states: "The coated portion of the fiber optic line 40 will **not** emit laser energy". ('777 patent at col. 4, lines 55-56, emphasis added).

It is axiomatic that when a patent specification says that a particular structure cannot perform the function of a means-plus-function limitation, that such structure cannot be included within the scope of the claim. *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1357 (Fed. Cir. 1999); *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1368 (Fed. Cir. 2001) and *Asyst Techs., Inc. v. Emtrak, Inc.,* 402 F.3d 1188, 1195 (Fed.Cir.2005). [10]

The Court should not have instructed the jury on equivalents infringement for the additional reasons set forth in Defendants' Memorandum of Law in Support of Their Joint Motion to Limit the Jury Charge to Literal Infringement (Dkt. # 215), and Defendants' Supplemental Memorandum in Support of Motion to Limit Jury Charge to Literal Infringement (Dkt. # 224) which are incorporated herein, including Diomed's failure to disclose its doctrine of equivalents infringement claim until submitting its proposed jury instructions.

---

[10] Additionally, it was legal error to allow Diomed to argue to the jury that under the doctrine of equivalents the claims cover maintaining contact between the sidewall of the fiber and vessel wall, while *not* maintaining contact between the uncoated tip of the fiber and the vessel wall, thereby allowing the uncoated tip to fire into blood. This Court held that the claims do not cover emitting laser energy "merely into the vein's interior or the blood within it". (Dkt. # 55, p. 12). Rather, the Court held that Diomed disclaimed this in distinguishing over the prior art Goldman patent (which taught inserting a fiber optic line to heat the blood and close the vein) (Dkt. # 55, p. 3), and because the sequential steps of the claim required maintaining the deliberately placed uncoated tip in physical contact with the vessel wall while the laser energy is emitted. (Dkt. # 55, p. 12). Spring Window Fashions LP v. Novo Indus. L.P., 323 F.3d 989, 995 (Fed. Cir. 2003) (claim cannot cover device similar to prior art distinguished to obtain patent);Novartis Pharmaceuticals Corp. v. Abbott Labs., 375 F.3d 1328, 1339 (Fed. Cir. 2004) (claim construction precluded patentee from asserting one element could be substituted for another); and Texas Instruments v. U.S. Intern. Trade Comm'n., 988 F.2d 1165, 1174-75 (Fed. Cir. 1993) (patentee barred from asserting as an equivalent that which it said would not work).

ME1 6296005v.5

**G.    In The Alternative, Defendants Are Entitled To Judgment As A Matter Of Law On Diomed's Doctrine Of Equivalents Infringement Claim Because No Reasonable Jury Could Conclude That Contact Between The Sidewall Of The Fiber And Vessel Wall Is Equivalent To The Deliberate, Maintained Contact Between the Uncoated Tip and Vessel Wall Required By The Claims.**

Diomed must prove its doctrine of equivalents claim with "particularized testimony and linking argument on a limitation by limitation basis." *Aquatex Industries, Inc. v. Techniche Solutions*, 2007 WL 582392 at 5 (Fed. Cir. Feb. 27, 2007). The *Aquatex* case set forth the patentee's evidentiary burden under the doctrine of equivalents as follows:

> 'Pursuant to our precedent, *a patentee must . . . provide particularized testimony and linking argument* as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents. *Such evidence must be presented on a limitation-by-limitation basis.* Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.'

*Id*. (emphasis in original), quoting *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558 (Fed. Cir. 1996). Further, such particularized testimony must be introduced by a technical person of skill in the relevant art, such as an expert witness. *Id*. ("who (on a limitation-by-limitation basis) describes the claim limitations and establishes that those skilled in the art would recognize the equivalents").

As set forth above, Diomed failed to establish that physicians following Defendants' IFUs (1) deliberately put the uncoated tip of the fiber optic line in physical contact with the wall of the blood vessel, and (2) maintain the tip-interior surface in physical contact with the vessel wall while laser energy is emitted to decrease the diameter of the blood vessel, as required by Claim 9. Under *Aquatex*, in order to prove infringement under the doctrine of equivalents,

ME1 6296005v.5

Diomed was required to provide with respect to each of these literally-absent limitations particularized testimony and linking argument as to the insubstantiality of differences between the respective claim limitation and the accused method, or with respect to how the accused method performs the same function, in the same way, to achieve the same result as each respective limitation.  Diomed provided no such testimony.

With respect to limitation (1) above, Diomed failed to provide any particularized testimony as to how contact between a degraded clad portion on the side of the fiber and vessel wall is equivalent to ***deliberately putting*** the ***uncoated tip*** into contact with the vessel wall, and how those skilled in the art would recognize such an equivalent.  To the contrary, Dr. Navarro admitted that any such burn back of the plastic cladding is ***not*** deliberate.  When asked whether he is "intentionally burning back plastic so that the side can emit laser energy and damage the vessel wall", Dr. Navarro unambiguously answered:  "Not intentionally."  3-13 Tr., p. 89.  Dr. Navarro also admitted that the purpose of the cladding along the side of the laser fiber is "to prevent the laser energy from getting out."  3-13 Tr., p. 87.  Dr. Anderson agreed.  3-15 Tr., p. 73 (purpose of cladding is to keep the optical radiation in the core and to get it to come out the front of the fiber).  Similarly, the '777 patent makes clear that the coated portion of the fiber does not emit laser energy.  '777 patent at col. 4, lines 55-56.  No reasonable jury could conclude that the unintentional burn back of cladding is equivalent to deliberately putting the uncoated tip into contact with the vessel wall at least because it would effectively eliminate the "deliberately putting" limitation from the claim.

With respect to limitation (2) above, Diomed failed to provide any particularized testimony showing that the sidewall of the fiber is maintained in contact with the vessel wall while laser energy is emitted, much less any such evidence showing that the purported contact

22

achieves the same result as the tip-interior surface contact required by the claim. To the contrary, Dr. Anderson admitted that he doesn't know when during the procedure the degradation occurs. 3-15 Tr., p. 78. Moreover, Dr. Proebstle's unrebutted testimony established that any such degradation and side emission has no effect on vein closure. 3-20 Tr., pp. 145-150.

Accordingly, Diomed failed to provide particularized testimony and linking argument on how the Defendants' methods include equivalents for each literally-absent claim limitation. Rather, Diomed presented only generalized testimony that is insufficient to meet the heavy burden necessary to prove doctrine of equivalents infringement.

## H. Defendants Are Entitled To Judgment As A Matter Of Law That Diomed Cannot Recover Lost Profits Or Price Erosion Damages.

By any measure, the jury's damages verdict against Defendants – totaling a combined $12.5 million – was substantial. For VSI, the $4.1 million verdict represented a remarkable 46.6% of its gross revenue from Vari-Lase sales.[11] Diomed's evidence on the issues, centering on the speculative opinions of its expert Philip Green, did not come close to supporting such a financial windfall. As Defendants predicted in their motion to exclude Green's testimony prior to trial, Green continued to ignore the actual evidence and to offer little more than unsupported and conclusory opinions. In addition, Green's false assumption that Defendants would have negotiated a royalty with a competitor, Diomed, rather than a pure licensor, Endolaser, artificially inflated his royalty analysis, making his royalty analysis excessive as well.

Because substantial evidence did not support the jury's lost profits award,[12] and for the additional reasons explained below, Defendants are entitled to: (1) judgment as a matter of law

---

[11] The inconsistency in the verdict between the defendants is additional evidence that the award is speculative. Diomed was awarded approximately 27 percent of AngioDynamics' revenues. By contrast, the verdict represents 47 percent of VSI's revenues based on the same alleged infringement. 3-21 Tr., p. 125.

[12] There is no question that the jury awarded Diomed lost profits damages. While the jury was not asked to itemize damages, the verdict was substantially more than the royalty even Diomed's expert proposed. *See* 3-15 Tr., p. 105

that Diomed cannot recover lost profits or price erosion damages; and (2) remittitur of the

damages award to a reasonable royalty, or in the alternative, a new trial on the issue of damages.

> **1.    The Jury's Lost Profits Damages Award Was Speculative, Excessive, And Not Supported By Substantial Evidence.**

To be entitled to lost profits, a claimant has the burden of proving actual damages,

including a causal nexus between infringement and lost profits. *See Rite-Hite Corp. v. Kelley*

*Co.*, 56 F.3d 1538 (Fed. Cir. 1995) (en banc); *see also Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563

(Fed. Cir. 1996); *Crystal Semiconductor Corp. v. Tritech Microelecs. Int'l, Inc.*, 246 F.3d 1336,

1353 (Fed. Cir. 2001). The lost profits claimant must demonstrate an expectation of exclusivity

such that, but for the infringement, it would have enjoyed the benefit of the infringer's sales.

*Kearns v. Chysler Corp.*, 32 F.3d 1541, 1551 (Fed. Cir. 1994). "[T]o prevent the hypothetical

from lapsing into pure speculation, [the Federal Circuit] requires sound economic proof of the

nature of the market and likely outcomes with infringement factored out of the economic

picture." *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed. Cir.

1999).

Diomed failed to established at least two of the required *Panduit* factors. First, the

evidence established that Diomed would <u>not</u> monopolize the relevant market if Defendants' sales

had not occurred. Instead, there are a number of acceptable non-infringing alternatives. Second,

Diomed did not establish the amount of its lost profits to a reasonable degree of certainty.

---

(Green testified that Diomed was entitled to $2.1 million in royalties from VSI and $6.3 million from
AngioDynamics).

24

### (a)  Diomed Would Not Monopolize The Market In The Absence Of Defendants' Sales.

There was no substantial evidence that Diomed would monopolize the market, or from which a jury could have determined Diomed's likely market share in the "but for" world.  These are just some of the key evidentiary points that Diomed failed to establish or rebut at trial:

No Evidence Of Diomed's Experience In The Market.  Green testified that he assumed an 80 percent capture rate because it "was consistent with Diomed's experience" in the market.  The only evidence regarding that "experience," however, was a July 2003 Lost Order report.  3-15 Tr., pp. 171-72, 194-95; Ex. 1188.  That single document, purporting to show sales lost more than 18 months before the claimed lost profits period began in 2005, is not "substantial evidence" that Diomed could have made Defendants' sales.  In fact, it demonstrates why Diomed would have had extreme difficulty doing so.  3-15 Tr., pp. 178-86.

Non-infringing Alternatives in the Market.  Green assumed that every seller of endovenous laser treatment products of any kind was an "accused infringer."  3-15 Tr., pp.174-77.  On cross-examination, however, he admitted that 22 percent of the endovenous laser treatment market has not been sued by Diomed.  *Id.* at 173-75.  Diomed presented no evidence that Dornier, Biolitec, or sellers of individual components are infringing the '777 patent.  Green's *ipse dixit* is not substantial evidence on which the jury could have based such a conclusion.

VNUS Medical Technologies.  Green assumed for his analysis that Diomed did not compete with VNUS for customers.  He simply ignored the testimony and exhibits establishing that the parties do compete.  *See, e.g.*, 3-14 Tr., pp. 85-86, 102-03, 161-62; Exs. 1091-1094; 3-15

Tr., p. 163.  In fact, the same lost order report Green relied on to show Diomed's "experience" in the marketplace demonstrates lost sales to VNUS.  Ex. 1188.

Competitors' Ability To Capture Sales.  Because Green assumed that all alternatives were infringing or unacceptable, he made no effort to analyze their actual ability to capture Defendants' sales.  Diomed's failure to present such evidence renders its entire lost profits theory speculative.  *Grain Processing*, 185 F.3d at 1352 ("[m]arket sales of an acceptable non-infringing substitute often suffice alone to defeat a case of lost profits"); *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458 (Fed. Cir. 1991) (there is no requirement that lost profits be awarded on the basis of market share where non-infringing substitutes exist); *SmithKline Diagnostics, Inc. v. Helena Labs Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991) (where evidence at trial revealed that the infringer actually had lost sales to a non-infringing competitor, lost profits theory was not established).

The speculation that Green engaged in to reach his conclusions was unnecessary in this case.  Diomed actually possesses exactly the type of information that would lead to a reliable conclusion about whether Diomed was losing sales to Defendants.  Diomed's witnesses testified that Diomed keeps Maximizer or "pipeline" reports where its sales representatives enter their sales activities daily, to track where Diomed's leads are coming from, and where and why Diomed lost sales.  3-14 Tr., pp. 91, 147-48.  Those reports would have told the parties, the experts, the Court, and the jury if Diomed competes with, and loses sales to, VNUS.  They would have also permitted an analysis of whether the conclusions Green drew from the July 2003 lost order report were reasonable.  They would have told everyone if Diomed's potential customer base is buying from other non-infringing competitors.  They would have told everyone the impact of Defendants' presence in the market on Diomed's sales.

MEl 6296005v.5

Green testified, however, that he was not given access to Diomed's Maximizer reports. He admitted that the reports were exactly the type of information he was looking for when he performed his analysis and that, had he been given the reports, the information may have changed his opinions on Diomed's lost profits. 3-15 Tr., pp. 172-73, 178. Diomed cannot ignore the best evidence – in its own possession – in favor of more speculative information to support a multi-million dollar damages verdict. *See Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 286 (S.D.N.Y. 2000) (excluding expert testimony on lost profits for failure to rely "on the most relevant and reliable data available" in reconstructing the relevant market); *De Jager Const. Inc. v. Schleininger*, 938 F.3d F. Supp. 446, 455 (W.D. Mich. 1996).

### (b)  Diomed Failed To Establish To A Reasonable Degree Of Certainty Its Expected Profits From The Alleged Lost Sales.

To establish the amount of its lost profits, Diomed again relied entirely on Green's testimony. The basic premise of Green's cost analysis, however, was proven to be false. When he performed his analysis, Green understood that Diomed had <u>just begun</u> to move from an outside sales force to an internal sales force at the end of 2004, an event that he said significantly changed Diomed's cost structure. 3-15 Tr., pp. 165, 167. Based on that understanding – which he admitted was important to his analysis – he concluded that Diomed was entitled to lost profits beginning in 2005. *Id.* Diomed's own witnesses, however, testified that Diomed largely had completed its move to an internal sales force by <u>2003</u>. 3-14 Tr., p. 89.

In addition, Green continued to assert the implausible theory that, aside from sales commissions, Diomed would not have incurred even $1 in additional costs as a result of doubling its sales between 2004 and 2005. Green offered no explanation, however, for the quarterly regression analysis he performed (but buried in his electronic work papers) that directly refutes his conclusions. 3-21 Tr., pp. 202-08; Ex. 1159.

27

Because no reasonable jury could have found sufficient evidence that Diomed had established its right to recover lost profits, Defendants are entitled to judgment as a matter of law.

### 2.    No Substantial Evidence Supported Diomed's Price Erosion Theory.

To recover lost profits from VSI on its theory of price erosion, Diomed had the burden of proving that but for VSI's infringement, it would have sold its product at a higher price. *BIC Leisure Prods.*, 1 F.3d at 1220.  Diomed must also "present evidence of the (presumably reduced) amount of product the patentee would have sold at the higher price." *Crystal Semiconductor*, 246 F.3d at 1357.  Diomed met neither burden at trial.

Diomed presented no evidence that *VSI's* competition, rather than competition from other lower-priced competitors, caused it to lower its prices.  3-157 Tr., pp. 199-200.  Diomed did not refute testimony establishing that VSI is not the lowest-priced competitor.  3-21 Tr., pp. 126-27 (Total Vein Solutions offers lower-priced kits; Cook Medical and Laser Peripherals offer lower-priced components).  Diomed presented no evidence that it could raise its prices while lower-priced competition remained in the market.  Even Green did not offer such an opinion.

Diomed also presented no evidence of the sales it would have made at higher prices.  On direct, Green explained only his *math* based on a power-point slide.  3-15 Tr., pp. 156-59.  He apparently performed no economic analysis.  In fact, the actual data proves that demand for Diomed's products declines with price increases.  3-15 Tr., pp. 200-05; Ex. 128, at 32073.

Finally, Green's attempt to include price erosion damages in his reasonable royalty analysis, essentially double-counting damages for the same sales, was incorrect as a matter of law.  3-26 Tr., p. 131 ("Diomed may not be awarded both lost profits, whether lost profits due to lost sales or due to price erosion, and reasonable royalties for the same sales.").

ME1 6296005v.5

### 3.    <u>Remittitur Is Appropriate In This Case.</u>

If the Court grants Defendants' motion for judgment on Diomed's lost profits theories,

remittitur would be appropriate. *See Huber v. JLG Indus., Inc.*, 344 F. Supp. 2d 769, 775 (D.

Mass. 2003) (Gorton, J.), *quoting Smith v. Kmart Corp.*, 177 F.3d 19, 29 (1st Cir. 1999) (damages

may not exceed a "rational appraisal or estimate of the damages that could be based on the

evidence before the jury").    Diomed's own expert concluded that a reasonable royalty in this

case totaled $2.17 million for VSI and $6.3 million for AngioDynamics. *See* 3-15 Tr., p. 105.

While Green's reasonable royalty theory was grossly excessive in its own right, as explained

below, his analysis acts as a ceiling to Diomed's recovery in the case.

Green's proposed "reasonable royalty," however, was based on the wholly *un*reasonable,

and demonstrably incorrect, assumption that Defendants would have chosen to negotiate a

royalty with a competitor, Diomed, rather than a pure licensor, Endolaser.  Green repeatedly

stated that a competitor would demand more money from a licensee than a non-competitor

would, and that the commercial relationship of the parties "is one of the most important factors"

in determining a reasonable royalty.  3-15 Tr., pp. 110-11.  At the time of both parties'

hypothetical negotiations, Endolaser still owned rights to the '777 patent. *Id*. at 145-197.[13]

Accordingly, Defendants are entitled to remittitur to a reasonable royalty, and if Diomed

does not accept the Court's determination of the royalty amount, Defendants are entitled to a new

trial on damages.

---

[13] Diomed did not acquire Endolaser's rights until September 2003, after both Defendants had entered the market. Although Diomed argued that Endolaser and Diomed entered into an agreement in June 2003 prohibiting Endolaser from negotiating with a third party, the executed agreement was not part of the record at trial.  Thus, there was no basis for the jury to conclude that Endolaser was prohibited from negotiating with VSI prior to its entry into the market in June 2003.

ME1 6296005v.5

## I. The Defendants Are Entitled To A New Trial Because The Court Incorrectly Rejected Other Issues Raised By The Defendants.

Defendants request a new trial for the following reasons arising from evidentiary rulings made by the Court before trial: 1) The Court should have excluded Dr. Green's lost profits and price erosion testimony and Dr. Navarro's expert work as untimely, for the reasons stated in Defendants' motion in limine. *See* Dkt. # 75, p. 2) The Court should have excluded Dr. Green's lost profits and price erosion testimony because it was not reliable, for the reasons stated in Defendants' motion in limine. *See* Dkt. # 180, p. 3) The Court should have excluded the evidence of photographs and histologies relied on by Dr. Navarro, for the reasons stated in Defendants' motion in limine. *See* Dkt. # 151, p. 4) The Court should have excluded evidence concerning Diomed's theory of infringement by side firing, for the reasons stated in Defendants' motion in limine. *See* Dkt. # 162, p. 5) The Court should have excluded evidence concerning Exhibits 539 and 540, the videotapes of Dr. Navarro allegedly performing a VSI and an AngioDynamics procedure, because Dr. Navarro did not disclose his intent to rely on and testify about those exhibits in his expert report, and because Dr. Min did not disclose his intent to testify about those exhibits in an expert report. Defendants also believe a new trial is warranted because the Court should have used the special verdict form proposed by Defendants, or something similar that asked the jury to address the specific elements of direct infringement that Diomed had to prove. *See Richardson-Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484-85 (Fed. Cir. 1997).

30

## III.  CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court grant Defendants'

Joint Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial.

Dated: April 11, 2007

**I hereby certify that a true copy of the above document was served upon the attorney of record for the Plaintiff and Counterclaim-Defendant Diomed, Inc. by electronic mail.**

**/s/ William H. Bright, Jr.**

THE DEFENDANT,
ANGIODYNAMICS, INC.


By  /s/ William H. Bright, Jr.
    William H. Bright, Jr.
    *wbright@mccarter.com*
    Mark D. Giarratana
    *mgiarratana@mccarter.com*
    McCARTER & ENGLISH, LLP
    CityPlace I
    Hartford, CT  06103
    Phone:  (860) 275-6700


THE DEFENDANT,
VASCULAR SOLUTIONS, INC.


By  /s/  Thomas Vitt
    Thomas Vitt
    *Vitt.Thomas@Dorsey.com*
    Heather Redmond
    *Redmond.Heather@Dorsey.com*
    DORSEY & WHITNEY LLP
    50 South Sixth Street
    Minneapolis, MN 55402-1498
    Phone:  (612) 340-5675

ME1 6296005v.5