THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIOMED, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>ANGIODYNAMICS, INC,<br><br>        Defendant. | Civil Action No. 04-10019 RGS |
| DIOMED, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>VASCULAR SOLUTIONS, INC.,<br><br>        Defendant. | Civil Action No. 04-10444 RGS<br>**(CONSOLIDATED UNDER<br>04-10019 RGS)** |

**DIOMED'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' JOINT MOTION FOR JUDGMENT
AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

Michael A. Albert
Michael N. Rader
John L. Strand
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8000

COUNSEL FOR
PLAINTIFF DIOMED, INC.

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 4

I.    LEGAL STANDARDS ............................................................................. 4

II.   DIOMED PRESENTED SUFFICIENT EVIDENCE TO SHOW DIRECT INFRINGEMENT... 5

      A.   Defendants Do Not Dispute That The Doctors Use Fiber Optic Lines With An Uncoated Tip ........................................................................................................5

      B.   Diomed Presented Sufficient Evidence That Doctors Perform Endovenous  Laser Procedures By Placing The Tip In Contact With The Vein Wall............................6

III.  DIOMED PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT OF CONTRIBUTORY INFRINGEMENT .............................................................. 13

IV.   DEFENDANTS PRESENTED SUFFICIENT EVIDENCE ON INDUCEMENT ..................... 14

      A.   The Court's Instruction on Inducement Was Proper Under Controlling Federal Circuit Precedent.............................................................................................14

      B.   Substantial Evidence Supported the Jury's Finding That the Defendants Had the Requisite Intent to be Liable for Inducement ........................................................15

V.    THE COURT PROPERLY CHARGED ON EQUIVALENTS AND THE JURY COULD PROPERLY FIND INFRINGEMENT BY EQUIVALENTS .................................... 19

      A.   The Court Properly Charged The Jury On Infringement Under The Doctrine Of Equivalents..................................................................................................19

           1.   Emissions From Uncoated Sidewalls................................................21

           2.   The Possibility Of Occasional Moments Without Contact Between The Vein Wall And The Laser Fiber Tip...............................................................23

      B.   Diomed Provided Specific Linking Testimony That Would Allow Reasonable   Jurors To Find Infringement Under The Doctrine Of Equivalents..................................24

VI.   THE JURY'S ASSESSMENT OF DAMAGES WAS SUPPORTED BY SUFFICIENT EVIDENCE AND REASONED EXPERT ANALYSIS............................................... 27

      A.   Diomed Presented Sufficient Evidence To Establish Lost Profits...........................27

           1.   Diomed Properly Defined The Market To Exclude Inferior Alternatives From The Market ...................................................................................................27

           2.   Diomed's Profits Were Calculated With A Reasonable Degree Of Certainty ............30

      B.   Price Erosion Damages Are Moot As They Were Not Awarded By The Jury.....................31

      C.   Remittitur Is Inappropriate As The Jury's Verdict Is Supported By Sufficient Evidence.....32

VII.  DEFENDANTS STATE NO OTHER BASIS TO DISTURB THE JURY'S VERDICT. .......... 32

## <u>INTRODUCTION</u>

Defendants' attack on the jury's verdict in their motion for judgment as a matter of law ("JMOL"), or, in the alternative, a new trial, rehashes virtually every pretrial motion and objection defendants made throughout this case, yet fails to identify any legal error. At trial, some of the world's leading experts testified at length and with precise and detailed scientific support regarding the cutting-edge vein treatment procedure at issue in this case. The jury carefully weighed and properly credited their testimony, and returned a measured verdict that accepted or rejected portions of each party's position. The jury system functioned exactly as it was supposed to, and defendants have offered no sound basis to overturn the verdict.

At trial, Diomed presented more than enough evidence to support the jury's verdict of inducement and contributory infringement. That evidence included testimony of leading experts, documents from defendants' own executives and practitioners, images of treatment and post-treatment veins from numerous angles and in various formats, and cross-examination admissions by defendants' own witnesses.

AngioDynamics and VSI presented the jury with scientifically unsound and indeed internally inconsistent theories regarding the means by which laser vein treatment works. While defense counsel told the jury that defendants had a "different method" than Diomed, their own key expert acknowledged that all three companies' methods were the same. While some of their experts argued that steam bubbles caused the damage that results in vein ablation, others admitted steam alone cannot have this effect. Defendants' business witnesses were no less self-contradictory. They repeatedly took positions on the witness stand diametrically opposed to their own earlier memos, public presentations, and emails. VSI's CEO told this Court one thing under oath (D.I. 136, Declaration of H. Root ("The Bright Tip project does not concern a 'device seeking to prevent contact.'")), and the PTO the opposite, also under oath (Ex. 426 (Bright Tip patent application claiming a "laser fiber . . . whereby the end of the means for transmitting light is prevented from contact with the vessel wall."). (3-21 (Root) 140-41). AngioDynamics' CEO, when confronted with his own contradictions, stunningly admitted that he tries to spin the facts

to his own advantage using "every means at my disposal," even including attempts to "muddy" the data. (3-19 (Hobbs) 173). These facts alone entitled the jury to disbelieve defendants, even if the scientific data were not equally overwhelming.

Much of Diomed's infringement evidence, moreover, was effectively unrebutted by contrary testimony. For example, defendants presented no evidence to contradict the many images of excised veins shown throughout the trial that show the "footprint" of trenching and carbonization caused by contact between the fiber tip and the vein wall. In one example of their attempt to respond to Diomed's evidence, defendants elicited a theory from Dr. Proebstle regarding the temperature of steam inside the body ($730^o$ Celsius) that was not only at odds with his own previously-published articles (indicating that temperature would be around 100 degrees), but that if true would result in explosively high pressure inside the leg. Defendants also failed adequately to explain away their <u>own</u> doctors' and trainers' repeated admissions, in training presentations and published articles, that tumescent fluid causes – and is deliberately designed and intended to cause – contact between the fiber tip and the vein wall throughout the procedure. This admission was in published materials by Dr. Olsen, a VSI employee, that VSI itself circulated to customers; it was repeatedly featured in the training slideshows used by Dr. Kabnick to teach the AngioDynamics procedure; it was in an abstract by Dr. Andrews and a peer-reviewed article by Drs. Timperman and Sichlau – all doctors whom defendants testified were authorities in the field upon whom they relied or indeed whom they hired to train doctors on their own procedures. As if that were not enough, AngioDynamics' own Vice President of Research and Development (Mr. Appling) concluded before the lawsuit began that "[i]f a laser source is within a lumen, then it must be in wall contact." (Ex. 26)

Defendants' motion walks through evidence that they presented to the jury. But the only question now before the Court is whether the jury had a basis upon which to credit Diomed's testimony over defendants'. It plainly did. Only one party – Diomed – brought in any laser-tissue interaction expert at all (Dr. Anderson). Only two Board-certified interventional radiologists testified – Dr. Min and Dr. Fan. Both supported Diomed's position. One of them,

moreover (Dr. Fan) refused even to be compensated for her time, so strongly was she offended by defendants' efforts to deceive medical practitioners in this field.

Defendants' contentions that their ultrasound videos should have been given greater weight by the jury likewise fall flat. Ultrasounds can be "murky" (as Dr. Anderson explained) and difficult to read, but what became clear was that they were being misread and mischaracterized by defendants' witnesses. By showing stills from those videos, Dr. Min was able to give the jury not just clear examples of contact between the laser fiber tip and the vessel wall, but also a clear explanation of how the defense witnesses were misunderstanding that evidence. (A key issue was that defendants' overlays on the ultrasounds showed only where the outside of the vein wall was, not the inside – ignoring the vein wall's thickness and thus purporting to show lack of contact when in fact there was contact.)

The jury also heard substantial evidence on contributory infringement. Indeed, the defendants admitted that they do not sell their kits or lasers for any other purpose besides ELT. Upon finding ELT was a contact procedure, therefore, the jury had to find contributory infringement, and properly did so.

The jury also properly credited Diomed's abundant evidence on inducement. Diomed's experts testified that the use of the defendants' instructions for use (and physician training materials) necessarily lead to contact. Defendants teach the use of tumescent fluid in a manner and volume designed to deliberately collapse the vein onto the laser fiber tip. The defendants' own prior admissions and writings evidenced their knowledge of these facts.

The Court's charge was also proper. The Court gave an instruction on inducement that is virtually identical to the one approved by an en banc panel of the Federal Circuit just last year. As for the doctrine of equivalents instruction, the charge was likewise proper under the case law, as Diomed adduced expert testimony during the trial specifically addressing both (1) the equivalence between the effects of laser energy emitted from the flat face at the end of the laser fiber tip and that emitted from the surrounding uncoated sides of the tip and (2) the equivalence

- 3 -

of the function, mechanism, and result of laser vein treatment during constant contact versus procedures in which any brief moments of non-contact may arguably occur.

Lastly, Diomed's damages claim, as analyzed by its expert Philip Green, was well supported. Defendants' primary dispute with Mr. Green's assessment related to how he defined the market, a classic jury question. He properly defined it to exclude a procedure that the evidence amply showed to be more expensive, more time consuming, and less clinically effective. Substantial evidence (including an independent market survey that defendants themselves cited) supported that definition. In any event, the jury did not unquestioningly adopt Mr. Green's analysis, but weighed it against Defendants' contrary testimony and came in with a verdict in between the two figures.

For these reasons, explained more fully below, defendants' motion should be denied.

## ARGUMENT

### I.   LEGAL STANDARDS

A district court may grant a motion for judgment as a matter of law ("JMOL") under Federal Rule of Civil Procedure 50 only "when after examining the evidence of record and drawing all reasonable inferences in favor of the nonmoving party, the record reveals no sufficient evidentiary basis for the verdict." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 75 (1st Cir. 2001). When evaluating such a motion, the court "may not weigh the evidence, undertake credibility determinations, or engage in differential fact-finding." Id. In sum, the court should deny the motion "unless the evidence, taken in the light most favorable to the prevailing party, points unerringly to an opposite conclusion." Id. Under Rule 59, moreover, a new trial should not be granted unless the jury's verdict is "against the clear weight of the evidence." Newell P.R. Ltd. v. Rubbermaid Inc., 20 F.3d 15, 22 (1st Cir. 1994). "A trial court should set aside a jury verdict only to prevent a miscarriage of justice." Id. "Mere disagreement with the verdict will not justify the granting of a new trial." Id.

Here, the defendants have requested that the Court enter judgment as a matter of law, or order a new trial, simply because they disagree with the measured verdict at which the jury arrived after careful deliberation. There is no basis upon which to disturb the jury's verdict.

## II. DIOMED PRESENTED SUFFICIENT EVIDENCE TO SHOW DIRECT INFRINGEMENT.

Diomed's evidence went far beyond the minimal standard necessary to allow a jury verdict to stand. The evidence amply demonstrated that doctors practicing endovenous laser procedures with the defendants' kits and lasers, following the defendants' instructions, directly infringe the `777 patent by performing each of its three steps as construed by the Court.

To show direct infringement of the construed claim, Diomed presented photographs of excised veins evidencing contact between the laser fiber tip and the vessel wall, ultrasounds showing contact, testimony from the foremost experts in the field that doctors use tumescent anesthesia to deliberately compress veins into contact, and admissions by the defendants' own executives and trainers that the procedure involves contact. In addition, the jury rightfully considered the credibility of the defendants' witnesses, many of whom were caught making statements to the Court that were in direct conflict with their prior statements or that had little or no scientific credibility. This evidence, some of which is detailed below, was more than sufficient to support the jury's verdict.

### A. Defendants Did Not Dispute That The Doctors Use "A Fiber Optic Lines With An Uncoated Tip".

The defendants do not dispute in their motion, nor did they deny at trial, that the kits they sell to doctors to perform endovenous laser ablation contain "a fiber optic line with an uncoated tip at its end capable of emitting laser energy."

In addition, Diomed presented extensive evidence that the laser emitting portion of the tip includes not just its face of the tip but also a portion of its side – an area that rapidly begins to grow larger once the procedure begins and as it progresses. (E.g., 3-22 (Anderson) 35-37; 3-13 (Navarro) 41-42). Defendants' own expert presented evidence that reinforced the fact that the

laser energy is emitted through a larger and larger area as the procedure progresses, allowing a larger area to make contact with the vessel wall. (3-20 (Proebstle) 190-191).[1]

### B.    Diomed Presented Sufficient Evidence That Doctors Perform Endovenous Laser Procedures By Placing The Tip In Contact With The Vein Wall.

Diomed presented substantial evidence (far more than is needed to meet the minimal Rule 50 and Rule 59 standards) that doctors performing endovenous laser procedures with the defendants' lasers and kits take deliberate steps to compress and drain the vein such that it assumes and maintains contact with the vein wall during the procedure.

*Footprint of Contact – Discrediting the "Steam Bubble" Theory*.  Diomed presented several images of veins after being treated with ELT that showed identical patterns of damage, including carbonization and trenching of the vein.  The only expert on laser-tissue interaction offered by any party to this case was Dr. R. Rox Anderson, director of the Wellman Center for Photomedicine at Massachusetts General Hospital.  Dr. Anderson testified that the damage seen after ELT can be caused <u>only</u> by the contact of the laser fiber tip and the vessel during an endovenous laser procedure.  (3-15 (Anderson) 87).  Defendants did not present any laser-tissue interaction expert to rebut this testimony, and even if they had, Dr. Anderson's testimony could certainly have been credited by the jury, as it evidently was.

Instead, defendants offered Dr. Thomas Proebstle, a dermatologist with no prior laser expertise, who had speculated in print that the damage seen in ELT could be caused by steam bubbles.  This theory, as adopted by the defendants, was thoroughly discredited throughout the trial.  Just one example of this impeachment occurred when Dr. Proebstle contradicted his own prior work and claimed on the stand that steam in a vein during ELT could reach 730 degrees. (3-20 (Proebstle) 193-194).  As Dr. Anderson explained, by reference to known laws of physics regarding pressure-temperature correlations, if the steam inside the vein got to such extreme temperatures, the leg would literally explode.  (3-22 (Anderson) 31-33).  Dr. Proebstle's

---

[1] Defendants' arguments concerning the doctrine of equivalents and the definition of "tip" are addressed below in Section V.

testimony not only contravened laws of physics, but was also directly contrary to his own published articles on the topic, in which he had acknowledged that the temperature of the steam would not get much higher than $100\,^{\circ}$ C. (Ex. 1110 at ANG2096). For either of these reasons alone, the jury was entitled to discount Dr. Proebstle's testimony as lacking in scientific basis or credibility.

The physical evidence analyzed by Dr. Anderson, including images showing the footprint of the fiber as it is dragged along the vessel wall during the procedure, also provides substantial support for the jury's verdict. For example, Dr. Navarro performed a procedure following VSI's instructions for use, and showed in court an image of the resulting vein, with a distinct line of carbonization. (Ex. 540I). Defendants ignore that testimony in their brief, other than to claim that the image should have been discounted by the jury because it was "exteriorized" and thus does not represent what occurs in the body during an ELT procedure. (Defs' Memo. in Supp. of Their Mot. for JMOL or New Trial (D.I. 247) ("Defs' Br.") at 10). But defendants mischaracterize the facts. As Dr. Navarro testified, he exteriorized the vein (in order to look at it) only <u>after</u> treating it per VSI's IFU. (3-12 (Navarro) 191-192). It is among the clearest possible evidence of exactly what happens as a result of following defendants' procedure. The jury was more than entitled to rely on it in finding infringement.

Diomed also presented other images of treated veins – including two from Dr. Proebstle's own articles – which showed such lines of carbonization. Here again, Defendants ignore or mischaracterize evidence. For example, they complain that Diomed relied on images from one of Dr. Proebstle's 2002 articles, in which he claims to have followed Dr. Navarro's protocol during a procedure (Defs' Br. at 11). But this is precisely the article that AngioDynamics itself claimed to have relied upon in support of their "steam bubble" theory. (3-19 (Hobbs) 104-105). For defendants now to contend that the article proves nothing is inconsistent with their own executives' testimony. The jury was entitled to find that the article shows exactly what Dr. Proebstle admits that it shows – carbonization resulting from ELT. Moreover, contrary to defendants' arguments, Diomed presented images of carbonization and trenching not only from

Dr. Proebstle's 2002 article, but also from his 2003 article (Ex. 1113), as well as from numerous other sources in the medical literature. Every time a vein is excised after being treated with ELT, either experimentally or clinically, it shows the tell-tale footprint of contact. (3-15 (Anderson) 46; 3-19 (Fan) 28; 3-13 (Navarro) 47-48; Exs. 422R, 476 and 1120).[2]

This evidence of the footprints, along with experts' testimony that all of the procedures, if performed with tumescent anesthesia, are materially the same (3-13 (Min) 188; 3-12 (Navarro) 181), left the jury with no reasonable choice <u>but</u> to conclude (as they did) that contact is deliberately made in each ELT procedure through the compression and drainage effects of tumescent fluid.

Defendants further assail this evidence of direct infringement by arguing that the histologies and some of the images do not show that contact is "maintained." (Defs' Br. at 10). But again, the lines of carbonization consistently establish contact along a treated <u>length</u> of vein tissue. Dr. Proebstle's own procedures show an extended length of carbonization, not just a single point of contact. (Ex. 1110). All of the images presented by Dr. Proebstle from his experiments (Ex. 1120), Dr. Fan's experimental videos (Ex. 1073-75), and photos from Dr. Navarro's experiments (<u>e.g.</u>, Ex. 422R), show continuous lines of carbonization and trenching, indicating that contact is maintained throughout a procedure treating a length of a vein. (3-13 (Navarro) 13, 18, 46-47). Strikingly, defendants never offered in response a single image of any vein after a treatment that did <u>not</u> show such a footprint. (But even if they had, the jury was entitled to credit Diomed's overwhelming evidence.)

Moreover, there was substantial testimony that it is this carbonization and trenching that is necessary to have reliably successful ELT procedures. (3-13 (Navarro) 7-8; 3-13 (Min) 186-187); 3-15 (Anderson) 46-47; 3-19 (Fan) 28). Dr. Anderson's unrebutted testimony was that "[t]he goal of this [procedure] is to obliterate the ability of the vein to ever carry blood again. To

---

[2] Indeed, when Dr. Proebstle attempted to set up an experimental situation designed to avoid contact (in order to see what would happen to the vein), he admittedly failed and ended up contacting the vein wall and getting the predictable result of carbonization and trenching. (3-20 (Proebstle) 187, 189).

do that you need to destroy the vein wall to the extent that the body no longer knows what it is." (3-15 (Anderson) 20-21). Any one of these pieces of testimony alone would have been ample grounds for the jury to conclude that is it the carbonization, trenching, and perforation of the vein that causes the procedure to be reliably successful, and that doctors performing the procedure deliberately bring about the contact that leads to the successful results. (3-15 (Anderson) 26-29).

*Admissions That Contact Occurs*. In addition to the evidence of "footprints" showing contact after endovenous laser procedures, and the impeachment of the defendants' expert witness, there were multiple admissions from the defendants' own executives and trainer physicians that contact occurs. Mr. Appling, for AngioDynamics, admitted in an email in 2002 that "[i]f a laser source is within a lumen, then it must be in wall contact." (Ex. 26). Likewise, Ms. Tina Barth-King, also for AngioDynamics, stated in a memorandum that, "[i]t is well known that an intravascular treatment device will come in contact with the wall of the vessel unless a vessel-centering mechanism is incorporated into the treatment device." (Ex. 24). In a paper VSI approved and circulated to its customers to explain the endovenous laser procedure, VSI's own Dr. Mark Olson wrote that "administration of perivenous tumescent anesthesia . . . compresses and reduces vein diameter to provide vein wall apposition and circumferential heating." (Ex. 65 at VSI007272). Defendants' motion fails to address any of these admissions.

Likewise, doctors affiliated with the defendants have admitted that they use tumescent anesthesia (as the defendants instruct) to make contact between the laser fiber tip and the vessel wall. For instance, in a peer-reviewed paper (Ex. 210) by Dr. Paul E. Timperman (who is a consultant for VSI (3-21 (Jakubowski) 180-182)) and Dr. Michael Sichlau (an AngioDynamics trainer (3-20 (Appling) 70)), admitted that, "[t]umescence improves heat transfer into the vein wall by coapting the wall against the laser fiber tip and by decreasing the volume of blood in the vein." Similarly, Dr. Lowell Kabnick, AngioDynamics' primary trainer and medical consultant (3-19 (Doster) 191-192), presented over a period of at least three years in different training sessions slides instructing that one of the purposes of tumescent is to "[c]ompress the treatment vein to achieve better vein wall contact" and to "[e]xsanguinate [i.e., drain] [the] vein being

- 9 -

treated." (Tr. Exs. 199, 200, 202).[3]  Finally, Dr. Torrence Andrews, another one of

AngioDynamics' trainers, presented an abstract at the Society of Interventional Radiology

instructing that when performing ELT procedures, he teaches that tumescent is used to

"extrinsically compress the target vein such that its physical contact with the endoluminal heat

source [i.e., the laser fiber tip] is maximized." (Ex. 70).  The jury was entitled to rely on all of

these admissions from defendants' own trainers and consultants in arriving at their verdict.

     ***Ultrasounds Further Establish Contact***.  In addition to the above evidence, which alone

suffices to support the jury's verdict, Diomed also presented ultrasound footage that showed

contact between the laser fiber tip and the vessel wall.  This footage constitutes direct evidence

of direct infringement.

     For example, Diomed presented ultrasounds Dr. Navarro took while following VSI's and

AngioDynamics' instructions for use.  (Exs. 539 & 540).  Dr. Min testified that he reviewed

these videos in their entirety, and concluded that contact was maintained between the laser fiber

tip and the vessel wall throughout these entire procedures.  (3-13 (Min) 186-188).  These videos

were in evidence in the jury room, and the jury was entitled to rely upon them to confirm Dr.

Min's point.  While obviously not required to walk the jury through every minute of every video

that was in evidence, Diomed did highlight to the jury a few examples of what these exhibits

showed.  Dr. Min showed the jury several still shots[4] from these videos to educate them on how

to read an ultrasound and to provide examples of how contact could be seen throughout the

procedures, though of course many others existed.  (3-22 (Min) 161-162).  Defendants'

suggestion that Dr. Min was required to walk the jury through the hours of ultrasound videos that

---

[3] While Dr. Kabnick argued at trial that these slides referenced "catheter electrodes," rather than laser fibers, he admitted that they were in the sections of his presentations on endovenous laser procedures and that he used them in connection with training doctors to do the AngioDynamics laser procedure.  (3-21 (Kabnick) 46, 65).

[4] Defendants argue that still shots are less helpful than videos.  But credible testimony was to the contrary – Diomed's experts noted that moving ultrasounds can be even more difficult, if not impossible, to interpret than stills because of moving artifacts of various origins that can obscure parts of the picture.  (3-15 (Anderson), 61; 3-14 (Min) 47-48).

the defendants admitted into evidence (Defs' Br. at 4-6) is unfounded and absurd.  The parties could have spent their entire two weeks allotted for trial just going through ultrasound videos if they had wished.  As the Court repeatedly and corrected reminded the parties and counsel, that is neither a practical nor an appropriate way to try a case.  Witnesses are not required (or even usually allowed) to expound at length on the contents of every single shred of evidence placed before the jury.  Rather, it is their job to distill the key points and leave it up to their opponents on cross-examination to identify any key weaknesses (if any may be found).  Here, while defendants' counsel did their best to try to find such weaknesses, the evidence in support of infringement – between the footprints of contact and the fact that a proper reading of the ultrasounds showed the vein walls <u>were</u> touching the fibers – was overwhelming.

Moreover, several of the ultrasound videos to which defendants allude were of questionable relevance at best.  For instance, in one of them, Dr. Samson admitted he was injecting the tumescent fluid into subcutaneous fat, not into the perivenous space as instructed by VSI and AngioDynamics.  (3-22 (Samson) 109).  The jury also heard that Dr. Proebstle did not follow AngioDynamics' IFUs, and that Dr. Golan – one of the instructors whose testimony and ultrasound footage AngioDynamics relied upon – had <u>never even read</u> AngioDynamics' IFU.  (3-22 (Golan) 134).  Defendants also wish the jury had given more weight to an ultrasound provided by Dr. Andrews, but he is the same AngioDynamics trainer who instructs others that tumescent is used to maximize the "physical contact" between the fiber and the vein (Ex. 70).  The jury had ample grounds to find that the weight of Dr. Andrews' statements supports Diomed's position, not defendants'.

While Dr. Min did not walk through every minute of the defendants' ultrasounds, he did highlight to the jury in rebuttal how defendants and their experts were misinterpreting those ultrasounds.  (3-22 (Min) 152-163).  He showed how Dr. Proebstle's overlay had outlined only the <u>outside</u> of the vein walls, neglecting to identify the interior walls that were in contact with the laser fiber.  (3-22 (Min) 161).  Dr. Min further testified that the examples of errors he showed the jury were representative of those he saw on other ultrasounds offered by the defendants.  (<u>Id.</u> at

162).  There simply is no requirement that a witness walk the jury laboriously through each and every example in the evidence of the same basic point, and trials would crawl to a standstill if that had to happen.  Cf. Liquid Dynamics Corp. v. Vaughan Co., Inc., 449 F.3d 1209, 1219-20 (Fed. Cir. 2006) (jury was allowed to infer that all 47 accused installations infringe even though only 11 were actually analyzed by the plaintiff's expert).

Significantly, the defendants never substantively challenged Dr. Min's conclusions about the proper reading of the ultrasounds, either during his cross examination or at any other time. (3-22 (Min) 166-174).  The defendants attacked Dr. Min's alleged bias and motives, but never came to grips with the problem Dr. Min had identified, namely that defendants had misrepresented where the interior of the vein wall was in their ultrasound overlays.  Despite the fact that several of their expert witnesses were in the courtroom at the time of his testimony, they did not (and could not) undermine the simple fact that the ultrasounds proved Diomed's point, not defendants'.[5]

Diomed also presented substantial numbers of cross sectional ultrasound images showing full collapse of the vessel wall against the sheath and/or fiber after the injection of tumescent. (Demo 61 (attached to Defs' Br. as Ex. C)).  These images came from the defendants' own training materials (Ex. 185), Dr. Kabnick's webcast teaching others how to perform the procedure (Ex. 479), and the procedures performed by Dr. Navarro using AngioDynamics' and VSI's IFUs (Exs. 539 & 540).

***Defendants' IFUs and Other Training Materials***.  A significant body of evidence that also supports the jury's verdict is the defendants' IFUs and other training videos.  This evidence was significant because both defendants admit that they expect their customers to follow the instructions and directions they are given.  (3-19 (Doster) 188, 197-200).  Whether this evidence

---

[5] Dr. Min, in fact, was the only witness formally trained in reading ultrasounds (3-22 (Min) 144), and one of only two witnesses who is a Board-certified interventional radiologist (the other being Dr. Fan, another Diomed witness).  Even if defendants had offered contrary testimony, the jury would still have been entitled to credit Dr. Min's and disbelieve defendants'.

is "circumstantial," has no bearing on either its relevance or its weight, as the Court properly instructed. (3-26 (Jury Charge) 98-99). See also Newell P.R. Ltd., 20 F.3d at 22; Liquid Dynamics Corp., 449 F.3d at 1219 ("There is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable *per se*."); Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330 (1960) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.").

Diomed's experts testified repeatedly that if one follows the IFUs or the defendants' other training materials, the vein will collapse after the injection of the tumescent anesthesia, causing compression and drainage of the vein, contact between the vessel wall and the laser fiber tip, and ultimately destruction of the vein with laser energy. (See, e.g., 3-12 (Navarro) 185-187; 3-13 (Min) 186-87). This evidence, again, is sufficient to independently support the jury's verdict.

## III. DIOMED PRESENTED SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT OF CONTRIBUTORY INFRINGEMENT.

Diomed's evidence of contributory evidence was sufficient to support the jury's verdict, despite the defendants' contention that Diomed provided insufficient evidence to show the defendants' products have no substantial non-infringing uses. See AquaTex Indus. v. Techniche Solutions, 419 F.3d 1374, 1380 (Fed. Cir. 2005) (requiring showing that products had no substantial non-infringing use to find contributory infringement). Diomed showed, however, that the defendants do not sell or promote their kits and lasers for any other purpose than those described in their IFUs, which use was found by the jury to infringe the `777 patent. (E.g., 3-19 (Doster) 188 ("Q: AngioDynamics sells its VenaCure kits exclusively for the VenaCure procedure, correct? A: That is correct. . . . Q: And the lasers . . . They're not sold for any other purpose, right? A: That's correct); (3-21 (Jakubowski) 181-182 (nearly identical exchange as with Doster)). This evidence is sufficient to support the jury's verdict that the defendants' contributorily infringed the `777 patent.

**IV.    DEFENDANTS PRESENTED SUFFICIENT EVIDENCE ON INDUCEMENT.**

       **A.    The Court's Instruction on Inducement Was Proper Under
            Controlling Federal Circuit Precedent.**

       In charging the jury on inducement, the Court correctly instructed that Diomed bore the

burden of demonstrating direct infringement and also showing that the defendants knowingly

induced such infringement with the intent to encourage it.  The Court's charge parallels the

instruction that the Federal Circuit upheld en banc in DSU Medical Corp. v. JMS Co., 471 F.3d

1293 (Fed. Cir. 2006):

> In order to induce infringement, there must first be an act of direct infringement and
> proof that the defendant knowingly induced infringement with the intent to encourage the
> infringement. The defendant must have intended to cause the acts that constitute the
> direct infringement and must have known or should have known [that] its action would
> cause the direct infringement.

Id. at 1305.  Here, the Court gave the substance of the first sentence in the DSU instruction:

> To prove inducement of infringement, Diomed must show by a preponderance of the
> evidence that someone else has directly infringed the '777 patent and that the defendant
> then under consideration – AngioDynamics or Vascular Solutions – has knowingly
> induced such infringement with the intent to encourage infringement.

(3-26 (Court) 117-18), and gave the second sentence of the DSU instruction almost word for

word:

> The defendant then under consideration must have intended to cause the acts that
> constitute direct infringement and must have known or should have known that its action
> would cause the direct infringement.

(3-26 (Court) 118).  In short, the Court adopted a jury instruction that an en banc panel of the

Federal Circuit endorsed less than a year ago.

       While claiming that the Court's instruction "misled" the jury because the charge did not

emphasize that a patent holder must show "specific intent to encourage infringement,"

AngioDynamics and VSI overlook the fact that the instruction in DSU itself likewise did not use

the words "specific intent."  This Court gave the exact substance of the DSU instruction, in

almost its exact language.  It was no more "misleading" than the instruction expressly approved

in that case. Indeed, the concept of specific intent was made clear the <u>DSU</u> instruction that a defendant "must have known or should have known" that "its actions would cause" the predicate acts of direct infringement. This Court's charge likewise made that standard clear, just as the <u>DSU</u> court did. AngioDynamics and VSI ignore the language of the very charge recently approved by the Federal Circuit and applied by this Court.

The Court likewise provided a complete and accurate statement of the law when it later explained to jurors that they were entitled to infer the requisite intent if the jury found that the defendants (1) knew about Diomed's patent and (2) intended doctors to perform acts that constituted direct infringement. (3-26 (Jury Charge) 118). In two decisions just prior to <u>DSU</u>, the Federal Circuit emphasized precisely that. <u>Golden Blount, Inc. v. Robert H. Peterson Co.</u>, 438 F.3d 1354, 1364 n.4 (Fed. Cir. 2006); <u>MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.</u>, 420 F.3d 1369, 1378 n.4 (Fed. Cir. 2005). In <u>Golden Blount</u>, the court upheld a judgment of induced infringement based on evidence that the defendant (1) "had notice of the patent" and (2) provided an instruction sheet that directed customers "to perform specific acts" ultimately resulting in direct infringement. 438 F.3d at 1364 n.4 ("[T]he district court could draw an inference of intent sufficient to meet either standard."). <u>MEMC</u> likewise reversed a summary judgment decision finding no induced infringement. 420 F.3d at 1378 n.4. The court reasoned that since the defendant had been aware of the patent-in-suit, one could presume intent "to cause an infringement" based on evidence that the party intended "to induce the specific acts constituting infringement." <u>Id.</u> The <u>en banc</u> <u>DSU</u> decision cites both <u>Golden Blount</u> and <u>MEMC</u> with approval.

### B. Substantial Evidence Supported the Jury's Finding That the Defendants Had the Requisite Intent to be Liable for Inducement.

Diomed presented abundant evidence from which reasonable jurors could have found that AngioDynamics and VSI had the requisite intent to induce infringement.

The defendants' arguments again misperceive the law of inducement. Reciting the "specific intent" requirement like a mantra, AngioDynamics and VSI ignore the plain import of

the Federal Circuit's <u>en banc</u> <u>DSU</u> decision – that a defendant can be liable based on evidence that it *should have known* that its actions would lead a third party to infringe a patent claim. 471 F.3d at 1306 ("The plaintiff has the burden of showing that the alleged infringer…knew **or should have known** his actions would induce actual infringements.") (emphasis added). This is necessarily a fact intensive inquiry based on the totality of the circumstances. As the Federal Circuit explained in <u>MEMC</u> and <u>Golden Blount</u>, moreover, fact-finders are entitled to infer the required intent based on (1) a defendant's knowledge of the patent-in-suit and (2) the defendant's intent to induce the allegedly infringing activities – each amply established here.

Substantial evidence supports a finding that AngioDynamics and VSI did in fact know and intend contact to occur.[6] But under <u>MEMC</u> and <u>Golden Blount</u> the jurors did not have to so find in order to reach their verdict – they simply had to determine whether the defendants (1) encouraged doctors to inject tumescent anesthesia deliberately into the perivenous space and (2) knew or should have known that this injection resulted in deliberate, maintained contact between the laser fiber and the vein wall such that doctors would be infringing the '777 patent. Both defendants concede that they instruct practitioners to inject tumescent fluid perivenously. The finding of inducement therefore hinges on the second prong – whether AngioDynamics and VSI knew or should have known that injecting tumescent anesthesia yields the requisite contact.

Diomed presented an array of documentary evidence and related testimony suggesting that the defendants actually <u>did</u> know that deliberately injecting tumescent anesthesia into the perivenous space resulted in the maintenance of contact between the laser fiber tip and the vessel wall. For example, AngioDynamics' trainer Dr. Kabnick conducted training sessions regarding

---

[6] Given the defendants' knowledge of statements in the medical literature explaining that contact is essential for the long-term success of the endovenous laser procedure (Exs. 210 or 241 (Timperman) and other evidence discussed <u>supra</u>), substantial evidence would support the jury's verdict even if the applicable standard *were* whether AngioDynamics and VSI actually desired contact. <u>See</u> <u>Diomed v. AngioDynamics</u>, 450 F. Supp. 2d 130, 152 (D. Mass. 2006) (denying defendants' motions for summary judgment of no inducement, as "a reasonable fact-finder could conclude that defendants intended contact to be employed in the use of their products regardless of their assertions to the contrary.").

endovenous laser ablation and displayed slides explaining that the tumescent technique served in part to ensure contact with the vein wall.  (Exs. 199, 200, 202).  The existence of the AngioDynamics and VSI "spacer tip" applications (Exs. 23, 27, 426) also makes clear that the defendants were acutely aware of the prospect of contact.  Moreover, as detailed above, AngioDynamics' and VSI's executives, trainers, and consultants, such as Mr. Appling and Drs. Timperman and Sichlau, admitted that contact will occur.  (See Section II).

        The defendants' own instructional materials further show that both AngioDynamics and VSI appreciated the connection between tumescent anesthesia and contact.  AngioDynamics disseminated instructions emphasizing that applying external pressure over the laser fiber tip causes the emitting section of the fiber to come into contact with the vessel wall.  (Ex. 461 at 3).  Moreover, Mr. Appling and Dr. Kabnick acknowledged in a patent application that "[e]xtrinsic pressure" from the tumescent fluid compresses the vein.  (Ex. 34 ¶ 9).  Dr, Kabnick even admitted at trial that tumescent narrows the vein by "putting pressure" on it.  (3-21 (Kabnick) 74).  VSI likewise nominally advised doctors to avoid applying pressure while the laser is fired.  (Ex. 1037 at 8).  Yet the very same document advocates the use of 150-250 milliliters of tumescent anesthesia and explains that the fluid "puts pressure on the vein."  (Ex. 1037 at 6).

        Even if the jury did not find actual knowledge (as they well could have), Diomed presented abundant evidence from which jurors could reasonably conclude that the defendants at the very least should have known that deliberately injecting tumescent anesthesia ensures that the laser fiber tip maintains contact with the vessel wall.  Drs. Andrews, Kabnick, Timperman, and Sichlau all presented or published papers that taught that the use of tumescent anesthesia would lead to contact.  (See supra Section II, Admissions That Contact Occurs).  Dr. Min reiterated this conclusion in a peer-reviewed article that Mr. Appling read.  (3-20 (Appling) 76-77).  In particular, Mr. Appling saw Dr. Min's explanation that delivering tumescent anesthesia is one way to "maximize laser energy transfer to the vein walls by providing maximal contact of the vein walls and [the] laser fiber tip."  (Ex. 1068 at 403; 3-20 (Appling) 76-77).

        Given this extensive knowledge base, the fact that the '777 patent does not expressly

teach the use of tumescent anesthesia to achieve contact is immaterial. VSI CEO Howard Root indeed acknowledged his understanding that manual compression – the particular method disclosed in the patent – was not necessarily the <u>only</u> means for ensuring contact. (3-21 (Root) 144-145). The jury was entitled to rely on such testimony.

In sum, <u>DSU</u> expressly allows jurors to find inducement even if they concluded simply that AngioDynamics and VSI <u>should have known</u> that, via the injection of tumescent fluid, doctors infringed Diomed's patent. <u>See</u> 471 F.3d at 1305.

Nor do the purported "warnings" that the defendants included in their instructions justify overturning the jury's inducement verdict. <u>E.g.</u>, <u>Acco Brands Inc. v. ABA Locks Manufacturer Ltd.</u>, 74 U.S.P.Q.2d 1947, 1951 (E.D. Tex. 2005) (affirming verdict that defendant induced infringement despite written instructions that specified a non-infringing mode of operation). The jury heard extensive expert testimony that the warnings to avoid contact are meaningless, particularly when coupled with the affirmative instructions to inject tumescent fluid and achieve separation between the vein and the surrounding tissue. (3-19 (Fan) 50-53).[7] Diomed also presented evidence that the very idea for the AngioDynamics' warning did not come from a medical professional, but instead came from the company's <u>in-house patent counsel</u>. (3-20 (Appling) 64-68). The attorney emphasized the plan in a document entitled "Navarro Patent Defenses." Ex. 38. In short, the jury had ample basis for concluding that the warning was nothing more than a medically meaningless paragraph that AngioDynamics envisioned invoking in precisely a situation like this.

For the above reasons, there was more than sufficient evidence to support the jury's finding of inducement.

---

[7] Dr. Fan chose to testify without compensation in part because of her frustration with defendants' use of these misleading statements in their instructions for use. (3-19 (Fan) 52). The defendants attempt (Defs' Br. at 15) to distort her testimony into a supposed admission that there is a serious "debate and disagreement" within the medical community about how the procedure works. In context, it was clear to the jury that Dr. Fan was saying that she was disturbed by the defendants' efforts to <u>manufacture</u> a debate and generate needless confusion with their "conflicting instructions."

**V.    THE COURT PROPERLY CHARGED ON EQUIVALENTS AND THE
        JURY COULD PROPERLY FIND INFRINGEMENT BY EQUIVALENTS.**

    **A.    The Court Properly Charged The Jury On
              <u>Infringement Under The Doctrine  Of Equivalents.</u>**

Recycling a series of arguments that they advanced in the course of their unsuccessful effort to limit the jury charge to literal infringement, defendants contend  that the Court erred in providing an instruction regarding the doctrine of equivalents.  (Defs' Br. at 18-20).  The record and the applicable law make clear, however, that the Court correctly instructed the jury.

Diomed offered two distinct theories as to why doctors practicing methods taught by the defendants infringed the '777 patent under the doctrine of equivalents even if they did not do so literally.  (3-26 (Closing) 83-84).  First, the jury heard testimony that "side emissions" of laser energy (i.e., that emitted from the unjacketed sidewalls of the laser fiber once the surrounding cladding degrades) are equivalent to emissions from the flat front face of the fiber.  Diomed also presented evidence that occasional moments during the procedure when the laser fiber tip may move out of contact with the vein wall are immaterial; maintaining contact for most of the time during the emission of laser energy is equivalent to maintaining contact for literally the entire procedure.  After reviewing two rounds of briefing concerning these theories, the Court decided to charge the jury regarding the doctrine of equivalents.

AngioDynamics and VSI muster only a generic challenge to the Court's instruction.  Even after the Court advised that it would be giving such a charge, neither defendant proposed a verdict form designed to distinguish between claim elements literally practiced by customers and those satisfied equivalently.  Nor did the defendants object during closing arguments when Diomed's counsel specifically referenced equivalence in connection with the "side emissions" theory.  (3-26 (Closing) 83-84).  The defendants' argument accordingly fails unless *no* legally adequate basis exists on which the Court could have issued an instruction regarding the doctrine of equivalents.  <u>Comark Commc'ns, Inc. v. Harris Corp.</u>, 156 F.3d 1182, 1188 (Fed. Cir. 1998) (affirming infringement verdict: "Because no special verdict interrogatory was used to determine which elements were met literally and which were met equivalently, this court cannot presume to

ascertain which elements the jury found to be met only by equivalents.  Thus, this court must uphold the jury verdict if there is sufficient evidence of equivalents and linking testimony such that a reasonable jury could have found that at least one element was met by equivalents.")  In one case, for example, the Federal Circuit affirmed a verdict of infringement without addressing the merits of the defendant's claim that the jury might have "relied on an inapplicable theory" of equivalence.  Hoeschst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1581 (Fed. Cir. 1996).  The court bypassed this claim because the defendant had never proposed a verdict form that addressed literal infringement and infringement under the doctrine of equivalence separately.  Id.  Neither did AngioDynamics or VSI.  So long as some legally adequate basis existed for the equivalence instruction, therefore, the defendants are not entitled to a new trial.

Moreover, AngioDynamics and VSI contest the legal foundation for the "maintaining" equivalence theory only in a footnote (Defs' Br. at 20 n.10).  They offer no substantive argument and have effectively waived this objection.  Coopersmith v. Lehman Bros., Inc., 344 F. Supp. 2d 783, 790 n.5 (D. Mass. 2004) (Gorton, J.) (declining to consider argument raised only in a footnote, noting that the First Circuit had "repeatedly held" that such arguments were waived).  In a lengthy brief that rehashes a long series of arguments previously briefed and resolved, it is neither reasonable nor necessary to expect the Court to address each and every individual contention that defendants raise only in footnotes (let alone revisit arguments in other pleadings that the defendants purport to incorporate by reference).

The equivalence instruction was in any event proper on the basis of both theories that Diomed articulated.  Defendants sought to advance semantic, hypertechnical theories that tried (unsuccessfully) to avoid literal infringement.  Such arguments exemplify why the doctrine of equivalents exists in the first place.  E.g., Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 857 (Fed. Cir. 1988) (reversing district court and holding that competitor infringed patents under the doctrine of equivalents; noting that the doctrine counterbalances the "unsparing" nature of literal infringement analysis and prevents parties from misappropriating the benefits of inventions on the weight of technicalities); see also Graver Tank & Mfg. Co. v. Linde Air

<u>Products Co.</u>, 339 U.S. 605, 607 (1950) (affirming finding that claims were infringed under the doctrine of equivalents, which targets "unscrupulous copyist[s]" relying on "unimportant and insubstantial" differences; without the doctrine, the law would be "plac[ing] the inventor at the mercy of verbalism and…subordinating substance to form").

### 1.    <u>Emissions From Uncoated Sidewalls</u>

One such issue arose from defendants' attempt to avoid the clear import of the patent by inviting jurors to conclude that the "tip" of a laser fiber used in the endovenous laser procedure consists solely of the flat front <u>face</u> of the fiber's unjacketed region, rather than the entire tip portion emanating from the jacket.  (<u>E.g.</u>, 3-12 (Opening) 145; 3-26 (Closing) 26).  In response, Diomed offered expert testimony consistent with the common-sense conclusion that the tip of the fiber (like the tip of a pencil or the tip of an iceberg) is the entire 2mm nib extending from the jacket at the end of a fiber that is typically over 2 meter long.  (3-13 (Navarro) 42).

By providing an instruction regarding infringement under the doctrine of equivalents, the Court allowed the jurors to bypass this linguistic dispute and focus on material disputed facts – the extent and speed of the degradation of the cladding that surrounds the laser fiber core, for instance.  In other words, even if the jury were to conclude that the face alone were the tip rather than the rest of the unjacketed portion, they could still find this difference immaterial and insubstantial because both the face and the side contact the wall during treatment.  As Diomed explained in closing:

> the defendants say it has to be the front face that emits the energy.  We disagree.
> We think even if the side of the tip emits the energy, it's the same procedure.  But
> it's an insubstantial difference.  Even if it's the side of the tip that emits the energy
> rather than the front or even if it's both, that's not a difference that's material to
> whether or not AngioDynamics and VSI have misappropriated the concept that
> Doctor Min and Doctor Navarro and their colleagues invented here.

(3-26 (Closing) 84).  This argument and the Court's subsequent instruction encapsulate the underlying principle – competitors practicing or teaching a particular method cannot evade patent claims on the basis of differences between the competitor's practice and the claimed process if those differences are "insubstantial" to persons of ordinary skill in the relevant art.

E.g., Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1351
(Fed. Cir. 2003) (affirming verdict that method claim was infringed under the doctrine of
equivalents).

      Neither of the two objections that the defendants level against the Court's instruction
survives scrutiny.

      First, defendants' argument that the doctrine only applies to later-developed technologies
does not undermine the instruction because lateral emission as a mode of action for the
procedure was in fact "later developed."  Only after filing the patent application did Dr. Navarro
and others discover that contact between the vein wall and the uncoated sides of the laser fiber
achieves substantially the same function as contact with the flat front face (damaging vein wall
tissue) in substantially the same way (direct absorption of laser energy) to achieve the same
result (fibrosis leading to permanent closure of the vein).  (3-13 (Navarro) 87-89).  This point is
admitted by the defendants.  (3-26 (Defs' Closing) 43).  Therefore, through no fault of their own,
the inventors were not able to incorporate a relevant description into the specification.  The
doctrine of equivalents therefore has *particular* applicability here.

      Second, the fact that the '777 specification disclaims the prospect of the coated sidewalls
emitting laser energy says nothing about uncoated portions of the sidewalls, created when the
surrounding cladding degrades.  The defendants merely recycle the arguments that they
repeatedly voiced when trying to keep Diomed's "side-firing" theory of infringement out of the
jury's hands.  See Diomed, Inc. v. AngioDynamics, Inc., 450 F. Supp. 2d 130, 150 (D. Mass.
2006) (explaining that a genuine issue of material fact existed as to whether "the coated sections
of lasers used with defendants' products decomposes so as to facilitate a larger area of contact");
D.I. 162 (denying defendants' motion in limine to preclude Diomed from offering testimony on
its side-firing theory, as "the issue involve[d] a question of fact for the jury").

### 2.     The Possibility Of Occasional Moments Without Contact Between The Vein Wall And The Laser Fiber Tip

AngioDynamics and VSI also attempted to sidestep Diomed's infringement claim by introducing ultrasound images that supposedly document particular points during the procedure when the laser fiber tip is not in contact with the vein wall.  In essence, the defendants took the view that even instantaneous moments without contact are enough to avoid liability.  Even if their theory had factual support (which as discussed above it does not), this too is precisely the sort of technicality that the doctrine of equivalents is designed to cover, in order to ensure that patent rights remain meaningful.  In Ericsson, Inc. v. Harris Corp., 352 F.3d 1369 (Fed. Cir. 2003), for example, the Federal Circuit considered a claim directed to a telephone circuit that supplied power only when the telephone was out of the cradle.  Id. at 1374.  Reversing the district court and reinstating the verdict of infringement, the Federal Circuit reasoned that reasonable jurors could find infringement under the doctrine of equivalents even though the accused product *did* occasionally deliver power while phones were on the hook.  Id. at 1374-75.  Here, by the same token, even if there were occasional moments without contact, they would not preclude a jury instruction (or finding) regarding infringement under the doctrine of equivalents.

Invoking the doctrine in this context does not vitiate the "maintaining" limitation or otherwise implicate any of the principles that the defendants summarily mention in their footnote.  (Defs' Br. at 20 n.10).  Diomed did not suggest to the jury that the '777 patent covers procedures in which physicians withdraw the fiber while only occasionally making contact with the vessel wall.  Instead, the operative question is whether AngioDynamics and VSI could avoid infringement if there were credible evidence that the doctors following their instructions occasionally lose contact in what is otherwise a contact-based procedure.  The Federal Circuit highlighted such a distinction in Ericsson, holding that occasional moments in which a limitation in the patent was not met could properly have been found by the jury to be a "trivial difference" that did not vitiate the limitation or avoid infringement.  Id. at 1375.  See also Abbot Labs. v. Andrx Pharms., Inc., 473 F.3d 1196, 1212 (Fed. Cir. 2007) (affirming preliminary injunction on

- 23 -

the basis of likely infringement under the doctrine of equivalents: "A claim element is not vitiated merely because it does not literally exist in the accused product -- such an interpretation of the all elements rule would swallow the doctrine of equivalents entirely."). Here, likewise, the evidence detailed above in Section II at the very least allowed reasonable minds to conclude that any moments without contact were few and far between, and amounted at most to an "insubstantial difference" from the literal meaning of the patent.

### B.    Diomed Provided Specific Linking Testimony That Would Allow Reasonable Jurors To Find Infringement Under The Doctrine Of Equivalents.

Because sufficient evidence exists in the record for reasonable jurors to have found that AngioDynamics and VSI customers literally infringe Diomed's patent (see supra Sections II, III & IV), the Court need not consider whether the record also supports a finding of infringement under the doctrine of equivalents. Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1582 n.12 (Fed. Cir. 1995) (reversing district court's grant of JMOL following general jury verdict: "In view of our decision on literal infringement, we need not address infringement under the doctrine of equivalents.").

In any event, Diomed also provided particularized testimony and linking argument that would allow reasonable jurors to find that contact between the vein wall and the degraded sidewall (i.e. areas where cladding has burned back) amounts to infringement under the doctrine of equivalents.[8] The operative question here is whether a person of ordinary skill in the art would deem any difference between this form of contact and the type literally recited in the claim to be "insubstantial." E.g., Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1351 (Fed. Cir. 2003) (affirming verdict that method claim was infringed under the doctrine of equivalents). One way to assess this question is to consider whether

---

[8] The record also contains expert testimony that maintaining contact between the laser fiber tip and the vein wall for the bulk of the procedure serves the same function and works in the same way to achieve the same result as maintaining contact for literally the entire period. (3-14 (Min) 50). The defendants do not challenge the factual basis for this equivalence theory, which alone suffices to justify the Court's equivalents instruction as discussed above.

sidewall contact fulfills substantially the same function in substantially the same way to achieve substantially the same result. E.g., Riles v. Shell Exploration & Prod. Co., 298 F.3d 1302, 1309 (Fed. Cir. 2002) (affirming verdict that method claim was infringed under the doctrine of equivalents); Laitram Corp, 863 F.2d at 857 (reversing district court and holding that competitor infringed patents under the doctrine of equivalents).

On the basis of the expert testimony from Drs. Anderson and Navarro, reasonable jurors could conclude that contact between the vein wall and the degraded sides of the laser fiber achieves substantially the same function as contact with the flat front face (damaging the vein wall tissue) in substantially the same way (direct absorption of light energy) to achieve the same result (fibrosis leading to permanent closure of the varicose vein). The patent itself emphasizes that the object of the invention is to cause "direct endothelial and vein wall damage with subsequent fibrosis." (Col. 3, lines 3-5). See Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc., 467 F.3d 1370, 1380 (Fed. Cir. 2006) (affirming judgment of infringement under the doctrine of equivalents, explaining that the district court had properly assessed the "way" prong of the analysis by referring to the patent itself).

Dr. Anderson explained that there is no "qualitative difference" between light that is emitted from the flat front face of the fiber and light that is emitted from the sides. (3-15 (Anderson) 45-46). In both cases, contact between the vein wall and the relevant light-emitting portion of the fiber delivers "more than enough" energy to do the job. (3-15 (Anderson) 46).[9] The processes and result are the same – "heating and carbonization and damage to the vessel wall." (3-15 (Anderson) 45).

Dr. Navarro likewise testified about his experiments that revealed the exact same "footprint" of carbonization and trenching regardless of whether he used the face of the fiber tip

---

[9] This explanation itself belies the defendants' claim (Defs' Br. at 23) that Dr. Proebstle's testimony regarding degradation and side emission went "unrebutted." When considering the side-firing phenomenon, the jurors had every right to credit testimony from Dr. Anderson – one of the world's leading experts on laser-tissue interactions – over that from Dr. Proebstle.

or its side to make contact with liver tissue or vein flaps. (3-14 Navarro) 44-48). Given this evidence, reasonable jurors could infer that the two types of contact are equivalents.[10] The footprints that Dr. Navarro observed during his experiments with the partially degraded sides are identical to those observed in actual treated veins. (Id.).

Moreover, both Dr. Navarro and Dr. Anderson testified that even unused fibers emit energy from their sides. (3-13 (Navarro) 43; 3-15 (Anderson) 44; 3-22 (Anderson) 35). The jury also heard Dr. Navarro's testimony that the entire unjacketed portion (tip) of the fiber becomes a laser-emitting section "within a few seconds" of the start of the procedure. (3-13 (Navarro) 40).

In maintaining that doctors do not "deliberately" burn the cladding to create a larger light-emitting section, AngioDynamics and VSI attempt to read additional limitations into Diomed's patent. As construed, the claims simply require deliberately making contact with the vessel wall. Reasonable jurors could conclude that practitioners do this by deliberately taking steps – the injection of tumescent anesthesia into the perivenous space, for example – that lead to contact. The side-emission phenomenon does not change this analysis at all. Indeed, doctors deliberately insert a fiber with cladding that "always" burns back to afford a larger laser-emitting surface. (3-13 (Navarro) 88-89).

---

[10] AngioDynamics and VSI incorrectly assert that Diomed failed to present any evidence of such equivalence. (Defs' Br. at 25). The defendants now also purport to contest whether Diomed offered "particularized" testimony that the sidewalls are maintained in contact with the vein wall at all. Diomed offered a wealth of such evidence (see Section II). Indeed, this is why defendants tried to distinguish the sides of the fiber from the "flat front face" in the first place.

VI.   **THE JURY'S ASSESSMENT OF DAMAGES WAS SUPPORTED BY SUFFICIENT EVIDENCE AND REASONED EXPERT ANALYSIS.**

A.    **Diomed Presented Sufficient Evidence To Establish Lost Profits.**

Defendants' repeatedly attack Mr. Green's testimony on damages (see D.I. 75 & 180) simply because they do not agree with the definition of the market he presented to the jury.  His market definition was amply based in the record, including an independent market analysis that AngioDynamics also relied upon.  The jury entered a measured award in between the sums suggested by the parties.  There is no basis to disturb the jury's finding.

The jury's award of lost profits is supported by sufficient evidence under the standard established by the seminal case of Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978) as adopted and modified by the Federal Circuit in State Indus. v. Mor-Flo Indus., 883 F.2d 1573 (Fed. Cir. 1989) and other cases.  In particular, Diomed presented sufficient evidence to show (1) demand for the patented product, (2) Diomed's capacity to make the infringers' sales, (3) the absence of non-infringing alternatives, and (4) that the profits lost can be reasonably calculated.

1.    **Mr. Green Properly Defined The Market To Exclude Inferior Alternatives From The Market.**

The proper starting point for analyzing these factors, and the basic point of disagreement that forms the basis of all of the defendants' attacks on Mr. Green's analysis, is to define the proper market.  Micro Chemical, Inc. v. Lextron, Inc., 318 F.3d 1119, 1124 (Fed. Cir. 2003).  The "market," as dictated by the Federal Circuit, should exclude any possibly alternative products with "disparately different prices or significantly different characteristics."  Id.  Mr. Green properly defined the market as the endovenous laser vein treatment market.  (3-15 (Green) 131-33).  This market definition is proper, as opposed to the larger "minimally invasive vein surgery" market proposed by the defendants so as to encompass the radiofrequency vein ablation product sold by VNUS.  There was extensive evidence to support the conclusion that the ELT procedure is superior to the VNUS procedure (see, e.g., Ex. 1044), and that the ELT procedure

- 27 -

kits are substantially less expensive – about half the price – of the VNUS kits (Ex. 1183 at ANG34854). In addition, Diomed's executives testified as to how Diomed does not consider VNUS a competitor, but merely another outdated alternative to ELT, along with vein stripping and other inferior technologies. (3-14 (Welch) 137; 3-14 (Wylie) 79-80). The independent Millennium Report, on which both parties relied, likewise carves the market out into a laser segment that it analyzes separately from the "minimally invasive" segment. Indeed, AngioDynamics' CEO, Eamon Hobbs, said in an email to his investors that "[m]any Venacure customers were previously VNUS customers, and they converted because their patients benefited from the speed and comfort of the laser procedure, with equal or better outcomes." (Ex. 1044). This evidence amply supports the jury's decision to credit Mr. Green's testimony (to the extent they did – they also discounted his proposed damages figure considerably).

Based on this properly supported market definition, Mr. Green concluded conservatively that Diomed would capture 80% of AngioDynamics' and VSI's total sales.[11] (3-15 (Green) 135-6). He reduced this number from 100% because he accounted for the fact that Diomed may not be able to make all of AngioDynamics' and VSI's sales. (Id.). For instance, he recognized that AngioDynamics has existing relationships with many of its customers, so it might be harder for Diomed to capture those sales, even if they were the only supplier of kits and lasers for ELT. (3-15 (Green) 180; 3-16 (Green) 11). In addition, this 80% capture rate was supported by third party research, as the Millennium Report (relied on by both damages experts in this case (3-21 (Hoffman) 191-192) demonstrated that Diomed, AngioDynamics, VSI, and the other currently accused infringers occupy 80% of the endovenous laser ablation market. (Ex. 1183 at 69-87). It is logical for a jury to conclude that Diomed would capture customers at the same percentage that the accused infringers currently occupy in the market.

The defendants argue that Diomed might not have able to achieve even the 80% capture rate. (Defs' Br. at 23-26). Defendants' primary argument is that there are other non-accused

---

[11] Diomed was entitled to a reasonable royalty on the remaining 20% of sales Mr. Green believed Diomed would not have been able to capture. (3-15 (Green) 153-54); 35 U.S.C. § 284.

infringers in the market that would have made some of AngioDynamics' and VSI's sales.  (Defs'
Br. at 25).  The jury, however, was entitled to credit the testimony of James Wylie that Diomed
believes all suppliers of kits and lasers for ELT are infringing, but that it made a business
decision not to sue them all at once.  (3-14 (Wylie) 96); See Pfizer, Inc. v. Teva Pharm., USA,
Inc., 429 F.3d 1364, 1381 (Fed. Cir. 2005) (affirming grant of preliminary injunction because a
"patentee does not have to sue all infringers at once").  Moreover, Biolitec, another provider of
kits and lasers for ELT, is AngioDynamics' supplier, so it was reasonable for the jury to infer
that they also infringed the `777 patent.  Furthermore, the Millennium Report – while it excludes
VNUS from the laser market segment as noted above – includes the other laser companies at
issue within that market, suggesting that their products are quite similar if not identical.  (Ex.
1183 at 69-87).[12]   In any event, the jury did not award the full amount suggested by Mr. Green,
so the jury already made a substantial adjustment downward from his figures based on their
assessment and balancing of all the evidence.

Defendants also contend that Mr. Green's conclusions were speculative because he did
not rely on a so-called "Maximizer" database maintained by Diomed in coming to his
conclusions.  (Defs' Br. at 26).  Mr. Green, however, had much more comprehensive data – he
had the total market share data from the Millennium Report, which defendants themselves relied
upon as authoritative.  This third party gathered data is inherently more reliable and more
complete than whatever sporadic raw data might have been in the Diomed database.  In any
event, defendants argued that point emphatically to the jury as well, and they must be presumed
to have considered it, along with Mr. Green's testimony as to why he came to his conclusions
without relying on the database (3-19 (Green) 11), when reaching the middle ground on damages

---

[12] There can be no dispute that Diomed had the capacity to make all the defendants' sales and
indeed considerably more.  The jury was entitled to credit Mr. Welch's testimony that Diomed's
sales force can make upwards of 20,000 sales calls a year – vastly in excess of the entire market
for this procedure.  (3-14 (Welch) 159).  Defendants do not dispute the point.

that they reached.  The Court should not "contravene the province of the jury by reweighing" this evidence.  Liquid Dynamics Corp., 449 F.3d at 1221.[13]

In sum, Diomed presented sufficient evidence to support the jury's finding of lost profits.

**2.    Diomed's Profits Were Calculated
With A Reasonable Degree Of Certainty.**

Defendants further claim that Mr. Green's methods of calculating Diomed's lost profits were unreliable.  Mr. Green's methods, however, were supported by sufficient evidence.  In particular, Mr. Green considered that Diomed's costs were fixed as of 2005 such that there was no correlation between its sales and its costs, so actual lost profits could be calculated from that date forward.  (3-15 (Green) 136-37; 164-67).

As defendants recognize, the primary reason why Mr. Green believed Diomed's costs became fixed in 2005 was because Diomed had moved all of its sales people in-house.  (3-15 (Green) 165-66).  And while defendants contend that this process of moving the sales force in-house was completed in 2003, they failed to consider that the process was not actually complete until the end of 2004, and that the sales force was still expanding in 2004.  (Id.).  These factors were considered by Mr. Green, presented to the jury, and the defendants had their opportunity to respond.  The issue was squarely one for the jury.

Furthermore, defendants attempt to impugn Mr. Green's analysis by suggesting that he performed an earlier regression analysis that was "buried in his electronic work papers" that allegedly refutes his conclusions on Diomed's costs.  This regression was not "buried" (Mr. Green voluntarily produced it to Dr. Hoffman, who sought to use Mr. Green's own work product as a shortcut for doing his own).  More to the point, Mr. Green considered it improper to rely on

---

[13] While not exactly an argument, VSI insinuates some error by contending that the fact that the award against it represents 46.6% of VSI's gross revenue from Vari-Lase sales is "remarkable." (Defs' Br. at 23).  This attack has no basis, however, as the purpose of the award is to fully compensate Diomed.  35 U.S.C. § 284.  What percentage that compensation may be of VSI's sales is irrelevant, and results from choices VSI made about how to set pricing, a decision it made at the time it chose to infringe.  The legal result is of its own doing; but even if damages exceeded its gross revenue, that would not establish error.

that regression for sound statistical reasons – it was less reliable, as evidenced by its $R^2$ number, a number used by statisticians to evaluate the reliability of the data provided. Dr. Hoffman acknowledged this point on cross. (3-22 (Hoffman) 11-12). The jury was entitled to conclude that Mr. Green simply relied on a more reliable regression.

**B.    Price Erosion Damages Are Moot As They Were Not Awarded By The Jury.**

VSI's challenge to the so-called award of price erosion damages is moot, as the jury did not award Diomed any such damages. The amount the jury awarded against VSI is almost precisely the amount of <u>lost profits</u> Diomed requested, <u>without</u> including the additional amount Diomed sought for price erosion. (Defs' Br. at 23 n. 12). Diomed requested $4,031,041 in lost profits damages from VSI, and another $2,467,712 in price erosion damages from VSI.[14] The jury awarded only $4,100,000 against VSI, an amount almost equal to the amount requested by Diomed in lost profits damages. (D.I. 228 & 229). Therefore, this part of defendants' arguments is moot. In any event, if the Court finds that price erosion damages were awarded, there is no reason to question that award as Diomed presented sufficient evidence to support such an award.

The evidence showed that the erosion of Diomed's prices was caused directly by VSI's competition. First, Diomed commonly encounters VSI (and AngioDynamics) in its sales calls, far more than the other, smaller, market participants. (3-14 (Wylie) 101). Therefore, in order to compete on price, Diomed must primarily concern itself with VSI's lower price. Second, the Millennium Report evidences that VSI is one of Diomed's biggest competitors in the market. (Ex. 1183). It was reasonable for the jury to conclude that a larger player such as VSI more dramatically affected Diomed's price as compared to a much smaller player.

In addition, it was likewise reasonable to assume that Diomed could have raised its price despite the presence of any other smaller player in the market, as there was sufficient evidence to show AngioDynamics' prices have always been on average higher than Diomed's prices. (3-15 (Green) 157). Indeed, contrary to defendants' assertion that Mr. Green offered no opinion on

---

[14] Diomed made no price erosion claim against AngioDynamics.

this issue, Mr. Green's opinion was that Diomed would have sold the kits at a higher price, despite the smaller players in the market.  (3-15 (Green) 157-158 ("So if it had been able to sell its kits without VSI in the marketplace, it would have sold them for a higher price . . ."")).  In addition, Mr. Green offered testimony that Diomed would have been able to increase its prices because of the inelasticity of the prices in the range being considered.  (3-15 (Green) 202-206; Ex. 128).  In sum, Mr. Green's conclusions were supported by substantial evidence.

**C.      Remittitur Is Inappropriate As The
Jury's Verdict Is Supported By Sufficient Evidence.**

For the reasons stated above, the jury's award of damages was supported by sufficient evidence and Mr. Green's analysis was well-reasoned, not speculative.  Therefore, remittitur is not proper.

**VII.    DEFENDANTS STATE NO OTHER
BASIS TO DISTURB THE JURY'S VERDICT.**

Defendants present a hodgepodge of other statements (not arguments) at the end of their brief as to why they believe they are entitled to a new trial.  (Dep Br. at 30).  Considering the defendants present no real argument as to why they are entitled to a new trial in this section of their brief, defendants' perfunctory arguments should be deemed waived.  Coopersmith v. Lehman Broth., Inc., 344 F. Supp. 2d 783, 790 n. 5 (D. Mass. 2004) (Gorton, J.) (citing Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 61 n. 17 (1st Cir. 1999) (finding that the First Circuit has "repeatedly held . . . arguments raised only in a footnote or in a perfunctory manner are waived.")).  Furthermore, even if the Court did consider the arguments, none of them meets the standard of "substantial justice" established by Fed. R. Civ. P. 60.  For these reasons, each request for a new trial in this section should be considered waived and/or denied.

Respectfully submitted,

DIOMED, INC.

By its attorneys,

Dated: <u>April 25, 2007</u>

<u>/s/ Michael A. Albert</u>
Michael A. Albert (BBO #558566)
malbert@wolfgreenfield.com
Michael N. Rader (BBO #646990)
mrader@wolfgreenfield.com
John L. Strand (BBO #654985)
jstrand@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
(617) 646-8000

## CERTIFICATE OF SERVICE

I certify that this document was served on defendants' counsel of record via email on April 25, 2007.  Attempts were made to file this document through the Court's electronic filing system on April 25, but the system appeared to be down as repeated attempts to access the login page failed.

I further certify that when the Court's electronic filing system is restored and access is gained, this document will be filed through that system.  That system should further serve counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ John L. Strand</u>