UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DIOMED, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>ANGIODYNAMICS, INC.,<br><br>    Defendant. | Civil Action No.: 04-10019-NMG |
| DIOMED, INC.,<br><br>    Plaintiff,<br><br>v.<br><br>VASCULAR SOLUTIONS, INC.,<br><br>    Defendant. | Civil Action No.: 04-10444-NMG<br>(CONS0LIDATED UNDER 04-10019 NMG) |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

I. **DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW, OR A NEW TRIAL, BECAUSE NO REASONABLE JURY COULD HAVE FOUND DIRECT INFRINGEMENT**

A. **Diomed Failed To Rebut Defendants' Ultrasound Evidence**

The first question this Court must answer is: Considering all the evidence and granting Diomed the benefit of any reasonable inferences, could a reasonable jury have found that following defendants' instructions concerning tumescent anesthesia necessarily causes deliberate and maintained contact between the uncoated tip of the laser fiber and the vessel wall while laser energy is being emitted? *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 75 (1st Cir. 2001). Diomed presented no infringing acts by defendants' customers, choosing instead to argue that infringement necessarily results from following defendants' instructions.

In its response, Diomed cannot point to any specific evidence establishing any period of maintained contact while laser energy was being emitted during even a single procedure following defendants' instructions, let alone that such maintained contact necessarily results. Diomed never attempted to show the jury even a single procedure following defendants' instructions and have an expert call out specifically where there is maintained contact during that procedure. Instead, Diomed relies on conclusory testimony, on "still shots" showing moments of contact in one or two procedures, or on evidence that does not address the core issue.[1]

Diomed's response ignores that its own witnesses established that maintained contact does not result merely from following defendants' instructions, but rather can only result from deliberate acts by doctors who want maintained contact. Dr. Fan and Dr. Anderson admitted that doctors can control how much tumescent anesthesia they use. 3/19 Tr. at 62-63; 3/15 Tr. at 53-

---

[1] Diomed's evidence is insufficient whether the "uncoated tip" is defined as the "very end", as required by the Court's claim construction, or as the side of the laser fiber. Diomed's witnesses did not establish that the use of tumescent anesthesia will necessarily lead to maintained contact with either the flat front face or the side.

1

54. Physicians can thus "choose to stop applying tumescent" and avoid the collapse of the vein onto the fiber tip that Diomed claims leads to maintained contact. 3/19 Tr. at 62-63.

Diomed also does not dispute Dr. Min's testimony that at least nine different variables affect how much tumescent anesthesia is necessary to obtain the collapse of the vein. *See* Defs. Joint Mem. at 8-9. Diomed's witnesses each follow a very specific set of techniques to obtain maintained contact. These techniques, including pumping anesthetic in until the doctor observes a "complete collapse", Trendelenberg positioning, and manual compression, go far beyond the defendants' recommendations to use tumescent anesthesia. *Id*. at 9.

Diomed's response on defendants' ultrasound videotapes only confirms that judgment as a matter of law should be granted. Defendants introduced 14 procedures, videotaped by four different physicians (Dr. Proebstle's six procedures, Dr. Samson's six procedures, Dr. Kabnick's webcast, and Dr. Andrews' instructional video). Dr. Proebstle and Dr. Samson each narrated long portions of a procedure *while laser energy was being emitted*, explaining that there was always a visible, open lumen at and in front of the laser fiber tip; that throughout the procedures the uncoated tip of the laser fiber was firing into blood and was not in contact with the vessel wall, and that steam bubbles at and in front of the laser fiber indicated the presence of an open lumen and the lack of contact. *See* 3/20 Tr. at 123-27; 3/22 Tr. at 61-72.

Diomed cannot dispute that, at trial, it offered evidence of only one moment of contact, during one of Dr. Proebstle's six procedures. Diomed offered no evidence of any contact, let alone maintained contact, during Dr. Samson's, Dr. Kabnick's, or Dr. Andrews' videotaped procedures. *See* Diomed Mem. at 11. Diomed tries to rely on Dr. Min's alleged superior reading of ultrasounds, and makes the false statement that Dr. Min and Dr. Fan were the only witnesses

2

formally trained in reading ultrasounds.[2] But Diomed had the burden of proving that infringement necessarily results from following defendants' instructions. If Dr. Min could have testified that there was maintained contact during any of defendants' 14 videotaped procedures, he should have done so at trial. He did not, and the fact that he only identified <u>one moment</u> of contact establishes that Diomed has failed to carry its burden of proof.

Moreover, Dr. Min never disputed the basic facts testified to by Drs. Kabnick, Proebstle, and Samson: defendants' ultrasound videotapes consistently show a visible, open lumen, with the laser fiber tip firing into blood and not in contact with the vessel wall, and with steam bubbles emanating at and in front of the laser fiber tip. Instead, he offered only his view that Dr. Proebstle had drawn the vessel wall in the wrong place in <u>one still shot</u>, and his conclusory assertion that this shot was "representative" of other portions of the ultrasound videotapes, which Dr. Min did not specify. *See* 3/22 Tr. at 162. Dr. Min's conclusory testimony cannot support a jury verdict that deliberate, maintained contact necessarily results from following defendants' instructions. *See Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312 (Fed. Cir. 2006).

The same result should follow regarding Dr. Min's conclusory testimony about Dr. Navarro's procedures allegedly following defendants' IFUs, Exs. 539 and 540. Diomed ignores the fact that Dr. Navarro did not follow AngioDynamics' IFU, as he did not place the patient in reverse Trendelenberg position. 3/13 Tr. at 103. Dr. Min did not substantively rebut Dr. Proebstle's testimony narrating extensive segments of Dr. Navarro's videotapes to show that there was not maintained contact. 3/20 Tr. at 137-38. Instead, Dr. Min stated generally that contact will be maintained "based on the videos that I'm seeing—that I've seen. This is, of course, just a snapshot in time." 3/13 Tr. at 187. Dr. Min never showed the jury anything more

---

[2] In fact, Dr. Proebstle, Dr. Samson, Dr. Kabnick, and Dr. Golan are all trained in reading ultrasounds and do so as a regular part of their medical practice. *See* 3/20 Tr. at 88-89; 3/21 Tr. at 32-33; 3/22 Tr. at 51, 57, 121-22.

than a "snapshot in time," and his conclusory testimony does not establish that maintained contact necessarily results from following defendants' instructions. *See Kim*, 465 F.3d at 1312.

The state of the record considered by the jury, then, is that defendants presented 14 videotape procedures following their instructions, with extensive testimony that there was *no maintained contact during the emission of laser energy*. In response, Diomed presented evidence of only <u>one</u> moment of alleged contact during <u>one</u> procedure. Diomed's witnesses established that the mere use of tumescent anesthesia, as recommended by defendants, is not sufficient to cause *maintained contact*; instead, maintained contact can only result from specific, deliberate acts by physicians that go far beyond anything taught by defendants. Because the evidence is simply overwhelming that maintained contact will not necessarily result from following defendants' instructions, defendants are entitled to judgment as a matter of law.

**B.     Diomed's Other Evidence, Concerning The Alleged "Footprint of Contact" And Alleged Admissions, Is Insufficient To Meet Diomed's Burden Of Proof**

None of Diomed's "footprint of contact" evidence establishes that doctors following defendants' instructions concerning tumescent anesthesia necessarily will achieve maintained contact between the uncoated tip of the fiber and the vessel wall while laser energy is being emitted. Diomed relies on Ex. 540I (an image from the procedure in which Dr. Navarro allegedly followed VSI's instructions) which shows a short segment of carbonization. Diomed ignores the main point: this short segment proves nothing about whether there is *maintained contact* during a VSI or AngioDynamics procedure. Moreover, Diomed claims that Dr. Navarro exteriorized this vein segment "only after treating it per VSI's IFU." Diomed Mem. at 7. Diomed mischaracterizes the record, as Dr. Navarro's testimony made clear that he exteriorized the vein before applying laser energy:

> Q:    And you say you pull a little segment of the vein out at the end of your procedure?

4

>   A: Yes, you can see exactly what is happening inside.
>
>   Q: Why do you do that?
>
>   A: <u>I access the vein not with the needle</u>. I do it direct vision. <u>So I make a little nick and pull the vein up. And then I pass the laser – I pass the sheath or tube, and I pass the laser fiber under direct vision</u>. So when I finish the procedure, I will see what has happened during the procedure, how the laser fiber has made contact with the vein wall.

3/12 Tr. at 192. That is contrary to defendants' instructions and, as Dr. Samson testified without contradiction, results in a completely different situation than lasering inside the body. 3/22 Tr. at 111.

Diomed also relied on a histology photograph from Dr. Proebstle's article (Demo 78). Diomed cannot dispute that the photograph came from an early procedure in which Dr. Proebstle stated clearly that he was following Dr. Navarro's recommended technique, not defendants'. *See* Defs. Joint Mem. at 11. Diomed now relies on a 2003 article that they never showed to the jury. Ex. 1113. That article also does not show maintained contact. *Id*. More importantly, the article is not about procedures following defendants' instructions; instead, it states that "the ELT procedure was performed as described" in Ex. 1110 ( Dr. Navarro's protocol). *See* Ex. 1113 n.6 and Ex. 1110 at 730. Similarly, Diomed presented no proof that "numerous other sources in the medical literature" showed "footprints of contact" after following defendants' procedures.

Diomed's reliance on the various experiments also is misplaced. *See* Diomed Mem. at 8. Dr. Fan's and Dr. Navarro's experiments were not attempts to follow defendants' instructions. They were attempts to force contact and observe the results on explanted veins in an experimental setting. Dr. Proebstle's experiment (Ex. 1120) also did not represent an attempt to follow defendants' instructions; instead he was attempting to show that carbonization results

5

even without contact.[3] Regardless, none of the experiments directly addresses the issue here – does following defendants' instructions necessarily cause maintained contact during the emission of laser energy? As stated above, the evidence on that issue was simply overwhelming, and warrants judgment as a matter of law.

Diomed finally attempts to bury the real issue by focusing on alleged "admissions" of contact. But none of the statements comes close to an admission that following defendants' instructions necessarily results in deliberate, maintained contact between the uncoated tip of the laser fiber and the vessel wall while laser energy is being emitted. The alleged "admissions" can be dealt with summarily:[4]

1. Diomed's snippets from Tina Barth-King's and Bill Appling's emails do not address whether there will be *maintained contact*, as opposed to moments of inadvertent contact, when following defendants' instructions. Indeed, they do not address AngioDynamics' procedure at all, but are discussing a device described in a different patent. 3/20 Tr. at 30-31. They certainly do not constitute an admission that maintained contact necessarily results from following defendants' instructions.

2. Dr. Olson's article for VSI was a survey of all the available literature, and the quote Diomed relies on cites to *Dr. Min's article* on the procedure. Ex. 65 at VSI007272. On the very next page, Dr. Olson cites to Dr. Proebstle concerning the mechanism of action. *Id.* at VSI007273. The single statement citing Dr. Min is not a binding admission that following defendants' instructions necessarily results in deliberate and maintained contact during laser emission.

3. The article by Timperman and Sichlau, Ex. 210, cannot be attributed to defendants. Fed. R. Civ. P. 801(d)(2)(B). Diomed falsely states that Dr. Timperman is a "consultant for VSI." He is not, and Mr. Jakubowski did not so testify. He merely stated that VSI relies on Dr. Timperman's article for the recommended amount of energy delivery. 3/21 Tr. at 180. In any event, Diomed presented no evidence that Drs. Timperman and Sichlau were writing with the specific requirements of the '777 patent in mind. The quote concerning "coapting the wall against the laser fiber tip" cannot be read to say that following the defendants' instructions necessarily causes deliberate and maintained contact between the *uncoated tip* and the vessel wall during the emission of laser energy. We have no way of knowing their views on that issue.

---

[3] One experiment involved a laser fiber completely covered with a sapphire tip, making contact impossible; yet carbonization nevertheless resulted. 3/20 Tr. at 156-57; Ex. 1120.

[4] AngioDynamics' statements cannot be attributed to VSI, or *vice versa*.

6

4. Dr. Kabnick's slides, as has been reviewed *ad nauseam*, discussed the catheter electrodes from the RF procedure, which unlike the laser fiber, are *designed* to expand into contact with the vessel wall.

5. Dr. Andrews' article was discussing thermal ablation techniques, including RF, in general. It is undisputed that RF requires contact to work. Nowhere does Dr. Andrews say that contact is required for a laser procedure. In fact, his video and training materials say just the opposite. Exs. 1105; 1104, slide 17.

Diomed failed to prove that following defendants' instructions necessarily results in deliberate, maintained contact. No reasonable jury could have so found, and defendants are entitled to judgment as a matter of law.

## II. DEFENDANTS ARE ENTITLED TO A NEW TRIAL OR JUDGMENT AS A MATTER OF LAW ON DIOMED'S DOCTRINE OF EQUIVALENTS CLAIM

### A. Diomed Cannot Assert Doctrine Of Equivalents Infringement Of The "Means For Emitting Laser Energy" Limitation As A Matter Of Law

Diomed does not dispute that "means plus function" limitations are subject to doctrine of equivalents infringement only in cases involving "later developed" technology. The question is simply one of timing. If the proposed equivalent arose at or before the patent filing date, then the doctrine of equivalents does not apply. *Al-Site Corp. v. VSI Int'l., Inc.*, 174 F.3d 1308, 1321, n.2 (Fed. Cir. 1999). Here, it is undisputed that the proposed equivalent – defendants' fibers having a coated sidewall and an uncoated tip for emitting laser energy – is the same type of fiber as described in the '777 patent itself. Thus, the proposed equivalent existed at the time of the '777 patent filing, and Diomed is barred from asserting doctrine of equivalents infringement as a matter of law. *Id.*; *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1311 (Fed. Cir. 1998); *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1379 (Fed. Cir. 2004).

Diomed does not dispute that defendants' fibers are the same type of coated fiber as described in the '777 patent. Diomed argues, however, that "lateral emission as a mode of action

7

of the procedure was in fact 'later developed'". Diomed Mem. at 22. The fact that Diomed "later developed" its litigation-driven theory on the "mode of action" has no bearing on the issue of whether doctrine of equivalents infringement applies. The dispositive issue is whether the technology of the "means for emitting laser energy" limitation existed at the time of the patent filing. The simple and undisputed fact remains that the "means for emitting laser energy" introduced at trial – fibers having coated sidewalls and uncoated tips – were the same type of fibers described in the '777 patent.

### B.   The '777 Patent Disclaimed The Coated Sidewalls From The Means For Emitting Laser Energy Limitation

Diomed's introduction of evidence and arguments on its "side emission" theory of infringement at trial constitutes reversible error. Diomed admits "the fact that the '777 specification disclaims the prospect of <u>coated</u> sidewalls emitting laser energy . . . ." Diomed Mem. at 22. Indeed, the '777 specification unambiguously states: "The coated portion of the fiber optic line 40 will **not** emit laser energy". Ex. 1001 at col. 4, lines 55-56 (emphasis added). This clear and unmistakable disclaimer legally bars Diomed from asserting that the "means for emitting laser energy" limitation covers the coated sidewalls of the fiber.

Diomed's argument that there are questions of fact as to the scope of the "means for emitting laser energy" limitation is legally incorrect. The scope of a means-plus-function limitation, and the effect of a statement made in the patent specification disclaiming coverage of subject matter from such a limitation, are questions of law that must be exclusively decided by the court. *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1366 (Fed. Cir. 2001).

The Federal Circuit consistently has rejected attempts by patentees to expand the scope of means-plus-function claims to cover structures disclaimed in the patent specification or during prosecution. For example, in *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1357 (Fed. Cir.

8

1999), the court held as a matter of law that a statement in the patent that a structure was "incapable" of achieving the desired results of the invention was an explicit disavowal of such structure from the scope of the means-plus-function claim. The *Signtech* case dictates the same result here. The '777 specification unambiguously states that the coated sidewalls of the fiber will **not** emit laser energy, and therefore disavows this structure from performing the function recited in the claim.

This clear disavowal in the '777 patent made it legally impermissible for Diomed to assert at trial that coated sidewalls of the fiber were the "means for emitting laser energy," and to introduce expert testimony and other extrinsic evidence that conflicted with the unambiguous disclaimer in the patent. *See Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1499 (Fed. Cir. 2001) (patentee cannot assert in later infringement action that disclaimed structure is equivalent to means-plus-function limitation); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1304 (Fed. Cir. 2005) (barring extrinsic evidence that would conflict with patent's unambiguous disclosure on means-plus-function scope). Further, Diomed argued at claim construction that this Court should not consider such extrinsic evidence on this type of claim construction issue. Doc. No. 39 at 2; Doc. No. 49 at 2.

### C.  Diomed Failed To Provide Particularized Evidence, And No Reasonable Jury Could Conclude That There Was Infringement Under The Doctrine of Equivalents

Diomed failed to support its doctrine of equivalents claim with "particularized testimony and linking argument on a limitation by limitation basis." *Aquatex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1328-29 (Fed. Cir. 2007). Diomed provided only generalized testimony as to the overall similarity between the claims and defendants' methods – exactly what the *Aquatex* court held "will not suffice". *Id.* at 1328.

9

With respect to the literally-absent limitation of deliberately putting the uncoated tip of the fiber into contact with the vessel wall, Diomed was required to present particularized testimony and linking argument as to: (1) how defendants' customers deliberately burn back the coating on the sidewalls of the fiber to uncoat the sidewalls, and put the uncoated sidewalls into contact with the vessel wall, and (2) how such steps perform substantially the same function, in the same way, to achieve the same result as the claim limitation. Diomed failed to introduce any such evidence. Rather, Dr. Navarro unambiguously admitted that any burn back of the plastic cladding is *not* deliberate. 3/13 Tr. at 89. Diomed argues that even though physicians do not deliberately burn back the cladding, they nevertheless somehow deliberately put the sidewalls that underlie the cladding into contact with the vessel wall. Diomed Mem. at 28. This is non-sensical. The burn back is admittedly unintentional, and any contact between a resulting exposed portion of the sidewall and the vessel wall also is necessarily unintentional.

Diomed likewise failed to provide any particularized testimony showing that any sidewall of the fiber is *maintained* in contact with the vessel wall while laser energy is emitted, much less any such evidence showing that the purported contact achieves the same result as the tip-interior surface contact required by the claim. Diomed can point only to generalized statements by Dr. Anderson to the effect that there is no "qualitative difference" between light emitted from the front verses the side and that the results are the same. Diomed Mem. at 27. Diomed mischaracterizes Dr. Anderson's testimony concerning any side emission being "'more than enough' energy to do the job". *Id.* at 27. Rather, Dr. Anderson was referring to the power spread over the flat uncoated face and damaged edges of that face – not the sidewalls . 3/15 Tr. at 46. Notably, Dr. Anderson did not testify at all about how the purportedly degraded and uncoated sidewall is *maintained* in contact with the vessel wall. Similarly, with respect to Dr.

10

Navarro, all Diomed can point to is his testimony that he gets a carbon tracing when he touches a piece of liver or a vein flap with either the front or side of the fiber. Diomed Mem. at 27-28. Based on this generalized testimony, Diomed argues that "reasonable jurors could infer that the two types of contact were equivalent." *Id.* This is the very type of testimony that *Aquatex* held to be legally insufficient to prove doctrine of equivalents infringement.

### D.    Defendants Did Not Waive Their Argument On The Doctrine Of Equivalents

Diomed's argument that defendants waived their objection to the equivalents charge is misplaced. Diomed Mem. at 19-20. It is well settled in the First Circuit[5] that a new trial should be ordered when a verdict encompasses multiple claims, one of which should not have been submitted to the jury, because it is impossible to tell whether consideration of the improperly submitted claim may have affected the verdict. *Baron v. Suffolk County Sheriff's Dept.*, 402 F.3d 225, 243 (1st Cir. 2005). For the reasons set forth above, as a matter of law the doctrine of equivalents claim should not have been submitted to the jury, and it is impossible to tell whether the jury's consideration of this claim affected the verdict.

### III.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ON DIOMED'S CLAIM OF INDUCING INFRINGEMENT

In its opposition to the defendants' request for a new trial, Diomed ignores the crucial third paragraph of the Court's charge on inducement. There, the Court identified just two facts that Diomed must prove to establish the requisite intent to induce infringement - "first, [the defendant] knew about Diomed's patent and, <u>second, intended to encourage practitioners to perform acts that constitute direct infringement.</u>" 3/26 Tr. at 117-18 (emphasis added).

---

[5] Diomed cites two Federal Circuit cases in support of its argument. Because the issue is procedural, and not unique to patent law, First Circuit law governs. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004). In addition, Diomed's cases do not hold that waiver results in all cases and are factually inapposite.

11

ME1 6380195v.1

The Federal Circuit in *DSU Med. Corp. v. JMS Co. Ltd.*, 471 F.3d 1293 (Fed. Cir. 2006), made clear that the Court's charge on the second element is incorrect. In *DSU*, the plaintiff complained that the court's instruction was "incorrect because it requires that the inducer possess specific intent to encourage another's infringement, and not merely that the inducer had knowledge of the acts alleged to constitute infringement." *Id.* at 1305. The Court rejected the plaintiff's claim holding that the plaintiff must prove that the defendant "knew or should have known his acts would induce actual infringements." *Id.* at 1304. Thus, the Court approved of the trial court's instruction specifically requiring that defendant "must have known or should have known that [sic] its action would cause direct infringement." *Id.* at 1305.

While the Court here followed the *DSU* holding in the first part of the instruction, when it told the jury specifically what they must find, it deviated significantly from *DSU* by instructing the jury that they could find intent if the defendants "intended to encourage practitioners to perform acts that constitute direct infringement." This is exactly the standard requested by the plaintiff in *DSU* and rejected by the Federal Circuit. The Court was required to tell the jury that it must find that defendants intended to cause actual infringement. Failing to do so misstates the law as set forth in *DSU* and misled the jury.

Diomed attempts to save the Court's charge by claiming that it used the standard used by trial courts in two cases addressed by the Federal Circuit immediately prior to *DSU*. However, in *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354 (Fed. Cir. 2006) and *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005), the court noted the lack of clarity regarding the intent standard. 438 F.3d at 1364, n.4; 420 F.3d at 1478, n.4. The ambiguity was specifically addressed in *DSU*. Discussing *MEMC* and *Golden Blount*, the court rejected the notion that intent to induce the specific acts that constitute infringement is

12

sufficient. 471 F.3d at 1306. Instead, "the inducer must have an affirmative intent to cause direct infringement." The court defined this affirmative intent as a "specific intent to encourage another's infringement." *Id*. Because the crucial paragraph of the inducement charge included the wrong instruction on intent, a new trial must be ordered on inducement.[6]

## IV.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL ON DAMAGES[7]

### A.    Diomed Is Not Entitled To Recover Lost Profits

Diomed attempts to characterize its entitlement to lost profits as a fact question the jury reasonably could have decided in its favor.[8] The issue, however, is purely legal: when a patentee has admitted it competes with a non-infringing alternative (VNUS), and the only evidence is that the patentee and alleged infringers *actually lose sales* to the alternative,[9] can the patentee recover lost profits by ignoring the non-infringing alternative? The answer to that question must be no. Defendants (and, apparently, Diomed) have found no case allowing lost profits damages without addressing the market share of an admitted competitor.

Diomed argues that its expert was entitled to offer an opinion that the relevant market excludes VNUS's products, and that the jury was entitled to accept his definition. That argument, however, divorces the issue from the fundamental question in the lost profits analysis:

---

[6] Defendants believe they are entitled to judgment as a matter of law on the inducement claim, but rely on their opening brief on the sufficiency of the evidence on intent. Diomed ignored evidence that many scientists and physicians, including Drs. Kabnick, Golan, Samson and Proebstle, have rejected the idea that contact is inevitable or necessary. Because defendants in good faith taught this non-contact approach, no reasonable jury could find that defendants intended practitioners to infringe the patent.

[7] Diomed is wrong that VSI's motion as to price erosion is moot. *See* Opp. to Diomed's Motion to Amend Judgment to Include Post-Judgment Sales [Doc. No. 264]; Hennen Decl. [Doc. No. 266] ¶¶ 3-9; Ex. B. VSI's moving brief addressed Diomed's remaining arguments.

[8] In the only case Diomed cites in support of its argument, *Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003), the Federal Circuit reversed, because the district court had defined the market to exclude the patented invention. The Court remanded to allow the patentee to prove that there are only two suppliers in the relevant market. *Micro Chem.*, 318 F.3d at 1124-25.

[9] *See* 3/14 Tr. at 102, 161-62; Ex. 1091, at 12 (listing VNUS first among Diomed's competitors); Ex. 1094; Ex. 1188.

13

but for the infringement, would Diomed have captured defendants' sales? *Crystal Semiconductor Corp. v. Tritech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001). Given the admissions regarding VNUS's competition, this simply was not an appropriate issue for expert debate. Mr. Green's characterization does not change the fact that Diomed would have lost sales to VNUS even in the absence of defendants' participation in the market.

Diomed also misses the point with regard to its failure to produce Diomed's "Maximizer" reports. While Diomed characterizes the reports as less comprehensive than the Millennium Report, the Court cannot accept Diomed's conclusion here. Diomed **never** produced the information to defendants or to the Court. Diomed's unsupported statement cannot overcome Green's admission that the "Maximizer" reports are exactly what he was looking for to perform the lost profits analysis, and that they might have changed his opinion. *See* 3/15 Tr. at 172-73, 178. On this point, Green's testimony makes sense. When the ultimate issue is whether Diomed could have made defendants' sales but for the infringement, there is no better evidence than Diomed's own database showing what actually happens in the marketplace on each sales call.

**B.     The Amount Of Diomed's Lost Profits Were Speculative And Unsupported By Substantial Evidence In The Case**

In their motion, defendants pointed out that Green's assumption as to the timing of Diomed's move from an external to internal sales force was wrong. Diomed contends that Green was correct. However, Diomed cites <u>not</u> to the testimony of its president Mr. Wylie, its vice president of marketing Mr. Welch, or its chief financial officer Mr. Swank to provide a factual basis for Green's assumption, but to Green's own testimony. *See* Diomed Br. at 30, *citing* Green's 3/15 testimony at 165-66.

Diomed's argument does not change the fact that Green's assumption – that Diomed transitioned to an internal sales force in 2005 – was <u>wrong</u>. Mr. Wylie testified that, based on

14

the spring 2002 SIR meeting, Diomed made the decision to put a direct sales force in place. *See* 3/14 Tr. at 63-64. By May or June of 2002, Diomed had eight direct sales representatives, and by the end of 2002, Diomed had seventeen. *Id.* at 64. Beginning in 2003, most of Diomed's sales were direct through its internal sales force. *Id.* at 88-89.

Green's erroneous assumption led him to the non-sensical conclusion that doubling Diomed's sales would have no impact on its costs outside of commissions, and it could not reasonably have been accepted by the jury.

## **CONCLUSION**

For the reasons set forth above, and in defendants' opening brief, defendants respectfully request that the Court grant their motion for judgment as a matter of law or a new trial.

Dated: May 9, 2007

**I hereby certify that a true copy of the above document was served upon the attorney of record for the Plaintiff and Counterclaim-Defendant Diomed, Inc. by electronic mail.**

**/s/ William H. Bright, Jr.**

THE DEFENDANT,
ANGIODYNAMICS, INC.

By  /s/ William H. Bright, Jr.
    William H. Bright, Jr.
    *wbright@mccarter.com*
    Mark D. Giarratana
    *mgiarratana@mccarter.com*
    McCARTER & ENGLISH, LLP
    CityPlace I
    Hartford, CT  06103
    Phone:  (860) 275-6700

THE DEFENDANT,
VASCULAR SOLUTIONS, INC.

By  /s/ Thomas Vitt
    J. Thomas Vitt
    *Vitt.Thomas@Dorsey.com*
    Heather D. Redmond
    *Redmond.Heather@Dorsey.com*
    DORSEY & WHITNEY LLP
    50 South Sixth Street
    Minneapolis, MN 55402-1498
    Phone:  (612) 340-5675

ME1 6380195v.1